UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

1:11-CV-11541-DJC

EDWIN BLEILER,

                    Plaintiff,

v.

COLLEGE OF THE HOLY CROSS,

                    Defendant.

**DEFENDANT'S
STATEMENT OF UNDISPUTED FACTS**

**Background**

1.      Plaintiff Bleiler ("Bleiler") was a student at the College of The Holy Cross ("Holy Cross" or the "College") from the Fall of 2007 to the Spring of 2011. (*See* Deposition of Edwin Bleiler ("Bleiler Dep.") 6:13-18 at tab 1, attached to Affidavit of Harold W. Potter, Jr., Esq. ("Potter Aff.") at Appendix Exhibit A.)

2.      Holy Cross is a private, non-profit college located in Worcester, Massachusetts. (Compl. ¶ 2.)

3.      Room, board tuition and fees were paid to Holy Cross on behalf of Bleiler. (Compl. ¶ 84.)

4.      The College receives federal funding under Title IX, 20 U.S.C. §§1681-1688 (2011) (Compl. ¶ 63.)

5.      Bleiler successfully completed his coursework with 3.13 GPA and had received 32 credits for his coursework (Compl. ¶8.)

6. Bleiler's freshman year at Holy Cross was 2007-2008. (Bleiler Dep. 9:15-17; Potter Aff. App. Ex. A, tab 1.)

7. Bleiler lived on campus freshman and sophomore years. (Bleiler Dep. 9:21-22; 14:5-7; Potter Aff. App. Ex. A, tab 1.)

8. Bleiler lived off campus his junior and senior years. (Bleiler Dep. 17:15-17; Potter Aff. App. Ex. A, tab 1.)

9. A female student made a complaint against Bleiler in May 2011 to the Holy Cross Public Safety Department (Bleiler Dep. 91-92 Ex. 5-7; Potter Aff. App. Ex. A, tab 1.)

10. Edwin Bleiler was placed on interim suspension, his senior year, on May 9, 2011, as a result of the complaint by the female student, pending a final disciplinary hearing. (Bleiler Dep. 69 Ex. 2; Potter Aff. App. Ex. A, tab 1.)

11. A disciplinary hearing on the complaint was held on May 18, 2011. (Bleiler Dep. 101:18-22; Potter Aff. App. Ex. A, tab 1.)

12. Following the hearing, Paul Irish ("Irish") informed Bleiler in person of the panel's decision to dismiss him from the College. (Bleiler Dep. 110:7-13; Potter Aff. App. Ex. A, tab 1.)

13. Bleiler received written notification of the decision on May 19, 2011 (Bleiler Dep. 111 Ex. 17, 111:6-17; Potter Aff. App. Ex. A, tab 1.)

14. Bleiler appealed the decision to the President of the college who affirmed the decision on May 26, 2011. (Bleiler Dep. 113, 115 Ex. 18-19; Potter Aff. App. Ex. A, tab 1.)

15. As of the date of his deposition, April 16, 2012, Bleiler was enrolled in the University of Kentucky. (Bleiler Dep. 6:19-22; Potter Aff. App. Ex. A, tab 1.)

## The Incident

16.     On May 1, 2011, a female Holy Cross student ("C.M.") gave her first of three statements to the College's Public Safety Department indicating that she was sexually assaulted by a male student, who she identified in the third statement as Bleiler. These events are collectively referred to as the "incident." (Bleiler Dep. Exs. 5-7; Potter Aff. App. Ex. A, tab 1.)

17.     On May 1, 2011, C.M. filed a Holy Cross Public Safety Witness Statement Form, stating that she and Bleiler had "hooked up (meaning made out)" before the night of the incident. In her statement, C.M. claims that, on the night in question, she consumed alcohol, was on antibiotics, and was "definitely out of it." She goes on to state that "[a]s [she and Bleiler] were making out, [she doesn't] remember how [her] clothes came off, but they did." She says "[t]he next thing I knew [Bleiler] was forcing himself inside me to which I didn't consent." The statement goes on to say that "this continued until [C.M.] was able to push him off/out of [her]" and that he asked for sex again, to which she said no, and he complied. (Bleiler Dep. 91 Ex. 5; Potter Aff. App. Ex. A, tab 1.)

18.     On May 5, 2011, C.M. filed a second Holy Cross Public Safety Witness Statement Form, which alleges that, on the night of the incident, she does not remember much before Bleiler leading her into his room. She states that:

> He then put his fingers inside me to which I remember saying "no" and he said "it's okay" but he didn't stop. I tried to move myself out of the way but he was forcing himself himself [sic] inside me. I definitely did not consent and I'm pretty sure I said no since my thoughts were screaming it.

She goes on to say "I did not want this. He continued for I don't know exactly how long, until I was able to push him off me." C.M. states that she doesn't remember anything after that except that she vaguely remembers getting dressed. (Bleiler Dep. 91 Ex. 6; Potter Aff. App. Ex. A, tab 1.)

19.     On May 9, 2011, C.M. filed a third Holy Cross Public Safety Witness Statement Form, stating that, during her hospital examination following the incident, "they found a 1 inch lasaration [sic], that still causes me daily pain and the area was worn out, tender and extremely painful. I bled for 5 days from these wounds. I can feel them and am reminded of the incident every time I walk." (Bleiler Dep. 92 Ex. 7; Potter Aff. App. Ex. A, tab 1.)

20.     Bleiler maintains that C.M. willingly engaged in sexual relations with him on the night of the incident. (Compl. ¶ 10.)

21.     Following the incident, five students filed Witness Statement Forms: Beth Federici ("Federici"), Jacob Yiznitsky ("Yiznitsky"), Kate DeFusco ("DeFusco"), Felicia Russo ("Russo"), and Elizabeth Masi ("Masi"). (Bleiler Dep. Exs. 8-14; Potter Aff. App. Ex. A, tab 1.)

22.     In her statement dated May 1, 2011, Federici states that immediately following the incident, C.M. "looked upset" and stated that she "knew the guy who had raped her." (Bleiler Dep. 93 Ex. 8; Potter Aff. App. Ex. A, tab 1.)

23.     In his statement dated May 1, 2011, Yiznitsky states that immediately following the incident, C.M. said "I think I was just raped" but that "he probably didn't mean it" and she "didn't want to get anyone in trouble." Yiznitsky advised her to go to Public Safety. (Bleiler Dep. 93 Ex. 9; Potter Aff. App. Ex. A, tab 1.)

24.     In a May 4, 2011 statement, Yiznitsky states that he saw C.M. and had the above-mentioned exchange with her "a few minutes or perhaps an hour" after the incident. (Bleiler Dep. 96 Ex. 13; Potter Aff. App. Ex. A, tab 1.)

25.     In her statement dated May 4, 2011, Masi states that earlier on the night of the incident, C.M. was intoxicated and Masi became worried when she could not find her after being told to leave a party. (Bleiler Dep. 95 Ex. 12; Potter Aff. App. Ex. A, tab 1.)

26.     In her statement dated May 5, 2011, DeFusco also states that earlier on the night of the incident, DeFusco became worried when she could not find C.M. after being told to leave a party. (Bleiler Dep. 96 Ex. 14; Potter Aff. App. Ex. A, tab 1.)

27.     On May 9, 2011, Bleiler was contacted by and met with Holy Cross Public Safety Sergeant Kathleen Culley ("Culley") and Officer Kate Mills. At that meeting, Culley informed Bleiler of the charges against him. Culley also read Bleiler his Miranda rights, which Bleiler indicated that he understood, and a copy of which he signed. (Bleiler Dep. 65:10-67:13, Ex. 1; Potter Aff. App. Ex. A, tab 1.)

28.     Six students at the College have been charged with Sexual Misconduct I since 2002. (Def.'s Resps. to Pl.'s Interrogs. Nos. 1-3; Ex. B.)

29.     Four have been found responsible. Of the four found responsible, three were dismissed from the College and one received a one-year suspension. (Def.'s Resps. to Pl.'s Interrogs. Nos. 1-3; Ex. B.)

30.     There are no known complaints of a violation for Sexual Misconduct I made by a male student against a female student at the College. (Def.'s Resp. to Pl.'s Interrog. No. 2; Ex. B.)

**Paul Irish**

31.     Public Safety referred C.M.'s complaint to Paul Irish ("Irish") on May 9, 2011. (Bleiler Dep. 69 Ex. 2; Potter Aff. App. Ex. A, tab 1.)

32.     Irish is the Director of Student Conduct and Community Standards at the College. Irish is also the Assistant to the Vice President for Student Affairs. (*See* Deposition of Paul A. Irish ("Irish Dep.") 9:17-20, at Potter Aff. App. Ex. A, tab 2.)

33.     In his tenure at Holy Cross, Irish has participated in four hearings for Sexual Misconduct I. (Irish Dep. 37:3-11; Potter Aff. App. Ex. A, tab 2.)

34.     Of the four Sexual Misconduct I hearings in which Irish has been involved, three students were found responsible. (Irish Dep. 58:8-13; Potter Aff. App. Ex. A, tab 2.)

35.     In a letter dated May 9, 2011, from Irish to Bleiler, Bleiler was informed in writing of a report filed against him indicating he sexually assaulted another student and of an investigation into the incident.   This letter also alerted him that he would be placed on interim suspension until a final disciplinary decision was rendered. (Bleiler Dep. 69 Ex. 2; Potter Aff. App. Ex. A, tab 1.)

36.     The May 9, 2011 letter informed Bleiler that a final decision regarding the matter would be made in accordance with the policies detailed in the College's Community Standards and Disciplinary Procedures for Students (the "Community Standards" or the "Standards") found in the Student Handbook (the "Handbook"). (Bleiler Dep. 69 Ex. 2; Potter Aff. App. Ex. A, tab 1.)

37.     Bleiler received this letter on or around May 9, 2011. (Bleiler Dep. 69:17-70:6; Potter Aff. App. Ex. A, tab 1.)

38.     In a letter dated May 10, 2011, Irish informed Bleiler that he was accused of having committed Sexual Misconduct I in violation of the College's Community Standards.  This letter identified the name of the complainant, the date and location of the incident, and instructed Bleiler of the requirement to attend a pre-hearing meeting. (Bleiler Dep. 71 Ex. 3; Potter Aff. App. Ex. A, tab 1.)

**The Handbook**

39.     The College promulgates a document published on a yearly basis titled in 2012-2011 "College of the Holy Cross - student Handbook and Planner 2010-2011. (Compl. ¶ 12.)

40.     Holy Cross's Code of Student Conduct defines Sexual Misconduct I as:

Any sexual penetration (anal, oral or vaginal), however slight, with any object or sexual intercourse by a man or woman upon a man or woman without effective consent. Sexual penetration includes vaginal or anal penetration by a penis, object, tongue or finger and oral copulation by mouth to genital contact or genital to mouth contact.

(Bleiler Dep. 121 Ex. 21, at 37; Potter Aff. App. Ex. A, tab 1.)

41.     Holy Cross's Code of Student Conduct defines effective consent as:

[I]nformed, freely and actively given mutually understandable words or actions which indicate a willingness to participate in mutually agreed upon sexual activity. Consent may never be given by minors . . . , mentally disabled persons and those who are incapacitated as a result of alcohol or other drug consumption (voluntary or involuntary) or those who are unconscious, unaware or otherwise physically helpless. Consent as a result of coercion, intimidation, threat of force or force is not effective consent.

(Bleiler Dep. 121 Ex. 21, at 37; Potter Aff. App. Ex. A, tab 1.)

42.     The Handbook provides:

In the absence of mutually understandable words or actions, it is the responsibility of the initiator, or the person who wants to engage in the specific sexual activity to make sure that he/she has the consent from his/her partner(s). Consent to some form of sexual activity does not necessarily consent to other forms of sexual activity. Mutually understandable consent must be obtained by the initiator at every stage of sexual interaction. Consent is mutually understandable when a reasonable person would consider the words and/or action of the parties to have expressed a mutually understandable agreement between them to do the same thing, in the same way, at the same time, with one another.

(Bleiler Dep. 121 Ex. 21, at 57; Potter Aff. App. Ex. A, tab 1.)

43.     The Handbook provides that:

[A] person who knows or reasonably should have known that another person is incapacitated may not engage in sexual activity with that person. Incapacitation means being in a state where a person lacks the capacity to appreciate the fact that the situation is sexual, or cannot appreciate (rationally and reasonably) the nature and/or extent of the situation.

(Bleiler Dep. 121 Ex. 21, at 57; Potter Aff. App. Ex. A, tab 1.)

44.     Additional College rules in the Handbook advise students that:

> -A person who is the object of sexual aggression is not required to physically or otherwise resist a sexual aggressor;
> -Silence, previous sexual relationships, and/or current a current sexual relationship with the initiator (or anyone else) may not, in themselves, be taken to imply consent;
> -Intentional use of alcohol or other drugs does not excuse a violation of the Sexual Misconduct Policy; . . .
> -Consent to sexual activity may be withdrawn at any time, as long as the withdrawal is communicated clearly (because you cannot be expected to read the mind of your sexual partner(s)), and all sexual activity must cease;
> -Consent has an expiration date. Consent lasts for a reasonable time, depending on the circumstances. A person's state of incapacity is a subjective determination that will be made after the incident in light of all facts available because people reach incapacitation at different points and as a result of different stimuli. They exhibit incapacity in different ways.

(Bleiler Dep. 121 Ex. 21, at 57; Potter Aff. App. Ex. A, tab 1.)

45.     The College's Handbook states that the College also considers factors that bear on incapacity such as: body weight; height; size; tolerance for alcohol; amount and type of alcohol consumed, along with their interaction with other drugs; and propensity for blacking out.

(Bleiler Dep. 121 Ex. 21, at 57; Potter Aff. App. Ex. A, tab 1.)

### The Disciplinary Procedures

46.     Holy Cross advises all students that to enter the College is to accept the rights and responsibilities of membership into the community, including "high standards of personal conduct and behavior." The College also assumes all students will abide by the College's policies, rules, and regulations, including "Community Standards and Disciplinary Procedures," and will abide by state, local, and federal laws. (Bleiler Dep. 121 Ex. 21, at 33; Potter Aff. App. Ex. A, tab 1.)

47.     The College has established Community Standards and Disciplinary Procedures

to address allegations of student misconduct.  Under these procedures:

> [S]tudents have the right "to be informed of any charges of
> misconduct, the right to adequate time to prepare a response to the
> charges, the right to hear information in support of the charges, the
> right to present evidence against the charges, and the right to a fair
> process which is appropriate to the circumstances.

(Bleiler Dep. 121 Ex. 21, at 33; Potter Aff. App. Ex. A, tab 1.)

48.     Community Standards of the College applies to student misconduct that takes

place on College premises and to off-campus conduct when the behavior may adversely impact

the College community or reputation.  (Bleiler Dep. 121 Ex. 21, at 34; Potter Aff. App. Ex. A,

tab 1.)

49.     The College advises students that the rules of evidence found in legal proceedings

do not apply, nor shall deviations from proscribed procedures necessarily invalidate a decision,

unless "significant prejudice" to a student respondent or to the College may result.  (Bleiler Dep.

121 Ex. 21, at 34; Potter Aff. App. Ex. A, tab 1.)

50.     The Director of Student Conduct and Community Standards (the "Director") has

the responsibility of administering all nonacademic discipline.  The Director also has the

authority to invoke an interim suspension when it is considered necessary to remove a student

from campus until the completion of a disciplinary hearing.  (Bleiler Dep. 121 Ex. 21, at 34;

Potter Aff. App. Ex. A, tab 1.)

51.     According to the College's Disciplinary Process and Procedures, any student may

submit a complaint by submitting a writing to the Office of Student Conduct and Community

Standards.  The Director or a designee reviews all complaints and determines if disciplinary

charges will be initiated, what specific violations a student will be charged with, and the

appropriate venue for adjudication. (Bleiler Dep. 121 Ex. 21, at 38; Potter Aff. App. Ex. A, tab 1.)

52.     Students accused of violating College policies will receive a written notification of the alleged violation, the location and date of this incident (if known), and the reporting party. (Bleiler Dep. 121 Ex. 21, at 38; Potter Aff. App. Ex. A, tab 1.)

53.     A hearing in front of the Community Standards Board (the "Board") will normally be conducted for students who face suspension or dismissal. (Bleiler Dep. 121 Ex. 21, at 38; Potter Aff. App. Ex. A, tab 1.)

54.     Prior to a hearing in front of the Board, the accused is required to attend a pre-hearing meeting with the hearing coordinator, usually the Director. In this meeting, the accused must review the information and choose to accept the charges, or to refute the charges, in which case a hearing will be scheduled, normally no less than seven days from the pre-hearing meeting. (Bleiler Dep. 121 Ex. 21, at 39; Potter Aff. App. Ex. A, tab 1.)

## Pre-Hearing

55.     Bleiler received the May 10, 2011 letter before the scheduled pre-hearing meeting. Bleiler attended the scheduled pre-hearing meeting with Irish on May 10, 2011. (Bleiler Dep. 70:22-72:5; Potter Aff. App. Ex. A, tab 1.)

56.     At the May 10, 2011 pre-hearing meeting, Bleiler signed a Pre-Hearing Checklist produced by the College's Office of Student Conduct & Community Standards indicating that he understood and accepted the following statements:

> 1. I have received a written notification of the complaint.
> 2. I understand the violation of the Community Standards that I am alleged to have committed.
> 3. I am aware of the identity of the complainant.
> 4. I understand that any behavior that can be construed as retaliation against the complainant or witnesses will be subject to

immediate disciplinary action including suspension/expulsion from the college.

5. I have a copy of the Student Handbook which includes the Community Standards Board procedures.

6. I understand that I may review the case file (a copy cannot be made nor can it be removed from the Office of Student Conduct & Community Standards) prior to the hearing.

7. I understand that I may have an advisor present with me during the hearing and I have reviewed the role of the advisor.

8. I understand that if I choose to have an advisor, s/he must be a faculty, staff or student member of the Holy Cross community.

9. I understand that if I choose to have an advisor it is my responsibility to provide the advisor's name to the Hearing Administrator no later than 48 hours prior to the hearing.

10. I understand that my witnesses will be asked to speak only to the incident in question and the relevancy of their testimony is subject to the discretion of the Community Standards Board Chair.

11. I understand that my witness list and copies of written statements must be submitted to the Hearing Administrator no later than 48 hours prior to the hearing.

12. I understand that the hearing will be scheduled taking into account only classes and other officially recognized absences from class.

13. I understand that the decision of the Community Standards Board is final pending appeal to the Vice President for Student Affairs/Dean of Students or designee.

14. I understand the circumstances which will be considered grounds for appeal and how to file an appeal if I so choose.

15. I understand that appeals must be filed no more than 72 hours after the date of the hearing to the VPSA/DOS and will be final. [Sanctions of expulsion may be appealed to the College President.]

16. I understand that the hearing, with the exception of the deliberations, may be taped and that the tape is considered property of the College.

17. I understand that should I wish to review the recording I may do so in the office, and may not make a copy or otherwise remove the recording.

18. I understand that I should contact Paul Irish with any questions.

19. I have been encouraged to discuss this matter with my family.

Each line of this document was initialed by Bleiler. (Bleiler Dep. 72:14-73:14, Ex. 4; Potter Aff. App. Ex. A, tab 1.)

57.     At the pre-hearing meeting, Bleiler received a copy of the Handbook and reviewed the case file with Irish, which contained the statements from C.M. and the other five students who filed statements. (Bleiler Dep. 90:18-92:4; Potter Aff. App. Ex. A, tab 1.)

## The Panel Process

58.     The Disciplinary Board (the 'Board) is made up of twenty-one people: six administrators and staff appointed by the Vice President for Student Affairs; six faculty members selected by the Dean of the College; and nine students recommended by the Student Government Association from the pool of eligible students. (Irish Dep. 28:15-29:7; Potter Aff. App. Ex. A, tab 2.)

59.     To be eligible to be recommended to serve on the Board, a student must be in good disciplinary standing at the time of recommendation. There are no other eligibility requirements. (Irish Dep. 29:15-30:12; Potter Aff. App. Ex. A, tab 2.)

60.     Once Irish, the Director, receives the student recommendations, he interviews the students to be selected for positions on the Board and draws questions from a standard application asking students to decide hypothetical disciplinary scenarios. (Irish Dep. 30:22-33:1; Potter Aff. App. Ex. A, tab 2.)

61.     From the twenty-one Board members, each panel consists of five members. (Irish Dep. 33:19-21; Potter Aff. App. Ex. A, tab 2.)

62.     Each five-person panel must consist of one faculty member, one staff member, one either faculty or staff member, and two students. (Irish Dep. 34:5-7; Potter Aff. App. Ex. A, tab 2.)

63.     In selecting the members of a five-person panel, Irish strives to achieve gender balance. (Irish Dep. 34:12-37:2; Potter Aff. App. Ex. A, tab 2.)

12

64.     Board members eligible to serve on Sexual Misconduct panels must have completed training in sexual misconduct, conducted by Irish twice per year. (Irish Dep. 37:12-38:3; Potter Aff. App. Ex. A, tab 2.)

65.     The Handbook advises students that both the accused and the accuser are informed of the names of members of the hearing panel not fewer than seventy-two hours prior to the hearing. If either party has information as to why a specific person should not be part of the panel, the party must present the information to the Director or hearing coordinator in writing no fewer than forty-eight hours prior to the start of the hearing. (Bleiler Dep. 121 Ex. 21, at 40; Potter Aff. App. Ex. A, tab 1.)

66.     The decision of the Director or hearing coordinator as to whether a conflict exists is final. (Bleiler Dep. 121 Ex. 21, at 39; Potter Aff. App. Ex. A, tab 1.)

67.     Irish has a practice of screening selected panel members with potential conflicts by asking selected panel members if they have any concerns or issues with the parties involved in the dispute. If a potential conflict is raised, Irish makes the final decision based on the facts of the case, and the individual's ability to be fair, among other factors. (Irish Dep. 41:3-44:23; Potter Aff. App. Ex. A, tab 2.)

68.     Board members are advised to notify the Director or hearing coordinator and to disqualify themselves from serving on a panel if they suspect a potential conflict exists with a party to the hearing. (Bleiler Dep. 121 Ex. 21, at 40; Potter Aff. App. Ex. A, tab 1.)

69.     The Director or hearing coordinator may meet with the panel for consultation regarding procedural elements at any time prior to or during the hearing or deliberations. (Bleiler Dep. 121 Ex. 21, at 40; Potter Aff. App. Ex. A, tab 1.)

70.     For each disciplinary hearing at the College, Irish's role is as an administrator. He serves as a resource for both complainants and respondents, schedules the hearing, assures all information is distributed, communicates with witnesses about scheduling, assures the hearing is properly recorded, and answers procedural questions. (Irish Dep. 47:23-48:22; Potter Aff. App. Ex. A, tab 2.)

71.     Irish is present during panel deliberations in order to answer procedural questions. (Irish Dep. 49:8-14; Potter Aff. App. Ex. A, tab 2.)

### The Bleiler Panel

72.     . The five panel members selected for Bleiler's hearing were: Professor Jude Kelley ("Kelley"), Professor Laurie King ("King"), College administrator Elizabeth Rice ("Rice"), student Grant Greeley ("Greeley"), and student Lauren [Brais] ("Brais"). (Bleiler Dep. 94 Ex. 10; Potter Aff. App. Ex. A, tab 1.)

73.     On May 11, 2011, Irish advised Bleiler of the names of those who had been selected as members of the hearing panel and asked Bleiler if he had any conflicts. Irish asked Bleiler to respond within twenty-four hours and, when he did not, Irish again asked Bleiler if he had any conflicts to which he responded "I do not have any conflicts with this panel." (Bleiler Dep. 94 Ex. 10; Potter Aff. App. Ex. A, tab 1.)

74.     On May 11, 2011, Irish asked all panelists in an email to let him know immediately if they had any conflicts with either complainant C.M. or respondent Bleiler. (*See* Affidavit of Paul A. Irish ("Irish Aff."), Ex. C.)

75.     On May 11, 2011, Brais informed Irish in an email that she had been a Head Resident Advisor in the dorm where C.M. resided. Irish responded that this relationship alone would not create a conflict "as long as [she] didn't have any issues that would put [her] fairness

in question." Brais responded that she had no issues with C.M. (Bleiler Dep. 94 Ex. 11; Potter Aff. App. Ex. A, tab 1.)

76.     As a Head Resident Advisor , Brais' responsibilities were more supervisory and related to building-wide activities rather than to individual residents. (*See* Deposition of Lauren Brais ("Brais Dep.") 17:14-18:4, at Potter Aff. App. Ex. A, tab 3.)

77.     The Head Residential Advisor "is kind of overseer of the Residential Advisors." (Bleiler Dep. 16:7-8; Potter Aff. App. Ex. A, tab 1.)

78.     On May 11, 2011, C.M. informed Irish in an email that Greeley was a Resident Advisor in her building and that she had a class with him during the semester that the incident took place. Irish indicated that this would not initially exclude Greeley, but that he would speak with him. Greeley responded that he had no conflicts. (Bleiler Dep. Exs. 12, 13; Potter Aff. App. Ex. A, tab 1.)

79.     Greeley acknowledged that he was a Resident Advisor in Healy dorm (C.M.'s dorm), but he did not know what floor she lived on. (*See* Deposition of Grant Greeley ("Greeley Dep.") 59:4-10, at Potter Aff. App. Ex. A, tab 4.)

80.     Dormitories had multiple floors and multiple Residential Advisors. For example, Bleiler lived in Mulledy Hall freshman year. It had four floors and a basement and thirteen Residential Advisors. Bleiler lived in Lehy Hall sophomore year. It had four floors and five Residential Advisors. (Bleiler Dep. 9-14; Potter Aff. App. Ex. A, tab 1.)

81.     The Residential Advisor for the students lived on the same floor as the students they were primarily responsible for. (Bleiler Dep. 15:5-9; Potter Aff. App. Ex. A, tab 1.)

82.     Students considered the Residential Advisor on their floor (or section) as their Residential Advisor. (Bleiler Dep. 32:1-7; Potter Aff. App. Ex. A, tab 1.)

83.     Greeley testified in his deposition that, although he and C.M. are Facebook "friends," he uses Facebook as a "networking tool," has over 2800 "friends," does not have a personal relationship with C.M. beyond possibly meeting her at parties, and did not recall having a class with her. (Greeley Dep. 52:2-59:25; Potter Aff. App. Ex. A, tab 4.)

84.     Irish asked Greeley, a gain, if he had any conflicts and if [Greeley] knew either [C.M. or Bleiler] and Greeley said he "didn't." (Greeley Dep. 58:17-23; Potter Aff. App. Ex. A, tab 4.)

85.     On May 13, 2011, Bleiler advised Irish that Bleiler and Greeley had mutual friends and that this potentially created a conflict. (Irish Dep. 154:7-20; Potter Aff. App. Ex. A, tab 2.)

86.     Greeley stated that he had never met Bleiler nor heard Bleiler's name mentioned before Irish contacted him to serve on the panel. (Greeley Dep. 51:22-52:1; Potter Aff. App. Ex. A, tab 4.)

87.     Bleiler did not know Grant Greeley personally. (Bleiler Dep. 36:11-14; Potter Aff. App. Ex. A, tab 1.)

88.     Bleiler did not have any problems personally with Grant Greeley (Bleiler Dep. 45:5-9; Potter Aff. App. Ex. A, tab 1.)

89.     Bleiler hadn't had any interactions with Grant Greeley or Lauren Brais on a personal level. (Bleiler Dep. 45:5-13; Potter Aff. App. Ex. A, tab 1.)

90.     Bleiler had never had a class with Professor Jude Kelley and had never talked with Professor Jude Kelley before the night of the panel hearing. (Bleiler Dep. 34:20-24, 35:1-4; Potter Aff. App. Ex. A, tab 1.)

91.     Bleiler had never had a class with Professor Lori King and had never talked with Professor Lori King prior to the hearing.  (Bleiler Dep. 35:5-12; Potter Aff. App. Ex. A, tab 1.)

92.     Bleiler does not remember any interaction with staff member Elizabeth Rice prior to the hearing.  (Bleiler Dep. 35:13-21; Potter Aff. App. Ex. A, tab 1.)

93.     Before the panel, Bleiler had never had contact with panel members Kelley, King, or Rice.  (Bleiler Dep. 34:16-36:7; Potter Aff. App. Ex. A, tab 1.)

94.     Bleiler discussed Brais and Greeley with Irish.  Irish "said that he had talked to both students, and they said that they did not" (have a conflict).  (Bleiler Dep. 38; Potter Aff. App. Ex. A, tab 1.)

95.     Brais received training on the College's sexual misconduct policies, including the roles that consent and intoxication play in the policies, when she became a member of the Community Standards Board.  (Brais Dep. 22:3-26:4; Potter Aff. App. Ex. A, tab 3.)

96.     Greeley received training on the College's sexual misconduct policies, including the roles that consent and intoxication play in the policies, when he became a member of the Community Standards Board.  (Greeley Dep. 20:2-23:25; Potter Aff. App. Ex. A, tab 4.)

97.     Kelley received training materials on the College's sexual misconduct policies, which he read and reviewed prior to serving on Bleiler's panel.  (*See* Deposition of Jude Kelley ("Kelley Dep.") 24:22-24, 133, Ex. 4, at Potter Aff. App. Ex. A, tab 5.)

98.     Elizabeth Rice received training on Holy Cross's sexual misconduct policies on or around the time she became a member of the Community Standards Board.  (Irish Aff. App. Ex. C.)

99. Lori King received training on Holy Cross's sexual misconduct policies on or around the time she became a member of the Community Standards Board. (Irish Aff. App. Ex. C.)

### The Advisor

100. Prior to the hearing, Bleiler had two to three meetings with an advisor, Professor Cahill. (Bleiler Dep. 79:18-80:12; Potter Aff. App. Ex. A, tab 1.)

### The Hearing

101. On May 18, 2011, Bleiler's hearing was conducted. (Bleiler Dep. 101:18-22; Potter Aff. App. Ex. A, tab 1.)

102. College Policies advise students that the purpose of publishing disciplinary regulations is to give notice to students of prohibited behavior and the regulations are not written with the specificity of a criminal statute. Questions of interpretation are referred to the Vice President for Student Affairs/Dean of Students and/or the Director. (Bleiler Dep. 121 Ex. 21, at 42; Potter Aff. App. Ex. A, tab 1.)

103. The College advises students that the basis for findings used during disciplinary proceedings is a "more likely than not" or "more than 50%" standard. If the Board finds a student "responsible" for a violation, it may recommend sanctions up to and including suspension or dismissal. (Bleiler Dep. 121 Ex. 21, at 41; Potter Aff. App. Ex. A, tab 1.)

104. The College outlines Board hearing procedures in detail, and provides that: the Chairperson convenes the Board; both parties are asked if the Director or hearing coordinator gave them an opportunity to challenge any Board members for cause; the allegations are read; the accuser and the accused are given an opportunity to respond; Board members question both parties; each side may question the other side and present witnesses; both parties may make a

final statement; the Board adjourns to deliberate and determines whether it is more likely than not that the accused has violated the Community Standard; if a violation is found, the Board recommends a sanction; the recommendation is forwarded to the Director, then to the Vice President for Student Affairs/Dean of Students; the Board informs each party of the decision; the hearing officer shares the results of the hearing no more than twenty-four hours after its conclusion in cases of sexual assault; and the Vice President for Student Affairs/Dean of Students may accept or alter the recommendations or refer the case to a new Board. (Bleiler Dep. 121 Ex. 21, at 41; Potter Aff. App. Ex. A, tab 1.)

105.    At the hearing, both Bleiler and C.M. made opening statements, were permitted to ask questions of the Board and of each other, were permitted to call witnesses, and gave closing statements. Bleiler was permitted to question each witness and stated that he was not prevented from doing so. (Bleiler Dep. 102:12-108:5; Potter Aff. App. Ex. A, tab 1.)

106.    On or around the date of the incident, Bleiler was six feet, one inches tall and weighed approximately 225 pounds. (Bleiler Dep. 29:16-24; Potter Aff. App. Ex. A, tab 1.)

107.    Bleiler estimates that on or around the date of the incident, C.M. was approximately five feet, five inches tall and weighed 140 pounds. (Bleiler Dep. 30:8-11; Potter Aff. App. Ex. A, tab 1.)

108.    Bleiler admitted that, before he initially penetrated C.M., he did not ask for her permission to have intercourse the evening of the incident. (Bleiler Dep. 109:24-110:4; Potter Aff. App. Ex. A, tab 1.)

109.    Panel hearings, but not deliberations, are recorded and students may make arrangements to listen to the recordings through the Director. Students are not permitted to

remove or make copies of the recordings. (Bleiler Dep. 121 Ex. 21, at 40; Potter Aff. App. Ex. A, tab 1.)

110.    A certified copy of the transcript of the hearing is attached. (*See* Ex. E.)

## The Deliberations

111.    During deliberations, panel members considered the complaint, witness statements, and hearing testimony from all parties in rendering their decision. (*See, e.g.*, Greeley Dep. 66:7-74:18; Brais Dep. 56:1-60:5; Potter Aff. App. Ex. A, tab 3-4.)

112.    Although Irish was present during deliberations, according to Brais, he answered administrative questions but was not "an active member of the discussion." (Brais Dep. 59:1-20; Potter Aff. App. Ex. A, tab 3.)

113.    According to panel member Brais, the panel during deliberations collectively discussed that the burden of proof was a "more likely than not" standard. (Brais Dep. 59:23-60:16; Potter Aff. App. Ex. A, tab 3.)

114.    C.M.'s virginity was not discussed during deliberations. (Kelley Dep. 61-64; Greeley Dep. 131:18-25; Potter Aff. App. Ex. A, tab 4-5.)

115.    It did not matter to Professor Kelley how many times she had or had not had sex. He was more interested in what happened on the night in question. (Kelley Dep. 62:19-24; 63:1-24; 64:1; Potter Aff. App. Ex. A, tab 5.)

## The Decision

116.    The Panel decided that Bleiler was responsible and recommended that he be dismissed from the College. (Kelley Dep. 103:8-12; 130:3-7; Potter Aff. App. Ex. A, tab 5.)

117.    The Panel decision on responsibility and dismissal was unanimous.  (Kelley Dep. 100:17-24; 101:1-7; 103:22-24; 104:1-5; Greeley Dep. 133:25; 134:1-6; Potter Aff. App. Ex. A, tab 4-5.)

118.    On the evening of the hearing, Irish informed Bleiler in person of the Panel's decision that he was responsible and recommended that he be dismissed from the College. (Bleiler Dep. 110:7-13; Potter Aff. App. Ex. A, tab 1.)

119.    In a letter dated May 19, 2011 from Jacqueline D. Peterson, Vice-President for Student Affairs/Dean of Students, to Kelley, Chair of the Community Standards Board, with a copy received by Bleiler, Peterson informed Kelley that the Board found Bleiler responsible for the violation of Sexual Misconduct I.  Further, the letter states that the Board determined that Bleiler did not receive effective consent for sexual activity and that C.M. was "highly intoxicated, incoherent, and was unaware of her circumstances."  As such, the Board deemed her to be "physically helpless at the time of the incident," thus unable to consent to sexual activity. Bleiler was informed that, should he wish to appeal, he should file his appeal to Rev. Michael C. McFarland, S.J. ("McFarland") no later than Tuesday, May 24, 2011 at 5:00 p.m.  (Bleiler Dep. 111 Ex. 17, 111:6-17; Potter Aff. App. Ex. A, tab 1.)

## Appeal

120.    A student has the right to appeal a Board decision if he can demonstrate (1) lack of fairness, (2) a violation of process, or (3) if there is significant new information that has been revealed that may alter the outcome of the matter.  (Bleiler Dep. 121 Ex. 21, at 41; Potter Aff. App. Ex. A, tab 1.)

121.    Appeals for dismissals are reviewed by the President of the College.  Letters of appeal must be received within five business days of the date of the decision letter.  The

President may decide that the appeal has merit, and alter the sanction or refer the case to a new Board, or decide that the appeal does not have merit and impose the sanction immediately. (Bleiler Dep. 121 Ex. 21, at 41; Potter Aff. App. Ex. A, tab 1.)

122. Bleiler submitted an appeal addressed to McFarland dated May 24, 2011. In the appeal, Bleiler argued that the College violated its own disciplinary procedures and that the hearing was fundamentally unfair. (Bleiler Dep. 113 Ex. 18; Potter Aff. App. Ex. A, tab 1.)

123. McFarland responded to Bleiler's appeal in a letter dated May 26, 2011. In this letter, McFarland addressed each of Bleiler's arguments for reversal, and, ultimately, denied the appeal and upheld Bleiler's dismissal from the College. (Bleiler Dep. 115 Ex. 19; Potter Aff. App. Ex. A, tab 1.)

Respectfully submitted,

COLLEGE OF THE HOLY CROSS

By its attorney,

/s/ *Harold W. Potter, Jr.*
Harold W. Potter, Jr. (BBO # 404240)
harold.potter@hklaw.com
Amanda Orcutt (BBO # pending)
amanda.orcutt@hklaw.com
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116-3889
(617) 523-2700

Dated: December 14, 2012

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent those indicated as non-registered participants on December 14 2012.

/s/ *Harold W. Potter, Jr.*
Harold W. Potter, Jr.