UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

1:11-CV-11541-DJC

| | |
|---|---|
| EDWIN BLEILER,<br><br>               Plaintiff,<br><br>v.<br><br>COLLEGE OF THE HOLY CROSS,<br><br>               Defendant. | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

On May 1, 2011, a young woman, a sophomore at the College of the Holy Cross ("Holy Cross" or the "College"), reported to the Holy Cross Public Safety Department ("Holy Cross Public Safety"), that she had been sexually assaulted by a male student a few hours earlier. Holy Cross Public Safety was required to investigate and process the complaint which it did. Following an investigation, Holy Cross Public Safety forwarded the file to Paul Irish ("Irish"), the Director of Student Conduct and Community Standards and Assistant to the Vice President for Student Affairs.

Irish reviewed the file on May 9, 2011 and placed the male student, senior Edwin Bleiler ("Bleiler"), on interim suspension pending a final disciplinary decision. Irish informed Bleiler that he was accused of having committed Sexual Misconduct I in violation of the College's Community Standards, identified the young woman, and the date and location of the incident. Irish further advised Bleiler that he was required to attend a prehearing meeting.

The pre-hearing meeting was held on May 10, 2011.  Bleiler denied violating Community

Standards.  Bleiler was told that a hearing would be scheduled and acknowledged the following:

1.  I have received a written notification of the complaint.

2.  I understand the violation of the Community Standards that I am alleged to have committed.

3.  I am aware of the identity of the complainant.

4.  I understand that any behavior that can be construed as retaliation against the complainant or witnesses will be subject to immediate disciplinary action including suspension/expulsion from the college.

5.  I have a copy of the Student Handbook which includes the Community Standards Board procedures.

6.  I understand that I may review the case file (a copy cannot be made nor can it be removed from the Office of Student Conduct & Community Standards) prior to the hearing.

7.  I understand that I may have an advisor present with me during the hearing and I have reviewed the role of the advisor.

8.  I understand that if I choose to have an advisor, s/he must be a faculty, staff or student member of the Holy Cross community.

9.  I understand that if I choose to have an advisor it is my responsibility to provide the advisor's name to the Hearing Administrator no later than 48 hours prior to the hearing.

10. I understand that my witnesses will be asked to speak only to the incident in question and the relevancy of their testimony is subject to the discretion of the Community Standards Board Chair.

11. I understand that my witness list and copies of written statements must be submitted to the Hearing Administrator no later than 48 hours prior to the hearing.

12. I understand that the hearing will be scheduled taking into account only classes and other officially recognized absences from class.

13. I understand that the decision of the Community Standards Board is final pending appeal to the Vice President for Student Affairs/Dean of Students or designee.

14. I understand the circumstances which will be considered grounds for appeal and how to file an appeal if I so choose.

15. I understand that appeals must be filed no more than 72 hours after the date of the hearing to the VPSA/DOS and will be final. [Sanctions of expulsion may be appealed to the College President.]

16. I understand that the hearing, with the exception of the deliberations, may be taped and that the tape is considered property of the College.

17. I understand that should I wish to review the recording I may
do so in the office, and may not make a copy or otherwise remove
the recording.
18. I understand that I should contact Paul Irish with any questions.
19. I have been encouraged to discuss this matter with my family.

A panel, consisting of two professors, an administrative staff member and two students, was assembled to hear the complaint, to hear Bleiler's response to the complaint, and to make a decision. The hearing was held on May 18, 2011 and a decision was rendered that day.

The panel decided unanimously that Bleiler was responsible and decided unanimously to recommend that Bleiler be permanently dismissed from Holy Cross. Bleiler appealed the decision to the President of Holy Cross. The President reviewed the appeal and affirmed the decision and recommendation of permanent dismissal.

Bleiler has filed claims for a violation of 20 U.S.C. §1681 (Title IX), breach of contract, breach of the implied covenant of good faith and fair dealing and unjust enrichment. The claims lack merit.

## FACTS

### Background

Bleiler was a student at Holy Cross from the Fall of 2007 to the Spring of 2011. Statement of Undisputed Facts ¶ 1 [hereinafter SUF]. Bleiler's freshman year was 2007-2008. SUF ¶ 6. Bleiler lived on campus freshman and sophomore years. SUF ¶ 7. Bleiler lived off campus his junior and senior years. SUF ¶ 8. Room, board, tuition, and fees were paid to Holy Cross on behalf of Bleiler. SUF ¶ 3. Bleiler received thirty-two credits for his coursework. SUF ¶ 5.

Holy Cross is a private, non-profit college located in Worcester, Massachusetts. SUF ¶ 2. The College receives federal funding under Title IX, 20 U.S.C. § 1681-1688 (2011). SUF ¶ 4.

#11851728_v1

### The Incident

On May 1, 2011, a female Holy Cross student ("C.M.") gave her first of three statements to Holy Cross Public Safety.  SUF ¶ 16.  She reported that she was sexually assaulted by a male student, who she identified in the third statement as Bleiler.  SUF ¶ 16.  These events are collectively referred to as the "incident."  C.M. reported that she and Bleiler had "hooked up (meaning made out)" before the night of the incident.  SUF ¶ 17.  In her statement, C.M. claims that, on the night in question, she consumed alcohol, was on antibiotics, and was "definitely out of it."  SUF ¶ 17.  She goes on to state that "[a]s [she and Bleiler] were making out, [she doesn't] remember how [her] clothes came off, but they did."  SUF ¶ 17.  She says "[t]he next thing I knew [Bleiler] was forcing himself inside me to which I didn't consent."  SUF ¶ 17.  The statement goes on to say that "this continued until [C.M.] was able to push him off/out of [her]" and that he asked for sex again, to which she said no, and he complied.  SUF ¶ 17.

On May 5, 2011, C.M. filed a second Public Safety Witness Statement.  SUF ¶ 18.  She reported that she does not remember much on the night of the incident before Bleiler led her into his room.  SUF ¶ 18.  She reported that:

> He then put his fingers inside me to which I remember saying "no"
> and he said "it's okay" but he didn't stop.  I tried to move myself
> out of the way but he was forcing himself himself [sic] inside me.
> I definitely did not consent and I'm pretty sure I said no since my
> thoughts were screaming it.

SUF ¶ 18.  She goes on to say "I did not want this.  He continued for I don't know exactly how long, until I was able to push him off me."  SUF ¶ 18.  C.M. reported that she doesn't remember anything after that except that she vaguely remembers getting dressed.  SUF ¶ 18.

On May 9, 2011, C.M. filed a third Witness Statement reporting that during her hospital examination following the incident, "they found a 1 inch lasaration [sic], that still causes me

daily pain and the area was worn out, tender and extremely painful. I bled for 5 days from these wounds. I can feel them and am reminded of the incident every time I walk." SUF ¶ 19.

Five students provided Witness Statements: Beth Federici ("Federici"), Jacob Yiznitsky ("Yiznitsky"), Kate DeFusco ("DeFusco"), Felicia Russo ("Russo"), and Elizabeth Masi ("Masi"). SUF ¶ 21. Federici reported that immediately following the incident, C.M. "looked upset" and stated that she "knew the guy who had raped her." SUF ¶ 22. Yiznitsky reported that immediately following the incident, C.M. said "I think I was just raped" but that "he probably didn't mean it" and she "didn't want to get anyone in trouble." SUF ¶ 23. Yiznitsky advised C.M. to go to Public Safety. SUF ¶ 23. Yiznitsky further reported that he talked with C.M. "a few minutes or perhaps an hour" after the incident. SUF ¶ 24. Masi reported that C.M. was intoxicated earlier on the night of the incident. SUF ¶ 25.

On May 9, 2011, Bleiler was contacted by and met with Holy Cross Public Safety Sergeant Kathleen Culley ("Culley") and Officer Kate Mills. SUF ¶ 27. At that meeting, Culley informed Bleiler of the charges against him. SUF ¶ 27. Culley also read Bleiler his Miranda rights, which Bleiler indicated that he understood, and signed. SUF ¶ 27. Bleiler chose not to make a statement at that time.

### Prior Unrelated Incidents of Sexual Misconduct at Holy Cross

Six students at the College have been charged with Sexual Misconduct I since 2002. SUF ¶ 28. Four have been found responsible. SUF ¶ 29. Of the four found responsible, three were dismissed from Holy Cross and one received a one-year suspension. SUF ¶ 29. There are no known complaints of a violation for Sexual Misconduct I made by a male student against a female student at Holy Cross. SUF ¶ 30.

#11851728_v1

### Paul Irish

Public Safety referred C.M.'s complaint to Irish on May 9, 2011.  SUF ¶ 31.  Irish is the

Director of Student Conduct and Community Standards at the College.  SUF ¶ 32.  Irish is also

the Assistant to the Vice President for Student Affairs.  SUF ¶ 32.  In his tenure at Holy Cross,

Irish has participated in four hearings for Sexual Misconduct I.  SUF ¶ 33.  Of the four Sexual

Misconduct I hearings in which Irish has been involved, three students were found responsible.

SUF ¶ 34.

Irish told Bleiler that a report for sexual assault had been filed against him by another

student and that there was an investigation.  SUF ¶ 35.  Irish also told Bleiler that he was on

interim suspension until a final disciplinary decision was rendered, and that a final decision

would be made in accordance with the policies detailed in the College's Community Standards

and Disciplinary Procedures for Students (the "Community Standards" or the "Standards") found

in the Handbook.  SUF ¶ 35-36.  Irish further told Bleiler that he was accused of having

committed Sexual Misconduct I in violation of the College's Community Standards, identified

the complainant, the date and location of the incident, and instructed Bleiler to attend a pre-

hearing meeting.  SUF ¶ 38.

### The Handbook

Holy Cross publishes a document on a yearly basis titled in 2010-2011, "College of the

Holy Cross - Student Handbook and Planner 2010-2011."  SUF ¶ 39.

Holy Cross's Code of Student Conduct defines Sexual Misconduct I as:

> Any sexual penetration (anal, oral or vaginal), however slight, with
> any object or sexual intercourse by a man or woman upon a man or
> woman without effective consent.  Sexual penetration includes
> vaginal or anal penetration by a penis, object, tongue or finger and
> oral copulation by mouth to genital contact or genital to mouth
> contact.

SUF ¶ 40.

Holy Cross's Code of Student Conduct defines effective consent as:

> [I]nformed, freely and actively given mutually understandable words or actions which indicate a willingness to participate in mutually agreed upon sexual activity. Consent may never be given by. . . , those who are incapacitated as a result of alcohol or other drug consumption (voluntary or involuntary) or those who are unconscious, unaware or otherwise physically helpless. Consent as a result of . . . force is not effective consent.

SUF ¶ 41.

The Handbook provides:

> *In the absence of mutually understandable words or actions, it is the responsibility of the initiator, or the person who wants to engage in the specific sexual activity to make sure that he/she has the consent from his/her partner(s).  Consent to some form of sexual activity does not necessarily consent to other forms of sexual activity.  Mutually understandable consent must be obtained by the initiator at every stage of sexual interaction.*  Consent is mutually understandable when a reasonable person would consider the words and/or action of the parties to have expressed a mutually understandable agreement between them to do the same thing, in the same way, at the same time, with one another.  (Emphasis added.)

SUF ¶ 42 (emphasis added).

The Handbook provides:

> [A] person who knows or reasonably should have known that another person is incapacitated may not engage in sexual activity with that person.  Incapacitation means being in a state where a person lacks the capacity to appreciate the fact that the situation is sexual, or cannot appreciate (rationally and reasonably) the nature and/or extent of the situation.

SUF ¶ 43.

Additional rules in the Handbook advise students that:

> -A person who is the object of sexual aggression is not required to physically or otherwise resist a sexual aggressor;

#11851728_v1

-Silence, previous sexual relationships, and/or a current sexual relationship with the initiator (or anyone else) may not, in themselves, be taken to imply consent;

-Intentional use of alcohol or other drugs does not excuse a violation of the Sexual Misconduct Policy; . . .

-Consent to sexual activity may be withdrawn at any time, as long as the withdrawal is communicated clearly (because you cannot be expected to read the mind of your sexual partner(s)), and all sexual activity must cease;

-Consent has an expiration date. Consent lasts for a reasonable time, depending on the circumstances. A person's state of incapacity is a subjective determination that will be made after the incident in light of all facts available because people reach incapacitation at different points and as a result of different stimuli. They exhibit incapacity in different ways.

SUF ¶ 44.

The Handbook also provides that Holy Cross considers factors that bear on incapacity such as: body weight; height; size; tolerance for alcohol; amount and type of alcohol consumed, along with their interaction with other drugs; and propensity for blacking out. SUF ¶ 45.

**The Disciplinary Procedures**

Holy Cross advises all students that to enter Holy Cross is to accept the rights and responsibilities of membership into the community, including "high standards of personal conduct and behavior." SUF ¶ 46. The College assumes all students will abide by the College's policies, rules, and regulations, including "Community Standards and Disciplinary Procedures," and will abide by state, local, and federal laws. SUF ¶ 46.

The College has established Community Standards and Disciplinary Procedures to address allegations of student misconduct. SUF ¶ 47. Community Standards of the College apply to student misconduct that takes place on College premises and to off-campus conduct when the behavior may adversely impact the College community or reputation. SUF ¶ 48. Under its procedures:

8

> [S]tudents have the right "to be informed of any charges of
> misconduct, the right to adequate time to prepare a response to the
> charges, the right to hear information in support of the charges, the
> right to present evidence against the charges, and the right to a fair
> process which is appropriate to the circumstances.

SUF ¶ 47.

The College advises students that the rules of evidence found in legal proceedings do not

apply, nor shall deviations from proscribed procedures necessarily invalidate a decision, unless

"significant prejudice" to a student respondent or to the College may result. SUF ¶ 49.

The Director of Student Conduct and Community Standards (the "Director") (Paul Irish)

has the responsibility of administering all nonacademic discipline. SUF ¶ 50. The Director also

has the authority to invoke an interim suspension when it is considered necessary to remove a

student from campus until the completion of a disciplinary hearing. SUF ¶ 50.

According to the College's Disciplinary Process and Procedures, any student may submit

a complaint. SUF ¶ 51. The Director or a designee reviews all complaints and determines if

disciplinary charges will be initiated, what specific violations a student will be charged with, and

the appropriate venue for adjudication. SUF ¶ 51.

Students accused of violating College policies receive a written notification of the alleged

violation, the location and date of this incident (if known), and the reporting party. SUF ¶ 52. A

hearing in front of the Community Standards Board (the "Board") is normally conducted for

students who face suspension or dismissal. SUF ¶ 53. Prior to the hearing, the accused is

required to attend a pre-hearing meeting with the hearing coordinator, usually the Director. SUF

¶ 54. In this meeting, the accused must review the information and choose to accept the charges,

or to refute the charges, in which case a hearing will be scheduled, normally no less than seven

days from the pre-hearing meeting. SUF ¶ 54.

#11851728_v1

### Pre-Hearing

Bleiler received the May 10, 2011 letter before the scheduled pre-hearing meeting and attended the pre-hearing meeting.  SUF ¶ 55.  Bleiler signed a Pre-Hearing Checklist produced by the College's Office of Student Conduct & Community Standards at the pre-hearing meeting indicating that he understood and accepted the following statements:

1.  I have received a written notification of the complaint.
2.  I understand the violation of the Community Standards that I am alleged to have committed.
3.  I am aware of the identity of the complainant.
4.  I understand that any behavior that can be construed as retaliation against the complainant or witnesses will be subject to immediate disciplinary action including suspension/expulsion from the college.
5.  I have a copy of the Student Handbook which includes the Community Standards Board procedures.
6.  I understand that I may review the case file (a copy cannot be made nor can it be removed from the Office of Student Conduct & Community Standards) prior to the hearing.
7.  I understand that I may have an advisor present with me during the hearing and I have reviewed the role of the advisor.
8.  I understand that if I choose to have an advisor, s/he must be a faculty, staff or student member of the Holy Cross community.
9.  I understand that if I choose to have an advisor it is my responsibility to provide the advisor's name to the Hearing Administrator no later than 48 hours prior to the hearing.
10. I understand that my witnesses will be asked to speak only to the incident in question and the relevancy of their testimony is subject to the discretion of the Community Standards Board Chair.
11. I understand that my witness list and copies of written statements must be submitted to the Hearing Administrator no later than 48 hours prior to the hearing.
12. I understand that the hearing will be scheduled taking into account only classes and other officially recognized absences from class.
13. I understand that the decision of the Community Standards Board is final pending appeal to the Vice President for Student Affairs/Dean of Students or designee.
14. I understand the circumstances which will be considered grounds for appeal and how to file an appeal if I so choose.
15. I understand that appeals must be filed no more than 72 hours after the date of the hearing to the VPSA/DOS and will be final. [Sanctions of expulsion may be appealed to the College President.]

10

16. I understand that the hearing, with the exception of the deliberations, may be taped and that the tape is considered property of the College.

17. I understand that should I wish to review the recording I may do so in the office, and may not make a copy or otherwise remove the recording.

18. I understand that I should contact Paul Irish with any questions.

19. I have been encouraged to discuss this matter with my family.

SUF ¶ 56. Each line of this document was initialed by Bleiler. SUF ¶ 56. Bleiler also was given a copy of the Handbook and reviewed the case file with Irish, which contained the statements from C.M. and the other five students who provided statements. SUF ¶ 57.

## The Panel Process

The Disciplinary Board (the "Board") is made up of twenty-one people: six administrators and staff appointed by the Vice President for Student Affairs; six faculty members selected by the Dean of the College; and nine students recommended by the Student Government Association from the pool of eligible students. SUF ¶ 58. To be eligible to be recommended to serve on the Board, a student must be in good disciplinary standing at the time of recommendation. There are no other eligibility requirements. SUF ¶ 59.

Each panel has five members from the twenty-one Board members. SUF ¶ 61. The panel must have one faculty member, one staff member, one either faculty or staff member, and two students. SUF ¶ 62. Irish strives to achieve gender balance in selecting the members of a five-person panel. SUF ¶ 63. Board members eligible to serve on Sexual Misconduct panels must have completed training in sexual misconduct, conducted by Irish twice per year. SUF ¶ 64.

The Handbook provides that the accused and the accuser are informed of the names of members of the hearing panel not fewer than seventy-two hours prior to the hearing. SUF ¶ 65. If either party has information as to why a specific person should not be part of the panel, the

11

party must present the information to the Director or hearing coordinator in writing no fewer than forty-eight hours prior to the start of the hearing. SUF ¶ 65.

Irish has a practice of screening selected panel members with potential conflicts by asking selected panel members if they have any concerns or issues with the parties involved in the dispute. SUF ¶ 67. If a potential conflict is raised, Irish makes the final decision concerning the alleged conflict based on the facts of the case, and the individual's ability to be fair, among other factors. SUF ¶ 67. Board members are advised to notify the Director or hearing coordinator and to disqualify themselves from serving on a panel if they suspect a potential conflict exists with a party to the hearing. SUF ¶ 68. The decision of the Director or hearing coordinator as to whether a conflict exists is final. SUF ¶ 66.

Irish's role is as an administrator. He serves as a resource for both complainants and respondents, schedules the hearing, assures all information is distributed, communicates with witnesses about scheduling, assures the hearing is properly recorded, and answers procedural questions. SUF ¶ 70. He may meet with the panel for consultation regarding procedural elements at any time prior to or during the hearing or deliberations. SUF ¶ 69. Irish is present during panel deliberations in order to answer procedural questions. SUF ¶ 71.

### The Bleiler Panel

The five panel members selected for Bleiler's hearing were: Professor Jude Kelley ("Kelley"), Professor Laurie King ("King"), College administrator Elizabeth Rice ("Rice"), students Grant Greeley ("Greeley"), and Lauren Brais ("Brais"). SUF ¶ 72.

On May 11, 2011, Irish advised Bleiler of the names of those who had been selected as members of the hearing panel and asked Bleiler if he had any conflicts. SUF ¶ 73. Irish asked Bleiler to respond within twenty-four hours and, when he did not, Irish again asked Bleiler if he had any conflicts to which he responded "I do not have any conflicts with this panel." SUF ¶ 73.

12

Irish asked all panelists to let him know immediately if they had any conflicts with either complainant C.M. or respondent Bleiler.  SUF ¶ 74.  Brais informed Irish that she had been a Head Resident Advisor ("RA") in the dorm where C.M. resided.  SUF ¶ 75.  Irish responded that this relationship alone would not create a conflict "as long as [she] didn't have any issues that would put [her] fairness in question."  SUF ¶ 75.  Brais responded that she had no issues with C.M.  SUF ¶ 75.  As a Head RA, Brais' responsibilities were more supervisory and related to building-wide activities rather than to individual residents.  SUF ¶ 76.  The Head RA "is kind of overseer of the RAs."  SUF ¶ 77.

C.M. informed Irish that Greeley was a RA in her building and that she had a class with him during the semester that the incident took place.  SUF ¶ 78.  Irish indicated that this would not initially exclude Greeley, but that he would speak with him.  SUF ¶ 78.  Greeley responded that he had no conflicts.  SUF ¶ 78.  Greeley acknowledged that he was a RA in Healy dorm (C.M.'s dorm), but he did not know on which floor she lived.  SUF ¶ 79.  Dormitories have multiple floors and multiple RAs.  SUF ¶ 80.  For example, Bleiler lived in Mulledy Hall freshman year.  SUF ¶ 80.  It had four floors and a basement and thirteen RAs.  SUF ¶ 80.  Bleiler lived in Lehy Hall sophomore year.  SUF ¶ 80.  It had four floors and five RAs.  SUF ¶ 80.  The RA for the students lived on the same floor as the students for whom they were primarily responsible.  SUF ¶ 81.  Students considered the RA on their floor (or section) as their RA.  SUF ¶ 82.

Greeley testified in his deposition that, although he and C.M. were Facebook "friends," he uses Facebook as a "networking tool," has over 2800 "friends," did not have a personal relationship with C.M. beyond possibly meeting her at parties, and did not recall having a class with her.  SUF ¶ 83.  Irish asked Greeley, again, if he had any conflicts and if Greeley knew

13

either C.M. or Bleiler and Greeley said he "didn't." SUF ¶ 84.  Greeley stated that he had never met Bleiler nor heard Bleiler's name mentioned before Irish contacted him to serve on the panel. SUF ¶ 86.  Bleiler admitted he did not know Greeley personally.  SUF ¶ 87.  Bleiler admitted that he did not have any problems personally with Greeley.  SUF ¶ 88.  Bleiler had not had any interactions with Greeley or Brais on a personal level.  SUF ¶ 89.  Bleiler discussed Brais and Greeley with Irish.  SUF ¶ 94.  Irish told Bleiler "that he had talked to both students, and they said that they did not" have a conflict.  SUF ¶ 94.

Bleiler had never had a class with Professor Kelley and had never talked with Professor Kelley before the night of the panel hearing.  SUF ¶ 90.  Bleiler had never had a class with Professor King and had never talked with Professor King prior to the hearing.  SUF ¶ 91.  Bleiler does not remember any interaction with staff member Rice prior to the hearing.  SUF ¶ 92. Bleiler had never had contact with panel members Kelley, King, or Rice prior to the hearing. SUF ¶ 93.

Brais, Greeley, and Kelley received training on the College's sexual misconduct policies, including the roles that consent and intoxication play in the policies, when they became a member of the Community Standards Board.  SUF ¶¶ 95-97.  Rice and King also received training on sexual misconduct policies when they became members of the Community Standards Board.  SUF ¶¶ 98-99.

### The Advisor

Prior to the hearing, Bleiler had two to three meetings with an advisor, Professor Cahill. SUF ¶ 100.

### The Hearing

Bleiler's hearing was conducted on May 18, 2011.  SUF ¶ 101.

14

Panel hearings, but not deliberations, are recorded and students may make arrangements to listen to the recordings through the Director. SUF ¶ 109. Students are not permitted to remove or make copies of the recordings. SUF ¶ 109. A certified copy of the transcript of the hearing is in the appendix at Exhibit E  SUF ¶ 110.

The College outlines the hearing procedures in detail, and provides that: the Chairperson convenes the panel; both parties are asked if the Director or hearing coordinator gave them an opportunity to challenge any panel members for cause; the allegations are read; the accuser and the accused are given an opportunity to respond; panel members question both parties; each side may question the other side and present witnesses; both parties may make a final statement; the panel adjourns to deliberate and determines whether it is more likely than not that the accused has violated the Community Standard; if a violation is found, the panel recommends a sanction; the recommendation is forwarded to the Director, then to the Vice President for Student Affairs/Dean of Students; the panel informs each party of the decision; the hearing officer shares the results of the hearing no more than twenty-four hours after its conclusion in cases of sexual assault; and the Vice President for Student Affairs/Dean of Students may accept or alter the recommendations or refer the case to a new panel. SUF ¶¶ 103-04.

At the hearing, Bleiler and C.M. made opening statements, were permitted to ask questions of the panel and of each other, were permitted to call witnesses, were permitted to question witnesses who were called to testify and gave closing statements. SUF ¶ 105. Bleiler was permitted to question each witness and stated that he was not prevented from doing so. SUF ¶ 105.

On or around the date of the incident, Bleiler was six feet, one inches tall and weighed approximately 225 pounds. SUF ¶ 106. Bleiler estimates that on or around the date of the

incident, C.M. was approximately five feet, five inches tall and weighed 140 pounds.  SUF ¶ 107.  Bleiler has admitted that, before he initially penetrated C.M., he did not ask for her permission to have intercourse the evening of the incident.  SUF ¶ 108.

### The Deliberations

During deliberations, panel members considered the complaint, witness statements, and hearing testimony from all parties in rendering their decision.  SUF ¶ 111.  Although Irish was present during deliberations, he answered administrative questions and was not "an active member of the discussion."  SUF ¶ 112.  The panel during deliberations collectively discussed that the burden of proof was a "more likely than not" standard.  SUF ¶ 113.  The panel did not discuss C.M.'s sexual history.  SUF ¶¶ 114-15.

### The Decision

The panel decided that Bleiler was responsible and recommended that he be dismissed from the College.  SUF ¶ 116.  The panel decision was unanimous.  SUF ¶ 117.  Irish informed Bleiler in person of the panel's decision.  SUF ¶ 118.  The decision was confirmed by a letter from Dean Jacqueline Peterson to Professor Kelley dated May 19, 2011 copied to Bleiler.  SUF ¶ 119.

### Appeal

A student has the right to appeal a decision if he can demonstrate (1) lack of fairness, (2) a violation of process, or (3) if there is significant new information that has been revealed that may alter the outcome of the matter.  SUF ¶ 120.  Appeals for dismissals are reviewed by the President of the College.  SUF ¶ 121.  Letters of appeal must be received within five business days of the date of the decision letter.  SUF ¶ 121.  The President may decide that the appeal has merit, and alter the sanction or refer the case to a new panel, or decide that the appeal does not have merit and impose the sanction immediately.  SUF ¶ 121.

16

Bleiler duly submitted an appeal to President McFarland dated May 24, 2011. SUF ¶ 122. In the appeal, Bleiler argued that the College violated its own disciplinary procedures and that the hearing was fundamentally unfair. SUF ¶ 122. President McFarland responded to Bleiler's appeal in a letter dated May 26, 2011. SUF ¶ 123. In this letter, President McFarland addressed each of Bleiler's arguments for reversal, denied the appeal and upheld Bleiler's dismissal from the College. SUF ¶ 123.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party can satisfy its burden by submitting affirmative evidence showing that the opposing party has no reasonable expectation of proving an essential element of its case or by negating an essential element of the opposing party's case. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986) ("failure of proof concerning an essential element of a non-moving party's case necessarily renders all other facts immaterial"). The non-moving party cannot defeat the motion for summary judgment by "rest[ing] on 'conclusory allegations, improbable inferences, or unsupported speculation . . . .'" *Welch v. Ciampa*, 542 F.3d 927, 935 (1st Cir. 2008) (quoting *McCarthy v. NW Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995)). Rather, "[t]o defeat a motion for summary judgment, the nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

#11851728_v1

## ARGUMENT

A.      **The Hearing Was Fair and the Decision Made in Good Faith and on Reasonable Grounds and Was Not Arbitrary or Capricious.**

Massachusetts defers to private colleges in disciplinary matters unless the hearing lacked basic fairness or the decision was not made in good faith and on reasonable grounds or was arbitrary or capricious. Bleiler's complaint is riddled with accusations that he was treated unfairly. *See, e.g.*, Compl. ¶¶ 56, 67, 68, 74, 76, 78, 85.[1] None have merit.

1.      **Bleiler Was Treated Fairly, and the Decision Was Made in Good Faith and on Reasonable Grounds, and Was Neither Arbitrary Nor Capricious.**

In Massachusetts,[2] "[c]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities." *Schaer v. Brandeis Univ.*, 434 Mass. 474, 482, 735 N.E.2d 373, 381 (2000) (citations omitted). Courts possess a "deference born of respect for the independence of private associations" and there is a "disinclination by courts to be drawn into their internal governance." *Schaer v. Brandeis Univ.*, 48 Mass. App. Ct. 23, 36, 716 N.E.2d 1055, 1060 (1999), *rev'd in part*, 434 Mass. 474, 735 N.E.2d 373 (2000). If a court examines a private university hearing, it does so "to ensure it was conducted with basic fairness." *Schaer*, 434 Mass. At 481. 735 N.E.2d at 380. A private university may not "arbitrarily or capriciously dismiss a student." *Coveney v. President & Trs. of the Coll. of Holy Cross*, 388 Mass. 16, 19, 445 N.E.2d 136, 138 (1983). If a school acts "in good faith and on reasonable grounds . . . [its] decision to suspend or expel a student will not be subject to successful

---

[1] Many of Bleiler's allegations of unfairness are analyzed under related but distinct standards. First, Holy Cross must conduct its disciplinary procedures with basic fairness. *See Schaer v. Brandeis Univ.*, 434 Mass. 474, 481, 735 N.E.2d 373, 380 (2000). Next, because Bleiler alleges breach of contract, the College must meet Bleiler's reasonable expectations under the Handbook with respect to the disciplinary procedures outlined therein. *See Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007). Bleiler's allegations as they relate to the breach of contract claim are discussed *infra. See infra* Part B.2.

[2] Massachusetts law applies to all Bleiler's state law claims. *See, e.g., Pacella v. Tufts Sch. of Dental Med.*, 66 F. Supp. 2d 234 (D. Mass. 1999).

challenge in the courts." *Id.*, 445 N.E.2d at 139. "A college must have broad discretion in determining appropriate sanctions for violations of its policies." *Id.* at 20, 445 N.E.2d at 139. "Violations of reasonable regulations of a school are a recognized ground for dismissal of a student." *Id.* at 19, 445 N.E.2d at 139. The First Circuit agrees. "Good faith and fair dealing cannot be separated from context, however - and in evaluating those covenants in the education milieu, courts must accord a school some measure of deference in matters of discipline. *Havlik v. Johnson & Wales University*, 509 F.3d 25, 35 (1st Cir. 2007) (citing *Schaer v. Brandeis Univ.*, 432 Mass. At 482, 735 N.E. 2d at 381) (stating that universities must be given broad discretion in disciplining students)).

Bleiler was treated fairly. He was advised of the charge, the identity of the complainant and the date and time of the incident. He was advised of his rights during a pre-hearing conference. He had the opportunity to review the case file and did review it prior to the hearing. He participated fully in the hearing. Both parties were permitted to give opening statements, question the panel and each other, call and question witnesses, and give closing statements. *See* SUF ¶ 105.

Holy Cross acted in good faith and on reasonable grounds. A female student made a serious complaint against a male student of sexual misconduct. Holy Cross was required by standards it set for all students and by Title IX to investigate, to provide a hearing to both parties in the event of a dispute and to make a decision. Holy Cross did so.

Bleiler's claim that the intercourse was consensual does not render the decision of the hearing panel arbitrary or capricious as long as the hearing was "conducted fairly." *See Coveney*, 388 Mass. at 20, 445 N.E.2d at 139. The fact that a panel, any panel, finds one person's testimony more credible than another person's testimony does not make a decision arbitrary or

capricious.  That is the role of a fact finder.  The fact that the finding is by a preponderance of

the evidence (more than 50%) does not make a decision unfair, arbitrary or capricious.  That is

the recognized standard.  That is the standard a fact finder must apply pursuant to Title IX.  *See*

*generally Dear Colleague Letter.*[3]  "Violations of reasonable rules and regulations of a school

are a recognized ground for dismissal of a student."  *Coveney*, 388 Mass. at 19, 445 N.E.2d at

139.

### 2.   There Is No Credible Evidence that Greeley, Brais or Irish Were Biased.

Bleiler has alleged that Greeley was biased because he was a Facebook "friend" of C.M.,

a RA in C.M.'s dormitory, had a class with C.M and had issues with Bleiler's friends.  Bleiler

claims that Brais was biased because she was a Head RA in C.M.'s dormitory.  Bleiler claims

that Irish was biased because he made statements on a news program discussing problems of

sexual misconduct on college campuses and had contact with witnesses.  Compl. ¶¶ 28, 47.

A university disciplinary body "is entitled to a presumption of honesty and integrity

absent a showing of actual bias such as animosity, prejudice, or a personal or financial stake in

the outcome."  *Ikpeozu v. Univ. of Neb.*, 775 F.2d 250, 254 (8th Cir. 1985) (citing *Hobert v.

Univ. of Chi.*, 751 F. Supp. 1294, 1301 (N.D. Ill. 1990)).  "In the intimate setting of a college or

university, prior contact between the participants is likely and does not per se indicate bias or

partiality."  *Gorman v. Univ. of R.I.*, 837 F.2d 7, 15 (1st Cir. 1988).[4]

---

[3]  Letter from Russlyn Ali, Assistant Sec'y for Civil Rights, Office for Civil Rights, U.S. Dep't of Educ. 14 (Apr. 4, 2011) (available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html) [hereinafter *Dear Colleague Letter*], attached at Appendix Exhibit D.  Policy guidance documents, such as this letter, do not add requirements to applicable law, but provide information and examples to inform recipients about how the Office of Civil Rights evaluates whether schools are complying with their legal obligations.  *Dear Colleague Letter* at 1 n. 1.

[4]  The University of Rhode Island is a public institution.  Students at public institutions have constitutional rights. *Gorman*, 837 F.2d at 12.  Holy Cross is a private institution.  Students at private institutions do not have constitutional rights.  *Coveney*, 388 Mass. at 21.  *A fortiori*, a standard acceptable at public schools should be acceptable at private schools.

"[A]lleged prejudice of university hearing bodies must be based upon more than mere speculation and tenuous inferences." *Buckholz v. Mass. Inst. of Tech*, 1993 WL 818518, at *3 (Mass. Super. Ct. July 6, 1993) (citing *Coveney*, 388 Mass. at 22, 445 N.E.2d at 140; *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 726 (1st Cir. 1983); *Gorman*, 837 F.2d at 15)[5]. There has been no showing of actual bias such as animosity, prejudice, or a personal or financial stake in the outcome in this case. Greeley and Brais did not even know Bleiler. The prior contact, if any, between Greeley and C.M. or Brais and C.M. was de minimus and would be expected in the intimate setting of a college.

Irish's general discussion of sexual assault on college campuses in the news does not demonstrate bias. In fact, the 2011 Department of Education "significant guidance document" encourages schools to "take proactive measures to prevent sexual harassment and violence." *Dear Colleague Letter* at 14. By speaking publicly about this issue, Irish was simply doing his job.

Bleiler claims that Greeley was hostile toward Bleiler at the hearing and aggressively badgered him. *See* Compl. ¶ 44. The record does not support that allegation. *See* Transcript of Hearing at Appendix, Exhibit F. Moreover, even if Greeley had asked difficult questions, that was his job. Alleged bias must be based on more than "speculation and tenuous inferences." *See Gorman*, 837 F.2d at 15.

### 3.    Bleiler's Remaining Claims of Unfairness Are Wholly Insubstantial.

Bleiler claims that he was treated unfairly because Holy Cross allowed C.M. to reference her virginity in her closing statement and because two persons who gave witness statements were not called to testify but their statements (which he had reviewed) were admitted. Compl. ¶¶ 75-76. A private university "is not required to adhere to the standards of due process . . . or to abide

---

[5] Attached at Appendix Exhibit E.

by rules of evidence adopted by courts." *Schaer*, 432 Mass. at 482, 735 N.E.2d at 381. In

*Schaer*, the Supreme Judicial Court found that a hearing was conducted with basic fairness

despite Brandeis's allegedly improper admission of testimony from four witnesses. *Id.* at 481-82,

735 N.E.2d at 380-81. The Court stated "Brandeis may choose to admit all statements by every

witness or it may choose to exclude some evidence. It is not the business of lawyers and judges

to tell universities what statements they may consider and what statements they may reject." *Id.*

at 482, 735 N.E.2d at 380. In any event, C.M.'s sexual history was not discussed by the panel

during deliberations.[6]

The process and hearing provided to Bleiler met the basically fair standard. Bleiler had a

full opportunity to review the file on the investigation, could have called any witness he wanted

to call, had the right to cross-examine witnesses who appeared to testify, exercised his right to

cross-examine witnesses who testified, had an advisor, had the opportunity to question C.M. and

had the right to make an opening statement and a closing statement. Moreover, so long as a

college substantially follows its own process and procedures, there is no claim. Private colleges

are not required to sequester witnesses, permit students to make copies of the hearing record or

require the recording of deliberations. *See generally Schaer*, 432 Mass. 474, 735 N.E.2d 373.[7]

---

[6] Moreover, the Handbook states that "[n]ormally . . . irrelevant prior sexual history" will not be admitted in a
hearing, and the Handbook also provides that "deviations from prescribed procedures [shall not] necessarily
invalidate a decision, unless significant prejudice to a student respondent of the college may result." Bleiler Dep.
121 Ex. 21, at 34, 58-59; Potter Aff. App. Ex. A, tab 1. There is no absolute prohibition on these statements, and, in
any event, C.M.'s statement in closing that she was a virgin prior to her encounter with Bleiler did not create
"significant prejudice." The panel stated they did not discuss that information when rendering a decision. *See* SUF
¶ 114. The chairperson of the panel was focused on what happened that night; it did not matter how many times
C.M. did or did not have sex. SUF ¶ 115.
[7] Even at public colleges and universities, the courts have been wary of "undue judicialization." *See Gorman*, 837
F.2d at 15.

**B.      Adding Counts To The Complaint Does Not Help Bleiler.**

The undisputed facts and prevailing law discussed above compel the conclusion that

Bleiler has no reasonable expectation of prevailing.  Accordingly, summary judgment is

appropriate.

      **1.      Bleiler's Title IX Claim Fails Because Holy Cross Provided Bleiler A Prompt and Equitable Resolution of the Complaint Against Him, and Did Not Otherwise Discriminate Against Him on the Basis of Sex.**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subject to discrimination under

any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a)

(2011).  Bleiler was not discriminated upon on the basis of sex.

      **a.      Holy Cross Provided Bleiler with A Prompt and Equitable Resolution of the Complaint Against Him Through Its Investigation and Hearing Process.**

Schools are required to "adopt and publish grievance procedures providing for the prompt

and equitable resolution of student and employee complaints alleging any action which would be

prohibited" by Title IX.  34 C.F.R. § 106.8 (2010); *see also Dear Colleague Letter* at 8.  Schools

are advised to "conduct investigations and hearings to determine whether sexual harassment or

violence occurred" and are required to use a preponderance of the evidence standard to evaluate

complaints. *See Dear Colleague Letter* at 10.

As outlined in detail above, Holy Cross's hearing procedures as written and as applied to

Bleiler provided for an "equitable" resolution of C.M.'s complaint.[8]  *See* 34 C.F.R. § 106.8.  The

College conducted an investigation into the complaint through the gathering of witness

statements, provided Bleiler with notice of the allegations against him, allowed him to review the

witness statements, allowed him to submit witness statements, allowed him to cross-examine

---

[8] Bleiler does not allege that the hearing was not prompt.

witnesses who appeared, and provided him ample opportunity to respond to those allegations at

the hearing. *See Dear Colleague Letter* at 10. This hearing was equitable. It provided Bleiler

basic fairness and it met his reasonable expectations under the Handbook. *See Schaer*, 432

Mass. at 481, 735 N.E.2d at 380; *see also infra* Part B.2. As noted above, as a private institution,

Holy Cross was not bound by constitutional standards of basic fairness. Even if it was, Holy

Cross met those standards.

> **b.      Holy Cross's Sexual Misconduct Policy Is Gender-Neutral and
>          Its Effect on More Male Students Is Justified on Gender-
>          Neutral Grounds.**

Bleiler claims that the wording of the College's sexual misconduct policy places an

unequal burden on male students engaging in sexual activity while intoxicated, and that the

policy is enforced disproportionately against male students in violation of Title IX. Compl. ¶¶

68-69. He further claims that the wording of the policy imposes strict liability on male students

when both students are intoxicated. Compl. ¶ 27.

Under Title IX, gender-based disparity may indicate the existence of sex discrimination.

*Franchi v. New Hampton Sch.*, 656 F. Supp. 2d 252, 261 (D.N.H. 2009). However, disparate

impact claims involve "practices that are facially neutral in their treatment of different groups but

that in fact fall more harshly on one group than another" and cannot be justified on a neutral

basis. *Id.* (quoting *Prescott v. Higgins*, 538 F.3d 32, 41 (1st Cir. 2008)).

Holy Cross defines Sexual Misconduct I as "[a]ny sexual penetration (anal, oral or

vaginal), however slight, with any object or sexual intercourse by a man or woman upon a man

or woman without effective consent." SUF ¶ 40. Under the policy, consent may never be given

by a student, male or female, who is incapacitated as a result of drug or alcohol use. SUF ¶ 41.

Sexual penetration is defined to include penetration "by a penis, object, tongue or finger and oral

copulation by mouth to genital contact or genital to mouth contact." SUF ¶ 40. Penetration can

be with any object, not just a penis, and includes all oral copulation as well as anal and oral penetration. SUF ¶ 40. The policy is gender neutral and applies to men and women.

The claim that the policy imposes strict liability on male students when both students engaging in intercourse are intoxicated is baseless. If two students, both incapacitated by drugs or alcohol, engage in "sexual penetration," both could be charged under the policy. SUF ¶ 40.

In this case, however, the point is moot. Bleiler did not contend that he was "incapacitated" as a result of alcohol consumption on the night of the incident. Moreover, Holy Cross is not aware of any claims of Sexual Misconduct I brought by a male student or a female student against a female student at Holy Cross. SUF ¶ 30. Of the six male students accused of this violation since 2002, four were found responsible, and three were dismissed. SUF ¶¶ 28-29. Bleiler has offered no facts to support his apparent claim that a female student would be treated differently than a male student if a complaint were brought against a female student . The gender-neutral explanation for more male students being found responsible under this policy is that male students were the only ones reported to have violated the gender neutral policy.

### 2.   Bleiler's Breach of Contract Claim Fails Because Holy Cross Met Bleiler's Reasonable Expectations Under the Handbook.

Bleiler alleges in Count II of his complaint that he and Holy Cross had a contractual relationship which was breached because Holy Cross violated its Disciplinary Procedures.[9] Even if Bleiler and Holy Cross did have a contract, Holy Cross met all reasonable expectations under the contract.

---

[9] For purposes of this Motion for Summary Judgment only, the Defendant does not challenge Bleiler's contention that a contract between Bleiler and Holy Cross existed. However, the Defendant expressly reserves the right to challenge whether there was a valid contract should this matter proceed. *See Pacella*, 66 F. Supp. 2d at 240 (Massachusetts courts have held that a student handbook will not be deemed a contract if a university (1) retains the right to unilaterally modify the handbook terms, (2) does not negotiate any of the terms with the student, and (3) does not call special attention to the handbook).

Apart from its general duty to conduct disciplinary proceedings in good faith and base decisions on reasonable grounds, a university that specifies disciplinary procedures in a Handbook may give students a contractual right to the procedures described. *See Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998)). The relevant terms of the contract "typically include language found in the university's student handbook." *Id.* In interpreting these contractual terms, courts employ a standard of "reasonable expectation" - what meaning the university reasonably should expect the student to take from the language. *Schaer*, 432 Mass. at 478, 735 N.E.2d at 378; *see also Havlik*, 509 F.3d at 34. Interpretation of the contract itself, including whether any ambiguities exist, is generally a question of law for the court. *Driscoll v. Bd. of Trs. of Milton Acad.*, 70 Mass. App. Ct. 285, 293, 873 N.E.2d 1177, 1185-86 (2007).

Bleiler claims that Holy Cross breached the terms of its contract with him by: allowing members with conflicts to serve on the hearing panel; through Irish's participation in the hearing panel's unrecorded deliberations; by Holy Cross's failure to sequester witnesses; through the admission of C.M.'s sexual history; by not allowing Bleiler an opportunity to cross examine two witnesses whose statements were part of the record but did not testify; by not allowing Bleiler to copy the hearing record; and by failing to make a record of the hearing panel's deliberations.[10] Compl. ¶¶ 75-76.

---

[10] Bleiler also requests that the Court require Holy Cross to give Bleiler a diploma. Compl. ¶ i. Bleiler was expelled for a serious breach of the rules of student conduct. The Handbook provides that all students will "abide by the policies, rules, and regulations of the college." SUF ¶ 46. Bleiler cannot reasonably expect to be awarded a diploma because he did not comply with the College's rules of student conduct. A reasonable student would expect that a college has an inherent right to discipline its students. *See Dinu v. Presidents & Fellows of Harvard Coll.*, 56 F. Supp. 2d 129, 132-33 (D. Mass. 1999). Granting Bleiler a diploma after he was found responsible for committing a serious violation of the rules of student conduct for which he was properly expelled would render Holy Cross powerless to enforce its disciplinary rules against a student who has completed his credit requirements. *See id.* at 133. Colleges "having the power to confer degrees . . . are necessarily vested with broad discretion as to the persons who shall receive those honors." *Id.*

### a. The Involvement of Irish and Students Greeley and Brais on the Hearing Panel Did Not Create Bias that Violated Bleiler's Reasonable Expectations of a Fair Process.

Bleiler alleges that the two student panelists Greeley, a Facebook "friend" of C.M. and a former RA in her building, and Brais, a former Head RA in C.M.'s building, were biased against Bleiler. *See* SUF ¶ 83. Bleiler further asserts that Irish's public statements generally discussing the problem of sexual assault on college campuses and his contact with the hearing's witnesses rendered him biased against Bleiler. Compl. ¶¶ 28, 47.

In its Handbook, Holy Cross states that students have the right to "a fair process which is appropriate under the circumstances." Compl. ¶ 13. In discussing the potential for bias of panel members, the Handbook states that: the accused and accuser are provided names of panel members no fewer than seventy-two hours before the hearing; if either party believes a conflict exists, he or she must present the information to the Director in writing forty-eight hours before the hearing starts; if the Director deems there is a potential conflict, another board member will be substituted; the Director's decision regarding conflicts is final. *See* Compl. ¶ 17.

The allegations of bias are not sufficient to suggest that Bleiler's hearing was conducted without basic fairness. *See supra* Part A.2. They also are not sufficient to suggest that Bleiler's reasonable expectations under the Handbook were not met. There is no dispute that Irish complied with these procedures. Irish provided Bleiler the names of the panel members seven days before the hearing, to which Bleiler responded he had no conflicts. *See* SUF ¶ 73. Irish investigated all potential issues raised by panel members and by Bleiler and deemed there to be no conflicts between Bleiler and the panel members and no conflicts between C.M. and the panel members. SUF ¶¶ 75-94. Irish's decision was final. SUF ¶ 66. Bleiler's reasonable expectations were met because the College complied with the procedures laid out in the Handbook for situations involving potential conflicts.

#11851728_v1

    **b.**  **The Remaining Reasons Stated for Breach of Contract Do Not Violate Bleiler's Reasonable Expectations Because They Are Not in the Handbook or Were Not Considered.**

  Bleiler asserts that Holy Cross's failure to sequester witnesses, the admission of C.M.'s sexual history, failure to give Bleiler an opportunity to cross examine two witnesses whose statements were part of the record but did not testify, failure to allow Bleiler to copy the hearing record, and failure to make a record of the hearing panel's deliberations breached the contract between Bleiler and Holy Cross. Compl. ¶¶ 75-76.

  The Handbook merely provides that witnesses for the complainant will be kept separate from witnesses for the respondent, a very different practice from sequestration and one which was followed here. The Handbook does not provide that C.M.'s sexual history would not be admitted but simply that it was not relevant. Further, it was not discussed during deliberations. SUF ¶ 114-15. The Handbook does not provide that witness statements of a person who may not appear cannot be considered by the panel. Bleiler himself offered testimony from someone who was unable to appear in person. Irish Aff. App. Ex. C. The Handbook does not provide for copying the record or for the recording of deliberations.

  Here, the terms of the alleged contract with Bleiler have been met. *See Havlik*, 509 F.3d at 34. Bleiler had the right to be informed of any charges of misconduct, the right to adequate time to prepare a response to the charges, the right to hear information in support of the charges, the right to present evidence against the charges, and the right to a fair process which is appropriate to the circumstances. SUF ¶¶ 46-47. Holy Cross complied. Bleiler was encouraged to meet with an advisor before the hearing, was provided the opportunity to review all the evidence against him, and to present witnesses and other evidence in his defense. SUF ¶¶ 56, 57, 98. Bleiler used the opportunity to give a statement and to present evidence. SUF ¶ 105.

The breaches that Bleiler asserts are not in the Handbook. In *Schaer*, the Supreme

Judicial Court found that the plaintiff's reasonable expectations under the Handbook were met

even though the university did not take a statement from the accused student or ask the accused

student for evidence or witnesses. *Schaer*, 432 Mass. at 478-79, 735 N.E.2d at 378. Similarly,

in this case, the Handbook does not provide that witnesses will be sequestered.[11] The Court

cannot assign the contract the meaning Bleiler now claims it has. *See id.* at 479, 735 N.E.2d at

378.

### 3.   Bleiler's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Fails Because the College Acted in Compliance with Established Disciplinary Procedures.

Courts measure allegations of a breach of the covenants of good faith and fair dealing

under the same familiar standard of whether a student's reasonable expectations were satisfied.

*See Havlik*, 509 F.3d at 35-36; *see also Sullivan v. Bos. Architectural Ctr., Inc.*, 57 Mass. App.

Ct. 771, 774, 786 N.E.2d 419, 421 (2003). In *Havlik*, for example, the First Circuit held that a

university did not breach the covenants of good faith and fair dealing where a student alleged

that an appeal officer of the university was improperly influenced by a campus crime report

describing the incident in which the student was involved. *Havlik*, 509 F.3d at 35. In affirming

the grant of summary judgment on this claim, the court stated that "[i]n the absence of any

probative evidence that the appeal officer ignored promised protections, improperly consulted

certain proof, acted arbitrarily in carrying out the procedures outlined in the handbook, or made

---

[11]   Moreover, witnesses were sequestered from the hearing. No witness was allowed in the hearing while another witness gave testimony. Witnesses were only in the hearing while they testified. Witnesses for the complainant and witnesses for the respondent were held in separate rooms prior to their testimony which is a standard procedure Holy Cross follows in all disciplinary hearings. Irish Aff. App. Ex. C; *see also* Bleiler Dep. 121 Ex. 21, at 40-41; Potter Aff. App. Ex. A, tab 1.

#11851728_v1

her decision in bad faith, there has been no showing that the plaintiff's reasonable expectations were thwarted." *Id.* at 36.

Here, as in *Havlik*, Bleiler has offered no probative evidence that Holy Cross has not met his reasonable expectations. *See Havlik*, 509 F.3d at 35-36; *see also supra* Part B.1.a-b. The College's disciplinary response to the incident followed its own "policies and procedures." *See Sullivan*, 57 Mass. App. Ct. at 771, 786 N.E.2d at 419-20 (entering summary judgment for the school on the claim of breach of the covenant of good faith and fair dealing where the school applies established disciplinary procedures as articulated, and the student had no reasonable expectation that the school would diverge from these procedures); *see also supra* Part B.2.a-c.

### 4.    Bleiler's Unjust Enrichment Claim Lacks Merit.

Unjust enrichment is the "retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.*, 534 F. Supp. 340, 347 (D. Mass. 1982). "An equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law." *Santagate v. Tower*, 64 Mass. App. Ct. 324, 329, 833 N.E.2d 171, 176 (2005). Restitution, the remedy for unjust enrichment, is appropriate "only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for [one of them] to retain it." *Id.* at 330, 833 N.E.2d at 176.

Here, the retention of Bleiler's tuition and fees does not violate fundamental principles of justice or equity and good conscience. *See Taylor Woodrow Blitman*, 534 F. Supp. at 347. Bleiler was a student at Holy Cross for four years until suspended. He paid for and received an education, thirty-two credits, room, board, and other services. Moreover, Bleiler has an adequate remedy at law.

## CONCLUSION

For the foregoing reasons, and upon the authorities cited, summary judgment should be granted to Holy Cross on all counts.

Respectfully submitted,

COLLEGE OF THE HOLY CROSS

By its attorney,

/s/ *Harold W. Potter, Jr.*
Harold W. Potter, Jr. (BBO # 404240)
harold.potter@hklaw.com
Amanda Orcutt (BBO # pending)
amanda.orcutt@hklaw.com
Holland & Knight LLP
10 St. James Avenue
Boston, MA  02116-3889
(617) 523-2700

Dated:  December 14, 2012

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent those indicated as non-registered participants on December 14, 2012.

/s/ *Harold W. Potter, Jr.*
Harold W. Potter, Jr.

#11851728_v1