# APPENDIX

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

1:11-CV-11541-DJC

EDWIN BLEILER,

　　　　　　　Plaintiff,

v.

COLLEGE OF THE HOLY CROSS,

　　　　　　　Defendant.

## AFFIDAVIT OF HAROLD W. POTTER, JR.

I, Harold W. Potter, Jr., on oath depose and say:

1.　　　I am an attorney admitted to practice in the Commonwealth of Massachusetts and to the Federal District Court of Massachusetts.

2.　　　I am a partner with Holland & Knight, 10 St. James Avenue, Boston, Massachusetts 02116.

3.　　　I represent the College of Holy Cross in this action.

4.　　　In that capacity, I have attended and participated in each of the multiple depositions taken in this case.

5.　　　The deposition transcripts attached to this affidavit are fair and accurate representations of each witness's deposition and the exhibits attached to the depositions are fair and accurate copies of the exhibits referenced.

6.      Attached to this affidavit and marked tab 1 is a true and accurate copy of the deposition of Edwin Bleiler, pages 6, 9-15, 17, 29-30, 32, 34-36, 38, 45, 65-67, 69-73, 79-80, 90-96, 101-111, 113, 115, 121, and exhibits 1-14, 17-19, and 21 pages 33-42 and 57-59.

7.      Attached to this affidavit and marked tab 2 is a true and accurate copy of the deposition of Paul Irish, pages 9, 28-34, 37-38, 41-44, 47-49, 58 and 154.

8.      Attached to this affidavit and marked tab 3 is a true and accurate copy of the deposition of Lauren Brais, pages 16-18, 22-26, and 56-60.

9.      Attached to this affidavit and marked tab 4 is a true and accurate copy of the deposition of Grant Greely, pages 20-23, 51-59, 66-74, 131, and 133-34.

10.     Attached to this affidavit and marked tab 5 is a true and accurate copy of the deposition of Jude Kelley, pages 24, 61-64, 100-01, 103-04, 130, and 133 and exhibit 4.

Signed under the pains and penalties of perjury this 14th day of December, 2012.


                          /s/ *Harold W. Potter, Jr.*
                          Harold W. Potter, Jr.


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent those indicated as non-registered participants on December 14, 2012.

                          /s/ *Harold W. Potter, Jr.*
                          Harold W. Potter, Jr.

#11878598_v1

# EXHIBITS TO POTTER AFFIDAVIT

# TAB 1

Page 6

1  And we'll proceed with the usual stipulation that
2  we'll save all objections except as to the form of
3  the question until time of trial.
4      Do you have any questions about the
5  procedure at all?
6  A.  (Shakes head.)
7  Q.  Where did you go to high school?
8  A.  Lincoln Sudbury.
9  Q.  When did you graduate?
10  A.  Two thousand seven.
11  Q.  How old were you when you graduated?
12  A.  I was 18 years old.
13  Q.  And where'd you go to college?
14  A.  College at Holy Cross.
15  Q.  When did you start there?
16  A.  In the fall of 2007.
17  Q.  When did you leave there?
18  A.  The spring of 2011.
19  Q.  What are you doing now?
20  A.  Currently enrolled in school in Kentucky.
21  Q.  What school is that?
22  A.  University of Kentucky.
23  Q.  What year are you in there?
24  A.  Right now technically would be somewhere

Page 7

1  within the junior -- junior year.
2  Q.  Okay.
3  A.  It's kind of -- I don't know what the whole
4  credits are at the current time.
5  Q.  Were any of your credits from Holy Cross
6  transferrable to University of Kentucky?
7  A.  Yeah.
8  Q.  What credits were transferred?
9  A.  To see -- I would have to kind of look
10  further to see what actual ones ended up
11  transferring over 'cause it's kind of all --
12  Q.  Okay.
13  A.  They have certain requirements --
14  Q.  Sure.
15  A.  -- about what they allow people to bring in.
16  So...
17  Q.  Could you do that with your attorney's
18  cooperation and just let me know what classes you
19  took at Holy Cross that you received credit for at
20  University of Kentucky?
21  A.  Yeah, yeah.  I think it will be -- it's kind
22  of still up in the air.  I'm still trying to hear
23  back from some of it and all that, but I can do
24  that.

Page 8

1  Q.  That's fine.  Have you ever been employed?
2  A.  Yes.
3  Q.  Where?
4  A.  Let's see.  I worked for -- in high school I
5  worked for -- the company's no longer's in
6  existence -- but Velocity Sports Performance.  Tied
7  into that was Batters -- Batter Up Batting Cages.
8  Also worked -- excuse me.
9      (Pause.)
10  A.  Can't remember the name of it.
11  Q.  If it comes to you.
12  A.  Skyhawks Sports Camps.
13  Q.  Where are they located?
14  A.  I think it's throughout Massachusetts.
15  Q.  Where?
16  A.  Throughout Massachusetts.
17  Q.  Throughout Massachusetts?
18  A.  Yeah.
19  Q.  And which one did you work at?
20  A.  It was kind of like a roaming thing.  You
21  were assigned.
22  Q.  And this was during the summers?
23  A.  Yeah, that was during the -- yeah, during
24  the -- it was after my senior year I worked there.

Page 9

1  Q.  All right.  Now how soon after you left Holy
2  Cross did you enroll at the University of Kentucky?
3  A.  This past spring.  So six months.  I sent in
4  my admission thing, and it had to go there.  So six
5  months after.
6  Q.  What did you do from the six months --
7  during the six months after you left Holy Cross
8  until you started at the University of Kentucky?
9  A.  I bartended.
10  Q.  Where?
11  A.  The International in bolt on, Massachusetts.
12  Q.  REPORTER'S NOTE:  Bowl ton?  That's a
13  golf --
14  A.  Golf club, yeah.
15  Q.  Now your freshman year at Holy Cross, that
16  was 2007-2008, correct?
17  A.  Yes.
18  Q.  And what -- did you live on campus that
19  year?
20  A.  Yes.
21  Q.  And what dormitory were you in?
22  A.  Mulledy Hall.  M-U-L-L-E-D-Y.
23  Q.  How many floors did Mulledy Hall have?
24  A.  The dorm -- floors of the dorm there was

Bleiler v.
College of the Holy Cross

Edwin R. Bleiler
May 16, 2012

---

Page 10

```
 1  four and then a basement which had half dorms and
 2  half like study rooms.
 3  Q.  Okay.  And that's Mulledy?
 4  A.  Yeah, M-U-L-L-E-D-Y.
 5  Q.  And how many residential advisors were there
 6  in Mulledy your freshman year?
 7      (Pause.)
 8  A.  Thirteen.
 9  Q.  Thirteen residential advisors?
10  A.  Yes.
11  Q.  In the building?
12  A.  Yep.
13  Q.  Mulledy Hall?
14  A.  Hm Hm.
15  Q.  And how were they broken up?  By floor or --
16  A.  Yeah, by floor and then by sections on a
17  floor.
18  Q.  And who was your residential advisor?
19  A.  Shea Senate.
20  Q.  Shea Senate?
21  A.  Yeah.
22  Q.  And is that S-H-A-Y?
23  A.  I think it's S-H-E-A.
24  Q.  S-H --
```

---

Page 11

```
 1  A.  -- E-A.
 2  Q.  Male or female?
 3  A.  Male.
 4  Q.  And were all of the residential advisors in
 5  that dormitory male?
 6  A.  No.
 7  Q.  Were all of the students in that dormitory
 8  male?
 9  A.  No.
10  Q.  Was it 50/50?
11  A.  Yeah.  I mean maybe a few percentage points
12  either side but...
13  Q.  Was the separation by floors and sections
14  based upon sex?
15  A.  The -- the basement was all male.  The
16  basement was all male.  First and second floors were
17  female.  Third floor was male, and the fourth floor
18  was half male.
19  Q.  What floor did you live on?
20  A.  Third floor.
21  Q.  Third floor?
22  A.  Yeah.
23  Q.  The all male floor?
24  A.  Yeah.
```

---

Page 12

```
 1  Q.  How many students were on that floor
 2  approximately?
 3  A.  I mean there was -- I couldn't tell you.  I
 4  mean it was -- the actual amount of people that
 5  lived in per room.  Some people had three, some
 6  people had four, some people had two.
 7  Q.  Your residential advisor was Shea Senate,
 8  correct?
 9  A.  Yes.
10  Q.  Do you know the names of any of the other
11  residential advisors who were in that building?
12  A.  I don't remember the differences between
13  years.
14      (Pause.)
15  A.  It all blended together.
16  Q.  Okay.  That's okay.  When you had a problem,
17  was it Shea Senate that you went to?
18  A.  Yes.
19  Q.  How often did you go see Shea Senate?
20  A.  I mean I didn't really -- maybe -- I mean go
21  to him for a problem or just have an interaction
22  with him?
23  Q.  Well, first why don't we say go for a
24  problem, number one.
```

---

Page 13

```
 1  A.  You know, maybe two, three, four times.  You
 2  know, a handful of times.
 3  Q.  During the year?
 4  A.  Yeah, yeah.
 5  Q.  What about just interactions?
 6  A.  That was more.  You know, we would have kind
 7  of, you know, weekly or every other week we'd have a
 8  hall meeting or something along those lines.
 9  Q.  All right.  What about the other residential
10  advisors on the other floors of the other sections,
11  did you meet with them individually?
12  A.  Individually, no.  But they would come
13  around, you know, for things like that.  They would
14  put -- you know, they put on different kind of -- it
15  was kind of a -- you know, they would have different
16  kind of programs that they kind of designed for
17  these times.  So, you know, different, you know,
18  residential advisors would come around and be part
19  of those.
20  Q.  And those would be group programs?
21  A.  Yeah.
22  Q.  But on an individual basis, did you interact
23  with respect to any of your problems with any of
24  these other residential advisors?
```

---

Page 14

1  A.  Not during my freshman year. I don't
2    believe so.
3  Q.  Okay.
4  A.  But if --
5  Q.  All right. How about your sophomore year,
6    where did you reside then?
7  A.  Lehy Hall.
8  Q.  Lehy Hall?
9  A.  L-E-H-Y.
10  Q.  And how many floors did that have?
11  A.  That was four as well except there was no --
12    no residential rooms in the basement. So it was
13    just the four.
14  Q.  Just the four floors?
15  A.  Four floors, yeah. There was no one in the
16    basement.
17  Q.  How many residential advisors were in Lehy
18    Hall?
19  A.  That was a smaller building. So I'd
20    probably say maybe five.
21  Q.  All right. Who was your residential
22    advisor?
23  A.  Kevin Wallace.
24  Q.  Kevin Walsh?

Page 15

1  A.  Wallace. Wallace.
2  Q.  Wallace, okay. And -- I'm sorry, I may have
3    asked but what floor was that on?
4  A.  The first floor.
5  Q.  First floor. And is that the way that it
6    usually worked; that the residential advisor for the
7    students lived on the same floor as the students
8    they were primarily responsible for?
9  A.  Yeah, you'd have -- there would be a --
10    yeah, you have like your -- immediate residential
11    advisor was the person who lived on your floor, and
12    then the HRA was like the head residential and that
13    kind of varied depending on just kind of the setup
14    of the dorm building where they would reside.
15  Q.  Okay.
16  A.  And then there was also -- the abbreviation
17    was a CRC. I forget the -- who was like a, you
18    know, actual faculty, you know, who lived on -- I
19    think it was community resource coordinator.
20    Community resource coordinator? And they were --
21    they lived -- there was one of those who lived per
22    building who had --
23  Q.  Did a head residential advisor ever live on
24    your floor? And let's say at Lehy Hall?

Page 16

1  A.  Lehy Hall, no.
2  Q.  What about Mulledy Hall?
3  A.  I can't remember at Mulledy Hall.
4  Q.  What was the responsibility of the head
5    residential advisor versus just a residential
6    advisor, if any?
7  A.  They were kind of the -- kind of overseer of
8    all the residential advisors. So any real issues or
9    anything -- I mean even -- kind of even the minor
10    things that were brought up to the RAs I feel like
11    always kind of ended up with -- the CRC and the HRA
12    were kind of the people who, you know, were the ones
13    who kind of dealt with all -- you know, something
14    might get brought up to the RA but, you know, most
15    of the time it would be going up a little higher
16    just because they were kind of -- I think, you know,
17    they had more training. And obviously the CRC was
18    the person actually hired for that purpose.
19  Q.  And did you ever have to interact with any
20    of the HRAs in let's say Mulledy?
21  A.  Not this that I can recall.
22  Q.  Right. What about Lehy Hall?
23  A.  Not -- not on an individual level.
24  Q.  Okay. Were the residential advisors usually

Page 17

1    in senior classes?
2  A.  No.
3  Q.  So they might be freshmen?
4  A.  Yeah, I believe.
5  Q.  Or sophomores?
6  A.  Sophomores. I'm not sure about freshmen but
7    I know sophomores for sure.
8  Q.  Residential --
9  A.  Yes.
10  Q.  Were you ever a residential advisor?
11  A.  No, I was not. I had other stuff going on.
12  Q.  Okay. And what about your junior year,
13    where did you live then?
14  A.  I lived off campus.
15  Q.  Were you off campus both your junior and
16    senior year?
17  A.  Yes.
18  Q.  And describe for me where you lived off
19    campus your junior year.
20  A.  Junior year was 125 College Street.
21  Q.  And are these buildings that are owned by
22    Holy Cross or not?
23  A.  No.
24  Q.  So you made your own arrangements --

Bleiler v.
College of the Holy Cross

Edwin R. Bleiler
May 16, 2012

Page 26

1  A.  I don't remember exactly.
2  Q.  Were all of your clothes off at some point?
3  A.  I don't know if they were completely off but
4     I mean moved.
5  Q.  Were all of her clothes off?
6  A.  Again, I don't -- I can't remember if they
7     were completely off.
8  Q.  Was her bra off?
9  A.  I believe so, yes.
10 Q.  Were you caressing her breasts?
11 A.  Yes.
12 Q.  Were your pants open?
13 A.  Yes.
14 Q.  Was she -- did she have her hand on your
15    penis?
16 A.  Yes.
17 Q.  Was she masturbating you?
18 A.  Yes.
19 Q.  Did you have an orgasm?
20 A.  Yes.
21 Q.  Did you touch her vagina at all?
22 A.  Not that I can recall.
23 Q.  Did you ask to do it?
24 A.  I was -- I think it was discussed, and she

Page 27

1     said she didn't want to.
2  Q.  Did she -- so did you discuss having
3     intercourse that night?
4  A.  No.
5  Q.  How long were you there?
6  A.  I'm not sure.
7  Q.  Did anything of a sexual nature other than
8     what we've talked about happen that night between
9     you and Caitlin?
10 A.  No.
11 Q.  Did you arrange to meet again?
12 A.  No.
13 Q.  Did you see her again between that night
14    which was sometime I take it in the fall of 2010 --
15 A.  Yes.
16 Q.  -- and May 1st of 2011?
17 A.  I mean maybe -- maybe in passing but nothing
18    -- no conversation or anything like that.
19 Q.  No conversation.  Did you ever send her any
20    e-mails?
21 A.  I sent her a few texts -- maybe one or two
22    text messages.
23 Q.  What were they about?
24 A.  Pretty generic, hi, how are you.  Hey,

Page 28

1     what's up.
2  Q.  Did she send you any text messages?
3  A.  No, I don't believe so.
4  Q.  So she didn't respond to your text messages?
5  A.  No.
6  Q.  Were you trying to continue the
7     relationship?
8  A.  I mean not -- you know, I was just kind of
9     -- I mean not -- I was, you know, just being
10    friendly, you know, trying to keep up.  But I mean
11    it hadn't really --
12 Q.  But you would have been interested if she
13    was interested, correct?
14 A.  I mean, yeah, if it had -- I mean if it had
15    come up.  I don't know.
16 Q.  Okay.  So we're clear then, you saw her once
17    at the bar.
18 A.  (Nods head.)
19 Q.  And there was no sexual activity that night?
20 A.  Right.
21 Q.  And then you met her at a party on campus in
22    a senior complex, and that night you did have a
23    sexual relationship as you've described, correct?
24 A.  Yes.

Page 29

1  Q.  Then between that incident and May 1st of
2     2011 you didn't have any further sexual involvement
3     with Caitlin Murphy; is that correct?
4  A.  Correct.
5  Q.  Now you played baseball at Holy Cross,
6     correct?
7  A.  Yes.
8  Q.  Are you playing in Kentucky, too?
9  A.  No.
10 Q.  Are you eligible?
11 A.  I would have to look at my -- the NCAA long
12    and eligibility restrictions, but at the same time
13    they're the number one team in the country so...
14    Or they were recently.  So I don't know
15    if I would be quite up to that level.
16 Q.  Okay.  How much did you weigh in 2011 -- May
17    1, 2011?
18 A.  Umm --
19 Q.  Approximately.
20 A.  Two hundred twenty-five pounds.
21 Q.  How tall are you?
22 A.  Six one.
23 Q.  Were you six one at that time?
24 A.  Yes.

Edwin R. Bleiler
May 16, 2012

Bleiler v.
College of the Holy Cross

---

Page 30

1  Q.  Somewhere I saw something said you were six
2  three.  You've never been six three; is that
3  correct?
4  A.  I don't think so, unless someone's really
5  trying to make me look a lot better from a
6  recruiting standpoint or -- I don't know.  They tend
7  to do that.
8  Q.  With Caitlin could you describe her for me?
9  How tall is she, approximate weight?  Any
10  description?
11  A.  Probably five five.  Maybe 140 pounds.
12  Q.  Okay.  Did you take any classes ever with
13  Caitlin Murphy?
14  A.  I mean I hadn't -- I hadn't known her until
15  -- well, not that I know of.  No.
16  Q.  The fall of 2010's the first time you became
17  aware of her?
18  A.  Right.
19  Q.  As far as you know, you were not in any
20  classes with her prior to that time?
21  A.  Prior, yes.
22  Q.  As far as you know, you weren't in any
23  classes with her in the spring of 2011 --
24  A.  Right.

---

Page 31

1  Q.  -- correct?
2  A.  Correct.
3  Q.  Basically you didn't have any real contact
4  other than maybe seeing each other on campus between
5  the fall and the spring?
6  A.  Yeah, maybe in passing or something.
7  Q.  Yeah, okay.  Now do you know what dormitory
8  she resided in?
9  A.  Yeah, it was still the Healy dorm.
10  Q.  She was in the Healy dorm?
11  A.  Yeah.
12  Q.  And that was her sophomore year?
13  A.  Yes.  That was the 2010-2011.
14  Q.  And that's the dorm that has four floors?
15  A.  Yes.
16  Q.  How many residential advisors in that
17  dormitory?
18  A.  I mean I don't -- I'm not sure.  I wasn't --
19  I never lived there.  I don't know the exact -- the
20  breakdown tends to vary from building to building.
21  So not living there myself, I can't --
22  Q.  As far as you know, was it is set up as the
23  other dormitories where they had a residential
24  advisor per floor per section?

---

Page 32

1  A.  Yeah, yeah, that was the general rule of
2  thumb they went by.
3  Q.  As far as students were concerned, did you
4  consider the residential advisor on your floor or
5  your section as your residential advisor?  Would
6  that be fair to say?
7  A.  Yeah.
8  Q.  Do you know what floor she lived on?
9  A.  I believe it was the third.
10  Q.  What about freshman year, what dorm did she
11  live in?  Do you know?
12  A.  I do not know.
13  Q.  And you didn't have any contact with her
14  freshman year anyway?
15  A.  (Shakes head.)
16  Q.  If you know, who were Caitlin Murphy's best
17  friends in May of 2011 let's say?
18  A.  I mean from kind of this whole experience,
19  you know, I found out, but before that I had no --
20  Q.  Okay.  Before that you didn't know who her
21  best friends were?
22  A.  Right.
23  Q.  And based on this experience you drew some
24  conclusions about who her best friends were,

---

Page 33

1  correct?
2  A.  Yes.
3  Q.  And who were they?
4  A.  I mean based on kind of what the -- how it
5  all -- you know, how it all played out with, you
6  know, who she had gone out with that night, the
7  other people she had run into later that night, it
8  was Beth Federici or -- I'm not sure on the exact
9  pronunciation of the last name.
10  Q.  Yes?
11  A.  Jacob Yiznitsky.  And then also the girls
12  she had gone out with that night which was -- who
13  were I believe Elizabeth Masi.  Sorry, I can't
14  remember -- I can't remember all the names.
15  Q.  All right.
16  A.  It's kind of --
17  Q.  Okay, that's fair.  With Beth Federici, do
18  you know the extent of Caitlin Murphy's relationship
19  with Beth Federici?
20  A.  No, I don't.
21  Q.  By the way, how large is Holy Cross?  How
22  many students?  Roughly.
23  A.  Twenty-eight hundred.
24  Q.  How many in each class?

---

Pages 30 - 33 (8)

Min-U-Script®

Page 34

1 A.  You know, seven hundred.  Seven twenty-five.
2 Q.  Okay.
3 A.  It tends to vary, you know.
4 Q.  What about Jacob Yiznitsky; do you know the
5   extent of her relationship with Jacob?
6 A.  (Shakes head.)
7 Q.  Your answer's no?  You've got to --
8 A.  Answer's no.
9 Q.  Elizabeth Masi?
10 A.  Not sure other than --
11 Q.  Were these folks people you knew at all
12   yourself personally before May 1, 2011?
13 A.  No.
14 Q.  Would you have recognized them?
15 A.  No.
16 Q.  Now after you were charged by Caitlin Murphy
17   of Sexual Misconduct 1 there was a panel set up to
18   hear the allegations against you, correct?
19 A.  Yes.
20 Q.  And the chair of that panel was Jude Kelley
21   who is, as I understand, a chemistry professor?
22 A.  Yes.
23 Q.  Had you ever had a class with Professor
24   Kelley?

Page 35

1 A.  No.
2 Q.  Had you ever talked to Professor Kelley
3   before the night of the panel hearing?
4 A.  No.
5 Q.  What about Professor Lori King who was a
6   math teacher?  Had you ever had a class with
7   Professor King?
8 A.  No.
9 Q.  Had you ever talked with Professor King
10   before the night of the hearing which was May
11   18th --
12 A.  No.
13 Q.  -- 2011?  And what about Elizabeth Rice who
14   was the staff member who was also on the panel; had
15   you ever interacted with her at all?
16 A.  No.  I mean not to -- with all -- you know,
17   not to the point where I would have remembered any
18   interaction.
19 Q.  That's fine.  Certainly nothing that jumps
20   to mind --
21 A.  Right, exactly.
22 Q.  -- at the moment?
23      You might have seen them here or there,
24   but they never became friends or mentors of yours or

Page 36

1   advisors of yours?
2 A.  No.
3 Q.  And you weren't -- were you in the chemistry
4   department as a major?
5 A.  Oh, no.
6 Q.  What about the math department?
7 A.  No.
8 Q.  Now Grant Greeley was in your class,
9   correct?
10 A.  Yes.
11 Q.  And my understanding is that you objected to
12   Grant Greeley being on that panel.  Did you know
13   Grant Greeley personally?
14 A.  Not personally but per se, no.
15 Q.  My understanding is that your objection
16   about Grant Greeley was that he had some issues with
17   some friends of yours; is that correct?
18 A.  Issues through mutual friends.
19 Q.  Issues through mutual friends?
20 A.  Yes.
21 Q.  And could you describe those for me?
22 A.  The specifics I wasn't, you know, absolutely
23   certain on.  One of my good friends from freshman
24   year had been roommates with one of his -- one of

Page 37

1   his friends, and, you know, I was just -- I knew
2   going into the hearing that, you know, it was kind
3   of what was on the line and everything so I didn't
4   want anyone who could have had any negative view of
5   me.  That was kind of my -- I don't know what
6   that --
7 Q.  All right.  Did you discuss that particular
8   concern with Paul Irish?
9 A.  Yes.
10 Q.  On how many occasions did you discuss it
11   with him?
12 A.  With him directly?
13 Q.  Yes.
14 A.  I brought it up in an e-mail.
15 Q.  Yes?
16 A.  And then he had responded saying he didn't
17   see that as a conflict, and then I also talked --
18   discussed that kind of -- he said -- he gave me a --
19   when we actually sat down face to face, he kind of
20   reinforced that.
21 Q.  All right.  When you sat down face to
22   face -- and you talked with Grant Greeley on one
23   occasion face to face, would that be fair?
24 A.  In the face to face?

**Page 38**

1  Q.  Yes.

2  A.  Yes.

3  Q.  Tell me about that face-to-face meeting with

4  specific reference to Grant Greeley.  What did he

5  say, and what did you say?

6  A.  Well, it was after I had sent the e-mail.

7  Q.  Yes.

8  A.  So I don't recall saying much myself.  It

9  was more of him just kind of saying that, you know,

10  based off of what I said that he didn't see that as

11  a reason -- as a -- what's the word I'm looking for?

12  -- as a reason to keep him off of the board.

13       He said that he had talked to -- that he

14  had talked to as well -- part of the process is to

15  ask them if they had any interactions with either

16  side and if they would have anything -- any --

17  Q.  Is the word you're searching for conflict?

18  A.  Yes.  Sorry.

19  Q.  That's okay.

20  A.  It's just one of those -- it was just

21  blanking.  Yeah, any conflicts -- yeah, as part of

22  the process, if they have any conflicts.

23  Q.  Okay.

24  A.  And he had said that he had talked to both

**Page 39**

1  students, and they said that they did not.

2  Q.  Did you also discuss with Paul Irish on that

3  occasion the concern about them being Facebook

4  friends?

5  A.  Yeah, I believe that was part of the -- I

6  don't know if it was that specific time 'cause, you

7  know, with the -- kind of getting the lead up from

8  the dates of, you know, when I first went in to talk

9  with him about this to the 18th, the actual hearing,

10  I was in there doing a lot of different things a lot

11  of different times.

12  Q.  Yes.

13  A.  But in that process, yeah, it was brought up

14  the Facebook issue.

15  Q.  So you brought up the Facebook issue with

16  him, and you brought up the fact that mutual friends

17  of yours had had some issues with --

18  A.  Yes.

19  Q.  -- Grant Greeley?

20  A.  Yes.

21  Q.  Those were the two reasons you felt he was

22  inappropriate to be on the panel, correct?

23  A.  Yeah.

24  Q.  Any other reasons?

**Page 40**

1  A.  Not at that time, no.

2  Q.  Any other reasons since then?

3  A.  I mean I found out that they both had more

4  instances with him than had been disclosed to me by

5  Mr. Irish.

6  Q.  All right.  What specifically did you find

7  out?

8  A.  That one of them had been her RA and that

9  another had been -- or Grant had been her HRA I

10  believe it was.  I might be getting it mixed up, but

11  I believe that he had been her HRA or he was at the

12  time, and then the other student member, Miss Brais,

13  that she had been her RA.  I wasn't sure if it was

14  current or previous but at some point.

15  Q.  And when you're referring to, for example,

16  Miss Brais as her RA, are you referring to her as

17  her RA on her floor, or are you referring to her as

18  an RA in the building?

19  A.  I personally don't know.  The only thing is

20  -- I used "her RA" because that's how -- well, when

21  I found out about that was through my appeals

22  process, Father McFarland who had been the president

23  at the time referred to her as her RA.  That's where

24  I got the --

**Page 41**

1  Q.  But is it fair to say that your relationship

2  with your RA, if any, depends upon whether or not

3  they're on your floor or in your section?

4  A.  Depends --

5       MS. SMITH-LEE: Objection to form.  Go

6  ahead.

7  A.  Depends on -- I mean between the two it

8  would depend.

9  Q.  Okay.  So you didn't know anything further

10  about the relationship let's say between Lauren

11  Brais and Caitlin Murphy other than that she was an

12  RA in that building; is that correct?

13  A.  I'm sorry, at which time?

14  Q.  At any time.

15  A.  Oh, no.  I'm saying before -- before not in

16  my objections, no.

17  Q.  No, not in your objections.

18  A.  Oh, okay.

19  Q.  But you subsequently learned that she was an

20  RA and --

21  A.  Yeah, I just don't -- okay.

22  Q.  I'm trying to find out what facts you know

23  about their relationship beyond the fact that you

24  now believe that she was an RA in a building where

Bleiler v.
College of the Holy Cross

Edwin R. Bleiler
May 16, 2012

**Page 42**

1    Caitlin Murphy resided.
2  A.  Thank you. The knowledge that I have since
3    then is pretty much through -- I mean that knowledge
4    was gained through Father McFarland, and he referred
5    to her as her RA. That's what I tried to explain
6    earlier. That's what I was told.
7  Q.  But you couldn't, for example, describe for
8    me how many times she met with Lauren Brais?
9  A.  No, I don't know --
10 Q.  You couldn't tell me whether they socialized
11   together?
12 A.  No. I don't have access to that
13   information.
14 Q.  You can't tell me whether they went out for
15   beers together?
16 A.  No, that's not information I would have.
17 Q.  You can't tell me whether or not they shared
18   classes together?
19 A.  With her and Miss Brais?
20 Q.  Lauren Brais.
21 A.  (Shakes head.)
22 Q.  And you couldn't tell me whether or not they
23   studied together?
24 A.  (Shakes head.)

**Page 43**

1  Q.  And you couldn't tell me whether they were
2    close friends or just acquaintances, correct?
3  A.  I couldn't tell you either way, no.
4  Q.  And no information has come to you since May
5    18, 2011 concerning any of those issues that I just
6    raised?
7  A.  Not between Miss Brais and Miss Murphy, no.
8  Q.  Okay. What about then Grant Greeley? I'd
9    ask the same --
10 A.  -- line of questions?
11 Q.  -- line of questions with respect to Grant
12   Greeley.
13     What do you know about the relationship
14   between Grant Greeley and Caitlin Murphy, if any?
15 A.  Well, I've since found out since the 18th of
16   May --
17 Q.  Okay.
18 A.  -- 2011 that he had been her HRA at the
19   time. So her head RA at the time. And that they
20   had also had a class together.
21 Q.  Okay. Anything else about their
22   relationship that you know?
23 A.  No.
24 Q.  Just for the record because I don't want to

**Page 44**

1    -- my objective here is not to trick you --
2  A.  Hm Hm.
3  Q.  -- at all. I think the roles are switched
4    but --
5  A.  Okay, yeah, I mean --
6  Q.  Lauren Brais was the HRA --
7  A.  Yeah, I wasn't sure.
8  Q.  -- in the building, but I could be wrong
9    about that. That really doesn't matter to me.
10     What matters to me is the relationship
11   -- the actual relationship between Grant Greeley and
12   Caitlin Murphy.
13     Did they socialize together?
14 A.  Not that I know of.
15 Q.  Did they study --
16 A.  I mean outside of class.
17 Q.  No, I know. Did they study together?
18 A.  They could have. You know, same --
19 Q.  You don't have any information --
20 A.  No.
21 Q.  -- that they did --
22 A.  -- that they had? No.
23 Q.  Did they go out drinking together?
24 A.  Not that I know of.

**Page 45**

1  Q.  All right. And if you just don't know, you
2    just don't know. That's fine. That's fine.
3  A.  Yeah, that's what I'm saying. I don't know.
4    Not with the information I know.
5  Q.  Okay. Now going back to Grant Greeley,
6    aside from the conflict with Grant Greeley that you
7    related concerning your friends, did you personally
8    have any problems with Grant Greeley?
9  A.  No.
10 Q.  Did you personally have any problems with
11   Lauren Brais?
12 A.  No. I hadn't had any interactions with
13   either of them on a personal level.
14 Q.  Okay. All right.
15     (Pause.)
16 Q.  When did you first meet Paul Irish?
17 A.  Actual first date that I met him? Not
18   positive on that one. Sometime either before or
19   during my freshman year.
20 Q.  During your freshman year?
21 A.  Yep.
22 Q.  And tell me about that meeting.
23 A.  That's what I said. I can't remember the
24   first time -- there was a little overload of stuff

Page 62

1  about sexual harassment?
2  A.  Not that I can recall, no.
3  Q.  Any discussions about the relationship
4  between alcohol and sexual harassment?
5  A.  Not that I can recall, no.
6  Q.  Now since the charge was filed against you
7  by Caitlin Murphy in May of 2011, have you read the
8  handbook?
9  A.  Yes.
10  Q.  Do you think you understand it now?
11     MS. SMITH-LEE: Objection.  You can
12  answer.
13  A.  Yes.
14  Q.  Do you agree that Caitlin Murphy had the
15  right to file a complaint against you?
16     MS. SMITH-LEE: Objection but go ahead.
17  A.  Can you say that -- sorry, can you ask one
18  more time?
19  Q.  Sure.  Do you agree that Caitlin Murphy as a
20  student at Holy Cross had the right to file a
21  complaint against any other student who she felt had
22  harassed her?  Forget about you.
23     MS. SMITH-LEE: Objection but go ahead.
24  A.  Yes.

Page 63

1  Q.  And do you agree that she had the right if
2  she felt that you had sexually harassed her or
3  sexually abused her -- that she had the right to
4  file a complaint against you?
5     MS. SMITH-LEE: Objection but go ahead.
6  A.  Yes.
7  Q.  And do you agree that when Caitlin Murphy
8  filed a complaint against you the college had the
9  duty to investigate it?
10     MS. SMITH-LEE: Objection but go ahead.
11  A.  Yes.
12  Q.  And do you agree that upon the filing of
13  that complaint the college had a duty to hold a
14  hearing to resolve the differences between you?
15     MS. SMITH-LEE: Objection but go ahead.
16  And if I could just have a standing objection to
17  legal conclusions here --
18     MR. POTTER: Yes, that's fine.
19     MS. SMITH-LEE: -- so I don't have to
20  keep interrupting.
21     MR. POTTER: Sure, that's fine.  That's
22  fine.
23  A.  Which hearing?
24  Q.  Well, I'm talking about the hearing on May

Page 64

1  18th.  And I'm asking you did the college have a
2  duty --
3  A.  That's why I wanted to figure out --
4  Q.  -- to hold a hearing so that each side could
5  state its point of view and a decision could be
6  made?
7  A.  The hearing was my choice to have one.
8  Q.  Oh, okay.
9  A.  That's why I wanted to figure out the
10  difference because the meetings with -- in the
11  meetings with Mr. Irish in those days I was
12  presented with the charge, and the hearing was a
13  result of my choice to fight the charge.
14  Q.  Okay.  Fair enough.
15  A.  So the hearing wasn't a duty -- that's what
16  I meant.  It wasn't a duty but more of a -- once I
17  kind of said it was, you know --
18  Q.  How did you first become aware that a charge
19  had been made against you?
20  A.  I was called into the public safety office.
21  Q.  And when were you called into the public
22  safety office?  Would this help?
23  A.  Yes.  So May 9th.
24     MR. POTTER: Could we have this marked

Page 65

1  as Exhibit number 1?
2  Q.  This, by the way, is HC 10105.
3     MS. SMITH-LEE: Sergeant Kelley --
4  whatever his name is?
5     MR. POTTER: This is the Miranda
6  (indicating).
7     MS. SMITH-LEE: Yes, thank you.
8     (Exhibit 1 marked
9     for identification.)
10  Q.  So looking at Exhibit 1 which says Holy
11  Cross Campus Police Notification of Miranda Rights,
12  does that refresh your memory as to the date when
13  you first heard you had been charged?
14  A.  Yes.
15  Q.  And that was on May 9th, 2011?
16  A.  Yes.
17  Q.  Who called you?
18  A.  I don't recall which -- I received a call
19  from public safety.  I'm not sure which officer it
20  was.
21  Q.  What did you do?
22  A.  I immediately went to the public safety
23  office.
24  Q.  What time of day was it?  Do you remember?

Page 66

1  A.  Not positive.  Maybe 10:30 a.m.
2  Q.  Did you meet with somebody there?
3  A.  Yes.  I met with public safety officers.
4  Q.  And was there more than one public safety
5  officer that you met with?
6  A.  Yes, there were two.
7  Q.  What did they say to you, and what did you
8  say to them?
9  A.  When they -- they read the charge and
10  then --
11  Q.  What did they read to you?
12  A.  They told me that -- I mean they told me
13  what I was being charged with.  I don't remember if
14  it was an actual piece of paper they were reading
15  off of or --
16  Q.  Did they show you the documents that Caitlin
17  Murphy had given them?
18  A.  No, not at that time.  No.  That was -- that
19  was -- I think the process is that they finalize
20  their reports and then give it to Mr. Irish, and
21  then Mr. Irish is the one who showed me those
22  documents.
23  Q.  Okay.  So you met with them.  They told you
24  what the charge was.

Page 67

1  A.  (Nods head.)
2  Q.  They told you that you didn't have to say
3  anything; is that correct?
4  A.  Yes.
5  Q.  And you decided at that time you didn't want
6  to say anything, correct?
7  A.  Right, yeah.  I mean I hadn't --
8  Q.  So you signed this document which is
9  Exhibit number 1, correct?
10  A.  Yes.
11  Q.  How long were you there?
12  A.  About thirty minutes maybe.  I'm not
13  positive.
14  Q.  Do you remember anything that you said or
15  that they said in words and substance?
16  A.  I mean it was kind of -- I was more shocked
17  or, you know, surprised at the charges.  I apologize
18  if my memory isn't great.  I don't remember too much
19  about the actual conversation.
20  Q.  It's okay.  It's okay.  So what did you do
21  after that?
22  A.  First thing I did was went back to my
23  apartment, and then I -- I called my father after
24  that.

Page 68

1  Q.  All right.  And after you called your
2  father, what did you do?
3  A.  I sent an e-mail to Mr. Irish, you know,
4  kind of asking him to come in and meet.
5  Q.  And did he respond to that e-mail?
6  A.  He called me -- I gave him -- I put my phone
7  number in the e-mail.
8  Q.  How soon after you sent the e-mail did he
9  call you?
10  A.  I'm not sure exactly.  I think I went -- by
11  the time I -- I think I met with him maybe like 3:30
12  that day.  Something like that.  Later that
13  afternoon is when I met with him.
14  Q.  How long did that meeting last?
15  A.  Actually, I'm not going to be able to
16  remember the actual time.  Sorry.
17  Q.  That's okay.  If you have an estimate of
18  time at any time, tell me that, too.
19  A.  Yeah, okay.
20  Q.  What did he say, and what did you say during
21  this meeting?
22  A.  I was kind of looking for -- kind of trying
23  to figure out what exactly -- you know, what it all
24  meant and all that.  He said -- you know, he gave me

Page 69

1  some information, but I think part of the -- part of
2  the process is that he has certain meetings and
3  stuff that are kind of designated to be more
4  information, you know, that he -- kind of their
5  process is something -- we talked about some -- I
6  don't know if we actually got into any specifics or
7  details.
8  Q.  Do you know whether he had received the
9  report from public safety by the time you got there?
10  A.  I think he had by the time I met with him.
11  Q.  Did he show you any of the materials?
12  A.  I think at that time -- I don't think at
13  that time.  I think the first time that I was
14  allowed to view the materials was during the first
15  official meeting.
16  Q.  All right.
17     MR. POTTER:  So could we have marked as
18  Exhibit 2?  This is HC 10104.  And this is a letter
19  dated May 9, 2011 to Mr. Edwin Bleiler from Paul A.
20  Irish.
21     (Exhibit 2 marked
22     for identification.)
23  Q.  Did you receive that letter from Mr. Irish?
24  This is Exhibit number 2.

Page 70

1  A.  Yes.
2  Q.  Did you receive it on May 9th, 2011 at that
3     3:30 meeting, or was it later?
4  A.  No, I think this was an e-mail I believe I
5     received later that day.  So after.  After that
6     meeting.
7  Q.  All right.  Now when you met with Mr. Irish
8     that day and before you'd received this letter, did
9     you -- well, strike that.
10        When you met with him and before you
11     received this letter, did Mr. Irish explain anything
12     to you about the process that would be going
13     forward?
14  A.  Yeah, he told me that there was -- I don't
15     remember the exact name of it, but there was a --
16     like that formal meeting that I was referencing
17     earlier was kind of the first time where, you know,
18     he has all the information; I'm given a chance to
19     look at it.  There's some other formalities and
20     stuff that are supposed to go on.
21  Q.  Okay.
22        MR. POTTER:  Could we have marked as the
23     next exhibit, the third exhibit, HC 10106 which is
24     entitled notice of pre-hearing meeting.

Page 71

1        (Exhibit 3 marked
2        for identification.)
3  Q.  Let me show you Exhibit number 3.
4  A.  Okay.
5  Q.  This one's unsigned, but did you receive
6     that from Paul Irish?
7  A.  Yes.
8  Q.  It provides you with a notice of a
9     pre-hearing meeting --
10  A.  The pre-hearing meeting, that's what I was
11     referencing earlier.
12  Q.  What did you do in response to this?
13  A.  I mean that -- I believe that 4 o'clock time
14     was agreed upon when I had met him the day before.
15     So, you know, he had -- that's why when you asked if
16     he had said anything about the policies or anything
17     like that, he said, you know, the first kind of step
18     in the whole thing was the pre -- the pre-hearing
19     meeting and that that was going to be, you know,
20     what day.  So we worked that all out.
21  Q.  Oh, okay.  And so you knew --
22  A.  Like I knew this was coming is what I'm
23     saying.
24  Q.  Oh, the two of you agreed that the next day

Page 72

1     you would have the pre-hearing meeting?
2  A.  The pre-hearing meeting, yeah.
3  Q.  At 4 o'clock?
4  A.  Yes.
5  Q.  Okay.
6        MR. POTTER:  Okay.  We'll take a break.
7        (A recess was taken.)
8        MR. POTTER:  We're going to mark HC
9     10107.  Could we have marked as Exhibit number 4 I
10     think it is the pre-hearing checklist for the
11     respondent dated 5/10/2011.
12        (Exhibit 4 marked
13        for identification.)
14  Q.  Let me show you Exhibit number 4.  Is that
15     your signature on there?
16  A.  Yes.
17  Q.  All right.  When did you receive this?
18  A.  On May 10th.
19  Q.  And was it this -- strike that.
20        Was this at the meeting with Paul Irish?
21  A.  Yeah, this was the whole first formalities
22     that I was referring to.
23  Q.  Before he handed you this pre-hearing
24     checklist for you to review, did you have any

Page 73

1     discussions about what was to proceed?
2  A.  I mean this was the first -- this was kind
3     of -- I'm trying to remember how -- I think this was
4     hand in hand with kind of some of the other stuff
5     that he was doing and he'd also given me -- I mean
6     the day before what he had said, you know,
7     pre-hearing meeting was the first step and --
8  Q.  Okay.
9  A.  -- and all that.
10  Q.  All right.  When you got this pre-hearing
11     checklist, were you sitting in his office?
12  A.  Yes.
13  Q.  And was he there?
14  A.  Yes.
15  Q.  And did you ask him any questions about the
16     pre-hearing checklist?
17        (Pause.)
18  A.  See, I'm not sure -- I know I asked him some
19     questions, but I'm not sure about --
20  Q.  You don't remember them as we sit here?
21  A.  Yeah, I don't remember anything specific
22     based off of --
23  Q.  It does say please read each statement
24     carefully.  Your initials next to a statement

Page 78

1  kind of there for support. You know, kind of to
2  have someone there to help you through the process.
3  You know, obviously there's different levels
4  involved in it but...
5  Q.  The next one, number 8, says that I
6  understand if I choose to have an advisor he or she
7  must be a faculty staff or student member of the
8  Holy Cross community.
9  A.  Yeah, that's what I was getting at.
10  Q.  You were told on that occasion that you
11  could have an advisor and the person who was your
12  advisor could be anybody from the faculty or the
13  administration or a student at the college as your
14  advisor, correct?
15  A.  Yeah, as I noted that.
16  Q.  Did you subsequently choose an advisor?
17  A.  Yes.
18  Q.  Who was that?
19  A.  It ended up being Miles Cahill who is an
20  economics professor.
21  Q.  And how did you end up choosing Miles
22  Cahill?
23  A.  After some failed attempts at other
24  advisors, he was given -- his name was given to me

Page 79

1  by Mr. Irish.
2  Q.  You say there were failed attempts with
3  other advisors. Could you tell me about those
4  failed attempts?
5  A.  Yeah. I had one faculty member who I had
6  wanted as my advisor, but I can't remember if I was
7  told by Mr. Irish or by the professor himself, but
8  he was told he was supposed to stay out of these
9  things because he had previously gotten his JD.
10  Q.  Oh. All right. Anybody else?
11  A.  I mean I hadn't -- I hadn't, you know,
12  reached out to anybody. You know, at that point I
13  kind of -- I mean 'cause obviously he was someone I
14  was kind of comfortable with, and after that I think
15  Mr. Irish had offered to give me a list of people
16  who had kind of been involved in before.
17  Q.  Uh-huh.
18  A.  And then through that I contacted a few
19  different people and then finally ended up with
20  Professor Cahill.
21  Q.  Had you had any interaction with Professor
22  Cahill before this?
23  A.  No.
24  Q.  What caused you to choose him?

Page 80

1  A.  Just kind of -- you know, after, you know,
2  not having -- you know, just kind of he had some
3  experience with it before. I sent him a few e-mails
4  to -- to different professors, and he was one of I
5  think maybe two or three that got back to me. It's
6  just kind of how it worked out I guess.
7  Q.  Did you meet with him?
8  A.  Yes, prior.
9  Q.  Prior to the meeting?
10  A.  Yes, prior.
11  Q.  How many times did you meet with him?
12  A.  I think like two or three times.
13  Q.  And tell me about the first meeting.
14  A.  It was kind of like an introduction
15  obviously.
16  Q.  Was it at his office?
17  A.  Yes, his office.
18  Q.  How long did it last?
19  A.  Probably 30, 45 minutes.
20  Q.  Can you tell me what he said and what you
21  said?
22  A.  I kind of explained to him my situation and
23  what was going on. He had had -- he had been a part
24  of the process before. I forget if it was an

Page 81

1  advisory role or if he had been -- I think he had
2  actually done both, advisory and been on the board
3  as well.
4     He was kind of giving me the basic
5  outlines of how the process goes and kind of gave me
6  his personal views of what -- kind of I guess what
7  things he looked for when he was on the other side
8  of it. So just kind of general.
9  Q.  What did he say he looked for, if you
10  remember?
11  A.  I can't really remember. I'm trying to --
12  you know, I'm trying to recall.
13  Q.  Okay. Did you have a subsequent meeting
14  with him?
15  A.  Yeah. Once I -- once it got closer to the
16  hearing on the 18th, you know, then I actually
17  prepared what I was going to -- kind of prepared
18  myself for the hearing, and then I talked to him a
19  little bit more about what the actual more material
20  type stuff instead of just the general outline kind
21  of thing we had on the first time we met.
22  Q.  How long did you meet with him the second
23  time?
24  A.  You know, maybe an hour.

Bleiler v.
College of the Holy Cross

Edwin R. Bleiler
May 16, 2012

Page 90

1 A.  I just listened to it I believe the one
2   time.
3 Q.  One time?
4 A.  One time, yeah, after.
5 Q.  Eighteen, I understand that I should call --
6   contact Paul Irish with any questions. Did you
7   understand that?
8 A.  Yes.
9 Q.  Did you contact Paul Irish a number of times
10   throughout this process?
11 A.  Yes.
12 Q.  Was he responsive?
13 A.  Yes. I mean he was -- yeah. Sure.
14 Q.  You were also encouraged to discuss this
15   matter with your family, and you did do that?
16 A.  Yeah, I mean I had already doue that. So
17   that wasn't much of a point.
18 Q.  So this was the pre-hearing meeting. What
19   else happened at the pre-hearing meeting aside from
20   your getting this pre-hearing checklist?
21 A.  I got the checklist. As I said, I got a
22   copy of the student handbook which includes the
23   procedures, and that was also the first time where
24   kind of he had that whole -- I think he was -- you

Page 91

1   know, he had the whole -- he had the file or what
2   was in the file at the time.
3 Q.  Okay. The statements in the file?
4 A.  Yes.
5   MR. POTTER: Could we have marked as the
6   next exhibit HC 10088 dated 5/1/11.
7   (Exhibit 5 marked
8   for identification.)
9 Q.  Looking at Exhibit number 5, is that a
10   document that you were given to review that day?
11 A.  Yes.
12 Q.  And that is a statement from Caitlin dated
13   5/1/2011 -- yeah, May 5 --
14 A.  What's that?
15 Q.  Yes.
16 A.  Yeah, yeah.
17   MR. POTTER: Could we have marked as the
18   next exhibit a statement dated May 5, 2011, and it
19   consists of three pages.
20   (Exhibit 6 marked
21   for identification.)
22 Q.  Showing you Exhibit 6 which is a three-page
23   statement dated May 5, 2011. It purports to be from
24   Caitlin Murphy. Did you receive that statement --

Page 92

1 A.  Do you want this one?
2 Q.  Yes, thank you. -- that statement on May
3   9th?
4 A.  Yes, I believe so.
5 Q.  And did you have a chance to review that
6   statement of Caitlin Murphy prior to the hearing?
7 A.  To the pre-hearing meeting?
8 Q.  No, no. Prior to the actual panel hearing.
9 A.  Yes. Yes, I did.
10 Q.  Did you review it on several occasions?
11 A.  Yes.
12 Q.  And did you review the prior statement on
13   several occasions also?
14 A.  Yes.
15 Q.  And that is Exhibit number 5. And then
16   there's a statement consisting of two pages, HC
17   10102 and 03, 5/9/11 also from Caitlin Murphy.
18   MR. POTTER: Could we have that marked
19   as the next exhibit?
20   (Exhibit 7 marked
21   for identification.)
22 Q.  Now looking, if you will, at Exhibit number
23   7, did you also receive and review that statement
24   prior to the hearing on May 18th, 2011?

Page 93

1 A.  Yes.
2 Q.  Next statement dated May 1, 2011, HC 10089
3   and HC 10090, a statement of Beth Federici.
4   MR. POTTER: Could I have that marked as
5   the next exhibit?
6   (Exhibit 8 marked
7   for identification.)
8 Q.  I show you Exhibit number 8 which is the
9   two-page statement from Beth Federici. Were you
10   given that on May 9th, 2011?
11 A.  Yes.
12 Q.  And did you review that prior to the
13   hearing?
14 A.  Yes.
15 Q.  Did you review it more than once?
16 A.  Yes.
17 Q.  And next is a two-page statement from Jacob
18   Yiznitsky dated 5/1/11. HC 10091 and 10092.
19   (Exhibit 9 marked
20   for identification.)
21 Q.  I'm showing you Exhibit number 9, and this
22   is a statement -- two-page statement of Jacob
23   Yiznitsky. Were you given that on May 9, 2011?
24 A.  Yes.

---

Page 94

1  Q.  Did you review that prior to the hearing?
2  A.  Yes.
3  Q.  On more than one occasion?
4  A.  Yes.
5      MR. POTTER: Next is HC 10093. It's a
6  statement from Kate DeFusco. May we have that
7  marked as the next exhibit? One page.
8      (Exhibit 10 marked
9      for identification.)
10  Q.  Now would you take a look at Exhibit number
11  10? Were you also given that statement on May 9th,
12  2011?
13  A.  Yes.
14  Q.  And did you review it prior to the hearing?
15  A.  Yes.
16  Q.  Did you review it more than once prior to
17  the hearing?
18  A.  Yes.
19  Q.  And here is the next statement 5/3/11 from
20  Felicia Russo HC 10094, one page.
21      (Exhibit 111 marked
22      for identification.)
23  Q.  Looking at Exhibit number 11 which is the
24  statement of Felicia Russo, were you given that on

---

Page 95

1  May 9, 2011?
2  A.  Yes.
3  Q.  Did you review it at that time?
4  A.  Yes.
5  Q.  Did you review it more than once before the
6  hearing?
7  A.  Yes.
8  Q.  The next is a statement HC 10095, 5/4/11,
9  Elizabeth -- I'm having a hard time with the last
10  name. So --
11  A.  I think it's Masi.
12  Q.  Masi?
13  A.  Yes.
14  Q.  Oh, Elizabeth Masi. So that's a one-page
15  statement 5/4/11.
16      MR. POTTER: The next exhibit.
17      (Exhibit 12 marked
18      for identification.)
19  Q.  Now showing you Exhibit number 12, the
20  statement from Elizabeth Masi. Were you given that
21  statement on May 9, 2011?
22  A.  Yes.
23  Q.  And did you review that statement then and
24  several times prior to the hearing?

---

Page 96

1  A.  Yes.
2  Q.  The next statement is a second statement of
3  Jason Yiznitsky dated 5/4/11, HC 10096. One page.
4      (Exhibit 13 marked
5      for identification.)
6  Q.  This is Exhibit number 13. Were you given
7  that statement prior to the hearing?
8  A.  Yes.
9  Q.  And did you review it more than once prior
10  to the hearing?
11  A.  Yes.
12  Q.  And number --
13      MR. POTTER: The next number, 5/5/11, by
14  Katelyn Desrosier, one page.
15      (Exhibit 14 marked
16      for identification.)
17  Q.  And this is Exhibit number 14. Were you
18  given this statement of Katelyn Desrosier prior to
19  the hearing?
20  A.  Yes.
21  Q.  Did you have several opportunities to review
22  it?
23  A.  Yes.
24  Q.  The next statement is HC 10101, and I'm

---

Page 97

1  having trouble reading this name, too. So I'll just
2  have you identify it.
3      MR. POTTER: Could we have that marked
4  as the next exhibit? It's HC 10101.
5      (Exhibit 15 marked
6      for identification.)
7  Q.  Looking at Exhibit 15, do you know whose
8  signature that is?
9  A.  I believe it was one of the -- I think the
10  Desrosiers. I'm not sure how you say the last name.
11  I think there's two of them. They're sisters or
12  something.
13  Q.  Were you given Exhibit 15 prior to the
14  hearing?
15  A.  Yes.
16  Q.  And you had several opportunities to review
17  it also?
18  A.  Yes.
19  Q.  Now did you ever go back to public safety
20  after that initial meeting with public safety on
21  May --
22  Q.  -- 8th?
23  Q.  -- 8th?
24  A.  No.

---

Bleiler v.
College of the Holy Cross

Edwin R. Bleiler
May 16, 2012

---

Page 98

1  Q.  So you never went back to look at their
2    files at all?
3  A.  I'm pretty sure their files are what
4    Mr. Irish had.
5  Q.  Okay.
6  A.  I think this whole thing is their files and
7    then he passes -- they pass it to him. And once
8    there -- I guess once they're done. I'm not sure
9    exactly.
10     MR. POTTER: I'm going to mark as a
11   package HC 10074 through HC 10087 which is the
12   College of Holy Cross Department of Public Safety
13   incident report plus investigatory reports.
14     (Exhibit 16 marked
15      for identification.)
16  Q.  Now looking at Exhibit 16 which consists of
17    the pages HC 10074 through HC 10087, would you take
18    a look at them and tell me whether you were given
19    those documents also prior to the hearing?
20     (Pause.)
21  A.  Yes.
22  Q.  So you had those documents. Did you have an
23    opportunity to review them prior to the hearing?
24  A.  Yes.

---

Page 99

1  Q.  On more than one occasion?
2  A.  Yes.
3  Q.  During your review and preparation for the
4    hearing itself after your pre-hearing meeting with
5    Mr. Irish, did you sit down and meet with him on any
6    subsequent occasions?
7  A.  Yeah, I mean kind of he was the one with the
8    -- access to the files. So any time I reviewed the
9    file I went -- you know, I had to get it from him.
10  Q.  Okay.
11  A.  And we'd have -- no, go ahead.
12  Q.  And did you go to his office each time?
13  A.  Yes.
14  Q.  Did he give you a place to review them, or
15    did you review them in his office?
16  A.  He gave me a place to review them.
17  Q.  So you could be by yourself?
18  A.  Yes.
19  Q.  Did you take notes?
20  A.  Yes.
21  Q.  Were you allowed to take notes?
22  A.  Yes. Wasn't allowed to take any actual --
23  Q.  You couldn't take the papers out?
24  A.  Right.

---

Page 100

1  Q.  But you could make notes from the papers,
2    correct?
3  A.  Yes.
4  Q.  Did you -- well, strike that.
5     Do you remember having any questions
6    during that phase from the first pre-hearing meeting
7    until the hearing itself that you felt you needed to
8    direct to Mr. Irish?
9     MS. SMITH-LEE: Objection but go ahead.
10  A.  Questions on? I mean --
11  Q.  Do you remember any questions --
12  A.  No.
13  Q.  -- that you had --
14  A.  That I had? Okay.
15  Q.  -- about the process that you asked him
16    about?
17  A.  I meau, you know, things from how the
18    process was going to go. As I said earlier, I ended
19    up asking him for help with an advisor.
20  Q.  Hm Hm.
21  A.  Questions, you know, about the process,
22    about -- about the things I had to do ahead of time
23    and things like that. Kind of -- you know, just
24    'cause while the process laid out, at the same time

---

Page 101

1    there's still some things that he had the knowledge
2    of that wasn't as explicit I guess. You know, just
3    like the actual process of getting an advisor,
4    things like that.
5  Q.  What was your relationship like with
6    Mr. Irish during this period?
7  A.  I mean it was formal. You know, I mean --
8  Q.  Any other description? Just formal?
9  A.  I mean, yeah, it was formal. It was, you
10    know, businesslike, formal. It was, you know -- ut
11    was kind of -- I mean that same. I mean I could use
12    different --
13  Q.  Businesslike and formal?
14  A.  Yeah, you know, I could keep using different
15    descriptions.
16  Q.  Yeah. Professional, whatever?
17  A.  Yeah, exactly.
18  Q.  Okay. So the evening of the hearing came on
19    May -- or the afternoon --
20  A.  Yeah.
21  Q.  -- of May 18th, 2011?
22  A.  Yeah.
23  Q.  You were introduced, and Caitlin was
24    introduced to the panel, correct?

---

Edwin R. Bleiler
May 16, 2012

Bleiler v.
College of the Holy Cross

Page 102

1 A.  We introduced ourselves but yes.
2 Q.  You introduced yourselves to the panel.  And
3 you were asked whether or not you had any objections
4 to the panel members, and you stated no further
5 objections but you did --
6 A.  I wanted to restate my previous objection.
7 Q.  You restated your original objections that
8 we've already discussed, correct?
9 A.  Yes.
10 Q.  About the two student members?
11 A.  Yes.
12 Q.  And then Caitlin Murphy made an opening
13 statement, correct?
14 A.  Yes.
15 Q.  And then you made an opening statement,
16 correct?
17 A.  Yes.
18 Q.  Were you restricted in any way from what you
19 said?
20 A.  No.  Not that I can recall.
21 Q.  All right.  And then at that point panel
22 members were entitled to ask some questions, and
23 they asked some questions of you, and they asked
24 some questions of Caitlin, correct?

Page 103

1 A.  Yes.
2 Q.  And then after that were you given an
3 opportunity to ask questions of Caitlin?
4 A.  Yeah.  There was an opportunity for both of
5 us to ask questions.
6 Q.  So you both had an opportunity to question
7 each other?
8 A.  Yes.
9 Q.  But you had to do it through the chair?
10 A.  Through the board, right.
11 Q.  You couldn't make a direct inquiry?
12 A.  Yeah.  I mean there was even a divider up in
13 the room as well.  So we couldn't even see each
14 other.
15 Q.  You couldn't see each other?
16 A.  Correct.
17 Q.  Following that testimony there were a number
18 of witnesses, correct?
19 A.  Following which one?
20 Q.  Following your testimony and Caitlin's
21 testimony.
22 A.  Yeah.
23 Q.  You weren't prevented from asking any
24 questions you wanted to ask; is that correct?

Page 104

1 A.  Yeah -- no.  No, I was not -- no, I was not
2 prevented.
3 Q.  And Caitlin wasn't prevented from asking
4 whatever questions she wanted to ask, correct?
5 A.  Yes -- no, not that I recall.  There were no
6 restrictions on that.
7 Q.  Then the next witness came on.  And the next
8 witness was Sergeant Scully -- Culley?
9 A.  Culley, yes.
10 Q.  That was the sergeant that you originally
11 met with?
12 A.  Yes.
13 Q.  And you had an opportunity to listen to
14 Sergeant Culley's testimony, correct?
15 A.  Yes.
16 Q.  And at the end of her testimony she was
17 asked questions by panel members.  And then you were
18 given an opportunity to ask questions, correct?
19 A.  Yes.  We were -- yeah, it was that same
20 process.  We both get a chance to ask questions of.
21 Q.  And did you ask any questions of Sergeant
22 Culley?
23 A.  Yes.
24 Q.  You weren't restricted in any way with the

Page 105

1 questions you could ask --
2 A.  No, not that I recall.  No.
3 Q.  -- of Sergeant Culley?  Okay.
4    The next witness was a Mr. Ford --
5 Officer Ford?
6 A.  Yeah, that was the other officer.
7 Q.  And it went the same way.  He gave his
8 testimony?
9 A.  Right.
10 Q.  The panel members asked questions?
11 A.  Right.
12 Q.  And you asked questions if you wanted to?
13 A.  Yeah, it was just kind of a -- you know,
14 while -- the whole thing was pretty much whoever the
15 witness was would give their testimony.  Then the
16 board would ask questions.
17 Q.  Okay.
18 A.  Then we were both allowed to ask questions.
19 And then if the board had further questions, they
20 once again had a chance to ask these questions.
21 Q.  Then Miss Masi testified?
22 A.  Yes.
23 Q.  And you were given an opportunity to ask her
24 any questions if you wanted to?

Min-U-Script®

Bleiler v.
College of the Holy Cross

Edwin R. Bleiler
May 16, 2012

Page 106

1  A.  Yes.
2  Q.  And Caitlin was given an opportunity to ask
3  any questions if she wanted to, and the panel was
4  given an opportunity, correct?
5  A.  Yes.
6  Q.  And then after that Miss Federici testified,
7  correct?
8  A.  Yes.
9  Q.  And the same process followed.  The panel
10  was allowed to ask her questions; you were allowed
11  to ask her questions, and Caitlin was allowed to ask
12  her questions, correct?
13  A.  Correct.
14  Q.  Nobody shut anybody off, correct?
15  A.  No, not from -- no.
16  Q.  And then the next person to testify was
17  Jacob Yiznitsky, correct?
18  A.  Yes.
19  Q.  And after his testimony the panel asked him
20  questions?
21  A.  Yes.
22  Q.  And you were permitted to ask questions?
23  A.  Yes.
24  Q.  And Caitlin was permitted to ask questions,

Page 107

1  correct?
2  A.  Yes.
3     (Pause.)
4  Q.  And then after that I think you presented
5  one witness through their --
6  A.  Yeah, I just made a point that since my
7  witness couldn't be there there was a statement in
8  the folder.
9  Q.  There was a statement from your witness.
10  And that was submitted, correct?
11  A.  Yeah, they already had --
12  Q.  And you were permitted to give a closing
13  statement?
14  A.  Well, the board members asked questions
15  again first.
16  Q.  The board members could ask additional
17  questions -- no, sorry.
18  A.  No, no, no I just wanted to make sure.
19  Q.  So they asked additional questions of you?
20  A.  Yes.
21  Q.  And of Caitlin?
22  A.  Yes.
23  Q.  And then following that you were each
24  allowed to give closing statements, correct?

Page 108

1  A.  Yes.
2  Q.  And neither of you were restricted in what
3  you could say; is that correct?
4  A.  No, not -- not that I can recall.  No.  Same
5  thing.
6  Q.  How long did the hearing last?
7  A.  Altogether?  Not positive.  Maybe three --
8  three hours maybe with all the -- with the breaks
9  and -- 'cause it would go on for a little bit, and
10  we'd take a fifteen-minute break or ten-minute
11  break.  So, you know, maybe three hours altogether
12  approximately.  I'm not positive on time.
13  Q.  If we go back to the incident itself that
14  night on May 1st, 2011, if I were to characterize
15  it, it would be fair to say that you felt that what
16  happened that evening was consensual and that
17  Caitlin felt it was forced by you?
18     MS. SMITH-LEE:  Objection, but you can
19  answer.
20  A.  Sorry, can you ask the question again?
21  Q.  If I were to characterize the positions of
22  the parties, you and Caitlin, about what happened in
23  your room on May 1st of 2011, your position was that
24  whatever sexual encounter you had that night was

Page 109

1  mutual and that -- and Caitlin's position was that
2  whatever sexual encounter you had that night was
3  forced by you, correct?
4     MS. SMITH-LEE:  Note my objection, but
5  you can answer.
6  A.  Yes.
7  Q.  And it was her position that you did -- that
8  she never consented to sexual intercourse, correct?
9     MS. SMITH-LEE:  Objection but go ahead.
10  A.  Yes, that was her --
11  Q.  And after the initial intercourse you got
12  off her, correct?
13     MS. SMITH-LEE:  Objection but go ahead.
14  Q.  You separated?
15  A.  Yes.
16  Q.  And you asked her whether you could continue
17  having intercourse --
18  A.  Yes.
19  Q.  -- or words to effect, correct?  And she
20  said no?
21  A.  Correct.
22  Q.  And you didn't go further, correct?
23  A.  Correct.
24  Q.  The first time that you had intercourse that

Edwin R. Bleiler
May 16, 2012

Bleiler v.
College of the Holy Cross

---

Page 110

1    evening --
2  A.  Hm Hm?
3  Q.  -- did you ask her can we have intercourse?
4  A.  No, I did not.
5  Q.  But you felt it was mutual?
6  A.  Yes.
7  Q.  Now the board deliberated, and a decision
8    was made. How were you informed of the decision?
9  A.  I was called by Paul Irish and then went
10   back to his office that evening.
11 Q:  What did he say? What did you say?
12 A.  I didn't say much. But he just told me
13   pretty much the findings of the hearing board.
14 Q.  Was anybody with you?
15 A.  My parents were with me, but they weren't
16   allowed in the room at the beginning. It was kind
17   of a -- just me and him. Then after he had told
18   me --
19 Q.  How did you react?
20 A.  As I said, I just really didn't say
21   anything. I just wanted --
22 Q.  Did your parents then come in?
23 A.  Yes.
24 Q.  Did they say anything?

---

Page 111

1  A.  Yes.
2  Q.  What did they say?
3  A.  I was too distraught to remember.
4  Q.  Did they tell you afterwards what they said?
5  A.  No.
6    MR. POTTER: Could I have marked as the
7  next exhibit HC 10068 which is a letter dated May
8  19, 2011 to Jacqueline D. Peterson from Jude Kelley
9  with a carbon copy to Eddie -- to E. Bleiler.
10   (Exhibit 17 marked
11   for identification.)
12 Q.  Exhibit number 17, did you receive that
13   Exhibit number 17?
14 A.  Yes.
15 Q.  Did you receive it on the date of the
16   letter?
17 A.  I believe so, yes.
18 Q.  What did you do after you received the
19   letter dated May 19, 2011 which is marked
20   Exhibit 17?
21 A.  I was told to direct an appeal if I were to
22   appeal to Father McFarland which I did.
23 Q.  How did you go about preparing an appeal?
24   MS. SMITH-LEE: I'm just going to put a

---

Page 112

1    blanket instruction on the record to answer to the
2    extent you can without revealing conversations with
3    counsel.
4      THE WITNESS: Okay.
5  Q.  Which is fine. I don't want to know what
6    you said to your attorney or what your attorney said
7    to you. I want to know what you did.
8  A.  I just tried to -- you know, I read over the
9    appeals policy.
10 Q.  Hm Hm.
11 A.  And just kind of went through that and went
12   back through -- that was when -- as you asked
13   earlier, if I had reviewed the tapes from --
14 Q.  Yes.
15 A.  -- that's when I went back through there.
16 Q.  How many times did you listen to the tapes?
17 A.  I only listened to them once before filing
18   the appeal. So I went, listened to the tapes and
19   then with -- you know, with the appeals process in
20   mind as kind of -- kind of put -- took what I could
21   from the tapes as parts where I would -- where I
22   wanted to or saw reason for an appeal.
23     MR. POTTER: Could we have marked as the
24   next exhibit a letter dated May 24, 2011, Dear

---

Page 113

1  Father McFarland. It consists of HC 10060 through
2  HC 10066.
3    (Exhibit 18 marked
4    for identification.)
5    MR. POTTER: Oh, I should also include
6  1067 -- 10067 because attached to it were the
7  Facebook pages. Yeah, I'm sorry.
8    THE WITNESS: That's perfectly fine.
9    (Pause.)
10 Q.  In looking at Exhibit 18 which is HC 10060
11   through 10067, is that the appeal that you sent to
12   Father McFarland?
13   (Pause.)
14 A.  Yes.
15 Q.  As you sit here today and having looked at
16   Exhibit number 18, is there any other basis for your
17   appeal other than the appeal that you submitted with
18   this letter of May 24, 2011? Was there any other
19   basis?
20     MS. SMITH-LEE: Objection but go ahead.
21 A.  Was there any other basis at the time?
22 Q.  Yes.
23 A.  Well, the -- I mean the appeals process was
24   to appeal, you know, the fundamental things. So

---

Page 114

1  those were the fundamental issues.
2  Q.  Do you have any other grounds for the
3  appeal?  I'm not talking about this case -- but for
4  the appeal that you didn't state that you wished
5  you'd stated?
6  A.  The things I found out later, you know, with
7  regards to, you know, being the RA or HRA or
8  whatever, however that -- I understand that we don't
9  know which one was which but, yeah, I would have
10  included that.
11  Q.  You would have included the HRA or the RA --
12  A.  Yeah, whatever.
13  Q.  -- as an additional conflict, correct?
14  A.  Correct.
15  Q.  All right.  Anything else?
16  A.  No, not that I -- not that I can -- not that
17  I can think of right now.
18     MR. POTTER:  The next exhibit is HC
19  10014 through HC 10018.  It's a letter from Father
20  McFarland to Edwin Bleiler dated May 26, 2011, and
21  it attaches to it the shipping notification and the
22  final page withdrawal/leave of absence document
23  which is 10018.
24     (Exhibit 19 marked

Page 115

1  for identification.)
2  Q.  This is Exhibit 19 which is Father
3  McFarland's letter to you --
4  A.  Hm Hm.
5  Q.  -- dated May 26, 2011.  Did you receive
6  that?
7  A.  Yes.  I received the letter.  I don't think
8  I -- I hadn't seen this -- the last page here
9  before, but that was June 2nd.
10  Q.  18 you hadn't seen before?
11  A.  I didn't see 18.
12  Q.  But you did receive the letter?
13  A.  I did.
14  Q.  And you received it on May 27th, correct?
15     (Pause.)
16  A.  Yeah -- yes.
17  Q.  Now in that letter -- let me just ask you a
18  couple things in that letter.  Father McFarland in
19  the second paragraph talks about the Facebook issue.
20  A.  Hm Hm.
21  Q.  And he says, however, that is often such a
22  superficial connection, especially for students who
23  have hundreds or even thousands of Facebook friends,
24  that it cannot be assumed that such a relationship

Page 116

1  in itself would constitute undue influence.
2  Q.  Do you disagree with that statement?
3     MS. SMITH-LEE:  Objection..  You can go
4  ahead.
5  A.  I'm sorry, I'm just trying to find it on the
6  page.
7  Q.  Oh.  It's in the second paragraph there
8  about -- I don't know -- ten lines down.  However.
9  A.  Yep, however, it is often -- do I disagree
10  with that statement?
11  Q.  Yes.
12     (Pause.)
13  A.  I mean I would disagree with -- I would
14  disagree with it in the sense that -- I mean, yeah,
15  with the sense that -- in the sense that it shows
16  some other relationship there, but the -- you know,
17  like -- I would disagree with my disagreement being
18  that Facebook friends would assume some form of
19  connection and therefore could have some form of
20  connection.
21  Q.  But in order to make that determination
22  don't you need to know more?
23  A.  I think it depends on the -- I mean if you
24  -- I mean it's -- I would say that's broad because

Page 117

1  hundreds of thousands is clearly a big numbers
2  difference, you know, with -- if you're friends
3  with, you know, 200 people versus 10,000 people,
4  there'd be --
5  Q.  But even with 200 people, don't you have to
6  examine the depth of the relationship, how often
7  they see each other, whether they socialize
8  together, whether they study together -- all the
9  kinds of things that develop a close relationship?
10  Don't you have to look at that?
11     MS. SMITH-LEE:  Note my objection, but
12  you can answer.
13  A.  I mean I would argue with, too, I mean with
14  today's -- that's more of a general issue but...
15  Q.  Hm Hm.
16  A.  I mean with the Internet and stuff today if
17  they only have 200 -- if that was the number --
18  Facebook friends, then they more closely monitor who
19  their friends are.  That would be my, you know,
20  on-the-face objection to that.
21  Q.  Okay.
22  A.  I mean just because it's so easy to have --
23  to have more I guess.
24  Q.  On the next page Father McFarland makes the

Edwin R. Bleiler
May 16, 2012

Bleiler v.
College of the Holy Cross

---

Page 118

1  statement at the top you also argue that the hearing
2  was unfair because the complainant only referenced
3  her injuries in her final statement and therefore
4  was not subject to cross-examination about them.
5  However, her second statement to public safety which
6  you had access to as part of her case file had an
7  even more detailed description of her physical
8  injuries than she gave in her final statement.
9      Do you see that?
10 A.  Yes, I do.
11 Q.  And you had that statement, correct?
12 A.  Yes.
13 Q.  And you had reviewed it several times,
14  correct?
15 A.  Yes.
16 Q.  And she had there described her physical
17  injuries, correct?
18      (Pause.)
19 A.  Could you ask the question one more time?
20  I'm sorry, I was trying to --
21 Q.  Yes. Caitlin Murphy had described in one of
22  her statements she gave to the police what her
23  physical injuries had been; is that correct?
24 A.  To some extent, yes.

---

Page 119

1      (Pause.)
2  Q.  Now if you look at Bleiler Exhibit number 5,
3  it says I was taken to the hospital after talking
4  with public safety and there they did an
5  examination. They found a one-inch laceration that
6  still causes me daily pain and the area was worn
7  out, tender and extremely painful. I bled for five
8  days from the wounds. I can feel them, and I am
9  reminded of the incident every time I walk.
10      Did you see that when you reviewed the
11  file?
12 A.  Yes. Was that statement the second
13  statement or the third statement?
14 Q.  Well, it --
15 A.  That's why I was confused.
16 Q.  Yeah, it looks like the third statement.
17 A.  That's what I was trying to play it back in
18  my mind how it all -- how it all worked out.
19 Q.  You weren't prohibited from asking any
20  questions about that if you wanted to at the
21  hearing, correct?
22 A.  Correct, yeah. Yeah, that's where my
23  confusion was -- what I was trying to remember.
24 Q.  I'm sorry.

---

Page 120

1 A.  That's fine. Neither your fault nor mine.
2 Q.  Huh?
3 A.  It wasn't your fault either. Just reading
4  off the page.
5      MS. SMITH-LEE: Could we go off the
6  record for a second?
7      MR. POTTER: Sure.
8      (Off the record.)
9      (A recess was taken.)
10     MR. POTTER: Could I have marked as the
11  next exhibit HC 109 -- 10292, and it's page 5 from
12  the handbook. It's the introduction and College of
13  the Holy Cross Mission Statement.
14     (Exhibit 20 marked
15      for identification.)
16 Q.  Exhibit 20 has page 5 and page 6 of the Holy
17  Cross handbook. I'm referring simply to page 5 just
18  because it's double copied.
19 A.  Yep.
20 Q.  I'd ask you to just look at that. If I
21  understand you correctly -- your testimony
22  correctly, you've never read the mission statement
23  of Holy Cross; is that correct?
24     MS. SMITH-LEE: Objection. Go ahead.

---

Page 121

1 Q.  Or you had never read it prior to May 11,
2  2011 -- I mean May 1, 2011?
3 A.  Correct. Yeah, not to my knowledge I hadn't
4  read the full -- I mean the whole -- you know, the
5  whole --
6 Q.  And you hadn't read the introduction to the
7  mission statement, correct?
8 A.  Correct. Correct, yeah.
9 Q.  All right.
10     MR. POTTER: Could I have marked as the
11  next exhibit HC 10320 through HC 10331? And it is
12  the community standards and disciplinary procedures
13  for students and the code of student conduct.
14     MS. SMITH-LEE: What's the end page?
15  Three three one?
16     MR. POTTER: Yeah, 331 but only because
17  it's copied that way.
18     MS. SMITH-LEE: Okay.
19     (Exhibit 21 marked
20      for identification.)
21 Q.  Referring if we could to Exhibit 21, it is
22  my understanding from your testimony that you have
23  never -- or had never reviewed that portion of the
24  handbook referenced on those pages prior to May 11,

---

# EXHIBIT 1
# TO TAB 1



## HOLY CROSS CAMPUS POLICE
## NOTIFICATION OF MIRANDA RIGHTS

Before asking you any questions, it is my duty to advise you of your rights:

1. You have the right to remain silent;
2. If you choose to speak, anything you say may be used against you in a court of law or any other proceedings;
3. You have the right to consult with a lawyer before answering any questions and you may have him/her present with you during questioning;
4. If you cannot afford a lawyer and you want one, a lawyer will be provided for you by the commonwealth without cost to you;
5. Do you understand what I have told you?
6. You may also waive your right to counsel and your right to remain silent and you may answer any question or make any statement you wish. If you decide to answer questions you may stop at any time to consult a lawyer.


Antes do hacerle cualquier pregunta, es mi oligacion avisarle de sus derechos:

1. Usted tiene el derecho de guardar silecio;
2. Si usted elige hablar, cualquier cosa que usted diga puede ser usada contra usted una corta u otro tramite;
3. Usted tiene el derecho do consultar con un abogado antes de contestar cualquier pregunta y puede tenerlo presente durante la interrogacion;
4. Si usted no puede contratar un abogada y quere uno, el estado le asignara uno sin gasto a usted;
5. Comprende lo que le he dicho;
6. Usted tambien puede renunciar el derecho a un abogado y su pregnuta o hacer cualquier declaracion que desee. Si decide contestar pregnutas, puede parar a cualquier tiempo para consultar un abogado.


SUSPECT _____   DATE _5/9/2011_

WITNESS ___Kate Milly___   DATE _5-9-11_

# EXHIBIT 2
# TO TAB 1

 **Holy Cross**

Office of Student Conduct & Community Standards
One College Street, Box 13A
Worcester, MA 01610-2395
508-793-2669

May 9, 2011

Mr. Edwin Bleiler
Class of 2011

Dear Edwin:

Please be advised that today I received a Public Safety report detailing an investigation into an incident from May 1, 2011. This report indicates that you sexually assaulted another student.   Based on the serious nature of this report you are being placed on **Interim Suspension.**

The interim suspension will remain in place until a final disciplinary decision is rendered, or until I receive additional information which would warrant reconsideration of the interim action.   At no time during the interim suspension may you be on campus.

A final decision regarding this matter will be made in accordance with the policies detailed in the College's Community Standards and Disciplinary Procedures for Students found in the Student Handbook.

Additionally, you are directed to have no contact, either directly or indirectly with Ms. Caitlin Murphy.

Please contact me with any questions or concerns.

Sincerely,

Paul A. Irish
Assistant to the Vice President for Student Affairs
Director Student Conduct & Community Standards


cc:      *Student File*
         *J. Peterson, Dean of Students / VP of Student Affairs*
         *R. Hart, Chief Public Safety*
         *M. Freeman, Associate Dean, Class of 2011*

# EXHIBIT 3
# TO TAB 1



COLLEGE OF THE HOLY CROSS

*Notice of Pre-Hearing Meeting*

*Office of Student Conduct & Community Standards*

May 10, 2011

Mr. Edwin Bleiler
Class of 2011

Dear Edwin:

Please be advised that I have received written information indicated that you are alleged to have violated the College's Community Standards.

    **Alleged Community Standard Violation** : Sexual Misconduct I
    **Date of Incident** : May 1, 2011
    **Location:** Off-Campus Apartment
    **Reporting Party:** Caitlin Murphy 2013

You are required to attend a pre-hearing meeting to discuss this allegation. The purpose of the meeting is to review the written materials and determine how you wish to proceed. You may choose to either accept responsibility for the violation(s), or contest your responsibility for the violation(s). If you choose to contest your responsibility for the violation, the pre-hearing meeting will be used to prepare you for an upcoming Community Standards Board Hearing.

Your *Pre-Hearing Meeting* has been scheduled for **May 10, 2011 at 4:00 PM** in Hogan 109. Should this time and date conflict with an academic commitment, please contact my office immediately to reschedule. If you do not attend a decision will be rendered without your input.

Sincerely,

Paul A. Irish
Assistant to Vice President for Student Affairs
Director of Student Conduct & Community Standards

HC10106

# EXHIBIT 4
# TO TAB 1



# Holy Cross

## Office of Student Conduct & Community Standards

### Pre-Hearing Checklist for the RESPONDENT

Please read each statement carefully. Your initials next to a statement indicate that you understand and accept the conditions of that statement.

1. I have received written notification of the complaint.

2. I understand the violation of the Community Standards that I am alleged to have committed.

3. I am aware of the identity of the complainant.

4. I understand that any behavior that can be construed as retaliation against the complainant or witnesses will be subject to immediate disciplinary action including suspension/expulsion from the College.

5. I have a copy of the Student Handbook which includes the Community Standards Board procedures.

6. I understand that I may review the case file (a copy cannot be made nor can it be removed from the Office of Student Conduct & Community Standards) prior to the hearing.

7. I understand that I may have an advisor present with me during the hearing and I have reviewed the role of the advisor.

8. I understand that if I choose to have an advisor, s/he must be a faculty, staff or student member of the Holy Cross community.

9. I understand that if I choose to have an advisor it is my responsibility to provide the advisor's name to the Hearing Administrator 48 hours prior to the hearing.

10. I understand that my witnesses will be asked to speak only to the incident in question and the relevancy of their testimony is subject to the discretion of the Community Standards Board Chair.

11. I understand that my witness list and copies of written statements must be submitted to the Hearing Administrator no later than 48 hours prior to the hearing.

12. I understand that the hearing will be scheduled taking into account only classes and other officially recognized absences from class.

13. I understand that the decision of the Community Standards Board is final pending appeal to the Vice President for Student Affairs/Dean of Students or designee.

14. I understand the circumstances which will be considered grounds for appeal and how to file an appeal if I so choose.

15. I understand that appeals must be filed no more than 72 hours after the date of the hearing to the VPSA/DOS and will be final.**

16. I understand that the hearing, with the exception of the deliberations, may be taped and that the tape is considered property of the College.

17. I understand that should I wish to review the recording I may do so in the office, and may not make a copy or otherwise remove the recording.

18. I understand that I should contact Paul Irish with any questions.

19. I have been encouraged to discuss this matter with my family.

Advisor Name, Witness Statements Due by: ___TBD___   Hearing Date & Time: ___TBD___

Respondent's Name: _Edw Blair_   Signature: _EL Blr_ Today's Date _5/10/7011_

**Sanctions of expulsion may be appealed to the College President.**

HCI0107

# EXHIBIT 5
# TO TAB 1



## College of the Holy Cross

### Public Safety Department
### Witness Statement Form

Well, we had met before / hooked up (meaning
made out) before. I was at a house off campus
when I saw him and he took me up to his room.
Being on antibiotics and having consumed
alcohol I was definitely out of; As we
were making out I don't remember how my clothes
came off but they did. The next thing I knew
he was forcing himself inside me to which I
didn't consent. This continued until I was able to
push him off/out of me. I did bleed from this
encounter. After pushing him off from me
he did ask for sex again and again but
he did not [try] force himself into me. he respected
me saying no.

**Signature:** _____  **Date:** 5/1/11

# EXHIBIT 6
# TO TAB 1



## College of the Holy Cross

### Public Safety Department
### Witness Statement Form

I began drinking that night at 6:30pm. I had previously decided that I was not going to drink too much because I was on antibiotics. From 6:30pm to 10:00pm I had 4 solo cups full of beer. I then left where I was at the apartments, with Marjorie Liggett, to go to where my band was performing at Clark Hall. Here I had a couple sips of a mixed drink of coke and vodka. I left here to go off campus to a house on clay with my friends Liz Masi, Katie DiFusco, Katelyn Desrosiers, Kristin Desrosiers and Felicia Russo. At this house I had not even maybe half of a solo cup of beer. I realized at this party that I had lost my phone. me, liz, katelyn, and kristin then left this house to go a house on Boyden. At this point I became incredibly drunk, which is very strange since I spaced my drinks and I normally drink much more without being

Signature: _____   Date: May 5, 2011

**Witness Statement Continuation**

this intoxicated. I don't remember how we got in the house but I do remember liz and I looking for a bathroom. We accidently opened the wrong door ~~too drunk~~ and I saw behind it a guy I knew, someone that I had made-out with before. I said hi but then left to climb the stairs. I don't remember anything that happened afterwards. The next thing I remember is him leading me to his room, which I'm pretty sure is on Caro and I don't remember leaving the party and going outside at all, and we were making out. The next thing I know, I'm really out of it and my clothes are off and I don't know how that happened. He then put his fingers inside of me to which I remember saying "no" and he said "it's okay" but he didn't stop. ~~Because I was~~ I tried to move myself out of the way but he ~~was~~ was forcing himself himself inside me. I definitely did not consent and I'm pretty sure I said no since my thoughts were screaming it. Being a virgin I did not want this. He continued for I don't know exactly how long, until I was able to push him off me. I was crying and I told him I was too drunk and tired and I wanted to leave. I remember him asking me for sex again but I said "no that wasn't supposed to happen." I don't remember anything after that, vaguely getting dressed and him asking me why I never text him back, really vaguely.

HC10099



## College of the Holy Cross

Public Safety Department
Witness Statement Form

The next thing I remember is seeing my friends Jake Yiznitsky and Beth Federici on Linden Lane. I don't remember exactly what I said but they said I needed to go to public safety, though I didn't want to. We stopped by my room to change out of my clothes before we went to public safety.

Signature: _____   Date: May 5, 2011

HC10100

# EXHIBIT 7
# TO TAB 1



## College of the Holy Cross

### Public Safety Department
### Witness Statement Form

I had been debating whether I should have the school taking action, instead of pressing charges criminally. I now see that the best way to handle this is through the school. Therefore I am releasing his name: Eddie Bleiler.

I ultimately made this decision also because I still suffer from injuries sustained during this incident, which I did not include in my other statements. I was taken to the hospital after talking with Public Safety and there they did examinations. They found a 1 inch lasaration, that still causes me daily pain. And the area was warm out, tender and extremely painful. I bled for 5 days afterwards from these wounds. I can feel them and am reminded

**Signature:** _____   **Date:** 5/9/11

(continued on back)

HC10102

## Witness Statement Continuation

Of the incident everytime I walk.

# EXHIBIT 8
# TO TAB 1



# College of the Holy Cross

### Public Safety Department
### Witness Statement Form

Jake and I were walking down Linden Lane around 1:45 am this morning. We encountered Caitlyn walking towards us. We were heading towards the edge of campus, and she was walking towards the main part of campus. We all said hi - but she looked upset. Jake asked her if she was okay, and she said that she was not. We asked her about it, and she said something about (I'm not quite sure of the wording) someone taking advantage of her. She did use the word rape. Jake and I turned around with Caitlyn and started walking back towards Dinand - up the steps. Caitlyn said all she wanted to do was sleep, but I was worried about her. Jake and I insisted she keep walking with us. Jake gave her his jacket because she was cold ( she told us that she couldn't remember where the firefighter jacket she had been wearing was). At some point in all of this, she said that she didn't have her phone. She wasn't entirely sure where that was either. While the three of us were walking around (we went up the row of dorms and back up to Healy on East St, I think). At this point Caitlyn told us that she knew the guy who had raped her. She said he was a senior who lives on Boydon Street - she had just come from a party there. He is on the baseball team. I think she

**Signature:** _Beth Federice_   **Date:** _May 1, 2011_

## Witness Statement Continuation

said his name was Alex or Eddie or something - I was honestly just trying to make sure she was okay. Whenever Jake and I would ask a question about what had happened - she looked like she was about to break down. Then she would try to change the subject. There were several points in the hour + that we spent with her trying to convince her to go to Public Safety that she cried.

HC10090

# EXHIBIT 9
# TO TAB 1



# College of the Holy Cross

### Public Safety Department
### Witness Statement Form

Met Caitlin on the sidewalk of Linden Lane approx. 1:50 a.m.
She was clutching her arms and staring into space, not noticing us
until we were right next to her. Seemed very happy to see us but didn't
seem her usual happy self. Asked what was wrong, said "nothing"
but cried a little. Asked again and said, "I think I was just raped."
We walked with her, put our arms around her, I gave her my jacket &
we talked. Seemed to be trying to avoid talking about it or thinking about it.
Said she knew her attacker and had had an off-and-on relationship but
nothing serious. Said she tried to say no & position herself so he couldn't
do anything but she couldn't. When we got back to her room we tried to
convince her to go to Public Safety, tried to talk to her about it but once
the topic was brought she immediately became on the verge of tears, saying
she wanted to go to bed and go to sorrow. She told us that he didn't use
protection and we convinced her to go to Public Safety. Said she didn't want
to get anyone in trouble and that "he probably didn't mean it." Throughout
the whole night she seemed to be trying to change the subject and not
wanting to think or talk about the situation. Having met her presumably

Signature: _Jacob M. Yonkers_        Date: _5/1/11_

HC10091

## Witness Statement Continuation

very soon after the incident. I don't believe she showered, she even remarked that her hair was so oily because she hadn't ~~showed~~ ~~for a~~ washed it in a couple days. While in her room she seemed very self-conscious, immediately putting on a big and baggy hoodie.

HC10092

# EXHIBIT 10
# TO TAB 1



## College of the Holy Cross

### Public Safety Department
### Witness Statement Form

I saw Caitlin Murphy at Clark at around 10:30ish pm on Saturday. After she finished performing (her band was playing outside of Clark), me, Caitlin, Liz Masi, and a few other girls I didn't know very well decided to go off campus to 12 Clay where our friend was hosting a surprise party. At 12 Clay, Caitlin became upset that she lost her phone so I spent a better part of my time there looking for it. We could not find it and then the group of girls we were with said we were going to 1 Boyden, so Liz, Caitlin, and I (with the other girls too... I'm sorry I'm not sure of their names) went to 1 Boyden. After being there for maybe 20 minutes, I decided to leave on my own (since 1 Boyden was getting so crowded and I didn't really want to stay any longer). I left the group of girls and got back to campus just before 1am.

**Signature:** KDiFusco      **Date:** 05/03/2011

# EXHIBIT 11
# TO TAB 1



## College of the Holy Cross

Public Safety Department
Witness Statement Form

On saturday Night I started my night by
hanging out with some of my friends
in Clark ~~when~~ starting around 9 PM. (Caitlin was not there)
Then we went to the Clark Block party
around 10 to see Caitlin perform in
her band. We stayed there for around
an hour. Then, a few of us, including
Caitlin, decided to go off campus. We
had arrived at 12 (?) Clay. By that
point, I was tired and the house
seemed desolate. So me and my
other friend decided to leave after
5 minutes. I was back on campus by
11:30, visited my boyfriend in Lehy,
went back to Healy (my dom) + was
in bed by 12:30 pm.

Signature: _Felicia Russo_          Date: _5/3/11_

HC10094

# EXHIBIT 12
# TO TAB 1



## College of the Holy Cross

Public Safety Department
Witness Statement Form

I went to the Clark Hall Block Party at around 10 PM with a few friends. I believe around 11, I went off campus to 1a Clay St. with Kristen Desrosiers, Katelyn Desrosiers, Katie DeFusco, and Caitlin Murphy. My 2 friends Felicia Russo & Brooke Cunningham left to go back to their rooms & called it a night. We stayed at 12 Clay for some time. Caitlin was upset she lost her phone; she had no idea where it went. With Kristen, Katelyn, Katie, & Caitlin, I went to 1 Boyden St. Katie left a few minutes after we got there. I remember going to the bathroom with Caitlin and then talking to some people at the house. We were told to get out but Caitlin didn't come out with us. I went back into the house to look for her, couldn't find her. I knew she was intoxicated so I got worried - I couldn't contact her b/c her phone was lost too. I waited about 15 minutes outside for her, stopped at 125 College St. with Katelyn & Kristen, then went to bed in Clark Hall.

Signature: Elizabeth Glios          Date: 5/4/11

HC10095

# EXHIBIT 13
# TO TAB 1



## College of the Holy Cross

### Public Safety Department
### Witness Statement Form

Today, May 4th I talked with Sergent Hayes and another officer about an incident that occured the previous Saturday night involving Caitlin Murphy and who I believe is named Edwin Bleiler. Last Saturday she had been at his house off campus, I believe on Caro St., when she was sexually assaulted and raped by Bleiler. I met her a few minutes or perhaps on hour at most after the incident. She told my friend and I, both of us friends of Caitlin, that she had been raped. She had known Edwin before but she had never had sex before, with him or anyone. She tried to stop it, saying that she kept moving away and trying to move so he couldn't do anything, but he got on top of her and she couldn't stop it. It was/is clear to me she never said yes or agreed to the act and she certainly didn't want any of this to happen, now or ever.

Signature: _Jacob M Yingst_ Date: _5/4/11_

# EXHIBIT 14
# TO TAB 1



## College of the Holy Cross

### Public Safety Department
### Witness Statement Form

I was at I orginally was hanging out with Teliria Russo, Liz Masi, Annie Helmcamp, Kristen Desrosiers, Caitlin Murphy at Clark Block Party watching Caitlin sing in her band. Then we decided to go to 12 Clay because some of our friends went there and said it was fun. I went to 12 Clay w/Liz, Annie, Kristen and Caitlin. We had beer there and talked to our friends, we all had fun. But then Caith lost her phone and was extremely upset over it. We all comforted her another find out who had the phone and if her phone was safe. We went to 1 Boyden after and made sure to stay together because Caitlin didn't have her phone. We went to wait for the bathroom on the 3rd floor of 1 Boyden. Then the owner began kicking everyone out so we left, it was really crowded and we tried as best to stay together. They kicked us out and we went downstairs and didn't see Caitlin anymore. Kristen said she saw Caitlin go down the stairs out of the house but she wasn't outside when we got there and Liz + Kristen went back inside to look for her while me and Annie waited outsid. We couldn't find her and were worried. We looked and waited for a while but never found her. We they went up the street and back to to campus and I went to mulkey to go to bed.

Signature: Katelyn Desrosiers     Date: 5/5/10

# EXHIBIT 17
# TO TAB 1

 **Holy Cross**

One College Street, Box 13A
Worcester, MA 01610-2395
508-793-2669

May 19, 2011

Jacqueline D. Peterson
Vice-President for Student Affairs/Dean of Students

Dear Dean Peterson,

A hearing panel of the Community Standards Board met on May 18, 2011 to consider the complaint filed by student Caitlin Murphy, Class of 2013, alleging that student Edwin Bleiler, Class of 2011, committed the following violation of the Community Standards: Sexual Misconduct I.

After hearing all relevant information and after careful deliberation, the Board found that Edwin, as the initiator did not seek, nor did he receive effective consent for sexual activity and intercourse with Ms. Murphy on May 1, 2011. The board also determined that Caitlin was highly intoxicated, incoherent, and was unaware of her circumstances. As such, the board deemed her to be physically helpless at the time of the incident. The board determined that due to her incapacitation, Caitlin could not consent to sexual activity.

Edwin has been found responsible for the violation of Sexual Misconduct I.  Based on the serious nature of this violation, the Board recommends the following sanction:

1. **College Dismissal.** Effective at the conclusion of the appeals period, Edwin should be permanently dismissed from the College of the Holy Cross.

Edwin should be informed that should he wish to file an appeal, it is to be directed to Rev. Michael C. McFarland, S.J. no later than Tuesday, May 24th at 5:00 PM.

Sincerely,

Jude Kelley
Chair - Community Standards Board

cc:
E. Bleiler – Respondent
Hearing folder

Laurie King
Liz Rice
Grant Greeley
Lauren Brais

# EXHIBIT 18
# TO TAB 1

May 24, 2011

Dear Father McFarland,

My name is Edwin Bleiler and later this week, I am scheduled to graduate from the College of the Holy Cross ("College") with a degree in Political Science. Upon graduation, I am to begin teaching in Argentina, and ultimately enroll in law school. As it stands today, I will not be able to realize these life-long dreams, because on May 18, 2011, days away from graduation, the Community Standards Board ("Board") found me responsible for Sexual Assault I, and recommended dismissal. For the reasons set forth below, including substantial procedural violations, I now respectfully file this appeal seeking to overturn the Board's findings and/or modify the sanction imposed.

I.     THE COLLEGE VIOLATED ITS OWN PROCEDURES REGARDING
       DISCIPLINARY HEARINGS

The College's Community Standards and Disciplinary Procedures ("Policy") governing disciplinary hearings clearly provides procedural safeguards which are intended to protect the integrity and fairness of the hearing. As set forth below, in my case, certain of these policies were violated, and I was effectively deprived of my right to a fair hearing, including the right to be adjudicated by an impartial and unbiased Board.

A.   TWO OF THE FIVE BOARD MEMBERS HAD PERSONAL
       RELATIONSHIPS WITH THE COMPLAINING WITNESS
       a.   Policy Provides That Conflicted Members Should Be Replaced

The College compromised the integrity of the hearing process by allowing board members with clear conflicts of interest to preside over my hearing. According to the Policy, no fewer than 72 hours before the hearing, the College would provide me with a list of proposed board members, specifically for the purpose of eliminating conflicted members. Specifically, the Policy provides:

> ...If the accuser or the accused has particular information as to why a specific
> person should not be a part of the panel hearing the case, either of these parties
> must present the information to the Director of Student Conduct and Community
> Standards or designated hearing coordinator in writing 48 hours prior to the start
> of the hearing. *If the Director deems that there is information to suggest a
> potential conflict, another board member will be substituted.* Policy, p. 40
> (emphasis added).

Moreover, to ensure a fair and unbiased board, board members are obligated to "notify the Director or hearing coordinator and disqualify themselves from serving on a board if they suspect a potential conflict with any party participating in a board hearing." *Id.*

HC10060

b.   College Ignored Explicit Evidence Of Conflicts

On May 11, 2011, I was notified in writing by Paul Irish of the names of five (5) potential Board
Members.  Though I initially did not believe there was a potential conflict and notified Mr. Irish,
hours later, when I recognized that I had prior unpleasant dealings (through mutual friends) with
one of the individuals - Grant Greeley - I immediately notified Paul Irish of the potential conflict.

My concerns regarding this "potential conflict" were largely dismissed.  Though my objection
was timely, and filed more than 48 hours prior to the hearing, in his reply, Mr. Irish focused not
on the substance of the potential conflict, but rather on the potential inconvenience of locating a
substitute board member.  Indeed, in response to my concern, on May 13, 2011 –five (5) days
prior to the hearing - Mr. Irish wrote that he had already "released the back-up panel members."
before I even had an opportunity to exercise my right to object under the Policy.

Instead, Mr. Irish indicated that he was content to rely on Mr. Greeley's alleged representation
that "he does not have any personal conflicts with either student and unless there is cause that
would jeopardize his ability to be a fair panelist I do intend to use him." *See Irish Email
5/13/2011, attached as Exhibit A.*

Mr. Irish's reliance on Mr. Greeley's representations of neutrality was misplaced.  First, I
specifically identified a potential personal conflict with Mr. Greeley, where based on prior
negative experience with him, I was concerned he would have been unable to remain impartial.
Second, and more importantly, it is undisputed that Mr. Greeley and the complaining witness
enjoyed a personal relationship prior to the disciplinary hearing.  Indeed, at a minimum Mr.
Greeley and the complaining witness shared at least one class together, and identify themselves
as "friends" on Facebook.  In light of Mr. Greeley's negative contact with me, and his self-
identified friendship with the complaining witness, Mr. Greeley could not possibly be considered
neutral. *See Facebook print-out, attached as Exhibit B.*

The Policy explicitly requires board members to recuse themselves in situations such as this one.
Nonetheless, instead of acknowledging this *potential conflict*, and allowing the College to decide
its importance, it appears Mr. Greeley willfully withheld information regarding his relationships
with the parties.  Indeed, the only thing more troubling than his prior relationship with the
complaining witness, is that when Mr. Irish specifically asked him about a potential conflict, *Mr.
Greeley again failed to disclose his relationship with the complaining witness*, and specifically
represented that he had <u>no</u> conflicts with either party.

HC10061

To make matters worse, the only remaining student member - Ms. Brais – also enjoyed a personal relationship with the complaining witness.[1] Indeed, Ms. Brais - like Mr. Greeley - was also listed as a "friend" of the complaining witness on Facebook. *See Facebook print-out, attached as Exhibit C.*

Immediately upon discovering that the only two students on the five-member Board explicitly acknowledged having a personal relationship with the complaining witness, I notified Paul Irish through my counsel, in writing, to ask that these two members be replaced pursuant to the Policy.  Though I brought the conflicts to Mr. Irish's attention -- more than 48 hours prior to the hearing as provided in the rules – Mr. Irish refused to offer substitute board members.  Instead, he stated that an acknowledgment of friendship on Facebook was not sufficient for "automatic disqualification".  Despite my request for additional information regarding the "automatic disqualification", including any written policies distinguishing "automatic" from a discretionary disqualification, I was only directed again to the Policy which makes no such distinction.  *See 5/16/2011 Email, attached as Exhibit D.*

On May 16, 2011, I met with Mr. Irish in person to renew my request that the two conflicted student Board members be replaced.  During that meeting, Mr. Irish revealed that the Board members' relationships with the complaining witness went far beyond just friendship on Facebook; indeed, according to Mr. Irish, Mr. Greeley and the complaining witness had shared at least one class together, and Ms. Brais had known the complaining witness at least since Ms. Brais' tenure as a Resident Advisor in the Hanselman dorm.

Nonetheless, despite these <u>potential conflicts</u> (the operative words under the Policy), which I identified more than 48 hours in advance of the hearing, Mr. Irish refused to attempt to substitute either member with an impartial student.  To the contrary, Mr. Irish flatly denied there was a conflict, and pointed only to the difficulties with finding available students at the end of the final exam period.  Notwithstanding Mr. Irish's concern that finding substitute board members may have been difficult, nothing in the Policy suggests that expedience and convenience should trump basic tenets of fairness and justice.

### B.   AT LEAST ONE OF THE CONFLICTED WITNESSES WAS OPENLY HOSTILE TOWARD ME DURING THE HEARING AND AT ONE POINT WAS RESTRAINED BY THE CHAIR

Any notion by the College that the conflicted Board members could set aside their personal relationships with the complaining witness and be objective, was dispelled within the first few minutes of questioning by Mr. Greeley.  Mr. Greeley was overtly hostile, sarcastic and dismissive of my testimony.  In contrast to the effusive praise he bestowed upon the complaining

---

[1] As an initial matter, it is worth noting that I was not given appropriate notice of Ms. Brais' appointment to the Board, as Mr. Irish mistakenly referred to her in the initial correspondence as Ms. Brias. *See email.* In fact, it was only by chance that I later realized Ms. Brais was the intended Board member.

witness' witnesses (even when their answers were non-responsive or doubtful on their face), Mr. Greeley suggested I was evasive when he repeatedly asked me the same questions and received the same answers. His vitriolic and hostile treatment of me was apparent to everyone, including the other Board Members; indeed at one point the Chair had to instruct Mr. Greeley to cease attacking me with an inappropriate and repetitive line of questioning.

II.     THE HEARING WAS FUNDAMENTALLY UNFAIR

A. THOUGH THE COMPLAINING WITNESS WAS NOT SUBJECT TO CROSS-
EXAMINATION REGARDING HER ALLEGED INJURIES, THE COLLEGE
ALLOWED HER TO REFERENCE THEM IN HER CLOSING STATEMENT

Even if the Board were comprised of neutral and unbiased members (which it was not), there were also a number of procedural issues which compromised my ability to adequately prepare and present my defense. First, in the course of preparing for the disciplinary hearing, the College instructed that the parties produce all witness statements and supporting documentation at least 48 hours prior to the hearing. In this case, I specifically asked the College whether the complaining witness had medical documentation to support her claims. I was told that she had received medical treatment, but the College did not have subpoena power to obtain relevant documents; therefore I could not obtain the complaining witness' medical records if she did not produce them herself.

Here, the complaining witness chose not to produce her medical records prior to the hearing, and indeed, during her testimony remained silent as to any claims of injuries or medical treatment. As such, I did not cross-examine her regarding these issues.

Despite her strategic decision to exclude testimony regarding her medical treatment (and avoid cross-examination regarding the same), the complaining witness made repeated and detailed references in her closing statement to her alleged injuries. Because this unsworn testimony was untested by the rigors of cross-examination, it offered no probative value, and was designed to do little more than inflame the passions of the Board.

B. WITNESSES WERE NOT SEQUESTERED

Moreover, contrary to the representations of the College's law enforcement officers, the witnesses were not separated to ensure accuracy. At the hearing, Officer Ford testified that he separated the complaining witness' witnesses, so that their statements did not get contaminated. In sharp contrast however, two of the complaining witness' witnesses (Mr. Yiznitsky and Ms. Federici) clearly state that they were sitting together and waiting, both at Public Safety and the Hospital, suggesting that they were in fact not separated.

C. THE COLLEGE MADE NO ATTEMPT TO PROTECT THE SANCTITY OF
THE DELIBERATIONS

With all due respect to the College's policies and personnel, including Mr. Irish, I find it concerning that it appears he was present at all times during the Board's deliberations. From the outset, Mr. Irish had contact with both parties, and on two separate occasions in his office, offered me the opportunity to make a statement regarding the complaining witness' allegations. It is my understanding that he also spoke with the complaining witness and presumably obtained statements from her; statements that were not necessarily part of her testimony to the Board (and for which she was not subjected to cross-examination) during the disciplinary hearing.

This is particularly troubling where nothing in the Policy suggests that the same individual charged with soliciting or obtaining pre-hearing statements from the parties, appointing board members, and vetting potential conflicts, would have unfettered access to the Board during its deliberations. It is even more concerning where the deliberations were not tape recorded, and thus there is no way to ensure the deliberative process was not tainted.

### D.  THE BOARD'S DECISION WAS CONTRARY TO THE WEIGHT OF THE EVIDENCE

Without delving too deeply into the facts of the case, it is worth noting that the complaining witness did not meet her burden of proof. Holy Cross Public Safety Officer Sergeant Kathleen Culley, a police officer specially trained in sexual assaults and familiar with the College policy, specifically stated that Ms. Murphy was intoxicated, not incapacitated. In contrast to Officer Culley's testimony, the three interested witnesses who testified after her offered scripted testimony that referenced each of the "context clues" set forth in the Policy. This was surprising and troubling, where their original witness statements to the Public Safety officers were silent as to any of these clues.

### E.  WITNESS STATEMENTS CONTRADICTORY

Though the complaining witness claimed little recollection of the night, she repeatedly referred to our encounter throughout the hearing as "rape." This is troubling where her initial witness statement made no such allegation, and her own witness, Ms. Federici, specifically testified that the complaining witness had not said she was raped, but rather "I think I was just taken advantage of." Notwithstanding her early witness statements, and the testimony of Ms. Federici, at the hearing, both the complaining witness and her own witness Mr. Yiznitsky insisted that she had referred to our encounter as "rape" from the outset. Where I was presumed innocent, and the complaining witness bore the burden of proof, her repeated references to rape at the hearing did little more than inflame the passions of the board and deprive me of a fair opportunity to present my defense.

## CONCLUSION

As a final matter, I have not found anything in the Policy authorizing the College to expel me and withhold my diploma after my academic requirements are complete. As of 5/23/2011, my

grades were released and I successfully obtained the 32 credits necessary to graduate; these credits were ultimately posted on an unofficial transcript prior to the expiration of the appeals period. Where it is undisputed that I have completed my academic requirements, I would suggest that my expulsion is untimely and inappropriate, and at the very least would ask you to consider alternative sanctions.

Specifically, I would ask that you modify the sanction imposed by the Board to allow me to receive my diploma and an untainted transcript. I am willing to honor any other sanctions requested by the College, including stay-away orders, or community service.

In considering the alternative sanctions, I ask that you consider the manner in which the procedural missteps impacted my ability to present a defense, including the open hostility during the hearing, of one of the conflicted board members. The College has failed to offer any legitimate justification for depriving me of my rights under the Policy to have my fate decided by a neutral and uninterested board. Notwithstanding the College's concern for expedience and the convenience of board members, the conflicts of interest I identified more than 48 hours before the hearing, were significant and pervasive, and substitution of the conflicted members was the only appropriate remedy.

Father, I am not capable of the acts that I am accused of by Ms. Murphy. If I thought Ms. Murphy was intoxicated or unable to freely consent I would never have engaged in any sexual activity with her. I am so sorry that this situation has put you and the Holy Cross Community in such a predicament. Thank you for your consideration. I am available at any time to meet and/ or answer any questions or discuss this further.

Sincerely,

Edwin R. Bleiler



HC10066



HC10067

# EXHIBIT 19
# TO TAB 1



## COLLEGE OF THE HOLY CROSS

*Office of the President*

May 26, 2011

Via Certified Mail

Mr. Edwin R. Bleiler
55 Saxony Drive
Sudbury, MA 01776

Dear Mr. Bleiler:

I have considered carefully your appeal of May 24 regarding the Community Standards Board hearing that occurred on May 18. I have reviewed the documentation in the file, listened to the recording of the Community Standards Board hearing and interviewed Paul Irish, who oversaw the process, Jacqueline Peterson, the Vice President of Student Affairs and Dean of Students, who rendered the decision based on the recommendation of the Board, and Prof. Jude Kelley, the chair of the Board.

You claim there were certain procedural errors that prevented you from having a fair hearing. First, you claim that the two student members of the Board should have been removed because they had conflicts of interest. One of them, Grant Greeley, you first objected to because you said you had "mutual friends." You did not, however, give any reason why this would create a conflict; and you did not at that time mention any "unpleasant dealings" with him through these friends, which you now bring up in your appeal. Therefore Mr. Irish did not remove him from the Board. Later your lawyer objected to both student members because they were Facebook "friends" with the complainant. However, that is often such a superficial connection, especially for students who have hundreds or even thousands of Facebook "friends," that it cannot be assumed that such a relationship in itself would constitute undue influence. Paul Irish did investigate your complaint and found that the only real contact the student Board members had with the complainant was the kind the students routinely have with one another here. One once was in a class with her and the other was her RA. Neither of the Board members indicated that the relationship would prejudice them in any way; and you never produced any evidence or reason to believe they could not be objective. You further assert that Grant Greeley was "hostile" toward you in the hearing. In listening to the recording of the hearing, I did not find that to be the case. On a couple of occasions, he did question you about sensitive matters that might make one uncomfortable. However, given the nature of the incident in question and the circumstances surrounding it, his questions were entirely relevant; in fact, unfortunately, they were questions that had to be asked. He did persist in his questioning, but only because your answers were vague and lacked the clarity that would have helped the Board understand the situation better.

HC10014

You also argue that the hearing was unfair because the complainant only referenced her injuries in her final statement and therefore was not subject to cross examination about them. However, her second statement to Public Safety, which you had access to as part of her case file, had an even more detailed description of her physical injuries than she gave in her final statement. Since you had ample opportunity to review the file before the hearing, her description of the injuries was available to you, and you had several opportunities to ask her about it during the hearing, had you chosen to do so.

Finally, you object to Mr. Irish's presence during the deliberations of the Board. However, that is something he routinely does. He remained as a resource to the Board, to answer any questions they might have about procedures or policies. He did not otherwise participate in the deliberations or attempt to influence them in any way.

Your objections notwithstanding, therefore, I have found the hearing and deliberations of the Board to have been fair and in keeping with our procedures. I have further determined that the evidence presented at the hearing was sufficient to support the Board's finding of responsibility for "Sexual Misconduct I" in violation of community standards. I also find the sanction of dismissal to be appropriate and consistent with what has been done in similar cases in the past. Therefore I am compelled to deny your appeal and uphold the dismissal.

Edwin, I know this is difficult for you; and I am sorry for that. But you have to understand that you made a very serious mistake, which has caused grave suffering for Ms. Murphy. You have to be held accountable. It is now necessary for you to accept responsibility for the consequences of your actions and move forward.

You are welcome to consult with your class dean, Prof. Mark Freeman, for advice on how to proceed from here. I hope this experience, as hard as it is, is something you can learn from, and that it ultimately leads to a better future for you.

Sincerely,

Michael C. McFarland, SJ
President

Cc:   Jacqueline Peterson, Vice President for Student Affairs and Dean of Students
      Paul Irish, Director, Office of Student Conduct and Community Standards
      Prof. Jude Kelley, Community Standards Board Hearing Panel Chair
      Prof. Mark Freeman, Dean Class of 2011
      Mary Sanchez, Registrar
      Student File

Ruth Ann Elias - UPS Ship Notification, Tracking Number 1Z0986E80151333769

| | |
|---|---|
| **From:** | "UPS Quantum View" <auto-notify@ups.com> |
| **To:** | <relias@holycross.edu> |
| **Date:** | 5/26/2011 4:08 PM |
| **Subject:** | UPS Ship Notification, Tracking Number 1Z0986E80151333769 |

☒ UPS

This message was sent to you at the request of College of the Holy Cross to notify you that the electronic shipment information below has been transmitted to UPS. The physical package(s) may or may not have actually been tendered to UPS for shipment. To verify the actual transit status of your shipment, click on the tracking link below or contact College of the Holy Cross directly.

## Important Delivery Information

**Scheduled Delivery:** 27-May-2011

## Shipment Detail

**Ship To:**
mr. edwin r. bleiler
55 saxony drive
SUDBURY
MA
01776
US

**Number of Packages:** 1
**UPS Service:**  NEXT DAY AIR
**Weight:**  0.1 LBS

**Tracking Number:**  1Z0986E80151333769
**Reference Number 1:** president's office
**Reference Number 2:** 100002-1000-7000

Click here to track if UPS has received your shipment or visit
http://www.ups.com/WebTracking/track?loc=en_US on the Internet.

HC10016

_____2RR2RR2no3tDd_Tyq1aXV873qFrT399@Ve-_____

Discover more about UPS:
Visit www.ups.com
Sign Up For Additional E-Mail From UPS
Read Compass Online

© 2011 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are trademarks of
United Parcel Service of America, Inc. All rights reserved.
For more information on UPS's privacy practices, refer to the UPS Privacy Policy.
Please do not reply directly to this e-mail. UPS will not receive any reply message.
For questions or comments, visit Contact UPS.

This communication contains proprietary information and may be confidential. If you are not the intended recipient,
the reading, copying, disclosure or other use of the contents of this e-mail is strictly prohibited and you are instructed
to please delete this e-mail immediately.
Privacy Policy
Contact UPS

# COLLEGE OF THE HOLY CROSS
Office of the Assistant Dean
Withdrawal/Leave of Absence

Student Name **EDWIN BLEILER**                    HC ID _026.9471_

Current Status: Active _____      LOA _____      Suspension _____

**FOR CURRENTLY ACTIVE STUDENTS:**

☐ **Term Cancellation**
(For withdrawals prior to term start)
Last Date of Attendance: _NS|9|11_

☐ **Term Withdrawal**
(For withdrawals after term start)

Last Date in Residence: _5|9|11_ (for Bursar use only)

**Course Withdrawal:**

☐ Drop Without Record                    ☐ Drop With Record

---

**FOR ALL STUDENTS - Program Action:**

☐ **Voluntary Withdrawal (VDIS)**

Reason:    ☐ *Medical*          ☐ *Transfer to Jesuit Institution*

☐ *Personal*        ☐ *Transfer to Private College*

☐ *Financial*       ☐ *Transfer to Public Institution*

☐ *Unknown*         ☐ *Transfer to Private University*

☐ *Transfer to Unknown Institution*

Transfer School (If known): _____

☑ **Involuntary Withdrawal (DISC)**

Reason:    ☐ *Failure to Register*        ☐ *Candidacy Terminated*

☐ *Academic Dishonesty*       ☐ *Disciplinary Suspension*

☑ *Disciplinary Dismissal*    ☐ *Leave Expired*

☐ *Financial*

☐ **Leave of Absence (LEAV)**

Reason:    ☐ *Personal*          ☐ *Medical*          ☐ *Financial*

☐ **Academic Suspension (SUSP)**          ☐ **Academic Dismissal (DISM)**

---

Action Requested By: _MarEvans_          Date: _JUNE 2, 2011_

*For Registrar's Use:*

☐ Term Canceled/Withdrawn    Date: _____ By: _____

☐ Program Status Updated    Date: _____ By: _____

Copies:  Class Dean, Bursar, Financial Aid, Vice-President for Student Affairs

HC10018

# EXHIBIT 21
# TO TAB 1



# College of the Holy Cross – Student Handbook and Planner

## 2010-2011

Property of: _____

Address: _____

Phone #: _____

In case of emergency, please notify:

Name: _____   Phone #: _____

The information in this book was the best available at press time. Watch for additional information and changes.



©2010 School Datebooks, Inc. All rights reserved.
No part of this publication may be reproduced, transmitted, transcribed, stored in any retrieval
system, or translated in any form without the written permission of School Datebooks, Inc.

2880 U.S. Hwy. 231 S., Suite 200 • Lafayette, IN 47909 • (765) 471-8883
http://www.schooldatebooks.com • sdi@schooldatebooks.com

1

HC10288

## GROUP B - DOCUMENTS THAT ESTABLISH IDENTITY:

- A state issued driver's license or ID card with photograph or information such as name, sex, date of birth, height, color of eyes
- School ID with photograph or U.S. Military card
- Other documents with similar information

## GROUP C - DOCUMENTS THAT ESTABLISH EMPLOYMENT ELIGIBILITY:

- Original, signed, Social Security card
- A certificate of birth issued by a state, county or municipal authority bearing a seal or other certification
- Unexpired INS Employment Authorization

A student may not work without I-9 clearance and will not be put on the payroll.

## STUDENT EMPLOYMENT GUIDE

The Human Resource Department in coordination with Information Technology Services has developed the "Student Employment Guide." Located on the Holy Cross web page, and accessed through Web Services, this allows you to view current employment positions available on campus. When you apply for a position, your application will go directly to the hiring manager for that specific job. You may apply by using your same campus user ID and password. As in the past, preference for all positions available will be given to Work Study approved students through the month of September. In addition, First year students are only allowed to work in Dining Services, although you should feel free to look at what positions will be of interest to you for future years. Departments are constantly listing open positions, so you may want to consult the Student Employment Guide periodically for new listings.

Questions regarding access to the site should be directed to the Help Desk. Feedback on the Student Employment Guide and its pro's and con's should be directed to Pat Halpin in the Human Resource Department. The Human Resource Department, O'Kane B72, is open 8:00 a.m. to 5:00 p.m. Monday through Friday. Detailed off campus job openings are posted outside Human Resources. Students who wish to obtain part-time campus employment should consult the Student Employment Guide.

# NEIGHBORHOOD BEHAVIOR

The expectation for appropriate student behavior does not end at the gates of the college. The College of the Holy Cross is an integral part of the College Hill neighborhood and the City of Worcester. Maintaining amicable and considerate relations between the college and local residents is essential to the college's mission. Student behavior that is disruptive of these relations will be addressed through the disciplinary system and appropriate community standards sections.

## COMMUNITY STANDARDS AND DISCIPLINARY PROCEDURES FOR STUDENTS

To enter the College of the Holy Cross is to accept an invitation to participate in the growth and development of a "community marked by freedom, mutual respect and civility." Students also accept the rights and responsibilities of membership in this community. High standards have been established for membership in this community, including high standards of personal conduct and behavior. Choosing to become a member of this community implies a commitment to an open dialogue about the basic human questions fundamental to a liberal arts education in a Jesuit tradition and a responsibility to maintain an environment in which this dialogue can occur. Respect for the dignity, integrity, well-being and property of others is essential to the maintenance of the Holy Cross community.

The College of the Holy Cross assumes that all students will abide by the policies, rules, and regulations of the college and by state, local, and federal laws. Community Standards and Disciplinary Procedures have been established to address allegations of student misconduct. The student conduct and discipline system exists to protect members of the College of the Holy Cross community and of students accused of violating the community standards. The discipline system is designed to educate students, encourage sound decision making and provide opportunities for growth and personal development.

All student members of the College of the Holy Cross community have certain rights. These include:

The right to learn, which includes the right of access to ideas, the right of access to facts and opinions, the right to express ideas, and the right to discuss those ideas with others.

The right to be treated as an individual member of the community, which includes the right to be free of discrimination based upon age, sex, religion, ethnic or national origin, handicap, or status as a veteran, and the right to be free from harassment of any type.

The right of peaceful coexistence, which includes the right to be free from violence, force, threats, and abuse, and the right to move about freely. The right to be free of any action that unduly interferes with a student's rights and/or learning environment.

The right to express opinion, which includes the right to state agreement or disagreement with the opinions of others and the right to an appropriate forum for the expression of opinion. The right of privacy, which includes the right to be free of unauthorized search of personal spaces.

In the case of disciplinary procedures, students have the right to be informed of any charges of misconduct, the right to adequate time to prepare a response to the charges, the right to hear information in support of the charges, the right to present evidence against the charges, and the right to a fair process which is appropriate to the circumstances.

33

## NEIGHBORHOOD BEHAVIOR

The expectation for appropriate student behavior does not end at the gates of the college. The College of the Holy Cross is an integral part of the College Hill neighborhood and the City of Worcester. Maintaining amicable and considerate relations between the college and local residents is essential to the college's mission. Student behavior that is disruptive of these relations will be addressed through the disciplinary system and appropriate community standards sections.

## AUTHORITY FOR STUDENT DISCIPLINE

Community Standards of the College of the Holy Cross addresses student misconduct that takes place on college premises and addresses off campus conduct when the behavior may have or has had an adverse impact upon the community or reputation of the College. Community Standards also applies to college sponsored events, activities, trips, etc. which may occur off-campus. The purpose of campus disciplinary proceedings is to provide a fair evaluation of a student's responsibility for violating college regulations. Rules of evidence ordinarily found in legal proceedings shall not be applied, nor shall deviations from prescribed procedures necessarily invalidate a decision, unless significant prejudice to a student respondent or the college may result.

Students includes all persons (other than faculty, staff or administrators ) taking or auditing courses at the College of the Holy Cross, either full or part time. Persons who are not currently enrolled for a particular term but who have a continuing relationship with the college are considered students.

Disciplinary authority may be delegated to college administrators, faculty members, committees, and organizations, as set forth in the community standards and through other appropriate policies, rules, or regulations adopted by the Board of Trustees. Under the direction of the Vice President for Student Affairs / Dean of Students (VPSA/DOS), the Director of Student Conduct and Community Standards has the responsibility to administer all nonacademic student discipline.

Discretionary responsibility for handling extreme cases, where such action is essential to maintaining the orderly processes of the college, is retained by the VPSA/DOS or designee. The college retains the right to suspend students pending a disciplinary review for allegations of gross misconduct or if they pose a threat or a perceived threat to the college community.

The VPSA/DOS or designee may impose conditions on a student's continued relationship with the college before, during, and/or after the conclusion of the disciplinary process.

The Community Standards and Disciplinary Procedures are reviewed every (3) three years by the Director of Student Conduct, Dean of Students /Vice President for Student Affairs, College General Counsel and the Student Life Committee. The next review is scheduled for the 2011-12 academic year.

## INTERIM SUSPENSION

When it is considered necessary to remove a student from campus until the completion of a discipline hearing, the VPSA/DOS, the Director of Student Conduct and Community Standards, or their designated representatives may invoke an immediate interim suspension from the college, and or college housing. An interim suspension may be imposed for the following reasons: a) to insure the safety and well-being of members of the college community or to preserve college property; b) to insure a student's own safety or well being; c) if a student poses a substantial threat of disruption or interference with the normal operations of the college; d) there is an allegation of gross misconduct in violation of criminal law.

During the interim suspension, a student may be denied access to college activities, facilities and/or classes or other privileges for which the student might otherwise be eligible, as the VPSA/DOS or designee may determine to be appropriate. The decision to alter or suspend privileges for an interim period shall be communicated by the VPSA/DOS or designee in writing to the student and shall be effective immediately. Notification shall either be hand-delivered or sent by certified mail. Failure or refusal to take receipt of notification shall not negate or postpone said action. The appropriate college authorities shall be notified of the temporary suspension.

The interim suspension and/or altered privileges shall remain in effect until a final decision has been made regarding pending complaints or until the VPSA/DOS or designee determines that the reason for imposing the suspension of privileges no longer exists. In the case of interim suspensions imposed as a result of criminal charges, the suspension may remain in effect until the matter is resolved through a criminal law process. If a student elects not to resolve a disciplinary mater or communicate their intentions regarding resolution of the allegation the interim suspension may become a permanent suspension or dismissal.

34

# CODE OF STUDENT CONDUCT:

The following actions are considered violations of community standards and are expressly prohibited:

## ALCOHOL

The majority of offenses committed against people and property at the College of Holy Cross are a direct result of alcohol use/abuse. The college has established clear and detailed policies addressing the use, possession and consumption of alcohol. The complete College Alcohol Policy may be found in the policy section of this handbook. The following are a sample of the more common violations:

For students under the age of twenty-one:

- Possession or consumption of alcohol
- Being under the influence of alcohol
- Attending a party where alcohol is present

For all students

- On campus possession of unauthorized quantities of alcoholic or common source alcohol containers including kegs, beerballs and alcoholic punches.
- Excessive consumption of alcohol, including drunkenness.
- Providing, selling, or distribution of alcohol to an individual under the age of twenty-one.
- Activities, devices, games and or contests that encourage excessive consumption of alcohol.
- Consumption of alcohol in public or in unauthorized communal areas of the campus.
- Hosting parties both on and off-campus where underage students and alcohol are present.
- Use, possession or manufacture of false identification, or misuse of valid identification.
- Allowing their vehicle to be used for the procurement of alcohol for underage students.
- Violations of local and state alcohol laws and ordinances.

## ARSON/UNAUTHORIZED USE OF FIRE

Setting or attempting to set a fire on campus. This may include, but is not limited to, creating or causing a bonfire, lighting trash and lighting a bulletin board or door materials on fire.

## BIAS MOTIVATED INCIDENTS/HATE CRIME

Any violation of community standards motivated by a consideration (real or perceived) of race, sex, color, religion, or sexual orientation is prohibited and will be treated more severely than a similar or related act in the absence of such motivation.

## CIVIL DISTURBANCE/DISORDERLY CONDUCT

Disturbing the peace, including noise disturbances on and off campus or aiding such activity. Such activities may include, but are not limited to: disorderly conduct, lewd acts, obstructing or interfering with any college related activity including the classroom / teaching environment , failure to comply with the directives of law enforcement or any college officials including faculty, failure to comply with an order of dispersal and any other conduct which may disturb the peace.

## COMPLICITY

Being present during the planning or implementation or otherwise assisting with a violation of any college policy. Students who anticipate or observe a violation of the community standards are expected to remove themselves from association or participation and are encouraged to report the incident.

## DESTRUCTION OF PROPERTY

Intentionally or recklessly damaging, vandalizing, destroying, or tampering with college property or the property of any person or business.

## EMOTIONAL ABUSE

Issuing harassing, degrading or abusive threats or statements that cause emotional injury; and or, causing emotional injury through careless or reckless behavior. Emotional abuse also includes willful damage to the reputation or psychological wellbeing of another. This covers all forms of communication including, but not limited to, written or electronic media.

## ENDANGERING BEHAVIOR

Conduct or reckless actions demonstrating a threat to any member of the community, including one's self, or to the proper functioning of the college.

## FAILURE TO COMPLY

Failure to comply with directions of college officials, including but not limited to public safety officers, administrators, Community Development Coordinators (CDC's) or Resident Assistants (RA's). Willfully disregarding an imposed sanction may be subject to additional sanctions at the discretion of the disciplinary officer.

35

HC10322

## FAILURE TO EXIT A COLLEGE BUILDING

Willfully disregarding a fire alarm or other order to evacuate a building.

## FALSE IDENTIFICATION

Possession, use, manufacture or sale of false or altered identification. This includes the misuse of valid identification.

## FALSE INFORMATION

Providing false information through forgery or alteration of any written or oral statement to a college official. False information may include, but is not limited to all college documents and records.

## GAMBLING

Students are expected to abide by all federal and state laws prohibiting illegal gambling.

## HAZING

Hazing is prohibited under Massachusetts General Laws (MGL 269, SS 17-19). Hazing refers to any activity or situation created that may humiliate, abuse, degrade or endanger a person's physical or mental health, in connection with joining or belonging to a group or organization, regardless of the person's willingness to participate. This includes, but is not limited to the following: forced or coerced consumption of alcohol or drugs, morally degrading, humiliating or illegal activities or games, physical abuse (whipping, paddling, branding, beating, forced calisthenics, creation of excessive fatigue), forced isolation, sleep deprivation, being forced to wear embarrassing or humiliating attire in public and consumption of vile substances.

## ILLEGAL DRUGS/CONTROLLED SUBSTANCES

The college supports all federal, state and local laws governing the possession, distribution, use and sale of illegal drugs and fully cooperates with the enforcement of all such laws. Any student determined to be manufacturing, cultivating, dealing, selling, or distributing illegal drugs on or off campus may be expelled from the college. Such students may be subject to arrest and further legal action. The college will cooperate fully with law enforcement officials in the investigation and prosecution of drug related cases. The college will assume a student is dealing drugs if the student possesses a quantity of illegal drugs not consistent with personal consumption and/or possesses paraphernalia indicative of distribution (scales, packaging materials, baggies, etc.).

On campus, the college strictly forbids the use or possession of illegal drugs, or use or possession of drug paraphernalia, including but not limited to bongs, scales and pipes. The college also strictly forbids the use of illegal drugs at college sponsored events on or off campus. In addition, all students present at the time of a drug violation may be held responsible for the infraction.

The use of prescription drugs for non-medical reasons is prohibited. Prescription drugs may only be used by the student to whom they are prescribed. The sale, distribution, or misuse of prescription drugs is a direct violation of federal and state law as well as college policy.

## MISCONDUCT DURING SENIOR WEEK

Violation of any community standard during the period between the end of final exams and Commencement may result in a loss of privileges, including Senior Week events awards ceremonies, Baccalaureate Exercises and/or Commencement. Egregious violations may result in suspension or dismissal.

## MISUSE OF SAFETY EQUIPMENT

The unauthorized use of or tampering with firefighting equipment, safety devices or other emergency safety equipment. This includes triggering a false alarm, or inappropriately discharging a fire extinguisher.

## MISUSE OR ABUSE OF COMPUTERS OR TELECOMMUNICATIONS EQUIPMENT

Including but not limited to , recording, posting or disseminating images, recordings or photos of another without that individual's permission, misuse or abuse of any computer, computer system, service, program, data, or communication network, particularly as defined by College ITS policies which can be found detailed on the ITS webpage.

## PHYSICAL ABUSE / VIOLENCE

Physically assaulting any person, including but not limited to fighting, relationship violence, and physical harm to one's self. Self-defense may only be used to the limited degree necessary for self-protection.

## POSSESSION OF DANGEROUS WEAPONS OR MATERIALS

Unauthorized possession of a dangerous weapon or material of any type or description, including, but not limited to firearms, compressed-air guns, sling shots, pellet guns, BB guns, knives, explosive devices, incendiary devices, fireworks, ammunition, or any item deemed to be dangerous by college officials.

36

HC10323

## SEXUAL MISCONDUCT

The complete Sexual Misconduct Policy may be found on page 152 of the Student Handbook. Listed below are the specific violations related to sexual misconduct.

### Sexual Misconduct I

Any sexual penetration (anal, oral or vaginal), however slight, with any object or sexual intercourse by a man or woman upon a man or woman without effective consent. Sexual penetration includes vaginal or anal penetration by a penis, object, tongue or finger and oral copulation by mouth to genital contact or genital to mouth contact.

### Sexual Misconduct II

Any intentional sexual touching, however slight, with any object by a man or woman upon a man or woman without effective consent. Sexual touching includes any bodily contact with the breasts, groin, genitals, mouth or other bodily orifice of another or any other bodily contact in a sexual manner. Any disrobing of another or exposure to another by a man or woman without effective consent.

### Sexual Exploitation

Any conduct in which a student takes advantage of another without his/her consent for his/her own advantage or benefit or to benefit or advantage anyone other than the one being exploited and that behavior does not constitute Sexual Misconduct I or II or Sexual Harassment.

*Effective consent is informed, freely and actively given mutually understandable words or actions which indicate a willingness to participate in mutually agreed upon sexual activity. Consent may never be given by minors (Massachusetts those not yet sixteen (16) years of age), mentally disabled persons and those who are incapacitated as a result of alcohol or other drug consumption (voluntary or involuntary) or those who are unconscious, unaware or otherwise physically helpless. Consent as a result of coercion, intimidation, threat of force or force is not effective consent.*

### Sexual Harassment

Any type of sexually oriented conduct, whether intentional or not, that is unwelcome and has the purpose or effect of creating an employment or academic environment that is hostile, offensive or coercive to a reasonable woman or man, as the case may be. For more information see the Sexual Harassment and Harassment Policies as detailed in the Student Handbook, which are available in the Office of Student Affairs, Hogan 109.

## STALKING

Engaging in a pattern of unwanted conduct directed at another person that threatens or endangers the safety, physical or mental health, or life or property of that person, or creates a reasonable fear of such a threat or action.

## THEFT

Theft of college or personal property, including possession of stolen property, attempted theft, conspiracy to steal, misappropriation of college property or services, misappropriation of personal property and identity theft.

## TRESPASS

Gaining unauthorized or forcible entry into any room, building or structure or computing system.

## VIOLATION OF COLLEGE POLICY

Violations of any college policy or regulation is prohibited. This includes but is not limited to the policies set forth by the Bookstore, Dining Services, Information Technology Services, Library, Public Safety, Residential Life and Housing, as well as the regulations described in the College Catalog and other sections of the Student Handbook.

## VIOLATIONS OF CRIMINAL LAW

Students are expected to obey federal, state and local laws. Students charged with a violation of criminal law, whether on or off the college premises, may be subject to college disciplinary action.

37

HC10324

# DISCIPLINARY PROCESS AND PROCEDURES

### Initiating a Compliant and Disciplinary Referrals

Any student or member of the internal or external community of the College of Holy Cross may initiate a complaint against a student member of the community by submitting in writing to the Office of Student Conduct and Community Standards, the following information:

a) The name(s) of the accused.

b) A statement explaining the nature and circumstances of the complaint, to include a list of possible witnesses.

c) The names, addresses and telephone numbers of those filing the complaint.

Referrals for disciplinary review may also be generated through reports received from campus offices including but not limited to the Department of Public Safety and Residence Life or external law enforcement agencies.

The Director of Student Conduct and Community Standards or designee reviews all complaints and reports and determines if disciplinary charges will be initiated, specific violation sections and the appropriate adjudication venue. A Community Standards Board hearing will normally be conducted for students who face the possibility of suspension or dismissal, or when the alleged violation may have a wide community impact. Discretionary responsibility for handling extreme cases, where such action is essential to maintaining the orderly processes of the college, is retained by the VPSA/DOS or designee.

## ALTERNATIVE DISPUTE RESOLUTION

### Mediation

Filing a complaint may not always require a formal disciplinary review process. With the approval of the Director of Student Conduct and Community Standards, or designee, the accuser and the student accused may agree to participate in a form of mediation. Resolution shall be achieved when the Director of Student Conduct and Community Standards or assigned mediators and involved parties are satisfied that the behavior at issue has been addressed. This resolution may include a letter from the mediation facilitator to the parties involved indicating the agreed upon resolution. If the accuser or accused believes that the informal process has been unsuccessful, formal disciplinary procedures could be initiated.

### Peer Conduct Advisory Board (PCAB)

Some violations of college policies may be referred to the Student Peer Conduct Advisory Board (PCAB). PCAB operates under the supervision and guidance of the Director of Student Conduct and Community Standards and Residence Hall Staff. Please contact the Director for information on PCAB procedures and membership opportunities.

## FORMAL DISCIPLINARY ACTION

### Notification of Disciplinary Charges

Students accused of violating the community standards will receive written notification* of the following:

* alleged community standard violation(s)
* location and date of incident (if known)
* reporting party(s)

Students are required to attend all disciplinary meetings and/or all hearings. If a student willfully misses a meeting and/or hearing, the case may proceed and a determination may be made in the student's absence without the right of appeal or review.

*including electronic delivery via e-mail*

### Disciplinary Conference

Students accused of non-academic offenses that may result in penalties less than dismissal or suspension are subject to a *Disciplinary Conference* with a hearing officer. Hearing officers are assigned by the Director of Student Conduct & Community Standards or designee and include but are not limited to Residence Life professional staff and other staff members in the Division of Student Affairs. The Disciplinary Conference is a one on one meeting with the accused student and hearing officer.

At this meeting the matter may be resolved, dropped, or may be adjudicated or referred to another appropriate hearing authority as determined by the hearing officer. The Director of Student Conduct & Community Standards or designee will review all hearings, decisions and sanctions.

Decisions that can be reached at a Disciplinary Conference are:

* A case may be held for further information/review as determined by the hearing officer.
* A case may be dropped for insufficient information or if the alleged violation does not constitute a policy violation as determined by the hearing officer.
* The hearing officer may reach a decision either of "responsible," "not responsible," " no finding," or "responsible for a lesser inclusive charge.

38

### Administrative Hearing

In some situations it may be necessary to conduct an *Administrative Hearing*. An administrative hearing is a more formal hearing than a Disciplinary Conference and is usually held when there is a dispute of the facts, or a need to hear from witnesses. Administrative hearings may be conducted by one hearing officer or by a panel of up to three hearing officers.

### Procedural Review

Students who have participated in a Disciplinary Conference, PCAB or Administrative Hearing, or who have been sanctioned as a result of accepting responsibility for violations in a pre-hearing meeting may request a procedural review.

A student may request a procedural review in writing within 48 hours after receiving written notification from the hearing officer of the findings and sanctions imposed. This request should explain the nature and circumstances of the request for a procedural review, citing the new information and/or the explanation with specifics of an alleged lack of procedural fairness. At the discretion of the VPSA/DOS or Director of Student Conduct and Community Standards, sanctions may be deferred while a request for procedural review is being considered.

If the VPSA/DOS or Director of Student Conduct and Community Standards decides that the request for a procedural review has merit, (e.g., improper procedures and/or where new information would be likely to change the previous result) s/he will refer the case back to the original hearing officer for further review.

### Community Standards Board Hearing

Any Holy Cross student who allegedly violates policy may be referred to the Community Standards Board (CSB), when the severity of the alleged offense may result in possible suspension or dismissal from the college, or when there are important community wide concerns connected with the incident. When more than one student is charged as a result of the same incident, one Community Standards Board hearing is generally conducted. Discretionary responsibility for handling extreme cases, where such action is essential to maintaining the orderly processes of the college, is retained by the VPSA/DOS or designee.

### Pre-Hearing Meeting

Prior to a Community Standards Board hearing, the accused student will meet with the hearing coordinator usually the Director of Student Conduct & Community Standards, for a pre-hearing meeting. In the pre-hearing meeting the accused student will review the information that is the basis of the allegation and determine how they wish to proceed. Accused students have three options in a pre-hearing meeting.

*Option 1:* Student chooses to accept responsibility for the violation(s). In this circumstance there is no hearing and the case will then be referred to the VPSA / DOS or designee for sanctioning with a sanction recommendation from the Director of Student Conduct & Community Standards. In instances where a student has been charged with multiple violations, they must accept responsibility for all violations, or choose Option 3. Students are not afforded an appeal if they choose Option 1, however a procedural review may be requested.

*Option 2:* Student chooses to accept responsibility for the violation(s). In this circumstance there is no hearing and the case will then be referred to the VPSA / DOS or designee for sanctioning with a sanction recommendation from the Community Standards Board. In instances where a student has been charged with multiple violations, they must accept responsibility for all violations, or choose Option 3. Students are not afforded an appeal if they choose Option 2, however a procedural review may be requested.

During this meeting the hearing coordinator will present the board with the facts of the student's current violation and any disciplinary history. The student will then have an opportunity to make a statement to the hearing board and the board will have an opportunity pose questions to the student. After the meeting the board will offer a recommended sanction to the VPSA. Characters references, whether in person or in writing will not be permitted in this meeting. Final recommendations shall reflect the majority opinion of the hearing panel.

Following this meeting the VPSA/DOS may take the following actions on a board's recommendations:

a. accept the recommendations in their entirety;

b. alter the recommended sanction by making it more severe, less severe or otherwise different.

Students are not afforded an appeal if they choose Option 1, however a procedural review may be requested.

*Option 3:* Student chooses to contest the charge(s), at which time the pre-hearing meeting will be used to review the hearing procedures, and schedule a time and date for the upcoming hearing (normally no less than 7 days from the pre-hearing meeting).

In the event that an accused student does not attend a pre-hearing meeting, a Community Standards Board Hearing will automatically be scheduled.

39

HC10326

# COMMUNITY STANDARDS BOARD PROCEDURES

## Preceding the Hearing

Student complainants must meet with the hearing coordinator prior to the hearing to review the hearing process. Non-student complainants may choose to meet with the hearing coordinator prior to the hearing. Both complainants and accused students may inspect the case file prior to the hearing. Case files are maintained in the Office of Student Conduct and Community Standards, and may not be photocopied or otherwise taken from the office.

The accused and the accuser are informed of the names of the members of the hearing panel scheduled to hear the complaint not fewer than 72 hours prior to the hearing. If the accuser or the accused has particular information as to why a specific person should not be a part of the panel hearing the case, either of these parties must present the information to the Director of Student Conduct and Community Standards or designated hearing coordinator in writing 48 hours prior to the start of the hearing. If the Director deems that there is information to suggest a potential conflict, another board member will be substituted. The decision of the Director or hearing coordinator is final.

Board members are expected to notify the Director or hearing coordinator and disqualify themselves from serving on a board if they suspect a potential conflict with any party participating in a board hearing.

The hearing board shall receive all written materials prior to the scheduled hearing. The Director of Student Conduct & Community Standards or designated hearing coordinator may meet with hearing panel for consultation regarding procedural elements at any time prior to or during the hearing or deliberations.

## Confidentiality

All parties including the accused student, the accuser and the hearing board, are required to respect confidentiality. Students appearing before a board, their advisors and witnesses, must not communicate with any member of the board or with the accuser(s) and their witnesses prior to the hearing. Any act which violates this confidentiality may be dealt with as a subsequent violation or as grounds for dismissal from the hearing.

Any implied or actual act of intimidation or harassment is strictly prohibited and may also be dealt with as a subsequent charge. Hearing results shared with a victim/ accuser are confidential and should be treated as such.

## Duties of Chairpersons

Chairpersons of Community Standards Boards determine the order of witnesses, duration of statements, determine appropriateness of questions and witness statements, and serve as the principal liaison between the Board and the Director of Student Conduct & Community Standards or designated hearing coordinator. The Chairperson will exercise control over the proceedings to avoid needless consumption of time and to achieve orderly completion of the hearing. Any person including the accused student, who disrupts a hearing, may be excluded by the chair. The chair may recess the hearing at any time. The chair has final authority on all procedural matters during the hearing.

## Advisors

Students are strongly encouraged to be accompanied by an advisor at a Community Standards Board hearing. An advisor may be a faculty, student or staff member of the College of the Holy Cross. Students who wish to be accompanied by an advisor to a Community Standards Board hearing, must inform the Director of Student Conduct & Community Standards a minimum of 48 hours in advance of the hearing, indicating the name and contact information for the advisor. The Director of Student Conduct & Community Standards can provide a charged student with the names of individuals willing to serve as an advisor.

The role of the advisor at the hearing is limited. S/he is not entitled to address the Board directly or otherwise speak for the student at the hearing. The student and his/her advisor can confer at any point during the hearing, however, the advisor should not formulate specific questions, responses, or statements for the student. Violations of these guidelines may result in the advisor being excused from the hearing.

## Attorneys

Holy Cross officials involved in the disciplinary system will only discuss procedural matters with attorneys. All other questions or concerns (written or verbal) will be referred directly to the Office of the General Counsel. All substantive questions, concerns, or comments concerning student discipline, as well as any written correspondence, including the filing of an appeal, must come directly from the student(s) involved. Attorneys may not attend disciplinary hearings or conferences.

## Recording of Hearings

Community Standards Board hearings (not the deliberations) are recorded for the use of the VPSA/DOS and/or the President of the college as appropriate and for students who are appealing a decision. Students may make arrangements to listen to the recording by scheduling an appointment with the Director of Student Conduct & Community Standards. Students are not permitted to remove the recordings from the office or make copies. Recordings, notes and all materials related to a case remain the sole property of the college. In most occasions, at the completion of the internal appeal process these recordings are destroyed.



HC10327

## Basis for Findings

The standard or basis for findings refers to the criterion or measure of proof that is used to assess if a student is responsible or not for violating Community Standards.

The basis for findings used during college disciplinary proceedings is "more likely than not." More likely than not means that more than 50% of the information presented indicates a violation has occurred and a student will be found responsible.

Decisions which can be made by the Community Standards Board are "responsible," "not responsible," "no finding," or "responsible for a lesser inclusive charge." If the decision is "responsible," the board may recommend sanctions up to and including college suspension or dismissal.

## The Community Standards Board Hearing

I.   The Chairperson will convene the board, have all parties introduce themselves, explain the purposes of the board, address the issues of honesty and confidentiality, and explain the role of advisors if any are present. All witnesses will be asked to leave the room.

II.  Both parties will be asked if the Director of Student Conduct & Community Standards or designated hearing coordinator offered them the opportunity to challenge any board members for cause.

III. Chairperson reads the allegation against the accused.

IV.  The accuser is given an opportunity to present her/his statement. The accused is given an opportunity to respond.

V.   Board members question both parties.

VI.  Each side is given an opportunity to question the other. This may be done through the Chair.

VII. Witnesses are brought into the room individually and answer questions from all parties. Witnesses for the accuser are heard first. Questions for witnesses from the accuser and accused may be directed through the Chair.

VIII. The accuser and the accused, respectively, are given the opportunity to make a final summary statement to the panel.

IX.  Upon hearing all relevant information, the panel adjourns to deliberate.

X.   The panel will determine if it is more likely than not that the accused has violated Community Standards. If a finding of responsibility is determined, the panel will then recommend appropriate sanctions.

XI.  The findings and recommendations will be forwarded to the VPSA/DOS via the Director of Student Conduct & Community Standards.

XII. Final recommendations shall reflect the majority opinion of the hearing panel.

XIII. The Board meets with the accused and accuser (may be done separately or together) to inform each party of the findings and recommendations being forwarded to the VPSA/DOS.

XIV. The hearing officer shall be responsible for providing written notification of the findings and recommendations to the accused and accuser within two business days after the conclusion of the hearing. In matters involving sexual assault/misconduct, the hearing officer will notify the accuser not more than 24 hours after the conclusion of the hearing. Final results of a disciplinary proceeding may only be shared in accordance with privacy law.

XV.  The VPSA/DOS may take the following actions on a board's recommendations:

   a. accept the recommendations in their entirety;
   b. alter the recommended sanction by making it more severe, less severe or otherwise different;
   c. refer the case to a new Community Standards Board to be reheard in its entirety;
   d. remand the case to the original hearing board panel for further review.

## Appeals

A student has the right to appeal a decision of a Community Standards Board Hearing if he or she can demonstrate a) a lack of fairness in the procedures, b) a violation of the process, or c) if there is significant new information (previously unknown) that has been revealed or discovered which alters the facts of the matter and may alter the outcome.

Appeals for sanctions less than dismissal are reviewed by the Vice President for Student Affairs / Dean of Students or designee. Appeals for dismissals are reviewed by the President of the College. The severity of a sanction is not a legitimate ground for an appeal however a student may ask that the appeals officer to review the sanction as part of the appeal process. Letters of appeal addressed to the Vice President for Student Affairs / Dean of Students, or the President of the College and must be received within five (5) business days of the date of the decision letter.

If the VPSA/DOS or President decides that the appeal has merit, (e.g. a case in which there is proof of improper procedures and/or where new information would be likely to change the previous result) s/he may:

a. alter the recommended sanction by making it more severe, less severe or otherwise different;
b. refer the case to a new Community Standards Board panel to be reheard in its entirety; or
c. remand the case to the original hearing board panel for further review.

If the VPSA/DOS or President decides that the appeal does not have merit, the sanctions are immediately imposed.

41

HC10328

**Community Standards Board Membership**

Each panel of the Community Standards Board is composed of five members selected from the faculty, administration and student body with a representation of two students, at least one faculty, and at least one staff member, the fifth member may be either faculty or staff. The Chairpersons for each panel of the Community Standards Board will be designated by the Director of Student Conduct and Community Standards or hearing coordinator.

Faculty board members are appointed for a staggered three-year term by the Vice President for Academic Affairs/Dean of the College. Administrative staff board members are appointed for a staggered three-year term by the Vice President for Student Affairs/Dean of Students. Student board members consist of recommendations by the Student Government Association and are appointed through their graduation by the Vice President for Student Affairs/Dean of Students upon the recommendation of the SGA Executive Board. At least one student and one faculty member of the Community Standards Board pool shall be elected members of the Student Life Council.

The VPSA/DOS and Director of Student Conduct and Community Standards may fill any openings on the Community Standards Board that occur during the academic year. In consultation with the VPSA/DOS, the Director may dismiss a member of the Board for failure to support the regulations, non-completion of duties, breach of confidentiality, or if a student member is found responsible for violating college rules/regulations.

**Disciplinary Action while criminal charges are pending**

When a student has been arrested or is otherwise subject to criminal charges they are required to immediately report this information to the Office of Student Conduct and Community Standards. Students may be accountable both to civil authorities and to the college for acts that constitute violations of the law and of the college community standards. Disciplinary action at the college will normally proceed during the pendency of criminal proceedings and will not be subject to challenge on the ground that criminal charges involving the same incident have been dismissed or reduced.

**Interpretation**

The purpose of publishing disciplinary regulations is to give students general notice of prohibited behavior. These regulations are not written with the specificity of a criminal statue. Any question of interpretation regarding the disciplinary procedures shall be referred to the VPSA/DOS and/or Director of Student Conduct and Community Standards for consideration.

**Parental/Guardian Notification**

At the discretion of the VPSA/DOS, the Director of Student Conduct and Community Standards or designated hearing officer, disciplinary decisions and sanctions may be shared with the student's parent(s) or guardian, and/or other appropriate college officials. This information is shared in a spirit of partnership to communicate concerns and assist in the success, development and education of students. Parents or family members may not attend any disciplinary hearings or conferences. Family members who are members of the college community may not serve as advisors.

**Stay-Away Order**

A Stay-Away Order may be imposed in instances where it is determined that a student poses a potential threat to another, or to maintain general order on campus. This order, specific to a person and/or location, would prohibit the subject of the order from having any further direct or indirect contact, including e-mail, mail, telephone, instant message, face to face, or through a third party, etc. with the offended individual. In addition, a Stay-Away Order prohibits contact by third-parties on their behalf. A Stay-Away Order may be imposed summarily, e.g., prior to a hearing, or as a result of a hearing. Violation of a Stay-Away Order could result in either Residence Hall or College suspension. The imposition of a Stay Away Order is not subject to appeal or challenge.

**Student Groups & Organizations**

A student group or organization may be held collectively and individually responsible when violations of community standards by those associated with the group or organization received the consent or encouragement of the group or organization's leaders or officers. Student groups and organizations are subject to an administrative hearing process. Sanctions for groups or organizations may include revocation or denial of registration or recognition, as well as other appropriate sanctions.

## DISCIPLINARY RECORDS:

Student discipline records are considered educational records and are governed by the Family Educational Rights and Privacy Act of 1974 (FERPA). Disciplinary records of all students are kept secured in the Office of Student Conduct and Community Standards and used for internal statistical reporting and external reporting required by law and federal regulations. They are also maintained by the office to assist in completing clearance forms for graduate schools, and employment background checks.

All students' discipline files are maintained until a student successfully completes their degree requirements. Exceptions include cases that are pending or open when the student leaves the college, or of students who were suspended, expelled or dismissed from the college. Under these circumstances, the files will be maintained for a period of seven years, from the student's original expected graduation date.

Violations of **Disciplinary Probation** and higher will be reported on Dean's Certificates or other disciplinary checks, prior to degree completion. A record of **Disciplinary Probation** may impact a student's ability to participate in various activities or roles on campus. These may include serving as a resident assistant, student government officer, orientation leader, hearing board member, or other leadership role. Students who have been placed on probation may also be excluded from participating in the study abroad program. Such a record may also be reported on law and graduate school applications, transfer forms, and in some instances, job applications, particularly for federal or state positions.

42

HC10329

## WHAT EFFECTIVE CONSENT MEANS

The College of the Holy Cross strongly encourages students who choose to engage in sexual behavior to verbally communicate their intentions and consent as clearly as possible. In the absence of mutually understandable words or actions, it is the responsibility of the initiator, or the person who wants to engage in the specific sexual activity, to make sure that he/she has the consent from his/her partner(s). Consent to some form of sexual activity does not necessarily consent to other forms of sexual activity. Mutually understandable consent must be obtained by the initiator at every stage of sexual interaction. Consent is mutually understandable when a reasonable person would consider the words and/or actions of the parties to have expressed a mutually understandable agreement between them to do the same thing, in the same way, at the same time, with one another. Consent which is obtained through the use of fraud or force (actual or implied), whether that force be physical force, threats, intimidation or coercion, is not effective consent.

Consent may never be given by minors (in Massachusetts, those not yet sixteen (16) years of age), those who are mentally disabled or by one who is incapacitated as a result of alcohol or other drug consumption (voluntary and involuntary) or those who are unconscious, unaware or otherwise physically helpless. A person who knows or should reasonably have known that another person is incapacitated may not engage in sexual activity with that person. Incapacitation means being in a state where a person lacks the capacity to appreciate the fact that the situation is sexual, or cannot appreciate (rationally and reasonably) the nature and/or extent of the situation.

## ADDITIONAL CLARIFYING RULES FOR SEXUAL MISCONDUCT

- A person who is the object of sexual aggression is not required to physically or otherwise resist a sexual aggressor;
- Silence, previous sexual relationships, and/or a current relationship with the initiator (or anyone else) may not, in themselves, be taken to imply consent;
- Intentional use of alcohol or other drugs does not excuse a violation of the Sexual Misconduct Policy;
- Attempts to commit sexual misconduct are also prohibited under this Policy, as is aiding the commission of sexual misconduct as an accomplice;
- Consent to sexual activity may be withdrawn at any time, as long as the withdrawal is communicated clearly (because you cannot be expected to read the mind of your sexual partner(s)), and all sexual activity must cease;
- An "intent to rape" is not required under the Sexual Misconduct I policy. Unlike murder, for which there must be intent to kill, Sexual Misconduct I is not an intent-based concept. The requisite intent for Sexual Misconduct I is demonstrated by engaging in the act of intercourse intentionally.
- Consent has an expiration date. Consent lasts for a reasonable time, depending on the circumstances. A person's state of incapacity is a subjective determination that will be made after the incident in light of all of the facts available because people reach incapacitation at different points and as a result of different stimuli. They exhibit incapacity in different ways.

**The following factors bear on incapacity:**

- Body weight, height and size;
- Tolerance for alcohol and other drugs;
- Amount and type of alcohol or other drugs consumed, and the mixture taken;
- Amount of food intake prior to consumption;
- Voluntariness of consumption;
- Vomiting;
- Propensity for blacking out (mentally or physically);
- Genetics.

Alcohol related incapacity results from a level of alcohol ingestion that is more severe than impairment, being under the influence, drunkenness or intoxication. It is less severe than alcohol poisoning or overdose, which may lead to coma or death. Evidence of incapacity may be detected from context clues, such as:

- Slurred speech;
- Bloodshot eyes;
- The smell of alcohol on their breath;
- Shaky equilibrium;
- Vomiting;
- Outrageous or unusual behavior;
- Unconsciousness.

None of these facts, except for unconsciousness, will constitute – in and of itself – incapacitation. Indications of consent are irrelevant if the initiator knows or should reasonably have known of the incapacity of another person.

57

HC10344

## STATEMENT ON CONFIDENTIALITY

The Holy Cross community understands that all parties involved in the report of a violation of the sexual misconduct policy experience significant distress, whether they be the victim, the accused or any other individual associated with the report. All parties involved are expected to be treated with respect and dignity and the community will provide a safe place where the individuals may receive appropriate personal support. If any person involved in the report of sexual misconduct desires confidential support, they should speak with professional staff in the Counseling Center, Chaplains' Office or Health Services. Staff in Health Services are required by federal law to pass along non personally identifiable statistical information to Public Safety.

The only information that will be released is that an incident was reported, the type of incident and the general location of the incident (i.e., "on campus" or "off campus"; no address will be given). Statistics given to Public Safety will be made available through publication in the Annual Campus Security Report. Students have the right under federal law (Title IX) to expect that reports of sexual misconduct will be taken seriously by the College of the Holy Cross. At the request of the student making the report, or when deemed necessary to protect the interests of the College community, reports will be investigated and properly resolved through administrative procedures. Officials of the College, such as the Residence Life staff, deans or other administrators, shall be available to any student seeking information or wishing to report an incident of sexual misconduct.

## FOR AN INDIVIDUAL REPORTING SEXUAL MISCONDUCT

The College of the Holy Cross recognizes that a student reporting an incident of sexual misconduct may desire confidentiality and may not want the College or Public Safety to investigate and attempt to resolve the incident. For any student who so requests, officials of the College will maintain confidentiality to the extent permitted by law. However, the College reserves the right to investigate and pursue resolution when it is deemed necessary to protect the interests of the College community. A student who initially requests confidentiality and who requests that the College not investigate or pursue resolution may later request that the College investigate and pursue resolution. Reports filed with Public Safety will be noted in a log that is made public within two (2) business days of the date of the report. No names or other information that could reveal the identity of the individuals involved will be made public in the Public Safety log.

Students should be aware that administrators (with the exception of Chaplains and Counseling Center Staff) must fulfill separate requirements as a matter of law. All personally identifiable information shall be kept confidential, but statistical information must be passed along to Public Safety regarding the type of the incident and its general location for publication in the Annual Campus Security Report. This report helps to provide the community with a clear picture of the extent and nature of campus crime to ensure greater community safety. In addition, College administrators must issue timely warnings for incidents reported to them that continue to pose a substantial threat to bodily harm or danger to members of the campus community.

## FOR AN INDIVIDUAL ACCUSED OF SEXUAL MISCONDUCT

Confidentiality with respect to a person accused of having violated the sexual misconduct policy is governed by the Family Educational Rights and Privacy Act (FERPA), also known as the Buckley Amendment. FERPA provides that personally identifiable information maintained in the educational records of an institution shall not be disclosed, except as otherwise specified by law.

## JURISDICTION

College jurisdiction and discipline shall be limited to conduct which occurs on College premises or which occurs off College premises and adversely affects members of the College community and/or pursuit of the College's mission.

## PERIOD OF LIMITATION

Any member of the College community may file a complaint against a student for allegedly violating the sexual misconduct policy. The term "student" includes all persons (other than faculty, staff or administrators) taking or auditing courses at the College, either full-time or part-time. Persons who are not officially enrolled for a particular term but who have a continuing relationship with the College are considered students. The term "member of the College community" includes any person who is a student, faculty member, administrator/staff member or any other person employed by the College. A person's status in a particular situation shall be determined by the Vice President for Student Affairs.

## STATEMENT OF RIGHTS

It is the goal of the College of the Holy Cross to ensure that students have access to needed resources, services and information. Normally, the College assures all students the following:

• To be treated with respect by College officials.

• To be notified of available spiritual and personal counseling, mental health, medical or student services, both on campus and in the community.

• To receive notification of options for and available assistance in changing academic and living situations after an alleged incident of sexual misconduct, if so requested and if such changes are reasonably available (no charges or investigation, campus or criminal, need occur before this option is available).

• To have an advisor present during a Community Standards Board hearing.

• To be informed of the outcome and sanction of any disciplinary hearing involving sexual misconduct.

58

HC10345

- To not have irrelevant prior sexual history admitted in a Community Standards Board hearing.
- To elect not to have reports of sexual misconduct resolved through the informal resolution.
- To be free from any behavior that may be construed by the College to be intimidating or harassing.

**For an Individual Reporting Sexual Misconduct:**

- To have reports of sexual misconduct responded to in accordance with Community Standards and Disciplinary Procedures for Students.
- To appeal the finding and sanction of the Community Standards Board in accordance with the standards for appeal.
- To not have a report investigated unless the College deems it necessary to protect the interests of the College community.

**For An Individual Accused of Sexual Misconduct:**

- To be notified of a report of sexual misconduct in accordance with Community Standards and Disciplinary Procedures for Students.
- To be heard in accordance with the Community Standards and Disciplinary Procedures for Students.

## SALES AND SOLICITATION

Sales, concessions, and fundraisers by students or student organizations require the approval of the Office of Student Programs and Involvement. This includes raffles, contests, sales and direct solicitation of funds. Solicitation of individual employees and alumni is not permitted. All other solicitation must be reported to the Office of the Vice President of Development. All approved sales or solicitations must have their College-issued license with them and visible at all times. Outside vendors are restricted to the Hogan Campus Center and require approval from Auxiliary Services. All violations should be reported to Public Safety and Student Affairs.

## SALES REPRESENTATIVES

A sales representative (student or non-student) who wishes to solicit on campus must have approval in writing from the Student Affairs Office. Such approval will normally be granted to students, unless the item is available through normal channels, such as the bookstore or the cafeteria. Solicitation in the Residence Halls also requires approval by the SGA and each house council.

## SMOKING POLICY

For health and safety reasons, all buildings at the College of the Holy Cross, including residence halls, are smoke free. Smoking is not permitted in any area of the buildings. In order to keep entryways smoke free, smoking is not permitted within 20 feet of entryways. Smoking is not permitted on the Stein Bridge, or within 20 feet of the entry to the bridge. The placement of containers for unused smoking materials will be located at a distance indicating where smoking is permitted in any entryway.

## SPORTS ACTIVITIES

To protect the grounds, sport activities are not permitted on the quadrangle or any grassed area adjacent to campus buildings. Instead, Freshman Field and the playing field next to the Hart Center should be used for these purposes. Students are expected to use care to avoid breaking windows and other damage to College property. Charges for any property damage will be billed directly to the student(s) responsible. Skating or Skateboarding: Due to the potential for injury, skating or skateboarding in a reckless manner is prohibited. Skating or skateboarding in buildings is prohibited.

## PROTEST AND DEMONSTRATION GUIDELINES

As an academic institution, the College of the Holy Cross is committed to an environment in which a variety of ideas can be reasonably proposed and critically examined. The College recognizes that the free exchange of ideas and expression may produce conflicts in beliefs and proposals for action. This exchange is an important element in the pursuit of knowledge.

All members of the College community have a responsibility to maintain channels of communication which foster a climate favorable to maintaining this exchange. Implicit in the pursuit of this exchange is the privilege to dissent and demonstrate in a peaceful and non disruptive manner without unreasonable obstruction or hindrance. The College expects that those who enjoy this privilege also accept the responsibility for their actions and for maintaining order.

The following are general guidelines for protests and demonstrations:

- Any assembly, protest or display may not interfere with the normal operations of the College, prevent access to any office, building or other facility, or threaten the well being or safety of any individual.
- The Division of Student Affairs serves as the contact and clearinghouse for anyone wishing to conduct a demonstration, rally, or protest on campus. General conduct, expectations and previously scheduled events will be reviewed with demonstrators.
- Student Affairs also serves as the conduit for campus wide communication regarding these activities. The Departments of Public Safety, Public Affairs and other offices or departments that may be potentially affected will be informed of any proposed activities by Student Affairs.

59

**HC10346**

# TAB 2

DEPO OF: PAUL A. IRISH          CondenseIt™          BLEILER VS. HOLY CROSS

Page 7

1    Q. Is there any reason you can't give your
2  best testimony today? Are you on any medications?
3    A. No.
4    Q. I should be more specific. Medications
5  that could affect your memory?
6    A. No.
7    Q. I don't need to know if you had an
8  aspirin this morning.
9        Can you just walk us through
10  chronologically your education history, starting
11  with graduation from college?
12    A. I graduated from Assumption College in
13  1990.
14    Q. Okay. What was your degree?
15    A. History.
16    Q. Did you have any further education,
17  formal education?
18    A. I did, yes.
19    Q. What came next?
20    A. I took education classes at Castleton
21  State College in Vermont.
22    Q. Okay.
23    A. I took some education classes at
24  Worcester State College.

Page 8

1    Q. Were these education classes in pursuit
2  of a master's in education?
3    A. Yes.
4    Q. And did you ultimately get a master's in
5  education?
6    A. I did not.
7    Q. Any other formal education?
8    A. Yes. I went to Northeastern University
9  for a master's in college student personnel and
10  counseling and I obtained --
11    Q. I'm going to have to get that down.
12  I've never heard of it. A master's in college
13  student --
14    A. Development and counseling.
15    Q. Okay, thanks. What years were you in
16  that program?
17    A. 1993 to 1995.
18    Q. Did you get your master's --
19    A. I did.
20    Q. -- in that. Okay. So that was in the
21  year 1995?
22    A. Yes.
23    Q. Anything else?
24    A. No.

Page 9

1    Q. Outside of those sort of formal
2  education programs, have you participated in any
3  other kind of specialized trainings, continuing
4  education?
5    A. Yes.
6    Q. Tell me a little bit about those.
7    A. I've completed a basic and intermediary
8  track for the Association of Student Conduct
9  Administrators. I attend annual professional
10  conferences for my field, including workshops and
11  other trainings.
12    Q. Maybe I should have asked you this
13  question first. We're going to hop around in time
14  a little. Can you tell me what your current
15  position is at Holy Cross and a little bit about
16  your responsibilities there?
17    A. Yes. My position is I'm the Director of
18  Student Conduct and Community Standards and I'm,
19  also, the Assistant to the Vice President for
20  Student Affairs.
21    Q. So, when you talk about attending
22  professional conferences in your field, is your
23  field defined as student conduct administrator?
24  How do you define your field?

Page 10

1    A. I have a split position. I am a
2  generalist in student affairs and a specialist in
3  student discipline, student conduct.
4    Q. How long have you held that position at
5  Holy Cross?
6    A. I started in November of 2004.
7    Q. Has this been your title and your
8  responsibilities all throughout?
9    A. The title used to be Director of
10  Judicial Affairs --
11    Q. Okay.
12    A. -- Assistant to the Vice President for
13  Student Affairs when I started.
14    Q. When did the title change?
15    A. 2005.
16    Q. Other than the title change though, have
17  your responsibilities more or less been the same
18  since you've been there?
19    A. No.
20    Q. So what were your responsibilities when
21  you started?
22    A. Primarily student discipline and
23  generalist responsibilities for student affairs.
24    Q. And how has that changed?

Page 11

1    A. I've been given additional
2  responsibilities such as co-chairing commencement,
3  some other campus-wide responsibilities.
4    Q. Okay. So, things like co-chairing
5  commencement, that's -- would you categorize that
6  as sort of additional responsibilities in service
7  to the college --
8    A. Yes.
9    Q. -- as opposed to your job description
10  really changing?
11    A. Yes.
12    Q. So, putting aside those sort of
13  extracurricular service things, have your core job
14  responsibilities remained the same?
15    A. Yes.
16    Q. And where were you before you went to
17  Holy Cross?
18    A. Northeastern University.
19    Q. What years were those?
20    A. February, 1999 to October of 2004.
21    Q. And what was your position or positions
22  at Northeastern?
23    A. I was the Assistant Director for the
24  Office of Student Conduct and -- it was of Student

Page 12

1  Conduct. It's a different acronym.
2    Q. That's okay. I'm sorry. Was that your
3  basic role throughout your time at Northeastern?
4    A. Yes. That was my title.
5    Q. So, putting aside titles at different
6  schools, would it be fair to say that you were
7  working in essentially the same field but in an
8  assistant director position?
9    A. Yes.
10    Q. As opposed to a director position?
11    A. Yes.
12    Q. And how about before February of 1999,
13  were you employed?
14    A. Yes, I was.
15    Q. Where were you?
16    A. I was at Dominican College of Blauvelt,
17  B-l-a-u-v-e-l-t, in New York.
18    Q. For how many years?
19    A. I was there from August of 1995 until
20  January of 1999.
21    Q. So is that a position you took more or
22  less right after getting your master's?
23    A. It is.
24    Q. And what was your job there?

Page 25

1   Q.  And do you know approximately how many
2 students --
3   A.  375 to 400, I believe.
4   Q.  And so in a hall that size how many RAs
5 would you have to serve that population?
6   A.  I don't know.
7   Q.  And what's the smallest residence hall?
8   A.  I'm not sure.
9   Q.  Is Mulledy -- are there any other halls
10 that are close to as large as Mulledy Hall or is
11 that kind of an outlier?
12   A.  Wheeler Hall is, also, a large residence
13 hall.
14   Q.  Let me just see if I can remember some
15 names to ask you specific questions.
16     The complaining witness in this case,
17 Ms. Murphy, do you recall which two residence halls
18 she lived in in her freshman and sophomore year?
19   A.  I do not.
20   Q.  Is Hanselman one of the residence halls?
21   A.  Yes.
22   Q.  How big is Hanselman?
23   A.  I don't know.
24   Q.  Smaller than Mulledy; smaller than

Page 26

1 Wheeler?
2   A.  Yes.
3   Q.  Bear with me for a minute.
4   MS. SMITH-LEE:  Off the record.
5   (Discussion off the record.)
6   Q.  Would it be consistent with your
7 understanding of how the residential life program
8 is structured that an RA in a particular building
9 would have developed some kind of relationship with
10 the residents on his or her hall?
11   A.  I don't know.
12   Q.  But you agree that is what's expected of
13 them?
14   A.  I would agree that's what's expected.
15   Q.  Okay.  Do the RAs get any particular
16 training in the college's conduct policies
17 generally?
18   A.  Yes.
19   Q.  What's the training that they receive?
20   A.  They receive training on a whole host of
21 issues.
22   Q.  Let's take one.  What training do they
23 receive on the alcohol policies?
24   A.  They receive training on what the policy

Page 27

1 is; where it's found.  They receive training on how
2 best to address the situation.
3   Q.  How best to address the situation, I'm
4 inferring from that answer that that's a broader
5 question than just how do they report it.  Do they
6 receive training on how to address an intoxicated
7 student?
8   A.  Yes.
9   Q.  What training do they receive on the
10 sexual misconduct policy?
11   A.  It is part of the overall training that
12 they receive related to student policies.
13   Q.  And who's responsible for doing that
14 training?
15   A.  I'm not sure.
16   Q.  That's a residential life function, not
17 a student conduct function?
18   A.  I'm not sure.
19   Q.  So it's not you?
20   A.  No.
21   Q.  So I want to ask you some general
22 questions, you know, not specific to the sexual
23 misconduct policy but just general questions about
24 your process, the process that you oversee, in

Page 28

1 student conduct.
2     How are -- let me back up.  It's my
3 understanding that certain types of infractions
4 entitle a student to a full hearing; is that right?
5   A.  Yes.
6   Q.  So I just want to talk about that
7 category of infractions.  I, also, understand that
8 there's other processes for other infractions.
9 But, for purposes of the student who's been charged
10 with something that entitles them to a full
11 hearing, what is your process for selecting panel
12 members for those hearings generally?
13   A.  Are you asking about how we compose the
14 pool or how we select from the pool?
15   Q.  That's a fair point.  Actually, I'm kind
16 of asking about both, but I wasn't doing it very
17 well.  What's your process for composing the pool?
18 We'll start with that.
19   A.  There are 21 members of the Community
20 Standards Board.  Six of them are administrators or
21 staff and those are appointed by the Vice President
22 for Student Affairs.
23   Q.  Okay.
24   A.  Six of those are faculty and those are

Page 29

1 selected and appointed by the dean of the college.
2   Q.  Okay.
3   A.  And nine of those are student positions.
4   Q.  And how are the students chosen?
5   A.  I receive a recommendation from the
6 Student Government Association for eligible
7 candidates.
8   Q.  Okay.
9   A.  And then they complete an application
10 and an interview process.
11   Q.  And do these students -- can interested
12 students initiate their own candidacy, if you will,
13 by approaching the Student Government Association?
14   A.  They could.
15   Q.  And what are the criteria for
16 eligibility?
17   A.  For?
18   Q.  I'm sorry, to be a student member of the
19 pool?
20   A.  You would need to be a good -- a student
21 in good standing.
22   Q.  Okay.  In good standing means?
23   A.  Disciplinary standing.
24   Q.  Okay.  So you can't have ever been

Page 30

1 subject to a disciplinary sanction or you just
2 can't have pending discipline?
3   A.  You would need to be in good
4 disciplinary standing at the time.
5   Q.  So a student who made a mistake in their
6 freshman year might still be able to serve on this
7 pool later in their college career?
8   A.  Yes.
9   Q.  Any other facets of good standing?
10   A.  Not that I'm aware of.
11   Q.  Any other eligibility criteria?
12   A.  No.
13   Q.  Okay.  So the Student Government
14 Association recommends these candidates.  They
15 complete an application, and what kind of
16 information are you trying to get from them on
17 their application to help you choose?
18   A.  I want to see what their other
19 involvement has been on campus; their ability to
20 make difficult decisions.  There's several other
21 questions that I ask.
22   Q.  So, once they submit these applications,
23 do you have interviews with the students?
24   A.  I do.

**Page 31**

1   Q. And in a typical year you've got nine
2 spots. First of all, do students just serve for
3 one year?
4   A. They serve until graduation.
5   Q. So, if they are selected as a sophomore,
6 they serve three years?
7   A. Yes.
8   Q. Is anybody ever selected as a freshman
9 or is that considered too young?
10   A. They might be selected as a freshman to
11 serve if we -- we might do a recruitment in the
12 spring for the following year, but I've not had
13 freshmen on the board, but they're not precluded
14 from being on the board.
15   Q. Okay. In a typical year do you have
16 more applicants than spots that you have to fill?
17   A. Yes.
18   Q. By a significant amount?
19   A. No.
20   Q. And are you the only one that makes this
21 decision or are there others involved in this?
22   A. I make the decision once I have the
23 recommendations.
24   Q. And that's a recommendation from the

**Page 32**

1 Student Government Association. Anybody else?
2   A. No.
3   Q. And your criteria -- let's say you've
4 got three applicants for two spots. You've
5 mentioned ability to make difficult decisions.
6 That's one of your criteria in making this choice?
7   A. Yes.
8   Q. How do you gauge that? How do you
9 figure out whether a student can make difficult
10 decisions?
11   A. In the application process we have some
12 scenarios. We ask them about prior experience with
13 difficulty and how they handled it.
14   Q. Some scenarios like hypothetical
15 disciplinary cases, what would you do? How would
16 you handle it?
17   A. Yes.
18   Q. Is there kind of a standard set of
19 materials for that, like, do you use the same
20 scenarios every year? Is there a packet that's
21 used in this process?
22   A. I have an application, standardized
23 application, that I use.
24   Q. Including the scenarios that you give?

**Page 33**

1   A. Yes.
2   MS. SMITH-LEE: Harry, I'm not sure,
3 frankly, whether that is or is not within our
4 document request, but that would be something we'd
5 be interested in seeing.
6   MR. POTTER: If you'd like to see
7 that, sure. We can make a list afterwards. I
8 mean, I'll make a list as we go along, but just to
9 make sure, that's fine.
10   MS. SMITH-LEE: Thank you.
11   Q. So, at the time of Mr. Bleiler's hearing
12 of the nine student members of the pool, what were
13 their -- what were their classes? How many were
14 seniors? How many were juniors?
15   A. I don't know.
16   Q. So, once you have the pool, you've got
17 21 people and you need to get to five, right --
18   A. Yes.
19   Q. -- for your hearing. What's your
20 process, generally, for selecting which five will
21 serve on any particular panel?
22   A. The first thing I do is send an e-mail
23 to the pool about availability with possible times
24 and dates.

**Page 34**

1   Q. Okay. Let's say you get ten people
2 writing back saying I'm available. How do you then
3 make your decision about who's going to sit on the
4 particular panel?
5   A. I have to have at least one faculty and
6 one staff, the third person is either faculty or
7 staff, and two students.
8   Q. Let's assume a hypothetical. You've got
9 your faculty and staff all lined up and you've got
10 four students who are available.
11   A. Yes.
12   Q. How do you then make the decision who
13 serves on the panel?
14   A. It's very case specific.
15   Q. Okay. Can you explain that?
16   A. I would like to have a male student and
17 a female student.
18   Q. And is that -- is that desire to have
19 gender balance on the students, is that specific to
20 sexual misconduct cases or just generally you
21 prefer to have that balance?
22   A. I prefer to have that balance.
23   Q. Any other things that you consider?
24   A. Yes.

**Page 35**

1   Q. Like what?
2   A. If we had a case with a student of
3 color, we'd want to make sure that one of the
4 panelists was an ALANA, A-L-A-N-A, student.
5   Q. I'm sorry. That's an acronym I'm not
6 familiar with.
7   A. African-American, Latino, Asian, Native
8 American.
9   Q. Any other considerations you've used to
10 winnow down the pool into your board?
11   A. None that I can recall.
12   Q. So the desire to have another student of
13 color on the panel, are you just roughly trying to
14 approximate a jury of one's peers? Is that the
15 impetus here?
16   A. No.
17   Q. So what -- this may seem obvious, but
18 why if you've got a student appearing before the
19 board who's a student of color do you think it's
20 important to have another student of color on the
21 panel?
22   A. That's a college decision that we feel
23 is important.
24   Q. And do you know what the reasoning is

**Page 36**

1 behind it?
2   A. I think so, that students feel that
3 they're represented on the panel.
4   Q. So, with respect -- let's assume you got
5 your students all set and you've got more faculty
6 and staff than you need. Are there similar -- what
7 other considerations do you use in choosing your
8 panel there?
9   A. Most likely it's who's responded to me
10 first.
11   Q. So there's not a similar attempt
12 necessarily to balance gender, race?
13   A. There could be. There could be. In the
14 pool, the faculty pool, it's mixed gender.
15   Q. But it sounds like it's not your
16 practice necessarily to think of that in the same
17 way you do with the student panelists; is that
18 fair?
19   A. No.
20   Q. No, you don't think of it, or no --
21   A. No, I don't think it's fair.
22   Q. So, if you had five faculty people
23 available for one hearing, is it your practice
24 typically to try to get a gender balance in that

Page 37

1  group as well?
2      A.  Yes.
3      Q.  Now, specifically with respect to sexual
4  misconduct hearings -- by the way, how many of
5  those have you participated in at Holy Cross?
6      A.  Four.  We have two categories of sexual
7  misconduct, Sexual Misconduct I and Sexual
8  Misconduct II.  I participated in four Sexual
9  Misconduct I board hearings.
10     Q.  And how many Sexual Misconduct II?
11     A.  Four other Sexual Misconduct IIs.
12     Q.  And we'll get back to that in a minute.
13  With respect to sexual misconduct hearings, either
14  I or II, or if the answer is different you can tell
15  me, are there any additional criteria that you use
16  in selecting your pool of panelists?
17     A.  Yes.
18     Q.  And what is that?
19     A.  That they've received training on sexual
20  misconduct policies at the college.
21     Q.  And of your 21 -- of the 20 or so in the
22  pool in, let's say, last May, how many of them had
23  received training in sexual misconduct?
24     A.  I'm not sure.

Page 38

1      Q.  How often do you conduct a training in
2  sexual misconduct?
3      A.  Two times a year.
4      Q.  You say you're not sure how many of your
5  pool in May of 2011 had done the training.  Did you
6  know at the time?
7      A.  I did.
8      Q.  I assume you keep records of that
9  somewhere?
10     A.  I no longer have that record.
11     Q.  What's the form of the record that you
12  once had?
13     A.  I keep an Excel spreadsheet with their
14  names and I note that they've completed the sexual
15  misconduct training in one of the columns.
16     Q.  So, as of May 18th, 2011, you had a
17  spreadsheet showing which of your panelists had
18  completed the training?
19     A.  Yes.
20     Q.  And do you recall checking the responses
21  against that spreadsheet?
22     A.  I do not recall that.
23     Q.  Do you recall consulting that
24  spreadsheet prior to sending out your initial

Page 39

1  e-mail?
2      A.  I do not recall that.
3      Q.  What's your practice usually with
4  respect to that?
5      A.  My practice is I would not put a panel
6  together that had not had the training on sexual
7  misconduct.
8      Q.  And what happened to that spreadsheet?
9      A.  It's a running list that I use that I
10  update with new students and new members.
11     Q.  Okay.  Are any of the people who served
12  on Mr. Bleiler's -- strike that.
13         Are any of the people who were in your
14  pool of potential panel members last May still in
15  your pool of potential panel members?
16     A.  Yes.
17     Q.  So you had an up-to-date list at least
18  with respect to those people?
19     A.  Yes.
20     Q.  Does your spreadsheet, also, indicate
21  when they took the training?
22     A.  It does not.
23     Q.  So that would give us some information
24  but not necessarily all?

Page 40

1      A.  Yes.
2      Q.  Okay.
3         MS. SMITH-LEE:  Harry, I'd put that on
4  the list, too.
5         MR. POTTER:  The current one?
6         MS. SMITH-LEE:  I can't ask you for
7  something you don't have.
8         MR. POTTER:  Whatever he has, yes.
9         MS. SMITH-LEE:  Thank you.
10     Q.  Who performs the training on sexual
11  misconduct?
12     A.  I do.
13     Q.  Do you utilize any external or internal
14  expertise consultants to assist you with that or is
15  that --
16     A.  I do not.
17     Q.  How long have you been running that
18  training?
19     A.  Since I started at Holy Cross.
20     Q.  2004?
21     A.  Yes.
22     Q.  Other than confirming that the panel
23  members had completed the training, is there any
24  additional criteria that you employ to select the

Page 41

1  panel for a sexual misconduct hearing?
2      A.  No.
3      Q.  Okay.  When you're putting together a
4  panel -- and we're not being specific to sexual
5  misconduct for these questions.  Just generally
6  speaking, when you put together a panel, do you
7  have any process for screening to identify
8  conflicts or potential biases among the panel
9  members?
10     A.  Yes.
11     Q.  What is that process?
12     A.  After I receive the available pool,
13  who's available, I will then send out the names of
14  the parties involved and what the situation is and
15  then I will ask them if they have any concerns or
16  issues with these students that would preclude them
17  from being a fair panelist.
18     Q.  Let's say you get back a response from a
19  faculty member who says I don't know.  I had this
20  student in my class and they weren't a great
21  student.  What do you do then?
22     A.  I would speak with the faculty member.
23     Q.  What would be -- has that ever happened?
24     A.  No, not hasn't been a great student, not

Page 42

1  that specific question.
2      Q.  Okay.  Let me make it more general then
3  because that's probably not fair.  Has it ever
4  happened that a faculty member gets this disclosure
5  and communicates to you some personal experience
6  with the student and some opinion, positive or
7  negative, about the student?
8      A.  That's happened.
9      Q.  What do you do in that situation?
10     A.  We would explore their ability to be
11  fair and make a fair decision based on the
12  information they may have had related to the
13  student.
14     Q.  Would you explore that whether the
15  opinion that was expressed was positive or
16  negative?
17     A.  Yes.
18     Q.  Are you the one that ultimately makes
19  the decision about whether the panel member can be
20  fair?
21     A.  Yes.
22     Q.  So what are your criteria for making
23  that decision?
24     A.  That's a very broad question.  They have

DEPO OF: PAUL A. IRISH          CondenseIt™          BLEILER VS. HOLY CROSS

Page 43

1 to be fair and not have information that would
2 question their fairness.
3     Q.  Have you ever in putting together these
4 panels declined to use a faculty member because
5 of -- a faculty or staff member because of one of
6 these disclosures?
7     A.  Yes.
8     Q.  On how many occasions?
9     A.  I don't know.
10    Q.  Do you think it's one, 20, a hundred?
11    A.  I don't know.  I'd rather not guess.
12    Q.  Okay.  What about if somebody raises a
13 concern about a student member of the panel, what's
14 your process for determining whether that student
15 can be fair?
16    A.  I need to collect information about what
17 the concern is.
18    Q.  What kind of information do you collect?
19    A.  I would meet with the student; ask them
20 what the concern is specifically.
21    Q.  The student who is raising the potential
22 conflict?
23    A.  Yes.
24    Q.  And then what?

Page 44

1     A.  I would, also, simultaneously speak with
2 the student involved or the hearing board member
3 involved.
4     Q.  And have you ever in putting together a
5 panel declined to use an available student panel
6 member because of a conflict?
7     A.  Yes.
8     Q.  Do you recall on how many occasions?
9     A.  I do not.
10    Q.  Can you give me an example of the nature
11 of a conflict that has in the past convinced you
12 that a student shouldn't be used?
13    A.  A teammate, someone that lived very
14 close to them on a floor that may have had a
15 negative interaction, those would be two examples.
16    Q.  And can you think of any examples of
17 things that you've considered to be a conflict with
18 respect to faculty or staff panel members, in other
19 words, in the incidents that you've declined to use
20 these members?
21    A.  Yes, perhaps someone is an advisor to a
22 program, like, a pre-med advisor, and that student
23 might be pre-med.
24    Q.  Okay.  So in that situation the concern

Page 45

1 would be that faculty member might have a
2 particular mentoring or advisory relationship to
3 the student?
4     A.  Yes.
5     Q.  So, in the case of a charged student,
6 would the concern be that that faculty member might
7 not be able to objectively assess the student's
8 behavior?
9     A.  I don't know.
10    Q.  You don't know what your concern would
11 be if you disqualified a --
12    A.  You asked me if I -- what the student's
13 concern would be.
14    Q.  Oh, no.  I'm sorry.  If I did, I
15 misspoke.  I'm asking what your concern would be.
16    A.  My concern would be that the faculty may
17 not feel that student feels they're approachable if
18 they've been in that role in the future.
19    Q.  Okay, I see.  So the faculty member -- I
20 don't want to put words in your mouth.  I just want
21 to make sure I understand the concern.
22        If that faculty member was part of
23 imposing discipline, that that might affect the
24 faculty/student relationship going forward?

Page 46

1     A.  It could.
2     Q.  Is that the concern?
3     A.  It could.
4     Q.  Any other examples of faculty or staff
5 that you've decided not to use because of a
6 conflict or a bias?
7     A.  None that I can recall.
8     Q.  Outside of sexual misconduct hearings,
9 how many disciplinary hearings since you've been at
10 Holy Cross have you been part of in a typical year?
11    A.  In a typical year, between four and six.
12    Q.  And the ones that don't involve sexual
13 misconduct allegations, what kinds of charges are
14 you hearing?
15    A.  In the board?
16    Q.  Yes.
17    A.  Fights.
18    Q.  Okay.
19    A.  Theft, alcohol, drugs, other forms of
20 serious misconduct or repeat misconduct.
21    Q.  Okay.  I'm going to hop back in time for
22 just a minute to your years at Northeastern.  How
23 many sexual misconduct hearings did you participate
24 in at Northeastern?

Page 47

1     A.  I don't remember.
2     Q.  Do you remember any?
3     A.  Yes.
4     Q.  Do you remember that it was just a few
5 or more than a handful?
6     A.  I don't recall.
7     Q.  Do you have a specific memory of any of
8 them?
9     A.  Yes.
10    Q.  And how many do you have a specific
11 memory of?
12    A.  Two.
13    Q.  And I understand the policy might be
14 titled differently, but were they both what you
15 would consider now at Holy Cross the equivalent of
16 a Sexual Misconduct I hearing?
17    A.  Yes.
18    Q.  So, generally speaking, again, any kind
19 of disciplinary hearing, describe for me your role
20 in the process.
21    A.  At Holy Cross or at Northeastern?
22    Q.  Fair point, Holy Cross.
23    A.  My role is the administrator, to ensure
24 that the procedures that we've set forth are

Page 48

1 followed.  I serve as a resource for the students
2 that are either a student complainant or a charged
3 student respondent.  I schedule the hearings; make
4 sure that all the information is distributed; that
5 the information is available for all the parties to
6 review; to serve as a resource.
7     Q.  How about during the hearing, itself,
8 what role, if any, do you play?
9     A.  I'm the procedural person.
10    Q.  Okay.
11    A.  If there are any procedure questions
12 that come up related to the handbook.
13    Q.  Anything else?
14    A.  I schedule the hearing.  I communicate
15 with the witnesses about their scheduling.
16    Q.  Okay.
17    A.  I bring them in the room and escort them
18 out when they're called.  I make sure that the
19 recording equipment is working.
20    Q.  Anything else in the conduct of the
21 hearing, itself?
22    A.  No.
23    Q.  And, generally, is it your practice --
24 the hearing, itself, is recorded, right?

BLEILER VS. HOLY CROSS          CondenseIt™          DEPO OF:  PAUL A. IRISH

Page 49

1  A. Yes.
2  Q. And then following the hearing the panel
3  deliberates?
4  A. Correct.
5  Q. And those deliberations are not
6  recorded?
7  A. Correct.
8  Q. Is it your practice typically to be
9  present for the deliberations after a hearing?
10  A. Yes.
11  Q. And what is your role, if any, in that
12  process?
13  A. If there's any procedural questions that
14  might arise.
15  Q. Help me with what kind of procedural
16  questions would come up in a deliberation as
17  opposed to the hearing, itself.
18  A. Can we listen to the recording and try
19  to hear from that witness again. That might be a
20  question that comes up.
21  Q. What's the answer to that question?
22  A. Yes.
23  Q. What other kinds of questions come
24  up that you consider procedural during the

Page 50

1  deliberations?
2  A. If there was a question of was there
3  any disciplinary history with the student and that
4  wouldn't be shared until a decision was made about
5  responsibility and could not be taken into
6  consideration.
7  Q. So the deliberations is a two-step
8  process?
9  A. Yes.
10  Q. You have to decide responsibility. So
11  you're saying you wouldn't share the history unless
12  and until the board got to sanctions?
13  A. After they make a decision on
14  responsibility and they have a discussion about
15  sanctions.
16  Q. And if they get to a decision on
17  sanctioning, they might turn to you and ask you
18  whether you have additional information about the
19  student's history?
20  A. Yes.
21  Q. And that would be information that
22  wouldn't be necessarily presented in the hearing?
23  A. It would not be presented in the
24  hearing.

Page 51

1  Q. Okay.
2  A. Unless a student offered it.
3  Q. Okay.
4  A. The charged student.
5  Q. Is there any other information, whether
6  it's at the responsibility or the sanction stage,
7  that you recall giving any panel in the concept of
8  a deliberative process?
9  A. They may ask for guidance on the range
10  of sanctions, precedents.
11  Q. When you say they may ask for guidance
12  on the range of sanctions, are they just asking you
13  what the possible sanctions are?
14  A. Yes.
15  Q. And what do you mean when you say
16  "precedents"?
17  A. Have there been similar cases and what
18  have other boards decided to do.
19  Q. Okay. So, in that instance at the
20  sanctions phase, at least, you're providing some
21  information to the panel that wasn't presented in
22  the hearing?
23  A. Correct.
24  Q. Any other information that you recall

Page 52

1  being asked for or providing in any deliberative
2  meeting?
3  A. Outside of sanctions?
4  Q. Are we done with sanctions? Any other
5  information, so, if there's other questions you've
6  been asked --
7  A. Besides sanctions?
8  Q. If there's other questions you've been
9  asked in the sanctions phase, right. You've told
10  me in the sanctions phase you might be asked about
11  the charged student's disciplinary history. You
12  might be asked about what other boards have
13  decided. You might be asked what the possible
14  sanctions are.
15  A. Yes.
16  Q. Is there any other kind of information
17  you recall providing to a panel during
18  deliberations relevant to the sanctions
19  determination?
20  A. Yes.
21  Q. Can you give me some examples?
22  A. Do we have to make a decision tonight;
23  can we reconvene the next day.
24  Q. Okay.

Page 53

1  A. I recall that sometimes coming up.
2  Q. Anything else in the sanctions piece
3  that you recall giving information about?
4  A. Educational sanctions compared to
5  punitive sanctions; fining or not to fine.
6  Q. And what's the information that you're
7  providing the board in that context?
8  A. A range.
9  Q. And are you, also, providing some
10  information about precedent in that regard?
11  A. Yes.
12  Q. So you might say one of the possible
13  sanctions is X. I'm aware that that's been imposed
14  in a case involving XYZ. Is that it?
15  A. Yes.
16  Q. Is that something you typically provide
17  or is that something you only provide if you're
18  asked a direct question?
19  A. I typically provide that.
20  Q. How about with respect to the
21  responsibility phase, what, if any, information do
22  you recall ever being asked for by a panel that was
23  deliberating prior to the
24  A. The only piece I recall is the

Page 54

1  reconvening question.
2  Q. Okay.
3  A. If we can't reach a decision about
4  responsibility, does it have to be unanimous, some
5  of the logistical pieces about voting.
6  Q. Okay. And it doesn't have to be
7  unanimous, right?
8  A. No.
9  Q. Is it simple majority?
10  A. Yes.
11  Q. In your experience are these decisions
12  more often than not unanimous or more often than
13  not split decisions?
14  A. More often than not unanimous.
15  Q. Now, it's my understanding that per the
16  policy the deliberations are not recorded; is that
17  right?
18  A. Yes.
19  Q. Does anybody take notes?
20  A. I take notes.
21  Q. What do you do with those notes after?
22  A. I use them to help the chair when the
23  chair is writing the letter which is the
24  recommendation to the vice president.

COPLEY COURT REPORTING  (617) 423-5841

Page 55

1   Q.  Typically do the other panel members
2 take notes?
3   A.  They do.
4   Q.  What happens to those notes?
5   A.  I collect every piece of paper in the
6 hearing, after the hearing, and dispose of it,
7 destroy it.
8   Q.  Immediately following the hearing?
9   A.  Immediately following the hearing.
10   Q.  Why do you do that?
11   A.  I do not want panel members to take
12 those materials out of the room.
13   Q.  So you collect them because you don't
14 want this information flying around the world?
15   A.  Correct.
16   Q.  Why do you dispose of them?
17   A.  There's no longer a need for those
18 materials.
19   Q.  Do you hold onto them at least as long
20 as it -- I'm sorry.  I may be understanding you,
21 too.  What about your own notes, do you dispose of
22 those?
23   A.  No.
24   Q.  Do you keep the panel members' notes at

Page 56

1 least as long as it takes to finalize the letter in
2 case you need to check something?
3   A.  No.
4       MS. SMITH-LEE:  Can we go off the
5 record for a minute?
6       (Discussion off the record.)
7   Q.  Do you recall taking notes during the
8 deliberations at Mr. Bleiler's hearing?
9   A.  I do.
10   Q.  Do you currently have those notes?
11   A.  I do.
12   Q.  Do you recall panel members taking notes
13 at Mr. Bleiler's hearing?
14   A.  In the hearing?
15   Q.  Sorry, in the deliberation?
16   A.  I do not recall them taking notes in the
17 deliberation.
18   Q.  I've just got to probe that a little
19 further to be lawyer-like here.  Do you just not
20 have a recollection one way or another or do you
21 specifically believe that they weren't taking
22 notes?
23   A.  I do not recall them taking notes.
24   Q.  Do you take notes during the hearing?

Page 57

1   A.  I do.
2   Q.  And do panel members take notes during
3 the hearing?
4   A.  They do.
5   Q.  And do you follow the same procedures
6 that you've just described where you collect the
7 notes from the panel members and destroy those
8 notes?
9   A.  I do.
10   Q.  But you keep yours?
11   A.  I do.
12   Q.  Do you know the reasons that -- do
13 you know the reason for the policy that the
14 deliberations are not recorded while the hearing
15 is?
16   A.  I do not.
17   Q.  Has that always been the policy since
18 you were at Holy Cross?
19   A.  Yes.
20   Q.  Was that, also, the policy at
21 Northeastern?
22   A.  Yes.
23   Q.  And did you follow a similar practice
24 with respect to notes at Northeastern?

Page 58

1   A.  I did.
2   Q.  Of the sexual misconduct proceedings
3 that you've been involved in, I think you said at
4 Holy Cross you've had four of each, one -- four in
5 the Sexual Misconduct I and four in the Sexual
6 Misconduct II; is that right?
7   A.  Yes.
8   Q.  Of the four Sexual Misconduct I
9 proceedings that you've been involved with --
10   A.  Yes.
11   Q.  -- how many of those students were found
12 responsible?
13   A.  Three.
14   Q.  And how about the Sexual Misconduct II?
15   A.  I do not recall.
16   Q.  And were all of the Sexual Misconduct I
17 cases allegations by a female complainant against a
18 male student?
19   A.  Yes.
20   Q.  Were all of the Sexual Misconduct II
21 cases allegations by a female student against a
22 male student?
23   A.  I do not recall.
24   Q.  Do you have any recollection ever in

Page 59

1 your tenure at Holy Cross of any allegation other
2 than by a female student against a male student?
3   A.  On sexual misconduct?
4   Q.  Yes, on sexual misconduct?
5   A.  Yes.
6   Q.  And how many incidents do you recall
7 that were other than a female student making an
8 allegation against a male student?
9   A.  I'll qualify that because under sexual
10 misconduct there's other things such as one
11 exposing one's self, for instance, that I have had
12 male students charged with that and male victims.
13   Q.  Okay.
14   A.  So, under Sexual Misconduct II, it's a
15 broader definition, so I have to qualify that a
16 little bit.
17   Q.  I appreciate that.  So for Sexual
18 Misconduct I you're not aware of anything at Holy
19 Cross other than a female allegation against a
20 male?
21   A.  Yes.
22   Q.  And there may be Sexual Misconduct II
23 allegations that don't involve a physical contact
24 that would be other than a female against a

Page 60

1 male student?
2   A.  Yes.
3   Q.  And you recall, at least, on some
4 occasions there was a male-on-male allegation on
5 Sexual Misconduct II?
6   A.  Yes.
7   Q.  Have you ever seen a male against a
8 female allegation under either of the policies?
9   A.  No.
10   Q.  Including the Sexual Misconduct II that
11 has some non-contact-based offenses?
12   A.  Yes.  I've seen -- I've seen a female
13 being charged with a sexual misconduct, too, in
14 non-contact-based situations.
15   Q.  By a male?
16   A.  By the administration.
17   Q.  And the example of a non-contact-based
18 offense you gave me a few minutes ago is exposure?
19   A.  Yes.
20   Q.  Was that what was at issue in the
21 allegations against the female student?
22   A.  Yes.
23   Q.  What was the outcome of that proceeding?
24   A.  This was at Northeastern.

Page 151

1  Q. Why would you not initially think that
2  this would exclude Grant from the board?
3  A. I don't know.
4  Q. And the conversations you've described
5  for us today with Mr. Greeley -- let me just strike
6  that and ask you: Do you recall following up with
7  Mr. Greeley about whether this would create a
8  conflict with him?
9  A. I do.
10  Q. Did you ask him the same kind of
11  questions you asked Ms. Brais?
12  A. I don't recall.
13  Q. Do you recall anything about that
14  follow-up with Mr. Greeley?
15  A. I do not.
16  Q. Did you disclose this fact to either
17  Ms. Longton or to Mr. Bleiler?
18  A. I don't recall.
19  Q. Just for the record because everybody
20  around this table knows who everybody is, but Ms.
21  Longton knows today was representing Mr.
22  Bleiler at the time, correct?
23  A. Yes.
24  Q. And you understood that?

Page 152

1  A. Yes.
2  (Series of e-mails, dated
3  5/11/11, was marked Exhibit No. 13 for
4  identification.)
5  Q. Quickly, before we get to Exhibit 13, in
6  your conversations with Mr. Greeley, one of the
7  things Ms. Murphy disclosed is she's also in a
8  class with him whose exam is the one I will be
9  taking on Wednesday.
10  Did you understand her to be referring
11  to the Wednesday that the hearing was scheduled
12  for?
13  A. I don't recall.
14  Q. If you look back at Exhibit 12, she's
15  sending you this e-mail a week before the hearing
16  and alerting you to the fact that the class that
17  she's in with Mr. Greeley is the exam which she'll
18  be taking on Wednesday. Do you see that?
19  A. Yes.
20  Q. Do you recall that part of your task in
21  scheduling was scheduling around Ms. Murphy and
22  other students' exams?
23  A. Yes.
24  Q. Did you understand her to be telling you

Page 153

1  that she not only is in a class with this guy but
2  she essentially was going to be in a class with him
3  the morning of her hearing?
4  A. No.
5  Q. You didn't think about that?
6  A. I don't recall that.
7  Q. Did you ask Mr. Greeley any questions
8  about that?
9  A. I don't recall that.
10  Q. Do you know how big a class it was?
11  A. I do not.
12  Q. Exhibit 13, same day, few hours later,
13  3:35 p.m., Grant Greeley writes you an e-mail in
14  response to your e-mail about identifying the
15  students saying, "I have no conflicts. See you
16  Wednesday." Do you see that?
17  A. Yes, GG.
18  Q. Can you tell, looking at this, was that
19  before or after you had this follow-up conversation
20  with him?
21  A. I don't know.
22  Q. Mr. Greeley didn't disclose to you that
23  he was an RA in Ms. Murphy's building?
24  A. I don't recall.

Page 154

1  Q. Other than seeing these words written in
2  these e-mails, do you have any recollection that
3  the issue of -- the issue of Mr. Greeley's role of
4  RA coming up at all?
5  A. Yes, I do.
6  Q. What do you recall?
7  A. I recall that I assumed at one point
8  Eddie indicated that some of his friends had a
9  run-in with Grant in the past and I assumed that
10  was in his role as an RA.
11  Q. Do you recall testing that assumption
12  with Mr. Greeley?
13  A. I do.
14  Q. And what do you recall about that
15  communication?
16  A. I recall that he had no conflicts at all
17  with Eddie.
18  Q. Did he say whether he had or had not had
19  a run-in with Eddie's friends?
20  A. I don't recall.
21  (E-mail, dated 5/12/11, was
22  marked Exhibit No. 14 for identification.)
23  Q. Sir, I'm showing you what we've marked
24  as Exhibit 14. It looks to be an e-mail from

Page 155

1  yourself to Helen Whall -- is that how you say her
2  name --
3  A. Yes.
4  Q. -- dated Thursday, May 12th, in the
5  morning. It says, "Good morning, Helen. I am
6  working on a sexual assault case that is being
7  heard by the board next Wednesday afternoon. I
8  sent the students, charged and complaining; a
9  list -- let me paraphrase it.
10  Are you telling Professor Whall that you
11  had sent the students a list of professors who
12  could be advisors, correct?
13  A. Correct.
14  Q. You go on to say, "The reporting student
15  didn't personally know any of the faculty listed,
16  but she did ask me to contact you to inquire if you
17  were available to serve as an advisor."
18  Do you see that?
19  A. Correct.
20  Q. Do you recall Ms. Murphy asking for your
21  help in this regard?
22  A. I do.
23  Q. What was the nature of her concern?
24  What did she say to you?

Page 156

1  A. I recall that in the list that I
2  provided her, she didn't personally know any of the
3  faculty, but she thought that Professor Whall might
4  be somebody that would work for her.
5  Q. Did she express to you that she felt
6  uncomfortable about reaching out to people she
7  didn't know?
8  A. I don't recall.
9  Q. You reached out to Professor Whall. Did
10  you reach out to anybody else on Ms. Murphy's
11  behalf?
12  A. I don't recall.
13  (Series of e-mails, dated
14  5/12/11, was marked Exhibit No. 15 for
15  identification.)
16  Q. Sir, I'm showing you what we've marked
17  as Exhibit 15 which is an e-mail from yourself to
18  an Edward Thompson that same morning.
19  A. Yes.
20  Q. Do you see that?
21  A. Yes.
22  Q. Mr. Thompson is, also, a faculty member?
23  A. Yes.
24  Q. Do you recall reaching out to Mr.

# TAB 3

BLEILER VS. HOLY CROSS                CondenseIt™                DEPO OF: LAUREN K. BRAIS

Page 13

1    A.  No.
2    Q.  What about with respect to the sexual
3  misconduct policy, did you ever have any
4  interactions with residents in any of these
5  three years around that?
6    A.  No, no interactions.
7    Q.  Okay.  When you did your week and a half
8  of training, you talked about issues -- you were
9  talking about issues that might come up.  Did the
10  sexual misconduct policy come up as an issue that
11  you were trained on?
12    A.  Yes.
13    Q.  And what was the nature of the training
14  that you received as an RA?
15    A.  I can't remember the exact specifics and
16  it ranged -- it changed, the training changes
17  throughout the years, but most of it was just
18  referring to the mandatory reporting policy, as RAs
19  of the school, that we have to report that it
20  happened and they have to record it.
21    I don't remember the specifics of --
22  the exact rule, but -- and there's a distinction
23  between us and other resources on campus who don't
24  need to be mandatory reporters.  That's the main

Page 14

1  crux of the situation, and then just most
2  situations that we encounter are, you know, you
3  call Public Safety or you call the professional
4  staff member on duty, and that would clearly be a
5  situation that would warrant that seriousness and
6  that's kind of where you would go from there with
7  that situation.
8    Q.  So you were told that part of your
9  responsibility is that if you became aware of
10  something that could be a violation of that policy,
11  you had to report it?
12    A.  Yes.
13    Q.  And what training, if any, did you
14  receive on -- on how to make that judgment about
15  whether you thought something might violate the
16  sexual misconduct policy?
17    A.  Much of the training is in actual
18  situations with role playing that's done.  There's
19  one night at the end of training where returning
20  resident assistants -- well, role-play situations
21  that you might encounter on a night on duty and
22  first-year RAs have to handle the situation.
23    So, much of the training really revolves
24  around that, and I can't remember the exact

Page 15

1  details, but most years it involved some form of a
2  sexual-misconduct-type situation that someone --
3  that you may encounter somebody in that situation
4  and kind of where to go from there and how to speak
5  with the student and handle the situation.
6    Q.  Okay.  Did you -- this might be implicit
7  in one of your prior answers, but did you ever find
8  yourself in a situation as an RA where you felt you
9  had to report something?
10    A.  No, I did not.
11    Q.  Did you ever find yourself in a
12  situation as an RA where you became aware that one
13  of your residents had been involved in a sexual
14  encounter?
15    A.  Not that I can -- no.  I can't remember
16  any situation.
17    Q.  Okay.  To your understanding, you know,
18  as a mandatory reporter, I'm going to ask you a
19  series of questions just so that I can try to
20  understand where you believe the line was drawn.
21  Is that fair?
22    A.  Yes.
23    Q.  Just so you know where I'm going.  I'm
24  not trying to play any tricks here.

Page 16

1    Would you consider becoming aware of
2  any sexual activity on the part of one of your
3  residents to be grounds to be concerned about
4  whether the misconduct policy had been violated?
5    A.  No.
6    Q.  So I take it there's -- you have some
7  barometer in your own understanding of when you
8  think it crosses the line; is that fair?
9    A.  Yes.
10    Q.  Did you believe as an RA that any time
11  you became aware of a resident on your hall having
12  been engaged in sexual activity while intoxicated,
13  that that by itself would cause you concern about a
14  violation of the misconduct policy?
15    A.  I can't speak to a situation like that
16  came up.  It just wasn't something that -- yeah, it
17  didn't come up.
18    Q.  So, prior to the events that bring us
19  here today, you just hadn't had occasion to think
20  about that?
21    A.  Yeah, I had an occasion, and many of
22  these situations that do happen are not talked
23  about amongst the RAs, like, if you know about a
24  situation, you don't tell all the other RAs that it

Page 17

1  happened.  I mean, it could have happened, but I
2  just wasn't aware of it.
3    Q.  And was that kind of scenario, sexual
4  activity in combination with alcohol, was that
5  kind of scenario one of the scenarios that was
6  role-played in your training?
7    A.  I don't believe -- I believe it was more
8  of a rape-type situation that was more role-played.
9    Q.  And when you say "a rape-type
10  situation," what do you mean by that?
11    A.  A situation where somebody felt like
12  they had been violated; that they, you know, that
13  they did not consent to have sex and they did.
14    Q.  And when you were moved from being an
15  RA to a head RA, how, if at all, did your
16  responsibilities change?
17    A.  The responsibilities are much more
18  supervisory.  You spend a lot more time working
19  with the RAs and helping the RAs in situations that
20  they've encountered and talking through and how
21  they should work with the residents.
22    You have less resident-specific contact
23  and it's much more related to building-wide
24  activities and, you know, how things are doing in

Page 18

1  the whole building.  You work with a professional
2  staff member.  Both of you kind of supervise the
3  staff of the RAs that are in that building for the
4  year.
5    Q.  So, you as a head RA, you don't have a
6  particular floor or wing that you're responsible
7  for?
8    A.  No.  You live on one of the floors.  I
9  lived on the first floor with the male residents.
10  So that was my role, but I wasn't their direct RA
11  so...
12    Q.  In your supervision with the floor
13  RAs -- is that a reasonable thing to call them?
14    A.  Yeah.
15    Q.  Would you meet with them weekly,
16  monthly?
17    A.  I would meet with them every other week
18  on, like, a rotating schedule with the professional
19  staff member.
20    Q.  And in those meetings would you speak
21  with the floor RAs about any particular issues they
22  were having with residents?
23    A.  Yup, basically talking about resident
24  issues and, also, you know, what activities they

**Page 19**

1 were planning for their hall and different things
2 like that.
3    Q. And in a context of giving that
4 supervision and support for any resident issues,
5 did you have to have some understanding and some
6 knowledge of the residents in the building, even if
7 you weren't their direct floor RA?
8    A. Yeah, I mean, the goal -- one of the
9 goals that was laid out for me was to know
10 everyone's, at least, face in the building, but
11 I didn't really have -- you know, I had some
12 relationship with residents but not that many.
13    Q. Okay. And you at some point were the --
14 I might be getting this mixed up. You were either
15 an RA or a head RA in a building in which Caitlin
16 Murphy lived, right?
17    A. Yes.
18    Q. Which year was that?
19    A. That was during my junior year and she
20 lived in Hanselman.
21    Q. I'll have a few questions about that in
22 a minute, but let's get a little more background
23 stuff. You were just in the building with her for
24 the one year?

**Page 20**

1    A. Yes.
2    Q. What other kinds of activities were you
3 involved with at Holy Cross?
4    A. I was on the Student Government
5 Association for three years.
6    Q. And can you tell me what that is and
7 what your role was?
8    A. The Student Government Association
9 represents the students and faculty in
10 administrative-type situations. I was the director
11 of programming for my sophomore and junior year,
12 and then my senior year I was the treasurer. In
13 that capacity I served on the Finance and Planning
14 Council, representing the student body.
15    Q. What kind of programming does the
16 Student Government Association put on?
17    A. It does the more serious programming, I
18 would say, on campus. It's less, you know, the
19 Friday night activity-type programming but more of
20 banquets and events and stuff like that.
21    Q. And any other activities? Did you
22 belong to any clubs?
23    A. That was my major involvement on
24 campus. I mean, it waxed and waned throughout

**Page 21**

1 other involvements, but that's pretty much it.
2    Q. And you on at least one occasion sat on
3 a Community Standards Board, right?
4    A. Yes.
5    Q. Which --
6    MS. SMITH-LEE: Off the record.
7    (Discussion off the record.)
8    MS. SMITH-LEE: We can go back on.
9    Q. So, aside from the proceeding that
10 brings us here today which is Mr. Bleiler's
11 disciplinary proceeding, had you served on a
12 panel previously?
13    A. No, I had not.
14    Q. And my understanding is that in order to
15 sit on a panel, you go through some process to be
16 put in the pool of available panelists; is that
17 correct?
18    A. Yes.
19    Q. When did you first apply to be a
20 panelist?
21    A. I applied during my sophomore year.
22    Q. And other than Mr. Bleiler, you just
23 never got called?
24    A. Yeah, I never got called because they

**Page 22**

1 always asked for availability and I was never
2 available.
3    Q. When you were first put into the pool
4 for the Community Standards Board before there
5 was any specific hearing in mind, what, if any,
6 training or orientation did you receive about the
7 disciplinary process?
8    A. Paul Irish held a training for me and I
9 believe there was one other student who received
10 the training at the same time as me.
11    Q. So this was just a training scheduled
12 for the two newest members of the pool?
13    A. Yes. I guess he holds them as he adds
14 people onto his pool of people.
15    Q. How long a training was it to the best
16 that you can remember?
17    A. It was, like, an afternoon. I would
18 say -- I can't speak to the number of hours that it
19 was, but it was, you know, it was a significant
20 time commitment. It took a while to schedule it
21 type thing.
22    Q. Less than a day, more than an hour?
23    A. Yes.
24    Q. What do you remember about the substance

**Page 23**

1 of that training?
2    A. I remember him going through just the
3 basic framework of, you know, how a hearing gets,
4 you know, called, what, you know, prompts one, and
5 then just going through how a hearing is held,
6 then, you know, talking about specific policies
7 that may come up for typical-type hearing cases.
8    Q. Okay. And what specific policies do you
9 remember getting trained on at that meeting?
10    A. I remember -- it was a long time ago. I
11 can't remember the exact policies. I think he
12 talked about, you know, specific cases that had
13 happened in the past and why it had prompted, you
14 know, a committee. So he used a lot of examples,
15 but I can't remember the exact examples.
16    Q. In that training where he talked about
17 specific cases in the past, did he talk about how
18 those cases had resolved?
19    A. I believe he did speak to, you know, the
20 resolution, yes.
21    Q. And was it your understanding that that
22 was an effort to sort of orient you, these are the
23 kinds of things that could happen and this is how
24 these facts turned out?

**Page 24**

1    A. Yeah.
2    Q. Okay. Do you remember being trained at
3 that meeting specifically with respect to the
4 sexual misconduct policy?
5    A. Yes. I remember it was a specific,
6 like, section of the training. It was kind of a
7 little bit, like, separate of it.
8    Q. Okay. Were you given materials?
9    A. Yes.
10    Q. And did you in that training go through
11 some examples, some exercises?
12    A. Yes.
13    Q. Okay. And I have what I think are the
14 materials that you were given and I'll show them to
15 you in a minute, but, before we do that, what do
16 you remember that you learned about the sexual
17 misconduct policy in that training?
18    A. I remember learning about the different
19 distinctions between the Sexual Misconduct I and
20 Sexual Misconduct II, and I remember learning
21 the -- that you just -- that it was, like,
22 preponderance of the evidence, like, 50 percent.
23 It wasn't beyond a reasonable doubt for these types
24 of cases.

Page 25

1 I remember, you know, the specific rule
2 about -- not rule but definition of what --
3 somebody giving consent during a sexual act.
4 Q. What do you remember about that
5 definition?
6 A. I remember it involved that you needed
7 to give consent through each step of the sexual act
8 and then, also, remembering -- talking about level
9 of intoxication and ability to give consent.
10 Q. In that training or as you came out of
11 that training did you have an understanding about
12 what level of intoxication someone would have to
13 have to not be able to give effective consent,
14 however you would describe it, whether it's a
15 number or a concept?
16 A. Yes. I think -- I mean, I can't speak
17 to exactly how I specifically remember exactly
18 that. Yeah, I don't have a recollection of that.
19 Q. You do recall that you did have some
20 understanding as you came out of that training?
21 A. Yes.
22 Q. Okay. After that particular training
23 did you receive any further training as a Community
24 Standards Board panel member about sexual

Page 26

1 misconduct?
2 A. Not that I can speak of. I mean,
3 I'm trying to remember if the sexual misconduct
4 training was part of the overall training or if it
5 was a separate, like, meeting, and I just -- I
6 can't recall.
7 Q. No. That's fair. You remember one --
8 you remember one training on sexual misconduct
9 close to when you were selected as a pool member,
10 right?
11 A. Yes.
12 Q. And that's the one that we've been
13 describing?
14 A. Yes.
15 Q. Other than that one, whether it was
16 connected to the general training or not, do you
17 remember ever receiving any further training
18 specific to the sexual misconduct policy?
19 A. No.
20 Q. After you were selected to serve on
21 Mr. Bleiler's panel, do you remember receiving any
22 further training or guidance or materials about the
23 sexual misconduct policy to prepare you to sit on
24 that panel?

Page 27

1 MR. POTTER: Objection. You can
2 answer.
3 A. I believe we received along with the
4 packet that we -- with all the evidence or the
5 statements that we received prior to the panel to
6 review, I remember receiving just a copy of the
7 sexual misconduct policy directly pulled from the
8 handbook. I believe that's what we had. I don't
9 recall if there was anything else included.
10 Q. So there was no further refresher
11 course, if you will, about the issues that you'd
12 discussed in the original training?
13 A. Not that I can recall.
14 MS. SMITH-LEE: Can we go off for one
15 second?
16 (Discussion off the record.)
17 Q. So I'm showing you what was marked at a
18 previous deposition as Irish Exhibit No. 4. It
19 says College of the Holy Cross, Office of Student
20 Conduct & Community Standards, CSB Training, Sexual
21 Misconduct. Do you see that?
22 A. Yes.
23 Q. Earlier when we talked about some
24 materials you got in your original training, are

Page 28

1 these those materials?
2 A. I believe that's representative of the
3 materials. I'm not sure if this is exactly. I
4 don't still have them.
5 Q. You were given something that looked
6 kind of like this?
7 A. Yes.
8 Q. If you could flip to -- where are we
9 going to start? If you look to page No. 4, there's
10 a section entitled General Guidelines to Open
11 Communication. Do you see that?
12 A. Yes.
13 Q. And you recall receiving some training,
14 sort of generally, about how to effectively ask
15 questions and listen for answers?
16 A. Yes.
17 Q. And the methods of questioning, you
18 recall receiving some of that training?
19 A. Yes.
20 Q. If you look to page No. 6, towards the
21 top of the page it says Ask Questions and then
22 there's four bullet points. Do you see that?
23 A. Yes.
24 Q. Do you recall some discussion about sort

Page 29

1 of what you should think of as the purpose of your
2 questioning as a panel member?
3 A. I don't remember the specifics of how we
4 went through with the packet.
5 Q. Okay.
6 A. But, yeah, I don't recall.
7 Q. Then we won't spend much time on this
8 page. How's that? We're going to skip all the way
9 almost towards the end. So we're on page 37. On
10 37 it starts off with the heading, Case Scenarios.
11 Do you see that?
12 A. Yes.
13 Q. Do you remember discussing case
14 scenarios in this training?
15 A. I believe so.
16 Q. Okay.
17 A. It was four years ago.
18 Q. Was it your understanding that the
19 purpose of these case scenarios to help get
20 you thinking about what might or might not be a
21 violation of the sexual misconduct policy?
22 A. Yes.
23 Q. Do you remember coming to -- you and the
24 other new panel member coming to any conclusions

Page 30

1 with respect to the case scenarios you were
2 presented with?
3 A. I don't recall --
4 Q. Okay.
5 A. -- exactly how we handled each of the
6 case scenarios. I know we went through them, but I
7 don't remember if we gave what we thought or what
8 we did exactly. I don't remember.
9 Q. Did Mr. Irish give you any feedback in
10 this training about what he thought the outcome
11 under the policy should be for these case
12 scenarios?
13 A. I don't recall. I know he spent time
14 going through and pointing out important pieces,
15 important evidence-type pieces, that we would see
16 in each of the cases, but I don't remember him
17 saying, you know, this will be somebody that's
18 guilty or not or something like that. I don't
19 recall that.
20 Q. You don't recall one way or another
21 whether he did or you don't think he did?
22 A. I don't recall what he did or what he
23 said.
24 Q. That's fine. Other than the sexual

Page 55

1  Q. Sure. So, showing you what was
2  previously marked as Irish 24 --
3      MS. SMITH-LEE: Actually, can we take
4  just a second for me to do a refill?
5      (Discussion off the record.)
6  Q. So, Irish 24, the top caption is
7  actually an e-mail from Paul to Eddie
8  Bleiler, but you see what he's attaching is a
9  letter to Dean Peterson from Jude Kelley. Do you
10 see that?
11 A. Mm-hmm.
12 Q. Have you ever seen that letter before?
13 Were you copied on the finding letter?
14 A. I can't remember. I don't recall.
15 Q. If you look at the second paragraph in
16 the letter, it says, "The board also determined
17 that Caitlin was highly intoxicated, incoherent and
18 was unaware of her circumstances."
19     Do you see that?
20 A. Yes.
21 Q. It goes on to say, "The board deemed her
22 to be physically helpless at the time of the
23 incident."
24 A. Yes.

Page 56

1  Q. What discussions do you recall in the
2  deliberations of the panel about whether she was
3  physically helpless? Why don't I ask a different
4  question and then maybe we'll get to that.
5      You served on the panel?
6  A. Yes.
7  Q. Fair to say there were basically two
8  distinct pieces to that service. There was the
9  hearing of evidence and then there was the
10 deliberations?
11 A. Yes.
12 Q. Tell me what you do remember about the
13 conversations and the deliberations piece of that.
14 A. It was distinctly divided into first
15 finding if Mr. Bleiler was at fault or not and then
16 beyond that what the repercussions should be once
17 we determined that. So we kind of divided it into
18 two segments.
19 Q. What do you recall about the discussions
20 around whether he was at fault?
21 A. We each kind of went around and said
22 kind of how we felt, what we had observed
23 throughout the hearing. We discussed, you know,
24 trying to determine her level of intoxication at

Page 57

1  the time and, you know, discussing if she was able
2  and if she did give consent for the sexual act.
3  Q. Okay. And you mentioned you discussed
4  how to determine her level of intoxication. What
5  kind of information were you trying to look at,
6  you, yourself, to try to determine how intoxicated
7  she was?
8  A. I think it mostly came from the
9  witnesses that saw her and that had been drinking
10 with her throughout the -- or the witness on the
11 phone had been drinking with her throughout the
12 night and the witnesses that found her after and
13 kind of her level of intoxication at different
14 points and then trying to kind of deduce from that
15 what her level might have been at the time of the
16 incident.
17 Q. And what do you recall of the discussion
18 around that issue?
19 A. I remember we, you know, tried to add up
20 how many drinks she had. It was a little unclear.
21 A lot of it was just based on what -- when her two
22 friends found her on campus after, kind of what
23 level of intoxication she was then, and knowing
24 that she had probably done a little bit of sobering

Page 58

1  since the incident and, you know, deducing back to
2  what level she would have been at during the
3  incident and, also, thinking about the duration
4  that she had been drinking for. She started
5  drinking during the day and, you know, or in the
6  afternoon, something like that, and drank
7  throughout the evening. So we kind of factored
8  all of those things in.
9  Q. Did you have any discussion about what
10 level of intoxication -- about Mr. Bleiler's level
11 of intoxication?
12 A. I don't recall if we had any specific
13 discussions about it. I remember personally
14 thinking that he had, you know, had a few drinks
15 but was in no way intoxicated, just based on what
16 he gave, and, also, his -- he was much more clear
17 on the whole entire incident. So that gave me
18 thought that he was less intoxicated than she was.
19 Q. And that was what you were thinking in
20 your own head?
21 A. Yes. I mean, the discussions -- I can't
22 remember the exact, you know, wording of who said
23 what, but I think it was conveyed at some point
24 that that's kind of how people felt.

Page 59

1  Q. Okay. You said we all went around the
2  table or went around, I think you said. Who do you
3  recall speaking in the part of the deliberations
4  that were about liability?
5  A. Everybody spoke.
6  Q. Everybody meaning?
7  A. All of the panel members, the five of
8  us.
9  Q. Mr. Irish was in the room?
10 A. He was in the room. I don't remember if
11 he was in the room for the entire deliberation, but
12 he was in there for the majority of the time.
13 Q. Do you recall Mr. Irish saying anything
14 in the first part of the deliberations about
15 liability?
16 A. I don't remember him saying much during
17 that piece, you know, maybe, like, administrative,
18 if we were looking for documents or things like
19 that, but not, you know, an active member of the
20 discussion.
21 Q. And what else do you remember about the
22 discussion on the liability piece?
23 A. We talked about the -- the burden of
24 proof that we needed, and I think at some point

Page 60

1  someone was, like, yeah, I'm definitely more than
2  50 percent sure, you know. It was -- it came,
3  you know, to a mutual agreement that we were all
4  definitely more than 50 percent sure that he was at
5  fault for this situation.
6  Q. Do you recall who first said that?
7  A. No.
8  Q. But you have a vivid memory of somebody
9  saying I'm definitely more than 50 percent?
10 A. Yeah, I definitely -- I remember it
11 being kind of a collective, you know, you're
12 sitting with a group of people and it was a
13 collective kind of thought of, you know, yeah,
14 like, I think -- you know, we kind of all came to a
15 point. I don't think there was one person that
16 kind of led the charge in the conversation.
17 Q. So, in the discussion about liability,
18 did anybody ever raise any questions about whether
19 they thought he was liable?
20 A. I guess I'm not understanding --
21 Q. Sure.
22 A. -- what you mean.
23 Q. If I understood your testimony, that,
24 you know, you guys went around and shared some

# TAB 4

Page 18

1 the election. So it came to us to decide if they
2 should remain in it or not, and because they didn't
3 actually get it approved, they unfortunately
4 couldn't run the election.
5   Q Okay. Okay. Thank you. So when you
6 first -- so end of freshman year, Mr. Irish sends
7 you this e-mail.
8     Did you fill out some kind of application,
9 some kind of form to be considered for the panel?
10   A I had an interview.
11   Q Okay. An interview with Mr. Irish?
12   A Yes.
13   Q But no paperwork?
14   A I don't remember.
15   Q What do you remember about the interview?
16   A I remember being in his office. I
17 remember -- I think it was a sunny day outside.
18   Q That being Massachusetts, not here, that
19 might have been unusual.
20     Do you remember any of the kinds of
21 questions he asked you?
22   A I don't.
23   Q Did he at any time explain to you or give
24 you any indication why he had thought you would be
25 an appropriate member for this pool?

Page 19

1   A I don't remember.
2   Q Did you have any opinion or understanding
3 about why it was that you were picked?
4   A I don't remember.
5   Q Do you know whether other members — other
6 student members of the pool had been picked out like
7 that by Mr. Irish or if others had decided on their
8 own initiative to apply?
9   A I couldn't say.
10   Q So when you had this interview, do you
11 think that was at the end of your freshman year or
12 the beginning of your sophomore year?
13   A I couldn't tell you for sure.
14   Q Then at some point, he told you, yes,
15 you're approved?
16   A Yes.
17   Q At that point, which — what, if any,
18 training did you get?
19   A We sat in all of -- the new members in a
20 meeting to go over all of the procedures, and we
21 were given a booklet, and this booklet just goes
22 over all the college policies and rules, and then
23 there's more stuff, but I can't remember what it is.
24   Q Okay. Do you remember roughly how many new
25 members there were then?

Page 20

1   A I can't recall.
2   Q Okay. At some point, did you have training
3 specific to sexual misconduct proceedings?
4   A Yes.
5   Q When was that?
6   A I don't recall the exact day or year, but
7 it was done once prior to this case, that we were
8 going to discuss the Ed case -- Ed and Caitlin, and
9 then it was done once in detail prior to that as
10 well. We reviewed all the stuff again for Ed and
11 Caitlin.
12   Q So at some point, you received training
13 that was specific to sexual misconduct proceedings
14 but not specific to Mr. Bleiler's case?
15   A Absolutely.
16   Q And then later yon received follow-up
17 training specific to Mr. Bleiler or in connection
18 with Mr. Bleiler's hearing?
19   A To make sure that all of us were -- it was
20 same exact training we had before, but they had it
21 because we were going to go into the Ed case.
22   Q Okay. Understood. Do you have any
23 recollection of how much time passed between those
24 two trainings?
25   A I don't recall.

Page 21

1   Q Okay. How many people were involved in the
2 first training?
3   A I don't recall.
4   Q Okay. Do you recall who did it?
5   A Paul.
6   Q Did he give you any materials in connection
7 with that training?
8   A He did.
9   Q What materials do you recall receiving?
10   A I don't recall what they are. All I know
11 is that those materials are received the very first
12 time I got training, and then those same materials
13 are in a packet that are in both subsequent sexual
14 conduct training packets.
15   Q And we'll get to those documents in due
16 course, not to worry. Let me ask you a question
17 before we get into those materials.
18     What were your reasons for voting to find
19 Mr. Bleiler responsible for the allegations?
20   A He didn't get consent, and she wasn't able
21 to give consent.
22   Q And was it your conclusion that she wasn't
23 able to give consent because she was intoxicated?
24   A Yes.
25   Q Okay. Sometimes cutting to the chase is

GRANT GREELEY - 8/21/2012

Page 22

1  helpful, but let me show you what was previously
2  marked as Irish Exhibit 4. And, Harry, I know you
3  want another copy of that one.
4       So what's been marked as Irish Exhibit 4 --
5  it's a rather thick document -- entitled "College of
6  the Holy Cross Office of Student Conduct & Community
7  Standards, CSB Training, Sexual Misconduct."
8       Do you see that?
9  A  Yes.
10 Q  CSB, would that be community standards
11 board?
12 A  Yes.
13 Q  So a few minutes ago when we were talking
14 about the two trainings that you received -- and
15 take as much time as you want to flip through -- my
16 first question is just going to be were these the
17 materials that you were given.
18 A  Many of the pages are familiar to me.
19 Q  Okay. I won't hold you to a photographic
20 memory of every page you looked at a few years ago,
21 but sitting here today, do you think that there were
22 any other materials that you don't see in this
23 packet that you were given at either of those
24 trainings?
25 A  I can't recall.

Page 23

1  Q  Okay. Approximately how long did the first
2  training last?
3  A  I can't recall.
4  Q  Do you remember if it was like a class
5  period or the better part of a day or --
6  A  It was enough that we had to take at least
7  a break or two to go to the rest room and get water.
8  Q  So it could have been an afternoon or a
9  morning?
10 A  Sure.
11 Q  Okay. I'm just trying to get a sense of
12 the period.
13      You didn't go away for a weekend to learn
14 this stuff?
15 A  Within one day.
16 Q  Okay. Thank you.
17      Do you recall going through -- tell me what
18 the format of the training was.
19      Was Mr. Irish just presenting you
20 information or were you engaged in discussions, case
21 scenarios?
22 A  As a group, we went over every page. We
23 also discussed as a group every page, and Paul Irish
24 discussed in detail about -- we discussed the page
25 itself as well.

Page 24

1  Q  Okay. And we're going to go through some
2  of these sections with the assistance of the
3  document itself, but before we do that, sitting here
4  today, do you remember yourself having any
5  particular questions or concerns regarding these
6  materials?
7  A  I don't recall.
8  Q  Okay. So if you turn to page 5, I would
9  say from page 5 to page 9 seems to be under the
10 heading "Methods of Questioning."
11      Do you see that?
12 A  "Methods of Questioning"?
13 Q  Yes. Do you recall generally having some
14 discussion during these trainings about effective
15 ways to ask witnesses questions?
16 A  Yes, I remember having those discussions.
17 Q  Okay. And I take it from the tone in that
18 answer, you don't remember the details of those
19 discussions?
20 A  I couldn't tell you much that happened a
21 year ago about an exact conversation, about an exact
22 class I ever took.
23 Q  Okay. Did you receive similar
24 training -- just on the questioning, did you receive
25 similar training in your role on the judicial

Page 25

1  council?
2  A  Can you say that again?
3  Q  Yes. Did you receive any comparable
4  training just on the issue of how to question
5  witnesses and gather information? Did you receive
6  any similar training in connection with your role on
7  the judicial council?
8  A  Nothing like this.
9  Q  Okay. We're not going to go through this
10 page by page. I promise you.
11      If you could flip to page 14, there's a
12 section called "Evidentiary Issues," some
13 paragraphs, one under "Relevance," one under "Rape
14 Shield," and the following page "Credibility."
15 There's a variety of subsections up through page 16.
16      Do you see that?
17 A  Yes.
18 Q  Do you recall -- do you recall any of the
19 discussions around the evidentiary issues you might
20 face in a sexual misconduct hearing?
21 A  I don't.
22 Q  If you look at the bottom of page 14,
23 there's a section entitled "Rape Shield."
24      Do you see that?
25 A  Yes.

7 (Pages 22 to 25)

GRANT GREELEY - 8/21/2012

| Page 50 | Page 52 |
|---|---|
| 1  Q  Okay.  But then the second discussion that | 1  A  Not -- no. |
| 2  we're talking about is the actual panel that was | 2  Q  When's the first time you met or first |
| 3  convened? | 3  heard of Caitlin Murphy? |
| 4  A  Yes. | 4  A  I was told that she was in my dorm, and I |
| 5  Q  And you said the other piece of information | 5  know that we're Facebook friends, and I'm sure we |
| 6  people commonly thought they wanted more of was | 6  met at parties, as I might have met Ed, but I don't |
| 7  level of intoxication. | 7  recall them. |
| 8     Are you talking about the complaining | 8  Q  Okay.  You heard testimony in the hearing |
| 9  witness's level of intoxication, the accused's level | 9  from some of the witnesses -- some witnesses, right? |
| 10  of intoxication, or both? | 10  A  We did. |
| 11  A  Overall alcohol.  It's just the big issue | 11  Q  Had you known or heard of any of them |
| 12  on our campus, and I feel like when it comes to | 12  before? |
| 13  rape, that's usually a question commonly asked, as | 13  A  No, I hadn't. |
| 14  it was in this case as well. | 14  Q  Okay.  Did you have any classes with |
| 15  Q  Okay.  When you say alcohol is a big issue | 15  Caitlin Murphy? |
| 16  on campus, tell me what you mean. | 16  A  I don't recall. |
| 17  A  On Caro Street, which is our off-campus | 17  Q  You said you were told she was in your |
| 18  area, there is a lot of drinking, and the City of | 18  building? |
| 19  Worcester has cracked down, as they might say. | 19  A  Yeah.  When Paul came and talked to me and |
| 20     And so as an RA whose job is to make sure | 20  asked me because he sat me down and wanted to know |
| 21  people don't drink on our substance-free campus, the | 21  if I had any relation to either Ed or Caitlin. |
| 22  big issue was how do you make people stay on campus | 22  Q  When did you become Facebook friends with |
| 23  and not drink, but then not go off campus to drink. | 23  Caitlin? |
| 24  That was a common threat with RAs and boards and | 24  A  I couldn't say. |
| 25  discussions in the community. | 25  Q  Do you know whether she friended you or you |

| Page 51 | Page 53 |
|---|---|
| 1  Q  Okay.  So students -- even students of | 1  friended her? |
| 2  legal drinking age aren't allowed to drink on | 2  A  I don't.  I have over 2,800 and something |
| 3  campus? | 3  Facebook friends.  I added ten Facebook friends in |
| 4  A  They are, but it's limited how much alcohol | 4  the last three or four days.  I use it as a |
| 5  you can bring on the campus, which then limits how | 5  networking tool.  I accept friendships from almost |
| 6  much you can ultimately drink. | 6  anyone within my network, that being college or high |
| 7  Q  Okay.  And so -- I understand your answer, | 7  school or entertainment.  I use it as just a -- it's |
| 8  I think. | 8  like a networking tool. |
| 9     Globally, alcohol is a big issue? | 9  Q  The day of the hearing, you had a final |
| 10  A  Yes, very much. | 10  exam right before the hearing, right? |
| 11  Q  And then you also said in sexual misconduct | 11  A  I don't know.  I don't know how you know |
| 12  cases, that becomes a concern for you. | 12  that. |
| 13     What's the connection? | 13  Q  Documents are a wonderful thing. |
| 14  A  For me, I think for anybody, I think, in | 14     Do you recall the classes you were taking |
| 15  that -- I had a discussion with -- meaning like the | 15  in that last semester? |
| 16  people on this board is that alcohol impairs | 16  A  I recall the ones I liked for sure.  I was |
| 17  people's judgments. | 17  taking a theater Shakespeare acting class with |
| 18  Q  Okay.  So let's talk about Mr. Bleiler. | 18  Professor Ed Iser who was like my college mentor.  I |
| 19     How were you -- actually before we do that, | 19  took my very first class with him at Holy Cross as |
| 20  let's go backwards a little bit. | 20  well, so that class sticks out. |
| 21  A  I'm going to grab another water. | 21     I was taking a sign language class with |
| 22  Q  Sure.  When's the first time you met or | 22  Professor Ying.  I love sign language.  So that |
| 23  heard of Edwin Bleiler? | 23  sticks out very clear.  What classes didn't I enjoy? |
| 24  A  When Paul asked me if I knew him. | 24     Oh, I take an amazing class with a biology |
| 25  Q  Okay.  You had never heard his name before? | 25  professor about HIV. |

14 (Pages 50 to 53)

GRANT GREELEY - 8/21/2012

Page 54

1    Q   All right. We'll come back to that.
2         Do you remember what your largest class was
3    in your last semester senior year?
4    A   I was very lucky. They were all very
5    small. My acting class was only like five or six
6    students, and my sign language class was six, and
7    the HIV class was like over 30, though. It could
8    have been 40, but it was like an intro class. So I
9    had to get my biology credit.
10   Q   You think that was your largest class that
11   semester?
12   A   I can't -- I knew what other classes were.
13   Do you have my college transcript? I would love to
14   go into detail.
15        MS. SMITH-LEE: I don't. That, I don't.
16        All right. Why don't we -- we can go off
17   the record for a minute.
18        (Recess taken.)
19        MS. SMITH-LEE: I am going to give you -- I
20   guess we can mark this. This is your transcript
21   that you had made. For now, I'm just marking that
22   and giving it to you.
23        (The document referred to was marked by the
24   Reporter as Plaintiff's Exhibit 1 for identification
25   and is attached hereto.)

Page 55

1    BY MS. SMITH-LEE:
2    Q   I'll represent to you this is a transcript
3    that your counsel had made from tapes of the
4    hearing. We may from time to time be referring to
5    things that happened in the hearing. So you have
6    your little guide.
7         And, you know, as we go through this,
8    obviously your memory controls. This is the
9    transcript. You were there. So whoever transcribed
10   it wasn't, but hopefully that will help.
11        You recall Mr. Irish sending you an e-mail
12   asking about your availability to serve on the
13   panel?
14   A   Yes.
15   Q   And you recall responding that you were
16   available?
17   A   Yes.
18        MS. SMITH-LEE: Okay. And I lied. I guess
19   we are going to actually mark -- this is 2. We're
20   going to spend all of about a minute on this.
21        (The document referred to was marked by the
22   Reporter as Plaintiff's Exhibit 2 for identification
23   and is attached hereto.)
24   BY MS. SMITH-LEE:
25   Q   I'm showing you what we've marked as

Page 56

1    Exhibit 2 which is an e-mail from you back to
2    Mr. Irish dated May 10th, do you see that, saying,
3    yes, I'm available a hundred percent free afternoon
4    on Wednesday?
5    A   Yes.
6    Q   Okay. So there's actually nothing at all
7    interesting in this e-mail. It's just to orient you
8    in terms of a date. That's dated May 10th.
9    A   And the hearing was on --
10   Q   May 18th.
11   A   May 18th.
12   Q   Correct, so that helps you orient in time
13   when you were asked by Mr. Irish to serve on the
14   panel.
15        Were you asked -- did you get a separate
16   e-mail from Mr. Irish asking if you had any
17   conflicts with the students?
18   A   He asked me to come into his office to
19   discuss it. I don't know if we exchanged e-mails on
20   that.
21   Q   Okay. Showing you what was previously
22   marked as Irish Exhibit 13, the e-mail at the
23   bottom, it's from Mr. Irish to you, "Good morning.
24   Please hold next Wednesday afternoon for the board
25   hearing."

Page 57

1         Do you see that?
2    A   Uh-huh.
3    Q   Then at the bottom of that e-mail, "Please
4    let me know immediately if you have a conflict with
5    either of the students involved."
6         Do you see that?
7    A   I do.
8    Q   And then your response later that day, "I
9    have no conflicts"?
10   A   I see that.
11   Q   Okay. So you just mentioned to me that, at
12   some point, Mr. Irish had called you into his office
13   to talk about conflicts?
14   A   Yes.
15   Q   But in the first instance when you saw
16   those names, you reported you had none, correct?
17   A   That's correct.
18   Q   Then do you recall when Mr. Irish called
19   you into his office?
20   A   I don't.
21   Q   Do you recall what he said to you?
22   A   He mentioned that I was a Facebook friend
23   with Caitlin, and he asked me how many Facebook
24   friends I had, how well do you know her, etcetera,
25   questions along that same line.

15  (Pages 54 to 57)

GRANT GREELEY - 8/21/2012

Page 58

1     And I responded that, at the time, I
2  probably had over 2,700 or 2,500. I said that it's
3  not -- that I don't actually know her past. I
4  slightly know her face, as it is a very small
5  campus, but that it wasn't a conflict. If it was, I
6  would have excused myself.
7     Q   Okay. Do you remember how long, either
8  after the initial e-mail about conflicts or before
9  the hearing, can you place that meeting in time
10 anywhere?
11    A   I can't, but I would assume it happens
12 between this e-mail and the hearing.
13    Q   Okay. Do you remember if that meeting took
14 place after you had picked up the materials for the
15 hearing or before?
16    A   It would have been before.
17    Q   Okay. Did Mr. Irish raise any other issues
18 with you in that meeting besides the issue of
19 Facebook friends and the general question of how
20 well you knew her?
21    A   He just asked me, again, if I had any
22 conflicts and if I knew either of them, and I
23 didn't.
24    Q   Okay. Did he ask you anything about
25 whether you had classes to cover?

Page 59

1     A   I don't recall. He might have.
2     Q   But you don't remember one way or another?
3     A   I don't.
4     Q   Do you remember him asking you any
5  questions about whether you interacted with her
6  within the building at Healey?
7     A   I don't recall.
8     Q   She was a Healey resident, right?
9     A   I'm told that, yeah. I couldn't tell you
10 even what floor she was on.
11    Q   I'm showing you what we previously marked
12 as Irish 12.
13    You were not on this e-mail, so you're
14 somewhat off the hook, but do you see at the bottom,
15 there's an e-mail dated 5-11-2011 from Caitlin
16 Murphy. "Good morning. I'm not sure if this would
17 count as a personal conflict, but Grant Greeley is
18 an RA in my building, and I also have a class with
19 him whose exam is the one I will be taking on
20 Wednesday."
21    Do you see that?
22    A   I do.
23    Q   Back to another subject, does that help in
24 any way --
25    A   I didn't even know she was in that class.

Page 60

1     Q   Does that help refresh your memory about
2  whether you had an exam right before the hearing?
3     A   It does.
4     Q   Do you remember now what class that was in?
5     A   I don't. I don't know what class that was.
6  I wish I did. I wish I had my transcript.
7     Q   Okay. Do you -- can we rule out any of
8  your classes? Would you remember if that was, for
9  example, the HIV class?
10    A   It could have been. That was a larger one
11 and I sat in the front.
12    Q   But you don't remember Mr. Irish asking you
13 about classes you had with Ms. Murphy or Healey
14 specifically?
15    A   I don't.
16    Q   Okay. Showing you what we've marked as
17 Exhibit 3 which is an e-mail from Paul Irish to what
18 looks like the members of the panel, do you see
19 that?
20    A   Yes.
21    (The document referred to was marked by the
22 Reporter as Plaintiff's Exhibit 3 for identification
23 and is attached hereto.)
24 BY MS. SMITH-LEE:
25    Q   It says, "Good morning. I am looking to

Page 61

1  start next Wednesday's hearing at 1 pm and would
2  like the board to meet a little bit before 12:30 pm.
3  That will allow us to discuss any procedural
4  concerns."
5     Do you see that?
6     A   Yes.
7     Q   Do you recall meeting just before the
8  hearing like that same day?
9     A   Yeah, we did.
10    Q   When you and I were talking about the
11 second time that you went through the sexual
12 misconduct training page by page, was that that
13 meeting?
14    A   We met downstairs just to convene before we
15 went upstairs. I don't know how long I was down
16 there. I don't remember which day the actual sexual
17 misconduct stuff happened.
18    Q   So here's all I'm trying to make sure I
19 understand is how many different meetings there were
20 and what they were about.
21    A   Yeah, I understand.
22    Q   So you had told me previously that the
23 panel met to go through this training material page
24 by page?
25    A   Yeah.

GRANT GREELEY - 8/21/2012

Page 66

1  copy -- probably there?
2     A   Yes.
3     Q   So that's May 16th in the afternoon. So
4  two days before the hearing, you had this
5  conversation with Mr. Irish?
6     A   Yes.
7     Q   A couple days prior to the hearing, you
8  received some case file materials, right?
9     A   I did. I don't know how many days before.
10    Q   That included some of the witness
11  statements from public safety?
12    A   Yeah, it was public safety. I think it was
13  witnesses, and I remember reading something -- I
14  think it was Caitlin's -- what she wrote down to
15  public safety like describing what happened.
16    Q   Okay. So you don't remember exactly when,
17  but you've got it at some point in advance of the
18  hearing, correct?
19    A   Usually it was within a day or two, and the
20  secretary would like us to go and get it.
21    Q   Were you given then or later on a witness
22  statement from Mr. Bleiler's roommate?
23    A   I don't know when I was given that. It
24  might have been with the packet originally. Usually
25  most things were, unless it was like -- sometimes

Page 67

1  things are submitted like during the hearings but --
2     Q   Okay. At some point, you did receive that
3  statement, though?
4     A   From his roommate?
5     Q   Uh-huh.
6     A   What's the roommate's name?
7     Q   Brendan McCrae or McCrae (phonetic).
8     A   Can you refresh my memory on the statement?
9     Q   Well, actually mostly I just want to know
10  if you remember seeing it.
11    A   I saw everything that was given to me. I
12  read a lot of people's statements and their accounts
13  of the day or that night.
14    Q   Do you have any independent recollection of
15  reading a statement from someone submitted on behalf
16  of Mr. Bleiler?
17    A   Like saying he's a good guy and he wouldn't
18  do something like this?
19        I need your help to help refresh my memory.
20    Q   Okay. Do you have any recollection -- but
21  I need to ask you what your recollection is, too.
22        Putting aside for a minute what the
23  statement might have said, do you have any memory of
24  seeing a statement -- let me stop and go back and do
25  it again.

Page 68

1        The statements from public safety were
2  statements by Ms. Murphy and her friends, correct?
3     A   Yeah, usually both sides put both their
4  stuff in there.
5        MS. SMITH-LEE: Let me show you -- we can
6  be off the record.
7        (Discussion held off the record.)
8  BY MS. SMITH-LEE:
9     Q   All right. I have shown you a series of
10  documents that were previously marked in
11  Mr. Bleiler's deposition as Exhibits 5, 6 -- I
12  believe actually these go 5 through 16.
13        Does that look right to you?
14    A   I feel like I might be missing things.
15    Q   I don't have mine in chronological order.
16    A   I don't see a 5 or a 13.
17        MR. POTTER: I don't see a 5 either.
18        THE WITNESS: I don't know if I see an 11
19  either.
20  BY MS. SMITH-LEE:
21    Q   I could well be wrong about 11 and 13, but
22  you should have a 5 and now you do.
23        So can you pull the one that's Exhibit 5
24  from Mr. Bleiler's deposition?
25    A   Yes.

Page 69

1     Q   Okay. So that's a statement dated 5-1-11.
2  It's not signed, but did you understand that to be
3  Ms. Murphy's initial statement to public safety?
4     A   Yes.
5     Q   And you reviewed that as part of the packet
6  that you got ahead of time?
7     A   Yes.
8        MS. SMITH-LEE: And then I'm going to turn
9  to Bleiler Exhibit 8.
10        Off the record.
11        (Discussion held off the record.)
12  BY MS. SMITH-LEE:
13    Q   All right. Bleiler Exhibit 8 is also a
14  statement dated May 1, 2011 signed by a Beth
15  Federici?
16    A   I don't even know her last name or her
17  first name.
18    Q   But you can see a signature down there?
19    A   Yeah, yeah.
20    Q   And there was a Beth Federici who testified
21  at the hearing?
22    A   Yes.
23    Q   You reviewed this statement prior to the
24  hearing?
25    A   Yeah.

18 (Pages 66 to 69)

Page 70

1    Q   You understand this to be a statement given
2  by one of Ms. Murphy's friends to public safety at
3  the initial report, right?
4    A   Yes.
5    Q   Then we go to Bleiler Exhibit 9, also a
6  statement that appears to be signed by Jacob
7  Yiznitsky?
8    A   Uh-huh, yes.
9    Q   You remember Jacob Yiznitsky gave testimony
10  at the hearing?
11    A   Yes.
12    Q   And this is another statement you got in
13  the packet and reviewed?
14    A   Yeah.
15    Q   You understood this to be another statement
16  of one of Ms. Murphy's friends?
17    A   Yes, I do.
18    Q   And Bleiler Exhibit 10 dated 5-3-2011
19  appears to be signed by a K.D. Fusco?
20    A   Yes.
21    Q   Did you review that statement ahead of
22  time?
23    A   Yes.
24    Q   Did you understand that to be another
25  account of the evening by one of Ms. Murphy's

Page 71

1  friends?
2    A   Yes, I did.
3    Q   Okay.  And 11 is -- Belier Exhibit 11 is
4  also dated 5-3 signed by Felicia Russo?
5    A   I don't have an 11.  Is it connected?
6        MR. POTTER:  It's --
7        THE WITNESS:  Oh, it's connected.
8        MS. SMITH-LEE:  Oh, look, and there's 12
9  too and 13.
10    Q   So that's another statement dated 5-3-11
11  signed by Felicia Russo?
12    A   Yes.
13    Q   And you understood that also to be a
14  statement -- an account of the evening by one of
15  Ms. Murphy's friends?
16    A   Yes, I did.
17    Q   And you reviewed that as well?
18    A   I did.
19    Q   Bleiler Exhibit 12 which is the next page
20  dated May 4, 2011 signed by Elizabeth Masi, do you
21  see that?
22    A   Yes.
23    Q   Do you recall hearing testimony from
24  Ms. Masi over the telephone at the hearing?
25    A   Yes, I do, yeah.

Page 72

1    Q   And you understood this to also be an
2  account of the evening by another one of
3  Ms. Murphy's friends?
4    A   I did.
5    Q   And the next page is Bleiler Exhibit 13
6  which is another statement by Mr. Yiznitsky dated
7  May 4th.
8        Do you see that?
9    A   Uh-huh.
10    Q   And you also reviewed that before the
11  hearing?
12    A   Yes.
13    Q   Okay.  And the next page is Exhibit 14, a
14  statement dated 5-5-11.  It appears to be signed by
15  a Katelyn or Kathryn Derosier -- Derosier?
16    A   Yes.
17    Q   Another one of Ms. Murphy's friends giving
18  an account of the evening?
19    A   Yes.
20    Q   And then Bleiler 15 is signed by what
21  appears to be a Kristen Derosier, also dated 5-5.
22        Do you remember reviewing that?
23    A   Number 15?
24    Q   Yeah.
25    A   Derosier, yes.

Page 73

1    Q   There are two Derosier, right?
2    A   Yeah, this one was -- I don't even know
3  what the first name is on that.  Horster.
4    Q   But you understood that there were two
5  separate people with the same last name who gave
6  statements?
7    A   Yes.
8    Q   All right.  So all of the ones that we've
9  just discussed, would you agree with me these were
10  statements given over the course of that week by
11  friends of Ms. Murphy either describing their
12  interactions with her after the alleged incident or
13  describing the various social events of the evening
14  and different people's level of intoxication?
15    A   Yes.
16    Q   So with that as a background, do you
17  sitting here today have a memory of reviewing any
18  other witness statements not submitted by either
19  Ms. Murphy or her friends in support of Mr. Bleiler
20  or in his defense?  Do you have any alternative
21  accounts of the evening or any other information at
22  all?
23    A   Looking at these, it jogged my memory to
24  like remember that.
25    Q   What do you remember?

GRANT GREELEY - 8/21/2012

Page 74

1    A  I remember these because I see them.  I
2  don't remember -- I don't know if there's any
3  others.  A roommate sounds familiar.  I don't know
4  if Paul Irish was having a discussion -- at the very
5  beginning, there was something about -- I remember
6  during the hearing someone said something about a --
7  like something added, but I don't know what it is,
8  and maybe that's someone else's statement or --
9    Q  Okay.
10   A  Was I given these things?
11   Q  I'm here to find stuff out.  I don't know
12  the answer to that.
13      So after the -- after the hearing concluded
14  and you all went back into your deliberations, did
15  you -- do you have a memory of sitting and reviewing
16  any written material that you hadn't had prior to
17  the hearing or did you go straight from hearing to
18  discussing?
19   A  I don't recall.
20   Q  So earlier today I asked you what your --
21  your own reasons were for voting to find Mr. Bleiler
22  responsible.
23      Do you recall that?
24   A  I did, yes.
25   Q  I believe you gave me a two-part answer;

Page 75

1  one was that you concluded that she hadn't given
2  consent, and then the second was that you concluded
3  that she was not capable of giving consent; is that
4  fair?
5    A  That's correct.
6    Q  So let's talk about the capacity to give
7  consent for a minute.
8       The reason for your conclusion that she was
9  not capable of giving consent was her level of
10  intoxication, right?
11   A  Yes.
12   Q  Do you recall -- I know you didn't recall
13  her name, but you do recall there was a public
14  safety officer who testified at the hearing?
15   A  I do.
16   Q  And do you recall that that public safety
17  officer was specifically trained in being able to
18  identify people's levels of intoxication?  Is that
19  part of her job, to your understanding?
20   A  To identify people who are drunk?
21   Q  To know whether people are intoxicated.
22   A  Sure, yeah.
23   Q  And do you recall her testimony that
24  Ms. Murphy was intoxicated but not incapacitated?
25   A  Do I remember her saying that?

Page 76

1    Q  Uh-huh.
2    A  Sounds right, yeah, sounds familiar.
3    Q  Okay.  And do you recall some testimony
4  both by Ms. Murphy and in Sergeant Culley's report
5  about the actual amount of alcohol Ms. Murphy had
6  consumed?
7    A  I remember many people discussed like
8  alcohol consumption.  I think everybody discussed
9  it.
10   Q  Okay.  Do you recall that both Ms. Murphy
11  and Sergeant Culley in her report actually laid out
12  specifically the number of drinks Ms. Murphy had had
13  over what period of time?
14   A  They probably did.
15   Q  Okay.  Do you recall the testimony that
16  Ms. Murphy had had approximately four beers between
17  6:30 and 10:00 p.m. and then half of a beer at the
18  final party she went to?
19      MR. POTTER:  Objection.
20  BY MS. SMITH-LEE:.
21   Q  Do you remember that?
22   A  Am I allowed -- even if he says objection,
23  I can still --
24   Q  He's just reserving his right to fight with
25  me about stuff later.

Page 77

1    A  Fun for you two.
2    Q  Do you want the question back?
3    A  Yeah, I would.  Distracted me.  I'm sorry.
4    Q  That's okay.
5       (The record was read as follows:
6       "Q  Do you recall the testimony
7       that Ms. Murphy had had
8       approximately four beers between
9       6:30 and 10:00 p.m. and then half
10      of a beer at the final party she
11      went to?")
12      THE WITNESS:  And this is from the public
13  safety officer?
14  BY MS. SMITH-LEE:
15   Q  From the public safety officer and from
16  some of Ms. Murphy's own statements.
17   A  I don't recall exact number of drinks they
18  all said they were having, but I remember the number
19  that was mentioned was a higher number.
20   Q  Okay.  And how many drinks do you believe
21  she had?
22   A  That I believe she had?
23   Q  Yeah.  What's the higher number you're
24  thinking of?
25   A  Well, I think anything over three drinks

20  (Pages 74 to 77)

Page 130

1   A  I don't recall.
2   Q  Okay.  Two of them, that's Federici and
3 Jacob Yiznitsky, didn't even see her until maybe a
4 half an hour after this took place; is that right?
5       MR. POTTER: Objection.
6       THE WITNESS: Based on reports, I think
7 that sounds right.
8 BY MS. SMITH-LEE:
9   Q  Okay.  So did you discuss or consider at
10 all whether you should consider the fact that they
11 had not actually even observed Ms. Murphy in the,
12 say, hour leading up to the actual alleged incident?
13       MR. POTTER: Objection.
14       THE WITNESS: Say the question again.
15       MS. SMITH-LEE: Sure.  It was a bad
16 question.
17   Q  And perhaps your prior answer is an answer
18 to all of these questions.
19       You don't recall any discussion about the
20 credibility of the various witnesses -- nonparty
21 witnesses?
22   A  You're saying -- I think you have to
23 elaborate on credibility.  That's very -- you're
24 saying do I -- I'm not going to ask the question for
25 you.

Page 131

1   Q  Did you talk about whether these people
2 were either qualified or had firsthand observational
3 information to support the opinions they were giving
4 you about how intoxicated Ms. Murphy was or was not?
5       MR. POTTER: Objection.
6       THE WITNESS: I don't remember those
7 conversations.  I don't recall.
8 BY MS. SMITH-LEE:
9   Q  You do or you don't?
10   A  I don't recall.
11   Q  Then in the paragraph above, we also talked
12 about this earlier, the caution against allowing
13 prior sexual history into the proceedings.
14       Do you remember that?
15   A  Discussing that earlier?
16   Q  Yes, earlier today.
17   A  Yes.
18   Q  Do you recall any discussion in the
19 deliberations about whether it was or was not
20 appropriate to consider Ms. Murphy's testimony about
21 her virginity?
22   A  That wasn't a factor for me.
23   Q  Was it discussed?
24   A  I don't believe so, and it wasn't a factor
25 for me.

Page 132

1   Q  Do you remember one way or another if it
2 was a factor for anybody else?
3   A  I don't recall.
4   Q  Let's turn to the discussions in your
5 deliberations about sanctions.
6       First of all, do you remember how long it
7 took the panel to make a finding on responsibility?
8   A  It took a while.  I don't know what a while
9 is, and I don't recall.
10   Q  Okay.  Did Mr. Irish participate in that
11 conversation at all?
12   A  We asked what the possible -- if sanctions
13 are the right word, what those would be.
14   Q  In the responsibility deliberations?
15   A  In the sanctions.
16   Q  No, no, no, I'm sorry.  I'm just in the
17 first part here.
18   A  Okay.  I see.
19   Q  The discussions on responsibility,
20 Mr. Irish was in the room, correct?
21   A  Yes.
22   Q  Did he say anything?
23   A  Not that I recall.
24   Q  Okay.  And then you moved on to the
25 sanctions deliberations?

Page 133

1   A  Uh-huh.
2   Q  And he -- at that point, he provided you
3 some information?
4   A  We asked what the possible sanctions would
5 be, I think the chair did, and he discussed that in
6 the past, people have been suspended and expelled.
7   Q  Okay.  Did he say -- did he give you any
8 indication about -- strike that.
9       Did he give you any indication about how
10 many people in the past had been suspended versus
11 expelled or did he comment on that at all?
12   A  Not that I recall.
13   Q  Okay.  How long were the deliberations on
14 sanctions?
15   A  I don't recall.  It was a very tough
16 choice.  So it wasn't made lightly.
17   Q  Did you have to take multiple votes on
18 that?
19   A  I don't recall.
20   Q  Did you actually ever take a vote on either
21 finding?
22   A  We did take a vote.
23   Q  On both?
24   A  We did.
25   Q  Okay.  Do you remember what the vote was?

GRANT GREELEY - 8/21/2012

Page 134

1    A   Responsible.
2    Q   Right.  Do you remember if everybody voted
3 the same way?
4    A   Yes, we all voted on responsible.
5    Q   And the sanctions as well?
6    A   Responsible.
7    Q   Okay.  Do you remember Mr. Irish following
8 up with you on the next day with an e-mail thanking
9 everybody for their service?
10   A   I don't recall.
11   Q   We'll look at it real quick.  Just for fun,
12 while I'm looking for that, I'll show you what was
13 previously marked as Irish Exhibit 3 which is a
14 transcript of an NPR interview, I believe, of
15 March 2010.
16       My question for you is whether you have
17 ever seen that before.
18   A   I have not.
19   Q   Were you ever aware that Mr. Irish had been
20 interviewed by any news outlet concerning sexual
21 misconduct on college campuses?
22   A   I was not.
23   Q   Had you ever discussed in a broader sense
24 the issue of sexual misconduct on college campuses
25 and the college's response with Mr. Irish outside of

Page 135

1 this proceeding?
2    A   I don't recall.
3    Q   You don't recall him ever giving you any
4 opinions talking about whether Holy Cross did a good
5 job or bad job of responding to this?
6    A   No.
7    Q   Has that ever been an issue on campus that
8 people have debated as a policy matter?
9    A   I have only ever heard of this incident of
10 rape because Holy Cross is really private about
11 their matters, I'm sure.
12   Q   It's not something you're aware of students
13 having different opinions on about whether the
14 policy is a fair policy, not a fair policy?
15   A   It's not a topic that I've discussed with
16 my fellow students.
17   Q   Okay.  I'm now showing you what was
18 previously marked as Irish 27.
19       Do you remember getting that — I'm
20 sorry — just for the record, that's an e-mail from
21 Paul Irish to — it would appear to be all of the
22 panel members, plus Jacqueline Peterson dated
23 Thursday, May 19th.
24       Do you recall receiving that?
25   A   I do not.

Page 136

1    Q   And he's embedded a link in there to an
2 article.
3        Do you see that?
4    A   I do.
5    Q   When you got this, did you open up the
6 article and read it?
7    A   I don't think I did actually.
8    Q   Okay.
9    A   I was graduating.
10   Q   Then I won't ask you any further questions.
11   A   I get a lot of e-mails.
12       MS. SMITH-LEE:  I think I have nothing
13 further.
14       MR. POTTER:  Okay.  I have nothing.
15       (Whereupon, at the hour of 12:11 p.m.,
16       the deposition was concluded.)
17
18
19
20
21
22
23
24
25

Page 137

1  STATE OF CALIFORNIA   )
2                        ) ss
3  COUNTY OF ORANGE      )
4
5        I, GRANT GREELEY, declare under the
6  penalties of perjury of the laws of the United
7  States that the foregoing is true and correct.
8        Executed this       day of          ,
9  2012, at            , California.
10
11
12
13
14       _____
15            GRANT GREELEY
16
17
18
19
20
21
22
23
24
25

35 (Pages 134 to 137)

# TAB 5

24

1    A.    I'm not sure if there is an actual

2  eligibility requirement.   I feel like that that

3  may be the preference, to have people with more

4  experience in those stressful situations to be

5  available and trained for those proceedings.

6    Q.    Was it Mr. Irish who sent this to you?

7    A.    I believe it was.

8    Q.    And you said it was a PDF.  So you got

9  that by e-mail?

10    A.    I did.

11    Q.    Do you still have that e-mail?

12    A.    I still have the PDF on my computer.

13    Q.    Okay.

14    A.    I may have the e-mail.  I am not sure.

15  I may have deleted it.

16    Q.    So, if you wanted to fix in your mind a

17  date when you were first provided this, could you

18  look at, say, the date on the PDF in your computer?

19    A.    That is a possibility, although

20  sometimes files will show when they were last

21  modified, not when they were last saved.

22    Q.    When you first got this Exhibit 4, did

23  you read it?

24    A.    I read it word for word.

1    see that?

2         A.    Yes.

3         Q.    And when you went and reviewed this in

4    connection with the Bleiler proceeding, did you

5    have an understanding of what that meant?

6         A.    I have a common-sense understanding of

7    what that means.  I don't have a legal background.

8         Q.    And what's your common-sense

9    understanding of what that means?

10        A.    My common-sense understanding of that is

11   that, you know, the evidence needs to be, you know,

12   sort of pursuant to the night in question and it

13   needs to be from, you know, a source that is

14   believable.

15        Q.    Okay.  Earlier today you testified that

16   Mr. Irish had expressed -- I don't know if concern

17   is the right word but had communicated to you some

18   information about not considering past sexual

19   history.  Do you remember that?

20        A.    Yes.

21        Q.    Do you recall in the hearing Ms. Murphy

22   making statements about her virginity?

23        A.    I do recall that.

24        Q.    Was that discussed in the deliberations?

62

1          A.     Ms. Murphy's virginity was not discussed

2     during the deliberations.

3          Q.     Did anybody raise any concern about

4     whether that was relevant or appropriate evidence

5     under the college's policies?

6          A.     During the hearing or during the

7     deliberations?

8          Q.     During the deliberations?

9          A.     To be honest with you, that was not

10    discussed during the deliberations.  Her virginity

11    was not discussed during the deliberations.

12         Q.     One way or another?

13         A.     No.

14         Q.     Okay.  But you have no way of knowing

15    whether those comments influenced the thinking of

16    other panel members if it wasn't discussed?

17                MR. POTTER:   Objection.

18         A.     I am not a mind reader.

19         Q.     And I don't expect you to be.  Did that

20    have any impact on you?

21         A.     In my decisions that day or in my --

22         Q.     As you were sitting there, receiving

23    evidence and hearing testimony, did Ms. Murphy's

24    discussion of her virginity and how she felt about

63

1   that have any impact on you in your thinking about

2   this case or your feelings about the case?

3              MR. POTTER:  Objection.  You can

4   answer.

5       A.    Well, you know, the rules that were

6   given were fairly clear, so, you know, it wouldn't

7   matter to me how many times she had or had not had

8   sex.  I was more interested in what happened on the

9   night in question.

10      Q.    And I understand and appreciate, I

11  think, what your answer is which is that you were

12  attempting to apply appropriate discipline in your

13  thinking about coming to a conclusion in this case?

14      A.    Yes.

15      Q.    That's all laudable.  My question is a

16  little bit different which is whether you had any

17  sort of -- any immediate reaction in your head to

18  hearing that information, even if you were able to

19  wall it off in the decision-making process?

20             MR. POTTER:  Objection.

21      Q.    Do you understand that question?

22      A.    Did I have an immediate reaction to

23  that?

24      Q.    Did it have any impact on you?

64

1        A.    No.

2        Q.    And you don't know whether it did or did

3   not on anybody else in the panel?

4              MR. POTTER:  Objection.

5        A.    It's not something that we discussed.

6   It's not something that I asked them about.

7              MS. SMITH-LEE:  We've been going about

8   an hour and 15.  Do you want to take a break?

9              MR. POTTER:  That's fine.

10                  (Recessed at 11:18 a.m.)

11                  (Resumed at 11:31 a.m.)

12       Q.    Welcome back.

13       A.    Thank you.

14       Q.    During the hearing and/or the

15   deliberations, did you, personally, take any notes?

16       A.    I may have.

17       Q.    Do you recall what became of those

18   notes?

19       A.    It may have been something that I may

20   have jotted down on, you know, the back of some

21   materials that Paul had handed us, you know.  We're

22   given statements, you know.  I guess we were going

23   to call it the packet.

24       Q.    The case materials?

100

1      A.    I think what I'm offering is my

2  recollection, you know.  There may very well be

3  topics that we discussed that are not coming to

4  mind.

5      Q.    But you don't remember any others

6  sitting here right this minute?

7      A.    You know, I think we've -- I think we're

8  touching on the ones that are most memorable to me.

9      Q.    Okay.  At some point was there a formal

10 vote taken on responsibility?

11     A.    Yes.  We wanted it to, you know, we

12 wanted it to be, you know, representative of the

13 board.  So we actually did go around the circle at

14 the end and actually have people decide, you know,

15 yes or no, do you think that, you know, this

16 individual was responsible for this.

17     Q.    And was that the question presented to

18 go around, is Mr. Bleiler responsible for violation

19 of the sexual misconduct policy, or was it framed

20 in a different way?

21     A.    I think that we -- we looked at specific

22 aspects of it first.  I think, you know, we may

23 have gone around and said, you know, do we think

24 that Ms. Murphy was capable of giving consent.  I

1    think, you know, we got everyone's opinion based on

2    that.

3              Then, you know, I think the penultimate

4    decision was do we think that Mr. Bleiler was, you

5    know, responsible for violation of this rule, and,

6    you know, the board was unanimous on their

7    decisions.

8         Q.    So, first, the question went around the

9    table, in words or substance, was Ms. Murphy

10   capable of giving consent.  Everybody says no, no,

11   no, no, no, and then the question goes around the

12   table, was Mr. Bleiler responsible for violation of

13   the policy, in words or substance?

14              MR. POTTER:  Objection.

15        A.    There may have been other questions that

16   went around.  It's a lot like we were equating one

17   with the other.  Does that make sense?

18        Q.    Okay.

19        A.    But, you know, at some point we wanted

20   to establish everybody's opinion on these, you

21   know, sort of important kind of, you know, these

22   important factors in making, you know, in deciding

23   whether or not the rule had been violated.

24        Q.    So what other -- and I may have been

1    about guessing, please.

2         A.    I can't remember the specific language.

3    I would -- I could make some assumptions about what

4    was -- about the specific language.

5         Q.    Okay.

6         A.    But it was, I mean, it was not a -- it's

7    not an ambiguous decision.

8         Q.    What do you mean "it's not an ambiguous

9    decision"?

10        A.    I mean, we all had the material there to

11   read what the rule was and then we all decided that

12   Mr. Bleiler had violated that rule.

13        Q.    And so who made the decision to call the

14   question, if you will, to say, okay, now it's time

15   to make this decision?

16        A.    I think that was something that was

17   reached by consensus.

18        Q.    Okay.

19        A.    When people -- when the conversation had

20   sort of died down a bit and, you know, it just

21   seemed like a logical progression.

22        Q.    Okay.  So the question went around the

23   table.  People individually were asked to say yes

24   or no, did he violate the policy, assuming that's

1  the question?

2      A.    Yes.

3      Q.    And you said it was unanimous, so

4  everybody said yes?

5      A.    Mm-hmm.

6      Q.    During that stage, up until that point

7  in the deliberations, had anybody asked any

8  questions of Mr. Irish?

9      A.    I don't think so.

10     Q.    Do you recall him speaking at all up to

11 that point in the deliberations?

12     A.    No.

13     Q.    So what happened next after that vote or

14 consensus was taken?

15     A.    That was when we told Mr. Irish that we

16 had come to a decision upon responsibility.

17     Q.    Okay.  And then what happened?

18     A.    And then we moved on to deciding

19 sanctions.

20     Q.    And how was that discussion handled?

21     A.    Well, I think, you know, the first

22 thing that we did -- we did at that point was we

23 actually -- we looked at the handbook to see, you

24 know, what it said about, you know, consequences

130

1    document.  Just give me a minute.

2         A.    Okay.

3         Q.    Did anybody on the panel make an

4    argument for any sanction less than expulsion at

5    any point in the deliberations?

6         A.    I don't remember any panel members being

7    proponents of a sanction less than expulsion.

8         Q.    Did the panel discuss suspension?

9         A.    Yes.

10        Q.    Tell me what you remember about those

11   discussions.

12        A.    Well, I remember the discussion being

13   that -- that that stage -- at that stage in, you

14   know, in the -- at that point, you know, in order

15   to provide what we would consider to be an

16   educational sanction, we were very limited with

17   respect to options that we had on the table that

18   could provide -- measure a sanction with the

19   severity of the event.

20        Q.    What were the reasons discussed that

21   suspension would not be a sufficient sanction?

22        A.    Well, we were at a point where

23   suspension -- suspension would have been just

24   essentially a postponement of graduation.

133

1    sanction?

2         A.    We had arrived at the decision that

3    suspension was too light of a sanction in light of

4    his violation of the campus rules.

5         Q.    I understand that that's where you

6    arrived.   That's why we're here.   What I'm trying

7    to understand is what you remember of the bases for

8    that finding, what else people talked about in

9    coming to the conclusion that that was an

10   insufficient sanction.

11        A.    I don't recall any other discussion

12   about that.

13                      (Series of e-mails, dated

14   5/19/11, was marked Exhibit No. 4 for

15   identification.)

16        Q.    Before we get to the exhibit, just one

17   quick last question on the sanctions deliberations,

18   after providing you with the information at the

19   beginning of your discussions about historical

20   sanctions, did Mr. Irish say anything in connection

21   with the sanctions deliberations?

22        A.    I don't remember him saying anything

23   else.

24        Q.    I'm showing you what we've marked as

# EXHIBIT 4
# TO TAB 5



**Paul Irish - Re: quick follow-up**

| | |
|---|---|
| **From:** | Jude Kelley |
| **To:** | Greeley, Grant; Brais, Lauren; Rice, Elizabeth; Irish, Paul; King, Laurie |
| **Date:** | Thursday, May 19, 2011 9:22 AM |
| **Subject:** | Re: quick follow-up |
| **CC:** | Peterson, Jacqueline |

Dear Paul,

Thank you for all the hard work you put into this hearing. We appreciated your professionalism and guidance throughout the entire process.

Sincerely,

Jude

>>> Paul Irish 05/19/11 8:27 AM >>>
Good Morning Everyone:
Thank you for your service yesterday, this was a very difficult case to hear and to have to decide. I was able to speak with both students last night about the finding and recommendation. Needless to say Caitlin was very relieved and thankful.

Last month there was a great deal of news about this topic on the national level. The way that we have handled these cases has been held up as a model. Many schools have not handled the cases well, necessitating government involvement and oversight. The attached article provides a summary of some of the wider concerns.

Once again thank you for your service, I hope everyone has a great summer.

Paul

http://www.csmonitor.com/USA/Education/2011/0404/White-House-targets-sexual-assault-on-campus?
cmpid=addthis_email&sms_ss=email&at_xb=4dd50a4b188588444%2C0

----

Paul A. Irish
Assistant to the Vice President for Student Affairs
Director of Student Conduct & Community Standards
College of the Holy Cross
One College Street, Box 13A
109 Hogan Campus Center
Worcester, Massachusetts 01610-2395
508-793-2999
Fax - 508-793-3343

This email and any files transmitted may contain confidential information as protected by the Family Educational Right to Privacy Act (FERPA), 20 USC §1232g and/or Electronic Communications Privacy Act, 18 U.S.C.§§ 2510-2521. If you are not the intended recipient you are hereby notified that any disclosure, copying, or distribution is prohibited. If you have received this electronic transmission in error, please delete it and notify me at pirish@holycross.edu immediately. Thank you.

HC10247

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 11-CV-11541

| | |
|---|---|
| EDWIN BLEILER,<br><br>Plaintiff<br><br>v.<br><br>COLLEGE OF THE HOLY CROSS,<br><br>Defendant | |

**DEFENDANT'S ANSWERS TO
PLAINTIFFS' FIRST SET OF
INTERROGATORIES**

The defendant, College of the Holy Cross, hereby responds to Plaintiff's First

Set of Interrogatories as follows:

## DEFINITIONS AND INSTRUCTIONS

Unless otherwise indicated, the following items have the following meanings when used in

these definitions and instructions and in the following interrogatories:

A.      "Mr. Bleiler" or "Plaintiff shall mean the Plaintiff, Edwin Bleiler, or his agents.

. B.      "You," "Defendant" or "the College" shall mean College of the Holy Cross, its agents,

servants, officers, employees, successors, predecessors, affiliates, trustees, parent companies,

subsidiaries, divisions, and other representatives or persons acting on its behalf or under its control.

C.      "Communication" shall mean any act or instance of transferring, transmitting,

passing, delivering, or giving information, by oral, written, or electronic means, including, but

not limited to, by notes, letter, telegram, telex, telephone facsimile, tape, electronic mail, voice

mail, or otherwise.

D.      "Document" shall mean the original and each non-identical copy of any original

form of recorded information or communication including, without limitation, correspondence,

1

books, pamphlets, periodicals, letters, memoranda (including any memorandum or report of a meeting or telephone or other conversation), invoice, account, credit memo, financial statement, general ledger, subsidiary or supporting ledger, journal, diary, telegram, report, record, contract, agreement, study draft, handwritten or other note, working paper, sketch, picture, photograph, plan, chart, paper, graph, index tape, data sheet or data processing card, computer software, computer disk, computer data tape, computer input or output, or any other written, recorded, transcribed, taped, filmed, or graphic matter, however produced or reproduced, sound reproductions, video cassette recordings, video disk recordings, or other video or moving picture recordings or reproductions, regardless of origin or location, in your possession, custody, or control or in the possession, custody, or control of anyone acting on your behalf. If copies of documents are not identical for any reason, including notations, initials, or identifying marks, each non-identical copy is a separate document within the meaning of this definition.

E.     "Electronic data" shall mean writings of every kind and description in forms other than ordinary paper records, whether inscribed by mechanical, facsimile, electronic, magnetic, digital, video, or any other means.

F.     "Person", whether used in the plural or the singular, shall mean any natural person, firm, association, partnership, corporation, limited liability company, or other entity. All references herein to any Person shall include the Person itself as well as its employees, officers, agents, and representatives.

G.     "Reflecting" shall mean evidencing, demonstrating, touching upon, mentioning, commenting on, incorporating, analyzing, transcribing, noting, evaluating, reviewing, reporting on, critiquing, criticizing, or showing in any way.

2

H.      "<u>Relating to</u>" shall mean referring to, describing, concerning, evidencing, or constituting.

I.      "<u>Identify</u>", when used with respect to a natural person, shall mean to set forth the person's name, employer, job title, home and business addresses, and home and business telephone numbers.

J.      "<u>Identify</u>", when used with respect to a person other than a natural person, shall mean to set forth its full name; its nature of organization, including the name of the state or country under whose laws it is organized; the address and telephone number of its principal place of business; and its principal line of business.

K.      "<u>Identify</u>", when used with respect to a document (regardless of whether any claim of privilege is asserted), shall mean to set forth the following information:

        1.      its nature (e.g., letter, memorandum, report, etc.);

        2.      the date it bears or, if undated, the date it was written or created;

        3.      the identity of the Person(s) who wrote or created it;

        4.      the identity of the Person(s) who received it;

        5.      its file number or other identifying mark or code;

        6.      its general subject matter;

        7.      its present or last known location; and

        8.      its present or last known custodian.

L.      Whenever used herein, the singular shall include the plural and the plural shall include the singular; the masculine shall include the feminine and the feminine shall include the masculine; the disjunctive ("or") shall include the conjunctive ("and"), and the conjunctive

("and") shall include the disjunctive ("or"); and each of the functional words "each," "every," "and," and "all" shall be deemed to include each of the other functional words.

With respect to any responsive documents or information for which you assert a claim of privilege of non-disclosure or otherwise withhold/do not disclose, your counsel shall provide a statement which:

a.   states the nature of the claim of non-disclosure or privilege and sets forth the statute, rule, decision or other basis which is claimed to give rise to the privilege or other justification for the non disclosure of the requested information; and

b.   a summary statement of the date, author(s), recipient(s), and subject matter of the information requested or the document withheld in sufficient detail to permit the Court to rule on the propriety of the objection.

Unless you claim that the entirety of a particular document is protected from disclosure, please produce the document with redactions rather than withholding it entirely, and include any such redactions in the statement described in the previous sentence.

Each interrogatory herein should be treated as continuing so as to require prompt, supplemental production if you discover, develop, or obtain additional responsive documents or information subsequent to your initial response.

<u>Objection To Definitions and Instructions</u>

Holy Cross objects to the definitions and instructions to the extent they purport to or intend to impose obligations beyond the scope of discovery provided for in the Federal Rules of Civil Procedure and the Local Rules.

**Interrogatory No. 1:**

Identify how many students have been charged under the College's disciplinary policy of Sexual Misconduct I and of such students, how many were female and how many were male.

**Response No. 1.**

**Objection** as overly broad and irrelevant. Without waiving this objection, charges for violating the College's disciplinary policy for Sexual Misconduct I have been brought against 6 male students since 2002. There has never been a complaint of a violation of the college's disciplinary policy for Sexual Misconduct I by any male student against any female student.

**Interrogatory No. 2:**

Identify how many students have been found to have violated the College's disciplinary policy of Sexual Misconduct I and of such students, how many were female and how many were male.

**Response No. 2.**

**Objection** as overly broad and irrelevant. Without waiving this objection, four male students against whom complaints have been made have been found responsible under the College's disciplinary policy for Sexual Misconduct I since 2002. There has never been a complaint of a violation of the College's disciplinary policy for Sexual Misconduct I by a male student against a female student.

**Interrogatory No. 3:**

Identify any and all consequences that have been imposed on College students upon findings that such students have violated the College's policy of Sexual Misconduct I and identify which consequences were imposed and in how many instances such consequences were imposed on each gender.

5

**Response No. 3.**

**Objection** as overly broad and irrelevant. Without waiving these objections, there has

never been a complaint of a violation of the College's disciplinary policy for Sexual Misconduct

I by any male student against any female student. Six male students have had complaints made

against them for a violation of the college's disciplinary policy for Sexual Misconduct I since

2002. Four have been found responsible. Two were found not responsible. Of the four male

students who were found responsible, three were expelled and one received a one year

suspension.

**Interrogatory No. 4**

Identify all policies and or practices adopted, employed, or considered by the College
relating to enforcement of the College's policy of Sexual Misconduct I.

**Response No. 4.**

Objection as overly broad but see the 2010-2011 Student Handbook, a copy of which has

been provided, which contains all of the policies and/or practices, adopted, employed or

considered by the College relating to enforcement of the College's policy concerning Sexual

Misconduct I for the 2010-2011 college year.

**Interrogatory No. 5:**

Identify all individuals with knowledge of the facts asserted in response to Interrogatories
1 through 4 above.

6

Response No. 5.

     Objection as overly broad.  Without waiving this objection:

        Paul Irish
        Assistant to the Vice President for Student Affairs
        Director of Student Conduct & Community Standards
        College of the Holy Cross
        1 College Street
        Worcester, MA  01610

               As to Responses:

               COLLEGE OF THE HOLY CROSS

               By:  Paul Irish
               Assistant to the Vice President for Student Affairs
               Director of Student Conduct & Community
               Standards
               College of the Holy Cross
               1 College Street
               Worcester, MA  01610

Objections:

Harold W. Potter, Jr.
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

7

#10816289_v1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Defendant's Answers To Plaintiffs' First Set

Of Interrogatories has been forwarded to plaintiff's counsel Emily E. Smith-Lee by first class

mail and email on December 16, 2011.

Harold W. Potter, Jr.

#10816289_v1

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

1:11-CV-11541-DJC

EDWIN BLEILER,

Plaintiff,

v.

COLLEGE OF THE HOLY CROSS,

Defendant.

## AFFIDAVIT OF PAUL A. IRISH

I, Paul A. Irish, on oath depose and say:

1.     I am the Director of Student Conduct and Community Standards and the Associate Dean of Students the College of Holy Cross ("Holy Cross").

2.     I coordinated and attended the Community Standards Board hearing concerning the complaint for a violation of Sexual Misconduct I against Edwin Bleiler held on May 18, 2011.

3.     Panel member Elizabeth Rice received training on Holy Cross's sexual misconduct policies on or around the time she became a member of the Community Standards Board.

4.     Panel member Lori King received training on Holy Cross's sexual misconduct policies on or around the time she became a member of the Community Standards Board.

5.     On May 11, 2011, I asked all panelists selected to serve on the Bleiler panel in an email to let me know immediately if they had any conflicts with either complainant C.M. or

respondent Mr. Bleiler.  After discussions with Mr. Bleiler and the student members of the panel, Grant Greeley and Lauren Brais, I determined that there were no conflicts which would disqualify either from serving.

6.      Mr. Bleiler offered an affidavit from Brendan McCrea in his defense.  Mr. McCrea did not appear in person at the hearing panel, but the panel, exercising its discretion, accepted the affidavit.

7.      Witnesses for the complainant and witnesses for the respondent were held in separate rooms prior to their testimony at the Bleiler panel.  This is a standard procedure followed by Holy Cross in all disciplinary hearings.  This is what is meant by the provisions on page 40-41 of the Handbook which provide that students appearing before the board "must not communicate with any member of the board or with the accuser(s) and their witnesses prior to the hearing" and that "[w]itnesses are brought into the room individually."

8.      Witnesses who testified for one side or the other at the Bleiler hearing were brought separately to the hearing room.  Once each witness completed his or her testimony, the witness left the hearing room and returned to one of the waiting rooms to await completion of the hearing in case the panel had additional questions.  No witnesses were recalled.  No witnesses were in the hearing room when another witness was testifying.  This is standard procedure for Holy Cross.

12/12/2012  15:53     5087933343                HC STU AFFAIRS                          PAGE  02/02

Signed under the penalties of perjury this _____ day of December, 2012

Paul A. Irish

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent those indicated as non-registered participants on December ____, 2012.

/s/ *Harold W. Potter, Jr.*
Harold W. Potter, Jr.

# EXHIBIT D



## UNITED STATES DEPARTMENT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

April 4, 2011

Dear Colleague:

Education has long been recognized as the great equalizer in America. The U.S. Department of Education and its Office for Civil Rights (OCR) believe that providing all students with an educational environment free from discrimination is extremely important. The sexual harassment of students, including sexual violence, interferes with students' right to receive an education free from discrimination and, in the case of sexual violence, is a crime.

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX. In order to assist recipients, which include school districts, colleges, and universities (hereinafter "schools" or "recipients") in meeting these obligations, this letter[1] explains that the requirements of Title IX pertaining to sexual harassment also cover sexual violence, and lays out the specific Title IX requirements applicable to sexual violence.[2] Sexual violence, as that term is used in this letter, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol. An individual also may be unable to give consent due to an intellectual or other disability. A number of different acts fall into the category of sexual violence, including rape,

---

[1] The Department has determined that this Dear Colleague Letter is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at:*
http://www.whitehouse.gov/sites/default/files/omb/assets/regulatory_matters_pdf/012507_good_guidance.pdf.
OCR issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This letter does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to us at the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, DC 20202.
[2] Use of the term "sexual harassment" throughout this document includes sexual violence unless otherwise noted. Sexual harassment also may violate Title IV of the Civil Rights Act of 1964 (42 U.S.C. § 2000c), which prohibits public school districts and colleges from discriminating against students on the basis of sex, among other bases. The U.S. Department of Justice enforces Title IV.

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-1100
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

sexual assault, sexual battery, and sexual coercion. All such acts of sexual violence are forms of sexual harassment covered under Title IX.

The statistics on sexual violence are both deeply troubling and a call to action for the nation. A report prepared for the National Institute of Justice found that about 1 in 5 women are victims of completed or attempted sexual assault while in college.[3] The report also found that approximately 6.1 percent of males were victims of completed or attempted sexual assault during college.[4] According to data collected under the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act (Clery Act), 20 U.S.C. § 1092(f), in 2009, college campuses reported nearly 3,300 forcible sex offenses as defined by the Clery Act.[5] This problem is not limited to college. During the 2007-2008 school year, there were 800 reported incidents of rape and attempted rape and 3,800 reported incidents of other sexual batteries at public high schools.[6] Additionally, the likelihood that a woman with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population.[7] The Department is deeply concerned about this problem and is committed to ensuring that all students feel safe in their school, so that they have the opportunity to benefit fully from the school's programs and activities.

This letter begins with a discussion of Title IX's requirements related to student-on-student sexual harassment, including sexual violence, and explains schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence. These requirements are discussed in detail in OCR's *Revised Sexual Harassment Guidance* issued in 2001 (*2001 Guidance*).[8] This letter supplements the *2001 Guidance* by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence. This letter concludes by discussing the proactive efforts schools can take to prevent sexual harassment and violence, and by providing examples of remedies that schools and OCR may use to end such conduct, prevent its recurrence, and address its effects. Although some examples contained in this letter are applicable only in the postsecondary context, sexual

---

[3] Christopher P. Krebs et al., The Campus Sexual Assault Study: Final Report xiii (Nat'l Criminal Justice Reference Serv., Oct. 2007), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf. This study also found that the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol. *Id.* at xviii.
[4] *Id.* at 5-5.
[5] U.S. Department of Education, Office of Postsecondary Education, Summary Crime Statistics (data compiled from reports submitted in compliance with the Clery Act), *available at*
http://www2.ed.gov/admins/lead/safety/criminal2007-09.pdf. Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person, forcibly and/or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. 34 C.F.R. Part 668, Subpt. D, App. A.
[6] Simone Robers et al., Indicators of School Crime and Safety: 2010 at 104 (U.S. Dep't of Educ. & U.S. Dep't of Justice, Nov. 2010), *available at* http://nces.ed.gov/pubs2011/2011002.pdf.
[7] Erika Harrell & Michael R. Rand, Crime Against People With Disabilities, 2008 (Bureau of Justice Statistics, U.S. Dep't of Justice, Dec. 2010), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/capd08.pdf.
[8] The *2001 Guidance* is available on the Department's Web site at
http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. This letter focuses on peer sexual harassment and violence. Schools' obligations and the appropriate response to sexual harassment and violence committed by employees may be different from those described in this letter. Recipients should refer to the *2001 Guidance* for further information about employee harassment of students.

harassment and violence also are concerns for school districts. The Title IX obligations discussed in this letter apply equally to school districts unless otherwise noted.

## Title IX Requirements Related to Sexual Harassment and Sexual Violence

### Schools' Obligations to Respond to Sexual Harassment and Sexual Violence

Sexual harassment is unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Sexual violence is a form of sexual harassment prohibited by Title IX.[9]

As explained in OCR's *2001 Guidance*, when a student sexually harasses another student, the harassing conduct creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe. For instance, a single instance of rape is sufficiently severe to create a hostile environment.[10]

Title IX protects students from sexual harassment in a school's education programs and activities. This means that Title IX protects students in connection with all the academic, educational, extracurricular, athletic, and other programs of the school, whether those programs take place in a school's facilities, on a school bus, at a class or training program

---

[9] Title IX also prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, even if those acts do not involve conduct of a sexual nature. The Title IX obligations discussed in this letter also apply to gender-based harassment. Gender-based harassment is discussed in more detail in the *2001 Guidance*, and in the 2010 Dear Colleague letter on Harassment and Bullying, which is available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[10] *See, e.g., Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006) (acknowledging that while not an issue in this case, a single incident of sexual assault or rape could be sufficient to raise a jury question about whether a hostile environment exists, and noting that courts look to Title VII cases for guidance in analyzing Title IX sexual harassment claims); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000) ("'[w]ithin the context of Title IX, a student's claim of hostile environment can arise from a single incident'" (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999))); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (explaining that rape and sexual abuse "obviously qualif[y] as...severe, pervasive, and objectively offensive sexual harassment"); *see also Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (in the Title VII context, "a single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with intimate parts of the body are among the most severe types of sexual harassment"); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010) (noting that "'[o]ne instance of conduct that is sufficiently severe may be enough,'" which is "especially true when the touching is of an intimate body part" (quoting *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007))); *McKinnis v. Crescent Guardian, Inc.*, 189 F. App'x 307, 310 (5th Cir. 2006) (holding that "'the deliberate and unwanted touching of [a plaintiff's] intimate body parts can constitute severe sexual harassment'" in Title VII cases (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005))).

sponsored by the school at another location, or elsewhere. For example, Title IX protects a student who is sexually assaulted by a fellow student during a school-sponsored field trip.[11]

If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects.[12] Schools also are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures. Because of these requirements, which are discussed in greater detail in the following section, schools need to ensure that their employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly. Training for employees should include practical information about how to identify and report sexual harassment and violence. OCR recommends that this training be provided to any employees likely to witness or receive reports of sexual harassment and violence, including teachers, school law enforcement unit employees, school administrators, school counselors, general counsels, health personnel, and resident advisors.

Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures. Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates.

Regardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance procedures or otherwise requests action on the student's behalf, a school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. As discussed later in this letter, the school's Title IX investigation is different from any law enforcement investigation, and a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate the conduct. The specific steps in a school's

---

[11] Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities. For example, Title IX protects a high school student participating in a college's recruitment program, a visiting student athlete, and a visitor in a school's on-campus residence hall. Title IX also protects employees of a recipient from sexual harassment. For further information about harassment of employees, see *2001 Guidance* at n.1.

[12] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13. The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Ed.,* 526 U.S. 629, 643, 648 (1999).

investigation will vary depending upon the nature of the allegations, the age of the student or students involved (particularly in elementary and secondary schools), the size and administrative structure of the school, and other factors. Yet as discussed in more detail below, the school's inquiry must in all cases be prompt, thorough, and impartial. In cases involving potential criminal conduct, school personnel must determine, consistent with State and local law, whether appropriate law enforcement or other authorities should be notified.[13]

Schools also should inform and obtain consent from the complainant (or the complainant's parents if the complainant is under 18 and does not attend a postsecondary institution) before beginning an investigation. If the complainant requests confidentiality or asks that the complaint not be pursued, the school should take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation. If a complainant insists that his or her name or other identifiable information not be disclosed to the alleged perpetrator, the school should inform the complainant that its ability to respond may be limited.[14] The school also should tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs.

As discussed in the *2001 Guidance*, if the complainant continues to ask that his or her name or other identifiable information not be revealed, the school should evaluate that request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. Thus, the school may weigh the request for confidentiality against the following factors: the seriousness of the alleged harassment; the complainant's age; whether there have been other harassment complaints about the same individual; and the alleged harasser's rights to receive information about the allegations if the information is maintained by the school as an "education record" under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g; 34 C.F.R. Part 99.[15] The school should inform the complainant if it cannot ensure confidentiality. Even if the school cannot take disciplinary action against the alleged harasser because the complainant insists on confidentiality, it should pursue other steps to limit the effects of the alleged harassment and prevent its recurrence. Examples of such steps are discussed later in this letter.

Compliance with Title IX, such as publishing a notice of nondiscrimination, designating an employee to coordinate Title IX compliance, and adopting and publishing grievance procedures, can serve as preventive measures against harassment. Combined with education and training programs, these measures can help ensure that all students and employees recognize the

---

[13] In states with mandatory reporting laws, schools may be required to report certain incidents to local law enforcement or child protection agencies.

[14] Schools should refer to the *2001 Guidance* for additional information on confidentiality and the alleged perpetrator's due process rights.

[15] For example, the alleged harasser may have a right under FERPA to inspect and review portions of the complaint that directly relate to him or her. In that case, the school must redact the complainant's name and other identifying information before allowing the alleged harasser to inspect and review the sections of the complaint that relate to him or her. In some cases, such as those where the school is required to report the incident to local law enforcement or other officials, the school may not be able to maintain the complainant's confidentiality.

nature of sexual harassment and violence, and understand that the school will not tolerate such conduct. Indeed, these measures may bring potentially problematic conduct to the school's attention before it becomes serious enough to create a hostile environment. Training for administrators, teachers, staff, and students also can help ensure that they understand what types of conduct constitute sexual harassment or violence, can identify warning signals that may need attention, and know how to respond. More detailed information and examples of education and other preventive measures are provided later in this letter.

**Procedural Requirements Pertaining to Sexual Harassment and Sexual Violence**

Recipients of Federal financial assistance must comply with the procedural requirements outlined in the Title IX implementing regulations. Specifically, a recipient must:

(A) Disseminate a notice of nondiscrimination;[16]

(B) Designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX;[17] and

(C) Adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex discrimination complaints.[18]

These requirements apply to all forms of sexual harassment, including sexual violence, and are important for preventing and effectively responding to sex discrimination. They are discussed in greater detail below. OCR advises recipients to examine their current policies and procedures on sexual harassment and sexual violence to determine whether those policies comply with the requirements articulated in this letter and the *2001 Guidance*. Recipients should then implement changes as needed.

(A) *Notice of Nondiscrimination*

The Title IX regulations require that each recipient publish a notice of nondiscrimination stating that the recipient does not discriminate on the basis of sex in its education programs and activities, and that Title IX requires it not to discriminate in such a manner.[19] The notice must state that inquiries concerning the application of Title IX may be referred to the recipient's Title IX coordinator or to OCR. It should include the name or title, office address, telephone number, and e-mail address for the recipient's designated Title IX coordinator.

The notice must be widely distributed to all students, parents of elementary and secondary students, employees, applicants for admission and employment, and other relevant persons. OCR recommends that the notice be prominently posted on school Web sites and at various

---

[16] 34 C.F.R. § 106.9.
[17] *Id.* § 106.8(a).
[18] *Id.* § 106.8(b).
[19] *Id.* § 106.9(a).

locations throughout the school or campus and published in electronic and printed publications of general distribution that provide information to students and employees about the school's services and policies. The notice should be available and easily accessible on an ongoing basis.

Title IX does not require a recipient to adopt a policy specifically prohibiting sexual harassment or sexual violence. As noted in the *2001 Guidance*, however, a recipient's general policy prohibiting sex discrimination will not be considered effective and would violate Title IX if, because of the lack of a specific policy, students are unaware of what kind of conduct constitutes sexual harassment, including sexual violence, or that such conduct is prohibited sex discrimination. OCR therefore recommends that a recipient's nondiscrimination policy state that prohibited sex discrimination covers sexual harassment, including sexual violence, and that the policy include examples of the types of conduct that it covers.

### (B) *Title IX Coordinator*

The Title IX regulations require a recipient to notify all students and employees of the name or title and contact information of the person designated to coordinate the recipient's compliance with Title IX.[20] The coordinator's responsibilities include overseeing all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints. The Title IX coordinator or designee should be available to meet with students as needed. If a recipient designates more than one Title IX coordinator, the notice should describe each coordinator's responsibilities (*e.g.*, who will handle complaints by students, faculty, and other employees). The recipient should designate one coordinator as having ultimate oversight responsibility, and the other coordinators should have titles clearly showing that they are in a deputy or supporting role to the senior coordinator. The Title IX coordinators should not have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest.

Recipients must ensure that employees designated to serve as Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the recipient's grievance procedures operate. Because sexual violence complaints often are filed with the school's law enforcement unit, all school law enforcement unit employees should receive training on the school's Title IX grievance procedures and any other procedures used for investigating reports of sexual violence. In addition, these employees should receive copies of the school's Title IX policies. Schools should instruct law enforcement unit employees both to notify complainants of their right to file a Title IX sex discrimination complaint with the school in addition to filing a criminal complaint, and to report incidents of sexual violence to the Title IX coordinator if the complainant consents. The school's Title IX coordinator or designee should be available to provide assistance to school law enforcement unit employees regarding how to respond appropriately to reports of sexual violence. The Title IX coordinator also should be given access to school law enforcement unit investigation notes

---

[20] *Id.* § 106.8(a).

and findings as necessary for the Title IX investigation, so long as it does not compromise the criminal investigation.

(C) *Grievance Procedures*

The Title IX regulations require all recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of sex discrimination complaints.[21] The grievance procedures must apply to sex discrimination complaints filed by students against school employees, other students, or third parties.

Title IX does not require a recipient to provide separate grievance procedures for sexual harassment and sexual violence complaints. Therefore, a recipient may use student disciplinary procedures or other separate procedures to resolve such complaints. Any procedures used to adjudicate complaints of sexual harassment or sexual violence, including disciplinary procedures, however, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution.[22] These requirements are discussed in greater detail below. If the recipient relies on disciplinary procedures for Title IX compliance, the Title IX coordinator should review the recipient's disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX.[23]

Grievance procedures generally may include voluntary informal mechanisms (*e.g.*, mediation) for resolving some types of sexual harassment complaints. OCR has frequently advised recipients, however, that it is improper for a student who complains of harassment to be required to work out the problem directly with the alleged perpetrator, and certainly not without appropriate involvement by the school (*e.g.*, participation by a trained counselor, a trained mediator, or, if appropriate, a teacher or administrator). In addition, as stated in the *2001 Guidance*, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. Moreover, in cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis. OCR recommends that recipients clarify in their grievance procedures that mediation will not be used to resolve sexual assault complaints.

---

[21] *Id.* § 106.8(b). Title IX also requires recipients to adopt and publish grievance procedures for employee complaints of sex discrimination.

[22] These procedures must apply to all students, including athletes. If a complaint of sexual violence involves a student athlete, the school must follow its standard procedures for resolving sexual violence complaints. Such complaints must not be addressed solely by athletics department procedures. Additionally, if an alleged perpetrator is an elementary or secondary student with a disability, schools must follow the procedural safeguards in the Individuals with Disabilities Education Act (at 20 U.S.C. § 1415 and 34 C.F.R. §§ 300.500-300.519, 300.530-300.537) as well as the requirements of Section 504 of the Rehabilitation Act of 1973 (at 34 C.F.R. §§ 104.35-104.36) when conducting the investigation and hearing.

[23] A school may not absolve itself of its Title IX obligations to investigate and resolve complaints of sexual harassment or violence by delegating, whether through express contractual agreement or other less formal arrangement, the responsibility to administer school discipline to school resource officers or "contract" law enforcement officers. *See* 34 C.F.R. § 106.4.

Page 9 – Dear Colleague Letter: Sexual Violence

_Prompt and Equitable Requirements_

As stated in the _2001 Guidance_, OCR has identified a number of elements in evaluating whether
a school's grievance procedures provide for prompt and equitable resolution of sexual
harassment complaints. These elements also apply to sexual violence complaints because, as
explained above, sexual violence is a form of sexual harassment. OCR will review all aspects of a
school's grievance procedures, including the following elements that are critical to achieve
compliance with Title IX:

- Notice to students, parents of elementary and secondary students, and employees of
  the grievance procedures, including where complaints may be filed;
- Application of the procedures to complaints alleging harassment carried out by
  employees, other students, or third parties;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity
  for both parties to present witnesses and other evidence;
- Designated and reasonably prompt time frames for the major stages of the complaint
  process;
- Notice to parties of the outcome of the complaint;[24] and
- An assurance that the school will take steps to prevent recurrence of any harassment
  and to correct its discriminatory effects on the complainant and others, if appropriate.

As noted in the _2001 Guidance_, procedures adopted by schools will vary in detail, specificity,
and components, reflecting differences in the age of students, school sizes and administrative
structures, State or local legal requirements, and past experiences. Although OCR examines
whether all applicable elements are addressed when investigating sexual harassment
complaints, this letter focuses on those elements where our work indicates that more
clarification and explanation are needed, including:

(A) _Notice of the grievance procedures_

The procedures for resolving complaints of sex discrimination, including sexual harassment,
should be written in language appropriate to the age of the school's students, easily
understood, easily located, and widely distributed. OCR recommends that the grievance
procedures be prominently posted on school Web sites; sent electronically to all members of
the school community; available at various locations throughout the school or campus; and
summarized in or attached to major publications issued by the school, such as handbooks,
codes of conduct, and catalogs for students, parents of elementary and secondary students,
faculty, and staff.

(B) _Adequate, Reliable, and Impartial Investigation of Complaints_

OCR's work indicates that a number of issues related to an adequate, reliable, and impartial
investigation arise in sexual harassment and violence complaints. In some cases, the conduct

---

[24] "Outcome" does not refer to information about disciplinary sanctions unless otherwise noted. Notice of the
outcome is discussed in greater detail in Section D below.

may constitute both sexual harassment under Title IX and criminal activity. Police investigations may be useful for fact-gathering; but because the standards for criminal investigations are different, police investigations or reports are not determinative of whether sexual harassment or violence violates Title IX. Conduct may constitute unlawful sexual harassment under Title IX even if the police do not have sufficient evidence of a criminal violation. In addition, a criminal investigation into allegations of sexual violence does not relieve the school of its duty under Title IX to resolve complaints promptly and equitably.

A school should notify a complainant of the right to file a criminal complaint, and should not dissuade a victim from doing so either during or after the school's internal Title IX investigation. For instance, if a complainant wants to file a police report, the school should not tell the complainant that it is working toward a solution and instruct, or ask, the complainant to wait to file the report.

Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime. Any agreement or Memorandum of Understanding (MOU) with a local police department must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation.[25] Moreover, nothing in an MOU or the criminal investigation itself should prevent a school from notifying complainants of their Title IX rights and the school's grievance procedures, or from taking interim steps to ensure the safety and well-being of the complainant and the school community while the law enforcement agency's fact-gathering is in progress. OCR also recommends that a school's MOU include clear policies on when a school will refer a matter to local law enforcement.

As noted above, the Title IX regulation requires schools to provide equitable grievance procedures. As part of these procedures, schools generally conduct investigations and hearings to determine whether sexual harassment or violence occurred. In addressing complaints filed with OCR under Title IX, OCR reviews a school's procedures to determine whether the school is using a preponderance of the evidence standard to evaluate complaints. The Supreme Court has applied a preponderance of the evidence standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e et seq. Like Title IX,

---

[25] In one recent OCR sexual violence case, the prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances.

Title VII prohibits discrimination on the basis of sex.[26] OCR also uses a preponderance of the evidence standard when it resolves complaints against recipients. For instance, OCR's Case Processing Manual requires that a noncompliance determination be supported by the preponderance of the evidence when resolving allegations of discrimination under all the statutes enforced by OCR, including Title IX.[27] OCR also uses a preponderance of the evidence standard in its fund termination administrative hearings.[28] Thus, in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred). The "clear and convincing" standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred), currently used by some schools, is a higher standard of proof. Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX. Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.

Throughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence. The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing.[29] For example, a school should not conduct a pre-hearing meeting during which only the alleged perpetrator is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the complainant; a hearing officer or disciplinary board should not allow only the alleged perpetrator to present character witnesses at a hearing; and a school should not allow the alleged perpetrator to review the complainant's

---

[26] See, e.g., Desert Palace, Inc. v. Costa, 539 U.S. 90, 99 (2003) (noting that under the "conventional rule of civil litigation," the preponderance of the evidence standard generally applies in cases under Title VII); Price Waterhouse v. Hopkins, 490 U.S. 228, 252-55 (1989) (approving preponderance standard in Title VII sex discrimination case) (plurality opinion); id. at 260 (White, J., concurring in the judgment); id. at 261 (O'Connor, J., concurring in the judgment). The 2001 Guidance noted (on page vi) that "[w]hile Gebser and Davis made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the Davis Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX." See also Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

[27] OCR's Case Processing Manual is available on the Department's Web site, at http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html.

[28] The Title IX regulations adopt the procedural provisions applicable to Title VI of the Civil Rights Act of 1964. See 34 C.F.R. § 106.71 ("The procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference."). The Title VI regulations apply the Administrative Procedure Act to administrative hearings required prior to termination of Federal financial assistance and require that termination decisions be "supported by and in accordance with the reliable, probative and substantial evidence." 5 U.S.C. § 556(d). The Supreme Court has interpreted "reliable, probative and substantial evidence" as a direction to use the preponderance standard. See Steadman v. SEC, 450 U.S. 91, 98-102 (1981).

[29] Access to this information must be provided consistent with FERPA. For example, if a school introduces an alleged perpetrator's prior disciplinary records to support a tougher disciplinary penalty, the complainant would not be allowed access to those records. Additionally, access should not be given to privileged or confidential information. For example, the alleged perpetrator should not be given access to communications between the complainant and a counselor or information regarding the complainant's sexual history.

Page 12 – Dear Colleague Letter: Sexual Violence

statement without also allowing the complainant to review the alleged perpetrator's statement.

While OCR does not require schools to permit parties to have lawyers at any stage of the proceedings, if a school chooses to allow the parties to have their lawyers participate in the proceedings, it must do so equally for both parties. Additionally, any school-imposed restrictions on the ability of lawyers to speak or otherwise participate in the proceedings should apply equally. OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment. OCR also recommends that schools provide an appeals process. If a school provides for appeal of the findings or remedy, it must do so for both parties. Schools must maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings.

All persons involved in implementing a recipient's grievance procedures (e.g., Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures. The training also should include applicable confidentiality requirements. In sexual violence cases, the fact-finder and decision-maker also should have adequate training or knowledge regarding sexual violence.[30] Additionally, a school's investigation and hearing processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed.

Public and state-supported schools must provide due process to the alleged perpetrator. However, schools should ensure that steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant.

### (C) Designated and Reasonably Prompt Time Frames

OCR will evaluate whether a school's grievance procedures specify the time frames for all major stages of the procedures, as well as the process for extending timelines. Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable. Both parties should be given periodic status updates. Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint. Whether OCR considers complaint resolutions to be timely, however, will vary depending on the complexity of the investigation and the severity and extent of the harassment. For example, the resolution of a complaint involving multiple incidents with multiple complainants likely would take longer than one involving a single incident that

---

[30] For instance, if an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner.

Page 13 – Dear Colleague Letter: Sexual Violence

occurred in a classroom during school hours with a single complainant.

(D) *Notice of Outcome*

Both parties must be notified, in writing, about the outcome of both the complaint and any appeal,[31] *i.e.*, whether harassment was found to have occurred. OCR recommends that schools provide the written determination of the final outcome to the complainant and the alleged perpetrator concurrently. Title IX does not require the school to notify the alleged perpetrator of the outcome before it notifies the complainant.

Due to the intersection of Title IX and FERPA requirements, OCR recognizes that there may be confusion regarding what information a school may disclose to the complainant.[32] FERPA generally prohibits the nonconsensual disclosure of personally identifiable information from a student's "education record." However, as stated in the *2001 Guidance*, FERPA permits a school to disclose to the harassed student information about the sanction imposed upon a student who was found to have engaged in harassment when the sanction directly relates to the harassed student. This includes an order that the harasser stay away from the harassed student, or that the harasser is prohibited from attending school for a period of time, or transferred to other classes or another residence hall.[33] Disclosure of other information in the student's "education record," including information about sanctions that do not relate to the harassed student, may result in a violation of FERPA.

Further, when the conduct involves a crime of violence or a non-forcible sex offense,[34] FERPA permits a postsecondary institution to disclose to the alleged victim the final results of a

---

[31] As noted previously, "outcome" does not refer to information about disciplinary sanctions unless otherwise noted.

[32] In 1994, Congress amended the General Education Provisions Act (GEPA), of which FERPA is a part, to state that nothing in GEPA "shall be construed to affect the applicability of title VI of the Civil Rights Act of 1964, title IX of Education Amendments of 1972, title V of the Rehabilitation Act of 1973, the Age Discrimination Act, or other statutes prohibiting discrimination, to any applicable program." 20 U.S.C. § 1221(d). The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between the requirements of FERPA and the requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. *See 2001 Guidance* at vii.

[33] This information directly relates to the complainant and is particularly important in sexual harassment cases because it affects whether a hostile environment has been eliminated. Because seeing the perpetrator may be traumatic, a complainant in a sexual harassment case may continue to be subject to a hostile environment if he or she does not know when the perpetrator will return to school or whether he or she will continue to share classes or a residence hall with the perpetrator. This information also directly affects a complainant's decision regarding how to work with the school to eliminate the hostile environment and prevent its recurrence. For instance, if a complainant knows that the perpetrator will not be at school or will be transferred to other classes or another residence hall for the rest of the year, the complainant may be less likely to want to transfer to another school or change classes, but if the perpetrator will be returning to school after a few days or weeks, or remaining in the complainant's classes or residence hall, the complainant may want to transfer schools or change classes to avoid contact. Thus, the complainant cannot make an informed decision about how best to respond without this information.

[34] Under the FERPA regulations, crimes of violence include arson; assault offenses (aggravated assault, simple assault, intimidation); burglary; criminal homicide (manslaughter by negligence); criminal homicide (murder and

disciplinary proceeding against the alleged perpetrator, regardless of whether the institution concluded that a violation was committed.[35] Additionally, a postsecondary institution may disclose to anyone—not just the alleged victim—the final results of a disciplinary proceeding if it determines that the student is an alleged perpetrator of a crime of violence or a non-forcible sex offense, and, with respect to the allegation made, the student has committed a violation of the institution's rules or policies.[36]

Postsecondary institutions also are subject to additional rules under the Clery Act. This law, which applies to postsecondary institutions that participate in Federal student financial aid programs, requires that "both the accuser and the accused must be informed of the outcome[37] of any institutional disciplinary proceeding brought alleging a sex offense."[38] Compliance with this requirement does not constitute a violation of FERPA. Furthermore, the FERPA limitations on redisclosure of information do not apply to information that postsecondary institutions are required to disclose under the Clery Act.[39] Accordingly, postsecondary institutions may not require a complainant to abide by a nondisclosure agreement, in writing or otherwise, that would prevent the redisclosure of this information.

## Steps to Prevent Sexual Harassment and Sexual Violence and Correct its Discriminatory Effects on the Complainant and Others

### Education and Prevention

In addition to ensuring full compliance with Title IX, schools should take proactive measures to prevent sexual harassment and violence. OCR recommends that all schools implement preventive education programs and make victim resources, including comprehensive victim services, available. Schools may want to include these education programs in their (1) orientation programs for new students, faculty, staff, and employees; (2) training for students who serve as advisors in residence halls; (3) training for student athletes and coaches; and (4) school assemblies and "back to school nights." These programs should include a

---

non-negligent manslaughter); destruction, damage or vandalism of property; kidnapping/abduction; robbery; and forcible sex offenses. Forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include rape, sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses are incest and statutory rape. 34 C.F.R. Part 99, App. A.

[35] 34 C.F.R. § 99.31(a)(13). For purposes of 34 C.F.R. §§ 99.31(a)(13)-(14), disclosure of "final results" is limited to the name of the alleged perpetrator, any violation found to have been committed, and any sanction imposed against the perpetrator by the school. 34 C.F.R. § 99.39.

[36] 34 C.F.R. § 99.31(a)(14).

[37] For purposes of the Clery Act, "outcome" means the institution's final determination with respect to the alleged sex offense and any sanctions imposed against the accused. 34 C.F.R. § 668.46(b)(11)(vi)(B).

[38] 34 C.F.R. § 668.46(b)(11)(vi)(B). Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the person is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses include incest and statutory rape. 34 C.F.R. Part 668, Subpt. D, App. A.

[39] 34 C.F.R. § 99.33(c).

discussion of what constitutes sexual harassment and sexual violence, the school's policies and disciplinary procedures, and the consequences of violating these policies.

The education programs also should include information aimed at encouraging students to report incidents of sexual violence to the appropriate school and law enforcement authorities. Schools should be aware that victims or third parties may be deterred from reporting incidents if alcohol, drugs, or other violations of school or campus rules were involved.[40] As a result, schools should consider whether their disciplinary policies have a chilling effect on victims' or other students' reporting of sexual violence offenses. For example, OCR recommends that schools inform students that the schools' primary concern is student safety, that any other rules violations will be addressed separately from the sexual violence allegation, and that use of alcohol or drugs never makes the victim at fault for sexual violence.

OCR also recommends that schools develop specific sexual violence materials that include the schools' policies, rules, and resources for students, faculty, coaches, and administrators. Schools also should include such information in their employee handbook and any handbooks that student athletes and members of student activity groups receive. These materials should include where and to whom students should go if they are victims of sexual violence. These materials also should tell students and school employees what to do if they learn of an incident of sexual violence. Schools also should assess student activities regularly to ensure that the practices and behavior of students do not violate the schools' policies against sexual harassment and sexual violence.

**Remedies and Enforcement**

As discussed above, if a school determines that sexual harassment that creates a hostile environment has occurred, it must take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects. In addition to counseling or taking disciplinary action against the harasser, effective corrective action may require remedies for the complainant, as well as changes to the school's overall services or policies. Examples of these actions are discussed in greater detail below.

Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should undertake these steps promptly once it has notice of a sexual harassment or violence allegation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow students to change academic or living situations as appropriate. For instance, the school may prohibit the alleged perpetrator from having any contact with the complainant pending the results of the school's investigation. When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the

[40] The Department's Higher Education Center for Alcohol, Drug Abuse, and Violence Prevention (HEC) helps campuses and communities address problems of alcohol, other drugs, and violence by identifying effective strategies and programs based upon the best prevention science. Information on HEC resources and technical assistance can be found at www.higheredcenter.org.

complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain. In addition, schools should ensure that complainants are aware of their Title IX rights and any available resources, such as counseling, health, and mental health services, and their right to file a complaint with local law enforcement.[41]

Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment. At a minimum, schools must ensure that complainants and their parents, if appropriate, know how to report any subsequent problems, and should follow-up with complainants to determine whether any retaliation or new incidents of harassment have occurred.

When OCR finds that a school has not taken prompt and effective steps to respond to sexual harassment or violence, OCR will seek appropriate remedies for both the complainant and the broader student population. When conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation.

Schools should proactively consider the following remedies when determining how to respond to sexual harassment or violence. These are the same types of remedies that OCR would seek in its cases.

Depending on the specific nature of the problem, remedies for the complainant might include, but are not limited to:[42]
- providing an escort to ensure that the complainant can move safely between classes and activities;
- ensuring that the complainant and alleged perpetrator do not attend the same classes;
- moving the complainant or alleged perpetrator to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;
- providing counseling services;
- providing medical services;
- providing academic support services, such as tutoring;

---

[41] The Clery Act requires postsecondary institutions to develop and distribute a statement of policy that informs students of their options to notify proper law enforcement authorities, including campus and local police, and the option to be assisted by campus personnel in notifying such authorities. The policy also must notify students of existing counseling, mental health, or other student services for victims of sexual assault, both on campus and in the community. 20 U.S.C. §§ 1092(f)(8)(B)(v)-(vi).
[42] Some of these remedies also can be used as interim measures before the school's investigation is complete.

- arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record; and
- reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the harassment and the misconduct that may have resulted in the complainant being disciplined.[43]

Remedies for the broader student population might include, but are not limited to:
*Counseling and Training*
- offering counseling, health, mental health, or other holistic and comprehensive victim services to all students affected by sexual harassment or sexual violence, and notifying students of campus and community counseling, health, mental health, and other student services;
- designating an individual from the school's counseling center to be "on call" to assist victims of sexual harassment or violence whenever needed;
- training the Title IX coordinator and any other employees who are involved in processing, investigating, or resolving complaints of sexual harassment or sexual violence, including providing training on:
  o the school's Title IX responsibilities to address allegations of sexual harassment or violence
  o how to conduct Title IX investigations
  o information on the link between alcohol and drug abuse and sexual harassment or violence and best practices to address that link;
- training all school law enforcement unit personnel on the school's Title IX responsibilities and handling of sexual harassment or violence complaints;
- training all employees who interact with students regularly on recognizing and appropriately addressing allegations of sexual harassment or violence under Title IX; and
- informing students of their options to notify proper law enforcement authorities, including school and local police, and the option to be assisted by school employees in notifying those authorities.

*Development of Materials and Implementation of Policies and Procedures*
- developing materials on sexual harassment and violence, which should be distributed to students during orientation and upon receipt of complaints, as well as widely posted throughout school buildings and residence halls, and which should include:
  o what constitutes sexual harassment or violence
  o what to do if a student has been the victim of sexual harassment or violence
  o contact information for counseling and victim services on and off school grounds
  o how to file a complaint with the school
  o how to contact the school's Title IX coordinator

---

[43] For example, if the complainant was disciplined for skipping a class in which the harasser was enrolled, the school should review the incident to determine if the complainant skipped the class to avoid contact with the harasser.

- o   what the school will do to respond to allegations of sexual harassment or violence, including the interim measures that can be taken
- requiring the Title IX coordinator to communicate regularly with the school's law enforcement unit investigating cases and to provide information to law enforcement unit personnel regarding Title IX requirements;[44]
- requiring the Title IX coordinator to review all evidence in a sexual harassment or sexual violence case brought before the school's disciplinary committee to determine whether the complainant is entitled to a remedy under Title IX that was not available through the disciplinary committee;[45]
- requiring the school to create a committee of students and school officials to identify strategies for ensuring that students:
  - o   know the school's prohibition against sex discrimination, including sexual harassment and violence
  - o   recognize sex discrimination, sexual harassment, and sexual violence when they occur
  - o   understand how and to whom to report any incidents
  - o   know the connection between alcohol and drug abuse and sexual harassment or violence
  - o   feel comfortable that school officials will respond promptly and equitably to reports of sexual harassment or violence;
- issuing new policy statements or other steps that clearly communicate that the school does not tolerate sexual harassment and violence and will respond to any incidents and to any student who reports such incidents; and
- revising grievance procedures used to handle sexual harassment and violence complaints to ensure that they are prompt and equitable, as required by Title IX.

*School Investigations and Reports to OCR*

- conducting periodic assessments of student activities to ensure that the practices and behavior of students do not violate the school's policies against sexual harassment and violence;
- investigating whether any other students also may have been subjected to sexual harassment or violence;
- investigating whether school employees with knowledge of allegations of sexual harassment or violence failed to carry out their duties in responding to those allegations;
- conducting, in conjunction with student leaders, a school or campus "climate check" to assess the effectiveness of efforts to ensure that the school is free from sexual harassment and violence, and using the resulting information to inform future proactive steps that will be taken by the school; and

---

[44] Any personally identifiable information from a student's education record that the Title IX coordinator provides to the school's law enforcement unit is subject to FERPA's nondisclosure requirements.

[45] For example, the disciplinary committee may lack the power to implement changes to the complainant's class schedule or living situation so that he or she does not come in contact with the alleged perpetrator.

Page 19 – Dear Colleague Letter: Sexual Violence

- submitting to OCR copies of all grievances filed by students alleging sexual harassment or violence, and providing OCR with documentation related to the investigation of each complaint, such as witness interviews, investigator notes, evidence submitted by the parties, investigative reports and summaries, any final disposition letters, disciplinary records, and documentation regarding any appeals.

## Conclusion

The Department is committed to ensuring that all students feel safe and have the opportunity to benefit fully from their schools' education programs and activities. As part of this commitment, OCR provides technical assistance to assist recipients in achieving voluntary compliance with Title IX.

If you need additional information about Title IX, have questions regarding OCR's policies, or seek technical assistance, please contact the OCR enforcement office that serves your state or territory. The list of offices is available at http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. Additional information about addressing sexual violence, including victim resources and information for schools, is available from the U.S. Department of Justice's Office on Violence Against Women (OVW) at http://www.ovw.usdoj.gov/.[46]

Thank you for your prompt attention to this matter. I look forward to continuing our work together to ensure that all students have an equal opportunity to learn in a safe and respectful school climate.

Sincerely,

/s/

Russlynn Ali
Assistant Secretary for Civil Rights

---

[46] OVW also administers the Grants to Reduce Domestic Violence, Dating Violence, Sexual Assault, and Stalking on Campus Program. This Federal funding is designed to encourage institutions of higher education to adopt comprehensive, coordinated responses to domestic violence, dating violence, sexual assault, and stalking. Under this competitive grant program, campuses, in partnership with community-based nonprofit victim advocacy organizations and local criminal justice or civil legal agencies, must adopt protocols and policies to treat these crimes as serious offenses and develop victim service programs and campus policies that ensure victim safety, offender accountability, and the prevention of such crimes. OVW recently released the first solicitation for the Services, Training, Education, and Policies to Reduce Domestic Violence, Dating Violence, Sexual Assault and Stalking in Secondary Schools Grant Program. This innovative grant program will support a broad range of activities, including training for school administrators, faculty, and staff; development of policies and procedures for responding to these crimes; holistic and appropriate victim services; development of effective prevention strategies; and collaborations with mentoring organizations to support middle and high school student victims.

# EXHIBIT E

Westlaw.

Not Reported in N.E.2d, 1993 WL 818618 (Mass.Super.)
(Cite as: 1993 WL 818618 (Mass.Super.))

▷
Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
Jeffrey W. BUCKHOLZ
v.
MASSACHUSETTS INSTITUTE OF TECHNOL-
OGY et al.[FN1]

> FN1. Paul Gray, in his capacity as President
> of MIT, Robert Randolph, individually and
> in his capacity as an agent of MIT, Leo Os-
> good, individually and in his capacity as an
> agent of MIT, Elias Gyftopoulos, in his ca-
> pacity as an agent of MIT, Shirley McBay, in
> her capacity as an agent of MIT, John Upgren
> and the Committee on Discipline and its
> members, William M. Deed, John G. Kassa-
> kian, Lucian W. Pye, William C. Wheaton,
> Mark S. Wrighton, Stephen W. Altes, Eric B.
> Chan, Kevin R. Foote, John M. Lee and
> Ricky Lynch, in their representative capaci-
> ties.

No. 852720.
July 6, 1993.

MEMORANDUM OF LAW AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT
LOPEZ, Judge.

*1 This case is before the court on the defendants'
motion for summary judgment. The plaintiff, Jeffrey
Buckholz, alleges that he was expelled from the
Massachusetts Institute of Technology ("MIT") as a
result of a disciplinary proceeding that was biased and
conducted in a manner that violated MIT's internal
disciplinary procedures. Buckholz also alleges slander
and invasion of privacy against various MIT admin-
istrators and faculty.

MIT now moves for summary judgment on behalf
of all defendants on the grounds that it violated none
of its internal procedures, that Buckholz can produce
no facts showing actual bias in the disciplinary hear-
ing, that all allegedly slanderous communications

were either privileged, non-actionable statements of
opinion or caused Buckholz no damage, and that no
private facts were revealed. Buckholz disputes the
interpretation of MIT's disciplinary procedures,
presents specific facts purporting to establish a triable
issue as to bias, and disputes whether the allegedly
slanderous statements were opinions. For the follow-
ing reasons, MIT's motion is allowed in part and de-
nied in part.

BACKGROUND
    The undisputed material facts are as follows.
Jeffrey Buckholz ("Buckholz") and Warren Sheaffer
(" "Sheaffer") were both graduate students in the
Transportation Engineering Department at the Mas-
sachusetts Institute of Technology during the aca-
demic year 1984-1985. During that year, Sheaffer and
Buckholz developed a generalized animosity towards
each other, apparently because of comments each
made during various student and student/faculty
meetings.

    The conflict became physical in March of 1985.
During that month, the two students confronted each
other over Buckholz' inability to bring a friend on a
student ski trip Sheaffer had organized. At the con-
clusion of this confrontation, Buckholz attempted to
kick Sheaffer, but Sheaffer blocked the kick with his
arm.

    On March 19, 1985, apparently angry over the
fact that Sheaffer had spoken to the head of the
Transportation Engineering Department, Nigel Wil-
son, about his behavior, Buckholz confronted Sheaffer
in the basement hallway near Sheaffer's office. A fist
fight ensued, during which Buckholz subdued Sheaf-
fer and beat him severely about the face and head.
Several witnesses reported seeing Buckholz striking
Sheaffer after Sheaffer had ceased to resist. After the
fight, both Sheaffer and Buckholz filed criminal
complaints against one another. Both complaints were
eventually dropped after Buckholz agreed to pay
Sheaffer $500.00.

    Directly after the fight, there occurred a series of
meetings from which Buckholz draws his allegations
of bias and defamation. On the afternoon of March 19,
1985, Buckholz met with Nigel Wilson and Robert

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1993 WL 818618 (Mass.Super.)
(Cite as: 1993 WL 818618 (Mass.Super.))

Randolph, Associate Dean for the Office of the Dean of Student Affairs ("ODSA"), to relate his version of the fight. Randolph expressed his disbelief of Buckholz' version, and reacted angrily at Buckholz' suggestion that Randolph disassociate himself with the disciplinary process.

**\*2** On March 20, 1985, Paul Filipski, Buckholz' housemate, met with Randolph to discuss Filipski's fear for his own safety. Filipski related the details of two other violent incidents involving Buckholz, as well as unrelated threats he had overheard Buckholz make against him. In response to these details, Randolph commented that Buckholz was a violent person, was paranoid, had difficulty discerning between fantasy and reality, and predicted that Buckholz would be expelled and would react violently to the expulsion. At Randolph's suggestion, Filipski moved out of Buckholz' house a certain amount of time after these meetings. On March 22, 1985, Filipski asked his other housemate, Glen Herman, to attend a meeting between he and Randolph, during which Randolph repeated his comments regarding Buckholz' behavior and likely reaction to probable disciplinary sanctions. Though Filipski asked Herman to attend out of Filipski's concern for Herman's safety, Herman did not follow Randolph's advice that he move out of-the house he and Buckholz shared.

Sometime thereafter, Leo Osgood, Assistant Dean for Student Affairs and a subordinate of Randolph, met with Buckholz' office-mates, Simon Lewis and Nayel El-Sheffi. During this meeting, Osgood held up a picture depicting Sheaffer's face after the fight and asked "have you seen his face?" Osgood is the advising Dean to the Committee on Discipline ("COD"). He was responsible for giving and explaining to both Buckholz and Sheaffer copies of the discipline committee procedures, and for coordinating and facilitating the meetings and hearings held by the COD.

The remaining facts involve the conduct of the disciplinary proceeding that lead to Buckholz' expulsion. As a result of the fight, Sheaffer filed disciplinary charges against Buckholz, alleging that Buckholz had violated MIT policies by committing assault and battery. MIT's Student Bulletin provides for the existence of the Committee on Discipline, whose purpose it is to hear and adjudicate disciplinary complaints against students.[FN1] On March 25, 1985, Osgood gave

and explained to Buckholz the COD procedures. Despite the intervention of Bruce MacDonald, Buckholz' attorney, the committee would not permit MacDonald to represent Buckholz at the COD hearing. Nor would the COD postpone the hearing until after the disposition of Sheaffer's criminal complaint, despite language in the MIT Student Bulletin that states "if any infraction causes a student to be involved in both Institute judicial proceedings and court proceedings, and if an Institute decision might prejudice the court case, the Institute will usually hold its decision in abeyance until after the court proceedings have reached a conclusive point."

> [FN2]. The rules of the COD are contained in the committee's statement of procedures, which were provided to Buckholz and Sheaffer before the COD hearing, and state in relevant part:
>
> Statement of Discipline Committee Procedures
>
> THE COMMITTEE ON DISCIP-LINE-RULES AND REGULATIONS UNDER WHICH IT OPERATES
>
> The Committee on Discipline is a Standing Committee of the Faculty. Its function and membership is prescribed by the *Rules and Regulations of the Faculty*, paragraphs 1.74 and I.74.5:
>
> 75.5 "The Committee on Discipline shall consist of the Dean for Student Affairs, six elected members of the Faculty, a member appointed biennially by and from the Committee on Educational Policy, and three undergraduate and two graduate students selected according to procedures of the respective student governments, all with voting rights. The term of student members shall be one year. The Committee shall consider such cases of alleged misconduct as shall be brought to its attention by the Dean for Student Affairs. An accused student shall be given an opportunity to appear in person at a meeting of the Committee. If the findings of the Committee include a recommendation that a student be required to withdraw from the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1993 WL 818618 (Mass.Super.)
(Cite as: 1993 WL 818618 (Mass.Super.))

Institute, the recommendation with the findings shall be reported to the President for approval or disapproval; otherwise, the Committee shall act with power."

GENERAL PROCEDURES

Who May Bring Charges

Charges may originate from a variety of sources and correspond to a variety of misconduct. Anyone in the MIT Community directly aggrieved may file a charge. Moreover, those who have responsibility for particular or general aspects of the Institute may originate charges of misconduct as they relate to the functions for which they are responsible. For example, the originator of a charge might be a department head, laboratory director, Chief of the Campus Patrol, Chairman of the faculty, administrative officer, officer of the student government, student residence officer, manager of facilities.

How Charges are Brought

A charge against a student (or students) and its documentation should be submitted to the Office of the Dean for Student Affairs (ODSA) by the complainant. If preferred, it may be sent directly to the Committee on Discipline. Once a charge has been initiated, a representative of the ODSA will contact the student (or students) being charged. Designated members of the ODSA offer guidance, information and advice to the complainant and to the student being charged at any time. Documentation of the charge is then transmitted to the Committee on Discipline if that Committee has not already received it directly for the complainant. Once the names of advisers and any witnesses have been submitted to the Committee, a hearing will be arranged by the Committee. The Chairman may convene the Committee to consider dismissal of the charge.

Off-campus misconduct is not a basis for disciplinary action unless it is considered a clear and present danger to the functions of the Institute. The Institute must determine its jurisdiction under this policy for each case.

C. Protection of the Rights of Students

In cases brought to the Committee, the following procedures are normally followed:

1. The Committee on Discipline (C.O.D.) consists of Faculty, students and the Dean for Student Affairs. No member of the Committee who is involved in a particular case will sit in judgment. A quorum consists of a majority of members. The Chairman may determine that, in the interest of efficiency, a panel shall act for the full Committee, using the same procedures and criteria for judgment. In such cases the panel consists of the Chairman of the Committee on Discipline, one Faculty and one student member and a representative from the Office of the Dean for Student Affairs (ODSA). The Dean for Student Affairs or the ODSA member functions as an ex-officio member and not as a voting member of the C.O.D. during a hearing. In all instances, copies of the charge brought before the C.O.D. will be distributed to all Committee members prior to the hearing of a case. Any member may volunteer to participate in the hearing or may request that the case be heard by a quorum of the Committee. If either the complainant or the accused student dissents from the judgement of the panel, he or she may appeal for a rehearing of the case by a quorum of the Committee. Such an appeal must be received by the Committee within ten working days from the date of the letter notifying them of the decision.

2. The student will be provided with a written copy of the charges against him or her with sufficient specificity and in sufficient time to prepare for the hearing. He or she is to be provided with a copy of the Discipline Committee Procedures and to be given ten class days in which to prepare

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1993 WL 818618 (Mass.Super.)
(Cite as: 1993 WL 818618 (Mass.Super.))

a response. A student may waive his or her right to this period in order to expedite the scheduling of a hearing. Witnesses to be called are to be identified to the Committee before the hearing.

3. The student has the right to assistance in the preparation of his or her defense from a member of the Faculty of administration, another student, or other person of his or her choice. He or she may ask the ODSA for referral to an adviser or counselor. The adviser or counselor may speak or question witnesses with the permission of the Committee.

4. The hearing is scheduled as soon as is feasible after the written charge and names of any witnesses and advisor have been received by the C.O.D. The student has a right to be present at the hearing and to be heard by the Committee. The refusal of a student to appear or to waive his or her right in writing shall not prevent the Committee from considering and dispos- ing of the case. The student may testify and present evidence and witnesses on his or her own behalf and may also question witnesses.

5. The decision of the C.O.D. is based only on properly acquired evidence introduced at the hearing. It is made in closed session following the hearing and transmitted to the student in writing. All decisions are by majority vote of members hearing the case. The Committee's judgement is final except in the case of recommendation for sus- pension or expulsion, when the final deci- sion rests with the President to whom the student may appeal.

6. The written decision or letter, with rea- sons for the decision, is kept in the ODSA as part of the student's file and in the Office of the C.O.D.

7. All meetings of the Committee and all hearings are closed to individuals who are not directly involved as the complainant, the defendant and his or her adviser or

counselor, and witnesses called in advance by each party.

II. SPECIFIC PROCEDURES

To permit an orderly sequence at the hearing, the Committee adheres to the following *"internal procedures:"*

1. Complainant's opening statement.

2. Statement by the student charged.

3. Witness (or witnesses) for the com- plainant testify.

4. Questioning of the complainant and witnesses by the student charged.

5. Witness (or witnesses) for the student charged testify.

6. Questioning of student charged and witnesses by the complainant. Committee members may ask questions at any time of any party.

After all testimony and statements have been completed and all questions asked, the hearing is concluded and the Commit- tee meets in executive session to consider the decision.

IV. SANCTIONS

Sanctions vary according to the serious- ness of the offense. Three general catego- ries of offenses are perceived: a) those impinging upon academic affairs and standards; b) those violating non-academic internal regulations or standards of con- duct of MIT and c) those against City, State and Federal Laws. Each case brought before the Committee on Discipline is treated individually. The case may be dismissed. The standard sanctions include a reprimand, informal probation, formal probation with or without monitoring, suspension and expulsion. In addition, sanctions may include requiring direct

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1993 WL 818618 (Mass.Super.)
(Cite as: 1993 WL 818618 (Mass.Super.))

restitution and/or designated service to the Community. The C.O.D. submits its recommendations with its findings for suspension and expulsion to the President for approval and action or disapproval.

On April 10, 1985 and April 12, 1985, Randolph attended two meetings of MIT personnel regarding the incident. At those meetings, members of the Transportation Engineering Department, the ODSA, campus police officials, and MIT's legal counsel discussed the level of anxiety in Buckholz' department resulting from the incident. At the first meeting, based upon these concerns and the concerns expressed by Filipski regarding Buckholz' behavior, it was decided that the disciplinary process should be expedited. During the second meeting, similar issues were discussed. Professor Elias Gyftopoulos attended these meetings. Gyftopoulos was the chairman of the COD and eventually participated in the COD hearing.

*3 The COD heard the matter on April 19, 1985. Though Buckholz represented himself, Associate Dean of Student Affairs Holly Heine attended as his advisor. Before the hearing, Buckholz attempted to retain an advisor from the ODSA to assist him at the hearing. Associate Dean Jean Richards of the ODSA declined to represent him, because information Randolph had given her had placed Buckholz in a "bad light." Though Holly Heine was appointed to assist him, Buckholz admits in his brief that he declined assistance because he believed the ODSA was biased against him. As a result of the hearing, the COD voted to recommend to MIT President Paul Gray that he expel Buckholz. After discussing the matter with Gyftopoulos and Nigel Wilson, Gray expelled Buckholz.[FN3]

> FN3. Buckholz refers to many other facts in his brief, including the fact that the ODSA asked him to agree to the COD hearing before the ten days the COD rules allowed him to prepare for the hearing had elapsed, and the fact that MIT counsel Thomas Henneberry told Randolph that Sheaffer's counsel threatened to sue MIT if Buckholz was not removed from campus. This court does not consider these facts material, as they do not address the behavior of the fact-finding body that recommended expulsion (the COD).

Buckholz now brings claims against MIT, Gyftopoulos, Randolph, Osgood, John Upgren, Dean of Student Affairs Shirley McBay, Gray, and the members of the COD, William M. Deed, John G. Kassakian, Lucian W. Pye, William C. Wheaton, Mark S. Wrighton, Stephen W. Altes, Eric B. Chan, Kevin R. Foote, John M. Lee and Ricky Lynch, in their representative capacities as agents of MIT and members of the COD, alleging that their conduct of the disciplinary process and hearing breached MIT's contract with Buckholz by disregarding MIT's own internal disciplinary procedures and by denying Buckholz his right to a disciplinary hearing conducted with "basic fairness." Buckholz also brings actions against MIT, Randolph, Osgood and Upgren, in their individual and representative capacities, for slander and against MIT, Randolph and Osgood, in their individual capacities, for invasion of privacy.

DISCUSSION

A. Disciplinary Proceeding

In general, a private university may not arbitrarily and capriciously expel a student. *Coveney v. President and Trustees of the College of the Holy Cross*, 388 Mass. 16, 19 (1983). This is a deferential standard requiring only that administrators act with reasonable grounds and in good faith. *Id*; see also *Hobert v. University of Chicago*, 751 F.Supp. 1294, 1301 (N.D.Ill.1990).

Where a university specifies disciplinary procedures, however, a student may have a contractual right to whatever procedural protections are described in a university's student handbook or disciplinary procedures manual. See *Coveney*, *supra*, at 21. Though *Coveney* only alluded to such rights, the First Circuit Court of Appeals, sitting in diversity, held that a student at a private university has a contract right to whatever procedural protections he or she could reasonably expect, based upon the terms manifested by the university. *Cloud v. Trustees of Boston University*, 720 F.2d 721, 724 (1983). The *Cloud* court also inferred, from dicta in *Coveney*, that any hearing required by the university's internal policies must be conducted with "basic fairness." *Cloud*, *supra*, at 725.

The *Cloud* court did not elucidate the exact meaning of the "basic fairness" standard it applied. In a similar case involving the internal disciplinary pro-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1993 WL 818618 (Mass.Super.)
(Cite as: 1993 WL 818618 (Mass.Super.))

cedures of a private university, the U.S. District Court for the Eastern District of Illinois stated that, to prevail on a breach of contract claim based upon university disciplinary procedures, a student must show that a disciplinary committee's decision "was made arbitrarily, capriciously and in bad faith." *Hobert v. University of Chicago, supra,* at 1300. The *Hobert* court further explained that a decision is arbitrary and capricious only if it is without any discernable rational basis. *Id.* at 1301. Moreover, in addressing the plaintiff's claims of bias, the *Hobert* court explained that a university disciplinary body is entitled to a presumption of integrity that is overcome by "a showing of actual bias such as animosity, prejudice, or a personal or financial stake in the outcome." *Id.* While *Hobert* and *Gorman v. University of Rhode Island,* 837 F.2d 7, 15 (1st Cir.1988) both hold that prior contact between members of a disciplinary committee and students does not alone indicate bias or impartiality, *Coveney* and *Cloud* go further, stating that prehearing knowledge of the facts of the incident giving rise to the hearing is not sufficient evidence of bias to avoid summary judgment. *Coveney, supra,* at 22; *Cloud, supra,* at 726. Finally, *Gorman* states that "the alleged prejudice of university hearing bodies must be based upon more than mere speculation and tenuous inferences." *Gorman, supra,* at 15.

  **\*4** Considering the foregoing, this court finds it is able to rule on only a portion of Buckholz' allegations concerning the COD hearing. Buckholz' claim that MIT failed to comply with its own internal procedures is essentially a question of contract interpretation, and is therefore amenable to summary judgment. See *Cloud, supra,* at 726. (Motion for summary judgment allowed.) Buckholz alleges that MIT violated its own internal disciplinary proceedings and therefore breached its contract with him by refusing to allow his attorney to represent him during the disciplinary hearing and by refusing to postpone the hearing until after the disposition of the criminal charges pending against him.

  In claiming that he had a contractual right to legal representation during his disciplinary hearing, Buckholz relies upon a portion of Section I(c)(3) of the Statement of Discipline Committee Procedures, which states "3. The student has the right to assistance in the preparation of his or her defense from a member of the faculty, administration, another student, or other person of his or her choice." The remainder of Section

I(c)(3) states that "the student may ask the Office of the Dean for Student Affairs for a referral to an advisor or a counselor," and that "the advisor or counselor may speak or question witnesses with the permission of the committee." Moreover, Section I(c)(6) clearly states that "all meetings of the committee and all hearings are closed to individuals who are not directly involved as the complainant, the defendant and his or her advisor or counselor, and witnesses called in advance by each party."

  Construing these provisions together as a single, rational document, it is clear that, regardless of who is involved in the pre-hearing preparations, only an advisor or counselor from the MIT community is permitted to represent a student at a disciplinary hearing, and then only with the permission of the disciplinary committee. See *U.S.M. Corp. v. Arthur D. Little Systems, Inc.,* 28 Mass.App.Ct. 108, 116 (1989) (clauses of a contract must be construed together so as to create a rational document). Buckholz himself admits in his deposition testimony that he understood advisor to refer to an academic advisor or counselor. Buckholz had no contractual right to representation by an attorney during the disciplinary hearing.

  Similarly, the committee's decision to conduct a hearing before the resolution of criminal charges against Buckholz did not violate Buckholz' contractual rights. This policy, contained in the MIT Student Bulletin, states, "If an infraction causes a student to be involved in both Institute judicial proceedings and court proceedings, and if an Institute decision might prejudice the court case, the Institute will *usually* hold its *decision* in abeyance until after the court proceedings have reached a conclusive point." (Emphasis added.) The plain language of the policy indicates that it is permissive, and that it applies to MIT's decision as to the disposition of a pending disciplinary proceeding, as opposed to the conduct of the hearing itself. Finally, Buckholz has failed to present specific facts showing that the decision to expedite the hearing prejudiced Buckholz' involvement with the criminal justice system.

  **\*5** This leaves the complex question of whether MIT is entitled to summary judgment upon Buckholz' claim that administration and COD bias denied him his right to a disciplinary hearing conducted with basic fairness. At the outset, this court notes that Buckholz has muddied the waters with numerous innuendo and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1993 WL 818618 (Mass.Super.)
(Cite as: 1993 WL 818618 (Mass.Super.))

immaterial facts, most notably the existence of bias against and fear of Buckholz in the campus community at large. No case cited considered facts that did not bear directly on the conduct of the individuals sitting in judgment at the hearing, and this court declines to do so. Evidence of the conduct of those uninvolved in the hearing is relevant only to the extent that it presents specific facts showing a triable issue as to whether the hearing itself was conducted unfairly, or whether the decision to expel is arbitrary and capricious.

Clearly, the decision to expel was not arbitrary and capricious. Though Buckholz disputes who started the fight, he does not dispute that he beat Sheaffer severely, that he had threatened Sheaffer in the past and that he was involved in other violent incidents. Thus, the COD had a rational reason to recommend the expulsion of Buckholz, and MIT President Paul Gray had a rational reason to accept the COD's recommendation. Moreover, Buckholz has failed to come forth with any improper acts on Gray's behalf. Buckholz has shown no contractual right to an interview with Gray prior to Gray's decision. Nor does Gray's consultation with Gyftopoulos and Wilson indicate any bias on Gray's part. In short, there is no evidence that Gray's actions were improper in any manner, or diverged from normal disciplinary procedures. The count against him is therefore dismissed.

Buckholz has, however, presented specific facts giving rise to the slightest of inferences of bias regarding the COD. Specifically, Buckholz has presented specific facts putting at issue whether Robert Randolph was prejudiced against Buckholz, and whether he had conveyed his prejudice to Professor Gyftopoulos during a meeting at which Buckholz' reputation was discussed.This, combined with excerpts from the COD hearing that create a triable issue as to whether Sheaffer enjoyed more credibility and sympathy than Buckholz, give rise to a triable issue as to whether the COD was biased against Buckholz. While this court considers this claim weak, it nevertheless feels compelled to let it go forward on this ground alone. In doing so, this court notes that both the *Hobert* and *Gorman* courts acted as fact finder and reviewed the record as such before finding that the record did not support allegations of bias. Though this court is tempted to review the hearing transcripts for evidence of bias, doing so would improperly impinge upon the province of the jury.

B. Defamation

Buckholz also brings actions for slander against Leo Osgood, Assistant Dean for Student Affairs, Robert Randolph, Associate Dean for Student Affairs, John Upgren and MIT.

a. Leo Osgood

*6 Buckholz alleges that Osgood defamed him during a meeting between Osgood and Buckholz' office-mates, Simon Lewis and Nayel El-Sheffi, at which Osgood displayed a photograph of Sheaffer's face after the fight and asked "have you seen his face?"

Osgood does not dispute the content of his remark. However, the statement does not support an action for slander. A statement is defamatory if it "hold [s] the plaintiff up to contempt, hatred, ridicule, scorn, or tends to impair his standing in the community." *Tantaglia v. Townsend,* 19 Mass.App.Ct. 693, 696 (1985). Statements of opinion, however, as opposed to statements of fact, are not actionable. *Id.* at 697. Whether a statement is one of fact is a question of law to be determined by the court. *Cole v. Westinghouse Broadcasting. Inc.,* 386 Mass. 303, 308-09 (1982).

The S.J.C. has distinguished between non-actionable statements of opinion based upon facts fully disclosed to the recipient of the statement, and actionable statements of mixed opinion and fact, or of opinion implying the existence of undisclosed defamatory facts. *Pritsker v. Brudnoy,* 389 Mass. 776, 779 (1983). To determine between actionable and non-actionable statements of opinion, a court must examine the statement in its entirety, the context in which the statement was made, and the facts surrounding the statement. *Cole, supra.*

Examining the context and circumstances surrounding Osgood's statements to Lewis and El-Sheffi, said statements are not actionable. Taken in context, Osgood's exclamation "Have you seen his face?" was an expression of his opinion regarding relative fault for the altercation, based upon his perception of the evidence portrayed by the photograph he displayed to Lewis and El-Sheffi. Whether or not his opinion was correct, it is clearly a non-actionable expression of opinion based upon facts familiar to all present at the meeting. As such, Osgood's statements are not ac-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1993 WL 818618 (Mass.Super.)
(Cite as: 1993 WL 818618 (Mass.Super.))

tionable as a matter of law.

b. Robert Randolph

Buckholz also alleges that Associate Dean for Student Affairs Robert Randolph slandered him during a meeting with Buckholz' housemates, Paul Filipski and Glen Herman, at which Randolph questioned Buckholz' mental stability, remarked upon Buckholz' perceived paranoia and propensity for violence, and predicted that Buckholz would react violently to anticipated disciplinary sanctions. Randolph replies that said statements were non-actionable statements of opinion, were privileged, and did not result in any harm to Buckholz. As this court finds that the statements were privileged, it is unnecessary to reach the issue of whether they were actionable or non-actionable.

Massachusetts recognizes a qualified privilege to publish defamatory statements "where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it." See *Bratt v. International Business Machines Corp.*, 392 Mass. 508, 513 n. 8 .(1984) (citing *Sheehan v. Tobin*, 326 Mass. 185, 190-91 (1950)). While originally intended to permit employers to give honest references to those seeking information regarding employees, the S.J.C. has applied it with some flexibility. See *Sheehan, supra*, at 191 (union members have an interest in the actions of their officers and committees).

*7 Such flexibility is warranted here. Buckholz has presented no facts disputing Filipski's affidavit testimony that he initiated the meetings with Randolph out of his own fear of Buckholz' behavior, and that he convinced Glen Herman to meet with Randolph because he feared for Herman's safety as well. When a student, feeling that his safety is threatened by another student, requests advice from an Associate Dean of Student Affairs, the opinions and advice given in response ought to be, and shall be treated by this court as, conditionally privileged. Such a privilege is lost only when a communication is "motivated by malice" or is made with reckless disregard for the truth, or was published excessively. *Bratt, supra*, at 514-15. In this particular case, Buckholz has presented no specific facts establishing that the statements were made maliciously, excessively published, or were made with reckless disregard for the truth. Given Filipski's testimony that he prompted Herman to visit Randolph,

publication to Herman was not excessive.

As Buckholz has failed to present specific facts showing that Randolph had abused his privilege, his defamation action must be dismissed.

c. John Upgren

Buckholz has failed to present any evidence to counter his original admission, contained in his answer to the defendant's interrogatory, that he knew of no statements made by John Upgren. His action against Upgren is therefore dismissed.

C. Invasion of Privacy

Buckholz' complaint also alleges invasion of privacy against Randolph. Though not specifically pled as such, this count appears to be an action for public disclosure of private facts pursuant to c. 214, § 1B. [FN4] General Laws c. 214, § 1B proscribes "disclosure of facts about an individual that are of a highly personal or intimate nature where there exists no legitimate countervailing interests." *Mulgrew v. Taunton*, 410 Mass. 631, 637 (1991).

> FN4. Chapter 214, § 1B states in relevant part: "A person shall have a right against unreasonable, substantial or serious interference with his privacy."

It strains credulity to allege that Randolph's discussions of facts known to those with whom he spoke may support an action for invasion of privacy. Buckholz does not dispute that the invasion of privacy count is based upon the same disclosures as his defamation claims. Nor does Buckholz dispute that the discussions between Buckholz, Filipski and Herman involved facts known to Filipski and Herman. Such discussions not involving the disclosure of unknown facts may not be the basis of a claim for invasion of privacy.

To the extent that Buckholz' allegations are based upon Randolph's activities during staff meetings prior to the disciplinary hearing, and to the extent that those attending the staff meeting did not already know of the facts revealed, this court finds there to be sufficient legitimate countervailing interests in Randolph's disclosures. Prohibiting the internal discussion of a university student's disciplinary problems among the staff members of that student's department and members of the ODSA, would impermissibly interfere with the

Not Reported in N.E.2d, 1993 WL 818618 (Mass.Super.)
**(Cite as: 1993 WL 818618 (Mass.Super.))**

university's ability to maintain discipline. Such inter-
ference is not favored, at least when, as here, the dis-
cussions did not involve information protected by
independent rules of confidentiality.[FN5] See *Cloud,*
*supra.*

> FN5. Indeed, since the discussions all in-
> volved Buckholz' prior altercations, all of
> which occurred in public in front of wit-
> nesses, this court wonders whether they in-
> volved private facts at all.

*8 Therefore, for similar reasons as those sup-
porting the application of a qualified privilege, this
court finds the existence of legitimate countervailing
interests to whatever minimal expectation of privacy
Buckholz may have had in the facts Randolph re-
vealed.

ORDER

For the foregoing reasons, this court hereby or-
ders that:

(1) with respect to Counts I, V, X, XIII, XIV, and
XVII of the plaintiff's complaint, to the extent that
these counts allege breach of contract based upon the
Massachusetts Institute of Technology's, its agents' or
employees' failure to adhere to its own disciplinary
rules, the defendants' motion for summary judgment is
ALLOWED; however, with respect to Counts I, V, X,
XIII, XIV and XVII of the plaintiff's complaint, in-
sofar as those counts allege a lack of basic fairness in
the university disciplinary hearing due to bias of the
Massachusetts Institute of Technology, its employees
or Agents, the defendants' motion for summary
judgment is DENIED; count IV is dismissed in its
entirety;

(2) with respect to Counts II, III, VI, VII, VIII, IX,
XI, XII and XV, the defendants' motion for summary
judgment is ALLOWED.

Mass.Super.,1993.
Buckholz v. Massachusetts Inst. of Technology
Not Reported in N.E.2d, 1993 WL 818618
(Mass.Super.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT F

# In The Matter Of:

*Bleiler v.*
*College of the Holy Cross*

*Hearing*
*May 18, 2011*

*Jones Reporting Company*
*Two Oliver Street, 8th Floor*
*Boston, MA  02109*

# Jones**Reporting**

*COMPANY*

Original File 2011 05 18 bleiler.prn
Min-U-Script® with Word Index

EXHIBIT
1
Greeley 8-2-12
BROAD 800-631-6989

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

**Page 1**

Pages: 123

COLLEGE OF THE HOLY CROSS
COMMUNITY STANDARDS BOARD

_ _ _ _ _ _ _ _ _ _
HEARING RE:
EDWIN BLEILER
_ _ _ _ _ _ _ _ _ _

BEFORE: Jude Kelly, Chairman
DATE: May 18, 2011

**Page 2**

1  PROCEEDINGS
2
3    CHAIRMAN: Okay. Good afternoon. My
4  name is Jude Kelly. I will serve as chair for
5  today's hearing. Today's date is Wednesday, May
6  18th. At this time, I will ask each party to
7  introduce themselves.
8    MS. MURPHY: I'm Caitlin Murphy.
9    MR. BLEILER: Edwin Bleiler.
10    CHAIRMAN: Thank you. Today's
11  hearing of the Community Standards Board is
12  called to consider the complaint filed by Caitlin
13  Murphy. This complaint alleges that there was a
14  violation of sexual misconduct on May 1, 2011.
15  Based on this complaint, Edwin Bleiler has been
16  charged with violation of sexual misconduct 1.
17    All participants in today's hearing
18  are expected to provide honest, accurate and
19  truthful information in a spirit dedicated to
20  making a fair decision. Dishonesty is taken very
21  seriously and may result in additional
22  disciplinary charges.
23    Caitlin, do you agree to provide
24  honest, accurate and truthful information today?

**Page 3**

1    MS. MURPHY: I do.
2    CHAIRMAN: Edwin, do you agree to
3  provide honest, accurate and truthful information
4  today?
5    MR. BLEILER: I do.
6    CHAIRMAN: Thank you. Okay. So now
7  I have to direct this to the witnesses: Do you
8  agree to provide accurate, truthful information
9  today?
10    (Witnesses respond; inaudible.)
11    CHAIRMAN: Thank you. And now at
12  this time we can excuse the witnesses, and please
13  wait in your designated waiting area until you
14  are called. We're just going to wait for Mr.
15  Irish to return.
16    Now I have a question for the
17  students. I understand that you have been
18  provided with the names of today's hearing board
19  members. Is this correct?
20    MS. MURPHY: Yes.
21    CHAIRMAN: Correct? Is this --
22  you've been provided the names? Okay. I also
23  understand you have communicated with Mr. Irish
24  about any possible objections to the panel. Is

**Page 4**

1  this correct?
2    MS. MURPHY: Yes.
3    CHAIRMAN: Correct? Okay. Now, are
4  there any objections?
5    MR. BLEILER: I did that.
6    CHAIRMAN: Oh, but at this stage, are
7  there -- you know, do you have an objections to
8  the board members that are here presently?
9    MR. BLEILER: (inaudible) express the
10  same concern I expressed to (inaudible).
11    MR. IRISH: We resolved that.
12    CHAIRMAN: That's been resolved.
13  Okay. Are there any other questions that either
14  of you have before the hearing begins? No
15  questions? No questions? Okay. Thank you.
16    Okay. We're going to start now with
17  opening statements, and we will start first with
18  Caitlin. And, Caitlin, could you please tell us
19  about this incident?
20    MS. MURPHY: In the early hours of
21  the morning on Sunday, May 1, 2011, I was raped
22  by Edwin Bleiler, and I'm here to hold this
23  person accountable for his wrongful decision and
24  actions.

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

Page 5

1  On the night in question, I had been
2  drinking. My friends and I decided to go to an
3  off-campus house and attend a party on Clay
4  Street. It was at this house that I realized I
5  was very inebriated. I vaguely remember leaving
6  this house, and we went to another house on One
7  Bowdoin. Here, I briefly saw Eddie while looking
8  for a bathroom, said hello, and went on my way.
9  I blacked out after this and cannot
10 remember anything until he was leading me to his
11 room, which I cannot remember going to. We were
12 kissing one second, and the next I realized that
13 I am no longer wearing any clothes, an action I
14 cannot remember happening.
15 He then shoves his fingers into my
16 vagina, which I protested, saying "no," and I
17 remember him telling me, "It's okay."
18 The next thing I know, he is forcing
19 his penis into my vagina. He did not ask and I
20 definitely did not consent and would not consent
21 to this. Prior to the rape, I was a virgin, with
22 every intention of saving myself for marriage.
23 When I finally got him off of me,
24 which was with difficulty, and for how long he

Page 6

1  was inside of me, I am not sure, I was visibly
2  upset and crying.
3  My memory from here is very foggy. I
4  remember that he asked if we could continue, to
5  which I said no, and I remember that he helped me
6  get dressed.
7  I do not remember how I left the
8  house or got back on campus, but the next thing I
9  remember is seeing my two friends, Jake Yiznitsky
10 and Beth Federici, who could see that I was not
11 my usual self, and upset. They convinced me to
12 go to Public Safety and ultimately to the
13 hospital.
14 According to the sexual misconduct
15 policy taken straight from the Holy Cross
16 website, consent may never be given by someone
17 who is incapacitated as a result of alcohol or
18 other drug consumption, voluntary or involuntary,
19 or those who are unconscious, unaware, or
20 otherwise visibly helpless.
21 My blacking in and out and physical
22 helplessness makes it clear that I was, without a
23 doubt, very much incapacitated, and there was no
24 way I was able to give effective consent. Not

Page 7

1  only has he violated me, he has violated this
2  community at Holy Cross.
3  CHAIRMAN: And we thank Caitlin for
4  her statement. Now, Edwin, could you please tell
5  us about this incident?
6  MR. BLEILER: My name is Edwin
7  Bleiler. I stand here before you accused of a
8  very horrible action, as you just heard
9  (inaudible). I still struggle, I don't have the
10 words to describe, you know, describe how
11 terribly sorry I am that both Ms. Murphy and
12 myself (inaudible).
13 I understand from the charges that
14 Ms. Murphy has accused me of taking advantage of
15 her in a state of intoxication in which she was
16 unable to consent. No matter the result of the
17 hearing today, I would like Ms. Murphy to know
18 that I would never have taken advantage of her if
19 I had believed that she was intoxicated or unable
20 to freely consent.
21 First off, I know that under --
22 according to the community standards of the
23 College of the Holy Cross, that there are strict
24 guidelines for what qualifies as sexual

Page 8

1  misconduct 1, for which I have been charged, and
2  also the statutes for intoxication, which speak
3  to the ability to give consent.
4  Secondly, on the matter of my own
5  personal standards, if I had thought that Ms.
6  Murphy was intoxicated or unable to freely
7  consent, I would never have had any sexual
8  contact with her.
9  You know, as Ms. Murphy has stated, I
10 ask the Board to consider two things, the
11 intoxication level of Ms. Murphy and the -- just
12 the -- the nature of the sexual conduct which is
13 going to be discussed.
14 On the night of April 30th and into
15 May 1st, I ran into Ms. Murphy at a party. From
16 there, I saw her briefly. From there, I -- from
17 there, we had -- didn't have contact.
18 I then was walking from the upstairs
19 in the party at One Bowdoin Street when I saw Ms.
20 Murphy again. We walked down the stairs together
21 as we were leaving the party. We hadn't -- we
22 had -- I had previously met Ms. Murphy and --
23 previous semester and we had, you know, had a
24 good time together at a party and had gone back

Jones Reporting Company
617-451-8900

Page 9

1  to her room later that night.
2      As we were walking down the stairs,
3  we hadn't had contact in a while, so we were
4  catching up, having a conversation about, "How
5  have you been, what's new," you know, that form
6  of conversation.
7      As we were walking out of this off-
8  campus house, I asked Ms. Murphy if she would
9  like to come back to my house with me, to which,
10  she had never been there before, but she said
11  yes.
12      From there, we walked from One
13  Bowdoin Street to my house at 38 Caro Street,
14  which is in -- you know, both -- both off-campus
15  houses in that Bowdoin/Caro Street area.
16      While walking, we continued to have
17  our conversation. At no point did I observe Ms.
18  Murphy stumble. At no point did I observe
19  bloodshot eyes. I did not smell any alcohol on
20  her. I did not watch her become unconscious. I
21  did not see any outrageous behaviors. And I did
22  not watch Ms. Murphy vomit.
23      Upon getting to my house, Miss Murphy
24  and I walked up to my second-floor apartment. I

Page 10

1  opened the door to the apartment, walked inside,
2  went up -- walked to my bedroom door, which I had
3  to unlock. I unlocked the door, opened it, and
4  Miss Murphy and myself walked inside.
5      At this point, we began -- we walked
6  over to the bed. We began kissing. Shortly
7  after, we began taking each other's clothes off.
8  Miss Murphy had to help me take off some of her
9  accessories; I could not figure out how to take
10  off her belt.
11      At this point, we continued kissing,
12  and Miss Murphy began to touch my penis with her
13  hand. This happened -- this went on for a short
14  period of time, after which Miss Murphy was on
15  top of me and began kissing me. It was at this
16  point when the intercourse first began. Shortly
17  after, we rolled over and continued the
18  intercourse.
19      After this, Miss -- shortly after
20  this, Miss Murphy kind of moved and ended the
21  intercourse, at which time, you know, I wasn't
22  really sure what she meant by this, by moving, so
23  I asked her, you know, if we could continue, to
24  which she said no. And I said I -- I said what

Page 11

1  -- you know, as a statement, said you've been
2  giving -- so I did not continue any sexual
3  intercourse at this time.
4      From this point on, Miss Murphy once
5  again began touching my penis with her hand, an
6  action which I ended before the action had been
7  complete.
8      At this time, Miss Murphy informed me
9  that she was tired, and I -- as she got dressed,
10  I, you know, helped her find some of her clothes
11  throughout my room. She asked me where the
12  bathroom was before she left, used the bathroom,
13  and then left. And from that point on, I had no
14  further contact with her.
15      CHAIRMAN: And we thank Edwin for his
16  statement.
17      Now, at this point in the hearing, we
18  will move on to the phase of questioning. And at
19  this time, the hearing panel may ask questions of
20  either party. So now I'll turn this over to the
21  panel members to ask questions that they may have
22  for either Caitlin or Edwin.
23      MALE PANEL MEMBER: And if we could
24  just ask everyone just to speak up. We've got a

Page 12

1  little bit of a fan, and we do need -- we do
2  record, so...
3      FEMALE PANEL MEMBER: Edwin, had you
4  been drinking that evening?
5      MR. BLEILER: Yes, I had.
6      FEMALE PANEL MEMBER: Would you say
7  that you were intoxicated?
8      MR. BLEILER: I mean, I had --
9      FEMALE PANEL MEMBER: How many drinks
10  did you have?
11      MR. BLEILER: I had been drinking
12  earlier that day with friends. I consumed, you
13  know, a couple of drinks earlier in the day. I
14  had showered, changed, and then gone out for the
15  night, where I continued to drink with a couple
16  of friends. I mean, I don't really know exactly,
17  you know, how many, you know, number-wise. I
18  wouldn't say it was any ridiculous amount of
19  alcohol.
20      MALE PANEL MEMBER: Did you say you
21  were intoxicated, or you aren't intoxicated?
22      MR. BLEILER: What's that?
23      MALE PANEL MEMBER: Did you say you
24  were intoxicated?

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

**Page 13**

1  MR. BLEILER: I mean, I wouldn't say
2  I was -- you know, I would say I was -- I mean,
3  yes, I would say.
4  MALE PANEL MEMBER: If you can give
5  us a timeframe when you started drinking and when
6  you ended drinking?
7  MR. BLEILER: I probably started
8  drinking around probably, like, around 3:00 in
9  the afternoon. We had been to the baseball games
10 that day and then other, you know, other alumni
11 had come back to campus, so we had been drinking
12 earlier in the day. I drank for -- probably
13 drank for a couple -- a few hours there before
14 going to the baseball game, at which point I came
15 back, showered, changed, then I went out for the
16 night probably around 9:00, I'd say, I went back
17 out for the night and then continued drinking
18 then until about 12:00.
19 CHAIRMAN: I have a question for
20 Edwin. I was reading through your statement, and
21 you had mentioned in your statement that you had
22 been together sexually a few months before. Now,
23 could you elaborate on that?
24 MR. BLEILER: Yeah. I had -- the

**Page 14**

1  first time I had met Miss Murphy was the previous
2  semester. We met and then on -- we had been, you
3  know, hanging out at an on-campus party. After
4  that, we had gone back to her room, and at which time
5  we had made out and she had -- we had removed
6  some articles of clothing and she touched my --
7  touched my penis with her hand.
8  FEMALE PANEL MEMBER: Was that just
9  the only other occasion that you've gotten
10 together is just that one time in the previous
11 semester?
12 MR. BLEILER: Yeah, I mean, I had
13 texted her a few times afterwards just to, you
14 know, see -- but, I mean, it didn't -- we really
15 hadn't gone -- really hadn't gone anywhere, we
16 hadn't really had any contact after.
17 FEMALE PANEL MEMBER: So when she
18 left your apartment that night, did you walk her
19 down the stairs, did you walk her out --
20 MR. BLEILER: Uh, no, I --
21 FEMALE PANEL MEMBER: Is that --
22 MR. BLEILER: But I was -- I would
23 admit that I was a little confused with what had
24 happened, just because, I mean, we had started

**Page 15**

1  and stopped, and then I stopped, and then she had
2  said that she was tired, and then she, then she
3  went and used the bathroom. I kind of sat there
4  for a minute just -- I don't know, I wasn't sure
5  whether she was going to come back into the room
6  or anything at that point. And then when I got
7  up to see kind of what was going on, she -- I
8  just -- I could see her walking down the stairs
9  at that time. But I did not -- no, I did not
10 walk her out.
11 CHAIRMAN: Other questions from Board
12 members? I have one question for Caitlin.
13 Caitlin, there is -- I was reading through the
14 statements, and there was mention of a party that
15 was -- where the party was essentially kind of
16 cleared, where the owners kind of kicked
17 everybody out and said, you know, people have to
18 get out, that sort of a thing.
19 And my question for you is, when you
20 go to a party with a group of friends, which I
21 -- you know, it seems like you were there with a
22 number of other friends, would it be normal
23 behavior for you to leave the party without
24 mentioning that to those friends, or do you

**Page 16**

1  usually sort of meet up with people that you
2  arrived with before and tell everyone where
3  you're going?
4  MS. MURPHY: I usually leave the
5  party with the people I come with. It's not
6  like me to leave and not tell anyone where I was
7  going.
8  CHAIRMAN: Okay.
9  MALE PANEL MEMBER: This is, like, a
10 more direct question, and I'm sorry that we have
11 to go into this, but in his writings, he said
12 that you were on top. And could you tell me
13 what -- I know this is, like, really personal,
14 but what position do you remember having sex and
15 what, like, what actually -- like, was he
16 holding you down? What happened?
17 MS. MURPHY: I was on the bottom. I
18 never remember being on top. I was on the
19 bottom.
20 FEMALE PANEL MEMBER: As far as your
21 drinking habits go, is that something that you
22 do on a -- do you rarely drink? Do you drink,
23 you know, every weekend?
24 MS. MURPHY: I usually drink one to

Page 17

1 two times a week, um, but I don't get, I mean
2 black out as I did on the night in question.
3 Um, I did start drinking earlier in the night,
4 and that could have (inaudible), but I usually
5 don't overdo it.
6     FEMALE PANEL MEMBER: Because in one
7 of your statements, you did say that you drank
8 more than what you drank that night and never
9 had --
10     MS. MURPHY: Yeah.
11     FEMALE PANEL MEMBER: -- that type
12 of an effect, so --
13     MS. MURPHY: So I usually have a
14 really big tolerance, but that's why I'm
15 confused as to why I was so blacked out.
16     CHAIRMAN: And just following up
17 with that, were you drinking anything that
18 evening that you wouldn't normally have drunk,
19 like, I mean, different beverages than usual,
20 anything of that nature?
21     MS. MURPHY: No, it was pretty much
22 beer and then a mixed drink of Coke and vodka
23 and then beer again, so . . .
24     MALE PANEL MEMBER: Ed, you describe

Page 18

1 her behavior as being unusual, I put that in my
2 own words, that you said she stopped. Can you
3 explain that whole -- to me? Because right now
4 you're being very vague and I can't really
5 understand what you're trying to tell us.
6     MR. BLEILER: Um, yeah, she -- I
7 mean, it was more of a -- she just kind of --
8 she just kind of moved, just kind of moved in
9 the, in the sexual intercourse, just kind of
10 moved. Like, she just, like, moved back on the
11 bed, if you will. And at that -- you know, but
12 it wasn't like a -- I didn't see it as a, like,
13 a, like, push or, like -- not, like, being, like
14 -- not, like, pushing me away, but just, like,
15 more of a repositioning of herself.
16     I mean, and then at that point, the
17 intercourse was stopped, so I wasn't sure if she
18 wanted to continue or not, and that's when I
19 asked her if she --
20     MALE PANEL MEMBER: Can you go into
21 her behavior, how was she acting?
22     MR. BLEILER: What, I mean, what
23 exactly?
24     MALE PANEL MEMBER: Her demeanor on

Page 19

1 that night. Like, what was -- how was she
2 acting?  What was her behavior?
3     MR. BLEILER: Oh, I mean, like I
4 said in my statement, you know, as of that
5 point, she said no, that she didn't want to
6 continue, which she did, but then she offered to
7 -- you know, then she kind of offered a
8 different sexual act, which we continued for a
9 little bit, and then I -- so, I mean, it wasn't
10 -- it was just -- it wasn't anything, you know,
11 I wouldn't say (inaudible), I mean, she
12 continued with -- she continued on with --
13     MALE PANEL MEMBER: Why did you end
14 it?
15     MR. BLEILER: What's that?
16     MALE PANEL MEMBER: Why did you end
17 it?
18     MR. BLEILER: Why?
19     MALE PANEL MEMBER: Yes.
20     MR. BLEILER: I mean, I admit that I
21 was kind of disappointed after, after, umm, you
22 know, after, you know, kind of going back,
23 after, um, you know, after the intercourse, but
24 I just -- it just wasn't what I wanted to do.

Page 20

1     MALE PANEL MEMBER: After she went
2 to the restroom, what happened directly after
3 that?
4     MR. BLEILER: She left after -- I
5 didn't see her after that.
6     MALE PANEL MEMBER: So she went to
7 the restroom and she -- you never saw her again?
8     MR. BLEILER: No.
9     MALE PANEL MEMBER: Like, she didn't
10 come back to you, nothing?
11     MR. BLEILER: No.
12     MALE PANEL MEMBER: Caitlin, do you
13 remember going to the restroom?
14     MS. MURPHY: No.
15     MALE PANEL MEMBER: Do you remember
16 what happened after you became more aware what
17 was happening?  Can you walk us through what
18 happened when you kind of -- from the reading,
19 at least, it seems that you kind of became aware
20 and you wanted to leave or -- can you walk us
21 through that?
22     MS. MURPHY: Um, I mean, after I
23 stopped the intercourse, I was really upset and
24 I wanted to leave. Um, he helped me get

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

Page 21

1 dressed. Um, and then I don't remember how I
2 had left the house, but I do -- I came to, I
3 guess, on Linden Lane, and that's when I saw my
4 friends.
5   CHAIRMAN: I have another question.
6 I'm looking at a statement from -- this is your
7 roommate, Brendan McCree (phonetic)?
8   MR. BLEILER: Yes.
9   CHAIRMAN: And he was mentioning in
10 his statement where Caitlin had opened his door
11 accidentally, and I guess I was -- just, in
12 order to get the timeline of things with respect
13 to his statement correct, did you observe
14 Caitlin going to the bathroom more than once, or
15 did she just go when she left?
16   MR. BLEILER: Yeah, she just went
17 when she left.
18   CHAIRMAN: Okay. So just the one
19 time?
20   MR. BLEILER: Yes.
21   MALE PANEL MEMBER: You kind of --
22 can you tell me what you think her level of
23 intoxication was?
24   MR. BLEILER: I didn't -- like I

Page 22

1 said before, I didn't see, you know, I didn't
2 see any signs of intoxication.
3   MALE PANEL MEMBER: So, zero to ten,
4 what would you give it?
5   MR. BLEILER: I honestly wouldn't
6 know. I hadn't been with her all night.
7   MALE PANEL MEMBER: You were with
8 her for --
9   MR. BLEILER: I mean, not previous,
10 previous to when we were leaving the party,
11 yeah --
12   MALE PANEL MEMBER: So when you were
13 with her, what would you say her level of
14 intoxication was?
15   MR. BLEILER: I mean, I would --
16 like I said, we had had -- we (inaudible)
17 drinking at a party before when we went back to
18 the room and, you know, enjoyed each other's
19 company. I wouldn't say there was any greater
20 than -- I didn't observe anything greater than
21 that.
22   MALE PANEL MEMBER: So I don't know
23 what -- you're not answering my question.
24   MR. BLEILER: I know, I'm just --

Page 23

1 I'm not -- you know, I don't --
2   MALE PANEL MEMBER: You just --
3   MR. BLEILER: I don't have any
4 indication. I mean, we've hung out twice. I
5 don't know what her level of intoxication was.
6 I don't -- I mean, not that I don't know, but I
7 don't -- like, how -- I'm trying to think of how
8 to explain this. I didn't see any signs of
9 intoxication.
10   MALE PANEL MEMBER: So, zero to ten,
11 if you had to give it a number?
12   MR. BLEILER: I mean, like -- I
13 mean, how -- like, I just -- I'm having trouble
14 with kind of where -- I mean, what the --
15 judging off what, I mean, is my, is my question.
16   FEMALE PANEL MEMBER: Well, I think,
17 you know, that you can have a buzz on and you're
18 happy and whatever, and then you can be totally
19 intoxicated where you're stumbling and falling
20 all over, so --
21   MR. BLEILER: Yeah, but, I mean,
22 like I said --
23   FEMALE PANEL MEMBER: So, I mean, if
24 she wasn't intoxicated the time before, then

Page 24

1 that would be a zero.
2   MR. BLEILER: Oh, no, I didn't -- I
3 didn't say she wasn't intoxicated the time
4 before; we had been drinking the time before as
5 well. My point was that I didn't see any signs
6 of, you know, stumbling, intoxication, vomiting,
7 you know, I didn't hear her slurring her words.
8 And then when I saw her -- and this was
9 consistent with how I had seen her the previous
10 time we had seen each other. You know, I don't
11 -- you know, I'm not --
12   MALE PANEL MEMBER: It doesn't
13 matter how she is from day to day. We just want
14 to know how she was on that one day.
15   MR. BLEILER: Oh, no, I understand
16 that.
17   MALE PANEL MEMBER: Because we all
18 go to parties.
19   MR. BLEILER: Yeah.
20   MALE PANEL MEMBER: We've all drunk,
21 everyone in this room, so we know when someone's
22 been buzzed or they've been drinking too much or
23 where they just had one shot, you can tell it's
24 in their eyes and their body language.

**Page 25**

1    MR. BLEILER: I mean, I would say
2 that she had definitely had more than one drink.
3 I mean, she didn't -- she wasn't expressing any
4 behaviors of being overly drunk or being overly
5 intoxicated. I mean, it would -- I would say it
6 was clear that she had had something to drink,
7 but was, I would say, like, the buzz level of
8 what you had -- like, if you -- you know what I
9 mean, like, the happiness, the happy kind of --
10 not -- just, like, you know, that whole -- you
11 know, happy, like, happy to be there, enjoying
12 your time, not anything to --
13    MALE PANEL MEMBER: I'm still
14 confused about your level of intoxication. Can
15 you tell us more about that?
16    MR. BLEILER: I mean, like I --
17 like, you know, I had been drinking throughout
18 the day. I would say that I was intoxicated,
19 but I was -- you know, I don't -- I didn't lose
20 any -- you know, I remember, you know, what I
21 was doing. I don't, you know, I don't recall
22 myself being, you know, anything overly, overly
23 intoxicated. You know what I mean? I would say
24 I was -- you know, for a personal -- you know, I

**Page 26**

1 can attest to my level (inaudible) then I would
2 say, you know, five or six on a scale of one --
3 zero to ten.
4    MALE PANEL MEMBER: What is a -- the
5 five and a six, like, what's your level of,
6 like, judgment (inaudible)?
7    MR. BLEILER: I mean, I was just
8 trying to say, you know, from zero being
9 perfectly sober and ten being throwing up,
10 blacked-out drunk, having no idea, you know,
11 what went on the next night.
12    MALE PANEL MEMBER: So what's a five
13 or a six to you?
14    MR. BLEILER: It would be somewhere
15 in the middle, where I, you know, have been
16 drinking, had been intoxicated, but was
17 completely aware of my surroundings, who I am,
18 what was going on.
19    MALE PANEL MEMBER: So you would say
20 you were of sound judgment?
21    MR. BLEILER: Yeah.
22    FEMALE PANEL MEMBER: How far is it
23 from the walk from one party (sic) to your
24 apartment? I'm not familiar with the area, so

**Page 27**

1 is it one block, two blocks?
2    MALE PANEL MEMBER: You mean from
3 One Bowdoin?
4    FEMALE PANEL MEMBER: Yeah.
5    MR. BLEILER: It's -- the way we
6 walk is, we -- I'm trying to think of the best
7 -- just trying to describe it.
8    FEMALE PANEL MEMBER: Well, just
9 distance.
10    MR. BLEILER: Oh, distance. Well, I
11 mean, we cut through the -- we cut through the
12 back yard, my back park -- the back parking lot,
13 and if you look -- if you're in my back parking
14 lot, you can stand and you could -- it's, you
15 know, twenty, twenty feet either way to touch on
16 the side of either house. So a very short
17 distance.
18    MALE PANEL MEMBER: Did you go out
19 the front or back door from the party to your
20 house?
21    MR. BLEILER: The front door is
22 never open. There's only one door that goes in
23 and out of the house. It's kind of -- it's out
24 on the side. The parking lot's here. The door

**Page 28**

1 is closer to the parking lot. It's not really a
2 front -- I mean, I guess you'd call it a back
3 door. It's not on the street. I mean, it's
4 kind of, like, a -- it's the main door to the
5 house.
6    MALE PANEL MEMBER: Caitlin, do you
7 know what house you left?
8    MS. MURPHY: Which one?
9    MALE PANEL MEMBER: Do you know if
10 you -- you say you don't know that you went to a
11 different house as he claims he did, but we
12 don't know that for sure.
13    MS. MURPHY: Um-hum.
14    MALE PANEL MEMBER: Did you know
15 that you left a different house, or did you
16 think you left the same house?
17    MS. MURPHY: I knew that he lived at
18 a different house, but I don't remember how I
19 got there. But I know that he lives in a
20 different house than the house that I saw
21 (inaudible).
22    FEMALE PANEL MEMBER: Where were you
23 in the Bowdoin house when your friends -- I
24 think that was the party where it got too

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

Page 29

1  crowded, so the owners of the home asked
2  everyone to start leaving, everybody to go.  And
3  that was when you were with a group of girls.
4  And one thought they saw you go out of the
5  house.
6      But anyway, they went back in to
7  find you, and you weren't there or they couldn't
8  find you.  So I'm just -- do you know?  Because
9  I think those girls, they're not the witnesses
10  today, but we did get their statements, but I
11  know a number of them said they went back in to
12  get you, which would be what friends would do,
13  because -- and I think then they were moving,
14  either going back or going somewhere.
15      But I'm just curious, do you think
16  you were still in the house when they went to
17  find you, or in the bathroom or --
18      MS. MURPHY: I'm really not sure.
19  The only thing I remember at that house was
20  looking for a bathroom with one of my friends,
21  seeing him, leaving, climbing stairs, and then I
22  can't remember anything after that until his
23  bedroom.  So I don't remember what the party
24  looked like, I don't remember it needing to be

Page 30

1  cleared out.  I can't recall anything.
2      MALE PANEL MEMBER: Eddie, were you
3  -- when you left the house, did you leave, like,
4  because they were kicking everyone out, or did
5  you leave before that or after that?  When did
6  you leave?
7      MR. BLEILER: Leave which house?
8      MALE PANEL MEMBER: Caro -- Bowdoin.
9      MR. BLEILER: I had been walking up
10  from the -- up the stairs to the -- through the
11  third floor where the party was, and that time
12  is when I ran into Miss Murphy, and then we
13  walked down the stairs together.
14      MALE PANEL MEMBER: Right back?
15      MR. BLEILER: Yes.
16      FEMALE PANEL MEMBER: So you say you
17  had a conversation, you caught up in the walk
18  from Bowdoin to your -- to Caro Street, right?
19      MR. BLEILER: Yes.
20      FEMALE PANEL MEMBER: So what did
21  you guys talk about?
22      MR. BLEILER: We were just -- you
23  know, "Hey, how are you, how have you been,"
24  type conversation, and just, you know --

Page 31

1      FEMALE PANEL MEMBER: Do you
2  remember any of the details?
3      MR. BLEILER: You mean specific
4  details?  It was just, you know, like, "Hey, how
5  are you?"  You know, "Good.  You?"  I mean, that
6  type of a conversation.  I mean, I don't think
7  -- there wasn't anything -- I mean, I had asked
8  her why she hadn't responded to my texts,
9  because I had sent her one or two texts after
10  the previous time we had been together.
11      FEMALE PANEL MEMBER: And what did
12  she say?
13      MR. BLEILER: She just said that,
14  you know, she hadn't -- she didn't -- hadn't
15  really -- I mean, she didn't really have
16  anything to -- I mean, I think she was just like
17  -- you know, I didn't really -- I mean, I don't
18  think -- I'm trying to think of what -- I don't
19  remember, like, I don't remember exactly what
20  she said in response.  I'm just trying to -- I
21  mean, I don't think it was --
22      MALE PANEL MEMBER: So it progressed
23  from, "Hi, how are you?  The weather's great,"
24  to texts, and then how did it progress to, "Come

Page 32

1  back to my place?"
2      MR. BLEILER: Well, I mean, we had
3  talked, just, like, the, "Hi, how are you"
4  conversation had happened.  I mean, we were
5  walking down, down the stairs, out of the party,
6  and then, you know, we had -- there was no kind
7  of destination where we were going, and I asked
8  her if she would like to come to my house with
9  me.
10      FEMALE PANEL MEMBER: And what was
11  her response to that?
12      MR. BLEILER: She said yes.
13      CHAIRMAN: I have another question
14  for Caitlin.  Caitlin, do you remember leaving
15  his house?
16      MS. MURPHY: (No verbal response)
17      CHAIRMAN: No?
18      MS. MURPHY: No.
19      CHAIRMAN: Does the Board have any
20  more questions for either party?
21      FEMALE PANEL MEMBER: I have one
22  more question.
23      CHAIRMAN: Sure.
24      FEMALE PANEL MEMBER: You had stated

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

Page 33

1 that she was the same level of intoxication, you
2 felt like, than the previous time that you guys
3 had been together, so would you characterize her
4 as being intoxicated that evening?
5    MR. BLEILER: Well, I mean, yeah, I
6 mean, I would say that she was kind of, you
7 know, buzzed or slightly intoxicated.
8    CHAIRMAN: Okay. Do you have any
9 more questions? I don't want to --
10    MALE PANEL MEMBER: No.
11    CHAIRMAN: -- hurry it along or
12 anything, if people are still thinking and have
13 questions they would like to ask.
14    MALE PANEL MEMBER: I mean, we can
15 still ask them at the end.
16    CHAIRMAN: Yeah, there will be time
17 for more questions. So at this point, we're
18 going to move on to the opportunity for the
19 students to have an opportunity to ask questions
20 of each other, but I would like to advise you
21 that these questions need to be directed through
22 me. So if you have a question for either party,
23 you can ask me and then I will relay that
24 question. So there will be no direct

Page 34

1 questioning of each other during this hearing.
2    So we are going to start with
3 Caitlin, and Caitlin, do you have any questions?
4 Oh, you have something to read?
5    MS. MURPHY: Yeah.
6    CHAIRMAN: I can do that. I just
7 start at the top and work my way down?
8    MS. MURPHY: Sure.
9    CHAIRMAN: Okay. Okay, so here's
10 the first -- Caitlin has four questions for you.
11 The first question she has is, "What made you
12 think effective consent was freely given?"
13    MR. BLEILER: Well, I mean, she had
14 -- when I had asked -- when we started -- when I
15 -- when we had seen her, I had, um, you know, I
16 had asked her if she wanted to come back to my
17 house.
18    MALE PANEL MEMBER: I'm sorry, could
19 you speak louder for me?
20    MR. BLEILER: Yes, sorry. I had
21 asked her if she wanted to come back to my
22 house. She had said yes. We had walked back to
23 my house. I had opened my door to my bedroom.
24 I had to unlock it. I opened the door, and she

Page 35

1 followed me into my room.
2    Then, you know, as we were, as we
3 were kissing, she -- you know, we were taking
4 off each other's clothing. She had assisted me
5 taking off her belt. She had to do it for me,
6 because I couldn't do it myself.
7    And then we had -- she had started
8 touching my penis with her hand. And then while
9 we were kissing and she had been on top of me,
10 that's when the intercourse started. So I had,
11 I mean --
12    MALE PANEL MEMBER: Can you explain
13 -- give me the little details. You're missing
14 all the little details, and I can't get a
15 picture of what's happening. So when you say
16 that she got on top of you, could you tell us
17 what happened?
18    MR. BLEILER: She -- yes. She was
19 on top of me, kissing me and straddling me. And
20 at that point is when my -- that was when the
21 intercourse had started, had first kind of
22 begun.
23    MALE PANEL MEMBER: How did it
24 begin?

Page 36

1    MR. BLEILER: With my penis going
2 inside of her vagina.
3    MALE PANEL MEMBER: Because you
4 initiated that, she initiated it?
5    MR. BLEILER: I mean, I would say it
6 was mutual.
7    FEMALE PANEL MEMBER: Can I -- I
8 just --
9    MR. IRISH: You'll have --
10    FEMALE PANEL MEMBER: Oh, later?
11    MR. IRISH: You'll all have a
12 chance, so --
13    FEMALE PANEL MEMBER: Keep going,
14 okay.
15    CHAIRMAN: Yeah. So we will --
16    MR. IRISH: (inaudible)
17    CHAIRMAN: All right, with a follow-
18 up question. We can keep going through your
19 questions if you'd like. Okay. The second
20 question that Caitlin has is, "Didn't you see
21 the change in my demeanor?"
22    MR. BLEILER: I mean, I hadn't
23 noticed any change in demeanor with the
24 continuing of other sexual activities. I, you

Page 37

1 know, I didn't see any change in demeanor. We
2 kept doing other things.
3    **CHAIRMAN:** Are there any follow-up
4 questions for that?
5    **FEMALE PANEL MEMBER:** Nothing for
6 that one.
7    **CHAIRMAN:** Okay. So we'll move on
8 to the third question. The third question is,
9 "What did you think when you were notified that
10 I was reporting the assault?"
11   **MR. BLEILER:** I was in, I, you know,
12 I was in, I was in disbelief. You know, I admit
13 that I, you know, didn't handle the situation as
14 a gentleman, that's for sure, but I, you know, I
15 was completely shocked. You know, I had been
16 unaware of any -- but that -- you know, I would
17 say shocking (inaudible).
18   **CHAIRMAN:** And the fourth out of the
19 five questions is, "Did you ever ask me point-
20 blank, 'Can we have sex?'"
21   **MR. BLEILER:** I probably (inaudible)
22 statements. I mean, it began, as I said before,
23 it began mutually while she had been on top of
24 me and when we had been -- when we had

Page 38

1 disengaged from the sexual intercourse and I
2 asked if we could continue, to which she said no
3 and which her statement was -- will show -- I
4 mean did show that I -- she said that I, you
5 know, I (inaudible) did not try to continue
6 sexual intercourse.
7    **CHAIRMAN:** Follow-ups? Okay. And
8 the final question -- I believe this is the
9 final question.
10   **MS. MURPHY:** Yes.
11   **CHAIRMAN:** Yes, okay. Final
12 question, "The extent of our physical
13 relationship was me touching your penis once,
14 and if you recall, I was very adamant about not
15 going any further. Why would you think I'd want
16 to have sex?"
17   **MR. BLEILER:** You know, like I had
18 said before, we began kissing after that and
19 that's when the intercourse had begun, so that
20 gave -- I mean, that is kind of where -- you
21 know, with her on top of me and one of the first
22 times it occurred is where I got the idea that
23 she (inaudible) want to have sex.
24   **MALE PANEL MEMBER:** Sorry, could you

Page 39

1 read that again?
2    **CHAIRMAN:** I can read it. Did I
3 misread it?
4    **MALE PANEL MEMBER:** I just need to
5 hear it again.
6    **CHAIRMAN:** Okay. The question was,
7 "The extent of our physical relationship was me
8 touching your penis once, and if you recall, I
9 was very adamant about not going any further.
10 Why would you think I'd want to have sex?"
11   **MALE PANEL MEMBER:** Can you explain
12 one more time to me what you just said?
13   **MR. BLEILER:** Yes, I said that she
14 had been touching my penis and then she had been
15 -- as I described before, she had been -- she
16 had been on top of me, kissing me. And that's
17 when the intercourse had first begun.
18   **MALE PANEL MEMBER:** You said prior
19 to this, and I might be wrong, that yes, I
20 believe you're saying yes to that she did say no
21 about touching, that that's all she wanted to
22 do. Did she ever say, "That's all I wanted to
23 do?"
24   **MR. BLEILER:** No.

Page 40

1    **MALE PANEL MEMBER:** She never
2 conveyed to you that she didn't want to go past
3 touching your penis?
4    **MR. BLEILER:** (No verbal response)
5    **MALE PANEL MEMBER:** Okay.
6 (inaudible).
7    **CHAIRMAN:** Okay. Are there further
8 questions? Because --
9    **MS. MURPHY:** Yeah. Just, did he
10 know I was a virgin?
11   **CHAIRMAN:** Okay. The question is,
12 did you know that she was a virgin?
13   **MR. BLEILER:** I did not.
14   **CHAIRMAN:** Okay. Now we can move on
15 with questions that Edwin may have, and I will
16 ask those of Caitlin if you have any questions.
17   **MR. BLEILER:** I do not.
18   **CHAIRMAN:** You have no questions.
19 Okay. All right. So now we are moving on to
20 the stage of witnesses, and --
21   **MALE PANEL MEMBER:** Do we get
22 questions?
23   **CHAIRMAN:** Oh.
24   **MALE PANEL MEMBER:** Or is that to

Bleiler v.                                                          Hearing
College of the Holy Cross                                       May 18, 2011

Page 41

1   the very end?
2       CHAIRMAN: I have none indicated on
3   my --
4       MR. IRISH: Yeah, let's -- we'll go
5   to witnesses. There's a time for final
6   questions from the Board.
7       CHAIRMAN: Yeah, there is a final
8   question period.
9       MR. IRISH: Could we just see how
10  everybody's doing?
11      CHAIRMAN: Yeah, are we going to
12  move on with the witnesses? Public Safety will
13  be our first witness. Would you like to
14  break? Because --
15      MS. MURPHY: (inaudible)
16      CHAIRMAN: I realize the temperature
17  in here is a little cold. Okay. Well, we will
18  move on with the witnesses, and we'll check and
19  see if a break is in order sort of --
20      MR. IRISH: After Public Safety and
21  we go to the first witness --
22      CHAIRMAN: Yeah.
23      MR. IRISH: -- and we make the phone
24  call, we'll take a break.

Page 42

1       CHAIRMAN: Okay. So at this time we
2   will hear from witnesses. We will begin with
3   our Public Safety officers, and we will begin
4   with Sergeant Culley. And, Sergeant Culley,
5   could you please tell us about your
6   investigation?
7       SGT. CULLEY: My name is Sergeant
8   Kathleen Culley. On May 1st, I received a phone
9   call at home about 3:30 in the morning
10  indicating that there had been a sexual assault
11  on campus, and there was no sexual assault
12  investigator available. So at about 3:30 in the
13  morning, I made myself available and came in to
14  Holy Cross.
15      I spoke with Officer Zach Ford, who
16  had originally spoke to the victim, Miss Murphy.
17  He updated me of the incident at that point,
18  which he can tell you about and from his report.
19      Initially, I spoke to Miss Murphy,
20  gave her her options of what she could do on
21  campus criminally, all the different types of
22  options that she could go forward with. My main
23  concern was to get her to a hospital and have an
24  evidence kit done and make sure, you know, that

Page 43

1   she was physically okay. She agreed to go to
2   the hospital.
3       Before going to the hospital, I
4   asked her to give me an account of exactly what
5   happened. And she stated that she had been
6   drinking and she started about 6:30, earlier
7   that evening, at Williams Hall with a bunch of
8   her friends from the rugby team. She left
9   Williams Hall at about 10:00 p.m. to meet
10  members of her band at Clark Hall for a
11  performance that they had.
12      While she was at Clark Hall, she
13  stated -- after she was done with her
14  performance at Clark Hall, she stated she went
15  off-campus to a party on Clay Street, and she
16  was not sure of the number of Clay Street that
17  she went to.
18      She said she went with her friends,
19  Miss Difusco (phonetic), Miss Russo, Miss Masi,
20  and twin sisters, Miss Caitlin DeRosia and Miss
21  Kristen DeRosia (phonetic). At about 11:00,
22  they went to the Clay Street party. She said
23  she had one glass of beer from a keg at that
24  party. She also said at the Williams Hall

Page 44

1   party, I'm sorry, I missed that part, she had
2   had four beers at that party.
3       She said she had lost her cell
4   phone, that she could not find it, and they were
5   able to locate it while she was at the party on
6   Clay Street. I believe through a phone call,
7   someone had told one of her friends that they
8   had her cell phone.
9       From the party on Clay Street, she
10  went to another party with all of the friends
11  that were stated previously, and she said that's
12  when the alcohol hit her system. She said she
13  did not have any alcoholic beverages at this new
14  party that she was at, and she didn't know where
15  she was at the time of this interview.
16      She said she went to go find a
17  bathroom, and when she was looking for the
18  bathroom, she ran into a male that she had made
19  out with prior to this evening. She had stated
20  that she didn't want to give the name of the
21  individual at this time. She said he took her
22  in his bedroom and he started making out with
23  her. She said things escalated sexually very
24  quickly, and it was without her consent.

Page 45

1    She said that they were kissing and
2 she felt it was suddenly that she had no clothes
3 on. She stated she does not know how her
4 clothes were removed and that she realized he
5 was forcing himself inside of her. And I asked
6 vaginal penetration with his penis, and she
7 stated yes.
8    I asked if a condom was used, which
9 she replied no. I asked if he ejaculated, which
10 she replied she didn't think so, and -- or, I'm
11 sorry, I asked if he ejaculated inside of her,
12 and she said, "I don't think so. I don't think
13 he ejaculated at all."
14    She said at that point she wanted to
15 leave, and he asked her, "Can we do this again?"
16 She told him no a few times. She said she told
17 him no to his further advances, that he was just
18 kissing her some more.
19    She said he helped her put her
20 clothes back on, and she just left the house for
21 herself and -- by herself and returned to
22 campus. She stated when she was walking up
23 Linden Lane, that's where she came to and she
24 met up with her two friends, Miss Federici and

Page 46

1 Miss -- Mr. Yiznitsky. They walked back to the
2 dorm, her dorm room, and they convinced her to
3 come to Public Safety, which they walked down to
4 Public Safety and met with Officer Ford.
5    At that point, Officer James Kimball
6 escorted her to the hospital to have an evidence
7 kit done, and at that point, that's where my
8 contact with her ended.
9    Do you want me to go further?
10    MR. IRISH: Well, there was a
11 subsequent investigation, right?
12    SGT. CULLEY: Right.
13    CHAIRMAN: Yeah, so --
14    SGT. CULLEY: So I --
15    CHAIRMAN: Were you involved in
16 those subsequent investigations?
17    SGT. CULLEY: There was two of us,
18 myself and Sergeant Josh Barry (phonetic), that
19 talked to individuals. He's not able to be here
20 today, but -- let's see. I had -- I also had
21 Caitlin write a -- or Officer Ford had Caitlin
22 write an account of what happened that evening.
23 Later in the evening -- or, later in the
24 investigation, I had her write another witness

Page 47

1 form of what happened.
2    I spoke to each individual witness
3 who also had witness statements. Would you like
4 me to go through each individual witness
5 statement?
6    MALE PANEL MEMBER: We've read it.
7    CHAIRMAN: We've reviewed those.
8    SGT. CULLEY: You've reviewed all
9 those? Okay.
10    CHAIRMAN: Is the Board fine with
11 this? Okay.
12    SGT. CULLEY: Okay. Let's see. On
13 May 5th, I spoke with Miss Murphy and her father
14 and -- let's see -- in regards to what her
15 options were criminally, judicial hearing. And
16 we went over what her options were. Let's see.
17    On Monday, May 9th, Miss Murphy came
18 to Public Safety and decided that she wanted to
19 give the name of the individual that is accused
20 her, Mr. Bleiler.
21    At that point, I contacted Mr.
22 Bleiler, went to Public Safety. He was read his
23 Miranda rights and at that time revoked his
24 right to speak with an attorney.

Page 48

1    And at that point, also, Caitlin,
2 that is when she wrote her follow-up witness
3 statement form.
4    That's it at that point.
5    CHAIRMAN: Okay. Thank you. We now
6 will move on to any questions that the hearing
7 panel has for Sergeant Culley. So if anyone has
8 questions for the sergeant.
9    FEMALE PANEL MEMBER: What were your
10 observations as far as her level of intoxication
11 at 3:30 in the morning?
12    SGT. CULLEY: I would say she was
13 intoxicated. I wouldn't say incapacitated.
14    MALE PANEL MEMBER: And you said you
15 arrived at 3:30?
16    SGT. CULLEY: Correct.
17    MALE PANEL MEMBER: And you got the
18 call at . . .?
19    SGT. CULLEY: About 3:15.
20    MALE PANEL MEMBER: When did she
21 arrive into Public Safety, based on your
22 records?
23    SGT. CULLEY: I'm sorry, three -- at
24 approximately 3:30, she came into Public Safety.

Page 49

1    MALE PANEL MEMBER: Say that again?
2    3:30, she came?
3    SGT. CULLEY: 3:30, yeah. So --
4    MALE PANEL MEMBER: So you got the
5  call --
6    SGT. CULLEY: And we do approximate
7  times.
8    MALE PANEL MEMBER: That's fine.
9    SGT. CULLEY: So, and I -- so I got
10 the call immediately at around 3:30, and I was
11 here about 3:45, I would say.
12   MALE PANEL MEMBER: You were there
13 too.
14   SGT. CULLEY: Yeah.
15   MALE PANEL MEMBER: Okay.
16   FEMALE PANEL MEMBER: So you
17 retrieved the dress from her room?
18   SGT. CULLEY: That's Officer Ford,
19 yes.
20   FEMALE PANEL MEMBER: We can have
21 him attest to that.
22   FEMALE PANEL MEMBER: What was her
23 demeanor as far as --
24   SGT. CULLEY: She was very tired.

Page 50

1  She kept saying she was very tired, she just
2  wanted to go to sleep. I continued to tell her
3  that it was very important to go to the hospital
4  and be checked out, and she eventually came and
5  said she would go to the hospital.
6    CHAIRMAN: I have one question, if
7  there are no other questions. So based on your
8  experience with, you know, this sort of matter
9  in the past, would you say that Caitlin's
10 demeanor was that of someone who had been
11 assaulted, just based on your personal
12 experiences with dealing with these cases?
13   SGT. CULLEY: I wouldn't say there
14 is a demeanor.
15   CHAIRMAN: Okay.
16   SGT. CULLEY: I would say people
17 react to it very differently. So I can't say
18 there's one way a person would react.
19   CHAIRMAN: Okay. Thank you. Are
20 there any more questions from the Board? Okay.
21 So at this point, questions can come from
22 Caitlin or Edwin. You know, you can ask
23 questions of the officer directly if you would
24 like, or if you'd like to ask them through me, I

Page 51

1  would be happy to convey those questions. So we
2  can start with Caitlin. Do you have any
3  questions for --
4    MS. MURPHY: Not at this time.
5    CHAIRMAN: Okay. So Caitlin has no
6  questions. Edwin, do you have questions for the
7  sergeant?
8    MR. BLEILER: Yes. Sergeant Culley,
9  you are aware -- you're aware of the standards
10 at Holy Cross, the Community Standards for
11 sexual misconduct (inaudible) involved with
12 alcohol and that -- of intoxication (inaudible)
13 with regard to consent?
14   SGT. CULLEY: Yes.
15   MR. BLEILER: And that, you know, as
16 the specialist who (inaudible) being trained in
17 the (inaudible) investigation of these matters
18 and the report-writing of these matters?
19   SGT. CULLEY: Um-hum.
20   MR. BLEILER: Would you say that
21 you've received that training?
22   SGT. CULLEY: Yes, I have had
23 training, yes.
24   MR. BLEILER: And you did not, in

Page 52

1  your report, involve any -- that she had
2  exhibited any signs of intoxication, not -- she
3  didn't slur her speech?
4    SGT. CULLEY: Right, I did not
5  indicate that.
6    MR. BLEILER: She did not have
7  bloodshot eyes?
8    SGT. CULLEY: I didn't indicate that
9  in the report, no.
10   MR. BLEILER: You couldn't smell
11 alcohol on her breath?
12   SGT. CULLEY: It's not indicated in
13 the report.
14   MR. BLEILER: I mean, (inaudible).
15   SGT. CULLEY: It's not indicated in
16 the report.
17   MR. BLEILER: She did not vomit?
18   SGT. CULLEY: It's not indicated in
19 the report.
20   MR. BLEILER: Okay. I have no
21 further questions.
22   CHAIRMAN: And if Caitlin has
23 further questions, you can ask them. It's not
24 -- we don't have to go in order here. We just

Page 53

1 started in the order that we have. So if you
2 have any further questions for the sergeant. . .
3 **MS. MURPHY:** (inaudible)
4 **CHAIRMAN:** Okay. No? Okay, all
5 right, thank you. Okay. So --
6 **MR. IRISH:** Does the Board have any
7 questions?
8 **CHAIRMAN:** Yeah, I mean, the Board
9 can follow up at this time as well, if there are
10 questions.
11 **MALE PANEL MEMBER:** Can you describe
12 her intoxication level again?
13 **SGT. CULLEY:** Sure. She was
14 intoxicated. She was glossy-eyed. She did have
15 slurred speech. And I wouldn't say she was
16 incapacitated.
17 **MALE PANEL MEMBER:** Based on when
18 you debriefed her, what time did she leave the
19 party? Is that in your -- did you find out at
20 all?
21 **SGT. CULLEY:** Left the party at One
22 Bowdoin Street?
23 **MALE PANEL MEMBER:** As in, sorry,
24 left Eddie's house.

Page 54

1 **SGT. CULLEY:** Left him? I don't
2 believe I -- she said she didn't have her phone
3 on her a lot of the time, so she didn't have a
4 good indication of what the timeframe was.
5 **MALE PANEL MEMBER:** Thank you.
6 **CHAIRMAN:** Further questions from
7 the Board? Okay.
8 **MALE PANEL MEMBER:** Do you guys have
9 questions?
10 **CHAIRMAN:** Okay. So we thank
11 Sergeant Culley for her testimony, and at this
12 point we'd like to call Officer Ford. So at
13 this point, Officer Ford, we would like to ask
14 you if there is anything you would like to add
15 to Sergeant Culley's report.
16 **MR. FORD:** I'd say -- I would say
17 no, not at this time, unless there's any
18 specific questions you'd like to ask me.
19 Actually, there was one thing I
20 did do. This Board member mentioned it with the
21 collecting of the evidence. I was asked by
22 Sergeant Culley to collect her dress in her
23 room. I asked Murphy for permission to enter
24 her room, and Officer Kimball and I collected

Page 55

1 the dress that she was wearing on the previous
2 evening in an evidence bag. It was placed into
3 an evidence bag and then given to U. Mass.
4 Memorial Hospital for the rape kit. That was
5 the only separate thing I did outside of
6 Sergeant Culley's (inaudible).
7 **MALE PANEL MEMBER:** Is there any
8 facts about the dress that came about through
9 that?
10 **MR. FORD:** Not that I know. I don't
11 actually have any results from the actual rape
12 kit or evidence that was taken. That would be
13 through Sergeant Culley.
14 **FEMALE PANEL MEMBER:** If she is able
15 to get that information, we -- you know, at this
16 point we don't have any information.
17 **CHAIRMAN:** Further questions that
18 the Board may have for Officer Ford?
19 **FEMALE PANEL MEMBER:** Can you speak
20 to Caitlin's demeanor when she first came in to
21 Public Safety?
22 **MR. FORD:** Yeah. She seemed very
23 upset. She seemed distraught. Mainly I just
24 asked her if, you know, she needed medical

Page 56

1 attention, because she told me that she had been
2 assaulted, and she stated at that time --
3 And so what I wanted to do is, I had
4 pulled her into the office, put her in an area,
5 had an officer sit with her and file a statement
6 while I contacted Officer Culley and called in,
7 you know, a specialist in sexual assault
8 investigation. But she appeared to be very
9 upset when she initially came in.
10 **CHAIRMAN:** And did she come with
11 other people, or did she come alone?
12 **MR. FORD:** She actually came with
13 two other people. She came in with Jacob
14 Yiznitsky and Beth Federici. And what I wanted
15 to do is, initially when they came in, I wanted
16 to separate the initial two witnesses and the
17 victim, put them in a secluded area so that way
18 they didn't speak to each other and put her in a
19 separate area as well so that way no evidence
20 could be contaminated at that point.
21 **CHAIRMAN:** And that's the standard
22 procedure?
23 **MR. FORD:** Yeah, usually.
24 **FEMALE PANEL MEMBER:** Can you also

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

Page 57

1  speak to her intoxication level?
2      MR. FORD: I could not clearly
3  ascertain that at that point, unfortunately.
4  Not through my training and experience.
5      CHAIRMAN: Okay. Are there further
6  questions from the Board members?
7      FEMALE PANEL MEMBER: I guess the
8  only question I have is, in her statement, there
9  was -- she was seated in the emergency room and
10 there was a medical report, and which she
11 mentioned in there. I was just wondering, where
12 does that go? Does that go to Public Safety,
13 you know, as far as the doctor examining her and
14 any injuries she may have incurred?
15     MR. FORD: That information --
16     FEMALE PANEL MEMBER: (inaudible)
17     MR. FORD: That actual report would
18 actually be her private information and she
19 would have to release that. And I believe,
20 through -- Sergeant Culley advised me that
21 that's good for about six months, that actual
22 report and all the evidence that was collected
23 through that initial kit.
24     CHAIRMAN: Okay. Seeing no further

Page 58

1  questions from the Board, we can move to
2  questious from the students, Caitlin and Edwin.
3  At this time, if Edwin would like to ask any
4  questions of Officer Ford, feel free at this
5  time.
6      MR. BLEILER: No questions.
7      CHAIRMAN: You don't want to ask any
8  questions?
9      MR. BLEILER: No.
10     CHAIRMAN: Okay. Caitlin, do you
11 have any questions for Officer Ford?
12     MS. MURPHY: No.
13     CHAIRMAN: Okay. Seeing no
14 questions from either student for Officer Ford,
15 no further questions from the Board, so I thank
16 Officer Ford for your testimony.
17     MR. FORD: Thank you.
18     CHAIRMAN: I think now would be a
19 good time to take a break. Mr. Irish, how long
20 should we break for?
21     MR. IRISH: Ten minutes?
22     (Off the record.)
23     CHAIRMAN: Okay. So we're back, and
24 the recorder is rolling. Okay. So we'll now

Page 59

1  hear from Caitlin's witnesses. And we have our
2  first witness here by telephone. Elizabeth, are
3  you with us on the line?
4      MS. MASI: Yes, I am.
5      CHAIRMAN: You can hear me okay?
6      MS. MASI: Yes.
7      CHAIRMAN: Okay. So I'm going to
8  read from my script here. Welcome, Elizabeth.
9  Please understand that you're expected to
10 truthfully inform us about this incident.
11 Please be reminded that dishonesty in this
12 hearing can result in serious disciplinary
13 charges. Do you agree to provide honest,
14 accurate and truthful information today?
15     MS. MASI: Yes.
16     CHAIRMAN: Okay. I'm sorry, I
17 forgot to introduce myself. My name is Jude
18 Kelly. I'm the chair of the Board here today.
19     MS. MASI: Okay.
20     CHAIRMAN: Okay. So we have read
21 your statement, all of the Board members have,
22 and we would like you to please tell us about
23 your involvement in this incident.
24     MS. MASI: Okay. Well, I met up

Page 60

1  with Caitlin at the Clark block party that was
2  going on, and she had come up, she had come from
3  previously drinking, so she had already -- when
4  I met her, she was already pretty intoxicated.
5      We decided to go off-campus to a
6  party we had heard with a few of our friends,
7  and I believe we went to 12 Clay Street first.
8  And when we were there, she was very visibly
9  upset, because she had lost her phone. And she
10 thought she had lost it there, but she had
11 actually lost it, like, hours prior, and she was
12 crying to me. And so I could really tell that
13 she was pretty visibly intoxicated to me,
14 because I don't -- she never cries.
15     So I was really worried, and so I
16 tried to deal with the phone situation for her.
17 We found out where the phone was, but we
18 couldn't get our hands on it.
19     We decided to go to another party at
20 One Bowdoin Street, and that party was a little
21 hectic. It was really crowded. We went in, and
22 I remember going in with Caitlin, and it was,
23 like, absolutely packed.
24     I remember she and I went to the

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

Page 61

1 bathroom together, and then from then on it was
2 like we were completely separated. I had no
3 idea where she went. I mean, there was a lapse
4 of time there that I'm also not completely aware
5 of.
6    But I was asked to leave the party
7 shortly after, so all my friends left. And when
8 I went outside, I realized Caitlin hadn't
9 followed me, and I got really worried. I knew
10 she was incredibly intoxicated. I knew she
11 didn't have her phone on her. So I actually
12 went back into the house and basically begged my
13 way back in to say, "Can I please look for my
14 friend?" Kind of looked for her throughout the
15 living room, the kitchen, on the upper level.
16 Couldn't find her anywhere.
17    And then I decided to stand outside
18 with my friends for about fifteen, twenty
19 minutes in hopes that she would come follow
20 down, because we had assumed she was getting
21 kicked out as well. And she never followed, and
22 I had no means of contacting her.
23    And so at that point, I felt like I
24 had -- I didn't really have any other options,

Page 62

1 so I went back to campus and then proceeded to
2 look for her the next morning.
3    CHAIRMAN: Okay, Elizabeth, we thank
4 you for your statement. At this point, we will
5 entertain questions from the hearing panel.
6    MS. MASI: Okay.
7    CHAIRMAN: So if you could stay on
8 the line and answer any questions that the panel
9 has, that would be great.
10    MS. MASI: Sure.
11    CHAIRMAN: Okay. Questions for the
12 panel?
13    MALE PANEL MEMBER: Hi, Elizabeth.
14 My name is Grant. I'm one of the council
15 members here.
16    MS. MASI: Okay.
17    MALE PANEL MEMBER: Do you know how
18 much time -- sorry. When you went back inside
19 to look for her, was the whole party cleared
20 out, or --
21    MS. MASI: no.
22    MALE PANEL MEMBER: -- was there
23 still people inside?
24    MS. MASI: No, there were a lot of

Page 63

1 people inside. I'm not sure exactly why my
2 group of friends was particularly kicked out. I
3 know they were just trying to kick out kids that
4 looked younger. But it was definitely really
5 packed, and that was a part of the struggle of
6 looking for her.
7    MALE PANEL MEMBER: How long did you
8 look for her inside?
9  ⎯ MS. MASI: I mean, inside, I would
10 say, like, several minutes. I kind of -- I
11 mean, I was -- I had to beg to kind of get back
12 in to look for her, so I was being hounded to
13 get out, so I kind of searched as much as I
14 could inside the house and then was asked
15 repeatedly to leave.
16    MALE PANEL MEMBER: How much time
17 elapsed between the bathroom and you going
18 outside?
19    MS. MASI: You know, I mean, for a
20 truthful answer, I'm not a hundred-percent sure.
21 I'm not fully aware of the timeframe either, but
22 I would say around -- I mean, like, it could --
23 honestly, like, it could be anywhere from ten
24 minutes to a little bit more.

Page 64

1    MALE PANEL MEMBER: Did you see her
2 leave the restroom?
3    MS. MASI: Yes. She walked out with
4 me, but then I got caught up talking to, I
5 believe, a girl that I'm going abroad with next
6 year, and I didn't know where Caitlin went after
7 that.
8    MALE PANEL MEMBER: Thank you so
9 much.
10    MS. MASI: Yeah.
11    FEMALE PANEL MEMBER: Would you --
12    FEMALE PANEL MEMBER: What --
13    FEMALE PANEL MEMBER: Sorry.
14    FEMALE PANEL MEMBER: No, go ahead.
15    FEMALE PANEL MEMBER: Would you say
16 you have a real clear memory of that evening?
17    MS. MASI: Yeah. I mean, I'll admit
18 that I had been drinking, but I was definitely
19 -- so there are definitely, like, a few lapses,
20 but I would say I have a pretty clear memory.
21    FEMALE PANEL MEMBER: What was the
22 activity at the Clark block party? What was
23 that all about?
24    MS. MASI: That was just -- Caitlin

Page 65

1 is in the band Sarkozy (phonetic), and they were
2 performing at the Clark block party, so we
3 wanted to see them perform. It was just, like,
4 a house-council-run event where they were
5 cooking -- there was, like, a barbecue and live
6 music.
7    FEMALE PANEL MEMBER: And how was
8 her performance?
9    MS. MASI: I mean, she was pretty
10 intoxicated, so she actually, like, left halfway
11 through the performance to leave with us, which
12 I don't think she normally would have done,
13 because she's really, really into the band. So
14 she kind of just up and left, and even her band
15 members were, like, asking me where she had
16 gone.
17    CHAIRMAN: Any further questions
18 from Board members? Okay. At this point,
19 Elizabeth, if you could stay on the line with
20 us, we will have questions from Caitlin and
21 Edwin.
22    MS. MASI: Okay.
23    CHAIRMAN: Caitlin, would you like
24 to start with the questions?

Page 66

1    MS. MURPHY: Was I acting my usual
2 self that night?
3    MS. MASI: Definitely not. I had
4 never seen you this intoxicated. You definitely
5 don't cry, especially over a phone. You had no
6 sense of where you lost the phone. You thought
7 you had just gotten a new phone, and you hadn't;
8 you had gotten the phone, like, a week earlier,
9 but you were crying because you had just gotten
10 it. You were definitely, like, the most
11 frazzled, the most intoxicated I've ever seen
12 you.
13    MS. MURPHY: Is it like me to go
14 wandering off and not tell you where I'm going?
15    MS. MASI: Absolutely not. That's
16 why I was as freaked out as I was, because --
17 or, like, that's at least why I made the effort
18 to look for you and I waited for you, because it
19 just wasn't like you to not follow or to come
20 along or to -- because it's kind of, we always
21 stay together, so that's why I was as freaked
22 out.
23    MS. MURPHY: And do you think, under
24 these circumstances, I would have been able to

Page 67

1 give effective consent?
2    MS. MASI: Absolutely not. Without
3 a doubt. You were completely incapacitated and
4 beyond the ability to give effective consent.
5    CHAIRMAN: Okay. Now, Edwin, if you
6 have questions for Elizabeth?
7    MR. BLEILER: You wrote a report in
8 this matter? Ms. Masi?
9    MS. MASI: I'm sorry, I can't really
10 hear.
11    CHAIRMAN: Can you hear him?
12    MS. MASI: No.
13    CHAIRMAN: Okay. We may be able to
14 move the phone here.
15    MALE PANEL MEMBER: I could barely
16 hear you too, so . . .
17    CHAIRMAN: Okay, we moved the phone,
18 so we'll try with the question again.
19    MS. MASI: Okay.
20    MR. BLEILER: Ms. Masi, you wrote a
21 report in this case?
22    MS. MASI: Yes.
23    MR. BLEILER: With the Public Safety
24 officers?

Page 68

1    MS. MASI: Yes.
2    MR. BLEILER: And anywhere in this
3 report, did you include any indications of Ms.
4 Murphy's level of intoxication?
5    MS. MASI: Yeah, I said she was
6 clearly intoxicated and that's why I was
7 worried.
8    CHAIRMAN: We're just getting the
9 reports together at the moment to make sure
10 everyone's on the same page here.
11    MS. MASI: Yeah, I mean, I couldn't
12 tell you verbatim what I wrote down, I don't
13 have that kind of memory, but I'm pretty sure.
14    CHAIRMAN: Okay. If you can just
15 hang on for a follow-up question, I think there
16 may he one.
17    MS. MASI: Yeah.
18    MR. BLEILER: In this report,
19 though, did you indicate that Miss Murphy had
20 slurred speech?
21    MS. MASI: Did I indicate that she
22 what?
23    MR. BLEILER: That she had -- any
24 indications of Miss Murphy slurring her speech?

---

**Page 69**

1  MS. MASI: No, I didn't think I -- I
2  wasn't that specific. I did say she was clearly
3  intoxicated.
4  MR. BLEILER: Yeah, but I'm just
5  referring to if you had indicated that she
6  slurred her speech.
7  MS. MASI: No, I don't think I
8  indicated she slurred her speech, although I can
9  say right now that she was.
10  MR. BLEILER: I have no further
11  questions.
12  CHAIRMAN: Okay. So I guess, I
13  mean, should we go back to see if the Board has
14  any more questions here based on anything you've
15  heard in the last few minutes? Okay. So I
16  guess at this point --
17  MALE PANEL MEMBER: Do we think we
18  might need any more information from her?
19  CHAIRMAN: Yeah, do we think we'd
20  need to talk to Elizabeth later?
21  FEMALE PANEL MEMBER: No, but I have
22  one question. You said you went back to Clark
23  to go to bed, but then you went to look for her
24  the next morning?

---

**Page 70**

1  MS. MASI: Yes.
2  FEMALE PANEL MEMBER: And did you
3  find her?
4  MS. MASI: Well, no. The following
5  morning, there was a reflection brunch for the
6  sophomore class that she had been planning to go
7  to and she was really excited for. And when she
8  didn't show up, kind of the warning bells went
9  off, and so I went to look for her in her room.
10  She wasn't answering.
11  I knew that she didn't have her
12  phone on her from the previous night, so I
13  collected her phone from the friend that had it
14  and I started to get worried that something
15  didn't feel right, and that's why I actually
16  contacted the CDC of her building and went
17  throughout the whole process, because I was
18  incredibly worried for her.
19  CHAIRMAN: Could you -- for those of
20  us who don't know what the CDC is, could you
21  explain what that is?
22  MS. MASI: Yeah. I don't know the
23  correct definition, but she is basically a woman
24  who's hired by the school, a professional, to

---

**Page 71**

1  kind of lead all the R.A.s in the whole
2  building. So her name is, like, Nikki, I think,
3  and she -- I originally got her R.A., her R.A.
4  contacted the head R.A., and then the head R.A.
5  got the CDC, because she is the one that Public
6  Safety reports and deals with these kinds of
7  issues.
8  CHAIRMAN: Oh, okay. Thank you.
9  MS. MASI: Um-hum.
10  FEMALE PANEL MEMBER: I actually
11  have one question.
12  CHAIRMAN: Another question?
13  FEMALE PANEL MEMBER: Can you speak
14  to, if you saw her drinking at all during the
15  evening, what you saw her drinking?
16  MS. MASI: I'm sorry, I couldn't
17  hear that.
18  FEMALE PANEL MEMBER: Sorry. Did
19  you see her drinking at any point during the
20  evening?
21  MS. MASI: Yes.
22  FEMALE PANEL MEMBER: And if so,
23  what did you see her drinking?
24  MS. MASI: I mean, she had shown up

---

**Page 72**

1  clearly intoxicated when I saw her, and then
2  when we went to 12 Clay Street, she had a drink
3  in her hand the whole time. And I witnessed her
4  drinking there.
5  CHAIRMAN: Okay. Well, at this
6  point, Elizabeth, we'd like to thank you for
7  your testimony, and I do not anticipate us
8  needing to call you back.
9  MS. MASI: Okay.
10  CHAIRMAN: But --
11  MALE PANEL MEMBER: Would you be at
12  this number if we needed to?
13  MS. MASI: Yes, absolutely.
14  CHAIRMAN: Okay. Thank you very
15  much.
16  MALE PANEL MEMBER: Thank you.
17  MS. MASI: Thank you.
18  (Off the record.)
19  CHAIRMAN: Okay.
20  MALE PANEL MEMBER: Okay, just speak
21  up as best you can --
22  MS. FEDERICI: Okay.
23  MALE PANEL MEMBER: -- so that
24  everybody can hear.

---

**Page 73**

1  CHAIRMAN: Yeah, we've been having a
2  hard time with the fans going and things, so if
3  you could speak as --
4  MS. FEDERICI: That's fine.  And I
5  actually don't have a lot of voice, so I'm sorry
6  that it's raspy.
7  CHAIRMAN: No, that's okay.  Okay.
8  So I'm going to read something official here
9  now.  Welcome, Beth.  Please understand that --
10  you're expected to truthfully inform us about
11  this incident.  Please be reminded that
12  dishonesty in this hearing can result in serious
13  disciplinary charges.  Do you agree to provide
14  honest, accurate and truthful information today?
15  MS. FEDERICI: Yes.
16  CHAIRMAN: Thank you.  So we have
17  all read your statement, but would you please
18  tell us about your involvement in this incident?
19  MS. FEDERICI: Sure.  So my friend
20  Jake and I went out for a walk, which we
21  normally do, like, at nighttime, and we were
22  heading on Linden Lane, I think, the main
23  entrance, and we ran into Caitlin just walking
24  down there.

**Page 74**

1  And she seemed pretty, like,
2  distraught, because she didn't even notice that
3  we were, like, right behind her.  We were
4  walking in opposite directions.  She didn't even
5  notice it was us until we were, like, in her
6  face and we were like, "Oh, Caitlin, oh, yeah."
7  And she seemed really upset, which
8  was odd, because Caitlin's usually, like, really
9  loud.  So we asked her what was wrong, and she
10  said that she thought she had been taken
11  advantage of.
12  And so we had been heading off-
13  campus and she had been heading, like, from off-
14  campus, so I assumed she was heading back on.
15  And we decided to turn around, so we headed up
16  towards, like, by O'Kane and just walked around
17  the campus for a while.
18  And she was talking to us about what
19  had happened and just telling us that she had
20  been at a party out on Bowdoin Street, and that
21  was when she gave us, like, (inaudible)
22  information about someone, like a baseball
23  player or someone that lived in the baseball
24  house or something like that, I don't know, we

**Page 75**

1  didn't have a lot of information.  We just
2  wanted to make sure she was okay.
3  So Jake and Caitlin and I were
4  walking around for probably, like, half an hour
5  or so before we decided to go back to Healy,
6  because Caitlin and I both live on the third
7  floor there.
8  And we just made food and talked for
9  a little while and stuff.  And she kept
10  commenting that -- we were eating nachos, and
11  she just kept commenting that she was drunk, but
12  they tasted really good anyway, even though it
13  was cheese and that was going to make her sick,
14  but -- and then we finally convinced -- I think
15  we went up with her, like, 1:45-ish.  And we
16  convinced her to go to Public Safety, but that
17  wasn't until around 3:00.  So then Jake and I
18  walked her over there and -- I don't know, when
19  do you want me to stop telling the story?
20  CHAIRMAN: No, I mean just -- I
21  mean, you can tell us what happened at Public
22  Safety if you'd like.
23  MS. FEDERICI: Okay.  So we walked
24  -- actually, okay, so we walked to Public

**Page 76**

1  Safety, and it said that it was closed, because
2  it was really late at that point, and it said to
3  go to Linden Lane for emergencies.  So we went
4  there, and they called someone, I think it was
5  Officer Ford, and said to meet, like, meet us
6  outside the O'Kane entrance.
7  So then they let us in, we walked by
8  over there and they let us in.  And then they
9  took Caitlin to talk to her, and Jake and I just
10  waited in a room for a while.  And then I really
11  don't remember, it was really early in the
12  morning and I had been up all night, but, like,
13  at one point they came in to talk to us to get,
14  like, information.  And Sergeant Culley came
15  over.  And they just wanted to know, like, our
16  names and basic information like that.
17  And then at one point, we went back
18  up to Healy to get clothes for Caitlin, because
19  she was going to the hospital, so we did that.
20  And then we came back down, and then we left to
21  go to the hospital.  That was at, like, 5:00 in
22  the morning, so a lot of it was just sitting
23  around waiting while she talked to Public
24  Safety.  I don't know what happened there, so --

Page 77

1    CHAIRMAN: Okay. Well, you know, we
2  thank you for your statement, and at this point,
3  if you would entertain questions from the
4  hearing panel, we would appreciate that.
5    MALE PANEL MEMBER: Hi, I'm Grant.
6  Were you intoxicated?
7    MS. FEDERICI: Yes.
8    MALE PANEL MEMBER: How intoxicated?
9    MS. FEDERICI: Not a lot. I
10 honestly -- I had stopped drinking around 11:30
11 that night, because I was sick, a little bit,
12 well, just slightly sick. And, yeah. It was a
13 Saturday night. I had drank the night before,
14 so --
15   MALE PANEL MEMBER: How much did you
16 have to drink?
17   MS. FEDERICI: Not a lot. Well, I'd
18 say about, like, maybe five drinks, but I wasn't
19 -- I mean, I still remember everything.
20   MALE PANEL MEMBER: Over what period
21 of time?
22   MS. FEDERICI: Over maybe three or
23 four hours. I really don't know. I didn't
24 really think it was that important at the time,

Page 78

1  so --
2    MALE PANEL MEMBER: Did you have
3  sound judgment?
4    MS. FEDERICI: Yes.
5    MALE PANEL MEMBER: Would you find
6  yourself to be, like, slurred speech, were you
7  stumbling?
8    MS. FEDERICI: No, not at all. We
9  were walking around just because we liked the
10 outside (inaudible), but I was fine.
11   MALE PANEL MEMBER: You said you met
12 her at what time?
13   MS. FEDERICI: I think it was 1:45,
14 because I remember -- it had just been a really
15 long day, and I remember walking around with
16 Jake and being like, oh, it's only 1:45.
17   And the (inaudible) was still going
18 on, for some reason, because that was -- I saw
19 in the big tower, like, the clock tower right in
20 front of Hogan, so, like, it was just chance
21 that I remembered that, but --
22   MALE PANEL MEMBER: That's good.
23 You said you walked around for how long before
24 you went to Healy?

Page 79

1    MS. FEDERICI: Not long. Wait, to
2  Healy? I don't know, it may have been, like,
3  half an hour. I really wasn't paying attention.
4    MALE PANEL MEMBER: And then you're
5  in Healy for how long?
6    MS. FEDERICI: A decent amount of
7  time. An hour or so, forty-five minutes. I
8  remember at one point, Caitlin left to go to the
9  bathroom, and Jake and I just said that we,
10 like, had to get her to go to Public Safety.
11 Jake and I were both -- we had both been
12 drinking, but we were fine. It was -- as soon
13 as we realized that it was kind of, like, a
14 crisis situation, that also, like, instantly
15 sobers you up, too, so --
16   MALE PANEL MEMBER: So you were --
17 how did you feel about what happened? Were you
18 -- what was your -- how were you feeling from
19 it?
20   MS. FEDERICI: Well, I was stressed.
21 I really just wanted to make sure she was okay.
22 I mean, like I said, I mean, I've known Caitlin
23 for a while now, this is actually my first
24 semester, but I met her, like, my first time --

Page 80

1  my first night here. She just -- I've never
2  seen her, like, withdrawn before. So when we
3  saw that, we kind of knew immediately something
4  was wrong.
5    MALE PANEL MEMBER: Can you tell me
6  more about her demeanor?
7    MS. FEDERICI: That night, or in
8  general?
9    MALE PANEL MEMBER: That night.
10   MS. FEDERICI: Like I said, she was
11 kind of just walking. She had, like, her arms
12 folded. She was very, like, just, like,
13 withdrawn, like I said, you know, and it just --
14 usually she'll be all like, "Oh, hey, what's
15 up," and, like, notice you from a distance, but
16 we were, like, in her face before we were like,
17 "Hey, Caitlin." And she was like, "Oh, hey,"
18 you know, like, it just, it didn't seem right.
19 There was something wrong.
20   MALE PANEL MEMBER: How did you --
21 can you tell me about her level of intoxication?
22   MS. FEDERICI: She was pretty drunk.
23 I mean, it's hard to tell when someone is -- I
24 mean, she was just, like I said, she was so

**Page 81**

1 different because she was introverted in that
2 sense that I can't really tell exactly how much.
3 But I remember when we were in Healy, she was
4 laying down and she's like, "I am so drunk right
5 now."
6    And we kept trying to get her to go
7 to Public Safety, and she didn't want to go
8 because she was so drunk and she didn't want to,
9 like, get in trouble in that sense, too. And
10 she was -- like, I remember that. She was like,
11 "No, I'm too drunk, I'm too drunk." And we,
12 like, we basically just made her go, which is
13 kind of mean, but --
14    **MALE PANEL MEMBER:** What did you
15 talk about?
16    **MS. FEDERICI:** We actually didn't
17 talk about what happened a lot. We were back
18 and forth, like, just random conversations. We
19 were eating nachos, which is, like, Caitlin's
20 favorite food, so we just kept making that.
21    And we talked about random things,
22 just, like, our friends, because we run in,
23 like, the same circles, but whenever we -- like,
24 Jake or I would bring up the -- I mean, she

**Page 82**

1 would be okay, you know, and then Jake and I
2 would bring it up, like, "You have to go to
3 Public Safety or something," and she looked like
4 she was about to cry, like, every time. Like,
5 there was, like, just, like, waves of being okay
6 and then just not at all.
7    **MALE PANEL MEMBER:** How aware do you
8 think she was about what was happening earlier
9 that day?
10    **MS. FEDERICI:** I don't know -- like,
11 what do you mean exactly?
12    **MALE PANEL MEMBER:** When she was
13 talking about what happened with Eddie.
14    **MS. FEDERICI:** So the first time
15 when we met her on Linden Lane and we asked her
16 what was wrong, I think pretty much the worst
17 that she said was, "I think I was just taken
18 advantage of." So she seemed pretty incoherent
19 in that sense. Like, she knew what had
20 happened, but she wasn't -- I don't know. I
21 don't know how to articulate that. She didn't
22 seem to know what was going on, not in her head,
23 I don't know, but she didn't even know how to
24 classify it, so . . .

**Page 83**

1    **MALE PANEL MEMBER:** Thank you.
2    **MS. FEDERICI:** You're welcome.
3    **CHAIRMAN:** Are there any other
4 questions from the Board members?
5    **FEMALE PANEL MEMBER:** Did she reveal
6 any other details of what happened, any other
7 specific things that she said, or did she just
8 say that she had been taken advantage of?
9    **MS. FEDERICI:** Yeah, she did,
10 actually. She said -- when we were walking
11 around, she was -- we didn't ask her for, like,
12 the full story of what had happened, because she
13 was just so, like, delicate at that point that
14 we didn't want to say anything to kind of make
15 it worse.
16    But she said that she had tried to
17 move and that it didn't work and that -- I'm
18 trying to think. I just -- like, we got the
19 story, like, in pieces, so it's really hard to,
20 like, bring together, but she said that she had
21 tried to move and it didn't work, and at that
22 point she had also mentioned that she was a
23 virgin and that it was her first time.
24    **MALE PANEL MEMBER:** Was she in pain?

**Page 84**

1    **MS. FEDERICI:** Yeah. And over the
2 next couple of days, she had told me that she
3 was also in pain, because she said that she
4 wasn't playing rugby because of it. She had a
5 rugby tournament, I think a couple of days
6 later, I don't remember, and she didn't play in
7 it, because she was in pain.
8    **MALE PANEL MEMBER:** Can you explain
9 to me the pain from that night?
10    **MS. FEDERICI:** I really don't know.
11    **MALE PANEL MEMBER:** You don't know.
12    **MS. FEDERICI:** I — yeah. I mean,
13 like, she was walking, but, I mean, she was
14 walking a little funny. It may have been
15 because of the pain, it may have been because
16 she was drunk. I really don't know.
17    Also, the hospital seemed to be a
18 pretty painful experience; she had to get, like,
19 shots and (inaudible), so --
20    **FEMALE PANEL MEMBER:** So you went to
21 the hospital with her?
22    **MS. FEDERICI:** Yeah. Jake and I
23 both went with her. We got there about 5:00 or
24 5:30, I don't remember exactly. And they took

Bleiler v.                                                                    Hearing
College of the Holy Cross                                                May 18, 2011

                                                                          Page 85

1 her in, and we didn't actually get to go in
2 there until about 9:00, I think actually because
3 they didn't know that we were there. And we
4 finally asked them and they're like, "Oh, you
5 can go back there," so -- and then we were with
6 her, and we left the hospital around 1:30 or
7    2:00, I think, so --
8    MALE PANEL MEMBER: How did her
9 level of intoxication change from the time that
10 you met her to the time that you were at Public
11 Safety?
12   MS. FEDERICI: She was still drunk
13 at Public Safety. Like --
14   MALE PANEL MEMBER: Did you find she
15 became more drunk or less drunk?
16   MS. FEDERICI: I don't know. A lot
17 of the time that we were in public -- well,
18 okay. While we were walking, she was obviously
19 pretty drunk, but she was also distraught, so I
20 honestly -- I don't know what that was. But in
21 Healy, she kept saying that she was really
22 drunk, and she seemed it, in a sense, you know,
23 just kind of, like, laying around and stuff.
24    And then in Public Safety, we --

                                                                          Page 87

1 in Lehy and we were just hanging out with
2 friends that whole night. I've never been off-
3 campus, but we had literally just walked down,
4 we walked from Lehy down the Dinand steps, and
5 we were just heading down Linden Lane. I don't
6 know where we were going. Jake was leading the
7 way. We were kind of just walking around.
8 That's what we do at night, so --
9    CHAIRMAN: I have a question. Had
10 you seen Caitlin earlier in that day, to your
11 recollection?
12   MS. FEDERICI: If I had seen her
13 earlier that day, it was at, like, brunch or
14 breakfast or something. I didn't see her at all
15 when she was, like, drunk or anything.
16   CHAIRMAN: Okay. So you wouldn't be
17 able to describe any of her activities
18 previously in the day?
19   MS. FEDERICI: No. I hadn't --
20 yeah, I hadn't seen her at all, I don't think.
21   CHAIRMAN: Okay. More questions
22 from the Board? Okay. At this point, we'll
23 have questions from Caitlin and Edwin, and we're
24 just kind of alternating this time, so we'll

                                                                          Page 86

1 Jake and I didn't spend a lot of time with her
2 at all, because she was talking to Sergeant
3 Culley and other people. So it was just, Jake
4 and I were in, like, a room alone, and then she
5 came out and she, like, laid on a table. She
6 was, just, like, laying on the table. She's
7 like, "I'm still drunk right now." And that was
8 at, like -- I think that was right before we
9 went to the hospital, so it would have been
10 about 5:00.
11    Oh, also, one of the things, she
12 wore shorts to Public Safety, and I remember
13 Jake and I being like, "It's pretty cold out.
14 You should put pants on." She's like, "No, no,
15 no, I'm fine, I won't be cold," or something
16 like that. Just, you know, when you're drunk,
17 you get warmer, I'm just saying.
18   MALE PANEL MEMBER: Anything else we
19 should know?
20   MS. FEDERICI: Not that I can think
21 of.
22   FEMALE PANEL MEMBER: Did you go to
23 the Clark block party?
24   MS. FEDERICI: No. I was with Jake

                                                                          Page 88

1 start with Edwin, if you have questions?
2    MR. BLEILER: Not at this time.
3    CHAIRMAN: Okay. Edwin has no
4 questions at this time. Caitlin, do you have
5 questions for Beth?
6    MS. MURPHY: How long did you
7 observe me being under the influence?
8    MS. FEDERICI: From the time I saw
9 you until at least until the time that we left
10 the hospital, and then I didn't see you for,
11 like, four hours in the hospital, so . . .
12   MS. MURPHY: So I was under the
13 influence at the hospital that (inaudible)?
14   MS. FEDERICI: Yeah, seemed like it.
15   MS. MURPHY: And do you think that
16 in that state, I would have been able to give
17 effective consent?
18   MS. FEDERICI: No. You were too
19 drunk. You just didn't seem like you, so I
20 don't know how you would have been able to give
21 consent. Sorry.
22   MS. MURPHY: That's all I have.
23   CHAIRMAN: Okay, that's all the
24 question Caitlin has. Edwin, do you have

Bleiler v.                                                                    Hearing
College of the Holy Cross                                                  May 18, 2011

Page 89

1 questions? It's okay if you don't. I don't
2 mean to push.
3    MR. BLEILER: (inaudible)
4    MS. FEDERICI: We'll be (inaudible)
5 too, so if there's any questions.
6    CHAIRMAN: Right.
7    MR. BLEILER: (inaudible)
8    CHAIRMAN: Sure.
9    MALE PANEL MEMBER: Can I ask a
10 question in this timeframe? You told me earlier
11 that, like, her level of intoxication was kind
12 of, like, up in the air, but then you just said
13 to her that, "You weren't -- you were
14 intoxicated to the point where you weren't able
15 to give consent"?
16    MS. FEDERICI: It didn't mean that
17 -- I said that she didn't seem like her, so I
18 don't know how you would be effectively able to
19 give consent when you don't even seem like
20 yourself.
21    MALE PANEL MEMBER: As in, "I'm
22 having a bad day"?
23    MS. FEDERICI: Maybe. I don't know.
24 I didn't see her that day.

Page 90

1    MALE PANEL MEMBER: Like, not able
2 to give consent, to me, would mean, like, you're
3 incapacitated to the point where you don't have
4 the ability to give consent. What's your idea
5 of giving consent?
6    MS. FEDERICI: I would say saying
7 yes.
8    MALE PANEL MEMBER: So you don't
9 think she had the ability to say yes or no?
10    MS. FEDERICI: I don't think so.
11    MALE PANEL MEMBER: Okay, that's
12 good. Thank you.
13    FEMALE PANEL MEMBER: At what point
14 did you observe that she was sober? Was it when
15 you saw her again at the hospital or --
16    MS. FEDERICI: I think at, like,
17 around 9:00. She definitely wasn't drunk
18 anymore. She may have been -- like, it's really
19 hard to tell with people, and especially, like,
20 when she was so stressed. We were, like, in a
21 completely different setting. People were
22 coming in and out.
23    Like, honestly, myself, like, I
24 don't -- like, I was exhausted at that point. I

Page 91

1 hadn't slept at all. You know, I was sobering
2 up, like, throughout the whole night. Like I
3 said, like, I wasn't -- I wasn't drunk by any
4 means like that, but it was just, by that point,
5 I was exhausted, so . . .
6    CHAIRMAN: Okay. If there are no
7 further questions from the Board or from
8 students? No more questions? Then, Caitlin
9 (sic), we thank you for your participation in
10 this hearing. You're now excused. But please
11 remain in --
12    (Off the record.)
13    CHAIRMAN: Okay. We've got the
14 recorder rolling? Okay. Welcome, Jacob.
15 Please understand that you're expected to
16 truthfully inform us about this incident.
17 Please be reminded that dishonesty in this
18 hearing can result in serious disciplinary
19 charges. Do you agree to provide honest,
20 accurate and truthful information to us today?
21    MR. YIZNITSKY: Yes.
22    CHAIRMAN: Thank you. We have read
23 your statement. Please tell us about your
24 involvement in this incident.

Page 92

1    MR. YIZNITSKY: Yeah, so Beth and I
2 went for a walk that night, and we were walking
3 down Linden Lane, and --
4    MALE PANEL MEMBER: Can you hear him
5 okay?
6    MALE PANEL MEMBER: No, not really.
7    CHAIRMAN: Okay. Could you please
8 speak up? We have a fan going here --
9    MR. YIZNITSKY: Yeah, yeah.
10    CHAIRMAN: -- and it's kind of
11 difficult to hear everybody, so --
12    MR. YIZNITSKY: Beth and I went for
13 a walk, and we met Caitlin on Linden Lane. Her
14 arms were crossed. It was really cold. She
15 didn't really seem herself, just seemed kind of
16 out of it. She didn't notice us until we were,
17 like, right next to her. And then she told us
18 that she had been raped.
19    So we turned around with her and we
20 went for a walk through campus. I really don't
21 know what we talked about too much. She was
22 having trouble walking. She was leaning on Beth
23 and me a lot. She stumbled a lot. I don't know
24 if you'd call her speech slurred, but she was

Page 93

1 definitely having trouble talking and, like,
2 forming her thoughts. And she seemed rather
3 drunk.
4    Went back to her room at Healy and
5 so she could change, and we had some snacks.
6 And then Beth and I, for about maybe an hour or
7 so, tried to convince her to go to Public
8 Safety. So then we walked her down there
9 through Linden Lane (inaudible) Public Safety.
10    CHAIRMAN: Okay. Well, thank you
11 for your statement. At this point, if you could
12 answer some questions from the Board, if the
13 Board has any questions for you?
14    MR. YIZNITSKY: Yeah.
15    MALE PANEL MEMBER: Do you mind if I
16 go?
17    FEMALE PANEL MEMBER: No.
18    MALE PANEL MEMBER: What was your
19 level of intoxication?
20    MR. YIZNITSKY: Very low.
21    MALE PANEL MEMBER: Can you explain
22 "very low" to me?
23    MR. YIZNITSKY: Like, three glasses
24 of wine.

Page 94

1    MALE PANEL MEMBER: Three glasses of
2 wine. And what was the time period over which
3 you had that?
4    MR. YIZNITSKY: An hour and a half.
5    MALE PANEL MEMBER: Three glasses
6 over an hour and a half. So you wouldn't become
7 intoxicated with three glasses of wine in an
8 hour and a half?
9    MR. YIZNITSKY: I was not drunk.
10    MALE PANEL MEMBER: How intoxicated
11 would you say you were?
12    MR. YIZNITSKY: (inaudible)
13    MALE PANEL MEMBER: Okay. That's
14 good. What was her level of intoxication?
15    MR. YIZNITSKY: Caitlin's?
16    MALE PANEL MEMBER: Yeah.
17    MR. YIZNITSKY: I would say very.
18 She and I have drank a lot together. She --
19    MALE PANEL MEMBER: You do or don't?
20    MR. YIZNITSKY: She and I have in
21 the past. We drank a lot together. And she
22 seemed very drunk. And she mentioned that she
23 had taken antibiotics also, and in my experience
24 with that, it affects you more so, too.

Page 95

1    MALE PANEL MEMBER: What signs made
2 you think she was very drunk?
3    MR. YIZNITSKY: Like I said, she was
4 having a lot of trouble walking, and she really
5 couldn't -- I mean, she was slurring, but it
6 was, like -- from the way she was talking, it
7 was pretty clear that she was drunk.
8    MALE PANEL MEMBER: What was her
9 demeanor?
10    MR. YIZNITSKY: Her demeanor?
11    MALE PANEL MEMBER: Yeah, like how
12 she was acting.
13    MR. YIZNITSKY: Yeah. Not herself,
14 that's for sure. She's usually a very happy,
15 peppy person, and, you know, we were in the
16 room, she was really sad, like, she was just
17 kind of, like, staring off into space and not
18 herself at all. Usually she's joking and
19 boisterous and happy, but she was --
20    MALE PANEL MEMBER: Would you say
21 that was the alcohol or being tired, or would
22 you say it was something else?
23    MR. YIZNITSKY: Definitely something
24 else. I've been around her intoxicated

Page 96

1 (inaudible).
2    MALE PANEL MEMBER: What did you
3 talk about?
4    MR. YIZNITSKY: On the walk? I
5 really don't remember too much. We asked who it
6 was. We didn't really press her for details or
7 anything like that. Back at the room, we talked
8 more about it, trying to convince her to go, if
9 he had used protection, how it had happened, and
10 we convinced her to go to Public Safety.
11    MALE PANEL MEMBER: What was going
12 through your head from when you saw her to when
13 you took her to Public Safety?
14    MR. YIZNITSKY: You always hear
15 about this stuff, but you never expect it to be
16 one of your friends, you never expect it to be,
17 because we were just heading for a walk and ran
18 into her.
19    MALE PANEL MEMBER: Were you worried
20 for her? Were you --
21    MR. YIZNITSKY: Yeah, I was
22 definitely worried for her.
23    MALE PANEL MEMBER: Like, how
24 serious did you take what she was saying?

Page 97

1     MR. YIZNITSKY: Very seriously. I
2 mean, for two hours, I convinced her to go to
3 Public Safety, and then I went over to the
4 hospital and stayed at the hospital for, what
5 was it, like eight hours or so?
6     MALE PANEL MEMBER: Was she in pain?
7     MR. YIZNITSKY: Was she in pain?
8     MALE PANEL MEMBER: Yeah.
9     MR. YIZNITSKY: Yes, actually, she
10 did say it hurt. She said --
11     MALE PANEL MEMBER: You said she was
12 in pain?
13     MR. YIZNITSKY: I think she said
14 that -- she said that her -- I definitely
15 remember afterward at the hospital, she said it
16 hurt. I don't remember (inaudible).
17     MALE PANEL MEMBER: Why did she
18 change her clothing?
19     MR. YIZNITSKY: She was cold
20 (inaudible).
21     MALE PANEL MEMBER: Okay. Thanks.
22     MR. YIZNITSKY: Yup.
23     FEMALE PANEL MEMBER: Did she reveal
24 any other specific details of what happened to

Page 98

1 you or provide answers to your questions?
2     MR. YIZNITSKY: Yeah, she -- I don't
3 know. She said that she was there and then he
4 got on top of her and that she tried to move out
5 of the way to try to push him off, but she
6 couldn't.
7     MALE PANEL MEMBER: Can you tell us
8 any more of the things that she said?
9     MR. YIZNITSKY: Ahh, she was very
10 drunk. She said she didn't remember really how
11 she got to the party. She had known him in the
12 past. They had had a semi-relationship earlier,
13 but it wasn't anything serious. Said it was her
14 first time having sex; well, if you want to
15 count it as sex. (inaudible).
16     CHAIRMAN: Could you tell me what
17 the specific phrasing she used the very first
18 time that she told you that something, you know,
19 that something had happened?
20     MR. YIZNITSKY: She said she was --
21 asked her how she was, and she said she was not
22 good, she had been raped.
23     CHAIRMAN: And those were her
24 specific words?

Page 99

1     MR. YIZNITSKY: (No verbal response)
2     CHAIRMAN: And that was -- how long
3 after you bumped into her on the sidewalk did
4 she say that to you?
5     MR. YIZNITSKY: It was right when we
6 bumped into her.
7     CHAIRMAN: Okay. Thank you.
8     MR. YIZNITSKY: Yup.
9     FEMALE PANEL MEMBER: Can you
10 characterize her reluctance to go to Public
11 Safety? Did she give you reasons?
12     MR. YIZNITSKY: She said that she
13 didn't think he meant to do it and she didn't
14 want to get him in trouble for doing this, that
15 she was tired. She said that she was really
16 tired and she didn't want to deal with all this
17 tonight and that we should go tomorrow. Those
18 were her two main reasons.
19     MALE PANEL MEMBER: How sure was she
20 about what happened?
21     MR. YIZNITSKY: She was pretty
22 adamant that she was raped.
23     CHAIRMAN: Okay. Are there further
24 questions from the panel? Okay. At this point,

Page 100

1 we will have questions from Caitlin and Edwin,
2 and at this point we'll start with a question
3 from Caitlin, if she has any questions for
4 Jacob?
5     MS. MURPHY: So would you say I was
6 even under the influence hours after the
7 incident?
8     MR. YIZNITSKY: Yeah, when they saw
9 you in the hospital room, you still seemed
10 (inaudible) and that was -- was it -- probably
11 around 9:00 in the morning (inaudible).
12     CHAIRMAN: Okay. No further
13 questions from Caitlin at this time. Edwin, do
14 you have questions?
15     MR. BLEILER: Yeah, I have a few.
16 You gave reports to Public Safety --
17     MR. YIZNITSKY: Um-hum.
18     MR. BLEILER: -- about this
19 incident? You gave two different reports?
20     MR. YIZNITSKY: Yeah, I gave a
21 second one, yes.
22     MR. BLEILER: And you knew that this
23 was going to be taken care of through the school
24 and also that it had criminal implications?

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

Page 101

1    MR. YIZNITSKY: Yeah.
2    MR. BLEILER: And that -- actually,
3 when was the -- how far apart were the two
4 reports?
5    MR. YIZNITSKY: Ahh, let's see. We
6 had Saturday. I want to say it was the next
7 Wednesday.
8    MR. BLEILER: So three days?
9    MR. YIZNITSKY: Yeah.
10    MR. BLEILER: And in either one of
11 these reports, did you acknowledge Ms. Murphy's
12 level of intoxication?
13    MR. YIZNITSKY: Umm, I don't know if
14 I did. (inaudible).
15    MR. BLEILER: So you testified that
16 -- you said here that she had trouble walking --
17    MR. YIZNITSKY: Um-hum.
18    MR. BLEILER: -- that she was
19 talking -- but did you include these in any of
20 your statements (inaudible)?
21    MR. YIZNITSKY: (inaudible) read the
22 statement. I don't know if I specified.
23    CHAIRMAN: Okay. Caitlin has
24 another question.

Page 102

1    MS. MURPHY: Yeah. What were the
2 words that I used when I saw you on Linden Lane
3 and you asked me what happened?
4    MR. YIZNITSKY: We asked you if you
5 were okay. You said, "No, I was raped." We
6 asked you if you knew who he was. You told us
7 who he was. And the words, "I was raped" was
8 very clear.
9    CHAIRMAN: Okay. So at this point,
10 unless there are further questions from the
11 Board, Jacob, we'd like to thank you for your
12 participation in this hearing. You are now
13 excused, but please remain in the designated
14 waiting area in case we have follow-up
15 questions.
16    (Off the record.)
17    CHAIRMAN: At this point, there are
18 no further witnesses being called, so we'll move
19 on to the closing questions and statements.
20    MR. BLEILER: I just wanted to say
21 that the only witness that I had couldn't be
22 available today and just to inform the Board
23 again that he submitted a written statement.
24    CHAIRMAN: Okay. And this was

Page 103

1 Brendan --
2    FEMALE PANEL MEMBER: McCree or
3 something?
4    CHAIRMAN: -- McCree?
5    MR. BLEILER: McCree, yup.
6    CHAIRMAN: Yeah, okay.
7    MR. IRISH: They got that.
8    CHAIRMAN: And we have -- we had --
9    MR. BLEILER: No, I just wanted to --
10 make sure.
11    CHAIRMAN: Right, yeah, we do have
12 his statement and we have read his statement.
13    MR. BLEILER: Okay. I was just --
14 wanted to make sure (inaudible).
15    CHAIRMAN: Thank you. Okay. So at
16 this point, we're going to move on to closing
17 questions and statements, and we start at this
18 time with more questions from the panel at this
19 point. So this is essentially, you know, the
20 last chance that the panel has to ask questions,
21 so anything that is still in your minds that you
22 want cleared up, this is a good time to ask
23 right now.
24    FEMALE PANEL MEMBER: So how long

Page 104

1 were you in your apartment with Caitlin, about?
2    MR. BLEILER: I would say we got
3 back to my apartment around 12:45 or 1:00 and
4 that she had left thirty -- probably thirty to
5 forty-five minutes later. So about, you know,
6 1:00 to 1:30 (inaudible).
7    FEMALE PANEL MEMBER: So the topic
8 of condoms has come up. So did you -- I mean,
9 did you not have time, or --
10    MALE PANEL MEMBER: Did you use a
11 condom?
12    MR. BLEILER: No.
13    MALE PANEL MEMBER: Why did you
14 choose not to use a condom?
15    MR. BLEILER: I just -- you know, it
16 all happened kind of unexpectedly for me. Not
17 unexpectedly, but, you know, it had happened
18 while she was on top of me and then, you know,
19 it hadn't been very long a period of time. And
20 once we no longer continued the intercourse, you
21 know, I asked her if she wanted to continue,
22 and, you know, at that time, I could have used a
23 condom if we had continued.
24    MALE PANEL MEMBER: You were okay

Page 105

1 not using a condom?
2    MR. BLEILER: I mean, I would -- I
3 mean, it had started while I wasn't using one.
4 I mean, if we had continued, I would have.
5    MALE PANEL MEMBER: You said she was
6 on top. Was that the only position that you
7 were in?
8    MR. BLEILER: No, I -- (inaudible)
9 my statement, we had rolled over, she was on the
10 bottom and I was on top after.
11    MALE PANEL MEMBER: Earlier, we were
12 talking about the actual act of penetrating for
13 sex, and I just need you to do that one more
14 time for me, tell me what happened.
15    MR. BLEILER: She had been on top of
16 me, straddling me, and that's when the
17 intercourse had begun, and --
18    MALE PANEL MEMBER: Did you realize
19 it was going to happen, or it was just, like,
20 out of the blue?
21    MR. BLEILER: I mean, I wouldn't say
22 it was out of the blue, but I didn't say it was,
23 like, blatantly obvious that it was going to
24 happen. It was kind of, like, while we were

Page 106

1 kissing, there was this kind of -- you know,
2 while we had been kissing.
3    MALE PANEL MEMBER: So, mentally,
4 did you know, like, you were about to have sex?
5    MR. BLEILER: No.
6    MALE PANEL MEMBER: You didn't?
7    MR. BLEILER: No.
8    MALE PANEL MEMBER: So she initiated
9 sex?
10    MR. BLEILER: I wouldn't say -- like
11 I said before, I would say it was -- I would say
12 it was mutual. I'd say it was just kind of --
13    CHAIRMAN: I have a question I'd
14 like to put in here --
15    MALE PANEL MEMBER: Yeah, take it.
16    CHAIRMAN: Okay. So, you know, I
17 apologize for being blunt, but I guess my
18 question is, you know, with respect to the act
19 of initial penetration, whose hands went where,
20 is what I would like to ask.
21    MALE PANEL MEMBER: Whose hands?
22    CHAIRMAN: Yes. I mean, were there
23 -- were anybody's hands involved in sort of
24 guiding the initial act of penetration in this

Page 107

1 case?
2    MR. BLEILER: Umm, I'm just trying
3 to remember. I honestly can't remember.
4    FEMALE PANEL MEMBER: On that same
5 vein, when you met Caitlin at the house, what
6 was your reason for inviting her back to your
7 room, to your house?
8    MR. BLEILER: Well, I had enjoyed
9 the previous time I had spent with her, so I
10 just invited her, I invited her back.
11    FEMALE PANEL MEMBER: So was it, you
12 were just going to continue the conversation and
13 trying to catch up there, or was it the intent
14 was that you were going to have some kind of
15 sexual encounter?
16    MR. BLEILER: Umm, you know, it was
17 kind of, you know, I had offered to -- you know,
18 it was kind of -- it was a place to continue
19 talking, and then if anything further happened
20 (inaudible).
21    FEMALE PANEL MEMBER: And I just
22 have a question for Caitlin. If you could just
23 go through the day as far as, what did you do
24 from the -- did you have -- starting with when

Page 108

1 you woke up in the morning, did you have
2 breakfast?
3    MS. MURPHY: Yes. I woke up, I
4 think it was 7:30 in the morning. I went to
5 breakfast with my rugby team (inaudible). I
6 didn't play in the rugby game because that was
7 the day of Battle of the Bands, and so I had to
8 leave early to go practice with my band. Then I
9 was at Battle of the Bands --
10    FEMALE PANEL MEMBER: What time was
11 that?
12    MS. MURPHY: -- the whole day. I
13 think it started -- it started at 1:00 or 2:00
14 and then -- well, we ended up winning Battle of
15 the Bands, so we performed the whole time. I
16 went to dinner after that around 6:00.
17    I then went to a rugby party at
18    6:30, and then the Clark block party started at
19    10:00, so I went there after drinking at the
20 rugby party. And at the Clark block party,
21 that's when I had the mixed drink.
22    And then from there, that's when I
23 went to the house on Clay with my friends, and I
24 had a drink there. And then that's when we went

Page 109

1 to One Bowdoin, and then I don't -- like, that's
2 where it gets fuzzy, because then I ended up at
3 his place and I don't know how --
4    FEMALE PANEL MEMBER: So do you
5 remember what you -- so you had breakfast and
6 dinner, but no lunch. Is that right? Because
7 you -- at the Battle of the Bands --
8    MS. MURPHY: No, I had lunch. I had
9 lunch, like, around noonish, I would say, with
10 my band.
11    FEMALE PANEL MEMBER: And what do
12 you usually -- I mean, did you have salad, did
13 you have a hamburger?
14    MS. MURPHY: I had a waffle,
15 actually, because it was still breakfast time,
16 so --
17    FEMALE PANEL MEMBER: Okay, so you
18 had breakfast, then you had a waffle at lunch,
19 and then what did you have for dinner?
20    MS. MURPHY: Dinner, I had a -- I
21 made myself a wrap.
22    FEMALE PANEL MEMBER: What do you do
23 in your band? Do you sing or do you play an
24 instrument?

Page 110

1    MS. MURPHY: I sing.
2    FEMALE PANEL MEMBER: Okay. And
3 were you able to sing at the Clark block party?
4    MS. MURPHY: They didn't play any of
5 my songs, so I only sang backup and I was -- I
6 mean, sang, I don't know if it was well, but I
7 sang.
8    FEMALE PANEL MEMBER: Is this the
9 drunkest you've ever been in your entire life?
10    MS. MURPHY: Umm, see, I had
11 different experiences with being drunk. This
12 is, like, the most serious, I would say. I
13 mean, there have been instances where I had been
14 less drunk and puking, but in this -- it was a
15 very different kind of drunk, since I didn't
16 vomit. But I've never blacked out this much
17 before.
18    FEMALE PANEL MEMBER: Did you take
19 any other drugs besides antibiotics?
20    MS. MURPHY: No.
21    CHAIRMAN: So were you -- I guess
22 I'm trying to -- I'm just trying to ascertain
23 more about your physical state that day. Were
24 you -- you know, I saw the mention of the

Page 111

1 antibiotics. Were you sick, did you have the
2 flu, was there --
3    MS. MURPHY: I was getting over
4 laryngitis, pharyngitis with vomiting, but I was
5 on the second-to-last day of my antibiotics,
6 so --
7    CHAIRMAN: So at that point, were
8 you -- there was --
9    MS. MURPHY: I was already better.
10    CHAIRMAN: Okay. So you weren't
11 vomiting or anything that day?
12    MS. MURPHY: No.
13    CHAIRMAN: Dehydrated or anything of
14 that nature?
15    MS. MURPHY: No. I was keeping
16 myself hydrated.
17    CHAIRMAN: Okay.
18    FEMALE PANEL MEMBER: Did you have
19 anything to drink at (inaudible)?
20    MS. MURPHY: Water.
21    MALE PANEL MEMBER: Do you remember
22 meeting Eddie?
23    MS. MURPHY: I remember looking for
24 a bathroom and opening a door and seeing him and

Page 112

1 saying, like, hi, and then running away because
2 I really had to go to the bathroom. But that's
3 the last I remember seeing (inaudible).
4    MALE PANEL MEMBER: Eddie, can you
5 tell us what happened right before you went to
6 Bowdoin, and then I'll stop you there?
7    MR. BLEILER: I had been -- I had
8 been there previously that night when I had left
9 to go, left to go to -- I had left the party,
10 but I hadn't left the house, because I have
11 friends who live on all three floors of the
12 house. It's one of three apartment houses. So
13 I had just gone to a different apartment
14 (inaudible) back upstairs at One Bowdoin.
15    And then that's when I met Miss
16 Murphy on the stairs going up to the third
17 floor. And then we walked down the stairs. I
18 asked -- you know, that's when we caught up. I
19 asked her if she would like to go back to my
20 house with me.
21    MALE PANEL MEMBER: Did you have to
22 convince her to come back? Did you, like, talk
23 her into it, or was it just -- like, how did it
24 happen?

Bleiler v.                                                                    Hearing
College of the Holy Cross                                                May 18, 2011

Page 113

1    MR. BLEILER: I said, "Would you
2  like" -- yeah, I said, "Do you want to go back
3  to my house?" And she said yes.
4    MALE PANEL MEMBER: How clear was
5  your memory of, like, all these events?
6    MR. BLEILER: I would say, you know,
7  pretty clear.
8    FEMALE PANEL MEMBER: Caitlin, can
9  you go through again your recollection of what
10  happened, what happened when you were -- just
11  prior to penetration?  Do you remember any of
12  those details, or is that all vague?
13    MS. MURPHY: I remember we were in
14  his room, we were making out.  I don't remember
15  my clothes coming off, but I do remember that he
16  had put his fingers in my vagina, and I remember
17  saying no.  And he was like, "It's okay."
18    And then I do remember trying to
19  move out of the way, because he was trying to
20  penetrate me, and then he did.  He was on top of
21  me.
22    FEMALE PANEL MEMBER: So you're
23  aware of that, you're aware of him being on top
24  of you and not putting a condom on, and then you

Page 114

1  ended it.  How did you end it or how did it
2  stop?
3    MS. MURPHY: Well, for your first
4  part, yes, I was aware that he was not wearing a
5  condom.  How long he was inside me, I'm not
6  quite sure.
7    I do remember finally getting him
8  off.  I remember -- I think I had pushed -- I'm
9  not really sure how I got him off, but it was,
10  like, I just, I stopped it (inaudible).
11    MALE PANEL MEMBER: Why, in your
12  opinion, do you think you were able to stop it
13  at that point and not earlier?
14    MS. MURPHY: Umm, I'm not sure.
15    MALE PANEL MEMBER: How long did the
16  sex last?
17    MS. MURPHY: That's something I --
18    MALE PANEL MEMBER: No idea?
19    MS. MURPHY: -- I have no idea how
20  long it lasted.  I don't have a timeframe of
21  that at all.
22    CHAIRMAN: So in your opinion, who
23  was the initiator of each level of sexual
24  activity?

Page 115

1    MS. MURPHY: He was.
2    MALE PANEL MEMBER: What was your
3  mental state, like, what were you thinking when
4  he was having sex with you?
5    MS. MURPHY: Well, my head was
6  screaming no.  I don't know if I was actually
7  verbalizing it or not, but I knew that I did not
8  want that.
9    MALE PANEL MEMBER: Eddie, did she
10  seem to be enjoying herself?
11    MR. BLEILER: It really wasn't -- it
12  really hadn't -- it really wasn't a long period
13  of time.  I mean, I would --
14    MALE PANEL MEMBER: So from somebody
15  who says they had a clear memory of the night,
16  how long did it last?
17    MR. BLEILER: No more than two
18  minutes.
19    MALE PANEL MEMBER: So of two
20  minutes, did it seem that it was an enjoyable
21  experience?
22    MR. BLEILER: Yeah, I had no
23  indications otherwise.  I mean, yes (inaudible).
24    MALE PANEL MEMBER: Why do you think

Page 116

1  she was enjoying herself?
2    MR. BLEILER: I mean, I don't know
3  -- like, I --
4    MALE PANEL MEMBER: Well, when
5  someone, like, has ice cream, they're usually
6  enjoying themselves and you can tell they're
7  enjoying themselves.
8    CHAIRMAN: Yeah, I think we're -- I
9  think we probably have enough information at
10  this point.  We can take a short break for a
11  moment.
12    MALE PANEL MEMBER: At this point
13  (inaudible) questions and then we can have
14  closing statements.
15    CHAIRMAN: Yeah, I mean, if there
16  are more questions about, you know, what
17  happened, but, you know, I don't know what level
18  of details we need to go into at this point.
19    MALE PANEL MEMBER: Why don't we --
20    FEMALE PANEL MEMBER: Just --
21    MALE PANEL MEMBER: Yup?
22    FEMALE PANEL MEMBER: Sorry, I
23  have --
24    MALE PANEL MEMBER: One last

Bleiler v.
College of the Holy Cross

Page 117

1  question, then we'll take a five-minute break,
2  and then we'll do closing statements.
3     **FEMALE PANEL MEMBER:** Do you
4  remember what your intentions were when you went
5  to the house? Did you have any expectations of
6  what was going to happen, or did you (inaudible)
7  going, do you remember?
8     **MS. MURPHY:** I mean, I really don't
9  remember, but I never, ever have any
10  expectations of sex.
11     **CHAIRMAN:** Okay. At this point,
12  we'll take a break, and then we'll --
13     (Off the record.)
14     **CHAIRMAN:** Okay. So we're now on to
15  the closing statements. At this time, Caitlin
16  and then Edwin may provide the hearing panel
17  with any final remarks or statements. Caitlin
18  goes first.
19     **MS. MURPHY:** As a point of
20  clarification, he was aware, during our previous
21  relationship, that I was adamant about not going
22  further. It should have been an indicator I
23  would not go further on the night in question.
24     I am aware of everything that is at

Page 118

1  stake for him, but this isn't about him. More
2  importantly, the stakes are high for me. I am
3  the one that has to live with this the rest of
4  my life and see it affect my daily life. Even
5  just going to the hospital that day was a
6  traumatic experience.
7     Not only am I scarred physically,
8  since, at the hospital, they found a one-
9  centimeter laceration on my vagina from the
10  encounter and active bleeding at the site, I am
11  scarred emotionally. I will never be the same
12  person I was before I was raped.
13     I experience almost daily panic
14  attacks and have negative changes in my persona
15  that has led to damaged relationships with some
16  of my peers. I am unable to focus on my work
17  and have needed to get two papers and a final
18  extended until after I leave campus. Studying
19  for these finals, on top of everything else, has
20  been extremely difficult.
21     Not only have I needed to worry
22  about finals under these circumstances, but I
23  now need to worry about possibly having
24  contracted HIV and other STDs as well.

Page 119

1     This has added such a stress on my
2  life, and it is a stress that no one should have
3  to go through. He took the power to say no away
4  from me. This was not his to take. He took my
5  virginity, something I was so dedicated to
6  saving for marriage, without my consent. This
7  was not his to take, and it can never be given
8  back. Something that is supposed to be
9  associated with love is now associated with
10  pain, both physically and emotionally. He needs
11  to be held accountable for his actions.
12     This Holy Cross -- excuse me. The
13  Holy Cross mission statement, taken directly
14  from the website, is, the college is dedicated
15  to forming a community which supports the
16  intellectual growth of all its members, while
17  offering them opportunities for spiritual and
18  moral development. I ask you, do you really
19  believe this mission, or is it something only
20  nice to have on a website to recruit students?
21     I was one of these students that
22  approached Holy Cross believing this statement.
23  The man that raped me has lived in this
24  environment that professes this commitment for

Page 120

1  four years. For this and many other reasons, he
2  deserves the maximum sanctions available.
3     I was extremely impaired, without
4  any ability to give effective consent, and he
5  raped me. This is not excusable under any
6  circumstance, and he needs to be held
7  responsible.
8     **CHAIRMAN:** Caitlin, we thank you for
9  your statement. At this time, I will ask Edwin
10  to provide his final remarks and statement.
11     **MR. BLEILER:** Throughout the course
12  of this hearing today, we've heard witness
13  statements and testimony. We heard three
14  friends of Miss Murphy's who came forward and
15  told us their information and their indications
16  of intoxication, yet the only independent,
17  trained professional who would be in -- who has
18  been trained to, you know, judge level of
19  intoxication has stated today that she was not
20  incapacitated.
21     If a trained professional said that
22  she was not incapacitated, I would have to
23  suggest to the Board myself that how myself, as
24  not a trained professional, was supposed to

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

Page 121

1 determine this level of intoxication.
2    In dealing with the issue of
3 consent, umm, you know, as I put forward today,
4 you know, once that we had -- once the consent
5 had been removed, we immediately stopped, I had
6 respected this decision, and that ultimately, as
7 my witness statement, not my -- the statement of
8 my witness says that when he observed Miss
9 Murphy, she was not crying and that she didn't
10 appear to be in any need of help or -- and she
11 didn't appear to be intoxicated. Once again,
12 you saw my witness saw Miss Murphy right before
13 she left my house.
14    I admit that in this case, I did not
15 act like a gentleman in a Catholic tradition,
16 but this misstep in that sense does not rise to
17 the level of violation of the community
18 standards in this sense.
19    I just have to reiterate again that
20 I am truly sorry that Miss Murphy and myself are
21 in this position, but -- and also that if I
22 would kind of -- if I would, like, want her to
23 know anything from me out of this, that if I
24 thought that she was intoxicated and unable to

Page 122

1 freely consent, I would have never engaged in
2 any sexual conduct.
3    CHAIRMAN: Edwin, we thank you for
4 your statement. At this point, the hearing
5 panel will now meet to consider the information
6 presented. Mr. Irish will contact you once we
7 have reached a decision on a recommendation for
8 the vice president of student affairs, dean of
9 students. You will all be informed by Mr. Irish
10 of our recommendations and any appeal processes.
11 Thank you.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 123

1                C E R T I F I C A T E
2
3       This is to certify the foregoing is a
4 true and accurate transcript, to the best of my
5 skill and ability, of a hearing before the
6 College of the Holy Cross Community Standards
7 Board in the matter of Edwin Bleiler, recorded
8 on May 18, 2011.
9
10
11
12
13
14
15
16
17
18
19
20    _____        _____
21 isa M. Cimmino                    Date
22 otary Public
23
24

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

---

' 

**5**

**'Can (1)**
37:20

**1**

**1 (4)**
2:14,16;4:21;8:1
**1:00 (3)**
104:3,6;108:13
**1:30 (2)**
85:6;104:6
**1:45 (2)**
78:13,16
**1:45-ish (1)**
75:17
**10:00 (2)**
43:9;108:19
**11:00 (1)**
43:21
**11:30 (1)**
77:10
**12 (2)**
60:7;72:2
**12:00 (1)**
13:18
**12:45 (1)**
104:3
**123 (1)**
1:1
**18 (1)**
1:13
**18th (1)**
2:6
**1st (2)**
8:15;42:8

**2**

**2:00 (2)**
85:7;108:13
**2011 (3)**
1:13;2:14;4:21

**3**

**3:00 (2)**
13:8;75:17
**3:15 (1)**
48:19
**3:30 (8)**
42:9,12;48:11,15,24;49:2,3,
10
**3:45 (1)**
49:11
**30th (1)**
8:14
**38 (1)**
9:13

---

**5:00 (3)**
76:21;84:23;86:10
**5:30 (1)**
84:24
**5th (1)**
47:13

**6**

**6:00 (1)**
108:16
**6:30 (2)**
43:6;108:18

**7**

**7:30 (1)**
108:4

**9**

**9:00 (4)**
13:16;85:2;90:17;100:11
**9th (1)**
47:17

**A**

**ability (5)**
8:3;67:4;90:4,9;120:4
**able (14)**
6:24;44:5;46:19;55:14;66:24;
67:13;87:17;88:16,20;89:14,18;
90:1;110:3;114:12
**abroad (1)**
64:5
**absolutely (4)**
60:23;66:15;67:2;72:13
**accessories (1)**
10:9
**accidentally (1)**
21:11
**According (2)**
6:14;7:22
**account (2)**
43:4;46:22
**accountable (2)**
4:23;119:11
**accurate (7)**
2:18,24;3:3,8;59:14;73:14;
91:20
**accused (3)**
7:7,14;47:19
**acknowledge (1)**
101:11
**act (5)**
19:8;105:12;106:18,24;
121:15
**acting (4)**
18:21;19:2;66:1;95:12

---

**action (4)**
5:13;7:8;11:6,6
**actions (2)**
4:24;119:11
**active (1)**
118:10
**activities (2)**
36:24;87:17
**activity (2)**
64:22;114:24
**actual (4)**
55:11;57:17,21;105:12
**actually (21)**
16:15;54:19;55:11;56:12;
57:18;60:11;61:11;65:10;
70:15;71:10;73:5;75:24;79:23;
81:16;83:10;85:1,2;97:9;101:2;
109:15;115:6
**adamant (4)**
38:14;39:9;99:22;117:21
**add (1)**
54:14
**added (1)**
119:1
**additional (1)**
2:21
**admit (5)**
14:23;19:20;37:12;64:17;
121:14
**advances (1)**
45:17
**advantage (5)**
7:14,18;74:11;82:18;83:8
**advise (1)**
33:20
**advised (1)**
57:20
**affairs (1)**
122:8
**affect (1)**
118:4
**affects (1)**
94:24
**afternoon (2)**
2:3;13:9
**afterward (1)**
97:15
**afterwards (1)**
14:13
**again (15)**
8:20;11:5;17:23;20:7;39:1,5;
45:15;49:1;53:12;67:18;90:15;
102:23;113:9;121:11,19
**agree (6)**
2:23;3:2,8;59:13;73:13;91:19
**agreed (1)**
43:1
**ahead (1)**
64:14
**Ahh (2)**
98:9;101:5
**air (1)**
89:12

---

**alcohol (7)**
6:17;9:19;12:19;44:12;51:12;
52:11;95:21
**alcoholic (1)**
44:13
**alleges (1)**
2:13
**almost (1)**
118:13
**alone (2)**
56:11;86:4
**along (2)**
33:11;66:20
**alternating (1)**
87:24
**although (1)**
69:8
**alumni (1)**
13:10
**always (2)**
66:20;96:14
**amount (2)**
12:18;79:6
**antibiotics (4)**
94:23;110:19;111:1,5
**anticipate (1)**
72:7
**anybody's (1)**
106:23
**anymore (1)**
90:18
**apart (1)**
101:3
**apartment (8)**
9:24;10:1;14:18;26:24;104:1,
3;112:12,13
**apologize (1)**
106:17
**appeal (1)**
122:10
**appear (2)**
121:10,11
**appeared (1)**
56:8
**appreciate (1)**
77:4
**approached (1)**
119:22
**approximate (1)**
49:6
**approximately (1)**
48:24
**April (1)**
8:14
**area (7)**
3:13;9:15;26:24;56:4,17,19;
102:14
**aren't (1)**
12:21
**arms (2)**
80:11;92:14
**around (25)**
13:8,8,16;49:10;63:22;74:15,

---

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

16;75:4,17;76:23;77:10;78:9,
15,23;83:11;85:6,23;87:7;
90:17;92:19;95:24;100:11;
104:3;108:16;109:9

**arrive (1)**
48:21

**arrived (2)**
16:2;48:15

**articles (1)**
14:6

**articulate (1)**
82:21

**ascertain (2)**
57:3;110:22

**assault (4)**
37:10;42:10,11;56:7

**assaulted (2)**
50:11;56:2

**assisted (1)**
35:4

**associated (2)**
119:9,9

**assumed (2)**
61:20;74:14

**attacks (1)**
118:14

**attend (1)**
5:3

**attention (2)**
56:1;79:3

**attest (2)**
26:1;49:21

**attorney (1)**
47:24

**available (4)**
42:12,13;102:22;120:2

**aware (13)**
20:16,19;26:17;51:9,9;61:4;
63:21;82:7;113:23,23;114:4;
117:20,24

**away (3)**
18:14;112:1;119:3

---

**B**

**back (53)**
6:8;8:24;9:9;13:11,15,16;
14:4;15:5;18:10;19:22;20:10;
22:17;27:12,12,13,19;28:2;
29:6,11,14;30:14;32:1;34:16,
21,22;45:20;46:1;58:23;61:12,
13;62:1,18;63:11;69:13,22;
72:8;74:14;75:5;76:17,20;
81:17;85:5;93:4;96:7;104:3;
107:6,10;112:14,19,22;113:2;
119:8

**backup (1)**
110:5

**bad (1)**
89:22

**bag (2)**
55:2,3

**band (7)**

43:10;65:1,13,14;108:8;
109:10,23

**Bands (2)**
108:7,9,15;109:7

**barbecue (1)**
65:5

**barely (1)**
67:15

**Barry (1)**
46:18

**baseball (4)**
13:9,14;74:22,23

**Based (6)**
2:15;48:21;50:7,11;53:17;
69:14

**basic (1)**
76:16

**basically (3)**
61:12;70:23;81:12

**bathroom (14)**
5:8;11:12,12;15:3;21:14;
29:17,20;44:17,18;61:1;63:17;
79:9;111:24;112:2

**Battle (4)**
108:7,9,14;109:7

**became (3)**
20:16,19;85:15

**become (2)**
9:20;94:6

**bed (3)**
10:6;18:11;69:23

**bedroom (4)**
10:2;29:23;34:23;44:22

**beer (3)**
17:22,23;43:23

**beers (1)**
44:2

**beg (1)**
63:11

**began (10)**
10:5,6,7,12,15,16;11:5;37:22,
23;38:18

**begged (1)**
61:12

**begin (3)**
35:24;42:2,3

**begins (1)**
4:14

**begun (4)**
35:22;38:19;39:17;105:17

**behavior (1)**
15:23;18:1,21;19:2

**behaviors (2)**
9:21;25:4

**behind (1)**
74:3

**believing (1)**
119:22

**bells (1)**
70:8

**belt (2)**
10:10;35:5

**besides (1)**

110:19

**best (2)**
27:6;72:21

**Beth (8)**
6:10;56:14;73:9;88:5;92:1,
12,22;93:6

**better (1)**
111:9

**beverages (2)**
17:19;44:13

**beyond (1)**
67:4

**big (2)**
17:14;78:19

**bit (4)**
12:1;19:9;63:24;77:11

**black (1)**
17:2

**blacked (3)**
5:9;17:15;110:16

**blacked-out (1)**
26:10

**blacking (1)**
6:21

**blank (1)**
37:20

**blatantly (1)**
105:23

**bleeding (1)**
118:10

**BLEILER (132)**
1:9;2:9,9,15;3:5;4:5,9,22;7:6,
7;12:5,8,11,22;13:1,7,24;14:12,
20,22;18:6,22;19:3,15,18,20;
20:4,8,11;21:8,16,20,24;22:5,9,
15,24;23:3,12,21;24:2,15,19;
25:1,16;26:7,14,21;27:5,10,21;
30:7,9,15,19,22;31:3,13;32:2,
12;33:5;34:13,20;35:18;36:1,5,
22;37:11,21;38:17;39:13,24;
40:4,13,17;47:20,22;51:8,15,20,
24;52:6,10,14,17,20;58:6,9;
67:7,20,23;68:2,18,23;69:4,10;
88:2;89:3,7;100:15,18,22;
101:2,8,10,15,18;102:20;103:5,
9,13;104:2,12,15;105:2,8,15,21;
106:5,7,10;107:2,8,16;112:7;
113:1,6;115:11,17,22;116:2;
120:11

**block (8)**
27:1;60:1;64:22;65:2;86:23;
108:18,20;110:3

**blocks (1)**
27:1

**bloodshot (2)**
9:19;52:7

**blue (2)**
105:20,22

**blunt (1)**
106:17

**BOARD (30)**
1:5;2:11;3:18;4:8;8:10;15:11;
32:19;41:6;47:10;50:20;53:6,8;

54:7,20;55:18;57:6;58:1,15;
59:18,21;65:18;69:13;83:4;
87:22;91:7;93:12,13;102:11,22;
120:23

**body (1)**
24:24

**boisterous (1)**
95:19

**both (8)**
7:11;9:14,14;75:6;79:11,11;
84:23;119:10

**bottom (3)**
16:17,19;105:10

**Bowdoin (13)**
5:7;8:19;9:13;27:3;28:23;
30:8,18;53:22;60:20;74:20;
109:1;112:6,14

**Bowdoin/Caro (1)**
9:15

**break (8)**
41:14,19,24;58:19,20;116:10;
117:1,12

**breakfast (6)**
87:14;108:2,5;109:5,15,18

**breath (1)**
52:11

**Brendan (2)**
21:7;103:1

**briefly (2)**
5:7;8:16

**bring (3)**
81:24;82:2;83:20

**brunch (2)**
70:5;87:13

**building (2)**
70:16;71:2

**bumped (2)**
99:3,6

**bunch (1)**
43:7

**buzz (2)**
23:17;25:7

**buzzed (2)**
24:22;33:7

---

**C**

**Caitlin (63)**
2:8,12,23;4:18,18;7:3;11:22;
15:12,13;20:12;21:10,14;28:6;
32:14,14;34:3,3,10;36:20;
40:16;43:20;46:21,21;48:1;
50:22;51:2,5;52:22;58:2,10;
60:1,22;61:8;64:6,24;65:20,23;
73:23;74:6;75:3,6;76:9,18;79:8,
22;80:17;87:10,23;88:4,24;
91:8;92:13;100:1,3,13;101:23;
104:1;107:5,22;113:8;117:15,
17;120:8

**Caitlin's (6)**
50:9;55:20;59:1;74:8;81:19;
94:15

**call (10)**

28:2;41:24;42:9;44:6;48:18;
49:5,10;54:12;72:8;92:24
**called (5)**
2:12;3:14;56:6;76:4;102:18
**came (19)**
13:14;21:2;42:13;45:23;
47:17;48:24;49:2;50:4;55:8,20;
56:9,12,13,15;76:13,14,20;86:5;
120:14
**campus (13)**
6:8;9:8;13:11;42:11,21;
45:22;62:1;74:13,14,17;87:3;
92:20;118:18
**can (62)**
3:12;13:4;18:2,20;20:17,20;
21:22;23:17,18;24:23;25:14;
26:1;27:14;33:14,23;34:6;
35:12;36:7,18;39:2,11;40:14;
42:18;45:15;49:20;50:21,22;
51:2;52:23;53:9,11;55:19;
56:24;58:1;59:5,12;61:13;
67:11;68:14;69:8;71:13;72:21,
24;73:12;75:21;80:5,21;84:8;
85:5;86:20;89:9;91:18;92:4;
93:21;98:7;99:9;112:4;113:8;
116:6,10,13;119:7
**can't (8)**
18:4;29:22;30:1;35:14;50:17;
67:9;81:2;107:3
**care (1)**
100:23
**Caro (3)**
9:13;30:8,18
**case (4)**
67:21;102:14;107:1;121:14
**cases (1)**
50:12
**catch (1)**
107:13
**catching (1)**
9:4
**Catholic (1)**
121:15
**caught (3)**
30:17;64:4;112:18
**CDC (3)**
70:16,20;71:5
**cell (2)**
44:3,8
**centimeter (1)**
118:9
**chair (2)**
2:4;59:18
**Chairman (145)**
1:12;2:3,10;3:2,6,11,21;4:3,6,
12;7:3;11:15;13:19;15:11;16:8;
17:16;21:5,9,18;32:13,17,19,23;
33:8,11,16;34:6,9;36:15,17;
37:3,7,18;38:7,11;39:2,6;40:7,
11,14,18,23;41:2,7,11,16,22;
42:1;46:13,15;47:7,10;48:5;
50:6,15,19;51:5;52:22;53:4,8;
54:6,10;55:17;56:10,21;57:5,

24;58:7,10,13,18,23;59:5,7,16,
20;62:3,7,11;65:17,23;67:5,11,
13,17;68:8,14;69:12,19;70:19;
71:8,12;72:5,10,14,19;73:1,7,
16;75:20;77:1;83:3;87:9,16,21;
88:3,23;89:6,8;91:6,13,22;92:7,
10;93:10;98:16,23;99:2,7,23;
100:12;101:23;102:9,17,24;
103:4,6,8,11,15;106:13,16,22;
110:21;111:7,10,13,17;114:22;
116:8,15;117:11,14;120:8;
122:3
**chance (3)**
36:12;78:20;103:20
**change (6)**
36:21,23;37:1;85:9;93:5;
97:18
**changed (2)**
12:14;13:15
**changes (1)**
118:14
**characterize (2)**
33:3;99:10
**charged (2)**
2:16;8:1
**charges (5)**
2:22;7:13;59:13;73:13;91:19
**check (1)**
41:18
**checked (1)**
50:4
**cheese (1)**
75:13
**choose (1)**
104:14
**circles (1)**
81:23
**circumstance (1)**
120:6
**circumstances (2)**
66:24;118:22
**claims (1)**
28:11
**clarification (1)**
117:20
**Clark (11)**
43:10,12,14;60:1;64:22;65:2;
69:22;86:23;108:18,20;110:3
**class (1)**
70:6
**classify (1)**
82:24
**Clay (9)**
5:3;43:15,16,22;44:6,9;60:7;
72:2;108:23
**clear (9)**
6:22;25:6;64:16,20;95:7;
102:8;113:4,7;115:15
**cleared (4)**
15:16;30:1;62:19;103:22
**clearly (4)**
57:2;68:6;69:2;72:1
**climbing (1)**

29:21
**clock (1)**
78:19
**closed (1)**
76:1
**closer (1)**
28:1
**closing (5)**
102:19;103:16;116:14;117:2,
15
**clothes (8)**
5:13;10:7;11:10;45:2,4,20;
76:18;113:15
**clothing (3)**
14:6;35:4;97:18
**Coke (1)**
17:22
**cold (5)**
41:17;86:13,15;92:14;97:19
**collect (1)**
54:22
**collected (3)**
54:24;57:22;70:13
**collecting (1)**
54:21
**COLLEGE (3)**
1:4;7:23;119:14
**coming (2)**
90:22;113:15
**commenting (2)**
75:10,11
**commitment (1)**
119:24
**communicated (1)**
3:23
**COMMUNITY (7)**
1:5;2:11;7:2,22;51:10;
119:15;121:17
**company (1)**
22:19
**complaint (3)**
2:12,13,15
**complete (1)**
11:7
**completely (6)**
26:17;37:15;61:2,4;67:3;
90:21
**concern (2)**
4:10;42:23
**condom (7)**
45:8;104:11,14,23;105:1;
113:24;114:5
**condoms (1)**
104:8
**conduct (2)**
8:12;122:2
**confused (3)**
14:23;17:15;25:14
**consent (25)**
5:20,20;6:16,24;7:16,20;8:3,
7;34:12;44:24;51:13;67:1,4;
88:17,21;89:15,19;90:2,4,5;
119:6;120:4;121:3,4;122:1

**consider (3)**
2:12;8:10;122:5
**consistent (1)**
24:9
**consumed (1)**
12:12
**consumption (1)**
6:18
**contact (7)**
8:8,17;9:3;11:14;14:16;46:8;
122:6
**contacted (4)**
47:21;56:6;70:16;71:4
**contacting (1)**
61:22
**contaminated (1)**
56:20
**continue (10)**
6:4;10:23;11:2;18:18;19:6;
38:2,5;104:21;107:12,18
**continued (12)**
9:16;10:11,17;12:15;13:17;
19:8,12,12;50:2;104:20,23;
105:4
**continuing (1)**
36:24
**contracted (1)**
118:24
**conversation (8)**
9:4,6,17;30:17,24;31:6;32:4;
107:12
**conversations (1)**
81:18
**convey (1)**
51:1
**conveyed (1)**
40:2
**convince (3)**
93:7;96:8;112:22
**convinced (6)**
6:11;46:2;75:14,16;96:10;
97:2
**cooking (1)**
65:5
**couldn't (10)**
29:7;35:6;52:10;60:18;61:16;
68:11;71:16;95:5;98:6;102:21
**council (1)**
62:14
**count (1)**
98:15
**couple (5)**
12:13,15;13:13;84:2,5
**course (1)**
120:11
**cream (1)**
116:5
**cries (1)**
60:14
**criminal (1)**
100:24
**criminally (2)**
42:21;47:15

crisis (1)
79:14
CROSS (9)
1:4;6:15;7:2,23;42:14;51:10;
119:12,13,22
crossed (1)
92:14
crowded (2)
29:1;60:21
cry (2)
66:5;82:4
crying (4)
6:2;60:12;66:9;121:9
Culley (41)
42:4,4,7,8;46:12,14,17;47:8,
12;48:7,12,16,19,23;49:3,6,9,
14,18,24;50:13,16;51:8,14,19,
22;52:4,8,12,15,18;53:13,21;
54:1,11,22;55:13;56:6;57:20;
76:14;86:3
Culley's (2)
54:15;55:6
curious (1)
29:15
cut (2)
27:11,11

D

daily (2)
118:4,13
damaged (1)
118:15
DATE (2)
1:13;2:5
day (22)
12:12,13;13:10,12;24:13,13,
14;25:18;78:15;82:9;87:10,13,
18;89:22,24;107:23;108:7,12;
110:23;111:5,11;118:5
days (3)
84:2,5;101:8
deal (2)
60:16;99:16
dealing (2)
50:12;121:2
deals (1)
71:6
dean (1)
122:8
debriefed (1)
53:18
decent (1)
79:6
decided (7)
5:2;47:18;60:5,19;61:17;
74:15;75:5
decision (4)
2:20;4:23;121:6;122:7
dedicated (3)
2:19;119:5,14
definitely (13)
5:20;25:2;63:4;64:18,19;

66:3,4,10;90:17;93:1;95:23;
96:22;97:14
definition (1)
70:23
Dehydrated (1)
111:13
delicate (1)
83:13
demeanor (11)
18:24;36:21,23;37:1;49:23;
50:10,14;55:20;80:6;95:9,10
DeRosia (2)
43:20,21
describe (6)
7:10,10;17:24;27:7;53:11;
87:17
described (1)
39:15
deserves (1)
120:2
designated (2)
3:13;102:13
destination (1)
32:7
details (9)
31:2,4;35:13,14;83:6;96:6;
97:24;113:12;116:18
determine (1)
121:1
development (1)
119:18
didn't (77)
8:17;14:14;18:12;19:5;20:5,
9;21:24;22:1,1,20;23:8;24:2,3,
5,7;25:3,19;31:14,15,17;36:20;
37:1,13;40:2;44:14,20;45:10;
52:3,8;54:2,3;56:18;61:11,24;
64:6;69:1;70:8,11,15;74:2,4;
75:1;77:23;80:18;81:7,8,16;
82:21,23;83:11,14,17,21;84:6;
85:1,3;86:1;87:14;88:10,19;
89:16,17,24;92:15,16;96:6;
98:10;99:13,13,16;105:22;
106:6;108:6;110:4,15;121:9,11
different (14)
17:19;19:8;28:11,15,18,20;
42:21;81:1;90:21;100:19;
110:11,15;112:13
differently (1)
50:17
difficult (2)
92:11;118:20
difficulty (1)
5:24
Difusco (1)
43:19
Dinand (1)
87:4
dinner (4)
108:16;109:6,19,20
direct (3)
3:7;16:10;33:24
directed (1)

33:21
directions (1)
74:4
directly (3)
20:2;50:23;119:13
disappointed (1)
19:21
disbelief (1)
37:12
disciplinary (4)
2:22;59:12;73:13;91:18
discussed (1)
8:13
disengaged (1)
38:1
Dishonesty (1)
2:20;59:11;73:12;91:17
distance (1)
27:9,10,17;80:15
distraught (3)
55:23;74:2;85:19
doctor (1)
57:13
doesn't (1)
24:12
don't (90)
7:9;12:16;15:4;17:1,5;21:1;
22:22;23:1,3,5,6,6,7;24:10;
25:19,21,21;28:10,12,18;29:23,
24;31:6,17,18,19,21;33:9;45:12,
12;52:24;54:1;55:10,16;58:7;
60:14;65:12;66:5;68:12;69:7;
70:20,22;73:5;74:24;75:18;
76:11,24;77:23;79:2;82:10,20,
21,23;84:6,10,11,16,24;85:16,
20;87:5,20;88:20;89:1,1,18,19,
23;90:3,8,10,24;92:20,23;
94:19;96:5;97:16;98:2;101:13,
22;109:1,3;110:6;113:14;
114:20;115:6;116:2,17,19;
117:8
done (4)
42:24;43:13;46:7;65:12
door (13)
10:1,2,3;21:10;27:19,21,22,
24;28:3,4;34:23,24;111:24
dorm (2)
46:2,2
doubt (2)
6:23;67:3
down (21)
8:20;9:2;14:19;15:8;16:16;
30:13;32:5,5;34:7;46:3;61:20;
68:12;73:24;76:20;81:4;87:3,4,
5;92:3;93:8;112:17
drank (7)
13:12,13;17:7,8;77:13;94:18,
21
dress (4)
49:17;54:22;55:1,8
dressed (3)
6:6;11:9;21:1
drink (12)

12:15;16:22,22,24;17:22;
25:2,6;72:2;77:16;108:21,24;
111:19
drinking (27)
5:2;12:4,11;13:5,6,8,11,17;
16:21;17:3,17;22:17;24:4,22;
25:17;26:16;43:6;60:3;64:18;
71:14,15,19,23;72:4;77:10;
79:12;108:19
drinks (3)
12:9,13;77:18
drug (1)
6:18
drugs (1)
110:19
drunk (31)
17:18;24:20;25:4;26:10;
75:11;80:22;81:4,8,11,11;
84:16;85:12,15,15,19,22;86:7,
16;87:15;88:19;90:17;91:3;
93:3;94:9,22;95:2,7;98:10;
110:11,14,15
drunkest (1)
110:9
during (4)
34:1;71:14,19;117:20

E

earlier (13)
12:12,13;13:12;17:3;43:6;
66:8;82:8;87:10,13;89:10;
98:12;105:11;114:13
early (3)
4:20;76:11;108:8
eating (2)
75:10;81:19
Ed (1)
17:24
Eddie (6)
5:7;30:2;82:13;111:22;112:4;
115:9
Eddie's (1)
53:24
EDWIN (27)
1:9;2:9,15;3:2;4:22;7:4,6;
11:15,22;12:3;13:20;40:15;
50:22;51:6;58:2,3;65:21;67:5;
87:23;88:1,3,24;100:1,13;
117:16;120:9;122:3
effect (1)
17:12
effective (6)
6:24;34:12;67:1,4;88:17;
120:4
effectively (1)
89:18
effort (1)
66:17
eight (1)
97:5
either (11)
4:13;11:20,22;27:15,16;

29:14;32:20;33:22;58:14;
63:21;101:10
ejaculated (3)
45:9,11,13
elaborate (1)
13:23
elapsed (1)
63:17
Elizabeth (8)
59:2,8;62:3,13;65:19;67:6;
69:20;72:6
else (4)
86:18;95:22,24;118:19
emergencies (1)
76:3
emergency (1)
57:9
emotionally (2)
118:11;119:10
encounter (2)
107:15;118:10
end (5)
19:13,16;33:15;41:1;114:1
ended (7)
10:20;11:6;13:6;46:8;108:14;
109:2;114:1
engaged (1)
122:1
enjoyable (1)
115:20
enjoyed (2)
22:18;107:8
enjoying (5)
25:11;115:10;116:1,6,7
enough (1)
116:9
enter (1)
54:23
entertain (2)
62:5;77:3
entire (1)
110:9
entrance (2)
73:23;76:6
environment (1)
119:24
escalated (1)
44:23
escorted (1)
46:6
especially (2)
66:5;90:19
essentially (2)
15:15;103:19
even (8)
65:14;74:2,4;75:12;82:23;
89:19;100:6;118:4
evening (11)
12:4;17:18;33:4;43:7;44:19;
46:22,23;55:2;64:16;71:15,20
event (1)
65:4
events (1)

113:5
eventually (1)
50:4
everybody (4)
15:17;29:2;72:24;92:11
everybody's (1)
41:10
everyone (5)
11:24;16:2;24:21;29:2;30:4
everyone's (1)
68:10
evidence (8)
42:24;46:6;54:21;55:2,3,12;
56:19;57:22
exactly (8)
12:16;18:23;31:19;43:4;63:1;
81:2;82:11;84:24
examining (1)
57:13
excited (1)
70:7
excusable (1)
120:5
excuse (2)
3:12;119:12
excused (2)
91:10;102:13
exhausted (2)
90:24;91:5
exhibited (1)
52:2
expect (2)
96:15,16
expectations (2)
117:5,10
expected (4)
2:18;59:9;73:10;91:15
experience (7)
50:8;57:4;84:18;94:23;
115:21;118:6,13
experiences (2)
50:12;110:11
explain (7)
18:3;23:8;35:12;39:11;70:21;
84:8;93:21
express (1)
4:9
expressed (1)
4:10
expressing (1)
25:3
extended (1)
118:18
extent (2)
38:12;39:7
extremely (2)
118:20;120:3
eyes (3)
9:19;24:24;52:7

**F**

face (2)

74:6;80:16
facts (1)
55:8
fair (1)
2:20
falling (1)
23:19
familiar (1)
26:24
fan (2)
12:1;92:8
fans (1)
73:2
far (7)
16:20;26:22;48:10;49:23;
57:13;101:3;107:23
father (1)
47:13
favorite (1)
81:20
Federici (45)
6:10;45:24;56:14;72:22;73:4,
15,19;75:23;77:7,9,17,22;78:4,
8,13;79:1,6,20;80:7,10,22;
81:16;82:10,14;83:2,9;84:1,10,
12,22;85:12,16;86:20,24;87:12,
19;88:8,14,18;89:4,16,23;90:6,
10,16
feel (3)
58:4;70:15;79:17
feeling (1)
79:18
feet (1)
27:15
felt (3)
33:2;45:2;61:23
FEMALE (75)
12:3,6,9;14:8,17,21;16:20;
17:6,11;23:16,23;26:22;27:4,8;
28:22;30:16,20;31:1,11;32:10,
21,24;36:7,10,13;37:5;48:9;
49:16,20,22;55:14,19;56:24;
57:7,16;64:11,12,13,14,15,21;
65:7;69:21;70:2;71:10,13,18,
22;83:5;84:20;86:22;90:13;
93:17;97:23;99:9;103:2,24;
104:7;107:4,11,21;108:10;
109:4,11,17,22;110:2,8,18;
111:18;113:8,22;116:20,22;
117:3
few (8)
13:13,22;14:13;45:16;60:6;
64:19;69:15;100:15
fifteen (1)
61:18
figure (1)
10:9
file (1)
56:5
filed (1)
2:12
final (8)
38:8,9,11;41:5,7;117:17;

118:17;120:10 .
finally (4)
5:23;75:14;85:4;114:7
finals (2)
118:19,22
find (11)
11:10;29:7,8,17;44:4,16;
53:19;61:16;70:3;78:5;85:14
fine (6)
47:10;49:8;73:4;78:10;79:12;
86:15
fingers (2)
5:15;113:16
first (23)
4:17;7:21;10:16;14:1;34:10,
11;35:21;38:21;39:17;41:13,21;
55:20;59:2;60:7;79:23,24;80:1;
82:14;83:23;98:14,17;114:3;
117:18
five (5)
26:2,5,12;37:19;77:18
five-minute (1)
117:1
floor (3)
30:11;75:7;112:17
floors (1)
112:11
flu (1)
111:2
focus (1)
118:16
foggy (1)
6:3
folded (1)
80:12
follow (3)
53:9;61:19;66:19
follow- (1)
36:17
followed (3)
35:1;61:9,21
following (2)
17:16;70:4
follow-up (4)
37:3;48:2;68:15;102:14
Follow-ups (1)
38:7
food (2)
75:8;81:20
forcing (2)
5:18;45:5
Ford (21)
42:15;46:4,21;49:18;54:12,
13,16;55:10,18,22;56:12,23;
57:2,15,17;58:4,11,14,16,17;
76:5
forgot (1)
59:17
form (3)
9:5;47:1;48:3
forming (2)
93:2;119:15
forth (1)

81:18
**forty-five (2)**
79:7;104:5
**forward (3)**
42:22;120:14;121:3
**found (2)**
60:17;118:8
**four (5)**
34:10;44:2;77:23;88:11;
120:1
**fourth (1)**
37:18
**frazzled (1)**
66:11
**freaked (2)**
66:16,21
**free (1)**
58:4
**freely (4)**
7:20;8:6;34:12;122:1
**friend (3)**
61:14;70:13;73:19
**friends (26)**
5:2;6:9;12:12,16;15:20,22,24;
21:4;28:23;29:12,20;43:8,18;
44:7,10;45:24;60:6;61:7,18;
63:2;81:22;87:2;96:16;108:23;
112:11;120:14
**front (4)**
27:19,21;28:2;78:20
**full (1)**
83:12
**fully (1)**
63:21
**funny (1)**
84:14
**further (24)**
11:14;38:15;39:9;40:7;45:17;
46:9;52:21,23;53:2;54:6;55:17;
57:5,24;58:15;65:17;69:10;
91:7;99:23;100:12;102:10,18;
107:19;117:22,23
**fuzzy (1)**
109:2

# G

**game (2)**
13:14;108:6
**games (1)**
13:9
**gave (6)**
38:20;42:20;74:21;100:16,19,
20
**general (1)**
80:8
**gentleman (2)**
37:14;121:15
**gets (1)**
109:2
**girl (1)**
64:5
**girls (2)**

29:3,9
**given (4)**
6:16;34:12;55:3;119:7
**giving (2)**
11:2;90:5
**glass (1)**
43:23
**glasses (4)**
93:23;94:1,5,7
**glossy-eyed (1)**
53:14
**goes (2)**
27:22;117:18
**Good (12)**
2:3;8:24;31:5;54:4;57:21;
58:19;75:12;78:22;90:12;
94:14;98:22;103:22
**Grant (2)**
62:14;77:5
**great (3)**
31:23;62:9
**greater (2)**
22:19,20
**group (3)**
15:20;29:3;63:2
**growth (1)**
119:16
**guess (8)**
21:3,11;28:2;57:7;69:12,16;
106:17;110:21
**guidelines (1)**
7:24
**guiding (1)**
106:24
**guys (3)**
30:21;33:2;54:8

# H

**habits (1)**
16:21
**hadn't (18)**
8:21;9:3;14:15,15,16;22:6;
31:8,14,14;36:22;61:8;66:7;
87:19,20;91:1;104:19;112:10;
115:12
**half (5)**
75:4;79:3;94:4,6,8
**halfway (1)**
65:10
**Hall (6)**
43:7,9,10,12,14,24
**hamburger (1)**
109:13
**hand (5)**
10:13;11:5;14:7;35:8;72:3
**handle (1)**
37:13
**hands (4)**
60:18;106:19,21,23
**hang (1)**
68:15
**hanging (2)**

14:3;87:1
**happen (4)**
105:19,24;112:24;117:6
**happened (33)**
10:13;14:24;16:16;20:2,16,
18;32:4;35:17;43:5;46:22;47:1;
74:19;75:21;76:24;79:17;
81:17;82:13,20;83:6,12;96:9;
97:24;98:19;99:20;102:3;
104:16,17;105:14;107:19;
112:5;113:10,10;116:17
**happening (4)**
5:14;20:17;35:15;82:8
**happiness (1)**
25:9
**happy (7)**
23:18;25:9,11,11;51:1;95:14,
19
**hard (4)**
73:2;80:23;83:19;90:19
**He's (1)**
46:19
**head (5)**
71:4,4;82:22;96:12;115:5
**headed (1)**
74:15
**heading (6)**
73:22;74:12,13,14;87:5;96:17
**Healy (8)**
75:5;76:18;78:24;79:2,5;
81:3;85:21;93:4
**hear (13)**
24:7;39:5;42:2;59:1,5;67:10,
11,16;71:17;72:24;92:4,11;
96:14
**heard (5)**
7:8;60:6;69:15;120:12,13
**HEARING (22)**
1:8;2:5,11,17;3:18;4:14;7:17;
11:17,19;34:1;47:15;48:6;
59:12;62:5;73:12;77:4;91:10,
18;102:12;117:16;120:12;122:4
**hectic (1)**
60:21
**held (2)**
119:11;120:6
**hello (1)**
5:8
**help (2)**
10:8;121:10
**helped (4)**
6:5;11:10;20:24;45:19
**helpless (1)**
6:20
**helplessness (1)**
6:22
**here's (1)**
34:9
**herself (8)**
18:15;45:21,21;92:15;95:13,
18;115:10;116:1
**Hey (5)**
30:23;31:4;80:14,17,17

**Hi (5)**
31:23;32:3;62:13;77:5;112:1
**high (1)**
118:2
**himself (1)**
45:5
**hired (1)**
70:24
**hit (1)**
44:12
**HIV (1)**
118:24
**Hogan (1)**
78:20
**hold (1)**
4:22
**holding (1)**
16:16
**HOLY (9)**
1:4;6:15;7:2,23;42:14;51:10;
119:12,13,22
**home (1)**
29:1;42:9
**honest (6)**
2:18,24;3:3;59:13;73:14;
91:19
**honestly (6)**
22:5;63:23;77:10;85:20;
90:23;107:3
**hopes (1)**
61:19
**horrible (1)**
7:8
**hospital (24)**
6:13;42:23;43:2,3;46:6;50:3,
5;55:4;76:19,21;84:17,21;85:6;
86:9;88:10,11,13;90:15;97:4,4,
15;100:9;118:5,8
**hounded (1)**
63:12
**hour (7)**
75:4;79:3,7;93:6;94:4,6,8
**hours (8)**
4:20;13:13;60:11;77:23;
88:11;97:2,5;100:6
**house (46)**
5:3,4,6,6;6:8;9:8,9,13,23;
21:2;27:16,20,23;28:5,7,11,15,
16,18,20,20,23;29:5,16,19;30:3,
7;32:8,15;34:17,22,23;45:20;
53:24;61:12;63:14;74:24;107:5,
7;108:23;112:10,12,20;113:3;
117:5;121:13
**house-council-run (1)**
65:4
**houses (2)**
9:15;112:12
**hundred-percent (1)**
63:20
**hung (1)**
23:4
**hurry (1)**
33:11

**hurt (2)**
97:10,16
**hydrated (1)**
111:16

**I**

**I'd (7)**
13:16;38:15;39:10;54:16;
77:17;106:12,13
**I'll (3)**
11:20;64:17;112:6
**I'm (52)**
2:8;4:22;16:10;17:14;21:6;
22:24;23:1,7,13;24:11;25:13;
26:24;27:6;29:8,15,18;31:18,
20;34:18;44:1;45:10;48:23;
59:7,16,18;61:4;62:14;63:1,20,
21;64:5;66:14;67:9;68:13;69:4;
71:16;73:5,8;77:5;81:11,11;
83:17;86:7,15,17;89:21;107:2;
110:22,22;114:5,8,14
**I've (6)**
66:11;79:22;80:1;87:2;95:24;
110:16
**ice (1)**
116:5
**idea (6)**
26:10;38:22;61:3;90:4;
114:18,19
**immediately (3)**
49:10;80:3;121:5
**impaired (1)**
120:3
**implications (1)**
100:24
**important (2)**
50:3;77:24
**importantly (1)**
118:2
**inaudible (57)**
3:10;4:9,10;7:9,12;17:4;
19:11;22:16;26:1,6;28:21;
36:16;37:17,21;38:5,23;40:6;
41:15;51:11,12,16,17;52:14;
53:3;55:6;57:16;74:21;78:10,
17;84:19;88:13;89:3,4,7;93:9;
94:12;96:1;97:16,20;98:15;
100:10,11;101:14,20,21;
103:14;104:6;105:8;107:20;
108:5;111:19;112:3,14;114:10;
115:23;116:13;117:6
**incapacitated (8)**
6:17,23;48:13;53:16;67:3;
90:3;120:20,22
**incident (11)**
4:19;7:5;42:17;59:10,23;
73:11,18;91:16,24;100:7,19
**include (2)**
68:3;101:19
**incoherent (1)**
82:18
**incredibly (2)**

61:10;70:18
**incurred (1)**
57:14
**independent (1)**
120:16
**indicate (4)**
52:5,8;68:19,21
**indicated (6)**
41:2;52:12,15,18;69:5,8
**indicating (1)**
42:10
**indication (2)**
23:4;54:4
**indications (4)**
68:3,24;115:23;120:15
**indicator (1)**
117:22
**individual (4)**
44:21;47:2,4,19
**individuals (1)**
46:19
**inebriated (1)**
5:5
**influence (3)**
88:7,13;100:6
**inform (4)**
59:10;73:10;91:16;102:22
**information (19)**
2:19,24;3:3,8;55:15,16;57:15,
18;59:14;69:18;73:14;74:22;
75:1;76:14,16;91:20;116:9;
120:15;122:5
**informed (2)**
11:8;122:9
**initial (4)**
56:16;57:23;106:19,24
**Initially (3)**
42:19;56:9,15
**initiated (3)**
36:4,4;106:8
**initiator (1)**
114:23
**injuries (1)**
57:14
**inside (13)**
6:1;10:1,4;36:2;45:5,11;
62:18,23;63:1,8,9,14;114:5
**instances (1)**
110:13
**instantly (1)**
79:14
**instrument (1)**
109:24
**intellectual (1)**
119:16
**intent (1)**
107:13
**intention (1)**
5:22
**intentions (1)**
117:4
**intercourse (16)**
10:16,18,21;11:3;18:9,17;

19:23;20:23;35:10,21;38:1,6,
19;39:17;104:20;105:17
**interview (1)**
44:15
**into (23)**
5:15,19;8:14,15;15:5;16:11;
18:20;30:12;35:1;44:18;48:21,
24;55:2;56:4;61:12;65:13;
73:23;95:17;96:18;99:3,6;
112:23;116:18
**intoxicated (34)**
7:19;8:6;12:7,21,21,24;23:19,
24;24:3;25:5,18,23;26:16;33:4,
7;48:13;53:14;60:4,13;61:10;
65:10;66:4,11;68:6;69:3;72:1;
77:6,8;89:14;94:7,10;95:24;
121:11,24
**intoxication (26)**
7:15;8:2,11;21:23;22:2,14;
23:5,9;24:6;25:14;33:1;48:10;
51:12;52:2;53:12;57:1;68:4;
80:21;85:9;89:11;93:19;94:14;
101:12;120:16,19;121:1
**introduce (2)**
2:7;59:17
**introverted (1)**
81:1
**investigation (5)**
42:6;46:11,24;51:17;56:8
**investigations (1)**
46:16
**investigator (1)**
42:12
**invited (2)**
107:10,10
**inviting (1)**
107:6
**involuntary (1)**
6:18
**involve (1)**
52:1
**involved (3)**
46:15;51:11;106:23
**involvement (3)**
59:23;73:18;91:24
**Irish (17)**
3:15,23;4:11;36:9,11,16;41:4,
9,20,23;46:10;53:6;58:19,21;
103:7;122:6,9
**isn't (1)**
118:1
**issue (1)**
121:2
**issues (1)**
71:7
**It's (26)**
5:17;16:5;24:23;27:5,14,23,
23;28:1,3,3,4;52:12,15,18,23;
66:20;73:6;78:16;80:23;83:19;
86:13;89:1;90:18;92:10;
112:12;113:17

**J**

**Jacob (4)**
56:13;91:14;100:4;102:11
**Jake (16)**
6:9;73:20;75:3,17;76:9;
78:16;79:9,11;81:24;82:1;
84:22;86:1,3,13,24;87:6
**James (1)**
46:5
**joking (1)**
95:18
**Josh (1)**
46:18
**Jude (3)**
1:12;2:4;59:17
**judge (1)**
120:18
**judging (1)**
23:15
**judgment (3)**
26:6,20;78:3
**judicial (1)**
47:15

**K**

**Kathleen (1)**
42:8
**Keep (2)**
36:13,18
**keeping (1)**
111:15
**keg (1)**
43:23
**Kelly (3)**
1:12;2:4;59:18
**kept (7)**
37:2;50:1;75:9,11;81:6,20;
85:21
**kick (1)**
63:3
**kicked (3)**
15:16;61:21;63:2
**kicking (1)**
30:4
**kids (1)**
63:3
**Kimball (2)**
46:5;54:24
**kind (53)**
10:20;15:3,7,15,16;18:7,8,8,
9;19:7,21,22,22;20:18,19;21:21;
23:14;25:9;27:23;28:4;32:6;
33:6;35:21;38:20;61:14;63:10,
11,13;65:14;66:20;68:13;70:8;
71:1;79:13;80:3,11;81:13;
83:14;85:23;87:7,24;89:11;
92:10,15;95:17;104:16;105:24;
106:1,12;107:14,17,18;110:15;
121:22
**kinds (1)**

Bleiler v.
College of the Holy Cross

71:6
**kissing (13)**
5:12;10:6,11,15;35:3,9,19;
38:18;39:16;45:1,18;106:1,2
**kit (5)**
42:24;46:7;55:4,12;57:23
**kitchen (1)**
61:15
**knew (9)**
28:17;61:9,10;70:11;80:3;
82:19;100:22;102:6;115:7
**known (2)**
79:22;98:11
**Kristen (1)**
43:21

**L**

**laceration (1)**
118:9
**laid (1)**
86:5
**Lane (10)**
21:3;45:23;73:22;76:3;82:15;
87:5;92:3,13;93:9;102:2
**language (1)**
24:24
**lapse (1)**
61:3
**lapses (1)**
64:19
**laryngitis (1)**
111:4
**last (6)**
69:15;103:20;112:3;114:16;
115:16;116:24
**lasted (1)**
114:20
**late (1)**
76:2
**later (7)**
9:1;36:10;46:23,23;69:20;
84:6;104:5
**laying (3)**
81:4;85:23;86:6
**lead (1)**
71:1
**leading (2)**
5:10;87:6
**leaning (1)**
92:22
**least (3)**
20:19;66:17;88:9
**leave (17)**
15:23;16:4,6;20:20,24;30:3,5,
6,7;45:15;53:18;61:6;63:15;
64:2;65:11;108:8;118:18
**leaving (6)**
5:5;8:21;22:10;29:2,21;32:14
**led (1)**
118:15
**left (30)**
6:7;11:12,13;14:18;20:4;

21:2,15,17;28:7,15,16;30:3;
43:8;45:20;53:21,24;54:1;61:7;
65:10,14;76:20;79:8;85:6;88:9;
104:4;112:8,9,9,10;121:13
**Lehy (2)**
87:1,4
**less (2)**
85:15;110:14
**let's (6)**
41:4;46:20;47:12,14,16;101:5
**level (25)**
8:11;21:22;22:13;23:5;25:7,
14;26:1,5;33:1;48:10;53:12;
57:1;61:15;68:4;80:21;85:9;
89:11;93:19;94:14;101:12;
114:23;116:17;120:18;121:1,17
**life (4)**
110:9;118:4,4;119:2
**liked (1)**
78:9
**Linden (10)**
21:3;45:23;73:22;76:3;82:15;
87:5;92:3,13;93:9;102:2
**line (3)**
59:3;62:8;65:19
**literally (1)**
87:3
**little (11)**
12:1;14:23;19:9;35:13,14;
41:17;60:20;63:24;75:9;77:11;
84:14
**live (4)**
65:5;75:6;112:11;118:3
**lived (3)**
28:17;74:23;119:23
**lives (1)**
28:19
**living (1)**
61:15
**locate (1)**
44:5
**long (16)**
5:24;58:19;63:7;78:15,23;
79:1,5;88:6;99:2;103:24;
104:19;114:5,15,20;115:12,16
**longer (2)**
5:13;104:20
**look (9)**
27:13;61:13;62:2,19;63:8,12;
66:18;69:23;70:9
**looked (4)**
29:24;61:14;63:4;82:3
**looking (6)**
5:7;21:6;29:20;44:17;63:6;
111:23
**lose (1)**
25:19
**lost (5)**
44:3;60:9,10,11;66:6
**lot (18)**
27:12,14;28:1;54:3;62:24;
73:5;75:1;76:22;77:9,17;81:17;
85:16;86:1;92:23,23;94:18,21;

95:4
**lot's (1)**
27:24
**loud (1)**
74:9
**louder (1)**
34:19
**love (1)**
119:9
**low (2)**
93:20,22
**lunch (4)**
109:6,8,9,18

**M**

**main (4)**
28:4;42:22;73:22;99:18
**Mainly (1)**
55:23
**makes (1)**
6:22
**making (4)**
2:20;44:22;81:20;113:14
**MALE (164)**
11:23;12:20,23;13:4;16:9;
17:24;18:20,24;19:13,16,19;
20:1,6,9,12,15;21:21;22:3,7,12,
22;23:2,10;24:12,17,20;25:13;
26:4,12,19;27:2,18;28:6,9,14;
30:2,8,14;31:22;33:10,14;
34:18;35:12,23;36:3;38:24;
39:4,11,18;40:1,5,21,24;44:18;
47:6;48:14,17,20;49:1,4,8,12,
15;53:11,17,23;54:5,8;55:7;
62:13,17,22;63:7,16;64:1,8;
67:15;69:17;72:11,16,20,23;
77:5,8,15,20;78:2,5,11;79:4,
16;80:5,9,20;81:14;82:7,12;
83:1,24;84:8,11;85:8,14;86:18;
89:9,21;90:1,8,11;92:4,6;93:15,
18,21;94:1,5,10,13,16,19;95:1,
8,11,20;96:2,11,19,23;97:6,8,
11,17,21;98:7;99:7;99:19;104:10,13,
24;105:5,11,18;106:3,6,8,15,21;
111:21;112:4,21;113:4;114:11,
15,18;115:2,9,14,19,24;116:4,
12,19,21,24
**man (1)**
119:23
**many (3)**
12:9,17;120:1
**marriage (2)**
5:22;119:6
**Masi (3)**
43:19;59:4,6,15,19,24;62:6,
10,16,21,24;63:4;19;64:3,10,17,
24;65:9;22;66:3,15;67:2,8,9,12,
19,20,22;68:1,5,11,17,21;69:1,
7;70:1,4,22;71:9,16,21,24;72:9,
13,17
**Mass (1)**
55:3

**matter (5)**
7:16;8:4;24:13;50:8;67:8
**matters (2)**
51:17,18
**maximum (1)**
120:2
**May (22)**
1:13;2:5,14,21;4:21;6:16;
8:15;11:19,21;40:15;42:8;
47:13,17;55:18;57:14;67:13;
68:16;79:2;84:14,15;90:18;
117:16
**maybe (4)**
77:18,22;89:23;93:6
**McCree (4)**
21:7;103:2,4,5
**mean (101)**
12:8,16;13:1,2;14:12,14,24;
17:1,19;18:7,16,22;19:3,9,11,
20;20:20;22:2,9,15;23:4,6,12,13,
14,15,21,23;25:1,3,5,9,16,23;
26:7;27:2,11;28:2,3;31:3,5,6,7,
15,16,17,21;32:2,4;33:5,6,14;
34:13;35:11;36:5,22;37:22;
38:4,20;52:14;53:8;61:3;63:9,
11,19,22;64:17;65:9;68:11;
69:13;71:24;75:20,21;77:19;
79:22,22;80:23,24;81:13,24;
82:11;84:12,13;89:2,16;90:2;
95:5;97:2;104:8;105:2,3,4,21;
106:22;109:12;110:6,13;
115:13,23;116:2,15;117:8
**means (2)**
61:22;91:4
**meant (2)**
10:22;99:13
**medical (2)**
55:24;57:10
**meet (5)**
16:1;43:9;76:5,5;122:5
**meeting (1)**
111:22
**MEMBER (239)**
11:23;12:3,6,9,20,23;13:4;
14:8,17,21;16:9,20;17:6,11,24;
18:20,24;19:13,16,19;20:1,6,9,
12,15;21:21;22:3,7,12,22;23:2,
10,16,23;24:12,17,20;25:13;
26:4,12,19,22;27:2,4,8,18;28:6,
9,14,22;30:2,8,14,16,20;31:1,
11,22;32:10,21,24;33:10,14;
34:18;35:12,23;36:3,7,10,13;
37:5;38:24;39:4,11,18;40:1,5,
21,24;47:6;48:9,14,17,20;49:1,
4,8,12,15,16,20,22;53:11,17,23;
54:5,8,20;55:7,14,19;56:24;
57:7,16;62:13,17,22;63:7,16;
64:1,8,11,13,21,14,15,21;65:7;
67:15;69:17,21,70:2;71:10,13,
18,22;72:11,16,20,23;77:5,8,15,
20;78:2,5,11;22;79:4,16;80:5,9,
20;81:14;82:7,12;83:1,5,24;
84:8,11,20;85:8,14;86:18,22;

Bleiler v.
College of the Holy Cross

89:9,21;90:1,8,11,13;92:4,6;
93:15,17,18,21;94:1,5,10,13,16,
19;95:1,8,11,20;96:2,11,19,23;
97:6,8,11,17,21,23;98:7;99:9,
19;103:2,24;104:7,10,13,24;
105:5,11,18;106:3,6,8,15,21;
107:4,11,21;108:10;109:4,11,
17,22;110:2,8,18;111:18,21;
112:4,21;113:4,8,22;114:11,15,
18;115:2,9,14,19,24;116:4,12,
19,20,21,22,24;117:3
members (12)
3:19;4:8;11:21;15:12;43:10;
57:6;59:21;62:15;65:15,18;
83:4;119:16
Memorial (1)
55:4
memory (6)
6:3;64:16,20;68:13;113:5;
115:15
mental (1)
115:3
mentally (1)
106:3
mention (2)
15:14;110:24
mentioned (5)
13:21;54:20;57:11;83:22;
94:22
mentioning (2)
15:24;21:9
met (14)
8:22;14:1,2;45:24;46:4;
59:24;60:4;78:11;79:24;82:15;
85:10;92:13;107:5;112:15
middle (1)
26:15
might (2)
39:19;69:18
mind (1)
93:15
minds (1)
103:21
minute (1)
15:4
minutes (9)
58:21;61:19;63:10,24;69:15;
79:7;104:5;115:18,20
Miranda (1)
47:23
misconduct (5)
2:14,16;6:14;8:1;51:11
misread (1)
39:3
Miss (29)
9:23;10:4,8,12,14,19,20;11:4,
8;14:1;30:12;42:16,19;43:19,
19,19,20,20;45:24;46:1;47:13,
17;68:19,24;112:15;120:14;
121:8,12,20
missed (1)
44:1
missing (1)

35:13
mission (2)
119:13,19
misstep (1)
121:16
mixed (2)
17:22;108:21
moment (2)
68:9;116:11
Monday (1)
47:17
months (2)
13:22;57:21
moral (1)
119:18
more (31)
16:10;17:8;18:7,15;20:16;
21:14;25:2,15;32:20,22;33:9,
17;39:12;45:18;50:20;63:24;
69:14,18;80:6;85:15;87:21;
91:8;94:24;96:8;98:8;103:18;
105:13;110:23;115:17;116:16;
118:1
morning (12)
4:21;42:9,13;48:11;62:2;
69:24;70:5;76:12,22;100:11;
108:1,4
most (3)
66:10,11;110:12
move (5)
11:18;33:18;37:7;40:14;
41:12,18;48:6;58:15;67:14;
83:17,21;98:4;102:18;103:16;
113:19
moved (6)
10:20;18:8,8,10,10;67:17
moving (3)
10:22;29:13;40:19
much (14)
6:23;17:21;24:22;62:18;
63:13,16;64:9;72:15;77:15;
81:2;82:16;92:21;96:5;110:16
Murphy (95)
2:8,8,13;3:1,20;4:2,20;7:11,
14,17;8:6,9,11,15,20,22;9:8,18,
22,23;10:4,8,12,14,20;11:4,8;
14:1;16:4,17,24;17:10,13,21;
20:14,22;28:8,13,17;29:18;
30:12;32:16,18;34:5,8;38:10;
40:9;41:15;42:16,19;47:13,17;
51:4;53:3;54:23;58:12;66:1,13,
23;68:19,24;88:6,12,15,22;
100:5;102:1;108:3,12;109:8,14,
20;110:14,10,20;111:3,9,12,15,
20,23;112:16;113:13;114:3,14,
17,19;115:1,5;117:8,19;121:9,
12,20
Murphy's (3)
68:4;101:11;120:14
music (1)
65:6
mutual (2)
36:6;106:12

mutually (1)
37:23
myself (14)
5:22;7:12;10:4;25:22;35:6;
42:13;46:18;59:17;90:23;
109:21;111:16;120:23,23;
121:20

N

nachos (2)
75:10;81:19
name (8)
2:4;7:6;42:7;44:20;47:19;
59:17;62:14;71:2
names (3)
3:18,22;76:16
nature (3)
8:12;17:20;111:14
need (9)
12:1;33:21;39:4;69:18,20;
105:13;116:18;118:23;121:10
needed (4)
55:24;72:12;118:17,21
needing (2)
29:24;72:8
needs (2)
119:10;120:6
negative (1)
118:14
new (3)
9:5;44:13;66:7
next (10)
5:12,18;6:8;26:11;62:2;64:5;
69:24;84:2;92:17;101:6
nice (1)
119:20
night (30)
5:1;8:14;9:1;12:15;13:16,17;
14:18;17:2,3,8;19:1;22:6;26:11;
66:2;70:12;76:12;77:11,13,13;
80:1,7,9;84:9;87:2,8;91:2;92:2;
112:8;115:15;117:23
nighttime (1)
73:21
Nikki (1)
71:2
none (1)
41:2
noonish (1)
109:9
normal (1)
15:22
normally (3)
17:18;65:12;73:21
notice (4)
74:2,5;80:15;92:16
noticed (1)
36:23
notified (1)
37:9
number (5)
15:22;23:11;29:11;43:16;

72:12
number-wise (1)
12:17

O

O'Kane (2)
74:16;76:6
objections (3)
3:24;4:4,7
observations (1)
48:10
observe (6)
9:17,18;21:13;22:20;88:7;
90:14
observed (1)
121:8
obvious (1)
105:23
obviously (1)
85:18
occasion (1)
14:9
occurred (1)
38:22
odd (1)
74:8
off (20)
5:23;7:21;10:7,8,10;23:15;
35:4,5;58:22;66:14;70:9;72:18;
91:12;95:17;98:5;102:16;
113:15;114:8,9;117:13
off- (4)
9:7;74:12,13;87:2
off-campus (4)
5:3;9:14;43:15;60:5
offered (3)
19:6,7;107:17
offering (1)
119:17
office (1)
56:4
Officer (17)
42:15;46:4,5,21;49:18;50:23;
54:12,13,24;55:18;56:5,6;58:4,
11,14,16;76:5
officers (2)
42:3;67:24
official (1)
73:8
on-campus (1)
14:3
once (9)
11:4;21:14;38:13;39:8;
104:20;121:4,4,11;122:6
One (53)
5:6,12;8:19;9:12;14:10;
15:12;16:24;17:6;21:18;24:14,
23;25:2;26:2,23;27:1,3,22;28:8;
29:4,20;31:9;32:21;37:6;38:21;
39:12;43:23;44:7;50:6,18;
53:21;54:19;60:20;62:14;
68:16;69:22;71:5,11;76:13,17;

79:8;86:11;96:16;100:21;
101:10;105:3,13;109:1;112:12,
14;116:24;118:3;119:2,21
**one- (1)**
118:8
**only (14)**
7:1;14:9;27:22;29:19;55:5;
57:8;78:16;102:21;105:6;
110:5;118:7,21;119:19;120:16
**open (1)**
27:22
**opened (5)**
10:1,3;21:10;34:23,24
**opening (2)**
4:17;111:24
**opinion (2)**
114:12,22
**opportunities (1)**
119:17
**opportunity (2)**
33:18,19
**opposite (1)**
74:4
**options (5)**
42:20,22;47:15,16;61:24
**order (4)**
21:12;41:19;52:24;53:1
**originally (2)**
42:16;71:3
**other's (3)**
10:7;22:18;35:4
**otherwise (2)**
6:20;115:23
**out (51)**
5:9;6:21;9:7;10:9;12:14;
13:15,17;14:3,5,19;15:10,17,18;
17:2,15;23:4;27:18,23,23;29:4;
30:1,4;32:5;37:18;44:19,22;
50:4;53:19;60:17;61:21;62:20;
63:2,3,13;64:3;66:16,22;73:20;
74:20;86:5,13;87:1;90:22;
92:16;98:4;105:20,22;110:16;
113:14,19;121:23
**outrageous (1)**
9:21
**outside (6)**
55:5;61:8,17;63:18;76:6;
78:10
**over (17)**
10:6,17;11:20;23:20;47:16;
66:5;75:18;76:8,15;77:20,22;
84:1;94:2,6;97:3;105:9;111:3
**overdo (1)**
17:5
**overly (4)**
25:4,4,22,22
**own (2)**
8:4;18:2
**owners (1)**
15:16;29:1

**P**

**packed (2)**
60:23;63:5
**page (1)**
68:10
**Pages (1)**
1:1
**pain (9)**
83:24;84:3,7,9,15;97:6,7,12;
119:10
**painful (1)**
84:18
**panel (251)**
3:24;11:19,21,23;12:3,6,9,20,
23;13:4;14:8,17,21;16:9,20;
17:6,11,24;18:20,24;19:13,16,
19;20:1,6,9,12,15;21:21;22:3,7,
12,22;23:2,10,16,23;24:12,17,
20;25:13;26:4,12,19,22;27:2,4,
8,18;28:6,9,14,22;30:2,8,14,16,
20;31:1,11,22;32:10,21,24;
33:10,14;34:18;35:12,23;36:3,
7,10,13;37:5;38:24;39:4,11,18;
40:1,5,21,24;47:6;48:7,9,14,17,
20;49:1,4,8,12,15,16,20,22;
53:11,17,23;54:5,8;55:7,14,19;
56:24;57:7,16;62:5,8,12,13,17,
22;63:7,16;64:1,8,11,12,13,44,
15,21;65:7;67:15;69:17,21;
70:2;71:10,13,18,22;72:11,16,
20,23;77:4,8,15,16,20,22;78:2,5,11,
22;79:4,16;80:5,9,20;81:14;
82:7,12;83:1,5,24;84:8,11,20;
85:8,14;86:18,22;89:9,21;90:1,
8,11,13;92:4,6;93:15,17,18,21;
94:1,5,10,13,16,19;95:1,8,11,
20;96:2,11,19,23;97:6,8,11,17,
21,23;98:7;99:9,19,24;103:2,18,
20,24;104:7,10,13,24;105:5,11,
18;106:3,6,8,15,21;107:4,11,21;
108:10;109:4,11,17,22;110:2,8,
18;111:18,21;112:4,21;113:4,8,
22;114:11,15,18;115:2,9,14,19,
24;116:4,12,19,20,21,22,24;
.117:3,16;122:5
**panic (1)**
118:13
**pants (1)**
86:14
**papers (1)**
118:17
**park (1)**
27:12
**parking (4)**
27:12,13,24;28:1
**part (3)**
44:1;63:5;114:4
**participants (1)**
2:17
**participation (2)**
91:9;102:12
**particularly (1)**
63:2
**parties (1)**

24:18
**party (51)**
2:6;5:3;8:15,19,21,24;11:20;
14:3;15:14,15,20,23;16:5;
22:10,17;26:23;27:19;28:24;
29:23;30:11;32:5,20;33:22;
43:15,22,24;44:1,2,5,9,10,14;
53:19,21;60:1,6,19,20;61:6;
62:19;64:22;65:2;74:20;86:23;
98:11;108:17,18,20,20;110:3;
112:9
**past (4)**
40:2;50:9;94:21;98:12
**paying (1)**
79:3
**peers (1)**
118:16
**penetrate (1)**
113:20
**penetrating (1)**
105:12
**penetration (4)**
45:6;106:19,24;113:11
**penis (11)**
5:19;10:12;11:5;14:7;35:8;
36:1;38:13;39:8,14;40:3;45:6
**people (12)**
15:17;16:1,5;33:12;50:16;
56:11,13;62:23;63:1;86:3;
90:19,21
**peppy (1)**
95:15
**perfectly (1)**
26:9
**perform (1)**
65:3
**performance (4)**
43:11,14;65:8,11
**performed (1)**
108:15
**performing (1)**
65:2
**period (6)**
10:14;41:8;77:20;94:2;
104:19;115:12
**permission (1)**
54:23
**person (4)**
4:23;50:18;95:15;118:12
**persona (1)**
118:14
**personal (4)**
8:5;16:13;25:24;50:11
**pharyngitis (1)**
111:4
**phase (1)**
11:18
**phone (18)**
41:23;42:8;44:4,6,8;54:2;
60:9,16,17;61:11;66:5,6,7,8;
67:14,17;70:12,13
**phonetic (5)**
21:7;43:19,21;46:18;65:1

**phrasing (1)**
98:17
**physical (4)**
6:21;38:12;39:7;110:23
**physically (3)**
43:1;118:7;119:10
**picture (1)**
35:15
**pieces (1)**
83:19
**place (3)**
32:1;107:18;109:3
**placed (1)**
55:2
**planning (1)**
70:6
**play (4)**
84:6;108:6;109:23;110:4
**player (1)**
74:23
**playing (1)**
84:4
**please (17)**
3:12;4:18;7:4;42:5;59:9,11,
22;61:13;73:9,11,17;91:10,15,
17,23;92:7;102:13
**pm (1)**
43:9
**point (62)**
9:17,18;10:5,11,16;11:4,13,
17;13:14;15:6;18:16;19:5;24:5;
33:17;35:20;42:17;45:14;46:5,
7;47:21;48:1,4;50:21;54:12,13;
55:16;56:20;57:3;61:23;62:4;
65:18;69:16;71:19;72:6;76:2,
13,17;77:2;79:8;83:13,22;
87:22;89:14;90:3,13,24;91:4;
93:11;99:24;100:2;102:9,17;
103:16,19;111:7;114:13;
116:10,12,18;117:11,19;122:4
**point- (1)**
37:19
**policy (1)**
6:15
**position (3)**
16:14;105:6;121:21
**possible (1)**
3:24
**possibly (1)**
118:23
**power (1)**
119:3
**practice (1)**
108:8
**presented (1)**
122:6
**presently (1)**
4:8
**president (1)**
122:8
**press (1)**
96:6
**pretty (16)**

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

17:21;60:4,13;64:20;65:9;
68:13;74:1;80:22;82:16,18;
84:18;85:19;86:13;95:7;99:21;
113:7
**previous (12)**
8:23;14:1,10;22:9,10;24:9;
31:10;33:2;55:1;70:12;107:9;
117:20
**previously (5)**
8:22;44:11;60:3;87:18;112:8
**Prior (5)**
5:21;39:18;44:19;60:11;
113:11
**private (1)**
57:18
**probably (9)**
13:7,8,12,16;37:21;75:4;
100:10;104:4;116:9
**procedure (1)**
56:22
**proceeded (1)**
62:1
**process (1)**
70:17
**processes (1)**
122:10
**professes (1)**
119:24
**professional (4)**
70:24;120:17,21,24
**progress (1)**
31:24
**progressed (1)**
31:22
**protection (1)**
96:9
**protested (1)**
5:16
**provide (10)**
2:18,23;3:3,8;59:13;73:13;
91:19;98:1;117:16;120:10
**provided (2)**
3:18,22
**Public (33)**
6:12;41:12,20;42:3;46:3,4;
47:18,22;48:21,24;55:21;57:12;
67:23;71:5;75:16,21,24;76:23;
79:10;81:7;82:3;85:10,13,17,
24;86:12;93:7,9;96:10,13;97:3;
99:10;100:16
**puking (1)**
110:14
**pulled (1)**
56:4
**push (3)**
18:13;89:2;98:5
**pushed (1)**
114:8
**pushing (1)**
18:14
**put (9)**
18:1;45:19;56:4,17,18;86:14;
106:14;113:16;121:3

**putting (1)**
113:24

## Q

**qualifies (1)**
7:24
**quickly (1)**
44:24
**quite (1)**
114:6

## R

**RA (4)**
71:3,3,4,4
**ran (5)**
8:15;30:12;44:18;73:23;
96:17
**random (2)**
81:18,21
**rape (3)**
5:21;55:4,11
**raped (9)**
4:21;92:18;98:22;99:22;
102:5,7;118:12;119:23;120:5
**rarely (1)**
16:22
**RAs (1)**
71:1
**raspy (1)**
73:6
**rather (1)**
93:2
**RE (1)**
1:8
**reached (1)**
122:7
**react (2)**
50:17,18
**read (12)**
34:4;39:1,2;47:6,22;59:8,20;
73:8,17;91:22;101:21;103:12
**reading (3)**
13:20;15:13;20:18
**real (1)**
64:16
**realize (2)**
41:16;105:18
**realized (5)**
5:4,12;45:4;61:8;79:13
**really (58)**
10:22;12:16;14:14,15,16;
16:15;17:14;18:4;20:23;28:1;
29:18;31:15,15,17;60:12,15,21;
61:9,24;63:4;65:13,13;67:9;
70:7;74:7,8;75:12;76:2,10,11;
77:23,24;78:14;79:3,21;81:2;
83:19;84:10,16;85:21;90:18;
92:6,14,15,20;95:4,16;96:5,6;
98:10;99:15;112:2;114:9;
115:11,12,12;117:8;119:18
**reason (2)**

78:18;107:6
**reasons (3)**
99:11,18;120:1
**recall (4)**
25:21;30:1;38:14;39:8
**received (2)**
42:8;51:21
**recollection (2)**
87:11;113:9
**recommendation (1)**
122:7
**recommendations (1)**
122:10
**record (6)**
12:2;58:22;72:18;91:12;
102:16;117:13
**recorder (2)**
58:24;91:14
**records (1)**
48:22
**recruit (1)**
119:20
**referring (1)**
69:5
**reflection (1)**
70:5
**regard (1)**
51:13
**regards (1)**
47:14
**reiterate (1)**
121:19
**relationship (3)**
38:13;39:7;117:21
**relationships (1)**
118:15
**relay (1)**
33:23
**release (1)**
57:19
**reluctance (1)**
99:10
**remain (2)**
91:11;102:13
**remarks (2)**
117:17;120:10
**remember (57)**
5:5,10,11,14,17;6:4,5,7,9;
16:14,18;20:13,15;21:1;25:20;
28:18;29:19,22,23,24;31:2,19,
19;32:14;60:22,24;76:11;77:19;
78:14,15;79:8;81:3,10;84:6,24;
86:12;96:5;97:15,16;98:10;
107:3,3;109:5;111:21,23;112:3;
113:11,13,14,15,16,18;114:7,8;
117:4,7,9
**remembered (1)**
78:21
**reminded (3)**
59:11;73:11;91:17
**removed (3)**
14:5;45:4;121:5
**repeatedly (1)**

63:15
**replied (2)**
45:9,10
**report (14)**
42:18;52:1,9,13,16,19;54:15;
57:10,17,22;67:7,21;68:3,18
**reporting (1)**
37:10
**reports (4)**
68:9;71:6;100:16,19;101:4,11
**report-writing (1)**
51:18
**repositioning (1)**
18:15
**resolved (2)**
4:11,12
**respect (2)**
21:12;106:18
**respected (1)**
121:6
**respond (1)**
3:10
**responded (1)**
31:8
**response (5)**
31:20;32:11,16;40:4;99:1
**responsible (1)**
120:7
**rest (1)**
118:3
**restroom (4)**
20:2,7,13;64:2
**result (6)**
2:21;6:17;7:16;59:12;73:12;
91:18
**results (1)**
55:11
**retrieved (1)**
49:17
**return (1)**
3:15
**returned (1)**
45:21
**reveal (2)**
83:5;97:23
**reviewed (2)**
47:7,8
**revoked (1)**
47:23
**ridiculous (1)**
12:18
**right (26)**
18:3;30:14,18;36:17;40:19;
46:11,12;47:24;52:4;53:5;69:9;
70:15;74:3;78:19;80:18;81:4;
86:7,8;89:6;92:17;99:5;103:11,
23;109:6;112:5;121:12
**rights (1)**
47:23
**rise (1)**
121:16
**rolled (2)**
10:17;105:9

rolling (2)
 58:24;91:14
room (23)
 5:11;9:1;11:11;14:4;15:5;
 22:18;24:21;35:1;46:2;49:17;
 54:23,24;57:9;61:15;70:9;
 76:10;86:4;93:4;95:16;96:7;
 100:9;107:7;113:14
roommate (1)
 21:7
rugby (7)
 43:8;84:4,5;108:5,6,17,20
run (1)
 81:22
running (1)
 112:1
Russo (1)
 43:19

S

sad (1)
 95:16
Safety (32)
 6:12;41:12,20;42:3;46:3,4;
 47:18,22;48:21,24;55:21;57:12;
 67:23;71:6;75:16,22;76:1,24;
 79:10;81:7;82:3;85:11,13,24;
 86:12;93:8,9;96:10,13;97:3;
 99:11;100:16
salad (1)
 109:12
same (7)
 4:10;28:16;33:1;68:10;81:23;
 107:4;118:11
sanctions (1)
 120:2
sang (3)
 110:5,6,7
Sarkozy (1)
 65:1
sat (1)
 15:3
Saturday (2)
 77:13;101:6
saving (2)
 5:22;119:6
saw (21)
 5:7;8:16,19;20:7;21:3;24:8;
 28:20;29:4;71:14,15;72:1;
 78:18;80:3;88:8;90:15;96:12;
 100:8;102:2;110:24;121:12,12
saying (9)
 5:16;39:20;50:1;85:21;86:17;
 90:6;96;24;112:1;113:17
scale (1)
 26:2
scarred (2)
 118:7,11
school (2)
 70:24;100:23
screaming (1)
 115:6

script (1)
 59:8
searched (1)
 63:13
seated (1)
 57:9
secluded (1)
 56:17
second (3)
 5:12;36:19;100:21
second-floor (1)
 9:24
Secondly (1)
 8:4
second-last (1)
 111:5
seeing (6)
 6:9;29:21;57:24;58:13;
 111:24;112:3
seem (8)
 80:18;82:22;88:19;89:17,19;
 92:15;115:10,20
seemed (12)
 55:22,23;74:1,7;82:18;84:17;
 85:22;88:14;92:15;93:2;94:22;
 100:9
seems (2)
 15:21;20:19
self (2)
 6:11;66:2
semester (4)
 8:23;14:2,11;79:24
semi-relationship (1)
 98:12
sense (7)
 66:6;81:2,9;82:19;85:22;
 121:16,18
sent (1)
 31:9
separate (3)
 55:5;56:16,19
separated (1)
 61:2
Sergeant (17)
 42:4,4,7;46:18;48:7,8;51:7,8;
 53:2;54:11,15,22;55:6,13;
 57:20;76:14;86:2
serious (6)
 59:12;73:12;91:18;96:24;
 98:13;110:12
seriously (2)
 2:21;97:1
serve (1)
 2:4
setting (1)
 90:21
several (1)
 63:10
sex (12)
 16:14;38:16,23;39:10;98:14,
 15;105:13;106:4,9;114:16;
 115:4;117:10
sex' (1)

37:20
sexual (19)
 2:14,16;6:14;7:24;8:7,12;
 11:2;18:9;19:8;36:24;38:1,6;
 42:10,11;51:11;56:7;107:15;
 114:23;122:2
sexually (2)
 13:22;44:23
SGT (29)
 42:7;46:12,14,17;47:8,12;
 48:12,16,19,23;49:3,6,9,14,18,
 24;50:13,16;51:14,19,22;52:4,8,
 12,15,18;53:13,21;54:1
she'll (1)
 80:14
she's (6)
 65:13;81:4;86:6,14;95:14,18
shocked (1)
 37:15
shocking (1)
 37:17
short (3)
 10:13;27:16;116:10
Shortly (4)
 10:6,16,19;61:7
shorts (1)
 86:12
shot (1)
 24:23
shots (1)
 84:19
shoves (1)
 5:15
show (3)
 38:3,4;70:8
showered (2)
 12:14;13:15
shown (1)
 71:24
sic (2)
 26:23;91:9
sick (4)
 75:13;77:11,12;111:1
side (2)
 27:16,24
sidewalk (1)
 99:3
signs (5)
 22:2;23:8;24:5;52:2;95:1
sing (3)
 109:23;110:1,3
sisters (1)
 43:20
sit (1)
 56:5
site (1)
 118:10
sitting (1)
 76:22
situation (3)
 37:13;60:16;79:14
six (4)
 26:2,5,13;57:21

sleep (1)
 50:2
slept (1)
 91:1
slightly (2)
 33:7;77:12
slur (1)
 52:3
slurred (6)
 53:15;68:20;69:6,8;78:6;
 92:24
slurring (3)
 24:7;68:24;95:5
smell (2)
 9:19;52:10
snacks (1)
 93:5
sober (2)
 26:9;90:14
sobering (1)
 91:1
sobers (1)
 79:15
somebody (1)
 115:14
someone (8)
 6:16;44:7;50:10;74:22,23;
 76:4;80:23;116:5
someone's (1)
 24:21
somewhere (2)
 26:14;29:14
songs (1)
 110:5
soon (1)
 79:12
sophomore (1)
 70:6
sorry (19)
 7:11;16:10;34:18,20;38:24;
 44:1;45:11;48:23;53:23;59:16;
 62:18;64:13;67:9;71:16,18;
 73:5;88:21;116:22;121:20
sort (5)
 15:18;16:1;41:19;50:8;
 106:23
sound (2)
 26:20;78:3
space (1)
 95:17
speak (11)
 8:2;11:24;34:19;47:24;55:19;
 56:18;57:1;71:13;72:20;73:3;
 92:8
specialist (2)
 51:16;56:7
specific (7)
 31:3;54:18;69:2;83:7;97:24;
 98:17,24
specified (1)
 101:22
speech (8)
 52:3;53:15;68:20,24;69:6,8;

Bleiler v.  
College of the Holy Cross

Hearing  
May 18, 2011

78:6;92:24  
**spend (1)**  
  86:1  
**spent (1)**  
  107:9  
**spirit (1)**  
  2:19  
**spiritual (1)**  
  119:17  
**spoke (5)**  
  42:15,16,19;47:2,13  
**stage (2)**  
  4:6;40:20  
**stairs (10)**  
  8:20;9:2;14:19;15:8;29:21;  
  30:10,13;32:5;112:16,17  
**stake (1)**  
  118:1  
**stakes (1)**  
  118:2  
**stand (3)**  
  7:7;27:14;61:17  
**standard (1)**  
  56:21  
**STANDARDS (7)**  
  1:5;2:11;7:22;8:5;51:9,10;  
  121:18  
**staring (1)**  
  95:17  
**start (11)**  
  4:16,17;17:3;29:2;34:2,7;  
  51:2;65:24;88:1;100:2;103:17  
**started (15)**  
  13:5,7;14:24;34:14;35:7,10,  
  21;43:6;44:22;53:1;70:14;  
  105:3;108:13,13,18  
**starting (1)**  
  107:24  
**state (4)**  
  7:15;88:16;110:23;115:3  
**stated (12)**  
  8:9;32:24;43:5,13,14;44:11,  
  19;45:3,7,22;56:2;120:19  
**statement (32)**  
  7:4;11:1,16;13:20,21;19:4;  
  21:6,10,13;38:3;47:5;48:3;56:5;  
  57:8;59:21;62:4;73:17;77:2;  
  91:23;93:11;101:22;102:23;  
  103:12,12;105:9;119:13,22;  
  120:9,10;121:7;7;122:4  
**statements (14)**  
  4:17;15:14;17:7;29:10;37:22;  
  47:3;101:20;102:19;103:17;  
  116:14;117:2,15,17;120:13  
**statutes (1)**  
  8:2  
**stay (3)**  
  62:7;65:19;66:21  
**stayed (1)**  
  97:4  
**STDs (1)**  
  118:24  
**steps (1)**

87:4  
**still (13)**  
  7:9;25:13;29:16;33:12,15;  
  62:23;77:19;78:17;85:12;86:7;  
  100:9;103:21;109:15  
**stop (4)**  
  75:19;112:6;114:2,12  
**stopped (8)**  
  15:1,1;18:2,17;20:23;77:10;  
  114:10;121:5  
**story (3)**  
  75:19;83:12,19  
**straddling (2)**  
  35:19;105:16  
**straight (1)**  
  6:15  
**Street (17)**  
  5:4;8:19;9:13,13,15;28:3;  
  30:18;43:15,16,22;44:6,9;  
  53:22;60:7,20;72:2;74:20  
**stress (2)**  
  119:1,2  
**stressed (2)**  
  79:20;90:20  
**strict (1)**  
  7:23  
**struggle (2)**  
  7:9;63:5  
**student (2)**  
  58:14;122:8  
**students (7)**  
  3:17;33:19;58:2;91:8;119:20,  
  21;122:9  
**Studying (1)**  
  118:18  
**stuff (3)**  
  75:9;85:23;96:15  
**stumble (1)**  
  9:18  
**stumbled (1)**  
  92:23  
**stumbling (3)**  
  23:19;24:6;78:7  
**submitted (1)**  
  102:23  
**subsequent (2)**  
  46:11,16  
**suddenly (1)**  
  45:2  
**suggest (1)**  
  120:23  
**Sunday (1)**  
  4:21  
**supports (1)**  
  119:15  
**supposed (2)**  
  119:8;120:24  
**sure (28)**  
  6:1;10:22;15:4;18:17;28:12;  
  29:18;32:23;34:8;37:14;42:24;  
  43:16;53:13;62:10;63:1,20;  
  68:9,13;73:19;75:2;79:21;89:8;  
  95:14;99:19;103:10,14;114:6,9,

14  
**surroundings (1)**  
  26:17  
**system (1)**  
  44:12

---

**T**

---

**table (2)**  
  86:5,6  
**talk (8)**  
  30:21;69:20;76:9,13;81:15,  
  17;96:3;112:22  
**talked (7)**  
  32:3;46:19;75:8;76:23;81:21;  
  92:21;96:7  
**talking (9)**  
  64:4;74:18;82:13;86:2;93:1;  
  95:6;101:19;105:12;107:19  
**tasted (1)**  
  75:12  
**team (2)**  
  43:8;108:5  
**telephone (1)**  
  59:2  
**telling (3)**  
  5:17;74:19;75:19  
**temperature (1)**  
  41:16  
**ten (6)**  
  22:3;23:10;26:3,9;58:21;  
  63:23  
**terribly (1)**  
  7:11  
**testified (1)**  
  101:15  
**testimony (4)**  
  54:11;58:16;72:7;120:13  
**texted (1)**  
  14:13  
**texts (3)**  
  31:8,9,24  
**Thanks (1)**  
  97:21  
**That's (41)**  
  4:12;17:14;18:18;21:3;35:10;  
  37:14;38:19;39:16,21,22;44:11;  
  45:23;46:7;48:4;49:8,18;56:21;  
  57:21;66:15,17,21;68:6;70:15;  
  73:4,7;78:22;87:8;88:22,23;  
  90:11;94:13;95:14;105:16;  
  108:21,22,24;109:1;112:2,15,  
  18;114:17  
**There's (5)**  
  27:22;41:5;50:18;54:17;89:5  
**they're (4)**  
  29:9;85:4;116:5,6  
**they've (1)**  
  24:22  
**thinking (2)**  
  33:12;115:3  
**third (5)**  
  30:11;37:8,8;75:6;112:16

**thirty (2)**  
  104:4,4  
**though (2)**  
  68:19;75:12  
**thought (6)**  
  8:5;29:4;60:10;66:6;74:10;  
  121:24  
**thoughts (1)**  
  93:2  
**three (10)**  
  48:23;77:22;93:23;94:1,5,7;  
  101:8;112:11,12;120:13  
**throughout (6)**  
  11:11;25:17;61:14;70:17;  
  91:2;120:11  
**throwing (1)**  
  26:9  
**timeframe (5)**  
  13:5;54:4;63:21;89:10;  
  114:20  
**timeline (1)**  
  21:12  
**times (5)**  
  14:13;17:1;38:22;45:16;49:7  
**tired (7)**  
  11:9;15:2;49:24;50:1;95:21;  
  99:15,16  
**today (14)**  
  2:24;3:4,9;7:17;29:10;46:20;  
  59:14,18;73:14;91:20;102:22;  
  120:12,19;121:3  
**Today's (5)**  
  2:5,5,10,17;3:18  
**together (13)**  
  8:20,24;13:22;14:10;30:13;  
  31:10;33:3;61:1;66:21;68:9;  
  83:20;94:18,21  
**told (10)**  
  44:7;45:16,16;56:1;84:2;  
  89:10;92:17;98:18;102:6;  
  120:15  
**tolerance (1)**  
  17:14  
**tomorrow (1)**  
  99:17  
**tonight (1)**  
  99:17  
**took (6)**  
  44:21;76:9;84:24;96:13;  
  119:3,4  
**top (18)**  
  10:15;16:12,18;34:7;35:9,16,  
  19;37:23;38:21;39:16;98:4;  
  104:18;105:6,10,15;113:20,23;  
  118:19  
**topic (1)**  
  104:7  
**totally (1)**  
  23:18  
**touch (2)**  
  10:12;27:15  
**touched (2)**  
  14:6,7

Bleiler v.
College of the Holy Cross

Hearing
May 18, 2011

touching (7)
11:5;35:8;38:13;39:8,14,21;
40:3
tournament (1)
84:5
towards (1)
74:16
tower (2)
78:19,19
tradition (1)
121:15
trained (5)
51:16;120:17,18,21,24
training (3)
51:21,23;57:4
traumatic (1)
118:6
tried (5)
60:16;83:16,21;93:7;98:4
trouble (7)
23:13;81:9;92:22;93:1;95:4;
99:14;101:16
truly (1)
121:20
truthful (8)
2:19,24;3:3,8;59:14;63:20;
-73:14;91:20
truthfully (3)
59:10;73:10;91:16
try (3)
38:5;67:18;98:5
trying (17)
18:5;23:7;26:8;27:6,7;31:18,
20;63:3;81:6;83:18;96:8;107:2,
13;110:22,22;113:18,19
turn (2)
11:20;74:15
turned (1)
92:19
twenty (3)
27:15,15;61:18
twice (1)
23:4
twin (1)
43:20
two (16)
6:9;8:10;17:1;27:1;31:9;
45:24;46:17;56:13,16;97:2;
99:18;100:19;101:3;115:17,19;
118:17
type (3)
17:11;30:24;31:6
types (1)
42:21

U

Uh (1)
14:20
ultimately (2)
6:12;121:6
um (8)
17:1,3;18:6;19:23;20:22,24;

21:1;34:15
Um-hum (5)
28:13;51:19;71:9;100:17;
101:17
umm (7)
19:21;101:13;107:2,16;
110:10;114:14;121:3
unable (5)
7:16,19;8:6;118:16;121:24
unaware (2)
6:19;37:16
unconscious (2)
6:19;9:20
under (7)
7:21;66:23;88:7,12;100:6;
118:22;120:5
unexpectedly (2)
104:16,17
unfortunately (1)
57:3
unless (2)
54:17;102:10
unlock (2)
10:3;34:24
unlocked (1)
10:3
unusual (1)
18:1
up (42)
9:4,24;10:2;11:24;15:7;16:1;
17:16;26:9;30:9,10,17;36:18;
45:22,24;53:9;59:24;60:2;64:4;
65:14;70:8;71:24;72:21;74:15;
75:15;76:12,18;79:15;80:15;
81:24;82:2;89:12;91:2;92:8;
103:22;104:8;107:13;108:1,3,
14;109:2;112:16,18
updated (1)
42:17
Upon (1)
9:23
upper (1)
61:15
upset (7)
6:2,11;20:23;55:23;56:9;
60:9;74:7
upstairs (2)
8:18;112:14
use (2)
104:10,14
used (7)
11:12;15:3;45:8;96:9;98:17;
102:2;104:22
using (2)
105:1,3
usual (3)
6:11;17:19;66:1
usually (12)
16:1,4,24;17:4,13;56:23;74:8;
80:14;95:14,18;109:12;116:5

V

vagina (5)
5:16,19;36:2;113:16;118:9
vaginal (1)
45:6
vague (2)
18:4;113:12
vaguely (1)
5:5
vein (1)
107:5
verbal (3)
32:16;40:4;99:1
verbalizing (1)
115:7
verbatim (1)
68:12
vice (1)
122:8
victim (2)
42:16;56:17
violated (2)
7:1,1
violation (3)
2:14,16;121:17
virgin (4)
5:21;40:10,12;83:23
virginity (1)
119:5
visibly (4)
6:1,20;60:8,13
vodka (1)
17:22
voice (1)
73:5
voluntary (1)
6:18
vomit (3)
9:22;52:17;110:16
vomiting (3)
24:6;111:4,11

W

waffle (2)
109:14,18
wait (3)
3:13,14;79:1
waited (2)
66:18;76:10
waiting (3)
3:13;76:23;102:14
walk (14)
14:18,19;15:10;20:17,20;
26:23;27:6;30:17;73:20;92:2,
13,20;96:4,17
walked (22)
8:20;9:12,24;10:1,2,4,5;
30:13;34:22;46:1,3;64:3;74:16;
75:18,23,24;76:7;78:23;87:3,4;
93:8;112:17
walking (23)
8:18;9:2,7,16;15:8;30:9;32:5;
45:22;73:23;74:4;75:4;78:9,15;

80:11;83:10;84:13,14;85:18;
87:7;92:2,22;95:4;101:16
wandering (1)
66:14
warmer (1)
86:17
warning (1)
-70:8
wasn't (26)
10:21;15:4;18:12,17;19:9,10,
24;23:24;24:3;25:3;31:7;66:19;
69:2;70:10;75:17;77:18;79:3;
82:20;84:4;90:17;91:3,3;98:13;
- 105:3;115:11,12
watch (2)
9:20,22
Water (1)
111:20
waves (1)
82:5
way (13)
5:8;6:24;27:5,15;34:7;50:18;
56:17,19;61:13;87:7;95:6;98:5;
113:19
we'd (4)
54:12;69:19;72:6;102:11
we'll (15)
37:7;41:4,18,24;58:24;67:18;
87:22,24;89:4;100:2;102:18;
117:1,2,12,12
We're (9)
3:14;4:16;33:17;58:23;68:8;
87:23;103:16;116:8;117:14
We've (8)
- 11:24;23:4;24:20;47:6,7;
73:1;91:13;120:12
wearing (3)
5:13;55:1;114:4
weather's (1)
· 31:23
website (3)
6:16;119:14,20
Wednesday (2)
2:5;101:7
week (2)
17:1;66:8
weekend (1)
16:23
Welcome (4)
59:8;73:9;83:2;91:14
weren't (4)
29:7;89:13,14;111:10
what's (8)
9:5;12:22;19:15;26:5,12;
35:15;80:14;90:4
whenever (1)
81:23
who's (1)
70:24
whole (10)
18:3;25:10;62:19;70:17;71:1;
72:3;87:2;91:2;108:12,15
whose (2)

Bleiler v.
College of the Holy Cross

106:19,21
**Williams (3)**
43:7,9,24
**wine (3)**
93:24;94:2,7
**winning (1)**
108:14
**withdrawn (2)**
80:2,13
**without (6)**
6:22;15:23;44:24;67:2;119:6;
120:3
**witness (12)**
41:21;46:24;47:2,3,4;48:2;
59:2;102:21;120:12;121:7,8,12
**witnessed (1)**
72:3
**witnesses (13)**
3:7,10,12;29:9;40:20;41:5,12,
13,18;42:2;56:16;59:1;102:18
**woke (2)**
108:1,3
**woman (1)**
70:23
**won't (1)**
86:15
**wondering (1)**
57:11
**words (6)**
7:10;18:2;24:7;98:24;102:2,7
**wore (1)**
86:12
**work (4)**
34:7;83:17,21;118:16
**worried (7)**
60:15;61:9;68:7;70:14,18;
96:19,22
**worry (2)**
118:21,23
**worse (1)**
83:15
**worst (1)**
82:16
**wouldn't (13)**
12:18;13:1;17:18;19:11;22:5,
19;48:13;50:13;53:15;87:16;
94:6;105:21;106:10
**wrap (1)**
109:21
**write (3)**
46:21,22,24
**writings (1)**
16:11
**written (1)**
102:23
**wrong (5)**
39:19;74:9;80:4,19;82:16
**wrongful (1)**
4:23
**wrote (4)**
48:2;67:7,20;68:12

## Y

**yard (1)**
27:12
**year (1)**
64:6
**years (1)**
120:1
**Yiznitsky (47)**
6:9;46:1;56:14;91:21;92:1,9,
12;93:14,20,23;94:4,9,12,15,17,
20;95:3,10,13,23;96:4,14,21;
97:1,7,9,13,19,22;98:2,9,20;
99:1,5,8,12,21;100:8,17,20;
101:1,5,9,13,17,21;102:4
**you'd (6)**
28:2;36:19;50:24;54:18;
75:22;92:24
**You'll (2)**
36:9,11
**you're (20)**
16:3;18:4,5;22:23;23:17,19;
27:13;35:13;39:20;51:9;59:9;
73:10;79:4;83:2;86:16;90:2;
91:10,15;113:22,23
**you've (7)**
3:22;11:1;14:9;47:8;51:21;
69:14;110:9
**younger (1)**
63:4
**Yup (4)**
97:22;99:8;103:5;116:21

## Z

**Zach (1)**
42:15
**zero (5)**
22:3;23:10;24:1;26:3,8