UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

_____

EDWIN BLEILER,                                    )
Plaintiff                                          )
                                                   )        C.A. No.: 11-cv-11541
v.                                                 )
                                                   )
COLLEGE OF THE HOLY CROSS                          )
Defendant                                          )
_____)

## PLAINTIFF'S RESPONSE TO DEFENDANTS STATEMENT OF UNDISPUTED FACTS AND STATEMENT OF DISPUTED/ADDITIONAL FACTS

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1 of the United States District Court

for The District of Massachusetts, Plaintiff, Edwin Bleiler ("Plaintiff or Mr. Bleiler"), in

support of his Opposition to Defendant, College of the Holy Cross's ("Defendant" or

"College") Motion for Summary Judgment, respectfully submits the following Response to the

Defendant's Statement of Undisputed Facts in Support of its Motion for Summary Judgment,

and Plaintiff's Statement of Disputed/Additional Facts.

## I.      RESPONSE TO THE COLLEGE'S STATEMENT OF FACTS

1.      Plaintiff  Bleiler ("Bleiler") was a student at the College of The Holy Cross ("Holy
        Cross" or the "College") from the Fall of 2007 to the Spring of 2011. *(See* Deposition
        of Edwin Bleiler ("Bleiler Dep.") 6:13-18 at tab 1, attached to Affidavit of Harold W.
        Potter, Jr., Esq. ("Potter Aff.") at Appendix Exhibit A.)

**Response:**  Undisputed.

2.      Holy Cross is a private, non-profit college located in Worcester, Massachusetts.
        (Compl. ¶ 2.)

**Response:**  Undisputed.

3.      Room, board tuition and fees were paid to Holy Cross on behalf of Bleiler.
        (Compl. ¶ 84.)

**Response:** Undisputed that Mr. Bleiler's parents paid room, board, tuition and fees to Holy Cross on his behalf. (Affidavit of Edwin Bleiler, ¶ 2)

4.    The College receives federal funding under Title IX, 20 U.S.C. §§1681-1688 (2011) (Compl. ¶ 63.)

**Response:** Undisputed.

5.    Bleiler successfully completed his coursework with 3.13 GPA and had received 32 credits for his coursework (Compl. ¶8.)

**Response:** Undisputed.

6.    Bleiler's freshman year at Holy Cross was 2007-2008. (Bleiler Dep. 9:15-17; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

7.    Bleiler lived on campus freshman and sophomore years. (Bleiler Dep. 9:21-22; 14:5-7; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

8.    Bleiler lived off campus his junior and senior years. (Bleiler Dep. 17:15-17; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

9.    A female student made a complaint against Bleiler in May 2011 to the Holy Cross Public Safety Department (Bleiler Dep. 91-92 Ex. 5-7; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

10.   Edwin Bleiler was placed on interim suspension, his senior year, on May 9, 2011, as a result of the complaint by the female student, pending a final disciplinary hearing. (Bleiler Dep. 69 Ex. 2; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

11.   A disciplinary hearing on the complaint was held on May 18, 2011. (Bleiler Dep. 101:18-22; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

12.   Following the hearing, Paul Irish ("Irish") informed Bleiler in person of the panel's decision to dismiss him from the College. (Bleiler Dep. 110:7-13; Potter Aff. App. Ex. A, tab I.)

**Response:** Undisputed.

13. Bleiler received written notification of the decision on May 19, 2011 (Bleiler Dep. 111 Ex. 17, 111:6-17; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

14. Bleiler appealed the decision to the President of the college who affirmed the decision on May 26, 2011. (Bleiler Dep. 113, 115 Ex. 18-19; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

15. As of the date of his deposition, April 16, 2012, Bleiler was enrolled in the University of Kentucky. (Bleiler Dep. 6:19-22; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

16. On May 1, 2011, a female Holy Cross student ("C.M.") gave her first of three statements to the College's Public Safety Department indicating that she was sexually assaulted by a male student, who she identified in the third statement as Bleiler. These events are collectively referred to as the "incident." (Bleiler Dep. Exs. 5-7; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed to the extent that on May 1, 2011, a female Holy Cross student ("C.M.") gave her first of three statements to the College's Public Safety Department and that she identified Mr. Bleiler in the third statement. Disputed to the extent that such statements indicated that C.M. was "sexually assaulted by a male student." (Bleiler Dep. Ex. 5-7)

17. On May 1, 2011, C.M. filed a Holy Cross Public Safety Witness Statement Form, stating that she and Bleiler had "hooked up (meaning made out)" before the night of the incident. In her statement, C.M. claims that, on the night in question, she consumed alcohol, was on antibiotics, and was "definitely out of it." She goes on to state that "[a]s [she and Bleiler] were making out, [she doesn't] remember how [her] clothes came off, but they did." She says "[t]he next thing I knew [Bleiler] was forcing himself inside me to which I didn't consent" The statement goes on to say that "this continued until [C.M.] was able to push him off/out of [her]" and that he asked for sex again, to which she said no, and he complied. (Bleiler Dep. 91 Ex. 5; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this is what is recorded in part, in C.M.'s written statement dated May 1, 2011.

18. On May 5, 2011, C.M. filed a second Holy Cross Public Safety Witness Statement Form, which alleges that, on the night of the incident, she does not remember much before Bleiler leading her into his room. She states that:

> He then put his fingers inside me to which I remember saying "no" and he said "it's okay" but he didn't stop. I tried to move myself out of the way but he was forcing himself himself [sic] inside me. I definitely did not consent and I'm pretty sure I said no since my thoughts were screaming it.

3

She goes on to say "I did not want this. He continued for I don't know exactly how long, until I was able to push him off me." C.M. states that she doesn't remember anything after that except that she vaguely remembers getting dressed. (Bleiler Dep. 91 Ex. 6; Potter Aff App. Ex. A, tab 1.)

**Response:** Undisputed that this is what is recorded in part, in C.M.'s written statement dated May 5, 2011.

19. On May 9, 2011, C.M. filed a third Holy Cross Public Safety Witness Statement Form, stating that, during her hospital examination following the incident, "they found a 1 inch lasaration [sic], that still causes me daily pain and the area was worn out, tender and extremely painful. I bled for 5 days from these wounds. I can feel them and am reminded of the incident every time I walk." (Bleiler Dep. 92 Ex. 7; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this is what is recorded in part, in C.M.'s written statement dated May 1, 2011.

20. Bleiler maintains that C.M. willingly engaged in sexual relations with him on the night of the incident. (Compl. ¶ 10.)

**Response:** Undisputed. Further, Bleiler maintains that C.M. was not incapacitated. (Bleiler Aff., ¶ 5)

21. Following the incident, five students filed Witness Statement Forms: Beth Federici ("Federici"), Jacob Yiznitsky ("Yiznitsky"), Kate DeFusco ("DeFusco"), Felicia Russo ("Russo"), and Elizabeth Masi ("Masi"). (Bleiler Dep. Exs. 8-14; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

22. In her statement dated May 1, 2011, Federici states that immediately following the incident, C.M. "looked upset" and stated that she "knew the guy who had raped her." (Bleiler Dep. 93 Ex. 8; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this is what is recorded in Ms. Federici's written statement dated May 1, 2011.

23. In his statement dated May 1, 2011, Yiznitsky states that immediately following the incident, C.M. said "I think I was just raped" but that "he probably didn't mean it" and she "didn't want to get anyone in trouble." Yiznitsky advised her to go to Public Safety. (Bleiler Dep. 93 Ex. 9; Potter Aff. App. Ex. A, tab 1.)

**Response:** Disputed to the extent that Yitznitsky states that C.M. made the above statements "immediately following the incident." Undisputed that the balance is what is recorded in part, in Yiznitsky's written statement dated May 1, 2011. Further, Yiznitsky's May 1, 2011, statement also declares that he met C.M. "presumably very soon" after the incident

and also delares that C.M. said that she "had had an off-an-on relationship with [Bleiler] but nothing serious." (Bleiler Dep., Ex. 9)

24. In a May 4, 2011, statement, Yiznitsky states that he saw C.M. and had the above-mentioned exchange with her "a few minutes or perhaps an hour" after the incident. (Bleiler Dep. 96 Ex. 13; Potter Aff. App. Ex. A, tab 1.)

**Response:** Disputed to the extent that Defendant asserts that the statement declares the above exchange occurred "a few minutes or perhaps an hour" after the incident, as Yiznitsky's May 4, 2011, statement simply says that he "***met*** her a few minutes or perhaps an hour at most after the incident." (Bleiler Dep., Ex. 13) Undisputed that the balance is what is recorded in part, in Yiznitsky's written statement dated May 4, 2011

25. In her statement dated May 4, 2011, Masi states that earlier on the night of the incident, C.M. was intoxicated and Masi became worried when she could not find her after being told to leave a party. (Bleiler Dep. 95 Ex. 12; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this is what is recorded in Ms. Masi's written statement dated May 4, 2011.

26. In her statement dated May 5, 2011, DeFusco also states that earlier on the night of the incident, DeFusco became worried when she could not find C.M. after being told to leave a party. (Bleiler Dep. 96 Ex. 14; Potter Aff. App. Ex. A, tab 1.)

**Response:** Disputed to the extent that DeFusco's statement is dated May 3, 2011, and to the extent that it contains no mention of DeFusco becoming worried when she could not find C.M. after being told to leave a party. (Bleiler Dep., Ex. 14)

27. On May 9, 2011, Bleiler was contacted by and met with Holy Cross Public Safety Sergeant Kathleen Culley ("Culley") and Officer Kate Mills. At that meeting, Culley informed Bleiler of the charges against him. Culley also read Bleiler his Miranda rights, which Bleiler indicated that he understood, and a copy of which he signed. (Bleiler Dep. 65:10-67:13, Ex. 1; Potter Aff. App. Ex. A, tab 1.)

**Response:** Disputed to the extent that the referenced deposition transcript and Notification of Miranda Rights contain no evidence of the identities of the officers, nor evidence that "Bleiler indicated that he understood" his Miranda rights. (Bleiler Dep. 65:10-67:13, Ex. 1)

28. Six students at the College have been charged with Sexual Misconduct I since 2002. (Def's Resps. to Pl.'s Interrogs. Nos. 1-3; Ex. B.)

**Response:** Undisputed. Further, all six students at the College who have been charged with Sexual Misconduct I since 2002 have been male. (Def's Resps. to Pl.'s Interrogs. Nos. 1-3)

29.     Four have been found responsible. Of the four found responsible, three were
        dismissed from the College and one received a one-year suspension. (Def.'s
        Resps. to Pl.'s Interrogs. Nos. 1-3; Ex. B.)

**Response:**  Undisputed.

30.     There are no known complaints of a violation for Sexual Misconduct I made by a male
        student against a female student at the College. (Def.'s Resp. to Pl.'s Interrog. No. 2; Ex. B.)

**Response:**  Undisputed.

31.     Public Safety referred C.M.'s complaint to Paul Irish ("Irish") on May 9, 2011.
        (Bleiler Dep. 69 Ex. 2; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed.

32.     Irish is the Director of Student Conduct and Community Standards at the College.
        Irish is also the Assistant to the Vice President for Student Affairs. *(See* Deposition of
        Paul A. Irish ("Irish Dep.") 9:17-20, at Potter Aff. App. Ex. A, tab 2.)

**Response:**  Undisputed.

33.     In his tenure at Holy Cross, Irish has participated in four hearings for Sexual
        Misconduct I. (Irish Dep. 37:3-11; Potter Aff. App. Ex. A, tab 2.)

**Response:**  Undisputed.

34.     Of the four Sexual Misconduct I hearings in which Irish has been involved, three
        students were found responsible. (Irish Dep. 58:8-13; Potter Aff. App. Ex. A, tab 2.)

**Response:**  Undisputed.

35.     In a letter dated May 9, 2011, from Irish to Bleiler, Bleiler was informed in writing
        of a report filed against him indicating he sexually assaulted another student and of
        an investigation into the incident. This letter also alerted him that he would be placed
        on interim suspension until a final disciplinary decision was rendered. (Bleiler Dep.
        69 Ex. 2; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed.

36.     The May 9, 2011 letter informed Bleiler that a final decision regarding the matter
        would be made in accordance with the policies detailed in the College's Community
        Standards and Disciplinary Procedures for Students (the "Community Standards" or
        the "Standards") found in the Student Handbook (the "Handbook"). (Bleiler Dep. 69
        Ex. 2; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

37.     Bleiler received this letter on or around May 9, 2011. (Bleiler Dep. 69:17-70:6; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

38.     In a letter dated May 10, 2011, Irish informed Bleiler that he was accused of having committed Sexual Misconduct I in violation of the College's Community Standards. This letter identified the name of the complainant, the date and location of the incident, and instructed Bleiler of the requirement to attend a pre-hearing meeting. (Bleiler Dep. 71 Ex. 3; Potter Aft: App. Ex. A, tab 1.)

**Response:** Undisputed Undisputed that this is what is written in part, in a letter dated May 10, 2011 from Irish to Mr. Bleiler.  (Bleiler Dep., 71 Ex. 3) .

39.     The College promulgates a document published on a yearly basis titled in 2012-2011 "College of the Holy Cross - student Handbook and Planner 2010-2011. (Compl. ¶ 12.)

        **Response:**  Undisputed to the extent that the College published a document entitled "College of the Holy Cross – Student Handbook and Planner 2010-2011."  r.

40.     Holy Cross's Code of Student Conduct defines Sexual Misconduct I as:

>       Any sexual penetration (anal, oral or vaginal), however slight, with any object or sexual intercourse by a man or woman upon a man or woman without effective consent. Sexual penetration includes vaginal or anal penetration by a penis, object, tongue or finger and oral copulation by mouth to genital contact or genital to mouth contact.

(Bleiler Dep. 121 Ex. 21, at 37; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Handbook.

41.     Holy Cross's Code of Student Conduct defines effective consent as:

>       [I]nformed, freely and actively given mutually understandable words or actions which indicate a willingness to participate in mutually agreed upon sexual activity. Consent may never be given by minors . . . , mentally disabled persons and those who are incapacitated as a result of alcohol or other drug consumption (voluntary or involuntary) or those who are unconscious, unaware or otherwise physically helpless. Consent as a result of coercion, intimidation, threat of force or force is not effective consent.

(Bleiler Dep. 121 Ex. 21, at 37; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Handbook.

42.    The Handbook provides:

> In the absence of mutually understandable words or actions, it is the responsibility of the initiator, or the person who wants to engage in the specific sexual activity to make sure that he/she has the consent from his/her partner(s). Consent to some form of sexual activity does not necessarily consent to other forms of sexual activity. Mutually understandable consent must be obtained by the initiator at every stage of sexual interaction. Consent is mutually understandable when a reasonable person would consider the words and/or action of the parties to have expressed a mutually understandable agreement between them to do the same thing, in the same way, at the same time, with one another.

(Bleiler Dep. 121 Ex. 21, at 57; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed that this language is contained in the Handbook.

43.    The Handbook provides that:

> [A] person who knows or reasonably should have known that another person is incapacitated may not engage in sexual activity with that person. Incapacitation means being in a state where a person lacks the capacity to appreciate the fact that the situation is sexual, or cannot appreciate (rationally and reasonably) the nature and/or extent of the situation.

(Bleiler Dep. 121 Ex. 21, at 57; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed that this language is contained in the Handbook.

44.    Additional College rules in the Handbook advise students that:

> -A person who is the object of sexual aggression is not required to physically or otherwise resist a sexual aggressor;
>
> -Silence, previous sexual relationships, and/or current a current sexual relationship with the initiator (or anyone else) may not, in themselves, be taken to imply consent;
>
> -Intentional use of alcohol or other drugs does not excuse a violation of the Sexual Misconduct Policy;
>
> -Consent to sexual activity may be withdrawn at any time, as long as the withdrawal is communicated clearly (because you cannot be expected to read the mind of your sexual partner(s)), and all sexual activity must cease;
>
> -Consent has an expiration date. Consent lasts for a reasonable time, depending on the circumstances. A person's state of

incapacity is a subjective determination that will be made after the incident in light of all facts available because people reach incapacitation at different points and as a result of different stimuli. They exhibit incapacity in different ways.

(Bleiler Dep. 121 Ex. 21, at 57; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Handbook..

45. The College's Handbook states that the College also considers factors that bear on incapacity such as: body weight; height; size; tolerance for alcohol; amount and type of alcohol consumed, along with their interaction with other drugs; and propensity for blacking out. (Bleiler Dep. 121 Ex. 21, at 57; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed to the extent that the Handbook states that "[t]he following factors bear on incapacity": body weight, height and size; tolerance for alcohol; amount and type of alcohol consumed; and propensity for blacking out. Disputed to the extent that the Handbook nowhere states that "interaction with other drugs" is one of these factors. Undisputed that the balance of the above-quoted language is contained in the Handbook.

46. Holy Cross advises all students that to enter the College is to accept the rights and responsibilities of membership into the community, including "high standards of personal conduct and behavior." The College also assumes all students will abide by the College's policies, rules, and regulations, including "Community Standards and Disciplinary Procedures," and will abide by state, local, and federal laws. (Bleiler Dep. 121 Ex. 21, at 33; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Student Handbook. Disputed that Holy Cross clearly communicates its expectations to incoming students, particularly as it relates to male students and the potential for allegations of sexual misconduct. (Bleiler Dep. 58-59, 61-62).

47. The College has established Community Standards and Disciplinary Procedures to address allegations of student misconduct. Under these procedures:

> [S]tudents have the right "to be informed of any charges of misconduct, the right to adequate time to prepare a response to the charges, the right to hear information in support of the charges, the right to present evidence against the charges, and the right to a fair process which is appropriate to the circumstances.

(Bleiler Dep. 121 Ex. 21, at 33; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that the College has established disciplinary procedures and that this language is included in those procedures.

48. Community Standards of the College applies to student misconduct that takes place on College premises and to off-campus conduct when the behavior may adversely impact

the College community or reputation. (Bleiler Dep. 121 Ex. 21, at 34; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed that this language is contained in the Handbook.

49.     The College advises students that the rules of evidence found in legal proceedings do not apply, nor shall deviations from proscribed procedures necessarily invalidate a decision, unless "significant prejudice" to a student respondent or to the College may result. (Bleiler Dep. 121 Ex. 21, at 34; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed that this information is contained in the Handbook.  Disputed to the extent that the Handbook and the CSB Training Materials also provides that certain evidence, such as a party's prior sexual history, should not be considered in a sexual misconduct proceeding.  (Irish Dep., Exs. 2 at 57, Ex. 4 at 14-15)

50.     The Director of Student Conduct and Community Standards (the "Director") has the responsibility of administering all nonacademic discipline. The Director also has the authority to invoke an interim suspension when it is considered necessary to remove a student from campus until the completion of a disciplinary hearing. (Bleiler Dep. 121 Ex. 21, at 34; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed that this language is contained in the Handbook.

51.     According to the College's Disciplinary Process and Procedures, any student may submit a complaint by submitting a writing to the Office of Student Conduct and Community Standards.  The Director or a designee reviews all complaints and determines if disciplinary charges will be initiated, what specific violations a student will be charged with, and the appropriate venue for adjudication. (Bleiler Dep. 121 Ex. 21, at 38; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed that this language is contained in the Handbook.

52.     Students accused of violating College policies will receive a written notification of the alleged violation, the location and date of this incident (if known), and the reporting party. (Bleiler Dep. 121 Ex.  21, at 38; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed that this language is contained in the Handbook.

53.     A hearing in front of the Community Standards Board (the "Board") will normally be conducted for students who face suspension or dismissal. (Bleiler Dep. 121 Ex. 21, at 38; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed that this language is contained in the Handbook.

54.     Prior to a hearing in front of the Board, the accused is required to attend a pre-hearing meeting with the hearing coordinator, usually the Director.  In this meeting, the accused must review the information and choose to accept the charges, or to refute the charges, in

which case a hearing will be scheduled, normally no less than seven days from the pre-hearing meeting. (Bleiler Dep. 121 Ex. 21, at 39; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Handbook.

55.     Bleiler received the May 10, 2011 letter before the scheduled pre-hearing meeting. Bleiler attended the scheduled pre-hearing meeting with Irish on May 10, 2011. (Bleiler Dep. 70:22-72:5; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

56.     At the May 10, 2011 pre-hearing meeting, Bleiler signed a Pre-Hearing Checklist produced by the College's Office of Student Conduct & Community Standards indicating that he understood and accepted the following statements:

1.  I have received a written notification of the complaint.

2.  I understand the violation of the Community Standards that I am alleged to have committed.

3.  I am aware of the identity of the complainant.

4.  I understand that any behavior that can be construed as retaliation against the complainant or witnesses will be subject to immediate disciplinary action including suspension/expulsion from the college.

5.  I have a copy of the Student Handbook which includes the Community Standards Board procedures.

6.  I understand that I may review the case file (a copy cannot be made nor can it be removed from the Office of Student Conduct & Community Standards) prior to the hearing.

7.  I understand that I may have an advisor present with me during the hearing and I have reviewed the role of the advisor.

8.  I understand that if I choose to have an advisor, s/he must be a faculty, staff or student member of the Holy Cross community.

9.  I understand that if I choose to have an advisor it is my responsibility to provide the advisor's name to the Hearing Administrator no later than 48 hours prior to the hearing.

10. I understand that my witnesses will be asked to speak only to the incident in question and the relevancy of their testimony is

subject to the discretion of the Community Standards Board Chair.

11. I understand that my witness list and copies of written statements must be submitted to the Hearing Administrator no later than 48 hours prior to the hearing.

12. I understand that the hearing will be scheduled taking into account only classes and other officially recognized absences from class.

13. I understand that the decision of the Community Standards Board is final pending appeal to the Vice President for Student Affairs/Dean of Students or designee.

14. I understand the circumstances which will be considered grounds for appeal and how to file an appeal if I so choose.

15. I understand that appeals must be filed no more than 72 hours after the date of the hearing to the VPSA/DOS and will be final. [Sanctions of expulsion may be appealed to the College President.]

16. I understand that the hearing, with the exception of the deliberations, may be taped and that the tape is considered property of the College.

17. I understand that should I wish to review the recording I may do so in the office, and may not make a copy or otherwise remove the recording.

18. I understand that I should contact Paul Irish with any questions.

19. I have been encouraged to discuss this matter with my family.

Each line of this document was initialed by Bleiler. (Bleiler Dep. 72:14-73:14, Ex. 4; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

57. At the pre-hearing meeting, Bleiler received a copy of the Handbook and reviewed the case file with Irish, which contained the statements from C.M. and the other five students who filed statements. (Bleiler Dep. 90:18-92:4; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

58.     The Disciplinary Board (the 'Board) is made up of twenty-one people: six administrators and staff appointed by the Vice President for Student Affairs; six faculty members selected by the Dean of the College; and nine students recommended by the Student Government Association from the pool of eligible students. (Irish Dep. 28:15-29:7; Potter Aft App. Ex. A, tab 2.)

**Response:**  Undisputed that this language is contained in the Handbook.

59.     To be eligible to be recommended to serve on the Board, a student must be in good disciplinary standing at the time of recommendation. There are no other eligibility requirements. (Irish Dep. 29:15-30:12; Potter Aff. App. Ex. A, tab 2.)

**Response:**  Undisputed that this language is contained in the Handbook

60.     Once Irish, the Director, receives the student recommendations, he interviews the students to be selected for positions on the Board and draws questions from a standard application asking students to decide hypothetical disciplinary scenarios. (Irish Dep. 30:22-33:1; Potter Aff. App. Ex. A, tab 2.)

**Response:** Disputed to the extent that Irish personally invited student Grant Greeley to apply for a position on the Board  (Greeley Dep.15-16)

61.     From the twenty-one Board members, each panel consists of five members. (Irish Dep. 33:19-21; Potter Aft: App. Ex. A, tab 2.)

**Response:**  Undisputed that this language is contained in the Handbook.

62.     Each five-person panel must consist of one faculty member, one staff member, one either faculty or staff member, and two students. (Irish Dep. 34:5-7; Potter Aff. App. Ex. A, tab 2.)

**Response:**  Undisputed that this language is contained in the Handbook.

63.     In selecting the members of a five-person panel, Irish strives to achieve gender balance. (Irish Dep. 34:12-37:2; Potter Aff. App. Ex. A, tab 2.)

**Response:**  Undisputed that Irish so stated in deposition.  Disputed that the panel considering Mr. Bleiler's case achieved gender balance as it contained three women and two men .  (Irish Dep., Ex. 10; Kelley Dep., Exs. 3, 4)

64.     Board members eligible to serve on Sexual Misconduct panels must have completed training in sexual misconduct, conducted by Irish twice per year. (Irish Dep. 37:12-38:3; Potter Aff. App. Ex. A, tab 2.)

**Response:**  Undisputed.

65.     The Handbook advises students that both the accused and the accuser are informed of the names of members of the hearing panel not fewer than seventy-two hours prior to the

hearing. If either party has information as to why a specific person should not be part of the panel, the party must present the information to the Director or hearing coordinator in writing no fewer than forty-eight hours prior to the start of the hearing. (Bleiler Dep. 121 Ex. 21, at 40; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Handbook.

66.    The decision of the Director or hearing coordinator as to whether a conflict exists is final. (Bleiler Dep. 121 Ex. 21, at 39; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Handbook.

67.    Irish has a practice of screening selected panel members with potential conflicts by asking selected panel members if they have any concerns or issues with the parties involved in the dispute. If a potential conflict is raised, Irish makes the final decision based on the facts of the case, and the individual's ability to be fair, among other factors. (Irish Dep. 41:3-44:23; Potter Aff. App. Ex. A, tab 2.)

**Response:** Disputed that Irish proactively or effectively screens panel members for conflicts, or that he did so in this case. (Irish Dep., 141-154, Exs. 10, 11, 12, 17, 19; Greeley Dep. 58-59; Brais Dep. 45-46, 51-54)

68.    Board members are advised to notify the Director or hearing coordinator and to disqualify themselves from serving on a panel if they suspect a potential conflict exists with a party to the hearing. (Bleiler Dep. 121 Ex. 21, at 40; Potter Aft. App. Ex. A, tab 1.)

**Response:** Disputed that panel members effectively followed or that Irish effectively enforced this policy. (Irish Dep., 141-154, Exs. 10, 11, 12, 17, 19; Greeley Dep. 58-59; Brais Dep. 45-46, 51-54)

69.    The Director or hearing coordinator may meet with the panel for consultation regarding procedural elements at any time prior to or during the hearing or deliberations. (Bleiler Dep. 121 Ex. 21, at 40; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Handbook.

70.    For each disciplinary hearing at the College, Irish's role is as an administrator. He serves as a resource for both complainants and respondents, schedules the hearing, assures all information is distributed, communicates with witnesses about scheduling, assures the hearing is properly recorded, and answers procedural questions. (Irish Dep. 47:23-48:22; Potter Aff App. Ex. A, tab 2.)

**Response:** Disputed. Mr. Irish plays an active role in several aspects of the proceedings that influence the outcome, including selection of panel members, the sharing of information as "training" that suggests one outcome over another, and, in this case, his participation in the deliberations of the panel and specifically his direction to the panel as to the appropriate sanction. (Irish Dep. 33-34, 36, 47-51, 193 Exs. 4, 9, 10; Brais Dep. 23, 26-27, 62-63; Kelley Dep. Ex. 3)

71.     Irish is present during panel deliberations in order to answer procedural questions. (Irish Dep. 49:8-14; Potter Aff. App. Ex. A, tab 2.)

**Response:**   Disputed.  Mr. Irish plays an active role in several aspects of the proceedings that influence the outcome, including selection of panel members, the sharing of information as "training" that suggests one outcome over another, and, in this case, his participation in the deliberations of the panel and specifically his direction to the panel as to the appropriate sanction. (Irish Dep. 33-34, 36, 47-51, 193 Exs. 4, 9, 10; Brais Dep. 23, 26-27, 62-63).

72.     The five panel members selected for Bleiler's hearing were: Professor Jude Kelley ("Kelley"), Professor Laurie King ("King"), College administrator Elizabeth Rice ("Rice"), student Grant Greeley ("Greeley"), and student Lauren [Brais] ("Brais"). (Bleiler Dep. 94 Ex. 10; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed.

73.     On May 11, 2011, Irish advised Bleiler of the names of those who had been selected as members of the hearing panel and asked Bleiler if he had any conflicts. Irish asked Bleiler to respond within twenty-four hours and, when he did not, Irish again asked Bleiler if he had any conflicts to which he responded "I do not have any conflicts with this panel." (Bleiler Dep. 94 Ex. 10; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed to the extent that on May 11, 2011, Irish advised Bleiler of the names of those who had been selected as members of the hearing panel and asked Bleiler if he had any conflicts.  Disputed to the extent that Bleiler also responded within 24 hours to Irish that he did a potential conflict with one of the members.   (Irish Dep., Exs. 10, 17)

74.     On May 11, 2011, Irish asked all panelists in an email to let him know immediately if they had any conflicts with either complainant C.M. or respondent Bleiler. *(See* Affidavit of Paul A. Irish ("Irish Aff."), Ex. C.)

**Response:**  Undisputed that Irish sent the email referenced in Paragraph 74, but disputed that this was an adequate means of screening for potential conflicts.

75.     On May 11, 2011, Brais informed Irish in an email that she had been a Head Resident Advisor in the dorm where C.M. resided. Irish responded that this relationship alone would not create a conflict "as long as [she] didn't have any issues that would put [her] fairness in question." Brais responded that she had no issues with C.M. (Bleiler Dep. 94 Ex. 11; Potter Aff. App. Ex. A, tab 1)

**Response:**  Undisputed.

76.     As a Head Resident Advisor, Brais' responsibilities were more supervisory and related to building-wide activities rather than to individual residents. *(See* Deposition of Lauren Brais ("Brais Dep.") 17:14-18:4, at Potter Aff. App. Ex. A, tab 3.)

**Response:**  Undisputed.

77.    The Head Residential Advisor "is kind of overseer of the Residential Advisors."
       (Bleiler Dep. 16:7-8; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed.

78.    On May 11, 2011, C.M. informed Irish in an email that Greeley was a Resident
       Advisor in her building and that she had a class with him during the semester that the
       incident took place. Irish indicated that this would not initially exclude Greeley, but
       that he would speak with him. Greeley responded that he had no conflicts. (Bleiler
       Dep. Exs. 12, 13; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Disputed to the extent that the exhibits attached by Defendant contain no evidence
that "[o]n May 11, 2011, C.M. informed Irish in an email that Greeley was a Resident Advisor
in her building and that she had a class with him during the semester that the incident took
place. Irish indicated that this would not initially exclude Greeley, but that he would speak
with him. Greeley responded that he had no conflicts."

79.    Greeley acknowledged that he was a Resident Advisor in Healy dorm (C.M.'s dorm),
       but he did not know what floor she lived on. *(See* Deposition of Grant Greeley
       ("Greeley Dep.") 59:4-10, at Potter Aff. App. Ex. A, tab 4.)

**Response:**  Undisputed.

80.    Dormitories had multiple floors and multiple Residential Advisors. For example,
       Bleiler lived in Mulledy Hall freshman year. It had four floors and a basement and
       thirteen Residential Advisors. Bleiler lived in Lehy Hall sophomore year. It had four
       floors and five Residential Advisors. (Bleiler Dep. 9-14; Potter Aff. App. Ex. A, tab
       1.)

**Response:**  Undisputed to the extent that Mulledy Hall, where Bleiler lived freshman year, and
Lehy Hall, where he lived sophomore year, had multiple floors and multiple Residential
Advisors.  Disputed to the extent that other "dormitories" at College of the Holy Cross generally
had multiple floors and multiple Residential Advisors.

81.    The Residential Advisor for the students lived on the same floor as the students they
       were primarily responsible for. (Bleiler Dep. 15:5-9; Potter Aff. App. Ex. A, tab 1.)

 **Response:**  Undisputed.

82.    Students considered the Residential Advisor on their floor (or section) as their
       Residential Advisor. (Bleiler Dep. 32:1-7; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed.

83.    Greeley testified in his deposition that, although he and C.M. are Facebook "friends,"
       he uses Facebook as a "networking tool, has over 2800 "friends," does not have a
       personal relationship with C.M. beyond possibly meeting her at parties, and did not

recall having a class with her. (Greeley Dep. 52:2-59:25; Potter Aff. App. Ex. A, tab 4.)

**Response:** Undisputed.

84.     Irish asked Greeley, again, if he had any conflicts and if [Greeley] knew either [C.M. or Bleiler] and Greeley said he "didn't." (Greeley Dep. 58:17-23; Potter Aff. App. Ex. A, tab 4.)

**Response:** Undisputed.

85.     On May 13, 2011, Bleiler advised Irish that Bleiler and Greeley had mutual friends and that this potentially created a conflict. (Irish Dep. 154:7-20; Potter Aff. App. Ex. A, tab 2.)

**Response:** Undisputed.

86.     Greeley stated that he had never met Bleiler nor heard Bleiler's name mentioned before Irish contacted him to serve on the panel. (Greeley Dep. 51:22-52:1; Potter Aff App. Ex. A, tab 4.)

**Response:** Undisputed.

87.     Bleiler did not know Grant Greeley personally. (Bleiler Dep. 36:11-14; Potter Aft App. Ex. A, tab 1.)

**Response:** Undisputed.

88.     Bleiler did not have any problems personally with Grant Greeley (Bleiler Dep. 45:5-9; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

89.     Bleiler hadn't had any interactions with Grant Greeley or Lauren Brais on a personal level. (Bleiler Dep. 45:5-13; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

90.     Bleiler had never had a class with Professor Jude Kelley and had never talked with Professor Jude Kelley before the night of the panel hearing. (Bleiler Dep. 34:20-24, 35:1-4; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

91.     Bleiler had never had a class with Professor Lori King and had never talked with Professor Lori King prior to the hearing. (Bleiler Dep. 35:5-12; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

92.    Bleiler does not remember any interaction with staff member Elizabeth Rice prior to the hearing. (Bleiler Dep. 35:13-21; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed.

93.    Before the panel, Bleiler had never had contact with panel members Kelley, King, or Rice. (Bleiler Dep. 34:16-36:7; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed.

94.    Bleiler discussed Brais and Greeley with Irish. Irish "said that he had talked to both students, and they said that they did not" (have a conflict). (Bleiler Dep. 38; Potter Aff. App. Ex. A, tab 1.)

**Response:**  Undisputed to the extent that Bleiler discussed Brais and Greeley with Irish. or to the extent that "Irish 'said that he had talked to both students, and they said that they did not' (have a conflict)."  Disputed that Irish had a meaningful conversation with either regarding potential conflict.  (Irish Dep., 141-154, Exs. 10, 11, 12, 17, 19; Greeley Dep. 58-59; Brais Dep. 45-46, 51-54)

95.    Brais received training on the College's sexual misconduct policies, including the roles that consent and intoxication play in the policies, when she became a member of the Community Standards Board. (Brais Dep. 22:3-26:4; Potter Aff. App. Ex. A, tab 3.)

**Response:**  Undisputed.

96.    Greeley received training on the College's sexual misconduct policies, including the roles that consent and intoxication play in the policies, when he became a member of the Community Standards Board. (Greeley Dep. 20:2-23:25; Potter Aff. App. Ex. A, tab 4.)

**Response:**  Undisputed.

97.    Kelley received training materials on the College's sexual misconduct policies, which he read and reviewed prior to serving on Bleiler's panel. *(See* Deposition of Jude Kelley ("Kelley Dep.") 24:22-24, 133, Ex. 4, at Potter Aff. App. Ex. A, tab 5.)

**Response:**  Undisputed.

98.    Elizabeth Rice received training on Holy Cross's sexual misconduct policies on or around the time she became a member of the Community Standards Board. (Irish Aff. App. Ex. C.)

**Response:**  Undisputed.

99.    Lori King received training on Holy Cross's sexual misconduct policies on or around the time she became a member of the Community Standards Board. (Irish Aff. App. Ex.C.)

**Response:**  Undisputed.

100.   Prior to the hearing, Bleiler had two to three meetings with an advisor, Professor Cahill. (Bleiler Dep. 79:18-80:12; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

101.   On May 18, 2011, Bleiler's hearing was conducted. (Bleiler Dep. 101:18-22; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

102.   College Policies advise students that the purpose of publishing disciplinary regulations is to give notice to students of prohibited behavior and the regulations are not written with the specificity of a criminal statute. Questions of interpretation are referred to the Vice President for Student Affairs/Dean of Students and/or the Director. (Bleiler Dep. 121 Ex. 21, at 42; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Handbook.

103.   The College advises students that the basis for findings used during disciplinary proceedings is a "more likely than not" or "more than 50%" standard. If the Board finds a student "responsible" for a violation, it may recommend sanctions up to and including suspension or dismissal. (Bleiler Dep. 121 Ex. 21, at 41; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Handbook.

104.   The College outlines Board hearing procedures in detail, and provides that: the Chairperson convenes the Board; both parties are asked if the Director or hearing coordinator gave them an opportunity to challenge any Board members for cause; the allegations are read; the accuser and the accused are given an opportunity to respond; Board members question both parties; each side may question the other side and present witnesses; both parties may make a final statement; the Board adjourns to deliberate and determines whether it is more likely than not that the accused has violated the Community Standard; if a violation is found, the Board recommends a sanction; the recommendation is forwarded to the Director, then to the Vice President for Student Affairs/Dean of Students; the Board informs each party of the decision; the hearing officer shares the results of the hearing no more than twenty-four hours after its conclusion in cases of sexual assault; and the Vice President for Student Affairs/Dean of Students may accept or alter the recommendations or refer the case to a new Board. (Bleiler Dep. 121 Ex. 21, at 41; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Handbook.

105.   At the hearing, both Bleiler and C.M. made opening statements, were permitted to ask questions of the Board and of each other, were permitted to call witnesses, and gave closing statements. Bleiler was permitted to question each witness and stated that he was not prevented from doing so. (Bleiler Dep. 102:12-108:5; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed to the extent that at the hearing both Bleiler and C.M. made opening statements, were permitted to ask questions of each other, were permitted to call witnesses, and gave closing statements. Further undisputed to the extent that Bleiler was permitted to question each witness and stated that he was not prevented from doing so. Disputed to the extent that C.M. made statements in her closing that were not presented as evidence during the hearing, about which Mr. Bleiler did not have the opportunity to cross examine her. (Bleiler Aff., ¶¶ 24-26, 32)

106.　On or around the date of the incident, Bleiler was six feet, one inches tall and weighed approximately 225 pounds. (Bleiler Dep. 29:16-24; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

107.　Bleiler estimates that on or around the date of the incident, C.M. was approximately five feet, five inches tall and weighed 140 pounds. (Bleiler Dep. 30:8-11; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

108.　Bleiler admitted that, before he initially penetrated C.M., he did not ask for her permission to have intercourse the evening of the incident. (Bleiler Dep. 109:24-110:4; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

109.　Panel hearings, but not deliberations, are recorded and students may make arrangements to listen to the recordings through the Director. Students are not permitted to remove or make copies of the recordings. (Bleiler Dep. 121 Ex. 21, at 40; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed that this language is contained in the Handbook.

110.　A certified copy of the transcript of the hearing is attached. *(See* Ex. E.)

**Response:** Undisputed to the extent that a true copy of the transcript of the hearing is attached. Disputed to the extent that said copy is neither signed nor notarized, and therefore is not certified.

111.　During deliberations, panel members considered the complaint, witness statements, and hearing testimony from all parties in rendering their decision. *(See, e.g.,* Greeley Dep. 66:7-74:18; Brais Dep. 56:1-60:5; Potter Aff. App. Ex. A, tab 3-4.)

**Response:** Undisputed to the extent that during deliberations panel members considered hearing testimony in rendering their decision. Disputed to the extent that the portion of Greeley's deposition cited and the attached exhibits contain no evidence that "[d]uring deliberations, panel members considered the complaint, witness statements, and hearing testimony from all parties in rendering their decision." Further disputed to the extent that the portion of Brais' deposition cited and the attached exhibits contain no evidence that "[d]uring

deliberations, panel members considered the complaint, witness statements, and hearing testimony from ***all parties*** in rendering their decision."

112.   Although Irish was present during deliberations, according to Brais, he answered administrative questions but was not "an active member of the discussion." (Brais Dep. 59:1-20; Potter Af. App. Ex. A, tab 3.)

**Response:**  Undisputed to the extent that Irish was present during deliberations and Brais stated in deposition that she did not consider him "an active member of the discussion." Disputed to the extent that ¶ 112 misstates Brais' testimony that:  "I don't remember him [Irish] saying much during that piece, you know, maybe, like, administrative, if we were looking for documents or things like that[.]"  (Brais Dep. 59)

113.   According to panel member Brais, the panel during deliberations collectively discussed that the burden of proof was a "more likely than not" standard. (Brais Dep. 59:2360:16; Potter Aff. App. Ex. A, tab 3.)

**Response:**  Undisputed.

114.   C.M.'s virginity was not discussed during deliberations. (Kelley Dep. 61-64; Greeley Dep. 131:18-25; Potter Aff. App. Ex. A, tab 4-5.)

**Response:**  Undisputed to the extent that the portion cited of Kelley's deposition states that C.M.'s virginity was not discussed during deliberations.  Disputed to the extent that the portions cited of Greeley's deposition do not definitely state that C.M.'s virginity was not discussed, but rather say:

> I don't believe so [that C.M.'s virginity was discussed], and it wasn't a factor for me.

115.   It did not matter to Professor Kelley how many times she had or had not had sex. He was more interested in what happened on the night in question. (Kelley Dep. 62:19-24; 63:124; 64:1; Potter Aff. App. Ex. A, tab 5.)

**Response:**  Undisputed that this is Professor Kelley's testimony.

116.   The Panel decided that Bleiler was responsible and recommended that he be dismissed from the College. (Kelley Dep. 103:8-12; 130:3-7; Potter Aff. App. Ex. A, tab 5.)

**Response:**  Undisputed.

117.   The Panel decision on responsibility and dismissal was unanimous. (Kelley Dep. 100:17-24; 101:1-7; 103:22-24; 104:1-5; Greeley Dep. 133:25; 134:1-6; Potter Aff. App. Ex. A, tab 4-5.)

**Response:**  Undisputed.

118.	On the evening of the hearing, Irish informed Bleiler in person of the Panel's decision that he was responsible and recommended that he be dismissed from the College. (Bleiler Dep. 110:7-13; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed to the extent that Irish informed Bleiler in person of "the findings of the hearing board." Disputed to the extent that the portion of Bleiler's transcript cited does not contain evidence that "on the evening of the hearing" Irish informed Bleiler that "he was responsible and recommended that he be dismissed from the College."

119.	In a letter dated May 19, 2011 from Jacqueline D. Peterson, Vice-President for Student Affairs/Dean of Students, to Kelley, Chair of the Community Standards Board, with a copy received by Bleiler, Peterson informed Kelley that the Board found Bleiler responsible for the violation of Sexual Misconduct I. Further, the letter states that the Board determined that Bleiler did not receive effective consent for sexual activity and that C.M. was "highly intoxicated, incoherent, and was unaware of her circumstances." As such, the Board deemed her to be "physically helpless at the time of the incident," thus unable to consent to sexual activity. Bleiler was informed that, should he wish to appeal, he should file his appeal to Rev. Michael C. McFarland, S.J. ("McFarland") no later than Tuesday, May 24, 2011 at 5:00 p.m. (Bleiler Dep. 111 Ex. 17, .111:6-17; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed to the extent that there is a letter dated May 19, 2011, with a copy received by Bleiler, informing the recipient that that the Board found Bleiler responsible for the violation of Sexual Misconduct I. Further undisputed to the extent that the letter states that the Board determined that Bleiler did not receive effective consent for sexual activity and that C.M. was "highly intoxicated, incoherent, and was unaware of her circumstances." As such, the Board deemed her to be "physically helpless at the time of the incident," thus unable to consent to sexual activity. Bleiler was informed that, should he wish to appeal, he should file his appeal to Rev. Michael C. McFarland, S.J. ("McFarland") no later than Tuesday, May 24, 2011 at 5:00 p.m. Disputed to the extent that said letter is from Jacqueline D. Peterson ("Peterson"), Vice-President for Student Affairs/Dean of Students, to Kelley, Chair of the Community Standards Board. The letter is, in fact, from Kelley to Peterson.

120.	A student has the right to appeal a Board decision if he can demonstrate (1) lack of fairness, (2) a violation of process, or (3) if there is significant new information that has been revealed that may alter the outcome of the matter. (Bleiler Dep. 121 Ex. 21, at 41; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

121.	Appeals for dismissals are reviewed by the President of the College. Letters of appeal must be received within five business days of the date of the decision letter. The President may decide that the appeal has merit, and alter the sanction or refer the case to a new Board, or decide that the appeal does not have merit and impose the sanction immediately.' (Bleiler Dep. 121 Ex. 21, at 41; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

122.     Bleiler submitted an appeal addressed to McFarland dated May 24, 2011. In the appeal, Bleiler argued that the College violated its own disciplinary procedures and that the hearing was fundamentally unfair. (Bleiler Dep. 113 Ex. 18; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

123.     McFarland responded to Bleiler's appeal in a letter dated May 26, 2011. In this letter, McFarland addressed each of Bleiler's arguments for reversal, and, ultimately, denied the appeal and upheld Bleiler's dismissal from the College. (Bleiler Dep. 115 Ex. 19; Potter Aff. App. Ex. A, tab 1.)

**Response:** Undisputed.

## II.   PLAINTIFF'S STATEMENT OF DISPUTED/ADDITIONAL FACTS

### A.  The Parties

1.   Edwin Bleiler was a senior at the College of the Holy Cross with a 3.31 GPA at the time of the disciplinary hearing at issue.  (Compl., ¶ 8; Bleiler Aff., ¶ 1)

2.   C.M. was a female student at the College who alleged that Mr. Bleiler had violated the College's sexual misconduct policy based solely on her incapacity to consent, allegedly due to alcohol consumption.  (Bleiler Dep. Exs. 3, 5)

3.   Mr. Bleiler maintains that C.M. was not incapacitated by alcohol when they had consensual sex.  ( Bleiler Aff., ¶ 5)

4.   Nonetheless, through the disciplinary procedures outlined below, the College conducted a hearing, which resulted in Mr. Bleiler's expulsion from the College on the very same day he would have graduated.  (Compl., ¶ ; Bleiler Dep. 113, 115; Bleiler Aff., ¶¶ 46-48)

### B.  Relevant Disciplinary Policies and Procedures as set forth in the Student Handbook

5.   The College of the Holy Cross – Student Handbook and Planner 2010-2011 ("Handbook") contains, *inter alia*, a statement of Community Standards and Disciplinary Procedures for Students ("Disciplinary Procedures"), which sets forth in part the following language:

. . . In the case of disciplinary procedures, students have the right to be informed of any charges of misconduct, the right to adequate time to prepare a response to the charges, the right to hear information in support of the charges, the right to present evidence against the charges, ***and the right to a fair process which is appropriate to the circumstances***.

(emphasis added).  (Compl., ¶¶ 12-13; Irish Dep. Ex. 2)

6. Any Student who is accused ("Accused") of violating policy in a way that may result in suspension or dismissal from the College may be referred to the Community Standards Board ("Board"). The Board shall receive all written materials before hearing. (Compl., ¶¶ 15; Irish Dep. Ex. 2)

7. The Board is comprised of five members, two students, at least one faculty member, and at least one staff member; the fifth member can be either faculty or staff. The Handbook sets forth the following policy and rules regarding board members and potential conflict of interest:

> The accused and the accuser are informed of the names of the members of the hearing panel scheduled to hear the complaint not fewer than 72 hours prior to the hearing. If the accuser or the accused has particular information as to why a specific person should not be a part of the panel hearing the case, either of these parties must present the information to the Director of Student Conduct and Community Standards or designated hearing coordinator in writing 48 hours prior to the start of the hearing. If the Director deems that there is information to suggest a potential conflict, another board member will be substituted. The decision of the Director or hearing coordinator is final.

> Board members are expected to notify the Director or hearing coordinator and disqualify themselves from serving on a board if they suspect a potential conflict with any party participating in a board hearing.

(Compl., ¶ 17; Irish Dep. Ex. 2)

8. Upon conclusion of the hearing the Board adjourns for deliberations. The Director or hearing coordinator may meet with the Board for consultation regarding procedural elements any time before or during hearing or deliberations. (Compl., ¶ 19; Irish Dep. Ex. 2)

9. The Handbook, however, does ***not*** provide for the Hearing Officer's participation in actual deliberations, nor does it authorize the Hearing Officer to be present for the entirety of the deliberations. (Compl., ¶ 20; Irish Dep. Ex. 2)

**C. The College's Sexual Misconduct Policy**

10. The Handbook defines "Sexual Misconduct I" as "any sexual penetration…however slight, with any object or sexual intercourse by a man or a woman upon a man or a woman without effective consent…" (Compl., ¶ 25; Irish Dep. Ex. 2)

11. Jude Kelley, a professor at the College and the Chair of the panel that heard Mr. Bleiler's case, acknowledged that the policy "seems to be kind of like a penetration-based rubric…" under which the one who "penetrates" is the initiator/respondent. (Kelley Dep. 80)

12. The policy goes on to state that "consent may ***never*** be given by…those who are incapacitated as a result of alcohol or other drug consumption (voluntary or involuntary). (emphasis added). (Compl., ¶ 26; Irish Dep. Ex. 2)

13. College policy also states that intentional alcohol use is no defense to liability under the sexual misconduct policy. *See* "CSB Training -Sexual Misconduct" ("Training Materials"). (Irish Dep., Ex. 2 at 57, Ex. 4 at 23)

14. This policy has ***only*** been enforced against male students at the College. (Compl., ¶ 29; Irish Dep. 59-61)

15. The allegation against Mr. Bleiler was solely Sexual Misconduct I, meaning that C.M. alleged that Mr. Bleiler had sexual intercourse with C.M. without effective consent, and that she could not give effective consent due to her intoxication. There were no allegations of coercion or force, and there was no allegation that Mr.

Bleiler was responsible for C.M.'s intoxication. (Compl., ¶ 30; 5/10/11 Letter from Irish to Bleiler; Irish Dep. Ex. 3)

16. There was evidence before the panel that C.M. at one point initiated contact with Mr. Bleiler's genitals, which was never even considered as a potential violation of the sexual misconduct policy-nor could it have been, as there was no "penetration." (Bleiler Aff., ¶¶ 30-31)

17. The College publishes a training manual to all panel members participating in disciplinary hearings involving charges of sexual misconduct, titled "CSB Training -Sexual Misconduct" ("Training Materials"). (Irish Dep., Ex. 4).

18. The Training Materials:

    (i)     Direct panel members to engage in questioning that assumes the guilt of the accused (Irish Dep. Ex. 4 at 5-7);

    (ii)    Discuss the negative effect of the admission of prior sexual history on the complainant but not on the accused (Irish Dep. Ex. 4 at 14-15);

    (iii)    Refer to a reporting complainant as a "victim," as opposed to a "reporter" or a "complainant," thereby assuming the guilt of the accused (Irish Dep. Ex. 4 at 18);

    (iv)     List among the alleged victim's but not the accused's rights, the right not to have irrelevant prior sexual history admitted in a campus hearing. (Irish Dep. Ex. 4 at 18-19);

    (v)     Contain a list of "rape myths" devoted to dispelling myths unfavorable to alleged victims, with no discussion of any "myths" that might be unfavorable to the accused; (Irish Dep. Ex. 4 at 20);

    (vi)     Contain exercises that all are strongly slanted toward finding that non-consensual sex occurred, without any scenarios that lean toward a finding that consensual sex occurred. (Irish Dep. Ex. 4 at 33-37)

**D. Bias of College Officials**

19. Paul Irish, College Director of Student Conduct and Community Standards, has admitted that the exclusive focus of campus education on the issue of sexual assault

27

is directed at making female students more comfortable reporting alleged violations of the sexual misconduct policy:

Oh, I think this is a pervasive problem on all our campuses. It's very underreported and we really have to ask: ***Why is it so underreported? What can we do to make victims feel comfortable to come forward, to feel supported*** ….

(emphasis added).  (Compl., ¶ 47; Irish Dep., Ex. 3)

20. In that same interview, Mr. Irish also acknowledged that there had been a focus on educating young women about "partying safe," but no corresponding effort to educate young men about the possible consequences of sexual activity and the "confusion in the issue on our campuses."  *Id.*

21. Despite Irish's pronouncements to the press about the importance of educating male students, Mr. Bleiler received no training or counseling for male students regarding sexual harassment or misconduct while a student at the College, although he did receive training re:  under-age consumption of alcohol.  (Bleiler Dep. 58-59, 61-62)

22. Irish's bias in favor of the complainant was also starkly evident in his actions.  He reached out to several professors on C.M.'s behalf, in an attempt to find her an appropriate student advisor but did not do the same for Mr. Bleiler, who he merely informed that he needed to submit the name of an advisor by a specific deadline. (Irish Dep., Ex. 14-17)

23. In fact, Mr. Irish did not permit Mr. Bleiler to use his first choice for faculty advisor for the hearing because the professor had previously earned a law degree. (Bleiler Dep. 78-79)

24. The faculty advisor that Mr. Bleiler was left using, Miles Cahill, was evidently more worried about whether C.M. and the panel would hold it against him for serving as the respondent's advisor view than he was in assisting Mr. Bleiler:  in an email to Irish dated May 19, 2011, Cahill expressed such concerns, prompting Irish to respond, essentially, that he would explain to the panel that Cahill was only doing his job.  (Irish Dep., Ex. 29)

25. Despite that Mr. Bleiler was never so charged, nor did C.M. so allege, Irish referred to the incident in several emails to Board and Faculty members as "a sexual assault case..."  (Kelley Dep. 45, Ex. 3; Irish Dep., Exs. 7, 9 at Bates No. HC10538, Exs. 14-15)

26. Jude Kelley, a professor at the College and the Chair of the hearing panel in this case, also remembers Irish in their interactions referring to the incident as a "sexual assault" case.  (Kelley Dep. 45)

27. Indeed, in his very first communication with prospective panel members, Mr. Irish characterized the matter as  "[a] very serious case…"  (Irish Dep., Ex. 9)

28. On May 19, 2012, the day after the hearing, Irish send an email to the panel members stating in part  "I [spoke] with both students last night about the finding and recommendation.  Needless to say [C.M.] was very relieved and thankful.  .  (Irish Dep., Ex. 27)

29. The email continues, in effect congratulating the panel for finding Mr. Bleiler responsible and recommending his expulsion, stating:

Last month there was a great deal of news about this topic on the national level.  The way that we have handled these cases has been held up as a model.  Many schools have not handled the cases well, necessitating government involvement and oversight.  The attached article provides a summary of some of the wider concerns.
….

*Id.*

**E. Bias of Panel Members**

30. Mr. Bleiler raised a concern prior to the hearing that the two student panel members were facebook friends with C.M., and that he had, through mutual friends, had some interaction with one of the panel members that might lead to bias against him. (Compl., ¶¶ 32-39, 43; Bleiler Dep. 36-37, 39-41; Brais Dep. 52-53; Irish Dep. Ex. 10, 11, 12, 13, 17, 18, 19, 21, 22)

31. Mr. Irish conducted no meaningful inquiry into the possibility of bias or a conflict with respect to these two students, and in fact failed to even disclose to Mr. Blieler that both students had served as Resident Advisor's in C.M.'s dormitories and that one of them was currently in a class with C.M.   (Compl., ¶¶ 32-39, 43; Bleiler Dep. 36-37, 39-41; Brais Dep. 52-53; Irish Dep. Ex. 10, 11, 12, 13, 17, 18, 19, 21, 22)

32. Despite Mr. Bleiler's timely, written objections to these panel members, and further discussion of his concerns in meetings with Irish, Irish refused to replace them on the panel.  (Compl., ¶¶ 32-39, 43; Bleiler Dep. 36-37, 39-41; Brais Dep. 52-53; Irish Dep. Ex. 10, 11, 12, 13, 17, 18, 19, 21, 22)

33. Mr. Irish's sole stated bases for his refusal were that: (i) he had already "released" the backup panelists; and (ii) the Board members had represented that he had no conflicts with either student.  (Compl., ¶ 34; Irish Dep. Ex. 17, 19)

34. Mr. Irish, in fact, had previously ascertained that other panel members were available, *after* Mr. Bleiler requested removal of both students.  (Compl., ¶ 43; Irish Dep., Ex. 18, 20)

35. Grant Greeley, one of the challenged panel members, displayed overt bias during the hearing. He repeatedly asked for details about the encounter with C.M., which Mr. Bleiler attempted to answer as completely as he could. (Compl., ¶ 44; Bleiler Aff., ¶ 28)

36. Mr. Greeley, however, continued to persist that there was some other detail he could provide, to the point that the Chair of the panel had to instruct him to stop his questioning. (Compl., ¶ 44; Bleiler Aff., ¶ 29)

37. At one point, Mr. Greeley became angry while asking whether it seemed that C.M. was enjoying herself, sarcastically commenting that "when someone has ice cream, they're usually enjoying themselves and you can tell they're enjoying themselves." (Compl., ¶ 44; Bleiler Aff., ¶ 29)

38. At his deposition, though Mr. Greeley asserted this apparent lack of detail as a "red flag" that had influenced his decision, he could not identify any information that was actually missing from Mr. Bleiler's answers to his questions:

> Q   Can you identify for me a single piece of information that you
> wish he had told you in this exchange that would have made you
> believe he was explaining himself?
> THE WITNESS:  I can't.

(Greeley Dep. 115)

39. Ms. Brais, the other student panel members, described her repeated exposure to the "rape play" in her role as a Resident Advisor, in which the takeaway message was that when friends who were drinking engaged in sexual activity it was considered "rape." (Brais Dep. 40-42)

40. She also acknowledged that she had never given any thought to the possibility that the policy would be applied against anyone other than male students, and observed that the training examples were only of a male raping a female.   (Brais Dep. 74)

41.   She further admitted a pre-hearing opinion that nothing short of suspension or expulsion would be an appropriate sanction if a student was found responsible for a violation of the policy.  (Brais Dep. 66, 69-70)

**F.  Fundamental Errors in the Proceedings**

42. Despite his extensive *ex parte* contact with both witnesses, receipt of information outside the proceedings themselves, and potential bias of his own, Mr. Irish was present at all times during the Board's deliberations.  (Compl., ¶ 48; Irish Dep. 49-56, 191-194)

43. He permitted C.M. to make repeated references to her virginity, notwithstanding the fact that prejudicial, "irrelevant sexual history" is explicitly prohibited by the Handbook and the Training Materials.  (Compl., ¶ 52; Irish Dep., Ex. 2, 4; Bleiler Dep. 127-128)

44. Mr. Bleiler observed that based on the reactions of the panel members, that such references provoked sympathy toward C.M. and animosity toward him.  (Bleiler Aff., ¶ 33)

45. The training materials further caution against crediting speculation or conjecture, yet witness after witness on C.M.'s behalf offered opinions as to her level of intoxication for which they had no basis, but again, no guidance was given to the panel about the types of evidence they should consider.  (Kelley Dep. 51-52; Ex. 4 at 26)

46. Similarly, despite the Training Materials' prohibition against drawing an adverse inference from an accused student's invocation of a right to remain silent, Mr. Irish permitted the Public Safety Officer to tell the panel that Mr. Bleiler had initially invoked that right, but failed to offer any guidance or instruction about whether that fact could be appropriately considered under the College's policies and training materials. (Irish Dep. 126, Ex. 4 at 19)

47. In deposition, Mr. Irish initially stated that his role as administrator is to ensure that the procedures the College has set forth are followed, and that during hearing he is the "procedural person." (Irish Dep. 47-48)

48. Later, however, Irish stated that it was not his job to be "gatekeeper" in terms of what constitutes appropriate, relevant evidence and that this job is that of the chair of the hearing board, Professor Kelley. (Irish Dep. 104)

49. Notwithstanding this statement, Mr. Irish never communicated to the Chair that it was his job, and not Irish's, to make sure that only relevant and appropriate information was introduced. (Irish Dep. 136-137; Kelley Dep. 30-31)

50. Kelley in fact stated that he did not think it was his duty to intervene and stop testimony, nor did he think it his duty to instruct the panel in deliberations to disregard such testimony, that no one ever identified it among his responsibilities as chair, and that in fact he did not act in that capacity as Chair. (Kelley Dep. 34-36, 60-62, 68)

51. Accordingly, despite the limitations on evidence set forth in the College's materials, as a practical matter there was nobody involved in this process who believed it was their duty to enforce those limitations. (Irish Dep. 128)

52. In his prior position at Northeastern University, Mr. Irish apparently viewed his role differently, when he essentially declared a mistrial in a student proceeding because a fact witness had offered her opinion that **no** rape had taken place. (Irish Dep. 105, Ex. 5).

53. In contrast, during Mr. Bleiler's hearing, though the only witness with the training and expertise to opine on C.M.'s level of intoxication specifically stated that she was "intoxicated, but not incapacitated," Mr. Irish permitted all of C.M.'s friends to offer the opinion that she had been incapable of giving effective consent. (Bleiler Aff., ¶ 37; Kelley Dep. 51-52)

54. Further, Mr. Bleiler timely submitted an affidavit of his roommate describing his observations of C.M. after she left Mr. Bleiler's room (after the sexual encounter), in which he saw her walk into his room by mistake in good spirits and laughing, go to the bathroom, and leave the apartment. (Bleiler Aff., ¶¶ 40-41;)

55. At the hearing, the Chair of the panel made reference to this statement, but it did not appear that the other panel members had a copy of the statement. (Bleiler Aff., ¶ 42)

56. During the course of this litigation, the College has produced documents purporting to reflect the materials given to the panel, which do ***not*** include this statement, suggesting that it may not, in fact, have been provided to the panel as required by the College's procedures. (Affidavit of Plaintiff's counsel, Emily Smith-Lee, ¶ 3)

57. As evidence that these acts and omissions were prejudicial to Mr. Bleiler, the Chair of the panel explained its findings by stating that they "could not ***rule out the possibility*** that C.M. was passed out on the bed and raped forcibly,"

notwithstanding the absence of any evidence in the hearing of forcible or coercive

activity.   (Kelley Dep, 147-149)

Respectfully submitted,
EDWIN BLEILER,
By his attorney:

/s/Emily E. Smith-Lee
Emily E. Smith-Lee (BBO# 634223)
esmithlee@slnlaw.com
Beth M. Nussbaum (BBO# 633878)
bnussbaum@slnlaw.com
Smith Lee Nebenzahl LLP
One Post Office Square
Sharon, MA  02067
781-784-2322
Dated: February 4, 2013                  781-793-0600 (facsimile)

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent by electronic mail to the following individuals on February 4, 2013:

Harold W. Potter, Jr. (BBO # 404240)
harold.potter@hklaw.com
Amanda Orcutt (BBO # pending)
amanda.orcutt@hklaw.com
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116-3889
(617) 523-2700

**Counsel for Defendant College of the Holy Cross**


/s/ Emily E. Smith-Lee