UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

EDWIN BLEILER,                                      )
Plaintiff                                           )
                                                    )          C.A. No.: 11-cv-11541
v.                                                  )
                                                    )
COLLEGE OF THE HOLY CROSS                           )
Defendant                                           )
_____)

**PLAINTIFFS MEMORANDUM OF LAW IN SUPPORT OF ITS
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

Plaintiff Edwin Bleiler was expelled from Defendant College of the Holy Cross on the
very day on which he would have graduated in May, 2011, following an allegation that he had a
sexual encounter with an intoxicated female student, and a fundamentally flawed disciplinary
proceeding arising from that allegation.  Mr. Bleiler contends that his expulsion was a result of:
(i) a policy that on its face creates a form of strict liability for male students that does not exist
for female students; (ii) enforcement of that policy by an administrator with a clear bias; (iii)
adjudication of the alleged violation by a panel that was influenced by biased training materials;
and (iv) departures from the stated policies and procedures of the College that influenced the
outcome of the hearing.  In short, for all of the reasons set forth below, once the mere allegation
was made, the result was a foregone conclusion, notwithstanding the College's promises of a
"fair" disciplinary process.

Defendants in their Motion emphasize case law giving colleges broad leeway in
administering disciplinary proceeds, but overlook entirely that: (i) no amount of leeway excuses
a school from its obligation of non-discrimination under Title IX; (ii) colleges are held to a
standard of basic fairness in such procedures; and (iii) the questions of bias and intent are

quintessentially fact questions, therefore inappropriate for resolution at summary judgment.  For all of these reasons, Defendant's Motion should be denied.

## II.    MATERIAL FACTS

### A.  The Parties

Edwin Bleiler was a senior at the College of the Holy Cross with a 3.31 GPA at the time of the disciplinary hearing at issue.  (Plaintiff's Statement of Disputed/Additional Facts ("SOF"), ¶ 1)  C.M. was a female student at the College who alleged that Mr. Bleiler had violated the College's sexual misconduct policy based solely on her incapacity to consent, allegedly due to alcohol consumption.  (SOF, ¶ 2)  Mr. Bleiler maintains that C.M. was not incapacitated by alcohol when they had consensual sex.  (SOF, ¶ 3)  Nonetheless, through the disciplinary procedures outlined below, the College conducted a hearing, which resulted in Mr. Bleiler's expulsion from the College on the very same day he would have graduated.  (SOF, ¶ 4)

### Relevant Disciplinary Policies and Procedures as set forth in the Student Handbook

The College of the Holy Cross – Student Handbook and Planner 2010-2011 ("Handbook") contains, *inter alia*, a statement of Community Standards and Disciplinary Procedures for Students ("Disciplinary Procedures"), which sets forth in part the following language:

> . . . In the case of disciplinary procedures, students have the right to be informed of any charges of misconduct, the right to adequate time to prepare a response to the charges, the right to hear information in support of the charges, the right to present evidence against the charges, ***and the right to a fair process which is appropriate to the circumstances***.

(emphasis added).  (SOF, ¶ 5)

Any Student who is accused ("Accused") of violating policy in a way that may result in suspension or dismissal from the College may be referred to the Community Standards Board

("Board"). The Board shall receive all written materials before hearing. (SOF, ¶ 6) The Board is comprised of five members, two students, at least one faculty member, and at least one staff member; the fifth member can be either faculty or staff. The Handbook sets forth the following policy and rules regarding board members and potential conflict of interest:

> The accused and the accuser are informed of the names of the members of the hearing panel scheduled to hear the complaint not fewer than 72 hours prior to the hearing. If the accuser or the accused has particular information as to why a specific person should not be a part of the panel hearing the case, either of these parties must present the information to the Director of Student Conduct and Community Standards or designated hearing coordinator in writing 48 hours prior to the start of the hearing. If the Director deems that there is information to suggest a potential conflict, another board member will be substituted. The decision of the Director or hearing coordinator is final.

> Board members are expected to notify the Director or hearing coordinator and disqualify themselves from serving on a board if they suspect a potential conflict with any party participating in a board hearing.

(SOF, ¶ 7)

Upon conclusion of the hearing the Board adjourns for deliberations. The Director or hearing coordinator may meet with the Board for consultation regarding procedural elements any time before or during hearing or deliberations. (SOF, ¶ 8) The Handbook, however, does ***not*** provide for the Hearing Officer's participation in actual deliberations, nor does it authorize the Hearing Officer to be present for the entirety of the deliberations. (SOF, ¶ 9)

**The College's Sexual Misconduct Policy**

The Handbook defines "Sexual Misconduct I" as "any sexual penetration…however slight, with any object or sexual intercourse by a man or a woman upon a man or a woman without effective consent…" (SOF, ¶ 10) Jude Kelley, a professor at the College and the Chair of the panel that heard Mr. Bleiler's case, acknowledged that the policy "seems to be kind of like a penetration-based rubric…" under which the one who "penetrates" is the initiator/respondent.

(Kelley Dep. 80) (SOF, ¶ 11) The policy goes on to state that "consent may **never** be given by…those who are incapacitated as a result of alcohol or other drug consumption (voluntary or involuntary). (emphasis added). (SOF, ¶ 12) College policy also states that intentional alcohol use is no defense to liability under the sexual misconduct policy. *See* "CSB Training -Sexual Misconduct" ("Training Materials"). (SOF, ¶ 13) This policy has **only** been enforced against male students at the College. (SOF, ¶ 14)

The allegation against Mr. Bleiler was solely Sexual Misconduct I, meaning that C.M. alleged that Mr. Bleiler had sexual intercourse with C.M. without effective consent, and that she could not give effective consent due to her intoxication. There were no allegations of coercion or force, and there was no allegation that Mr. Bleiler was responsible for C.M.'s intoxication. (SOF, ¶ 15) There was evidence before the panel that C.M. at one point initiated contact with Mr. Bleiler's genitals, which was never even considered as a potential violation of the sexual misconduct policy-nor could it have been, as there was no "penetration." (SOF, ¶ 16)

The College publishes a training manual to all panel members participating in disciplinary hearings involving charges of sexual misconduct, titled "CSB Training -Sexual Misconduct" ("Training Materials"). (SOF, ¶ 17). The Training Materials:

    i.    Direct panel members to engage in questioning that assumes the guilt of the accused;

    ii.    Discuss the negative effect of the admission of prior sexual history on the complainant but not on the accused;

    iii.    Refer to a reporting complainant as a "victim," as opposed to a "reporter" or a "complainant," thereby assuming the guilt of the accused;

    iv.    List among the alleged victim's but not the accused's rights, the right not to have irrelevant prior sexual history admitted in a campus hearing.;

    v.    Contain a list of "rape myths" devoted to dispelling myths unfavorable to alleged victims, with no discussion of any "myths" that might be unfavorable to the accused;

vi.    Contain exercises that all are strongly slanted toward finding that non-consensual sex occurred, without any scenarios that lean toward a finding that consensual sex occurred.

(SOF, ¶ 18)

**Bias of College Officials**

Paul Irish, College Director of Student Conduct and Community Standards, has admitted that the exclusive focus of campus education on the issue of sexual assault is directed at making female students more comfortable reporting alleged violations of the sexual misconduct policy:

> Oh, I think this is a pervasive problem on all our campuses. It's very underreported and we really have to ask: ***Why is it so underreported? What can we do to make victims feel comfortable to come forward, to feel supported*** ….

(emphasis added). (SOF, ¶ 19) In that same interview, Mr. Irish also acknowledged that there had been a focus on educating young women about "partying safe," but no corresponding effort to educate young men about the possible consequences of sexual activity and the "confusion in the issue on our campuses." (SOF, ¶ 20) Despite Irish's pronouncements to the press about the importance of educating male students, Mr. Bleiler received no training or counseling for male students regarding sexual harassment or misconduct while a student at the College, although he did receive training re: under-age consumption of alcohol. (SOF, ¶ 21)

Irish's bias in favor of the complainant was also starkly evident in his actions. He reached out to several professors on C.M.'s behalf, in an attempt to find her an appropriate student advisor but did not do the same for Mr. Bleiler, who he merely informed that he needed to submit the name of an advisor by a specific deadline. (SOF, ¶ 22) In fact, Mr. Irish did not permit Mr. Bleiler to use his first choice for faculty advisor for the hearing because the professor had previously earned a law degree. (SOF, ¶ 23) The faculty advisor that Mr. Bleiler was left using, Miles Cahill, was evidently more worried about whether C.M. and the panel would hold it against him for serving as the respondent's advisor view than he was in assisting Mr. Bleiler: in

an email to Irish dated May 19, 2011, Cahill expressed such concerns, prompting Irish to respond, essentially, that he would explain to the panel that Cahill was only doing his job. (SOF, ¶ 24)

Despite that Mr. Bleiler was never so charged, nor did C.M. so allege, Irish referred to the incident in several emails to Board and Faculty members as "a sexual assault case..." (SOF, ¶ 25) Jude Kelley, a professor at the College and the Chair of the hearing panel in this case, also remembers Irish in their interactions referring to the incident as a "sexual assault" case. (SOF, ¶ 26) Indeed, in his very first communication with prospective panel members, Mr. Irish characterized the matter as "[a] very serious case…." (SOF, ¶ 27)

On May 19, 2012, the day after the hearing, Irish send an email to the panel members stating in part "I [spoke] with both students last night about the finding and recommendation. Needless to say [C.M.] was very relieved and thankful. (SOF, ¶ 28) The email continues, in effect congratulating the panel for finding Mr. Bleiler responsible and recommending his expulsion, stating:

Last month there was a great deal of news about this topic on the national level. The way that we have handled these cases has been held up as a model. Many schools have not handled the cases well, necessitating government involvement and oversight. The attached article provides a summary of some of the wider concerns.
….

(SOF, ¶ 29)

**Bias of Panel Members**

Mr. Bleiler raised a concern prior to the hearing that the two student panel members were facebook friends with C.M., and that he had, through mutual friends, had some interaction with one of the panel members that might lead to bias against him. (SOF, ¶ 30) Mr. Irish conducted no meaningful inquiry into the possibility of bias or a conflict with respect to these two students,

and in fact failed to even disclose to Mr. Blieler that both students had served as Resident Advisor's in C.M.'s dormitories and that one of them was currently in a class with C.M.    (SOF, ¶ 31)  Despite Mr. Bleiler's timely, written objections to these panel members, and further discussion of his concerns in meetings with Irish, Irish refused to replace them on the panel. (SOF, ¶ 32)  Mr. Irish's sole stated bases for his refusal were that: (i) he had already "released" the backup panelists; and (ii) the Board members had represented that he had no conflicts with either student.  (SOF, ¶ 33)  Mr. Irish, in fact, had previously ascertained that other panel members were available, *after* Mr. Bleiler requested removal of both students.  (SOF, ¶ 34)

Grant Greeley, one of the challenged panel members, displayed overt bias during the hearing.   He repeatedly asked for details about the encounter with C.M., which Mr. Bleiler attempted to answer as completely as he could.  (SOF, ¶ 35)  Mr. Greeley, however, continued to persist that there was some other detail he could provide, to the point that the Chair of the panel had to instruct him to stop his questioning.  (SOF, ¶ 36)  At one point, Mr. Greeley became angry while asking whether it seemed that C.M. was enjoying herself, sarcastically commenting that "when someone has ice cream, they're usually enjoying themselves and you can tell they're enjoying themselves."  (SOF, ¶ 37)  At his deposition, though Mr. Greeley asserted this apparent lack of detail as a "red flag" that had influenced his decision, he could not identify any information that was actually missing from Mr. Bleiler's answers to his questions:

Q   Can you identify for me a single piece of information that you wish he had told you in this exchange that would have made you believe he was explaining himself?

THE WITNESS:  I can't.

(SOF, ¶ 38)

Ms. Brais, the other student panel members, described her repeated exposure to the "rape play" in her role as a Resident Advisor, in which the takeaway message was that when friends

who were drinking engaged in sexual activity it was considered "rape."  (SOF, ¶ 39)  She also acknowledged that she had never given any thought to the possibility that the policy would be applied against anyone other than male students, and observed that the training examples were only of a male raping a female.   (SOF, ¶ 40)   She further admitted a pre-hearing opinion that nothing short of suspension or expulsion would be an appropriate sanction if a student was found responsible for a violation of the policy.  (SOF, ¶ 41)

### Fundamental Errors in the Proceedings

Despite his extensive *ex parte* contact with both witnesses, receipt of information outside the proceedings themselves, and potential bias of his own, Mr. Irish was present at all times during the Board's deliberations.  (SOF, ¶ 42)  He permitted C.M. to make repeated references to her virginity, notwithstanding the fact that prejudicial, "irrelevant sexual history" is explicitly prohibited by the Handbook and the Training Materials.  (SOF, ¶ 43)  Mr. Bleiler observed that based on the reactions of the panel members, that such references provoked sympathy toward C.M. and animosity toward him.  (SOF, ¶ 44) The training materials further caution against crediting speculation or conjecture, yet witness after witness on C.M.'s behalf offered opinions as to her level of intoxication for which they had no basis, but again, no guidance was given to the panel about the types of evidence they should consider.  (SOF, ¶ 45)   Similarly, despite the Training Materials' prohibition against drawing an adverse inference from an accused student's invocation of a right to remain silent, Mr. Irish permitted the Public Safety Officer to tell the panel that Mr. Bleiler had initially invoked that right, but failed to offer any guidance or instruction about whether that fact could be appropriately considered under the College's policies and training materials.  (SOF, ¶ 46)

In deposition, Mr. Irish initially stated that his role as administrator is to ensure that the procedures the College has set forth are followed, and that during hearing he is the "procedural person." (SOF, ¶ 47) Later, however, Irish stated that it was not his job to be "gatekeeper" in terms of what constitutes appropriate, relevant evidence and that this job is that of the chair of the hearing board, Professor Kelley. (SOF, ¶ 48) Notwithstanding this statement, Mr. Irish never communicated to the Chair that it was his job, and not Irish's, to make sure that only relevant and appropriate information was introduced. (SOF, ¶ 49) Kelley in fact stated that he did not think it was his duty to intervene and stop testimony, nor did he think it his duty to instruct the panel in deliberations to disregard such testimony, that no one ever identified it among his responsibilities as chair, and that in fact he did not act in that capacity as Chair. (SOF, ¶ 50) Accordingly, despite the limitations on evidence set forth in the College's materials, as a practical matter there was nobody involved in this process who believed it was their duty to enforce those limitations. (SOF, ¶ 51)

In his prior position at Northeastern University, Mr. Irish apparently viewed his role differently, when he essentially declared a mistrial in a student proceeding because a fact witness had offered her opinion that *no* rape had taken place. (SOF, ¶ 52). In contrast, during Mr. Bleiler's hearing, though the only witness with the training and expertise to opine on C.M.'s level of intoxication specifically stated that she was "intoxicated, but not incapacitated," Mr. Irish permitted all of C.M.'s friends to offer the opinion that she had been incapable of giving effective consent. (SOF, ¶ 53) Further, Mr. Bleiler timely submitted an affidavit of his roommate describing his observations of C.M. after she left Mr. Bleiler's room (after the sexual encounter), in which he saw her walk into his room by mistake in good spirits and laughing, go to the bathroom, and leave the apartment. (SOF, ¶ 54) At the hearing, the Chair of the panel

made reference to this statement, but it did not appear that the other panel members had a copy of the statement. (SOF, ¶ 55) During the course of this litigation, the College has produced documents purporting to reflect the materials given to the panel, which do ***not*** include this statement, suggesting that it may not, in fact, have been provided to the panel as required by the College's procedures. (SOF, ¶ 56)

As evidence that these acts and omissions were prejudicial to Mr. Bleiler, the Chair of the panel explained its findings by stating that they "could not ***rule out the possibility*** that C.M. was passed out on the bed and raped forcibly," notwithstanding the absence of any evidence in the hearing of forcible or coercive activity. (SOF, ¶ 57)

## III. ARGUMENT

### A. <u>Standard</u>

Disputed facts that involve issues bearing on bias, intent, and motive are particularly inappropriate for disposition at the Summary Judgment phase, as they are solely within the province of a jury to decide. *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928-929 (1st Cir. 1983). Where the state of mind of one of the parties, (here including members of Defendant's administration, staff, faculty, and student body) is crucial to the outcome of the case, the bar for awarding summary judgment is even higher than the normally stringent standard requiring that all inferences be made in favor of the non-movant. Under such circumstances, it is especially important that the jury have the opportunity to assess the evidence and weigh the credibility of witnesses, as motive and intent are often difficult to discern from bare transcripts and other evidentiary documents. *See Blare v. Husky Injection Molding Systems Boston, Inc.,* 419 Mass. 437, 439 (1995); *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 809 (1991). Thus courts must be particularly cautious about granting summary judgment in such

cases.  *See Stepanischen*, 722 F.2d at 928-929; *Vittands v. Sudduth*, 49 Mass. App. Ct. 401, 407-08 (2000).

### B.  Plaintiff Has Raised a Triable Issue of Fact on his Claims under Title IX

Title IX states in pertinent part, "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ..." 20 U.S.C. § 1681(a).  A Title IX claim against a school arising from disciplinary proceedings will lie if the plaintiff can demonstrate either that the conduct of the university in question was motivated by a sexual bias, that a university's discriminatory actions resulted "from classifications based upon archaic assumptions, or that there was an erroneous outcome caused by a "pattern of decision-making" whereby the University's disciplinary procedures governing sexual assault claims is "discriminatorily applied or motivated by a chauvinistic view of the sexes."  *Doe v. Univ. of the South.*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009).[1]

Mr. Bleiler's claims with respect to the bias inherent in the policy, the biased implementation and enforcement of that policy, and the College's departures from its own policies and procedures asserts that unfairly influenced the outcome of the hearing are sufficient under the standard articulated in *Doe* to support a Title IX claim.  *See id*.  Further, these contentions by their nature involve questions of intent and motive, issues that lend themselves to trial, not summary judgment.  *See In re Varrasso*, 37 F.3d 760, 764 (1st Cir. 1994)("… courts must be exceptionally cautious in granting "*brevis*" disposition in such cases.");  *Buckholz v. Massachusetts Inst. of Tech.*, 852720, 1993 WL 818618 (Mass. Super. July 6, 1993) (denying

---

[1] In *Doe*, the court allowed a motion to dismiss the Title IX claims because the complaint did not allege any facts that might demonstrate bias in the applicable policies or their implementation.  In contrast, such bias is at the heart of Mr. Bleiler's factual allegations.  Notably, the *Doe* court did allow that plaintiff's remaining claims to go to trial, at which the jury awarded the plaintiff $50,000 on his negligence claim against the University.  *See generally*, Docket No. 4:09-cv-00062, E.D. TN.

summary judgment in a student discipline case where plaintiff had presented specific facts giving rise "to the slightest of inferences of bias" regarding the M.I.T. disciplinary body at issue).  As noted by the court in *Buckholz*:

> Though this court is tempted to review the hearing transcripts for evidence of bias, doing so would improperly impinge upon the province of the jury.

*See* id.[2]

1.  Bias in the Policy Itself

Mr. Bleiler's claim of bias begins with the sexual misconduct policy itself, which states:

> Any sexual penetration (anal, oral or vaginal), however slight, with any object or sexual intercourse by a man or woman upon a man or woman without effective consent. Sexual penetration includes vaginal or anal penetration by a penis, object, tongue or finger and oral copulation by mouth to genital contact or genital to mouth contact.

SOF, ¶ 10.

The policy further states that a person incapacitated by alcohol cannot give effective consent to sexual activity, but at the same time that intentional alcohol use by a ***respondent*** is no defense to liability under the sexual misconduct policy.  SOF, ¶¶ 12-13.  In other words, two students of the same level of intoxication are viewed differently under the policy.  Defendants' assert that, in such a hypothetical, both students would be subject to disciplinary proceedings: this is flatly contradicted by the way in which all of its own witnesses interpret the policy.  For example, Jude Kelley, a professor at the College and the Chair of the panel that heard Mr.

---

[2] Significantly, the *Buckholtz* Court differentiated the matter from the *Hobert* and *Gorman* cases (both of which Defendant also cited in support of this very same point: *See* Def. Mem at 20-21), which were on appeal after trial. *See id*., citing *Hobert v. Univ. of Chi.*, 751 F. Supp. 1294 (N.D. Ill. 1990); *Gorman v. Univ. of R.I.*, 837 F.2d 7, 15 (1st Cir. 1988).  Similarly, the other case Defendant cites in service of the proposition that a disciplinary body is entitled to a presumption of integrity absent a showing of actual bias, *Ikpeozu v. Univ. of Neb.*, 775 F.2d 250 (8th Cir. 1985), was also decided after trial and thus is inapposite to the instant case.  *Ikpeozu*, moreover involves academic dismissal, and is thus rendered even more remote from the circumstances of this case.  *See Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 88, 98 S. Ct. 948, 954, 55 L. Ed. 2d 124 (1978)  (citations omitted) (Court knows of no case holding that institutions of higher education are subject to judicial review in application of academic standards).

Bleiler's case, acknowledged that the policy "seems to be kind of like a penetration-based rubric…," under which the one who "penetrates" is the initiator/respondent. SOF, ¶ 11. The student members of the panel also testified that they had never considered under what circumstances a female student might be responsible for a violation of the policy. SOF, ¶39-40. Indeed, there was evidence before the panel that C.M. at one point initiated contact with Mr. Bleiler's genitals, which was never even considered as a potential violation of the sexual misconduct policy- nor could it have been, as there was no "penetration." SOF, ¶ 16.

2. Bias in the Communication, Implementation and Enforcement of the Policy

The record is replete with evidence that the College's approach to its sexual misconduct policy, including the training materials provided to the hearing panel, the guidance given to the panel by the administrator responsible for these proceedings (Mr. Irish), and the information disseminated to the student body at large about the policy, are heavily slanted toward the presumption that if a male and female student engage in sexual activity when alcohol is involved, there has been a sexual assault.   By way of example, the College publishes a training manual to all panel members participating in disciplinary hearings involving charges of sexual misconduct, titled "CSB Training -Sexual Misconduct" ("Training Materials").   The bias of the Training Materials toward the rights of reporting complainants are evident insofar as they:

(i)      Direct panel members to engage in questioning that assumes the guilt of the accused;

(ii)     Discuss the negative effect of the admission of prior sexual history on the complainant but not on the accused;

(iii)     Refer to a reporting complainant as a "victim," as opposed to a "reporter" or a "complainant," thereby assuming the guilt of the accused;

(iv)     List among the alleged victim's but not the accused's rights, the right not to have irrelevant prior sexual history admitted in a campus hearing;

(v)     Contain a list of "rape myths" devoted to dispelling myths unfavorable to alleged victims, with no discussion of any "myths" that might be unfavorable to the accused; and

(vi)    Contain exercises that all are strongly slanted toward finding that non-consensual sex occurred, without any scenarios that lean toward a finding that consensual sex occurred[3].

(SOF, ¶ 18).  As Mr. Irish has himself admitted, moreover, the exclusive focus of campus education on the issue of sexual assault is directed at making female students more comfortable reporting alleged violations of the sexual misconduct policy:

> Oh, I think this is a pervasive problem on all our campuses. It's very underreported and we really have to ask: ***Why is it so underreported? What can we do to make victims feel comfortable to come forward, to feel supported*** ….

SOF, ¶ 19.

In that same interview, Mr. Irish also acknowledged that there had been a focus on educating young women about "partying safe," but no corresponding effort to educate young men about the possible consequences of sexual activity and the "confusion in the issue on our campuses."  SOF, ¶ 20.

No doubt this approach was born out of the salutary desire to avoid some of the historical unfairness that female victims of sexual assault have faced when reporting such events. Nonetheless, it has had the effect of creating a presumption of guilt that falls on the male students, even, as was the case here, in the absence of any allegations of force, coercion, manipulation or participation in the intoxication of the young woman.

3.  Bias on the Part of the Individuals Involved in Mr. Bleiler's Hearing

---

[3]While Irish in deposition professed not to know whether the examples given in the exercises constituted sexual assault, during the above-referenced press interview, he referred to such exercises as "descriptive types of examples of what could be considered sexual assault."   (Irish Dep. 90-95; Ex. 3 at 2)

There is also evidence in the record that certain individuals who participated in the process were biased, either against Mr. Bleiler personally or against male student respondents generally. Mr. Irish, the administrator responsible for selecting, training, and guiding the hearing panel, has demonstrated his own bias publicly and in these proceedings. As noted above, he has been outspoken in the press about the need to continue to make the hearing process friendlier to female complainants. In his prior position at Northeastern University, moreover, Mr. Irish essentially declared a mistrial in a student proceeding because a fact witness had offered her opinion that *no* rape had taken place. SOF, ¶ 52. In contrast, during Mr. Bleiler's hearing, though the only witness with the training and expertise to opine on C.M.'s level of intoxication specifically stated that she was "intoxicated, but not incapacitated," Mr. Irish permitted all of C.M.'s friends to offer the opinion that she had been incapable of giving effective consent- the very same type of opinion on an ultimate issue that he had disallowed where unfavorable to the complainant. SOF, ¶ 53.

Other aspects of Mr. Irish's handling of these proceedings also reveal his bias. Where he actively solicited faculty members to serve as C.M.'s faculty advisor during the hearing, he in fact interfered with Mr. Bleiler's attempt to secure an appropriate advisor, telling Mr. Bleiler's first choice that he was ineligible to serve simply because he held a J.D. degree. SOF, ¶¶ 22-24. The faculty advisor that Mr. Bleiler was left using, Miles Cahill, was evidently more worried about whether C.M. and the panel would hold it against him for serving as the respondent's advisor view than he was in assisting Mr. Bleiler: in an email to Irish dated May 19, 2011, Cahill expressed such concerns, prompting Irish to respond, essentially, that he would explain to the panel that Cahill was only doing his job. SOF, ¶ 24.

Prior to the hearing, Mr. Bleiler raised a concern to Mr. Irish that the two student panel members were both facebook friends with C.M., and that he was concerned about Mr. Greeley's potential bias due to a previous altercation with one of Mr. Bleiler's friends.  SOF, ¶ 30.  Mr. Irish dismissed these concerns, stating that the panel had already been convened (though Mr. Bleiler's objection was timely made pursuant to the written procedures).  SOF, ¶¶ 31-33.  More tellingly, Mr. Irish was aware at the time that both Ms. Brais and Mr. Greeley had served as Resident Advisors in C.M.'s dormitories, and that Mr. Greeley was currently in a class with C.M. (in which they were taking a final exam together immediately preceding the disciplinary hearing) did not disclose those facts to Mr. Bleiler, and made only the most cursory inquiry about whether either student had a reason to be biased ***against C.M.*** by virtue of that experience.  SOF, ¶¶ 31-33.  He never inquired as to whether they had a close enough relationship with C.M. that they might have a bias against Mr. Bleiler, and acknowledged that that was not his purpose in making the inquiry. SOF, ¶¶ 31-34.

There is evidence, moreover, that at least Mr. Greeley was openly hostile to Mr. Bleiler during the hearing.   He repeatedly asked for details about the encounter with C.M., which Mr. Beliler attempted to answer as completely as he could.  SOF, ¶ 35.  Mr. Greeley, however, continued to persist that there was some other detail he could provide, to the point that the Chair of the panel had to instruct him to stop his questioning.  SOF, ¶ 36.  At one point, Mr. Greeley became angry while asking whether it seemed that C.M. was enjoying herself, sarcastically commenting that "when someone has ice cream, they're usually enjoying themselves and you can tell they're enjoying themselves."  SOF, ¶ 37.  At his deposition, though Mr. Greeley asserted this apparent lack of detail as a "red flag" that had influenced his decision, he could not identify any information that was actually missing from Mr. Bleiler's answers to his questions:

Q   Can you identify for me a single piece of information that you wish he had told you in this exchange that would have made you believe he was explaining himself?

THE WITNESS:  I can't.

SOF, ¶ 38.

Finally, the testimony of Ms. Brais, the other student panel member, at a minimum supports the inference that she came to the hearing with preconceived ideas about responsibility in a situation such as this one.  By way of example, Ms. Braise described her repeated exposure to the "rape play" in her role as a Resident Advisor, in which the takeaway message was that when friends who were drinking engaged in sexual activity it was considered "rape."  SOF, ¶ 39. She also acknowledged that she had never given any thought to the possibility that the policy would be applied against anyone other than male students, and admitted a pre-hearing opinion that nothing short of suspension or expulsion would be an appropriate sanction if a student was found responsible for a violation of the policy.  SOF, ¶¶ 40-41.  Though Ms. Brais' preconceived notions were perhaps more subtle than those of Mr. Greeley or Mr. Irish, her comments are illustrative of the culture bias created by the way in which the College has chosen to design, communicate, and implement its policies on sexual misconduct.

4.  Bias in the Conduct of Mr. Bleiler's Hearing

Finally, the record contains numerous examples of bias in the conduct of Mr. Bleiler's hearing.  First, though the training materials clearly state that a complainant's prior sexual history should not be admitted or considered, the panel permitted C.M. to make repeated references to her virginity.  SOF, ¶ 43.  Mr. Bleiler observed that, based on the reactions of panel members, this appeared to have a powerful influence on them, but he was left with no way to counter or address that allegation.  SOF, ¶ 44.  Second, though the training materials also clearly

state that a respondent has a right to decline to answer questions and that choice cannot be held against him, the Public Safety officer was allowed to tell the panel that he had initially invoked his Miranda rights, with no guidance or instruction given to the panel that they were not to consider that fact in their deliberations. SOF, ¶ 46. Indeed, it was clear from the testimony of both Mr. Irish and the Chair of the panel (Professor Kelley), that ***nobody*** was charged with screening evidence to be sure it comported with the College's policies, or with advising the panel with respect to what they should and should not consider. SOF, ¶¶ 47-51.

The combined effects of these factors was perhaps most apparent in the testimony of Professor Kelley, who explained that the panel had made a finding that C.M. was "physically helpless" because the panel "could not rule out the possibility that C.M. was passed out on the bed and raped forcibly." SOF, ¶ 57. Professor Kelley acknowledged that there was no evidence before the panel that this had occurred: in fact, that was never C.M.'s allegation. SOF, ¶ 57. Accordingly, an eminently reasonable inference could be drawn from this testimony that the institutional and individual biases in this process, combined with the admission of irrelevant and inflammatory evidence, caused the panel to essentially convict Mr. Bleiler of something he had not even been accused of.

For all of these reasons, Plaintiff has raised a triable issue of fact on the question of whether the College's conduct was motivated by a sexual bias, that its discriminatory actions resulted "from classifications based upon archaic assumptions, or that there was an erroneous outcome caused by a "pattern of decision-making" whereby the University's disciplinary procedures governing sexual assault claims is "discriminatorily applied or motivated by a chauvinistic view of the sexes," any of which support a claim under Title IX. See *Doe*, 687 F. Supp. 2d at 756.

### C.  Plaintiff Has Raised a Triable Issue of Fact on his Contract Claims

Massachusetts courts recognize that a student has a right to assert claims arising from

disciplinary proceedings if the school fails to follow its own policies and procedures or if the

process is "fundamentally unfair" in violation of the student's reasonable expectations.  *See Dinu*

*v. President and Fellows of Harvard College*, 56 F.Supp.2d 129, 130 (D. Mass. 1999)( Modern

case law pretty well accepts that relationship between a university and its students has "a strong,

albeit flexible, contractual flavor.");  *Buckholz*, 852720, 1993 WL 818618 ("In general, a private

university may not arbitrarily and capriciously expel a student").  As noted by the dissent in

*Schaer v. Brandeis University*:

> [I]f the university puts forth rules of procedure to be followed in disciplinary
> hearings, the university should be legally obligated to follow those rules. To do
> otherwise would allow Brandeis to make promises to its students that are nothing
> more than a "meaningless mouthing of words." **383 *Tedeschi v. Wagner*
> *College, supra* at 662, 427 N.Y.S.2d 760, 404 N.E.2d 1302. While the university's
> obligation to keep the members of its community safe from sexual assault and
> other crimes is of great importance, at the same time the university cannot tell its
> students that certain procedures will be followed and then fail to follow them. ***In***
> ***a hearing on a serious disciplinary matter there is simply too much at stake for***
> ***an individual student to countenance the university's failure to abide by the***
> ***rules it has itself articulated***.

432 Mass. 474, 485 (2000)(emphasis added).

Here, Plaintiff has adduced evidence that the College did not follow its own specific

procedures in: (i) admitting irrelevant and highly prejudicial testimony about C.M.'s alleged

virginity; (ii) failing to provide all members of the panel with an exculpatory witness statement

submitted by Mr. Bleiler; (iii) allowing Mr. Irish, an administrator with a clear bias and who had

extensive ex parte contact with both parties prior to the hearing, to be present for the entire

deliberation and to offer his guidance on the appropriate sanction; and (iv) allowing the Public

Safety officer to describe Mr. Bleiler's initial invocation of his Miranda rights without informing

the panel that this information was not to be considered or held against him.

Further, Plaintiff has adduced evidence to support his claims that the Defendants' actions, even if not violative of a specific provision in either the Handbook or the CSB Training Materials, amounted to a breach of the implied covenant of good faith and fair dealing and contrary to his reasonable expectations. *See Buckholz*, 852720, 1993 WL 818618 (denying summary judgment where, even in the absence of a specific contractual breach, plaintiff had presented evidence capable of supporting an inference of bias). This evidence in includes all of the above, as well as: (i) Mr. Irish's uneven administration of the pre-hearing process, including his active assistance to C.M. in finding an appropriate faculty advisor and active interference with Mr. Bleiler's choice of an advisor; (ii) Mr. Irish's failure to undertake more than a cursory review of potential biases or conflicts of panel members; and (iii) Mr. Irish's failure to even disclose known facts that could give rise to an inference of such bias or conflict until after the hearing.

Finally, whether analyzed as a breach of contract, breach of the implied covenant of good faith and fair dealing, or under the more generalized requirement that schools meet the reasonable expectations of students in administration of student discipline, the record supports a finding that the College fell short. Students are assured in the handbook of a right to a fair process. SOF, ¶ 5. When Mr. Bleiler was informed of the allegations against him, he was told by Mr. Irish that ***even if he accepted responsibility*** he should expect to be expelled and forego the Holy Cross degree that he had worked so hard to earn. His only choice, therefore, was to accept at face value the promise of a fair process, and proceed with the hearing. For all the reasons described above, neither the hearing nor the process surrounding the hearing was fair. The panel heard evidence that C.M., a young woman of average height and build, consumed a total of four and a half beers over a six hour period, as well as testimony from the Public Safety

officer that she was not incapacitated, and nonetheless found her to have been incapacitated by alcohol.  The panel heard testimony about her active participation in the sexual act, but declined to even ask her whether she could confirm or deny that testimony.  The panel heard zero evidence of any forcible or coercive activity, yet nonetheless decided she had been "physically helpless" because they "could not **_rule out the possibility_** that C.M. was passed out on the bed and raped forcibly."  SOF, ¶ 57.  As it turns out, therefore, once the charge was leveled, the result was in effect pre-ordained.  Nothing about this corresponds to a student's "reasonable expectations" of a "fair process."  For this reason as well, Defendants' motion should be denied.

## IV.    Conclusion

For all of the reasons set forth above, Plaintiff Edwin Bleiler respectfully requests that the Court Deny Defendant's Motion for Summary Judgment.


Respectfully submitted,

EDWIN BLEILER,
By his attorneys:

/s/Emily E. Smith-Lee_____
Emily E. Smith-Lee (BBO# 634223)
esmithlee@slnlaw.com
Beth M. Nussbaum (BBO# 633878)
bnussbaum@slnlaw.com
Smith Lee Nebenzahl, LLP
One Post Office Square
Sharon, MA  02067
781-784-2322
781-793-0600 (facsimile)

Dated: February 4, 2013