UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

EDWIN BLEILER,
                              Plaintiff,

v.                                                          1:11-CV-11541-DJC

COLLEGE OF THE HOLY CROSS,
                              Defendant.


**DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF
DISPUTED/ADDITIONAL FACTS**

1.  Edwin Bleiler was a senior at the College of the Holy Cross with a 3.31 GPA at the time of
the disciplinary hearing at issue. (Compl., ¶ 8; Bleiler Aff., ¶ 1)

> **RESPONSE**: Disputed to the extent that paragraph 8 of the Complaint indicates that
> Bleiler's GPA was a 3.13, but not material for purposes of summary judgment.
> Otherwise undisputed.

2.  C.M. was a female student at the College who alleged that Mr. Bleiler had violated the
College's sexual misconduct policy based solely on her incapacity to consent, allegedly due to
alcohol consumption. (Bleiler Dep. Exs. 3, 5)

> **RESPONSE**: Undisputed that C.M. was a female student at the College who alleged
> Bleiler had violated the College's sexual misconduct policy.  Disputed that C.M. alleged
> his violation due solely to her incapacity to consent.  (College App.; Bleiler Dep. Ex. 5, 6,
> 7; Potter Aff. App. Ex. A, tab 1.)[1]

3.  Mr. Bleiler maintains that C.M. was not incapacitated by alcohol when they had consensual
sex. (Bleiler Aff., ¶ 5)

> **RESPONSE**: Undisputed that Bleiler maintains this position.

4.  Nonetheless, through the disciplinary procedures outlined below, the College conducted a
hearing, which resulted in Mr. Bleiler's expulsion from the College on the very same day he
would have graduated. (Compl., ¶ ; Bleiler Dep. 113, 115; Bleiler Aff., ¶¶ 46-48)

---

[1]  This response statement mainly directs the Court to the Appendix provided by Bleiler.  However, at times the
College cites the Appendix originally filed by Holy Cross.  The Appendix provided by Bleiler will be cited as
"Bleiler App."  The Appendix provided by Holy Cross in its initial motion for summary judgment will be referred to
as "College App."

**RESPONSE**: Undisputed that the hearing resulted in Bleiler's expulsion.  The fact that Bleiler may have graduated on the same day as his expulsion is immaterial for purposes of summary judgment.

5.  The College of the Holy Cross – Student Handbook and Planner 2010-2011 ("Handbook") contains, *inter alia*, a statement of Community Standards and Disciplinary Procedures for Students ("Disciplinary Procedures"), which sets forth in part the following language:

> . . . In the case of disciplinary procedures, students have the right to be informed of any charges of misconduct, the right to adequate time to prepare a response to the charges, the right to hear information in support of the charges, the right to present evidence against the charges, ***and the right to a fair process which is appropriate to the circumstances***.

(emphasis added). (Compl., ¶¶ 12-13; Irish Dep. Ex. 2)

> **RESPONSE**: Undisputed that the Handbook contains this language, but noted that none of the cited language in the Handbook is highlighted.  (Bleiler App.; Bleiler Dep. Ex. 21, page 33).

6.  Any Student who is accused ("Accused") of violating policy in a way that may result in suspension or dismissal from the College may be referred to the Community Standards Board ("Board"). The Board shall receive all written materials before hearing. (Compl., ¶¶ 15; Irish Dep. Ex. 2)

> **RESPONSE**: Undisputed.

7.  The Board is comprised of five members, two students, at least one faculty member, and at least one staff member; the fifth member can be either faculty or staff. The Handbook sets forth the following policy and rules regarding board members and potential conflict of interest:

> The accused and the accuser are informed of the names of the members of the hearing panel scheduled to hear the complaint not fewer than 72 hours prior to the hearing. If the accuser or the accused has particular information as to why a specific person should not be a part of the panel hearing the case, either of these parties must present the information to the Director of Student Conduct and Community Standards or designated hearing coordinator in writing 48 hours prior to the start of the hearing. If the Director deems that there is information to suggest a potential conflict, another board member will be substituted. The decision of the Director or hearing coordinator is final.

> Board members are expected to notify the Director or hearing coordinator and disqualify themselves from serving on a board if

2

they suspect a potential conflict with any party participating in a
board hearing.

(Compl., ¶ 17; Irish Dep. Ex. 2)

    **RESPONSE**: Undisputed that the Handbook contains this language.


8.  Upon conclusion of the hearing the Board adjourns for deliberations. The Director or hearing
coordinator may meet with the Board for consultation regarding procedural elements any time
before or during hearing or deliberations. (Compl., ¶ 19; Irish Dep. Ex. 2)

    **RESPONSE**: Undisputed.

9.  The Handbook, however, does ***not*** provide for the Hearing Officer's participation in actual
deliberations, nor does it authorize the Hearing Officer to be present for the entirety of the
deliberations. (Compl., ¶ 20; Irish Dep. Ex. 2)

    **RESPONSE**: Disputed that the Handbook does not authorize the Hearing Officer to be
present for the entirety of the deliberations. Undisputed that the Handbook does not
provide for the Hearing Officer's participation in actual deliberations. (Bleiler App., Irish
Dep. Ex. 2.) The Handbook speaks for itself. This fact is not material for purposes of
summary judgment.

10.  The Handbook defines "Sexual Misconduct I" as "any sexual penetration…however slight,
with any object or sexual intercourse by a man or a woman upon a man or a woman without
effective consent…" (Compl., ¶ 25; Irish Dep. Ex. 2)

    **RESPONSE:** Disputed. This definition is not the full definition. (College App.; Bleiler
Dep. 121 Ex. 21, at 37, Potter Aff. App. Ex. A, tab 1.)

11.  Jude Kelley, a professor at the College and the Chair of the panel that heard Mr. Bleiler's
case, acknowledged that the policy "seems to be kind of like a penetration-based rubric…" under
which the one who "penetrates" is the initiator/respondent. (Kelley Dep. 80)

    **RESPONSE**: Undisputed that Jude Kelley, a professor at the College and the Chair of
the panel testified that "it seems to be kind of like a penetration-based rubric." The
statement that Kelley indicates the one who "penetrates" is the initiator/respondent is not
supported by the cited deposition testimony.

12.  The policy goes on to state that "consent may ***never*** be given by…those who are
incapacitated as a result of alcohol or other drug consumption (voluntary or involuntary).
(emphasis added). (Compl., ¶ 26; Irish Dep. Ex. 2)

    **RESPONSE**: Undisputed that the Handbook contains this language, but note that the
word "never" is not highlighted in the Handbook. (Bleiler App.; Irish Dep. Ex. 2.).

13.  College policy also states that intentional alcohol use is no defense to liability under the sexual misconduct policy. *See* "CSB Training -Sexual Misconduct" ("Training Materials"). (Irish Dep., Ex. 2 at 57, Ex. 4 at 23)

> **RESPONSE**: Undisputed to the extent that the training materials state that "[i]ntentional use of alcohol/drugs by the respondent is not an excuse for violation of the sexual misconduct policy."  (Bleiler App.; Irish Dep. Ex. 4, at 23.)

14.  This policy has ***only*** been enforced against male students at the College. (Compl., ¶ 29; Irish Dep. 59-61)

> **RESPONSE**: Undisputed that only male students have been found responsible under the policy, as Holy Cross has had no known complaints of Sexual Misconduct by a male or female student against a female student.  (College App., Ex. B., Def.'s Resp. to Pl.'s Interrog. No. 2.)

15.  The allegation against Mr. Bleiler was solely Sexual Misconduct I, meaning that C.M. alleged that Mr. Bleiler had sexual intercourse with C.M. without effective consent, and that she could not give effective consent due to her intoxication. There were no allegations of coercion or force, and there was no allegation that Mr. Bleiler was responsible for C.M.'s intoxication. (Compl., ¶ 30; 5/10/11 Letter from Irish to Bleiler; Irish Dep. Ex. 3)

> **RESPONSE**:  Undisputed that the sole charge against Bleiler was for Sexual Misconduct I.  Undisputed that C.M. alleged that Mr. Bleiler had sexual intercourse with C.M. without obtaining effective consent.  Undisputed that C.M. alleged that she could not give effective consent due to intoxication.  Undisputed that there was no allegation that Mr. Bleiler was responsible for C.M.'s intoxication.  Disputed that there were no allegations of coercion or force.  (College App.; Bleiler Dep. Ex. 5, 6, 7; Potter Aff. App. Ex. A, tab 1.)

16.  There was evidence before the panel that C.M. at one point initiated contact with Mr. Bleiler's genitals, which was never even considered as a potential violation of the sexual misconduct policy-nor could it have been, as there was no "penetration." (Bleiler Aff., ¶¶ 30-31)

> **RESPONSE**:  Undisputed that Mr. Bleiler testified that C.M. at one point had contact with his genitals.  This fact is not material for purposes of summary judgment.  Bleiler never brought allegations of Sexual Misconduct against C.M.

17.  The College publishes a training manual to all panel members participating in disciplinary hearings involving charges of sexual misconduct, titled "CSB Training -Sexual Misconduct" ("Training Materials"). (Irish Dep., Ex. 4).

> **RESPONSE**: Undisputed.

18.  The Training Materials:

(i) Direct panel members to engage in questioning that assumes the guilt of the accused (Irish Dep. Ex. 4 at 5-7);

>**RESPONSE**: Disputed as argumentative, conclusory and a mischaracterization of the training materials. The cited portion of the training materials instruct "questions that elicit an open-ended response" to get a "better understanding as of the student's thinking." This dispute should not preclude summary judgment as the training materials speak for themselves. (Bleiler App.; Irish Dep. Ex. 4, at 7.)

(ii) Discuss the negative effect of the admission of prior sexual history on the complainant but not on the accused (Irish Dep. Ex. 4 at 14-15);

>**RESPONSE**: Undisputed to the extent that the portion of materials cited discusses the state's Rape Shield Law. Disputed that training materials only consider the negative effect of admission of prior sexual history on the complainant. The training materials contain two scenarios for considering past sexual history as a credibility exercise. The first states that "Complainant wants to testify that she has heard that the accused student has raped other women. May she?" The second states that "The accused student's fraternity brother wants to testify that he has heard around that the complainant is loose and easy. May he?" This dispute should not preclude summary judgment as the training materials speak for themselves. (Bleiler App.; Irish Dep. Ex. 4 at 36.)

(iii) Refer to a reporting complainant as a "victim," as opposed to a "reporter" or a "complainant," thereby assuming the guilt of the accused (Irish Dep. Ex. 4 at 18);

>**RESPONSE**: Disputed as an impermissible conclusion and argument drawn from unsupportive facts. In fact, the training materials also refer to the complainant as an "alleged victim" on the same cited page. (Bleiler App.; Irish Dep. Ex. 4, at 18.)

(iv) List among the alleged victim's but not the accused's rights, the right not to have irrelevant prior sexual history admitted in a campus hearing. (Irish Dep. Ex. 4 at 18-19);

>**RESPONSE**: Undisputed that the training materials contain this language.

(v) Contain a list of "rape myths" devoted to dispelling myths unfavorable to alleged victims, with no discussion of any "myths" that might be unfavorable to the accused; (Irish Dep. Ex. 4 at 20);

>**RESPONSE**: Undisputed that rape myths are discussed in the cited materials. Disputed that the materials contain a "list." The rape myths are discussed in text and state that it is a rape myth that men cannot be raped. (Bleiler App.; Irish Dep. Ex. 4, at 20.)

(vi) Contain exercises that all are strongly slanted toward finding that non-consensual sex occurred, without any scenarios that lean toward a finding that consensual sex occurred. (Irish Dep. Ex. 4 at 33-37)

**RESPONSE**: Disputed as an impermissible conclusion and argument drawn from unsupportive facts. The case scenarios provided in the training materials describe scenarios that are not clearly in favor of finding that non-consensual sex has occurred. (Bleiler App.; Irish Dep. Ex. 4 at 37.)

19. Paul Irish, College Director of Student Conduct and Community Standards, has admitted that the exclusive focus of campus education on the issue of sexual assault is directed at making female students more comfortable reporting alleged violations of the sexual misconduct policy:

> Oh, I think this is a pervasive problem on all our campuses. It's very underreported and we really have to ask: ***Why is it so underreported? What can we do to make victims feel comfortable to come forward, to feel supported*** ….

(emphasis added). (Compl., ¶ 47; Irish Dep., Ex. 3)

**RESPONSE**: Disputed. The cited statement refers to victims not female students. (Bleiler App.; Irish Dep. Ex. 3)

20. In that same interview, Mr. Irish also acknowledged that there had been a focus on educating young women about "partying safe," but no corresponding effort to educate young men about the possible consequences of sexual activity and the "confusion in the issue on our campuses." *Id*.

**RESPONSE**: Undisputed that Irish acknowledged that there had been a focus on educating young women about "partying safe." Disputed that Irish stated there is no corresponding effort to educate young men about the possible consequences of sexual activity. Irish stated "On college campuses . . . we haven't done enough with our young men to say, you know, if you get involved with a young woman and you do not know her . . . and you've been drinking . . . this is a warning sign." (Bleiler App.; Irish Dep. Ex. 3, at 4.)

21. Despite Irish's pronouncements to the press about the importance of educating male students, Mr. Bleiler received no training or counseling for male students regarding sexual harassment or misconduct while a student at the College, although he did receive training re: under-age consumption of alcohol. (Bleiler Dep. 58-59, 61-62)

**RESPONSE**: Disputed. Bleiler received the Handbook which detailed the College's sexual misconduct policies and procedures. (College App.; Bleiler Dep. 72:14-73:14; Potter Aff. App. Ex. A, tab 1.)

22. Irish's bias in favor of the complainant was also starkly evident in his actions. He reached out to several professors on C.M.'s behalf, in an attempt to find her an appropriate student advisor but did not do the same for Mr. Bleiler, who he merely informed that he needed to submit the name of an advisor by a specific deadline. (Irish Dep., Ex. 14-17)

**RESPONSE**: Disputed as an impermissible conclusion drawn from unsupportive facts. See Also, Irish's Supplemental Affidavit submitted in response.

23. In fact, Mr. Irish did not permit Mr. Bleiler to use his first choice for faculty advisor for the hearing because the professor had previously earned a law degree. (Bleiler Dep. 78-79)

    **RESPONSE**: Undisputed that Bleiler was not permitted to use professors with law degrees as advisors. Disputed to the extent that Bleiler implies this policy was applied only against him. The Handbook provides that "Attorneys may not attend disciplinary hearings or conferences." (Bleiler App.; Irish Dep. Ex. 2, at 40.)

24. The faculty advisor that Mr. Bleiler was left using, Miles Cahill, was evidently more worried about whether C.M. and the panel would hold it against him for serving as the respondent's advisor view than he was in assisting Mr. Bleiler: in an email to Irish dated May 19, 2011, Cahill expressed such concerns, prompting Irish to respond, essentially, that he would explain to the panel that Cahill was only doing his job. (Irish Dep., Ex. 29)

    **RESPONSE**: Disputed as impermissible conclusions drawn from unsupportive facts.( Bleiler App.; Irish Dep. Ex. 29.)

25. Despite that Mr. Bleiler was never so charged, nor did C.M. so allege, Irish referred to the incident in several emails to Board and Faculty members as "a sexual assault case..." (Kelley Dep. 45, Ex. 3; Irish Dep., Exs. 7, 9 at Bates No. HC10538, Exs. 14-15)

    **RESPONSE**: Undisputed except as to the statement that "nor did C.M. so allege" which is disputed. (College App.; Bleiler Dep. Ex. 5, 6, 7; Potter Aff. App. Ex. A, tab 1).

26. Jude Kelley, a professor at the College and the Chair of the hearing panel in this case, also remembers Irish in their interactions referring to the incident as a "sexual assault" case. (Kelley Dep. 45)

    **RESPONSE**: Undisputed.

27. Indeed, in his very first communication with prospective panel members, Mr. Irish characterized the matter as "[a] very serious case…" (Irish Dep., Ex. 9)

    **RESPONSE**: Undisputed.

28. On May 19, 2012, the day after the hearing, Irish send an email to the panel members stating in part "I [spoke] with both students last night about the finding and recommendation. Needless to say [C.M.] was very relieved and thankful. (Irish Dep., Ex. 27)

    **RESPONSE**: Undisputed.

29. The email continues, in effect congratulating the panel for finding Mr. Bleiler responsible and recommending his expulsion, stating:

> Last month there was a great deal of news about this topic on the national level. The way that we have handled these cases has been held up as a model. Many schools have not handled the cases well,

necessitating government involvement and oversight. The attached article provides a summary of some of the wider concerns.

*Id.*

> **RESPONSE**: Disputed as an impermissible argument and conclusion drawn from unsupportive facts. The conclusion that this email in effect congratulates the panel for finding Bleiler responsible and recommend expulsion is disputed as an impermissible conclusion. The reference is to the process and methodology not to the finding that Mr. Bleiler was responsible and recommending expulsion. The email speaks for itself. Undisputed that the email contains this language. (Bleiler App.; Irish Dep., Ex. 27)

30. Mr. Bleiler raised a concern prior to the hearing that the two student panel members were facebook friends with C.M., and that he had, through mutual friends, had some interaction with one of the panel members that might lead to bias against him. (Compl., ¶¶ 32-39, 43; Bleiler Dep. 36-37, 39-41; Brais Dep. 52-53; Irish Dep. Ex. 10, 11, 12, 13, 17, 18, 19, 21, 22)

> **RESPONSE**: Undisputed that Bleiler raised this concern.

31. Mr. Irish conducted no meaningful inquiry into the possibility of bias or a conflict with respect to these two students, and in fact failed to even disclose to Mr. Bleiler that both students had served as Resident Advisor's in C.M.'s dormitories and that one of them was currently in a class with C.M. (Compl., ¶¶ 32-39, 43; Bleiler Dep. 36-37, 39-41; Brais Dep. 52-53; Irish Dep. Ex. 10, 11, 12, 13, 17, 18, 19, 21, 22)

> **RESPONSE**: Disputed as argumentative and an impermissible conclusion drawn from unsupportive facts. (Bleiler App.; Bleiler Dep. 36-37, 39-41; Brais Dep. 52-53; Irish Dep. 141:11-154:20, 175:23-176:21, Ex. 10, 11, 12, 13, 17, 18, 19, 21, 22; College App., Ex. C, Irish Aff. ¶5.)

32. Despite Mr. Bleiler's timely, written objections to these panel members, and further discussion of his concerns in meetings with Irish, Irish refused to replace them on the panel. (Compl., ¶¶ 32-39, 43; Bleiler Dep. 36-37, 39-41; Brais Dep. 52-53; Irish Dep. Ex. 10, 11, 12, 13, 17, 18, 19, 21, 22)

> **RESPONSE**: Undisputed that these panelists were not removed from the panel.

33. Mr. Irish's sole stated bases for his refusal were that: (i) he had already "released" the backup panelists; and (ii) the Board members had represented that he had no conflicts with either student. (Compl., ¶ 34; Irish Dep. Ex. 17, 19)

> **RESPONSE**: Disputed (Bleiler App.; Irish Dep. 141:11-154:20, 175:23-176:21.) However, this fact is not material for purposes of summary judgment, as the Handbook states that it is the Director or hearing coordinator's decision as to whether a conflict exists, and that decision is final. (Bleiler App.; Irish Dep. Ex. 2, at 40.)

34. Mr. Irish, in fact, had previously ascertained that other panel members were available, *after* Mr. Bleiler requested removal of both students. (Compl., ¶ 43; Irish Dep., Ex. 18, 20)

> **RESPONSE**: This fact is not material for purposes of summary judgment. Irish had already deemed that a conflict did not exist before he sent the email that Bleiler cites. (Bleiler App.; Irish Dep. Ex. 21.)

35. Grant Greeley, one of the challenged panel members, displayed overt bias during the hearing. He repeatedly asked for details about the encounter with C.M., which Mr. Bleiler attempted to answer as completely as he could. (Compl., ¶ 44; Bleiler Aff., ¶ 28)

> **RESPONSE**: Disputed that asking for further detail demonstrates "overt bias." These are impermissible opinions and conclusion, not statements of fact and are not supported by the hearing transcript. (College App.; Hearing Transcript Ex. F 21:21-26:21; 35:12-36:6; 114:11-116:7.)

36. Mr. Greeley, however, continued to persist that there was some other detail he could provide, to the point that the Chair of the panel had to instruct him to stop his questioning. (Compl., ¶ 44; Bleiler Aff., ¶ 29)

> **RESPONSE**: Disputed. These are impermissible opinions and conclusions, not facts, and are not supported by the hearing transcript. (College App.; Hearing Transcript Ex. F 21:21-26:21; 35:12-36:6; 114:11-116:7.)

37. At one point, Mr. Greeley became angry while asking whether it seemed that C.M. was enjoying herself, sarcastically commenting that "when someone has ice cream, they're usually enjoying themselves and you can tell they're enjoying themselves." (Compl., ¶ 44; Bleiler Aff., ¶ 29)

> **RESPONSE**: Disputed. These are impermissible opinions and conclusion, not statements of fact, and are not supported by the hearing transcript. (College App.; Hearing Transcript Ex. F 21:21-26:21; 35:12-36:6; 114:11-116:7.)

38. At his deposition, though Mr. Greeley asserted this apparent lack of detail as a "red flag" that had influenced his decision, he could not identify any information that was actually missing from Mr. Bleiler's answers to his questions:

> > Q Can you identify for me a single piece of information that you wish he had told you in this exchange that would have made you believe he was explaining himself?
> > THE WITNESS: I can't.

(Greeley Dep. 115)

> **RESPONSE**: Disputed. The cited testimony does not support the assertion and conclusion that "at his deposition, though Mr. Greeley asserted this apparent lack of detail as a "red flag" that had influenced his decision . . . ." There is no reference to red

flags or the apparent lack of detail that influenced his decision. Moreover, the decision was not his decision. It was the panel's decision. Undisputed that the quoted question and answer are on page 115. (Bleiler App.; Greeley Dep. 115)

39. Ms. Brais, the other student panel members, described her repeated exposure to the "rape play" in her role as a Resident Advisor, in which the takeaway message was that when friends who were drinking engaged in sexual activity it was considered "rape." (Brais Dep. 40-42)

> **RESPONSE**: Disputed. The cited testimony does not support the assertions and conclusions. (Bleiler App.; Brais Dep-. 40-42)

40. She also acknowledged that she had never given any thought to the possibility that the policy would be applied against anyone other than male students, and observed that the training examples were only of a male raping a female. (Brais Dep. 74)

> **RESPONSE**: Disputed. The cited testimony does not support these assertions. (Bleiler App.; Brais Dep. 40-42) This fact is not relevant for purposes of summary judgment.

41. She further admitted a pre-hearing opinion that nothing short of suspension or expulsion would be an appropriate sanction if a student was found responsible for a violation of the policy. (Brais Dep. 66, 69-70)

> **RESPONSE**: Disputed that the cited testimony warrants this conclusion. (Bleiler App.; Brais Dep. 40-42) She did not say that her pre-hearing opinion was that nothing short of suspension or expulsion would be an appropriate sanction if a student was found responsible for a violation of the policy. Brais stated that she developed the view that Sexual Misconduct I was a "serious offense" before the panel and that she could not envision a situation where anything less than those two would be appropriate. The fact that one could not envision a situation does not mean that there would not be such a situation. She could not think of one was all she was saying. (Bleiler App.; Brais Dep. 66:18-23.) This fact is not relevant for purposes of summary judgment.

42. Despite his extensive *ex parte* contact with both witnesses, receipt of information outside the proceedings themselves, and potential bias of his own, Mr. Irish was present at all times during the Board's deliberations. (Compl., ¶ 48; Irish Dep. 49-56, 191-194)

> **RESPONSE**: Disputed as a mischaracterization of the testimony. (Bleiler App.; Irish Dep. 49-56, 191-194)

43. He permitted C.M. to make repeated references to her virginity, notwithstanding the fact that prejudicial, "irrelevant sexual history" is explicitly prohibited by the Handbook and the Training Materials. (Compl., ¶ 52; Irish Dep., Ex. 2, 4; Bleiler Dep. 127-128)

> **RESPONSE**: Undisputed that C.M. made references to her virginity during the hearing. Disputed because "he" is ambiguous. If he is meant to apply to the Chair of the Panel, he determines what may be admitted and has discretion in doing so. (Bleiler App.; Irish Dep. 47-48, 104.) Also disputed because C.M.'s virginity was not considered by the

panel in deliberations. (College App.; Kelley Dep. 61-64; Greeley Dep. 131:18-25; Potter Aff. App. Ex. A, tab 4-5.) Further, Bleiler had the opportunity to ask C.M. about her virginity. The students had an opportunity to question each other through the Chairman of the panel, and *only* C.M. took the opportunity to do so. In fact, C.M. asked Bleiler if he knew she was a virgin. (College App.; Hearing Transcript Ex. F 33:16-34:1; 40:7-20.)

44. Mr. Bleiler observed that based on the reactions of the panel members, that such references provoked sympathy toward C.M. and animosity toward him. (Bleiler Aff., ¶ 33)

> **RESPONSE**: Undisputed that Bleiler states this in his affidavit. Disputed that his observations were accurate. (Bleiler App.; Kelley Dep. 62:19-24; 63:1-24; 64:1; College App. Ex. F, Hearing Transcript generally; College App. ; Potter Aff. App. Tab 5; Kelley Dep. 61-64:62:19-24; 63:124; 64:1; Greeley Dep. 131:18-25, Tab 4..)

45. The training materials further caution against crediting speculation or conjecture, yet witness after witness on C.M.'s behalf offered opinions as to her level of intoxication for which they had no basis, but again, no guidance was given to the panel about the types of evidence they should consider. (Kelley Dep. 51-52; Ex. 4 at 26)

> **RESPONSE**: Undisputed that the training materials caution against crediting speculation or conjecture. Disputed that observations and opinions are conjecture or speculation. Disputed as argumentative and conclusory. The materials also instruct panel members to "[e]xamine each piece of evidence in the context of the standard of proof . . . . The facts of the case are those events, circumstances, incidents, or actions you firmly believe to be true in light of the evidence and testimony you have heard." (Bleiler App.; Irish Dep. Ex. 4, at 26.)

46. Similarly, despite the Training Materials' prohibition against drawing an adverse inference from an accused student's invocation of a right to remain silent, Mr. Irish permitted the Public Safety Officer to tell the panel that Mr. Bleiler had initially invoked that right, but failed to offer any guidance or instruction about whether that fact could be appropriately considered under the College's policies and training materials. (Irish Dep. 126, Ex. 4 at 19)

> **RESPONSE**: Undisputed that the Public Safety Officer told the panel that Bleiler had initially invoked his right to remain silent. Dispute suggestion as argumentative and conclusory that panel members drew an adverse inference based on this information. Moreover, there was no prejudice because Bleiler made an opening statement, testified, asked questions, and made a closing statement at the hearing. (College App.; Hearing Transcript Ex. F 7:6-11:14, 120:11-122:2, *passim*.)

47. In deposition, Mr. Irish initially stated that his role as administrator is to ensure that the procedures the College has set forth are followed, and that during hearing he is the "procedural person." (Irish Dep. 47-48)

> **RESPONSE**: Undisputed that Irish testified that his role is as an "administrator, to ensure the procedures we've set forth are followed. I serve as a resource for the students

that are either a student complainant or a charged student respondent. I schedule hearings; make sure that all the information is distributed; that the information is available for all the parties to review; to serve as a resource. . . . I am the procedural person." (Bleiler App.; Irish Dep. 47-48.)

48. Later, however, Irish stated that it was not his job to be "gatekeeper" in terms of what constitutes appropriate, relevant evidence and that this job is that of the chair of the hearing board, Professor Kelley. (Irish Dep. 104)

> **RESPONSE**: Undisputed that Irish stated that it was not his job to be "gatekeeper" and that this job is that of the chair of the hearing board, Professor Kelley. Disputed to the extent that Bleiler suggests this testimony is inconsistent with the testimony above. The testimony speaks for itself. (Bleiler App.; Irish Dep. 47-48, 104.)

49. Notwithstanding this statement, Mr. Irish never communicated to the Chair that it was his job, and not Irish's, to make sure that only relevant and appropriate information was introduced. (Irish Dep. 136-137; Kelley Dep. 30-31)

> **RESPONSE**: Disputed as a mischaracterization of the facts. Irish testified that he recalled having a conversation with Kelley about his responsibilities as Chair, but he did not recall the contents of that conversation. (Bleiler App.; Irish Dep. 36:17-37:8.)

50. Kelley in fact stated that he did not think it was his duty to intervene and stop testimony, nor did he think it his duty to instruct the panel in deliberations to disregard such testimony, that no one ever identified it among his responsibilities as chair, and that in fact he did not act in that capacity as Chair. (Kelley Dep. 34-36, 60-62, 68)

> **RESPONSE**: Disputed as a mischaracterization of the facts. Kelley in fact testified that it was his **responsibility** to "make sure that the evidence that is entered is relevant to the case, but I didn't think it necessarily my duty to make people stop talking when they were talking . . . unless what they're talking about is just grossly irrelevant to the case." (Bleiler App.; Kelley Dep. 34:9-16.)

51. Accordingly, despite the limitations on evidence set forth in the College's materials, as a practical matter there was nobody involved in this process who believed it was their duty to enforce those limitations. (Irish Dep. 128)

> **RESPONSE**: Disputed as an impermissible conclusion drawn from unsupportive facts,

52. In his prior position at Northeastern University, Mr. Irish apparently viewed his role differently, when he essentially declared a mistrial in a student proceeding because a fact witness had offered her opinion that ***no*** rape had taken place. (Irish Dep. 105, Ex. 5).

> **RESPONSE**: Irish's prior employment history is not material for purposes of summary judgment.

53. In contrast, during Mr. Bleiler's hearing, though the only witness with the training and expertise to opine on C.M.'s level of intoxication specifically stated that she was "intoxicated, but not incapacitated," Mr. Irish permitted all of C.M.'s friends to offer the opinion that she had been incapable of giving effective consent. (Bleiler Aff., ¶ 37; Kelley Dep. 51-52)

> **RESPONSE**:  Disputed as argumentative and not a statement of fact.  There is no particular training or expertise required to observe that another person appears drunk and incapacitated.  Testimony is received in the discretion of the Board Chair.  Mr. Irish was not the Board Chair.  Moreover, it is clear from the hearing transcript that the observations of the witnesses and police were made hours apart.  (College App.; Hearing Transcript Ex. F 42:7-14; 66:1-67:4; 75:23-76:24; 78:11-79:15; 80:20-81:13; 92:19-95:7.)

54. Further, Mr. Bleiler timely submitted an affidavit of his roommate describing his observations of C.M. after she left Mr. Bleiler's room (after the sexual encounter), in which he saw her walk into his room by mistake in good spirits and laughing, go to the bathroom, and leave the apartment. (Bleiler Aff., ¶¶ 40-41;)

> **RESPONSE**: Undisputed that Bleiler's roommate's affidavit contained this description.  Undisputed that Mr. Bleiler submitted an affidavit from his roommate.

55. At the hearing, the Chair of the panel made reference to this statement, but it did not appear that the other panel members had a copy of the statement. (Bleiler Aff., ¶ 42)

> **RESPONSE**: Disputed as an impermissible conclusion drawn from unsupportive facts.  The hearing transcript speaks for itself:
>
> > **MR. BLEILER**: I just wanted to say that the only witness that I had couldn't be available today and just to inform the Board again that he submitted a written statement.
> > **CHAIRMAN**: Okay.  And this was Brendan--
> > **FEMALE PANEL MEMBER**: McCree or something?
> > **CHAIRMAN**: --McCree?
> > **MR. BLEILER**: McCree, yup.
> > **CHAIRMAN**: Yea, okay.
> > **MR. IRISH**: They got that.
> > **CHAIRMAN**: And we have--we had--
> > **MR. BLEILER**: No, I just wanted to make sure.
> > **CHAIRMAN**: Right, yeah, we do have his statement and we have read his statement.
>
> (College App.; Hearing Transcript Ex. F 21:5-15; 102:20-103:12.)

56. During the course of this litigation, the College has produced documents purporting to reflect the materials given to the panel, which do ***not*** include this statement, suggesting that it may not, in fact, have been provided to the panel as required by the College's procedures. (Affidavit of Plaintiff's counsel, Emily Smith-Lee, ¶ 3)

13

**RESPONSE**: Whether or not the College has produced the statement is not material for purposes of summary judgment because Bleiler had the statement. Further, and more importantly, the panel had the statement as indicated by the testimony above. (College App.; Hearing Transcript Ex. F 102:20-103:12.)

57. As evidence that these acts and omissions were prejudicial to Mr. Bleiler, the Chair of the panel explained its findings by stating that they "could not ***rule out the possibility*** that C.M. was passed out on the bed and raped forcibly," notwithstanding the absence of any evidence in the hearing of forcible or coercive activity. (Kelley Dep, 147-149)

**RESPONSE**: Disputed. There was evidence of force. (College App.; Bleiler Dep. Ex. 5, 6, 7; Potter Aff. App. Ex. A, tab 1). Sexual Misconduct I, Effective Consent, and Penetration are all defined terms. This testimony is not relevant for purposes of summary judgment because the question before the panel was not rape but effective consent. (Bleiler App.; Irish Dep. Ex. 2 at 37, 56-57.)

Respectfully submitted,

THE COLLEGE OF THE HOLY CROSS

By its attorneys,

/s/ Harold W. Potter, Jr., Esq.
Harold W. Potter, Jr. (BBO # 404240)
harold.potter@hklaw.com
Amanda Orcutt Amendola (BBO # 684504)
amanda.orcutt@hklaw.com
Holland & Knight LLP
10 St. James Avenue
Boston, MA  02116-3889
(617) 523-2700

<u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the date specified below.

/s/ Harold W. Potter, Jr.
Harold W. Potter, Jr.

Dated:  February 25, 2012