_____

|  |  |  |
|---|---|---|
| EDWIN BLEILER, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-11541-DJC |
| | ) | |
| COLLEGE OF THE HOLY CROSS, | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

### MEMORANDUM AND ORDER

**CASPER, J.**                                                      **August 26, 2013**

## I.      Introduction

Plaintiff Edwin Bleiler ("Bleiler") has sued Defendant College of the Holy Cross ("Holy Cross" or the "College") regarding Holy Cross's expulsion of Bleiler in May 2011. Bleiler alleges violations of Title IX of the Educational Amendment of 1972 ("Title IX"), 20 U.S.C § 1681 ("Count I") as well as claims for breach of contract ("Count II"), breach of the implied covenant of good faith and fair dealing ("Count III") and unjust enrichment ("Count IV"). Holy Cross now moves for summary judgment on all claims. D. 17. For the reasons stated below, the Court GRANTS the College's motion for summary judgment on all counts.

## II.     Factual and Procedural Background

The following facts are undisputed except where noted. Bleiler was a student at Holy Cross, a private non-profit college, from the Fall of 2007 until the Spring of 2011. Pl. Resp. to Def. Stmt. of Facts, D. 24 ¶¶ 1-2. Holy Cross receives federal funding under Title IX, 20 U.S.C.

§§ 1681-1688.  D. 24 ¶ 4.  In May 2011, a female student, C.M.,[1] made a complaint against Bleiler to the Holy Cross Public Safety Department.  D. 24 ¶ 9.  C.M. alleged that Bleiler sexually assaulted her in the early hours of May 1, 2011 while she was intoxicated and unable to give effective consent.  D. 24 ¶¶ 16-17; Def. Resp. to Pl. Stmt. of Facts, D. 33 ¶ 15.  On May 9, 2011, a Public Safety officer contacted Bleiler and informed him of the charges.  D. 24 ¶ 27.  Bleiler read and signed his Miranda rights at that time.  D. 24 ¶ 27.  Bleiler maintained that "C.M. willingly engaged in sexual relations with him on the night of the incident."  D. 24 ¶ 20.

On May 9, 2011, the Public Safety Department referred the complaint to Paul Irish ("Irish"), the Holy Cross Director of Student Conduct and Community Standards and Assistant to the Vice President for Student Affairs.  D. 24 ¶¶ 31-32.  That day, Irish sent Bleiler a letter saying that there had been a complaint against him regarding a sexual assault.  Irish's letter stated that there would be an investigation and that Bleiler would be placed on interim suspension pending a disciplinary decision made in accordance with Holy Cross's Community Standards and Disciplinary Procedures of Students ("Disciplinary Procedures") contained in the Holy Cross Student Handbook ("Handbook").  D. 24 ¶¶ 35-36; D. 19 Exh. 1 at 78-91 (excerpts from Handbook).  The following day, May 10, 2011, Irish notified Bleiler in writing that he had been accused of "Sexual Misconduct I in violation of the College's Community Standards" and identified the name of the complainant, the date and location of the alleged incident and instructed Bleiler to attend a pre-hearing meeting.  D. 24 ¶ 38.  Bleiler attended the pre-hearing meeting with Irish on May 10, 2011 and signed a "pre-hearing checklist" produced by the College's Office of Student Conduct and Community Standards.  D. 24 ¶¶ 55-56.  The pre-hearing checklist indicated, in pertinent part, that Bleiler had "received a written notification of

---

[1] The parties' briefing identifies this individual only by her initials.

the complaint," "under[stood] the violation of the Community Standards that [he was] alleged to have committed," was "aware of the identity of the complainant," "under[stood] that [he] may have an advisor present," and was notified that "sanctions of expulsion may be appealed to the College President." Id.

On May 11, 2011, Irish informed Bleiler of the individuals who had been selected as members of the hearing panel ("Hearing Panel" or "Panelists"), including the names of one male and one female student panelist, and asked Bleiler to respond within 24 hours if he had any conflicts. D. 24 ¶ 73. Irish subsequently asked the Panelists to inform him if they had conflicts with either C.M. or Bleiler. D. 24 ¶ 74. The female student panelist informed Irish that she had been a Head Resident Advisor in the dormitory where C.M. resided. D. 24 ¶ 75. Irish responded that this relationship would not create a conflict "as long as [she] didn't have any issues that would put [her] fairness in question." D. 24 ¶ 75 (internal quotation marks omitted). The female student responded that she had no issues with C.M. D. 24 ¶ 75. Additionally, C.M. informed Irish that the male student panelist was a Resident Advisor in her building and that she had a class with him. D. 24 ¶ 78. Irish responded that these reasons alone would not exclude the male student panelist but that Irish would follow up with the male student. Id. In following up, the male student panelist stated that he did not have conflicts with either C.M. or Bleiler. D. 24 ¶¶ 78, 84. On May 13, 2011, Bleiler advised Irish that Bleiler and the male student panelist had mutual friends and that this fact potentially created a conflict. D. 24 ¶ 85. Bleiler did not have any problems personally with the male student panelist and did not know him personally. D. 24 ¶¶ 87-88. Irish informed Bleiler that "he had talked to both students, and they said that they did not" have a conflict. D. 24 ¶ 94. All the Panelists received training on the College's sexual misconduct policies prior to serving on the Hearing Panel. D. 24 ¶¶ 95-99; D. 26 Exh. 2 at 24-60

(copy of "CSB Training – Sexual Misconduct" materials, hereinafter "Training Materials"). Prior to the hearing, Bleiler had "two to three" meetings with an advisor, Professor Cahill. D. 24 ¶ 100.

Bleiler's hearing was held on May 18, 2011. D. 24 ¶ 101. At the hearing "both Bleiler and C.M. made opening statements, were permitted to ask questions of the Board and of each other, were permitted to call witnesses and gave closing statements. Bleiler was permitted to question each witness." D. 24 ¶ 105. The hearing was recorded, but the Panelists' deliberations were not. D. 24 ¶ 109. During deliberations, the panel members considered the complaint, witness statements and hearing testimony. D. 24 ¶ 111. Irish was present during the deliberations to answer administrative questions, but did not participate in the Hearing Panel's decision-making.[2] D. 24 ¶ 112. That same day, the panel unanimously decided that Bleiler was responsible and recommended that he be dismissed from the College. D. 24 ¶¶ 116-17. Irish informed Bleiler in person of the Hearing Panel's decision. D. 24 ¶ 118. On May 19, 2011, Bleiler was informed in writing of the Panel's findings and advised that he could file an appeal to the president of the College, Rev. Michael C. McFarland ("McFarland") by May 24, 2011. D. 24 ¶ 119. On May 24, 2011, Bleiler filed his appeal, arguing that the hearing was fundamentally unfair and that the College had violated its disciplinary procedures. D. 24 ¶ 122. On May 26, 2011, McFarland responded to Bleiler's appeal and adopted the panel's recommendation that Bleiler be dismissed from the College. D. 24 ¶ 123.

Bleiler filed this action against Holy Cross in Middlesex Superior Court on July 28, 2011. D. 1 Exh. 1 at 2. On September 1, 2011, Holy Cross removed the matter to federal court. D. 1.

---

[2] Bleiler argues that Irish did participate in deliberations, D. 24 ¶¶ 70-71, but points to no evidence in the record that he did so.

The College has moved for summary judgment and the Court held a hearing on this motion on May 23, 2013, after which the Court took this matter under advisement. D. 34, 36.

## III.    Standard of Review

The Court grants a moving party's motion for summary judgment when there is no genuine dispute of material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A dispute is genuine if "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party," Vélez–Rivera v. Agosto–Alicea, 437 F.3d 145, 150 (1st Cir. 2006) (quoting United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992)) (internal quotation marks omitted), and a fact is material if it is "one that might affect the outcome of the suit under the governing law." Id. (quoting Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 748 (1st Cir. 1994)) (internal quotation marks omitted).  "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In doing so, the Court "must scrutinize the record in the light most favorable to the summary judgment [opponent] and draw all reasonable inferences . . . to that party's behoof." Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005).  However, the Court affords no weight to "conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001).

## IV.    Discussion

### A.    Holy Cross is Entitled to Summary Judgment that It Did Not Violate Title IX (Count I)

Count I of Bleiler's complaint alleges that the College violated Title IX, 20 U.S.C. §§ 1681 et seq.  Title IX guarantees that "[n]o person in the United States shall on the basis of sex,

be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Under regulations promulgated by the Department of Education ("Department") a school subject to Title IX is required to "adopt and publish grievance procedures providing for prompt and equitable resolution of student . . . complaints alleging any [prohibited] action." 34 C.F.R. § 106.8.

The Department has published guidance explaining the "prompt and equitable resolution" requirement. See D. 19 Exh. 1 at 145 ("Dear Colleague Letter"). Under these guidelines, schools should provide notice to students of the procedures, conduct an "adequate, reliable, and impartial investigation of complaints," provide "the opportunity for both parties to present witnesses and other evidence," and provide prompt notice of the final outcome. Id. at 9. According to the guidance, "a school's investigation and hearing processes cannot be equitable unless they are impartial[,] [t]herefore, any real or perceived conflict of interest between the fact-finder or decision-maker and the parties should be disclosed." Id. at 12. Every person involved in implementing the procedures and deciding a complaint in a sexual violence case "should have adequate training or knowledge regarding sexual violence." Id. In addition, the guidance recommends that, to comply with Title IX, schools should use a preponderance of evidence standard in resolving complaints and should provide an appeals process. Id. at 10-12.

Bleiler argues that Holy Cross's disciplinary policy relating to alleged sexual assault and the implementation of that policy as applied to him violate Title IX. Pl. Opp., D. 27 at 11, 18. In his complaint, Bleiler alleges that the "College's disciplinary policies, as written and as implemented in [Bleiler]'s case, are not equitable and do not accord due process to the accused." D. 1 Exh. 1 ¶ 67. Bleiler also alleges that the "disciplinary process" and "sexual misconduct

policy at issue" imposes an "unequal burden on male and female students" and "discriminates against male students accused of sexual misconduct." D. 1 Exh. 1 ¶¶ 68-69. In his opposition to the College's motion for summary judgment, Bleiler clarifies his position that: (1) the College's "policy . . . on its face creates a form of strict liability for male students that does not exist for female students"; (2) there were "departures from the stated policies and procedures of the College that influenced the outcome of the hearing"; (3) the disciplinary policy in his case was enforced "by an administrator with a clear bias"; and (4) the disciplinary panel was "influenced by biased training materials" and was biased for other reasons. D. 27 at 1, 6-8.

### 1. Nature of Bleiler's Title IX Claim

First, Bleiler alleges that the College violated the Department's guidance about resolving student complaints "alleging any action which would be prohibited by Title IX or its regulations." D. 1 Exh. 1 ¶ 65. Specifically, Bleiler alleges that the College's actions were not "equitable" as required by Title IX regulation and did not "accord due process" to him as required by the Department's guidance. D. 1 Exh. 1 ¶¶ 65-67.[3] This claim focuses upon whether the College was not equitable is reaching its decision to expel Bleiler and thus failed to satisfy Title IX.

_____

[3] The Court assumes without deciding that Bleiler has a private right of action to pursue his Title IX claim insofar as the alleged violations relate to Department guidance. The same case that Bleiler cites as providing the applicable framework for evaluating his claims, see D. 27 at 11, also cites a Supreme Court decision to support a holding that the "University's alleged failure to comply with Title IX regulations promulgated by the United States Department of Education, does not confer a private right of action." Doe v. Univ. of the South, 687 F. Supp. 2d 744, 758 (E.D. Tenn. 2009) (citing Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 291-292 (1998) (considering a failure to promulgate an effective policy under 34 C.F.R. § 106.8(b), i.e., the same regulation that Bleiler relies upon here, and holding that "[a]gencies generally have authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate even if those requirements do not purport to represent a definition of discrimination under the statute. We have never held, however, that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements") (internal citations omitted)).

Second, Bleiler further alleges that he was discriminated against and denied the educational benefits of the College "on the basis of sex" in violation of Title IX. 20 U.S.C. § 1681(a). See D. 1 Exh. 1 ¶¶ 68-70 (stating that "Bleiler has been denied the benefits of the College's educational program in violation of Title IX" where the College's "disciplinary process . . . discriminates against male students" and "imposes an unequal burden on male and female students for the same behavior").

a)      "Equitable Resolution" Claim

To evaluate whether there is a genuine dispute of material fact as to Bleiler's equitable resolution and due process claims, the first question is to determine what process was due. Since there is no dispute that Holy Cross is a private school, D. 24 ¶ 2, the federal Constitution does not establish the level of due process that the College had to give Bleiler in his disciplinary hearing. See, e.g., Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 51 (1st Cir. 2000) (observing that "a private university is not directly governed by the due process requirements of the Fifth and Fourteenth Amendments"); Fine Mortuary College, LLC v. Am. Bd. of Funeral Serv. Educ., Inc., 473 F. Supp. 2d 153, 157 (D. Mass. 2006) (granting summary judgment to defendant on constitutional due process claim where defendant "is not a 'state actor'"); Schaer v. Brandeis Univ., 432 Mass. 474, 481 (2000) (holding that "[a] university is not required to adhere to the standards of due process guaranteed to criminal defendants" in disciplinary actions against its students); Coveney v. President & Trustees of the Coll. of the Holy Cross, 388 Mass. 16, 21 (1983) (collecting cases and stating that "[i]t is clear that because the college is a private institution, [the student] had no constitutional right to a hearing [or] to have an attorney present").

That said, "[a] private university, college, or school may not arbitrarily or capriciously dismiss a student." Coveney, 388 Mass. at 19 (collecting cases). The Department's published guidance does not have independent force of law but informs this Court's evaluation of whether the College's procedures were "equitable." For Bleiler to defeat the College's motion for summary judgment on equitable resolution and due process grounds, he must at least show a genuine dispute of material fact about whether the College's policies were in compliance with the Department's guidance, whether the College was in compliance with its own policies or whether the College acted arbitrarily or capriciously in dismissing Bleiler.

b)      Sex-Based Claim

It appears that the appropriate standard of how to analyze Bleiler's sex-based Title IX allegations as to his disciplinary proceedings has not been squarely addressed by the First Circuit, but as explained below, it is a question that this Court need not resolve.

In the Second Circuit, Title IX claims against universities arising from disciplinary hearings are evaluated under an "erroneous outcome" or "selective enforcement" standard. Yusuf v. Vassar College, 35 F.3d 709, 715-16 (2d Cir. 1994). Both of these standards require a plaintiff to demonstrate that the conduct of the university in question was motivated by a sexual bias. Id.; see also Murray v. N.Y. Univ. College of Dentistry, 57 F.3d 243, 251 (2d Cir. 1995) (requiring a "causal connection between the flawed outcome and gender bias" and "particular circumstances" supporting an inference of gender bias, such as "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender").

The Sixth Circuit faced a similar challenge brought by a disciplined student who asked that court should adopt the Yusuf framework and consider two other standards to his claims—

"deliberate indifference" and "archaic assumptions." Mallory v. Ohio Univ., 76 Fed. Appx. 634, 638-39 (6th Cir. 2003). The Sixth Circuit found no need to do so, where "assuming arguendo that these standards apply," the court affirmed a grant of summary judgment for the defendant university where there was no genuine dispute of material fact whether the university's actions were motivated by the disciplined student's sex. Id. at 639. At least one district court in the Sixth Circuit has since applied all four standards as the applicable law. Doe, 687 F. Supp. 2d at 756 (stating that "Title IX Claims against universities arising from disciplinary hearings are analyzed under the erroneous outcome standard, selective enforcement standard, deliberate indifference standard, and archaic assumptions standard").

Without labeling his claims as such, Bleiler's position is that his Title IX claim against the College should survive when evaluated under the erroneous outcome and archaic assumptions standards. D. 27 at 11 (reciting the definitions of these two standards as found in Doe). Under the "erroneous outcome" standard, the question is whether the College's actions are "motivated by sexual bias" or if the "disciplinary hearing process constitutes a 'pattern of decision-making' whereby the [College's] disciplinary procedures governing sexual assault claims is 'discriminatorily applied or motivated by a chauvinistic view of the sexes.'" Doe, 687 F. Supp. 2d at 756 (citing Mallory, 76 Fed. Appx. at 640; Yusuf, 35 F. 3d at 715). "The 'archaic assumptions' standard, which has been applied where plaintiffs seek equal athletic opportunities, finds discriminatory intent in actions resulting from classifications based upon archaic assumptions" about gender. Mallory, 76 Fed. Appx. at 638-39.[4]

---

[4] Under the selective enforcement standard, the evaluation is whether a person of the opposite gender "in circumstances sufficiently similar to [this student] was treated more favorably by the [College]." Doe, 687 F. Supp. 2d at 756 (citing Mallory, 76 Fed. Appx. at 641). Bleiler does not argue that this is the case, and the College has received no complaints by male students against female students for Sexual Misconduct I. D. 24 ¶ 31. Under the deliberate

The College also raises "disparate impact" as an appropriate consideration where Bleiler alleges discrimination against male students but where the College maintains that its policies are gender-neutral.  D. 24.  Gender-based disparity may indicate the existence of sex discrimination. Franchi v. New Hampton Sch., 656 F. Supp. 2d 252, 261 (D.N.H. 2009).  "Title IX, like other anti-discrimination schemes, permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination."  Id. (quoting Cohen v. Brown Univ., 101 F.3d 155, 171 (1st Cir. 1996).  Such "disparate impact" claims involve "'practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified' on a neutral basis."  Id. (quoting Prescott v. Higgins, 538 F.3d 32, 41 (1st Cir. 2008)).

This Court need not decide which is the appropriate standard to use to evaluate a sex-based Title IX claim brought by a student against a university arising from a disciplinary hearing. Since under either of the standards invoked by Bleiler, he has failed to show a genuine dispute of material fact as to the presence of impermissible bias based upon sex.  That is, Bleiler does not cite "competent evidence" and "specific facts" such that a reasonable jury could resolve his sex-based Title IX claim in his favor.  See Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1995)).  Furthermore, to the extent that Bleiler raises a disparate impact sex-based Title IX claim that could be considered separately from the above considerations, see D. 27 at 4 (stating that the College's policy "has only been enforced against male students at the College"

---

indifference standard, the question is whether "an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct."  Doe, 687 F. Supp. 2d at 757 (citing Mallory, 76 Fed. Appx. at 638); Gebser, 524 U.S. at 290-91.  Bleiler also does not argue that this standard should apply in this case.

(emphasis in original)), on the undisputed facts the College is entitled to judgment as a matter of law.

        2.     *There is No Genuine Dispute of Material Fact as to Whether the College's Code of Conduct Is Facially Biased Against Men*

Holy Cross' Handbook sets out a Code of Student Conduct ("Code of Conduct"), D. 24 ¶ 46-47; D. 19 Exh. 1 at 83 (relevant excerpts from Handbook), that Bleiler alleges is biased against men. D. 27 at 12-13. The Handbook's Code of Conduct lists violations of community standards that are "expressly prohibited" and defines "Sexual Misconduct I" as:

> Any sexual penetration (anal, oral or vaginal), however slight, with any object or sexual intercourse by a man or woman upon a man or woman without effective consent. Sexual penetration includes vaginal or anal penetration by a penis, object, tongue or finger and oral copulation by mouth to genital contact or genital to mouth contact.

D. 19 Exh. 1 at 81, 83; D. 24 ¶ 40. Effective Consent is defined as "[i]nformed, freely and actively given mutually understandable words or actions which indicate a willingness to participate in mutually agreed upon sexual activity." D. 24 ¶ 41; D. 19 Exh. 1 at 83. The Handbook also states that "[c]onsent may never be given by . . . those who are incapacitated as a result of alcohol or other drug consumption (voluntary or involuntary) or those who are unconscious, unaware or otherwise physically helpless." D. 24 ¶ 41; D. 19 Exh. 1 at 83. Further, the Code of Conduct states:

> In the absence of mutually understandable words or actions, it is the responsibility of the initiator, or the person who wants to engage in the specific sexual activity to make sure that he/she has the consent from his/her partner(s). Consent to some form of sexual activity does not necessarily consent to other forms of sexual activity. Mutually understandable consent must be obtained by the initiator at every stage of sexual interaction. Consent is mutually understandable when a reasonable person would consider the words and/or actions of the parties to have expressed a mutually understandable agreement between them to do the same thing, in the same way, at the same time, with one another.

D. 24 ¶ 42.  The Handbook also makes it clear that (1) an individual is not required physically to resist an aggressor, (2) silence, or a previous or current sexual relationship does not imply consent, (3) intentional alcohol or drug use does not excuse a violation of the sexual misconduct policy, and (4) consent may be withdrawn at any time if clearly communicated, or can expire depending on the circumstances.  D. 24 ¶ 44.  Regarding incapacitation, the Handbooks states:

> A person who knows or reasonably should have knows that another person is incapacitated may not engage in sexual activity with that person.  Incapacitation means being in a state where a person lacks the capacity to appreciate the fact that the situation is sexual, or cannot appreciate (rationally and reasonably) the nature and/or extent of the situation.

D. 24 ¶ 43.  The Handbook also distinguishes incapacitation from impairment related to alcohol as follows:  "incapacity results from a level of alcohol ingestion that is more severe than impairment, being under the influence, drunkenness or intoxication.  It is less severe than alcohol poisoning or overdose, which may lead to coma or death."  D. 19 Exh. 1 at 89.  The Handbook lists factors for detecting incapacity and says that "[a] person's state of incapacity is a subjective determination that will be made after the incident in light of all facts available because people reach incapacitation at different points and as a result of different stimuli [and] exhibit incapacity in different ways."  D. 23-24 at 9, ¶¶ 44-45.  Finally, the Handbook states that "[i]ndications of consent are irrelevant if the initiator knows or should reasonably have known of the incapacity of another person."  D. 19 Exh. 1 at 89.

Bleiler argues that this Code of Conduct "creates a form of strict liability for male students that does not exist for female students."  D. 27 at 1.  To support this proposition, Bleiler argues that the policy has a "penetration-based rubric" where the person who "penetrates" is the initiator/respondent.  D. 27 at 3-4, 12-13.  Bleiler also cites as support the policy's provisions that

consent may never be given by those who are incapacitated as a result of alcohol consumption. D. 27 at 4.

This Court finds that no reasonable jury could find that the Code of Conduct is biased as Bleiler alleges. The policy is clear that a person, regardless of gender, who penetrates in any way another person's anus, mouth, or vagina without effective consent is engaging in Sexual Misconduct I.[5] The initiator and recipient of the penetration can be either men, women or some combination of same. Here there is no evidence supporting Bleiler's contention that the Code of Conduct is embedded with a gender preference and thus there is no triable issue arising from the Code of Conduct.

Nor is there any triable issue regarding any alleged disparate impact arising from past applications of the Code of Conduct. Holy Cross has charged six male students with Sexual Misconduct I under the College's Disciplinary Policy. D. 24 ¶ 28; D. 33 ¶ 14. After hearings in each of the cases, four of the six accused students were found responsible and two were not. D. 24 ¶ 29. Of the four students found responsible, three students were expelled and one student was suspended for a year. D. 24 ¶ 29. Holy Cross has received no complaints by male students against female students for Sexual Misconduct I under the disciplinary policy. D. 24 ¶ 30 and Bleiler points to no evidence in the record to support his contention that "once the mere allegation [of sexual misconduct] was made, the result was a foregone conclusion, notwithstanding the College's promises of a 'fair' disciplinary process," D. 27 at 1, particularly against the undisputed evidence in the record that, after disciplinary proceedings, two of six

_____

[5] Bleiler also argues that other forms of sexual misconduct could not be a violation of the sexual misconduct policy, D. 27 at 4, but this is not correct. The Handbook also defines other forms of sexual misconduct, including Sexual Misconduct II, which is "[a]ny intentional sexual touching, however slight, with any object by a man or woman upon a man or woman without effective consent," Sexual Exploitation and Sexual Harassment. D. 19 Exh. 1 at 83.

accused male students were found not responsible, and one male student was found responsible but was not expelled.

<blockquote>
3.      *There is No Genuine Dispute of Material Fact that the College Had Sufficient Disciplinary Procedures Under Title IX and that The College Applied Its Disciplinary Procedures Equitably and Accorded Bleiler All Process He Was Due*

     a)      <u>Disciplinary Procedures</u>
</blockquote>

The Disciplinary Procedures set out in the Student Handbook provide that:

> Students have the right to be informed of any charges of misconduct, the right to adequate time to prepare a response to the charges, the right to hear information in support of the charges, the right to present evidence against the charges, and the right to a fair process which is appropriate to the circumstances.

D. 24 ¶ 47; D. 19 Exh. 1 at 79-80. The Director of Student Conduct and Community Standards ("Director") administers all nonacademic discipline. D. 24 ¶ 50. The Director "may meet with the Panel for consultation regarding procedural elements at any time prior to or during the hearing or deliberations." D. 24 ¶ 69.

Holy Cross's Disciplinary Proceedings include notice provisions, as follows: following the submission of a written complaint to the Office of Student Conduct and Community Standards, the Director will review and complaint and determine "if disciplinary charges will be initiated, what specific violations a student will be charged with, and the appropriate venue for adjudication." D. 24 ¶ 51. A student accused of a violation will receive written notification. D. 24 ¶ 52. If the accused student faces possible suspension or dismissal the accused student must attend a meeting with a coordinator, usually the Director. D. 24 ¶¶ 53-54. At this meeting the accused reviews the information and must "choose to accept the charges, or to refute the charges, in which case a hearing [("Hearing")] will be scheduled, normally no less than seven days from the . . . meeting." D. 24 ¶ 54.

The Hearing Panel ("Panel") is comprised of a subset of members of the Community Standards Board ("Board"). The Board includes six school administrators and staff, six faculty members and nine students. D. 24 ¶ 58. From these members, the Director selects five persons to serve on the Panel: two students, one faculty member, one staff member and a fifth person who is either a faculty or staff member. D. 24 ¶ 62. The complaining student and the accused student are given the names of the selected panel members no less than seventy-two hours before the hearing date and may present any potential conflicts with the panel members to the Director up to forty-eight hours before the hearing. D. 24 ¶ 65. Panel members are also requested to notify the Director or disqualify themselves from the panel if they have a potential conflict with one of the student parties. D. 24 ¶ 68. According to the Handbook, "[i]f the Director deems that there is information to suggest a potential conflict, another board member will be substituted." D. 33 ¶ 7. As discussed in more detail below, Holy Cross provides training materials to all panel members participating in sexual misconduct hearings. D. 33 ¶ 17; D. 26 Exh. 2 at 24-60 (copy of the training materials).

Both the complaining and accused students are encouraged to consult with and be accompanied at the hearing by a faculty, staff member or student advisor. D. 19 Exh. 1 at 86. The Director "can provide a charged student with the names of individuals willing to serve as an advisor" and students must inform the Director of the advisor's name and contact information forty-eight hours before the hearing. D. 19 Exh. 1 at 86. The advisor's role is limited and he or she may not speak directly to the Board or speak on behalf of the student. D. 19 Exh. 1 at 86. The Handbook states that "[a]ttorneys may not attend disciplinary hearings or conferences." D. 19 Exh. 1 at 86.

The Handbook warns that in Disciplinary Proceedings, "the rules of evidence found in legal proceedings do not apply, nor shall deviations from proscribed procedures necessarily invalidate a decision, unless 'significant prejudice' to a student respondent or to the College may result." D. 24 ¶ 49. In its "Statement of Rights," the Handbook states that "normally the College assures all students the [right] . . . [t]o not have irrelevant prior sexual history admitted in a Community Standards Board hearing." D. 19 Exh. 1 at 90-91. The standard of proof required to find a student responsible and recommend sanctions is "'more likely than not' or 'more than 50%.'" D. 24 ¶ 103. In addition, "[f]inal recommendations shall reflect the majority opinion of the hearing panel." D. 19 Exh. 1 at 87.

The Handbook provides that at the hearing both parties are given the opportunity to respond to the allegations. D. 24 ¶ 104. Both parties are then questioned by the Panel, allowed to present witnesses, allowed to present questions for the other party, and allowed to make a final statement. Id. The Panel then deliberates and if they find that "it is more likely than not that the accused has violated the Community Standard," they recommend a sanction which is forwarded to the Director and the Vice President for Student Affairs/Dean of Students. Id. Students are informed of the decision within twenty-four hours after the hearing. Id. A student can appeal a Board decision of dismissal to the President of Holy Cross within five days from the date of decision if the student "can demonstrate (1) lack of fairness, (2) a violation of process, or (3) if there is significant new information that has been revealed that may alter the outcome of the matter." D. 24 ¶¶ 120-21. After receiving a letter of appeal, the president may alter the sanction, refer the case to a new panel or impose the sanction immediately. D. 24 ¶ 121.

There is no genuine dispute of material fact that the College's policy is gender-neutral and complies with the Department's regulations and guidance. In particular, there is no dispute

that the College's Disciplinary Procedures: (1) provides notice to students of the procedures; (2) describe an adequate, reliable, and impartial investigation of complaints; (3) provide the opportunity for both parties to present witnesses and other evidence; and (4) provide prompt notice of the final outcome. D. 24 ¶¶ 47-58, 102-05; <u>see</u> Dear Colleague Letter at 9. There is no dispute that the Disciplinary Procedures also provide mechanisms for disclosure of any real or perceived conflict(s) of interest between decision-makers and the parties. D. 24 ¶¶ 65, 68; <u>see</u> Dear Colleague Letter at 9. There is no dispute that the Procedures also follow the Department's guidance that persons hearing a complaint in a sexual assault case have adequate training. D. 24 ¶¶ 64, 95-99; <u>see</u> Dear Colleague Letter at 12. Finally, in conformity with the Department's guidance, there is no dispute that the College uses a preponderance of evidence standard in resolving complaints and provides an appeals process. D. 24 ¶¶ 103, 120-23; <u>see</u> Dear Colleague Letter at 11-12.

b) <u>Alleged Departure from Procedures</u>

Bleiler, however, alleges that the College departed from its procedures where: (1) Irish was present at all times during the Board's deliberations; (2) C.M. was permitted to make references to her virginity in the hearing, notwithstanding that "irrelevant sexual history" is explicitly prohibited by the Handbook and the Training Materials; (3) witnesses on C.M.'s behalf offered opinions as to her level of intoxication for which they had no basis and no guidance was given to the panel about the types of evidence they should consider; (4) a testifying Public Safety Officer stated that Bleiler had initially invoked his right to remain silent and there was no guidance of whether that fact could be appropriately considered under the College's policies and training materials; (5) Irish never communicated to the Chair of the Hearing Panel that it was the Chair's job to make sure that only relevant and appropriate information was introduced and

therefore no one involved in the proceedings enforced those limitations; and (6) the Hearing Panel did not have a copy of a statement of a witness submitted by Bleiler.

To the extent that Bleiler alleges violations in procedures that could be problematic in a court of law, "[a] university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts. 'A college must have broad discretion in determining appropriate sanctions for violations of its policies.'" Schaer, 432 Mass. 474, 482 (2000) (quoting Coveney, 388 Mass. at 20 (1983)). The Handbook here explicitly states, "[r]ules of evidence ordinarily found in legal proceedings shall not be applied, nor shall deviations from prescribed procedures necessarily invalidate a decision, unless significant prejudice to a student respondent or the college may result." D. 19 Exh. 1 at 80. Here, Bleiler cites no "significant prejudice" as to the testimony about virginity, intoxication or Bleiler's right to remain silent, and the evidence in the record regarding these matters suggests otherwise. See, e.g., D. 19 Exh. 1 at 115:131 (panel members' deposition testimony that virginity was not discussed and was not a factor for individual decision makers); id. at 120-21 (same).

Further some of these alleged departures from procedure are not supported by the record. In particular, the College's training materials do instruct panelists as to the role consent and intoxication play in the College's sexual misconduct policies. D. 24 ¶¶ 95-96. The record indicates that the Panel concluded based on witness statements that C.M. was "highly intoxicated, incoherent, and was unaware of her circumstances" and "unable to consent to sexual activity." Id. ¶ 119 (internal citations omitted); see also id. ¶ 25 (discussing witness statement corroborating C.M.'s intoxication). In addition, the College's training materials do instruct panelists as to Bleiler's "right to refuse to answer some questions, and to not have that silence

used against them," D. 26 Exh. 2 at 41, and instruct on relevance at some length, instructing <u>inter</u> <u>alia</u> that "the judicial body must strive to disregard [irrelevant] testimony in its deliberations, and refuse to allow it to color its decision," D. 26 Exh. 2 at 36. There is no prohibition in the College's Disciplinary Procedures (or under Title IX) that would prevent Irish from being present at, but not participating in, the Board's deliberations. The only evidence regarding the role of the Chair of the panel was the deposition testimony of the Chair that his role was in part to "make sure that the evidence that is entered is relevant to the case," D. 33 ¶¶ 49-51 (quoting D. 26 Exh. 4 at 3:34), which is consistent with Department guidance and the College's Disciplinary Proceedings. Moreover, the record reveals that the Panel did have access to the statement of a witness submitted by Bleiler. D. 32 at 12 (quoting D. 19 Exh. 1 at 201:102-03). The Court concludes that, in light of this record, none of Bleiler's contentions create a genuine dispute of material fact regarding whether the College's policies were in compliance with Department guidance, whether College was in compliance with its own policies or that the College acted arbitrarily or capriciously.

c)      <u>Alleged Bias of Director</u>

Bleiler's contention that Irish, the Director of Student Conduct and Community Standards, was biased against him, also does not create a genuine dispute of material fact as to these issues. In support of his argument, Bleiler cites a media interview that Irish gave over a year before the incident between Bleiler and C.M. in which he opined that sexual misconduct was "very unreported" and where he stated that Colleges should be concerned about "[w]hat can we do to make victims [of sexual misconduct] feel comfortable to come forward, to feel supported . . . ." D. 27 at 5. Bleiler further alleges that Irish did more to support the alleged victim, C.M., than he did for him, the accused, in the actions he took to assist each in finding a

faculty advisor. D. 27 at 6. Bleiler also cites as evidence of bias that Irish referred to the matter as a "sexual assault case" and "[a] very serious case" in his e-mails to others prior to Hearing. D. 27 at 6.[6]

The allegation of Irish's views as expressed in the media are not relevant to the issue of whether the Hearing Panel (of which Irish was not an deliberating member) was biased against Bleiler in reaching its decision or whether the College violated its policies, the Department's guidance or whether the College acted arbitrarily or capriciously in dismissing Bleiler. As to the allegation of Irish providing more support to C.M. in finding a faculty advisor, the Handbook provides that "the [Director] can provide a charged student with the names of individuals willing to serve as an advisor," D. 19 Exh. 1 at 86, and Irish did so. See also D. 26 Exh. 2 at 101 (e-mail from Irish stating that "I sent the students, charged and complaining, a list of 10 professors who have advised students in the past, or had been board members in the past"). C.M. sought additional assistance finding an advisor, see e.g., D. 34 Exh. 2 at 2; Bleiler did not. Bleiler alleges that his first choice of advisor, who was a professor of the College who also held a J.D. degree was not permitted to serve as an advisor, D. 33 ¶ 23, but the Handbook provides that "[a]ttorneys may not attend disciplinary hearings or conferences," D. 19 Exh. 1 at 86, and there is no allegation that Irish did not universally apply this rule. As to the allegation that Irish identified the case as "very serious" and involved a claim of sexual assault, there is no genuine dispute of material fact that this statement showed bias on the part of Irish where such description was a characterization of C.M.'s allegations.

---

[6] Bleiler also cites Irish's behavior in a prior position at Northeastern University. D. 27 at 9. Those actions, undertaken under a different school's policies where Irish had a different role, also do not create a genuine dispute of material fact as to Irish's alleged bias against Bleiler and Bleiler's claims under Title IX.

d)        <u>Alleged Bias of Training Materials Used By Panel Members</u>

Bleiler alleges that his panel was biased by the Training Materials provided by the College.  Holy Cross provides the Training Materials to all Panelists participating in sexual misconduct hearings.  D. 33 ¶ 17; D. 26 Exh. 2 at 24-60 (copy of Training Materials).  Bleiler alleges that the Training Materials show bias where they:  (1) direct panel members to engage in questioning that assumes the guilt of the accused; (2) discuss the negative effect of the admission of prior sexual history on the complainant but not on the accused; (3) refer to a reporting complainant as a "victim," as opposed to a "reporter" or a "complainant," thereby assuming the guilt of the accused; (4) list the right not to have irrelevant prior sexual history admitted in a campus hearing among the alleged victim's but not the accused's rights; (5) contain a list of "rape myths" devoted to dispelling myths unfavorable to alleged victims, with no discussion of any "myths" that might be unfavorable to the accused; and (6) contain exercises that all are strongly slanted toward finding that non-consensual sex occurred, without any scenarios that lean toward a finding that consensual sex occurred.  D. 27 at 13.

Bleiler's claim of bias is that the bias is "toward the rights of reporting complainants," which is not the same as alleging bias or discrimination against male students as required for his Title IX claim. Despite Bleiler's characterization of these Training Materials, there is no evidence that the materials directed Panelists to assume the guilt of the accused or that Panelists did so; the discussion of the negative effect of prior sexual history and the admittance of such history was in the context of discussing rape-shield laws; although the materials refer to the reporting complainant as a "complainant" and "alleged victim," such references to the "victim" without any qualifier would not permit a "reasonable jury could resolve the point in favor of the nonmoving party," <u>Vélez–Rivera</u>, 437 F.3d at 150 in the absence of any evidence in the record

regarding the effect of same on the Panelists or their deliberations of Bleiler's case; the section discussing rape "myths" does not show gender bias and included as examples of myths "that a woman or man who has had many sexual partners has somehow by those behaviors lost the ability to consent, as if by waiver" and that "men cannot be raped." D. 26 Exh. 2 at 42. There is no genuine dispute as to whether the materials are biased in favor of a particular gender nor is there evidence to support Bleiler's sex-based Title IX allegations that he was dismissed as a result of the Panel's exposure to such Training Materials.

e)      Alleged Bias of Panel Members

Although Bleiler argues that the two student members of the five-person panel were biased against him, this contention also fails to raise a genuine dispute of material fact as to whether the College's policies were in compliance with Department guidance, whether the College was in compliance with its own policies or that the College acted arbitrarily or capriciously in dismissing Bleiler. Bleiler alleges that the two student panel members had social connections to C.M. that constituted bias but that Irish refused to remove them from the panel. However, consistent with Department guidance and compliance with the College's Disciplinary Procedures, those connections were fully disclosed before the hearing and explored by Irish prior to the hearing after consultation with both parties. The record shows that Irish concluded that both panel members believed that they did not have a conflict of interest and also established the student panel members did not know C.M. well and there was no suggestion in the record that either knew Bleiler. D. 24 ¶¶ 75-94. Moreover, "[i]n the intimate setting of a college or university, prior contact between the participants is likely and does not per se indicate bias or partiality." Gorman v. Univ. of Rhode Island, 837 F.2d 7, 15 (1st Cir. 1988). Bleiler also characterizes the male student growing angry at Bleiler in the hearing and persisting in detailed

questioning of him and the female student's belief that suspension or expulsion would be an appropriate sanction if a student was found responsible for violation of the sexual misconduct policy and her participation as a student Resident Advisor in a "rape play" whose message was that "when friends who were drinking engaged in sexual activity it was considered rape" as further evidence of their bias against him.  D. 27 at 7-8; D. 33 ¶¶ 35-41.  However, a school's disciplinary body "is entitled to a presumption of honesty and integrity absent a showing of actual bias such as animosity, prejudice, or a personal or financial stake in the outcome." Ikpeozu v. Univ. of Nebraska, 775 F.2d 250, 254 (8th Cir. 1985).  That is, "alleged prejudice of university hearing bodies must be based upon more than mere speculation and tenuous inferences."  Buckholz v. Mass. Inst. Of Tech., No. 85-2720, 1993 WL 818618, at *3 (Mass. Super. Ct. July 6, 1993).  Here, the allegation of the bias of these two members of a five-person panel is at best tenuous.  First, the followup questioning of Bleiler by the male student during the hearing concerned the key issue that the Panelists had to determine; namely, whether C.M. had given effective consent.  D. 19 Exh. 1 at 204-05.  Second, the allegations about the female student's participation in a training program or holding the opinion that suspension or expulsion would be warranted if a student were found responsible for sexual misconduct also does not suggest actual bias or predisposition in favor of a particular outcome or a personal stake in a particular outcome in the determination of responsibility or the appropriate sanction, if one was warranted, in Bleiler's case.

For all of the above reasons, the Court concludes that as to his equity and due process claims, Bleiler has not demonstrated a genuine dispute of material fact on whether the College's policies were in compliance with the Department's guidance, or that the College was in compliance with its own policies, or that the College acted arbitrarily or capriciously in

dismissing Bleiler.  Nor has Bleiler shown evidence that Bleiler was disciplined and expelled because of his gender.  Since there is no genuine dispute of material fact, the College is entitled to summary judgment as a matter of law on Count I.

## B.    Holy Cross is Entitled to Summary Judgment as to the State Law Claims

Having granted summary judgment on the only federal claim in this case, the Court must now decide whether to retain jurisdiction over the remaining state law claims.  "[T]he termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction, but, rather, sets the stage for an exercise of the court's informed discretion."  Senra v. Town of Smithfield, 715 F.3d 34, 41 (1st Cir. 2013) (quoting Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256-57 (1st Cir. 1996)).  "In deciding whether to exercise supplemental jurisdiction in such a circumstance, a judge 'must take into account concerns of comity, judicial economy, convenience, fairness, and the like.'"  Senra, 715 F.3d at 41 (quoting Roche, 81 F.3d at 257).

This case has been pending since first filed in the Middlesex Superior Court on July 28, 2011.  D. 1 Exh. 1 at 2.  Given the age of this case and the resolution of the sole federal claim at the summary judgment stage after the completion of discovery, there is little reason to allow the additional cost and delay inherent in a remand of the state law claims to the Superior Court.  This is particularly true where the parties do not dispute the existence of a contract between the parties which lays at the heart of the contract claims, D. 19 at 25 n.9, and many of the considerations the Court has already addressed as to the Title IX claim apply to the state law claims.  For these reasons and after careful consideration about the balance of comity, judicial economy and fairness to the parties (who have had a full opportunity to take discovery on all of the claims and

argue this pending motion as to all of these claims), the Court exercises its discretion and retains jurisdiction over the state law claims which it now addresses.

### 1. *Breach of Contract (Count II)*

Count II alleges that the College breached the terms of a contractual relationship between Bleiler and the College. The terms of this contract were the terms contained in the Student Handbook and other college materials.[7] D. 1 Exh. 1 ¶ 72. Specifically, in his complaint Bleiler alleges that Holy Cross breached the terms of its contract with him by: (1) allowing members with conflicts to serve on the hearing panel; (2) failing to sequester witnesses during the investigatory process; (3) admitting C.M.'s sexual history at the hearing; (4) not allowing Bleiler an opportunity to cross examine two witnesses whose statements were part of the record but who did not testify; (5) not allowing Bleiler to copy the hearing recording; (6) failing to make a record of the hearing panel's deliberations; and (7) allowing Irish to participate in the hearing panel's unrecorded deliberations. D. 1 Exh. 1 ¶¶ 75-76. While Bleiler raised and the Court addressed some of these claims in the context of evaluating his Title IX claim, the Court re-addresses them here where the alleged violations sound in contract law.

When interpreting contracts between students and their academic institutions, under Massachusetts law courts "employ 'the standard of reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give

---

[7] The College does not dispute the existence of such a contract for the purposes of its summary judgment motion and so the Court assumes without deciding that such a contract exists. D. 19 at 25 n.9; cf. Havlik v. Johnson & Wales Univ., 509 F.3d 25, 34 (1st Cir. 2007) (stating based on inferences drawn from Rhode Island law that "[a] student's relationship to his university is based in contract [and] [t]he relevant terms of the contractual relationship . . . typically include language found in the university's student handbook"); but cf. Pacella v. Tufts Univ. Sch. of Dental Med., 66 F. Supp. 2d 234, 240 (D. Mass. 1999) (noting that "[w]hether a student handbook can supply the terms of the contract between a university and its students is unclear under Massachusetts law"); see also Schaer, 432 Mass. at 478 (assuming without deciding that a contract existed between a student and his college).

it.'" <u>Schaer v. Brandeis Univ.</u>, 432 Mass. at 478 (collecting cases). Contract interpretation, including whether any ambiguities exist in the disputed contractual terms, is generally a question of law for the Court. <u>Driscoll v. Bd. of Trs. of Milton Acad.</u>, 70 Mass. App. Ct. 285, 293 (2007).

In the Handbook, Holy Cross states that students have the right to "a fair process which is appropriate under the circumstances." D. 1 Exh. 1 ¶ 13. There has not been a breach of Bleiler's contract with the College, where neither the Handbook nor related documents created obligations that are in conflict with the College's actions or where the College did comply with the reasonable expectations generated by the Handbook and related documents.

First, the Handbook sets forth the policy and rules regarding board members and potential conflicts of interest. D. 1 Exh. 1 ¶ 17. The Handbook states that the accused and accuser are to be provided names of panel members "no fewer than 72 hours before the hearing"; that if either party believes a conflict exists, he or she must present the information to the Director "in writing 48 hours prior to the start of the hearing"; and that "[i]f the Director deems there is information to suggest a potential conflict, another board member will be substituted"; and that the Director's decision regarding conflicts is final. <u>Id.</u>

The College met all of those obligations. Here, Irish provided Bleiler the names of the panel members seven days before the hearing. D. 1 Exh. 1 ¶ 73. Bleiler initially reported no conflicts but then two days after receiving the list, reported to Irish over email that, "I was looking over the potential board members again and I have realized that I have mutual friends with [the male panel member] which was a conflict I had not previously realized." D. 26 Exh. 2 at 104. Irish responded a few minutes later indicated that he had "already released the back-up panel members [and that the male panel member] has indicated that he does not have any personal conflicts with either student and unless there is cause that would jeopardize his ability

to be a fair panelist I intend to use him," inviting Bleiler to call to discuss the matter. D. 26 Exh. 2 at 104. Three days before the hearing Bleiler's privately-retained attorney contacted Irish to indicate that both student panel members were "friends" with C.M. on Facebook.[8] Id. at 107-08. Irish responded the next day that he expected to see Bleiler "today and will discuss what specific cause he may have to ask that these board members are excused [but that] Facebook 'friends' is not an automatic disqualification." D. 26 Exh. 2 at 107. Irish communicated with the panel members who believed that they did not have a conflict of interest and determined that neither of the student panel members knew C.M. well. D. 24 ¶¶ 83-84, 86-89, 94. These actions by Irish on behalf of the College do not breach the reasonable expectations conveyed by the Handbook where the College complied with the procedures laid out in the Handbook for situations involving potential conflicts.

Second, as to sequestration of the witnesses in the investigatory process, the Handbook provides for no such requirement and there is no allegation that rules pertaining to witnesses that are in the Handbook, D. 19 Exh. 1 at 87, were materially violated. Third, although the Handbook does state that "[n]ormally . . . irrelevant prior sexual history" may not be admitted, D. 19 Exh. 1 at 91, it is not clear that C.M.'s statement that "[p]rior to the rape I was a virgin with every intention of saving myself for marriage," D. 19 Exh. 1 at 177:5, was such.[9] Fourth,

---

[8] The record indicates that C.M. had 1,125 "friends" on Facebook. D. 19 Exh. 1 at 70.

[9] C.M. raised the issue again in a question to Bleiler and in her final remarks. D. 19 Exh. 1 at 185:40, 185:119. The Handbook makes no absolute prohibition on these statements, and, in any event, the limited testimony that C.M. was a virgin prior to her encounter with Bleiler cannot readily be said to have been a material breach of contract by the College. See Schaer, 432 Mass. at 482 (noting that "[a] university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts"). The Handbook here explicitly states, "[r]ules of evidence ordinarily found in legal proceedings shall not be applied, nor shall deviations from prescribed procedures necessarily invalidate a decision, unless significant prejudice to a student respondent or the college may result." D. 24 ¶ 49. Here, even assuming the contract was violated by the testimony about virginity, there has been no

the Handbook does not provide that non-appearing witness statements cannot be considered by the panel and Bleiler himself offered testimony in this form from someone who was unable to appear in person. D. 33 ¶ 54. Fifth, the Handbook does not provide for copies of the hearing or recording of deliberations, and in fact provides that "[i]n most occasions, at the completion of the internal appeal process these recordings are destroyed." D. 19 Exh. 1 at 86. Finally, no term of the Handbook prevented Irish from attending but not participating in the panel's deliberation on Bleiler's responsibility.

The Court has further considered additional examples of the College's alleged breach of contract that were not alleged in Bleiler's complaint, but that were raised in his opposition to the Defendants' motion for summary judgment: (1) failing to provide all members of the panel with an exculpatory witness statement submitted by Bleiler; (2) Irish's "uneven" administration of the pre-hearing process "including his active assistance to C.M. in finding an appropriate faculty advisor and active interference with Mr. Bleiler's choice of an advisor"; (3) allowing a Public Safety officer to describe Bleiler's initial invocation of this Miranda rights without informing the panel that this information was not to be considered or used against him; (4) Irish's failure to undertake more than a cursory review of potential biases or conflicts of panel members; (5) and Irish's failure to even disclose known facts that could give rise to an inference of such bias or conflict until after the hearing. D. 27 at 19-20.

The Court finds no basis to find any contractual breach. First, the hearing transcript belies the claim that the panel did not have access to the statement. D. 32 at 12 (quoting D. 19 Exh. 1 at 201:102-03). Second, as discussed above, the Handbook provides that "the [Director]

_____

showing of significant prejudice where multiple panel members in later depositions testified that the issue was not discussed and was not a factor in decision-making. D. 19 Exh. 1 at 115:131; id. at 120-21.

can provide a charged student with the names of individuals willing to serve as an advisor," D. 19 Exh. 1 at 86, and the Court finds no basis that this provision was breached, D. 32 at 13; <u>see also</u> D. 26 Exh. 2 at 101 (email from Irish stating that "I sent the students, charged and complaining, a list of 10 professors who have advised students in the past, or had been board members in the past"). Bleiler also alleges that his first choice of advisor, who was a professor of the College and held a J.D. degree, was not permitted to serve as an advisor but the Handbook provides that "[a]ttorneys may not attend disciplinary hearings or conferences." D. 19 Exh. 1 at 86. As to these allegations and to the remaining three examples listed above (which were discussed above in regard to Count I), the Court finds no basis that the alleged conduct gives rise to a contractual breach. <u>See</u> <u>Schaer</u>, 432 Mass. at 482 (noting the difference between rights accorded in a court proceeding and any contractual rights provided by a student handbook).

The Handbook states that Bleiler has a right to "a fair process which is appropriate under the circumstances," D. 1 Exh. 1 ¶ 13, and under these circumstances the Court finds under the reasonable expectation test that there are no terms (including the general rule that there be a "fair process") that were breached as a matter of contract law. <u>Cf.</u> <u>Havlik</u>, 509 F.3d at 35 (stating that "[t]o the extent the handbook's terms are explicit, it is plain that the University complied with them"); <u>Schaer</u>, 432 Mass. at 479 (evaluating a contract formed by a student handbook, and holding that "[n]othing in this section requires university officials to obtain an interview from the accused student, to seek evidence from the accused student, or to grant the accused student an opportunity to provide witnesses at the investigatory stage in the proceedings. . . . [The student] could not assign to the contract the meaning he now claims it has"). For all of the above reasons, the Court finds that there is no genuine dispute of material fact and that the College is entitled to summary judgment as a matter of law as to Count II.

2.      *Breach of the Implied Covenant of Good Faith and Fair Dealing*
        *(Count III)*

Count III alleges a breach of the implied covenant of good faith and fair dealing.  "The covenant of good faith and fair dealing is implied in every contract."  Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 441 Mass. 376, 385 (2004) (citations omitted). "The purpose of the covenant is to guarantee that 'the parties remain faithful to the intended and agreed expectations of the contract.'" Kuchera v. Parexel Int'l Corp., 719 F. Supp. 2d 121, 125 (D. Mass. 2010) (quoting Eigerman v. Putnam Invs., 450 Mass. 281, 287 (2007) (quoting Uno Rests., 441 Mass. at 376)).  "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance."  Uno Rests., Inc., 441 Mass. at 385.  Accordingly, the "requirement of good faith performance is . . . circumscribed by the obligations in the contract."  Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005).

Here, as discussed above, Bleiler provides no probative evidence that the College has not met the "reasonable expectations" underlying the terms of the Handbook and related documents. Cf. Havlik, 509 F.3d at 36 (affirming summary judgment on a breach of implied covenant claim and stating "[i]n the absence of any probative evidence that the [school] ignored promised protections, improperly consulted certain proof, acted arbitrarily in carrying out the procedures outlined in the handbook, or made [a] decision in bad faith, there has been no showing that the plaintiff's reasonable expectations were thwarted"); Sullivan v. Bos. Arch. Ctr., Inc., 57 Mass. App. Ct. 771, 774 (2003) (holding that a student had not shown a breach of the implied covenant where "[t]he policies and procedures contained well-defined processes for addressing [the student's] grievance [were] made . . . available . . . and applied . . . as articulated" and that the

student "had no 'reasonable expectation' that the [school] would not follow its own procedures developed to resolve such disputes but would instead agree to adopt a different approach that the student preferred"). For these reasons, the Court finds that there is no genuine dispute of material fact and that the College is entitled to summary judgment as a matter of law as to Count III.

### 3. *Unjust Enrichment (Count IV)*

Count IV alleges a claim of unjust enrichment in the case that "this Court finds no remedy at law available to [Bleiler]." D. 1 Exh. 1 ¶ 83. "Unjust enrichment is [the] 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005) (quoting Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co., 534 F. Supp. 340, 347 (D. Mass. 1982)). A claim for unjust enrichment requires three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009) (citing Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 68:5 (4th ed. 2003)). Here, the third element is not present; Bleiler was a student at the College for four years until he was suspended. He paid for and received an education, academic credit, room, board and other services. While this payment surely came with the expectation that in the normal course Bleiler would receive a college diploma, under the disciplinary circumstances presented here, Bleiler is not due a refund on his tuition and fees incurred before disciplinary proceedings commenced. Bradshaw v. Penn. State Univ., No. 10-4839, 2011 WL 1288681, at *2 (E.D. Pa. Apr. 5, 2011) (finding that dismissed

student's unjust enrichment claim fails as a matter of law where student attended classes for which she paid); <u>Zinter v. Univ. of Minn.</u>, 799 N.W.2d 243, 247 (Minn. App. 2011) (affirming trial court's dismissal of complaint for unjust enrichment because university "provided appellant with the instruction for which she paid").

Moreover, a plaintiff is not entitled to recovery on a theory of unjust enrichment where there is a valid contract that defines the obligations of the parties. <u>Bos. Med. Ctr. Corp. v. Sec'y of Exec. Office of Health and Human Servs.</u>, 463 Mass. 447, 467 (2012) (citing <u>York v. Zurich Scudder Invs., Inc.</u>, 66 Mass. App. Ct. 610, 620 (2006)). Had Bleiler been successful in his contract claim, he would have had an adequate remedy at law. <u>Id.</u> For all of these reasons, the Court finds that there is no genuine dispute of material fact and that the College is entitled to summary judgment as a matter of law as to Count IV.

## V. Conclusion

For the reasons stated above, the Court GRANTS Holy Cross's motion for summary judgment, D. 17, on all counts.

**So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge